# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| DAVID DELL'AQUILA, LORANNDA BORJA, TODD CHESNEY, and BRENT WEBER, on behalf of themselves and all others similarly situated, | Case No. 3:19-cv-00679 |
| | Judge William L. Campbell, Jr. |
| Plaintiffs, | Magistrate Jefferey S. Frensley |
| v. | |
| WAYNE LaPIERRE, the NATIONAL RIFLE ASSOCIATION OF AMERICA, a New York not-for-profit corporation, and the NRA FOUNDATION, INC., a Washington, D.C. not-for-profit corporation, | JURY TRIAL DEMANDED |
| Defendants. | |

## <u>SECOND AMENDED COMPLAINT</u>

The Plaintiffs, David Dell'Aquila, Lorannda Borja, Todd Chesney and Brent Weber, on behalf of themselves and all those similarly situated, file this Amended Complaint, by and through counsel, against Wayne LaPierre, the National Rife Association of America, a New York not-for-profit corporation, and the NRA Foundation, Inc., a Washington, D.C. not-for-profit corporation. In support hereof, the Plaintiffs state as follows:

### <u>Parties & Jurisdiction</u>

1.    Plaintiff, David Dell'Aquila, is an adult individual residing at 862 Bresslyn Road, Nashville, TN 37205.

2.    Plaintiff, Lorannda Borja, is an adult individual residing at 405 Stella Avenue, Lawrenceburg, TN 38464.

3.    Plaintiff, Todd Chesney, is an adult individual residing at Todd Chesney, 678 North Fire Sky Lane, Chino Valley, Arizona 86323.

4.      Plaintiff, Brent Weber, is an adult individual residing at 1502 W. Browning Street, Andover, Kansas 67002.

5.      Defendant, Wayne LaPierre, is the Chief Executive Officer of the National Rifle Association ("LaPierre").  He maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

6.      Defendant, National Rifle Association of America, is a New York not-for-profit corporation (the "NRA").  The NRA has a registered office at c/o Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

7.      Defendant, the NRA Foundation, Inc., is a Washington, D.C. not-for-profit corporation (the "NRA Foundation").  The NRA Foundation has a registered office at c/o Corporation Service Company, 1090 Vermont Avenue, N.W., Washington, D.C. 20005.

8.      The Plaintiffs are asserting jurisdiction in this Court pursuant to 28 U.S.C. § 1332.

## Background

9.      This is a class action lawsuit for fraud in the solicitation of donations by the Defendants Wayne LaPierre, the National Rifle Association of America, and the NRA Foundation, Inc.

10.     The National Rifle Association, commonly referred to as the "NRA," holds itself out as the premier gun rights lobbying organization in the United States.

11.     The NRA solicits donations by means of web pages, e-mail solicitations, and solicitations through the United States postal service.  For example, the NRA's website makes the following claims:

**WHAT IS THE NRA?**

The NRA is America's preeminent gun rights organization, made up of nearly five million members. Together, we fight and win the toughest battles

2

for the Second Amendment, all while offering the best firearms educational programs in the country.

Every day, the NRA fights back against politicians, judges, and bureaucrats who want to regulate, restrict, and ultimately, destroy your Second Amendment freedom.

That's why you need to join the NRA RIGHT NOW.[1]

12.     The NRA sells annual memberships in the organization through the United States postal service and the NRA's website.  The cost of an annual membership, as of December 2019, is $45 per year.  A lifetime membership sells for $1,500.  The NRA has approximately five million dues paying or lifetime members.

13.     The NRA claims that membership dues are used for gun education in the United States, and to lobby for gun ownership rights.  Specifically, the NRA's website states as follows:

**How does the NRA use my membership dues?**

Your support will help us defend your Second Amendment freedom whenever and wherever it comes under attack.

In addition, your membership dues will help the NRA cultivate the next generation of sportsmen and women through our youth firearms trainings…empower women with our self-defense programs…and support our police officers with our world-class law enforcement training programs.

**What is the NRA's history?**

The National Rifle Association was founded in 1871 by U.S. Army veterans Col. William C. Church and Gen. George Wingate to "promote and encourage rifle shooting on a scientific basis." In the following decades, the NRA has provided world-class firearms instruction to thousands of gun owners across the country.

