**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

DAVID DELL'AQUILA, LORANNDA
BORJA, TODD CHESNEY, and                        Case No. 3:19-cv-00679
BRENT WEBER, on behalf of
themselves and all others similarly
situated,                                       Judge William L. Campbell, Jr.

                Plaintiffs,          Magistrate Jefferey S. Frensley

v.

WAYNE LaPIERRE, the NATIONAL
RIFLE ASSOCIATION OF AMERICA,
and NRA FOUNDATION, INC.,

                Defendants.



Filed on behalf of the Plaintiffs

Counsel of record for this party:

Elliott J. Schuchardt, Esq.
B.P.R. No. 027016

SCHUCHARDT LAW FIRM
6223 Highland Place Way, Suite 201
Knoxville, TN 37919
Phone:  (865) 304-4374
E-mail:  elliott016@gmail.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................I

BACKGROUND ............................................................................................................... 1

ARGUMENT ................................................................................................................... 4

I.     Plaintiffs have standing to sue Defendants for charity fraud under New York law............4

      A.     New York law determines the liability of the NRA and Wayne LaPierre. ............. 5

      B.     The New York State Not-For-Profit Corporation Law does *not* confer immunity on Wayne LaPierre. ............................................................... 6

      C.     New York State has a line of cases which *allow* a donor to sue for fraud in the inducement of the donation........................................................... 7

      D.     The cases cited by Defendants do *not* apply to this case since they are from other jurisdictions and are distinguishable.............................................. 8

      E.     Tennessee corporate law does *not* apply in this case, and does *not* bar this lawsuit. ................................................................................. 10

II.    The complaint states a valid claim for fraud.................................................11

      A.     The Amended Complaint states a valid claim for fraud against the NRA and Wayne LaPierre............................................................. 12

      B .    The Amended Complaint states a valid claim for fraud against the NRA Foundation and Wayne LaPierre................................................. 14

      C.     The Amended Complaint pleads fraud with adequate specificity. ...................... 15

      D.     The Amended Complaint is sufficiently plausible to satisfy the pleading requirements of *Twombly*....................................................... 16

III.   The complaint states a valid claim against the NRA and Wayne LaPierre for violation of the RICO statute. ...........................................................17

IV.   The complaint states a valid claim against the NRA Foundation and Wayne LaPierre for violation of the RICO statute.......................................................20

V.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(d)(2)(A)...............................................................................22

CONCLUSION.................................................................................... 23

# TABLE OF AUTHORITIES

**Cases**

Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 2009 U.S. LEXIS 3472, 28-29 (2009)................................................................................................. 16, 17

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)........................................................ 16

Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1140; 185 L. Ed. 2d 264, 269; 2013 U.S. LEXIS 1858, *4 (2013)................................................................................................ 16

Dixon v. Producers Agric. Ins. Co., 198 F.Supp.3d 832, 837 (M.D. Tenn. 2016) ...................... 12

Edgar v. MITE Corp., 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982)............. 5

First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) ............................................................................. 5, 11

In re Del-Met Corp., 322 B.R. 781, 801 (Bankr. M.D. Tenn. 2005........................................ 5, 10

Kincaid v. S. Tr. Bank, 221 S.W.3d 32, 39 (Tenn. Ct. App. 2006)............................................ 12

Marcus v. Jewish National Fund (Keren Keyemeth Leisrael), Inc., 158 A.D.2d 101 (N.Y. App. 1990) ......................................................................................................... 7, 16

Orient v. Linus Pauling Inst. of Sci. & Med., 936 F. Supp. 704, 705–06 (D. Ariz. 1996) ............ 9

Pearson v. Garrett-Evangelical Theological Seminary, Inc., 790 F. Supp. 2d 759, 765 (N.D. Ill. 2011) ...................................................................................................... 8

Smithers v. St. Luke-Roosevelt Hospital, 281 A.D.2d 127 (N.Y. 1st. Dep. 2001) ....................... 8

Vanderbilt Univ. v. Scholastic, Inc., 382 F. Supp. 3d 734, 763 (M.D. Tenn. 2019) ................... 12

Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008)...................... 12

Wilding v. DNC Services Corp. 2017 WL 6345492, at 5 (S.D. Fla. 2017)................................... 9

**Statutes**

18 U.S.C. § 1341 ................................................................................................... 19, 21

18 U.S.C. § 1961 ................................................................................................... 19, 21

18 U.S.C. § 1962(c) ............................................................................................... 19, 21

18 U.S.C. § 1964(c) ....................................................................................................... 21

28 U.S.C. § 1332(d)(2)(A) ................................................................................................... 22

McKinney's N-PCL, Ch. 35, § 720 (2020) ............................................................................ 6

T.C.A. § 48-53-104 (2020) ................................................................................................... 11

U.S.C. § 1332(c)(1) (2020). ................................................................................................... 23

**Other Authorities**

Restatement (Second) of Conflict of Laws § 302, Comment b, at 307–08 (1971) ........................ 5

ii

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

DAVID DELL'AQUILA, LORANNDA
BORJA, TODD CHESNEY, and                    Case No. 3:19-cv-00679
BRENT WEBER, on behalf of
themselves and all others similarly
situated,                                   Judge William L. Campbell, Jr.