When anti-gun lobbyists and politicians began their war on the Second Amendment four decades ago, the NRA fought back. And over the years, we've defeated hundreds of attempts on the national, state and local levels to infringe on your Right to Keep and Bear Arms.

---

[1] https://membership.nra.org/FAQ?gclid=Cj0KCQiAgKzwBRCjARIsABBbFuiB0tmcEPvesgbB3SMTCyJ7 lAf4Vd2hKSg_PrNE4Io5-0QfojZTryQaAqjwEALw_wcB

[3] Id.

Today, the NRA stands as America's oldest civil rights organization. Every time there's a threat to your gun rights, the NRA is there to defend your freedom. We also provide firearms training and gun safety programs to gun owners from all walks of life.[3]

14.     The NRA's website contains a "Uniform Disclosure Statement" concerning the activities of the organization.  The NRA also provides a printed copy of the Uniform Disclosure Statement to donors by means of the United States mails.  Specifically, the Uniform Disclosure Statement states as follows:

On behalf of The National Rifle Association of America, Inc. (NRA), 11250 Waples Mill Road, Fairfax, Virginia, 22030, this charitable solicitation is being made by the NRA. Contributions raised will be used to advance the mission of the NRA.[4]

15.     Donations to the NRA are not tax deductible, since the organization is engaged in lobbying efforts.

16.     In 1990, the NRA created a separate tax-deductible organization.  That organization is the NRA Foundation, chartered in the District of Columbia.

17.     According to its website, the NRA Foundation focuses on promoting shooting sports and education.  The website for the NRA Foundation describes its mission as follows:

For more than two decades, The NRA Foundation has served the needs of freedom-loving Americans across this great nation. We continue to teach freedom through programs that instill knowledge about our nation's great history. We build partnerships with leaders in our communities and provide grants that are instrumental in funding programs that support our shared vision.

Since our establishment in 1990, we've awarded nearly $398 million in grant funding in support of the shooting sports. These grants provide essential funding that benefits programs such as youth education, law enforcement training, hunter education, conservation, firearms and marksmanship training and safety, and much more.[5]

---

[4] https://www.nra.org/NRA-UniformDisclosureStatement.pdf

[5] https://www.nrafoundation.org/

4

18.     The NRA Foundation describes its mission as threefold:  freedom, family and future.  The Foundation claims to promote freedom by "protecting our Second Amendment freedoms with activities that promote safe and responsible firearms ownership."  The Foundation claims to promote family by "bringing families together through hunting and shooting sport traditions and Friends of NRA activities."  Finally, the Foundation claims to promote the future by "investing in the next generation of America's leaders, a significant majority of The NRA Foundation grants support youth shooting sports programs."[6]

19.     The NRA Foundation offers to provide grants to eligible organizations in the United States.  The Foundation's website describes this offer as follows:

> The NRA Foundation provides financial support to eligible projects, programs and organizations through its Grant Program. Each year, volunteer committees from across the country tirelessly raise charitable dollars and generous donors make gifts that are in turn awarded as grants in support of educational and public service programs relating to the shooting sports in our communities.
>
> The general focus of Foundation grants is to:
>
> - Promote, advance and encourage firearms, shooting sports and hunting safety.
>
> - Educate individuals with respect to firearms, firearms history, participation in the shooting sports, hunting safety, and marksmanship.
>
> - Conduct research in furtherance of improved firearms safety and marksmanship facilities and techniques.[7]

20.     The website for the NRA Foundation contains a "Donor Bill of Rights."  It states that all donors to the NRA Foundation have the following rights:

> To be informed of the organization's mission, of the way the organization intends to use donated resources, and of its capacity to use donations effectively for their intended purposes.

---

[6] Id.

[7] https://www.nrafoundation.org/grants/

> To be informed of the identity of those serving on the organization's governing board and <u>to expect the board to exercise prudent judgment in its stewardship responsibilities</u>.
>
> To have access to the organization's most recent financial statements.
>
> <u>To be assured your gifts will be used for the purposes for which they are given</u>.[8]

21.     Defendants NRA and NRA Foundation have maintained the above statements -- or similar statements -- on their websites during the applicable time period for this case, from November 30, 2015 through January 26, 2019.