               Plaintiffs,           Magistrate Jefferey S. Frensley

v.

WAYNE LaPIERRE, the NATIONAL
RIFLE ASSOCIATION OF AMERICA,
and NRA FOUNDATION, INC.,

               Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS COMPLAINT

The Plaintiffs, David Dell'Aquila, Lorannda Borja, Todd Chesney and Brent Weber, by and through counsel, file this memorandum of law in opposition to the Defendants' motions to dismiss the complaint. In support hereof, the Plaintiffs state as follows:

## Background

This is fraud lawsuit involving solicitations by the National Rifle Association of America ("NRA"), and the NRA Foundation, Inc. (the "NRA Foundation"). Defendant Wayne LaPierre is the Chief Executive and Executive Vice President of the NRA.

The Plaintiffs are all persons who relied upon Defendants' fraudulent solicitations, and donated money to the NRA and/or the NRA Foundation.

The NRA holds itself out as the premier gun rights lobbying organization in the United States. The NRA solicits donations by means of web pages, e-mail solicitations, and solicitations through the United States postal service.

In its solicitations, the NRA claims that membership dues are used to lobby for gun ownership rights and for gun education in the United States. Specifically, the NRA's website states as follows:

> How does the NRA use my membership dues?
>
> Your support will help us defend your Second Amendment freedom whenever and wherever it comes under attack.
>
> In addition, your membership dues will help the NRA cultivate the next generation of sportsmen and women through our youth firearms trainings…empower women with our self-defense programs…and support our police officers with our world-class law enforcement training programs.

The NRA's website contains a "Uniform Disclosure Statement" concerning the activities of the organization. The NRA also provides a printed copy of the Uniform Disclosure Statement to donors by means of the United States mails. Specifically, the Uniform Disclosure Statement states as follows:

> On behalf of The National Rifle Association of America, Inc. (NRA), 11250 Waples Mill Road, Fairfax, Virginia, 22030, this charitable solicitation is being made by the NRA. <u>Contributions raised will be used to advance the mission of the NRA</u>.1

Contributions to the NRA are not tax-deductible because the organization engages in lobbying.

The NRA Foundation is a separate *tax-deductible* organization. According to its website, the NRA Foundation focuses on promoting shooting sports and education. The website for the NRA Foundation describes its mission as follows:

> For more than two decades, The NRA Foundation has served the needs of freedom-loving Americans across this great nation. We continue to teach freedom through programs that instill knowledge about our nation's great history. We build partnerships with leaders in our communities and provide grants that are instrumental in funding programs that support our shared vision.

---

1 https://www.nra.org/NRA-UniformDisclosureStatement.pdf

2

Since our establishment in 1990, we've awarded nearly $398 million in grant funding in support of the shooting sports. These grants provide essential funding that benefits programs such as youth education, law enforcement training, hunter education, conservation, firearms and marksmanship training and safety, and much more.[2]

The website for the NRA Foundation contains a "Donor Bill of Rights." It states that all donors to the NRA Foundation have the following rights:

To be informed of the organization's mission, of the way the organization intends to use donated resources, and of its capacity to use donations effectively for their intended purposes.

To be informed of the identity of those serving on the organization's governing board and to expect the board to exercise prudent judgment in its stewardship responsibilities.

To have access to the organization's most recent financial statements.

To be assured your gifts will be used for the purposes for which they are given.[3]

Defendants NRA and NRA Foundation have maintained the above statements -- or similar statements -- on their websites during the applicable time period for this case, from November 30, 2015 through January 26, 2019.

Archives of Defendants' websites are available online through the Internet Archive. The Internet Archive is a non-profit organization which preserves digital images of websites, captured at specific moments in time.

Plaintiffs David Dell'Aquila, Lorannda Borja, Todd Chesney, and Brent Weber were exposed to the marketing messages of Defendants NRA, NRA Foundation and Wayne LaPierre.