22.     Archives of Defendants' websites are available online through the Internet Archive. The Internet Archive is a non-profit organization which preserves digital images of websites, captured at specific moments in time.

23.     The Internet Archive indicates that Defendants have continually published statements about themselves that are similar or identical to the statements currently on their websites.  For example, on January 6, 2016, Defendant NRA made the following statement about its mission on its website:

> <u>While widely recognized today</u> as a major political force and <u>as America's foremost defender of Second Amendment rights</u>, the NRA has, since its inception, been the premier firearms education organization in the world. But our successes would not be possible without the tireless efforts and countless hours of service our nearly five million members have given to champion Second Amendment rights and support NRA programs. As former Clinton spokesman George Stephanopoulos said, "Let me make one small vote for the NRA. They're good citizens. They call their congressmen. They write. They vote. They contribute. And they get what they want over time."[9]

24.     Defendant Wayne LaPierre has served as the Chief Executive Officer of the NRA. since 1991.

---

[8] https://www.nrafoundation.org/a-donor-bill-of-rights/ (emphasis added).

[9] https://web.archive.org/web/20160202235054/https://home.nra.org/about-the-nra/ (emphasis added).

25.     LaPierre uses his position with the NRA to encourage donations to both the NRA and to the NRA Foundation.  For example, on July 21, 2014, LaPierre sent an e-mail to the NRA donor base, stating as follows:

> On November 4, you and I are facing the biggest election of our lives.
>
> If Obama wins control of Congress, he'll have the unstoppable power to disarm American gun owners and destroy our freedom. But if you and I can defeat Obama's hand-picked gun-ban candidates, he'll go home at the end of his second term without EVER signing a major gun-ban bill into law.
>
> The stakes couldn't be higher. But we CAN'T WIN this election without your immediate support.
>
> That's why I'm asking you to renew your NRA membership today or even become a Life Member of the NRA. And to make it easier for you to make one of these commitments, we've created a special membership account for you here at NRA.
>
> *   *   *
>
> This is our opportunity to hand Obama the biggest defeat of his political career. But if we lose this election battle, our guns and our rights will be as good as gone.
>
> Victory starts with you – and your decision to upgrade or extend your membership today.
>
> Please access your special NRA membership account immediately to see the credits and discounts waiting for you – and to see the gifts you can receive when you upgrade or renew.
>
> Thanks in advance for standing tall with me in the most important election in freedom's history.
>
> Wayne LaPierre

26.     As of July 18, 2019, Defendant LaPierre was continuing to solicit donations on behalf of the NRA, based on its gun rights mission.  On that day, LaPierre sent an e-mail to the NRA donor base stating:

> You and I are now fighting the toughest and most consequential election battles of our lives – and I need you shoulder-to-shoulder with me like never before.

7

The news media is now attacking NRA 24/7, with a nonstop barrage of fake news and lies. Billionaire Michael Bloomberg is pledging to spend AT LEAST $500 million electing a gun-ban extremist to the White House next year.

And we're facing the most radical anti-gun candidates in the history of American politics – gun-hating zealots who want to LICENSE and FINGERPRINT gun owners, OUTLAW magazines holding more than 10 rounds, and BAN and CONFISCATE every semi-automatic rifle in America.

\* \* \*

That's why – to prepare for these massive battles AND say thank you for your past support – I want to offer you a generous membership discount. Make no mistake: If you and I and our fellow NRA members don't band together and fight with all our strength, we will LOSE this election, a gun-ban fanatic will SEIZE the White House, and our guns and freedom will be GONE forever.

27.     Defendants also solicited funds from the Plaintiffs by means of the United States postal service.

28.     For example, on April 28, 2016, Laura Evans, from the NRA Office of Advancement, sent a letter to Dell'Aquila stating:  "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment.  For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

29.     On May 8, 2017, Laura Evans, from the NRA Office of Advancement, sent a letter to Dell'Aquila stating:  "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment.  For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

30.     March 15, 2018, the Executive Director of the NRA sent a letter to Plaintiff Dell'Aquila, stating "Your leadership is vital to the future of the Second Amendment.  It is the dedication of patriots like you that inspires others to stand up for freedom."