---

2 https://www.nrafoundation.org/

3 https://www.nrafoundation.org/a-donor-bill-of-rights/ (emphasis added).

Plaintiffs reasonably relied upon Defendants' solicitations, and made donations to the NRA and/or the NRA Foundation.

In 2019, Plaintiffs learned that Defendants' solicitations were materially and intentionally false. Instead of spending the donated money on the solicited purposes, Defendants used significant portions of the donated funds for purposes unrelated to Defendants' core missions. Large portions of the funds apparently went astray to unrelated third parties.

In early 2019, Plaintiffs learned that the NRA was paying its outside counsel, Texas attorney William A. Brewer, III, *about $2 million per month*. In the first quarter of 2019, Brewer's firm charged the NRA over *$97,000 per day*, according to internal NRA documents posted anonymously online. These expenditures had not been properly authorized by the NRA, or documented by the Brewer law firm.

On April 22, 2019, the NRA's former public relations firm, Ackerman Brewer, disclosed that it had paid hundreds of thousands of dollars for clothing and private travel for Wayne LaPierre, and *then billed the expenses back to the NRA*. These reimbursements were not included as part of LaPierre's compensation on IRS Form 990, filed by the NRA.

Plaintiffs have also learned of improper spending by the NRA Foundation, in the hundreds of thousands of dollars.

The issue in this case is whether Plaintiffs have standing to seek recovery of their funds, individually and as members of a broader class.

**Argument**

**I.**     **Plaintiffs have standing to sue Defendants for charity fraud under New York law.**

In their motions to dismiss, Defendants argue that that this Court does not have subject matter jurisdiction over this case because Plaintiffs allegedly do not have standing to sue a charity for fraud.

4

Defendants cite several cases -- *from other jurisdictions* -- which allegedly stand for the proposition that a donor to a charity does not have standing to sue the charity to ensure that the donation is used for the purpose solicited. It is proper for the Court to reject this line of cases for the reasons set forth below.

A. **New York law determines the liability of the NRA and Wayne LaPierre**.

The NRA is a New York corporation. As a result, New York law will determine the liability of the NRA and its employee, Wayne LaPierre, in this case.

Claims that involve the internal affairs of a corporation should be resolved in accordance with the law of the state of incorporation. See, e.g., In re Del-Met Corp., 322 B.R. 781, 801 (Bankr. M.D. Tenn. 2005) (citing First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983)).

"The internal affairs doctrine is a conflict of laws principle which recognizes that only one state should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders— because otherwise a corporation could be faced with conflicting demands." Edgar v. MITE Corp., 457 U.S. 624, 645, 102 S.Ct. 2629, 2642, 73 L.Ed.2d 269 (1982) (citing Restatement (Second) of Conflict of Laws § 302, Comment b, at 307–08 (1971)).

Since the NRA is chartered in New York State, it is proper for this Court to apply the law of New York State to determine the liability of the NRA and its employee, Wayne LaPierre.

5

**B.    The New York State Not-For-Profit Corporation Law does *not* confer immunity on Wayne LaPierre.**

In their motions to dismiss, Defendants argue that Section 720 of the New York State Not-For-Profit Corporation Law limits the persons who have standing to sue a not-for-profit corporation or a person who is employed by such corporation.

A closer reading of the law indicates that it has no application to Defendants NRA or the NRA Foundation.  The statute only applies *to persons employed* by a New York State not-for-profit corporation.  The statute states, in pertinent part, as follows:

> (a) An action may be brought against <u>one or more directors, officers, or key persons of a corporation</u> to procure a judgment for the following relief:
>
>> (1) To compel the defendant to account for his official conduct in the following cases:
>>
>>> (A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.
>>>
>>> (B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.
>>
>> (2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.
>>
>> (3) To enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets, where there are reasonable grounds for belief that it will be made.
>
> (b) An action may be brought for the relief provided in this section . . . by the attorney general, by the corporation, or, in the right of the corporation, by any of the following:
>
>> (1) A director or officer of the corporation.
>>
>> (2) A receiver, trustee in bankruptcy, or judgment creditor thereof.

McKinney's N-PCL, Ch. 35, § 720 (2020).

6

Nothing in the above statute provides for any sort of immunity for the NRA or the NRA Foundation. The statute solely applies to lawsuits against officers of a New York State not-for-profit corporation. Thus, contrary to Defendants' assertions, it does not provide any sort of immunity to the Defendant entities in this case.

The purpose of the statute is to govern lawsuits relating to the internal affairs of a New York not-for-profit corporation. It does not govern lawsuits for fraud committed by persons employed by a non-profit corporation. As noted below, the New York State caselaw makes this clear.