31.     On May 23, 2018, Laura Evans, from the NRA Office of Advancement, sent a letter to Dell'Aquila stating:   "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment.   For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

32.     On July 3, 2018, Wayne LaPierre sent a personal letter to Dell'Aquila stating "Your leadership inspires so many to stand up and fight for the values we hold dear."   His letter intended to solicit additional donations to the NRA and the NRA Foundation.

33.     On July 11, 2018, Christopher Cox, the Executive Director of the NRA, sent a letter to Dell'Aquila stating:

> With the help of dedicated advocates like you, we've been able to restore the Second Amendment in ways we wouldn't have hoped for more than four decades ago. . . .   However, the battleground is shifting now.   The antigun opposition is more organized, better funded, and more ruthless that at any time in our nation's history. . .   That is why your support is more necessary and meaningful than ever.   New fronts are opening in the war on your rights every day, and there is no cavalry coming to save us.   You are freedom's last stand, and I couldn't be prouder to stand with you.   Together, we will prevail.

34.     Each year, the NRA sends a dues renewal notification to all of its members through the United States postal service.   Each of the Plaintiffs Dell'Aquila, Borja, Chesney, Weber received such a notice from the NRA.   The renewal statement serves as a reminder that dues are currently due.   It also includes the Uniform Disclosure Statement, which states:   "Contributions raised will be used to advance the mission of the NRA."

35.     Plaintiffs David Dell'Aquila, Lorannda Borja, Todd Chesney, and Brent Weber were exposed to the marketing messages of Defendants NRA, NRA Foundation and Wayne LaPierre.

36.     Plaintiffs Dell'Aquila, Borja, Chesney, and Weber reasonably relied upon Defendants' solicitations, and made donations to the NRA and the NRA Foundation.

37.     During the period from November 30, 2015 through January 26, 2019, Plaintiff Todd Chesney made the following donations to the NRA, on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 2/16/2017 | NRA | $20 |
| 6/18/2018 | NRA | $50 |

38.     During the period from November 30, 2015 through January 26, 2019, Plaintiff Lorannda Borja made the donations to the NRA by purchasing special "NRA" license plates through the Tennessee Department of Motor Vehicles each year.  Whenever she made a purchase of license plates, $35 from the fee would be donated by Borja -- through the Tennessee DMV -- to the NRA.  Borja made donations of the following amounts on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 11/30/2015 | NRA | $35 |
| 12/8/2016 | NRA | $35 |
| 12/4/2017 | NRA | $35 |
| 12/10/2018 | NRA | $35 |

39.     During the period from November 30, 2015 through January 26, 2019, Plaintiff Dell'Aquila made the following donations to the following Defendants:

| Date | Payee | Amount |
|------|-------|--------|
| 3/22/16 | NRA | $1,000 |
| 3/14/16 | NRA | $100 |
| 3/30/16 | NRA | $1,000 |
| 4/18/16 | NRA | $250 |

| | | |
|---|---|---|
| 6/2/16 | NRA Foundation | $20,000 |
| 9/2/16 | NRA | $90 |
| 10/25/16 | NRA | $100 |
| 11/1/16 | NRA | $100 |
| 3/9/17 | NRA | $2,000 |
| 3/9/17 | NRA | $2,500 |
| 4/3/17 | NRA | $100 |
| 4/16/17 | NRA | $100 |
| 4/27/17 | NRA | $100 |
| 4/28/17 | NRA | $100 |
| 4/28/17 | NRA | $218 |
| 4/28/17 | NRA Foundation | $500 |
| 5/16/17 | NRA | $100 |
| 6/5/17 | NRA Foundation | $20,000 |
| 10/4/17 | NRA | $100 |
| 10/4/17 | NRA | $60 |
| 2/10/18 | NRA | $2,500 |
| 2/24/18 | NRA | $250 |
| 2/25/18 | NRA | $2,000 |
| 2/28/18 | NRA Foundation | $80 |
| 3/6/18 | NRA | $250 |
| 3/30/18 | NRA | $104 |
| 6/12/18 | NRA | $2,500 |

| 9/25/18 | NRA Foundation | $20,000 |
| 1/26/19 | NRA | $2,500 |

40.    Plaintiff Brent Weber is a benefactor member of the NRA.  During the period from November 30, 2015 through January 26, 2019, Weber donated funds to the NRA for membership upgrades, and to help with its lobbying efforts.