## C. New York State has a line of cases which *allow* a donor to sue for fraud in the inducement of the donation.

New York State has a line of cases which allow a donor to sue a charity for fraud in the inducement of the donation.

For example, in Marcus v. Jewish National Fund (Keren Keyemeth Leisrael), Inc., 158 A.D.2d 101 (N.Y. App. 1990), a group of persons who had donated money to the Jewish National Fund, contending that the Fund had committed fraud by claiming that it distributed the funds in both Israel and the territories occupied by Israel during the Six-Day War. The complaint alleged that this was not true, and that the funds were only distributed in Israel.

The complaint stated claims for 1) common law fraud, (2) misrepresentation, and (3) false advertising. The New York appellate court held that the complaint stated a *valid claim* for common law fraud. Id. at 889-90. The Court explained its reasoning as follows:

> Plaintiffs' pleadings contain all of the elements necessary to assert a cause of action for both common law fraud and misrepresentation, including the precise fraudulent practices and misrepresentations of which they complain. Contrary to the holding of the [lower] court that the first two causes of action are defective in failing to particularize which alleged false advertisements plaintiffs relied upon in making their donations, plaintiffs were under no obligation to correlate certain contributions with specific advertisements.

7

Id. at 890 (emphasis added).  The appellate court therefore reinstated the complaint as to common law fraud.

Similarly, in Smithers v. St. Luke-Roosevelt Hospital, 281 A.D.2d 127 (N.Y. 1st. Dep. 2001), a donor sued to enforce a restrictive covenant in a charitable gift.  The defendant charity, St. Luke-Roosevelt Hospital, moved to dismiss on grounds of standing.  The hospital contended that only the New York State attorney general had authority to enforce the restrictive covenant.  The New York court held that the plaintiff *did have standing* to enforce the restrictive covenant.  Specifically, the court explained as follows:

> The donor of a charitable gift is in a better position than the Attorney General to be vigilant and, if he or she is so inclined, to enforce his or her own intent.

Id. at 435 (emphasis added).

Thus, the law of New York allows a donor to a charity -- such as the Plaintiffs in this case -- to sue the charity to enforce the purpose of the donation.  See also Pearson v. Garrett-Evangelical Theological Seminary, Inc., 790 F. Supp. 2d 759, 765 (N.D. Ill. 2011) ("A body of case law in New York . . . does recognize donor standing") (citing Smithers v. St. Luke's Roosevelt Hospital Center, 281 A.D.2d 127, 723 N.Y.S.2d 426, 427 (2001)).

### D.      **The cases cited by Defendants do *not* apply to this case since they are from other jurisdictions and are distinguishable.**

The cases cited by Defendants in support of their motions to dismiss do not apply in this case.  Such cases are from jurisdictions that apply a different law.  In addition, the facts of the cases are distinguishable from the facts of this case.

In the cases that denied standing, the donor plaintiffs were *seeking to control the internal operating procedures of the recipient organizations*.  That is not occurring here.

8

For example, in <u>Orient v. Linus Pauling Inst. of Sci. & Med.</u>, 936 F. Supp. 704, 705–06 (D. Ariz. 1996), the Plaintiff -- Jane M. Orient, M.D. -- filed suit against the Linus Pauling Institute of Science and Medicine ("LPI") for "tortious interference with access to public information" and breach of fiduciary duty.

Dr. Orient was a physician in private practice specializing in internal medicine. Her only connection to LPI was donations that she made to LPI totalling $60. On the basis of her donations to LPI, Dr. Orient requested the opportunity to copy and review research data allegedly possessed by LPI pertaining to several serious health conditions. Her request for access to the research was denied on the basis that the requested data was "unavailable." Other scientists allegedly making similar requests were also denied access.

Out of a fear that the particular research data was on the verge of destruction, Dr. Orient filed the Complaint against LPI. She asked the Court to issue an injunction "preventing the destruction of the research data." Dr. Orient alleged that LPI wrongly interfered with her right of access to the research.

The U.S. District Court for the District of Arizona dismissed the case, after finding that Dr. Spalding did not have standing to challenge the internal procedures of Defendant LPI. LPI owed her no duty to make the requested information available. Needless to say, the case is distinguishable from the case at bar. In this case, there was a duty to make correct representations concerning the use of the solicited funds, and such representation was materially false.

In <u>Wilding v. DNC Services Corp</u>. 2017 WL 6345492, at 5 (S.D. Fla. 2017). In that case, several individuals filed suit against the Democratic National Committee to recover funds which they donated to the Democratic party during the 2016 presidential election. They claimed that they had made such donations "in reliance on the DNC's promise of neutrality in the presidential primaries."