41.    In 2019, Plaintiffs Dell'Aquila, Borja, Chesney and Weber learned that Defendants' solicitations were materially and intentionally false.

42.    Instead of spending the donated money on the solicited purposes, Defendants used significant portions of the donated funds for purposes unrelated to the NRA's core mission.

43.    Plaintiffs learned this information from media reports, following an investigation conducted by the NRA's former President, Lt. Col. Oliver North ("North").

44.    North served as President of the NRA from September 2018 through April 2019.

45.    After becoming President of the NRA, North learned of possible material financial misconduct by the NRA.

46.    In early 2019, North learned that the NRA was paying its outside counsel, Texas attorney William Brewer, *about $2 million per month*.  These expenditures had not been properly authorized by the NRA, or documented by the Brewer law firm.  North further learned that the NRA had paid roughly $20 million to Brewer from April 2018 through March 2019. When North and others requested to see the invoices relating to these extraordinary payments, Defendants LaPierre and the NRA repeatedly denied North access to the information.

47.    On April 17, 2019, North learned of allegations in the New Yorker magazine that raised concerns about possible mismanagement of NRA funds. The New Yorker article quoted a former head of the IRS Exempt Organizations division as stating: "The litany of red flags is just

extraordinary;" and "The materials reflect one of the broadest arrays of likely transgressions that I've ever seen."

48.     On April 18, 2019, North wrote a letter to the General Counsel of the NRA and to the Chairman of the Audit Committee, explaining his concerns with the NRA's multi-million dollar monthly payments to attorney Brewer.  In that letter, North requested that the NRA conduct an outside, independent review of the millions of dollars in payments to Brewer.

49.     On April 22, 2019, the NRA's former public relations firm, Ackerman Brewer, disclosed that it had hundreds of thousands of dollars for clothing and private travel for Wayne LaPierre, and then billed the expenses back to the NRA.  These reimbursements were not included as part of LaPierre's compensation on IRS Form 990, filed by the NRA.

50.     North pressed the NRA to investigate the above allegations.  North initially raised his concerns through internal-NRA channels, including the NRA's Audit Committee.

51.     On April 25, 2019, North wrote another letter -- this time to the Executive Committee of the NRA Board of Directors.  In that letter, North stated his intention to form a "Crisis Management Committee," to investigate the allegations of extraordinary spending by the NRA.

52.     Each time that North raised concerns about potential financial misconduct and tried to retain professionals to correct any wrongdoing, North's efforts were thwarted by Defendant LaPierre and the NRA's outside counsel, Brewer.  Ultimately, LaPierre managed to shut down North's Crisis Management Committee.  As of this date, there has been no independent investigation of the NRA's spending.

53.     Meanwhile, LaPierre retaliated against North for attempting to investigate the organization's spending.

54.     Ultimately, Wayne LaPierre forced North out, as President of the NRA.

**Class Action Allegations**

55.     Pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, the Plaintiff brings this action on behalf of himself and two nationwide classes of Plaintiffs.

56.     The first class of similarly situated persons is defined as:  all persons residing in the United States who have donated funds to the NRA from November 30, 2015 through January 26, 2019 (the "NRA Class").

57.     The second class of similarly situated persons is defined as:  all persons residing in the United States who have donated funds to the NRA Foundation from November 30, 2015 to January 26, 2019 (the "NRA Foundation Class").

58.     Excluded from each nationwide class are the Defendants, their legal representatives, heirs, successors, and assigns of Defendants, and all judges who may ever adjudicate this case.

59.     This action is brought as a class action and may be so maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.  The Plaintiff reserves the right to modify the two nationwide classes.