The plaintiffs contended that -- based on an e-mail leak -- this premise was not true and that the DNC actually supported the Hillary Clinton campaign. The court held that Plaintiffs lacked standing in the case because the Plaintiffs have failed to assert a causal link between their donations and the DNC's statements.

The case is entirely different from this case. In the *Wilding* case, there was no allegation that the plaintiffs' funds were not spent on the Democratic primary, or for benefit of the Democratic party. The funds were used substantially for the purposes solicited. The court therefore found that there was not sufficient causation to an injury.

In this case, Plaintiffs are contending that literally millions of dollars of their donated funds have gone astray, and were being used for purposes not within the solicited programs. The case is thus very different.

It is therefore proper for this Court to follow the New York line of cases regarding charity fraud, and deny Defendants' motions to dismiss.

E. **Tennessee corporate law does *not* apply in this case, and does *not* bar this lawsuit.**

In its brief, the NRA Foundation argues that Section 48-53-104 of the Tennessee Code prevents Plaintiffs from filing this lawsuit. It is proper for the Court to reject this argument for the reasons set forth below.

First, as noted above, this case is governed by the not-for-profit law of the Defendants' states of incorporation, namely New York State (for the NRA) and the District of Columbia (for the NRA Foundation). See In re Del-Met Corp., 322 B.R. 781, 801 (Bankr. M.D. Tenn. 2005) (citing First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611, 621, 103 S.Ct. 2591, 77

L.Ed.2d 46 (1983)).  Since we are not dealing with a Tennessee non-profit corporation, Tennessee non-profit corporation law does not apply.

Second, even if the Tennessee non-profit law did apply -- and it does not -- there is nothing in the Tennessee non-profit corporation law which would bar this lawsuit.  The NRA Foundation cites T.C.A. § 48-53-104, in its argument that it is somehow immune in this lawsuit.  However, a closer reading of that statute shows that it does not apply.

Section 48-53-104 states as follows:

> (a) Except as provided in subsection (b), the validity of corporate action may not be challenged <u>on the ground that the corporation lacks or lacked power to act</u>.

T.C.A. § 48-53-104 (2020) (emphasis added).

The above statute refers to a challenge of corporate power "on the ground" that a particular corporate action was authorized, or *ultra vires*.  The statute essentially abolishes the defense that a particular corporate action was *ultra vires*, or beyond the powers set forth in the corporation's charter.

It has no application to the case before the Court because Plaintiffs are <u>not</u> claiming that Defendants' actions were beyond the NRA Foundation's charter.

## II.     <u>The complaint states a valid claim for fraud.</u>

The first and second counts of the complaint assert claims for fraud against the NRA, the NRA Foundation and Wayne LaPierre.

Tennessee recognizes two theories of fraud: fraud and fraudulent concealment.

To plead fraud, a plaintiff must show the following elements: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the

11

misrepresented fact; and (6) plaintiff suffered damage as a result of the misrepresentation. Vanderbilt Univ. v. Scholastic, Inc., 382 F. Supp. 3d 734, 763 (M.D. Tenn. 2019); Dixon v. Producers Agric. Ins. Co., 198 F.Supp.3d 832, 837 (M.D. Tenn. 2016) (citing Walker v. Sunrise Pontiac-GMC Truck, Inc., 249 S.W.3d 301, 311 (Tenn. 2008)).

Fraudulent concealment, also known as constructive fraud, "is essentially fraud without the element of intent. Neither actual dishonesty of purpose nor intent to deceive is an essential element[.]" Vanderbilt Univ. v. Scholastic, Inc., 382 F. Supp. 3d 734, 763 (M.D. Tenn. 2019); Kincaid v. S. Tr. Bank, 221 S.W.3d 32, 39 (Tenn. Ct. App. 2006). Rather, constructive fraud is a breach of a legal or equitable duty that is deemed fraudulent because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. Vanderbilt. at 763.

### A. The Amended Complaint states a valid claim for fraud against the NRA and Wayne LaPierre.

In their motions, the NRA and Wayne LaPierre argue that Plaintiffs have failed to plead the elements of (i) falsity, (ii) knowledge and intent of falsity, (iii) reliance, and (iv) injury.

It is proper for the Court to reject this argument because the complaint does plead all of the required elements for fraud.