60.     <u>Numerosity of the Nationwide Classes</u>:  Each nationwide Class is so numerous that the individual joinder of all members, in this or any action is impracticable. The exact number of Class members is presently unknown to the Plaintiff; however, it is believed that the NRA Class numbers at least five million persons.  The identity of the members of each class and their addresses maybe ascertained from the business records maintained by the NRA and the NRA Foundation.  Class members may be informed of the pendency of this action by a combination of e-mail and/or public notice.

61.     <u>Commonality</u>:  There is a well-defined community of interest in the questions of law and fact involved affecting the members of each Class. These common legal and factual questions for the case involving the NRA Class include:

a.     Whether the Plaintiffs gave money to the NRA with the expectation that such funds would be spent to promote the NRA's core mission.

b.     Whether the NRA misspent such money, on matters unrelated to the NRA's core mission described in Defendants' solicitations.

c.     Whether Defendants LaPierre and the NRA should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

62.    These common legal and factual questions for the case involving the NRA Foundation Class include:

a.     Whether the Plaintiffs gave money to the NRA Foundation with the expectation that such funds would be spent to promote the NRA's core mission.

b.     Whether the NRA Foundation misspent such money, on matters unrelated to the NRA's core mission described in Defendants' solicitations.

c.     Whether Defendants LaPierre and the NRA Foundation should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

63.    Typicality:  The claims of Plaintiffs Dell'Aquila, Borja, Chesney and Weber are typical of the claims of the members of the NRA Class and the NRA Foundation Class. Dell'Aquila, Borja, Chesney and Weber and each member of the NRA Class has, by definition, given funds to the NRA during the period from November 30, 2015 through January 26, 2019.

64.    Dell'Aquila and each member of the NRA Foundation Class has, by definition, given funds to the NRA Foundation during the period from November 30, 2015 through January 26, 2019.

65.    All members of the each class have suffered similar harm arising from Defendants' violations, as alleged herein.

66.    Adequacy:  Plaintiffs Dell'Aquila, Borja, Chesney and Weber are adequate representatives of the NRA Class because their interests do not conflict with the interests of the

15

members of the classes he seeks to represent.  Plaintiff Dell'Aquila is an adequate representatives of the NRA Foundation Class because his interests do not conflict with the interests of the members of that class.

67.     Plaintiffs Dell'Aquila, Borja, Chesney and Weber intend to prosecute this action vigorously.  Dell'Aquila, Borja, Chesney and Weber will fairly and adequately protect the interests of the members of each Class.

68.     <u>Predominance and Superiority</u>: This suit may also be maintained as a class action under pursuant to Rule 23(b)(3) of the Federal Rule of Civil Procedure because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class.  A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual Class member, depending on the circumstances, may be relatively small or modest, especially given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Furthermore, it would be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done to them.  Moreover, even if Class members themselves could afford such individual litigation, the court system could not.  Individual litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expenses to all parties and the court system presented by the complex legal issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I**

**Fraud**

**Dell'Aquila, Borja, Chesney
and Weber and NRA Class
v. LaPierre and the NRA**

69.     The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

70.     During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja and each member of the NRA Class.

71.     When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

72.     Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

73.     As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

74.     Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA used the solicited funds for alternative purposes, including without limitation, the following:

        a.     By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

17

b.    By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

c.    By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

d.    By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

e.    By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

f.    By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

g.    By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

h.    By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

i.    By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

j.    By paying for private jet travel for Wayne LaPierre on a regular basis.

k.    By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

75.    Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

76.    Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

77.    The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

18

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter an order (a) certifying the NRA Class as a Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys fees.

## COUNT II

### Fraud

### Dell'Aquila and NRA Foundation Class
### v. LaPierre and the NRA Foundation

78. The Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

79. During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

80. When soliciting such funds, Defendants LaPierre and the NRA Foundation advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

81. Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

82. As a result of such reliance, Plaintiff Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

83.     Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

a.      By transferring approximately $80 million from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible lobbying organization) over a ten-year period.

b.      By paying $425,000 *per year* for nine years to the Speedway Children's Charity, a non-profit organization <u>not</u> related to the NRA's core mission.

c.      By paying at least $125,000 to Youth for Tomorrow, a non-profit organization <u>not</u> related to the NRA's core mission.  Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

84.     Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

85.     Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

86.     The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter an order (a) certifying the NRA Foundation Class as Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Plaintiff Dell'Aquila and each member of the NRA Foundation Class damages equal to the amounts such persons donated to the NRA Foundation during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys fees.