Specifically, Count I of Amended Complaint states follows:

70.     During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja and each member of the NRA Class.

71.     When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

72.     Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

73.     As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

74.     <u>Defendants' statements concerning the use of the solicited funds were materially and intentionally false.</u> In reality, the NRA used the solicited funds for alternative purposes, including without limitation, the following:

    a.    By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

    b.    By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

    c.    By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

    d.    By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

    e.    By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

    f.    By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

    g.    By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

    h.    By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

    i.    By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

    j.    By paying for private jet travel for Wayne LaPierre on a regular basis.

    k.    By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

75. <u>Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations</u>.

76. Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

Second Amended Complaint, ¶¶ 70-76 (emphasis added).

All of the required elements of fraud are specifically plead in the above pleading -- falsity, knowledge of falsity, reliance, damages, etc. Paragraphs 74 and 75 very specifically plead *scienter*, on the part of Defendants. It is therefore proper for the Court to reject Defendants' arguments concerning the required elements of fraud.

**B . The Amended Complaint states a valid claim for fraud against the NRA Foundation and Wayne LaPierre.**

In their motions, the NRA Foundation and Wayne LaPierre argue that Plaintiffs have failed to plead the elements of (i) falsity, (ii) knowledge and intent of falsity, (iii) reliance, and (iv) injury.

It is proper for the Court to reject this argument because the complaint does plead all of the required elements for fraud.

Specifically, Count II of Amended Complaint states follows:

79. During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

80. When soliciting such funds, Defendants LaPierre and the NRA Foundation advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

81. Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

82. As a result of such reliance, Plaintiff Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

83.    Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

      a.    By transferring approximately $80 million from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible lobbying organization) over a ten-year period.

      b.    By paying $425,000 per year for nine years to the Speedway Children's Charity, a non-profit organization not related to the NRA's core mission.

      c.    By paying at least $125,000 to Youth for Tomorrow, a non-profit organization not related to the NRA's core mission.  Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

84.    Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

85.    Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

86.    The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

Second Amended Complaint, ¶¶ 70-76 (emphasis added).

All of the required elements of fraud are specifically plead in the above pleading -- falsity, knowledge of falsity, reliance, damages, etc.  Paragraphs 83 and 84 very specifically plead scienter, on the part of Defendants.  It is therefore proper for the Court to reject Defendants' arguments concerning the required elements of the complaint.

**C.    The Amended Complaint pleads fraud with adequate specificity.**

Defendants next contend that the complaint does not meet the specificity requirements for pleading fraud, set forth in Rule 9(b) of the Federal Rules of Civil Procedure.

It is proper for the Court to reject this argument because the Complaint very specifically pleads the fraudulent statements made by Defendants.  Paragraphs 11 through 34 of the Amended

Complaint very specifically states the statements made by Defendants, the speaker of such statements, and the time that such statements were made.

As noted by the New York state court in <u>Marcus v. Jewish National Fund (Keren Keyemeth Leisrael), Inc.</u>, 158 A.D.2d 101 (N.Y. App. 1990):

> <u>Plaintiffs' pleadings contain all of the elements necessary to assert a cause of action for both common law fraud and misrepresentation</u>, **including the precise fraudulent practices and misrepresentations of which they complain**. Contrary to the holding of the [lower] court that the first two causes of action are defective in failing to particularize which alleged false advertisements plaintiffs relied upon in making their donations, <u>plaintiffs were under no obligation to correlate certain contributions with specific advertisements</u>.

<u>Id</u>. at 890 (emphasis added).

The detail in the complaint satisfies all of the required elements for pleading fraud with specificity.

### D. **The Amended Complaint is sufficiently plausible to satisfy the pleading requirements of _Twombly_.**

Defendants next contend that the complaint is not sufficiently "plausible," to satisfy the plausibility requirement set forth in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007).

To establish standing, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." <u>Clapper v. Amnesty Int'l USA</u>, 133 S. Ct. 1138, 1140; 185 L. Ed. 2d 264, 269; 2013 U.S. LEXIS 1858, *4 (2013).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" <u>Wikimedia Foundation v. National Security Agency</u>, 857 F.3d 193, 208 (4th Cir. 2017).

In <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 2009 U.S. LEXIS 3472, 28-29 (2009), the U.S. Supreme Court elaborated on this standard:

16

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Id., at 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id., at 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929.

Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949 (emphasis added).

The Plaintiffs respectfully submit that their complaint includes sufficient allegations of fact to satisfy the plausibility standard set forth in the U.S. Supreme Court's recent rulings concerning specificity of pleading. The Plaintiffs' complaint includes the specific amounts that each plaintiff donated, the dates of such donations, the false statements made by Defendants, and the damages incurred by Defendants. It is therefore proper for the Court to deny Defendants' motions to dismiss.