**COUNT III**

**Violation of RICO**

**Dell'Aquila, Borja, Chesney, Weber
and the NRA Class
v. LaPierre and the NRA**

87.     The Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

88.     During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja and each member of the NRA Class.

89.     Defendants solicited funds from Plaintiffs Dell'Aquila, Borja, Chesney, Weber, and each member of the NRA Class by means of the United States postal service.

90.     When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

91.     Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

92.     As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

93.     Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA used the solicited funds for alternative purposes, including without limitation, the following:

a.  By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

b.  By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

c.  By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

d.  By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

e.  By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

f.  By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

g.  By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

h.  By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

i.  By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

j.  By paying for private jet travel for Wayne LaPierre on a regular basis.

k.  By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

94.     Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

95.     Plaintiffs Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

22

96.     The above course of conduct constitutes racketeering activity, as defined in 18 U.S.C. § 1961.  Specifically, the activity constitutes mail fraud, as defined in 18 U.S.C. § 1341.

97.     According to 18 U.S.C. § 1962(c), it is also unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to engage in any sort of racketeering activity.   Defendant LaPierre is employed by the NRA, which is an enterprise engaged in interstate commerce.  Defendant NRA is associated with Defendant NRA Foundation, which is an enterprise engaged in interstate commerce.  All three Defendants are therefore proscribed from engaging in racketeering activity, pursuant to the law.

98.     Defendants LaPierre and NRA have violated 18 U.S.C. § 1962(c) by engaging in racketeering activity.

99.     According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

100.    The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys fees.

# COUNT IV

## Violation of RICO

### Dell'Aquila and NRA Foundation Class
### v. LaPierre and the NRA Foundation

101.    The Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

102.    During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

103.    Defendants solicited funds from Plaintiff and each member of the NRA Class by means of the United States postal service.

104.    When soliciting such funds, Defendants LaPierre and the NRA Foundation advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

105.    Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

106.    As a result of such reliance, Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

107.    Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

    a.    By transferring approximately $80 million from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible

lobbying organization) over a ten-year period. Such funds then became subject to the financial improprieties described in Count I of this Complaint and jeopardized the tax-deductibility of the donations made by Plaintiffs.

b.    By paying $425,000 *per year* for nine years to the Speedway Children's Charity, a non-profit organization not related to the NRA's core mission.

c.    By paying at least $125,000 to Youth for Tomorrow, a non-profit organization not related to the NRA's core mission. Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

108.    Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

109.    Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

110.    The above course of conduct constitutes racketeering activity, as defined in 18 U.S.C. § 1961. Specifically, the activity constitutes mail fraud, as defined in 18 U.S.C. § 1341.

111.    According to 18 U.S.C. § 1962(c), it is also unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to engage in any sort of racketeering activity. Defendant LaPierre is employed by the NRA, which is an enterprise engaged in interstate commerce. Defendant NRA Foundation is associated with the NRA, which is an enterprise engaged in interstate commerce. All three Defendants are therefore proscribed from engaging in racketeering activity, pursuant to the law.

112.    Defendants LaPierre and NRA have violated 18 U.S.C. § 1962(c) by engaging in racketeering activity.

113.    According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United

25

States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

114. The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court awarding to Plaintiff Dell'Aquila and each member of the NRA Foundation Class damages equal to three times the amounts such persons donated to the NRA Foundation during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys fees.

Respectfully submitted,


By: /s/ Elliott Schuchardt
    Elliott J. Schuchardt, Esq.
    B.P.R. No. 027016

SCHUCHARDT LAW FIRM
6223 Highland Place Way, Suite 201
Knoxville, TN 37919
Phone: (865) 304-4374
E-mail: elliott016@gmail.com

*Counsel for the Plaintiffs*

## <u>VERIFICATION</u>

I, David Dell'Aquila, hereby swear and affirm that I have read the foregoing Amended Complaint, and that the allegations and facts set forth in the Complaint are true and correct, to the best of my knowledge, information and belief.

/s/ David Dell'Aquila
David Dell'Aquila