## III. The complaint states a valid claim against the NRA and Wayne LaPierre for violation of the RICO statute.

In their motions, the NRA and Wayne LaPierre argue that the Plaintiffs have not adequately pled a violation of the RICO statute. Specifically, they claim that the Plaintiffs have failed to adequately plead "scienter" in connection with the statute.

It is proper for the Court to reject this argument. The Amended Complaint does adequately plead *scienter* in connection with the RICO count. Count III of the Amended Complaint states as follows:

> 88.    During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja and each member of the NRA Class.

> 89.    Defendants solicited funds from Plaintiffs Dell'Aquila, Borja, Chesney, Weber, and each member of the NRA Class by means of the United States postal service.

> 90.    When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

17

91.     Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

92.     As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

93.     <u>Defendants' statements concerning the use of the solicited funds were materially and intentionally false</u>.  In reality, the NRA used the solicited funds for alternative purposes, including without limitation, the following:

    a.    By spending over $97,000 per day for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

    b.    By spending approximately $2 million per month for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

    c.    By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

    d.    By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

    e.    By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

    f.    By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

    g.    By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

    h.    By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

18

<blockquote>

i.       By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

j.       By paying for private jet travel for Wayne LaPierre on a regular basis.

k.      By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

94.   <u>Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations</u>.

95.   Plaintiffs Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

96.   The above course of conduct constitutes racketeering activity, as defined in 18 U.S.C. § 1961. Specifically, the activity constitutes mail fraud, as defined in 18 U.S.C. § 1341.

97.   According to 18 U.S.C. § 1962(c), it is also unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to engage in any sort of racketeering activity. Defendant LaPierre is employed by the NRA, which is an enterprise engaged in interstate commerce. Defendant NRA is associated with Defendant NRA Foundation, which is an enterprise engaged in interstate commerce. All three Defendants are therefore proscribed from engaging in racketeering activity, pursuant to the law.

98.   Defendants LaPierre and NRA have violated 18 U.S.C. § 1962(c) by engaging in racketeering activity.

99.   According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

100.   The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

</blockquote>

Second Amended Complaint, ¶¶ 88-100 (emphasis added).

All of the required elements of fraud are specifically plead in the above pleading -- falsity,

knowledge of falsity, reliance, damages, etc. Paragraphs 93 and 94 very specifically plead scienter,

on the part of Defendants.

Defendants also alleged that Plaintiffs have not adequately alleged that Defendants violated RICO by means of an "enterprise." It is proper for the Court to reject this argument.

It is therefore proper for the Court to reject Defendants' arguments concerning the required elements of the complaint. Paragraph 97 of the Amended Complaint clearly and adequately pleads that Defendants participated in an "enterprise," in violation of the RICO statute.

## IV. The complaint states a valid claim against the NRA Foundation and Wayne LaPierre for violation of the RICO statute.

In their motions, the NRA Foundation and Wayne LaPierre argue that the Plaintiffs have not adequately pled a violation of the RICO statute. Specifically, they claim that the Plaintiffs have failed to adequately plead "scienter" in connection with the statute.

It is proper for the Court to reject this argument. The Amended Complaint does adequately plead *scienter* in connection with the RICO count. Count IV of the Amended Complaint states as follows:

102. During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

103. Defendants solicited funds from Plaintiff and each member of the NRA Class by means of the United States postal service.

104. When soliciting such funds, Defendants LaPierre and the NRA Foundation advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

105. Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

106. As a result of such reliance, Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

107.   <u>Defendants' statements concerning the use of the solicited funds were materially and intentionally false</u>.  In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

a.   By transferring approximately $80 million from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible lobbying organization) over a ten-year period.  Such funds then became subject to the financial improprieties described in Count I of this Complaint and jeopardized the tax-deductibility of the donations made by Plaintiffs.

b.   By paying $425,000 per year for nine years to the Speedway Children's Charity, a non-profit organization not related to the NRA's core mission.

c.   By paying at least $125,000 to Youth for Tomorrow, a non-profit organization not related to the NRA's core mission.  Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

108.   <u>Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations</u>.

109.   Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

110.   The above course of conduct constitutes racketeering activity, as defined in 18 U.S.C. § 1961.  Specifically, the activity constitutes mail fraud, as defined in 18 U.S.C. § 1341.

111.   According to 18 U.S.C. § 1962(c), it is also unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to engage in any sort of racketeering activity.  Defendant LaPierre is employed by the NRA, which is an enterprise engaged in interstate commerce.  Defendant NRA Foundation is associated with the NRA, which is an enterprise engaged in interstate commerce.  All three Defendants are therefore proscribed from engaging in racketeering activity, pursuant to the law.

112.   Defendants LaPierre and NRA have violated 18 U.S.C. § 1962(c) by engaging in racketeering activity.

113.   According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

114.    The total amount of damages incurred by all Plaintiffs, including the NRA
Foundation Class, is greater than $5 million.

Second Amended Complaint, ¶¶ 88-100 (emphasis added).

All of the required elements of fraud are specifically plead in the above pleading -- falsity,

knowledge of falsity, reliance, damages, etc.   Paragraphs 107 and 108 very specifically plead

scienter, on the part of Defendants.

Defendants also alleged that Plaintiffs have not adequately alleged that Defendants violated

RICO by means of an "enterprise."  It is proper for the Court to reject this argument.

It is therefore proper for the Court to reject Defendants' arguments concerning the required

elements of the complaint.  Paragraph 111 of the Amended Complaint clearly and adequately pleads

that Defendants participated in an "enterprise," in violation of the RICO statute.

**V.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C.
         § 1332(d)(2)(A).**

Defendants argue that this Court does not have subject matter jurisdiction over this case.

It is proper for the Court to reject this argument, because the Court clearly has subject matter

jurisdiction over this class action case.

This Court has diversity jurisdiction in this case pursuant to 28 U.S.C. § 1332(d)(2)(A).

Section 1332(d)(2)(A) states as follows:

> (2)  The district courts shall have original jurisdiction of any civil action in
> which the matter in controversy exceeds the sum or value of $5,000,000,
> exclusive of interest and costs, and is a class action in which --
>
> (A) any member of a class of plaintiffs is a citizen of a State different from
> any defendant.

28 U.S.C. § 1332(d)(2)(A) (2020).

The above statute reflects to the Class Action Fairness Act of 2005, which modified the

complete diversity requirement for a federal lawsuit between different states.  For a federal court to

have subject matter jurisdiction over a class action, the parties need only satisfy *minimal diversity*. Minimal diversity is when at least one plaintiff is a resident of a state that is different from at least one defendant. This makes it easier for a class action lawsuit to proceed in federal court than prior to passage of the Act.

In any event, in this case, the parties have complete diversity of citizenship: Plaintiffs David Dell'Aquila and Lora Borja are both citizens of Tennessee; Plaintiff Todd Chesney is a citizen of Arizona; and Plaintiff Brent Webber is a citizen of Kansas.

Each corporate defendant is a citizen of its incorporation and every state where it has its principal place of business. 28 U.S.C. § 1332(c)(1) (2020). Thus, the NRA is a citizen of both New York State (where it is incorporated) and Virginia (where it has its principal place of business). The NRA Foundation is a citizen of both Washington, D.C. (where it is incorporated) and Virginia (where it has its principal place of business). Finally, Defendant Wayne LaPierre is a citizen of Virginia, where he resides.

Thus, this Court has proper subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) (2020).

<u>**CONCLUSION**</u>

WHEREFORE, for the reasons stated above, the Plaintiff respectfully requests that this Honorable Court enter an order denying Defendants' motions to dismiss the complaint.

Respectfully submitted,

By: <u>/s/ Elliott Schuchardt</u>
      Elliott J. Schuchardt
      B.P.R. No. 027016

23

SCHUCHARDT LAW FIRM
6223 Highland Place Way, Suite 201
Knoxville, TN 37919
Phone: (865) 304-4374
E-mail: elliott016@gmail.com

*Counsel for the Plaintiff, David
  Dell'Aquila*

## **CERTIFICATE OF SERVICE**

I, Elliott J. Schuchardt, hereby certify that I served a true and correct copy of the foregoing

Brief in Opposition to Defendants' Motions to Dismiss Complaint on the following persons on this

4th day of March 2020 by means of the Court's CM / ECF system:

William A. Brewer, Esq.
Email: wbb@brewerattorneys.com
*Counsel for Wayne LaPierre and*
*National Rifle Association*

Wallace A. McDonald
Email: amcdonald@lpwpc.com
*Counsel for Wayne LaPierre and*
*National Rifle Association*

Aubrey B. Harwell , Jr., Esq.
Email: aharwell@nealharwell.com
*Counsel for NRA Foundation, Inc.*

John E. Quinn
Email: jquinn@nealharwell.com
*Counsel for NRA Foundation, Inc.*

William J. Harbison , II, Esq.
Email: jharbison@nealharwell.com
*Counsel for NRA Foundation, Inc.*

/s/ Elliott Schuchardt
Elliott J. Schuchardt