## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| **IN RE: NATIONAL RIFLE ASSOCIATION BUSINESS EXPENDITURES LITIGATION** | § § § § § § |

**MDL Docket No. _____**

**ORAL ARGUMENT REQUESTED**

## THE NATIONAL RIFLE ASSOCIATION'S MOTION
## TO TRANSFER CASES FOR COORDINATED OR CONSOLIDATED
## PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

The National Rifle Association of America respectfully moves the Judicial Panel on Multidistrict Litigation ("JPML") for an Order, pursuant to 28 U.S.C. § 1407 and the Rules of Procedure of the JPML, transferring four (4) related actions pending in federal district courts to the Northern District of Texas for centralization of the actions for coordinated or consolidated pre-trial proceedings.

For the reasons set forth in its Memorandum In Support of Its Motion to Transfer Cases Pursuant to 28 U.S.C. § 1407 for Centralization of the Actions for Coordinated or Consolidated Pre-trial Proceedings, filed herewith, the Motion should be granted and all of the "Related Actions" identified in the attached Schedule of Actions, as well as any tag-along actions or other cases that may be filed asserting related or similar claims, should be transferred to the Northern District of Texas for centralization of the actions for coordinated or consolidated pre-trial proceedings.

Dated: October 20, 2020

Respectfully submitted,

By: /s/ *Sarah B. Rogers* _____ _
    William A. Brewer III
    wab@brewerattorneys.com
    Sarah B. Rogers
    sbr@brewerattorneys.com

**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR MOVANT**
**THE NATIONAL RIFLE ASSOCIATION**

2

# BEFORE THE UNITED STATES JUDICIAL PANEL
# ON MULTIDISTRICT LITIGATION

IN RE: NATIONAL RIFLE       §
ASSOCIATION BUSINESS       §
EXPENDITURES LITIGATION    §   **MDL Docket No. _____**
                               §
                               §   **ORAL ARGUMENT REQUESTED**

## MEMORANDUM OF LAW IN SUPPORT OF THE NATIONAL RIFLE ASSOCIATION'S MOTION TO TRANSFER CASES FOR COORDINATED OR CONSOLIDATED PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

William A. Brewer
Sarah B. Rogers
**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR MOVANT
THE NATIONAL RIFLE ASSOCIATION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. I

TABLE OF AUTHORITIES ........................................................................................ II

INTRODUCTION .......................................................................................................... 1

ARGUMENT .................................................................................................................. 7

    A.    THE ACTIONS INVOLVE COMMON QUESTIONS OF FACT. ............................................ 7

    B.    CENTRALIZATION SERVES THE CONVENIENCE OF THE PARTIES AND WITNESSES. ..................... 12

    C.    CENTRALIZATION WILL PROMOTE THE JUST AND EFFICIENT CONDUCT OF THESE ACTIONS. .... 14

    D.    TRANSFER TO THE NORTHERN DISTRICT OF TEXAS WOULD BEST SERVE THE GOALS OF 28
U.S.C. § 1407. ...................................................................................................... 14

CONCLUSION ............................................................................................................. 16

# TABLE OF AUTHORITIES

## CASES

*In re Centurylink Residential Customer Billing Disputes Litig.*,
280 F. Supp. 2d 1383 (J.P.M.L. 2017)...................................................... 8

*In re Conseco Life Ins. Co. Cost of Ins. Litig.*, 323 F. Supp. 2d 1381 (J.P.M.L. 2004)................. 8

*In re Daily Fantasy Sports Mktg. & Sales Practices Litig.*,
158 F. Supp. 3d 1375 (J.P.M.L. 2016)...................................................... 13

*In re Delphi Corp. Sec., Derivative & "Erisa" Litig.*, 403 F. Supp. 2d 1358 (J.P.M.L. 2005) .... 16

*In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*,
939 F. Supp. 2d 1374 (J.P.M.L. 2013)....................................................... 7

*In re Ford Motor Co. F-150 and Ranger Truck Fuel Economy Mktg. and Sales Pracs. Litig.*,
412 F. Supp. 3d 1355 (J.P.M.L. 2019)...................................................... 16

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
396 F. Supp. 3d 1374 (J.P.M.L. 2019)...................................................... 16

*In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381 (J.P.M.L. 2003)............... 7, 13

*In re M3Power Razor System Mktg. and Sales Practices Litig.*,
398 F. Supp. 2d 1363 (J.P.M.L. 2005)........................................................ 7

*In re Merscorp. Inc. Real Estate Settlement Procedures Act (RESPA) Litig.*,
560 F. Supp. 2d 1371 (J.P.M.L. 2008)........................................................ 7

*In re Metoprolol Succinate Patent Litig.*, 329 F. Supp. 2d 1368 (J.P.M.L. 2004) ...................... 14

*In re MI Windows & Doors, Inc., Prod. Liab. Litig.*, 857 F. Supp. 2d 1374 (J.P.M.L. 2012) ..... 14

*In re Peruvian Rd. Litig.*, 380 F. Supp. 796 (J.P.M.L. 1974) ........................................ 8

*In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968) ................................. 14

*In re Radioshack Corp. "ERISA" Litig.*, 528 F. Supp. 2d 1348 (J.P.M.L. 2007) ...................... 14

*In re Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d 1360 (J.P.M.L. 2015) .................. 14

*In re Wells Fargo Wage and Hour Emp't Practices Litig. (No. III)*,
804 F. Supp. 2d 1382 (J.P.M.L. 2011)...................................................... 14

*In re Westinghouse Electric Corp. Uranium Con. Litig.*, 405 F. Supp. 316 (J.P.M.L. 1975) ...... 13

*In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 802 F. Supp. 2d 1374 (J.P.M.L. 2011).. 7

## STATUTES

28 U.S.C. § 1407....................................................................... *passim*

## RULES

Judicial Panel on Multidistrict Litigation Rule 6.2 ....................................... 1

## OTHER AUTHORITIES

Barbara J. Rothstein & Catherine R. Borden, Managing Multidistrict Litigation in Products
Liability Cases: A Pocket Guide for Transferee Judges, Federal Judicial Center (2011) .......... 5

Manual for Complex Litigation (Fourth) (2010) ................................................. 14, 15

Pursuant to 28 U.S.C. § 1407 and Judicial Panel on Multidistrict Litigation ("JPML" or the "Panel") Rule 6.2, The National Rifle Association ("NRA" or the "Association") respectfully moves the Panel for an order transferring the currently-filed cases listed in the attached schedule of actions (collectively, the "Actions"), as well as any cases subsequently filed involving similar facts or claims ("tag-along cases") to the Northern District of Texas for coordinated pre-trial proceedings, or alternatively, to any other court with the capacity to facilitate their expeditious resolution.

## **INTRODUCTION**

The presently-filed Actions are four cases currently pending in four different district courts concerning the finances and governance of the NRA, a New York-domiciled not-for-profit corporation. The Actions center on alleged abuses by NRA fiduciaries, and encompass lawsuits by the NRA designed to redress these abuses, along with a pretextual, unconstitutional gambit by New York State officials to sue derivatively regarding the same transactions. Because the Actions make overlapping and contradictory factual claims regarding the same parties, events and relationships, the risk of inconsistent adjudications is high, and voluminous duplicative discovery is a certainty. The parties to the Actions—and other, related actions that are likely to be removed to federal court—have already acknowledged that the cases involve common questions of fact, and that litigating them piecemeal in different fora would be inefficient.[1] Accordingly, the NRA seeks transfer and consolidation.

---

[1] *See e.g.*, *Nat'l Rifle Ass'n of Am. v. James*, Civ. No. 1:20-cv-00889 (N.D.N.Y.), Dkt. No. 8 (letter from NYAG to the Court) at 3 ("*Finally*, given the pending Charities Bureau Action addressing the NRA's alleged violations of New York's statutory scheme for the oversight of not-for-profit entities, it is respectfully submitted that abstention is appropriate here."); *Nat'l Rifle Ass'n of Am. v. North*, Index No. 903843-20 (Sup. Ct. Albany Cnty.), Dkt. No. 48 (order granting motion for stay), at 6 ("In his answer . . . North denies engaging in misconduct and alleges that the NRA is retaliating against him for reporting potential financial wrongdoing and inadequate governance to

In mid-2017, the NRA learned that high-ranking New York State Democratic officials intended to weaponize the state government's regulatory powers against it in order to weaken it as a political force before the 2020 election. One intended cudgel was the New York State Office of the Attorney General (the "NYAG"), which had broad supervisory authority over not-for-profits that are domiciled in New York, like the NRA. New York's former Attorney General, Eric Schneiderman, was apparently so troubled by this campaign that he warned the NRA about it. Schneiderman advised that the NRA should get its affairs in order, because the NYAG would eventually be forced to investigate its operations and finances. Despite believing it was operating in compliance with New York law, the NRA undertook an internal review of its controls, compliance and governance—to inform its strategy in anticipated litigation, and to fortify itself against the attacks Schneiderman warned were coming.

The NRA's efforts ultimately led it to determine that its largest vendor, advertising agency Ackerman McQueen ("Ackerman"), was systematically overcharging the NRA and falsifying invoices, as well as misrepresenting the benefits of a significant amount of the services it provided. For example, Ackerman provided misleading, inflated viewership metrics for NRATV, the digital media platform it pitched, produced and scripted, where costs were skyrocketing and programming inexplicably wandered far afield from the NRA's mission of defending the Second Amendment. Ackerman also engaged in a practice of pass-through block billing that obscured the purpose and

---

other NRA officials and directors . . . [and] "begins by referencing the Attorney General's . . . complaint in the Dissolution Case"), 9 ("North argues that a stay of this action during the pendency of the Dissolution Case 'will preserve judicial resources, prevent inconsistent results, and protect [his] rights' because the Dissolution Case 'encompasses substantially all of the issues in this action.'"), 11 ("Initially, it is apparent that the AG's Complaint in the Dissolution Case encompasses the bulk of the issues raised by the NRA's request for declaratory and injunctive relief in this action.").

2

amount of certain expenditures, including payments to the NRA's new president, Oliver North, purportedly in connection with his role in an NRATV series. When the NRA sought additional documentation from Ackerman, Ackerman refused to provide it, leading to litigation beginning in April 2019 between the NRA and Ackerman. One of those actions is pending in the Northern District of Texas[2], where the NRA claims against Ackerman for fraud and breach of fiduciary duty recently withstood a motion to dismiss and discovery has begun.[3]

In response to the litigation (the "Ackerman Litigation") Ackerman and its employees (*e.g.* North) have made retaliatory and disingenuous allegations of financial improprieties at the NRA, including inappropriate personal expenditures by NRA CEO Wayne LaPierre. Upon learning of these accusations, an NRA donor commenced a putative class action on behalf of all NRA donors in the Middle District of Tennessee (the "Dell'Aquila Litigation").[4] The class action complaint specifically references allegations made by North concerning LaPierre's spending[5] as well as excessive payments to Ackerman[6], and seeks refunds of contributions on the basis of alleged fraud and RICO violations. Although the court in that action dismissed all claims against LaPierre and the RICO claim against the NRA, it denied the motion as to a claim for fraud against the Association. As such, a conference to set a discovery schedule is set for November 6, 2020.

---

[2] *Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al.*, Civ. Case No. 3-19-cv-02074-G (N.D. Tex.).

[3] Preliminary document discovery has occurred. A Scheduling Order was entered on October 13, 2020, and depositions are slated to begin in November 2020. *See id.* Dkt. No. 174.

[4] *See Dell'Aquila v. LaPierre* et al., Civ. Case No. 3:19-cv-00679 (M.D. Tn.), Dkt. 1 ¶ 14 ("Plaintiff . . . has learned this information from an investigation conducted by the NRA's former President, Lt. Col. Oliver North."); *id.* ¶¶ 27-28 ("LaPierre terminated the NRA's agreement with . . . Ackerman McQueen . . . . Ackerman . . . responded to the breach by disclosing information concerning certain financial improprieties raised in this lawsuit.").

[5] *Id.* ¶ 45c, d, and h.

[6] *Id.* ¶ 45e.

3

Additionally, a former Ackerman employee, Grant Stinchfield, filed an affidavit in the Ackerman Litigation attesting to corrupt practices he witnessed during his employment at the company. On December 20, 2019, Ackerman sued Stinchfield in the United States District Court for the Northern District of Texas in retaliation for his testimony—ostensibly challenging its veracity (such lawsuit, the "Stinchfield Litigation").[7] The truthfulness of Stinchfield's statements about Ackerman's dealings with the NRA is centrally at issue in the Stinchfield Litigation; thus, discovery is expected to overlap extensively with the discovery in the other Actions. The Stinchfield Litigation is currently in discovery.

In the meantime, Schneiderman resigned from the office of the NYAG, and his successor, Letitia James, made the destruction of the NRA a central theme of her campaign for office. Even before the Ackerman allegations surfaced, James vowed that if elected, she would undertake a fishing expedition into the NRA's finances, maligning the Association as a "criminal enterprise" whose "deadly propaganda" (*i.e.*, gun rights advocacy) should be extinguished. James took office in January 2019, and, as promised, launched a sweeping investigation as part of her plan to distract and ultimately destroy the NRA. The investigation included taking testimony and obtaining evidence from nearly 90 witnesses located in 27 states. It focused frequently on the exact same transactions and issues that the NRA targeted in its own compliance review, many of which were *already the subject of litigation* commenced by the NRA to recover funds from faithless former agents like Ackerman.

---

[7] *Ackerman McQueen Inc. v. Stinchfield*, Civ. No. 3:19-cv-03016-X (N.D. Tx.).

4

Ultimately, James delivered on her campaign promise to leverage the full power of her office against the NRA. On August 10, 2020[8], the NYAG filed an action in New York State court (the "NYAG State Action")[9] that purported to sue derivatively, on behalf of NRA members, with respect to many of the same transactions that were already the subject of the Ackerman Litigation and the Dell'Aquila Litigation. Predictably, the suit seeks dissolution of the NRA. Like other pending litigation, the NYAG State Action involves allegations of self-dealing by former and current NRA executives (including LaPierre[10]) and makes repeated references to the NRA's transactions with Ackerman[11] as the basis for claiming a lack of NRA board oversight into how the NRA spent its donations. Because (i) James' allegations bear no resemblance to traditional corporate dissolution actions, which have historically been levied against sham non-profits; and (ii) James had repeatedly stated during her campaign that her "top issue" as Attorney General would be using the non-profit laws to "target" the NRA, James' enforcement action has been roundly criticized by legal scholars, the ACLU, and other civil rights advocates as politically motivated and an extraordinary abuse of power.[12] On August 6, 2020, the NRA filed a Section

---

[8] James purported to commence the NYAG State Action on August 6, 2020, but the verification that accompanied that filing was defective. *See People v. Nat'l Rifle Ass'n of Am.*, et al., Index No. 451625/2020 (Sup. Ct. N.Y. Cnty.), Dkt. Nos 10-11.

[9] Although the NYAG State Action is currently pending in state court, the NRA takes the view that the action belongs in federal court as a compulsory counterclaim to its own Section 1983 action, which as a result of James' failure to properly verify her complaint, was first-filed. The NRA has moved to dismiss the state action on *forum non conveniens* and related grounds. In any event, should these actions be consolidated, the state action will benefit from the coordinated discovery practices recommended to transferee judges dealing with related state actions. *See, e.g.*, Barbara J. Rothstein & Catherine R. Borden, Managing Multidistrict Litigation in Products Liability Cases: A Pocket Guide for Transferee Judges, FEDERAL JUDICIAL CENTER, Ch. 6 (2011).

[10] *See* Ex. A to *Nat'l Rifle Assn'n of Am. v. James*, No. 1:20-cv-00889 (N.D.N.Y.) ¶¶ 35-215.

[11] *Id.* ¶¶ 297-396.

[12] *See, e.g.*, Editorial, *How Did Caribbean Yacht Vacations Promote the Second Amendment? We May Find Out in Court*, WASH. POST. (Aug. 8, 2020), https://www.washingtonpost.com/opinions/

5

1983 suit against James in the Northern District of New York alleging infringement of the NRA's

First and Fourteenth Amendment rights on the ground that James' hostilities represented retaliation

for the NRA's protected political advocacy and constituted selective enforcement of New York's

not-for-profit law (such litigation, the "NYAG Federal Action" and collectively with the NYAG

State Action, the "NYAG Litigation").[13] While in its infancy, James' defense to the NYAG Federal

Action will no doubt include the same affirmative allegations of misconduct that are found in the

NYAG State Action and the Dell'Aquila Litigation, all of which directly overlap with the subject

matter of the Ackerman Litigation and Stinchfield Litigation.

---

is-this-really-the-right-penalty-for-the-nra/2020/08/07/f81778fc-d8e2-11ea-930e
d88518c57dcc_story.html ("We question whether dissolution is the right penalty, even if the
charges are proven in court."); Henry Olsen, *New York's Lawsuit to Dissolve the NRA is
Outrageous*, WASH. POST. (Opinion, Aug. 7, 2020), https://www.washingtonpost.com/
opinions/2020/08/07/new-yorks-lawsuit-dissolve-nra-is-outrageous/ ("James's allegations . . .
would certainly be damning if true. . . . None of this, however, justifies destroying the organization
itself. The NRA is still supported by millions of people and has substantial assets. It is neither
broke nor derelict."); Ruth Marcus, *The NRA is a Cesspool. That Doesn't Mean It Should Be
Dissolved*, WASH. POST. (Opinion, Aug. 9, 2020),
https://www.washingtonpost.com/opinions/2020/08/09/nra-is-cesspool-that-doesnt-mean-it-
should-be-dissolved/; Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*,
BLOOMBERG (Opinion, Aug. 6, 2020), https://www.bloomberg.com/articles/2020-08-
06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit; David Cole, *The NRA Has a
Right to Exist*, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-has-
a-right-to-exist-11598457143?mod=opinion_lead_pos7 ("The American Civil Liberties Union
rarely finds itself on the same side as the National Rifle Association in policy debates or political
disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to
dissolve the NRA"); Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the
NRA*, THE HILL (Opinion, Aug. 8, 2020), https://thehill.com/opinion/judiciary/511155-the-tragic-
irony-of-the-new-york-state-lawsuit-against-the-national-rifle-association ("Trying to dissolve an
organization engaged in political speech should not occur absent overwhelming proof that it is a
criminal enterprise, which is why this has never happened with a group like the NRA."); Alan Z.
Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Opinion,
Aug. 11, 2020), https://www.lawfareblog.com/attempt-dissolve-nra-threatens-democratic-norms
("I personally can't stand [the NRA] . . . . [b]ut that said . . . . James's attempt to dissolve the NRA
in its entirety is a violation of key democratic and rule-of-law norms.").

[13] *Nat'l Rifle Ass'n of Am. v. James*, Civ. Case No. 1:20-cv-00889 (N.D.N.Y.).

## ARGUMENT

### Legal Standard

Congress authorized the Judicial Panel on Multidistrict Litigation (the "Panel") to transfer multiple civil actions for consolidated or coordinated pretrial proceedings when three criteria are met: (1) "one or more common questions of fact are pending in different districts"; (2) transfer would serve the "convenience of the parties and witnesses"; and (3) transfer would "promote the just and efficient conduct of such actions." 28 U.S.C. § 1407. In applying § 1407, this Panel has held that transfer is particularly appropriate where it will "eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary."[14] Although only three federal actions have been filed thus far, the posture of those cases and the fact that one is a putative class action demonstrates that consolidation is necessary for an efficient resolution.

### A.    The Actions Involve Common Questions of Fact.

Actions should be centralized when they involve common questions of fact.[15] Even though individual factual or legal issues may exist, centralization does not require complete identity of issues, or even a majority.[16] "The presence of differing legal theories is outweighed when the underlying actions, such as those here, arise from a common factual core."[17] Here, consolidation

---

[14] *In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003).

[15] *See In re E.I. du Pont de Nemours & Co. C-8 Personal Injury Litig.*, 939 F. Supp. 2d 1374, 1374 (J.P.M.L. 2013).

[16] *See In re Zimmer NexGen Knee Implant Prods. Liab. Litig.*, 802 F. Supp. 2d 1374, 1376-77 (J.P.M.L. 2011) (centralization "does not require a complete identity or even a majority of common factual or legal issues as a prerequisite to transfer."); *In re Merscorp. Inc. Real Estate Settlement Procedures Act (RESPA) Litig.*, 560 F. Supp. 2d 1371, 1372 (J.P.M.L. 2008) (presence of "unique state law claims" did not weigh against transfer).

[17] *In re M3Power Razor System Mktg. and Sales Practices Litig.*, 398 F. Supp. 2d 1363, 1364 (J.P.M.L. 2005); accord *In re Centurylink Residential Customer Billing Disputes Litig.*, 280 F.

7

is appropriate because all of the actions concern the central issue of how the NRA was spending its money; moreover, all will entail discovery regarding the relationship between the NRA and Ackerman and the performance by various executives of their fiduciary duties in connection with the same.[18]

Despite seeking different relief and raising varying legal issues, each of the four Actions centers on broader questions of the NRA's governance, policies and procedures, its vendor relationships, and the manner in which it has expended its donations. This is no coincidence. When New York's former Attorney General warned the NRA that it would likely face hostilities from his office (at the behest of partisan political powers in New York), the NRA undertook to prepare itself for such an attack by examining and bolstering, where appropriate, its internal controls. Many events which flowed from this effort lay at the heart of all four Actions. Although the NRA is now accused in the NYAG Litigation of giving inadequate scrutiny to expenses submitted by certain executives and "favored vendors,"[19] in truth, it was the NRA's demand that all officers, executives, directors and vendors rigorously comply with expense-documentation requirements beginning in 2018 which led to the revelations and disputes at the core of the Actions.[20] As set forth in the

---

Supp. 2d 1383, 1385 (J.P.M.L. 2017) (rejecting argument for denying centralization based on "differences among the various state laws on which plaintiffs bring their claims.").

[18] *See In re Conseco Life Ins. Co. Cost of Ins. Litig.*, 323 F. Supp. 2d 1381, 1383 (J.P.M.L. 2004) (granting transfer where each action named the same defendant and "share questions of fact arising out of" defendant's decision to change its method of calculating deductions, which plaintiffs alleged breached the terms of their life insurance policies); *In re Peruvian Rd. Litig.*, 380 F. Supp. 796, 798 (J.P.M.L. 1974) (granting transfer of two contract actions filed by subcontractor against construction companies because factual allegations were "inextricably intertwined and raise sufficiently complex common issues concerning the design and construction of the road project.").

[19] Declaration of Sarah B. Rogers in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Rogers Decl."), Ex. A ¶¶ 4-8.

[20] *Id.* ¶ 15; *see also* Declaration of Michael J. Collins in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Collins Decl."), Ex. A ¶ 47.

8

NYAG Federal Action[21] and Ackerman Litigation,[22] a "handful of executives and vendors" resisted the NRA's compliance demands, and would ultimately attempt to shift blame for their conduct—resulting in multiple overlapping lawsuits.

Among NRA vendors, Ackerman was the most hostile to transparency and reform, and "embark[ed] on a campaign to 'kill the messenger'" by demanding that NRA employees, and even NRA outside counsel, who questioned its expenses be fired or denied access to records.[23] Eventually, a group of internal NRA whistleblowers emerged whose concerns (including serious alleged abuses by Ackerman) were presented to the Audit Committee of the NRA Board of Directors. Those whistleblower concerns now figure prominently in all four Actions.[24] Lt. Col. Oliver North, who had been elected president of the NRA, was receiving a seven-figure salary from Ackerman under a contract he refused to disclose, and which had not been properly approved in accordance with the NRA's bylaws.[25] Over the course of late 2018 and early 2019, North and Ackerman attempted to squelch scrutiny of Ackerman's dealings, including through North's assertion of pretextual concerns regarding the NRA's governance.[26] These tensions culminated in an attempted leadership coup at the April 2019 NRA Annual Meeting, wherein North and an allied Board member with ties to Ackerman, Dan Boren, threatened to release purportedly damaging expense information (the same information that Ackerman previously concealed from the NRA)

---

[21] Rogers Decl. Ex. A ¶ 15.

[22] Collins Decl. Ex. A ¶¶ 51-58.

[23] *Id.* ¶ 56.

[24] Rogers Decl. Ex. A ¶¶ 488-494.

[25] *Id.* ¶¶ 449, 465, 467; *see also* Rogers Decl. Ex. B ¶ 22; *see also* Collins Decl. Ex. A ¶¶ 62-67, 148, 172.

[26] Rogers Decl. Ex. A ¶¶ 457, 461-462; *see also* Collins Decl. Ex. A ¶ 56.

9

unless NRA CEO Wayne LaPierre agreed to resign and withdraw a then-pending lawsuit—a state-court precursor to the Ackerman Litigation.[27]

Contemporaneously with these events, the NYAG prepared for and commenced the politically driven investigation which underlies the recently-filed NYAG Litigation.[28] The NYAG aggressively sought documents from the NRA regarding the NRA-Ackerman relationship and expenses billed to the NRA by Ackerman; unsurprisingly, these document productions overlap heavily with discovery in the Ackerman Litigation,[29] and NRA counsel expect that the voluminous discovery required in the two matters will continue to overlap as the NYAG Litigation proceeds.[30] Among the facts and transactions encompassed by both the NYAG investigation and the Ackerman Litigation were: an aborted real-estate purchase in Dallas, Texas orchestrated by Ackerman;[31] executive travel and entertainment expenses invoiced through Ackerman;[32] the NRA Audit Committee's review of Ackerman-related contracts;[33] alleged sexual harassment of an Ackerman executive by a now-fired NRA executive;[34] the coup attempt at the 2019 April Annual Meeting;[35] and operations and controls associated with NRATV.[36]

---

[27] Collins Decl. Ex. A ¶¶ 70-74, 78; *see also id.* ¶ 2; *see also* Rogers Decl. Ex. A ¶¶ 468-470; *see also id.* Ex. B at ¶¶ 15, 22.

[28] Rogers Decl. ¶ 6; *see also id.* Ex. B ¶¶ 22-23.

[29] Rogers Decl. Ex. B ¶¶ 24-25; *see also id.* ¶ 6.

[30] *Id.* ¶ 6.

[31] Rogers Decl. Ex. A ¶¶ 209-215; *see also* Collins Decl. Ex. B ¶¶ 51, 115.

[32] Rogers Decl. Ex. A ¶¶ 247, 249, 299, 309-323; *see also* Collins Decl. Ex. A ¶¶ 19, 53, 72, 75; *see also id.* Ex. B ¶¶ 50, 115.

[33] Collins Decl. Ex. A ¶¶ 62-64; *see also* Rogers Decl. Ex. A ¶¶ 510-513, *see also id.* Ex. B ¶ 33.

[34] Rogers Decl. Ex. A ¶ 270; *see also* Collins Decl. Ex. B ¶ 30.

[35] Rogers Decl. Ex. A ¶¶ 468-471; *see also* Collins Decl. Ex, A ¶¶ 70-74.

[36] Rogers Decl. Ex. A ¶ 447; *see also* Collins Decl. Ex. A ¶¶ 21-37.

10

The two remaining Actions—the Dell'Aquila Litigation and the Stinchfield Litigaiton—both sprang from the same events. The Dell'Aquila Litigation was commenced in August 2019 by an NRA donor who expressed concerns about Ackerman's accusations of misspending at the NRA, and referenced them extensively in his operative pleading.[37] The Stinchfield Litigation, meanwhile, was brought by Ackerman against a former employee who testified in support of the NRA in the Ackerman Litigation, and hinges on the veracity of that employee's statements about Ackerman's business relationship with the NRA.[38]

Although none of the Actions has progressed past the discovery stage, the Ackerman Litigation is furthest along,.[39] The propriety of Ackerman's billing, including what NRA executives knew about Ackerman's billing practices and their level of control over those practices, will be a focus of discovery in all four Actions.[40] As part of its defense to the Ackerman Litigation, Ackerman has asserted certain improprieties in NRA spending, and has also made allegations about purportedly excessive legal fees incurred by the NRA.[41] The same issues feature in the NYAG Litigation[42] and the Dell'Aquila Litigation.[43] Discovery will be voluminous: roughly 3,000 pages of material have been produced in the Ackerman Litigation and Stinchfield Litigation, even

---

[37] Declaration of William A. Brewer in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Brewer Decl."), Ex. A.

[38] Declaration of Ian Shaw in Support of Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 ("Shaw Decl."), Ex. A ¶¶ 1-2; 9-32. Counsel for the NRA also represents Mr. Stinchfield and the declaration is filed solely in his capacity as an individual with relevant knowledge of the litigation.

[39] Collins Decl. ¶¶ 6-7.

[40] Collins Decl. ¶ 10; *see also* Rogers Decl. ¶ 7; *see also* Shaw Decl. ¶ 4; *see also* Brewer Decl. ¶ 4.

[41] Collins Decl. Ex. B, Page 34 ¶ 2.

[42] Rogers Decl. ¶ 7.

[43] Brewer Decl. ¶ 4.

11

though discovery is in its early stages, and a prior, related state action (which was stayed for overlapping with the Ackerman Litigation) entailed 59,880 pages of document discovery.[44] There are currently 36 third-party subpoenas outstanding in the Ackerman Litigation alone.[45] Many overlapping or related documents will be relevant to the NYAG Litigation.[46] Although discovery has not yet begun in either the NYAG State Action or the NYAG Federal Action, more than 88,000 pages of documents were produced by the NRA to the NYAG in advance of the NYAG State Action, and it is expected that this record will be augmented as discovery proceeds.[47] Discovery in the Dell'Aquila Litigation will encompass the same issues.[48] Such discovery is expected to be voluminous, and to overlap with discovery in the other Actions. The Actions will notably require testimony from an immense number of witnesses, either by deposition or at trial. Exhibit E to the Rogers Declaration identifies witnesses likely to possess knowledge or documents relevant to one or more Actions.[49] Moreover, although Exhibit E to the Rogers Declaration focuses on third-party witnesses, numerous NRA employees and current and former Board members likewise possess knowledge and/or records relevant to all four Actions; duplicative discovery from these witnesses, too, could be avoided or mitigated by consolidation.

## B.    Centralization Serves the Convenience of the Parties and Witnesses.

Transfer for coordinated or consolidated pre-trial proceedings serves the convenience of the parties because, without it, the parties would necessarily be engaged in duplicative pre-trial

---

[44] Collins Decl. ¶ 7.

[45] Collins Decl. ¶ 7.

[46] Rogers Decl. ¶¶ 6-7.

[47] Rogers Decl.  ¶ 6.

[48] Brewer Decl. ¶ 3.

[49] Rogers Decl. Ex. E.

12

motion practice, discovery, and other proceedings in at least four separate actions, and likely more. Accordingly, a transfer of these actions for centralized pre-trial proceedings would "eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel, and the judiciary."[50]

Absent transfer, most of the witnesses, who are numerous and scattered across the country, would face the prospect of being separately deposed in each of the actions. A transfer and resulting consolidation would minimize the burden placed on these witnesses.[51] If the investigation performed by the New York Attorney General is any indication, this could encompass up to 90 different witnesses.

To the extent one of the Actions presents a unique discovery issue, the transferee judge would be well-situated to develop a pre-trial program to "insure that the needs of the respective parties" for any such individualized issues would "be accommodated concurrently with the common pretrial matters."[52]

---

[50] *In re IDT Corp. Calling Card Terms Litig.*, 278 F. Supp. 2d 1381, 1382 (J.P.M.L. 2003).

[51] *See In re Daily Fantasy Sports Mktg. & Sales Practices Litig.*, 158 F. Supp. 3d 1375, 1379 (J.P.M.L. 2016) (even where different theories of relief are involved, centralization is appropriate where actions involve common discovery regarding the nature of the defendants' business, advertising, and internal policies, and at least some of defendants' employees will be witnesses in all actions).

[52] *In re Westinghouse Electric Corp. Uranium Con. Litig.*, 405 F. Supp. 316, 319 (J.P.M.L. 1975) ("Section 1407 proceedings will prevent duplication of discovery, eliminate the possibility of colliding pretrial rulings by courts of coordinated jurisdiction, and avoid potentially conflicting preliminary injunctive demands on Westinghouse with respect to its delivery of uranium.").

13

**C. Centralization Will Promote the Just and Efficient Conduct of These Actions.**

Centralization under Section 1407 would promote the just and efficient conduct of the three pending actions and any potential tag-along actions[53] by avoiding unnecessary duplication of judicial effort and inconsistent rulings.

Centralization is appropriate when it "will eliminate duplicative discovery . . . and conserve the resources of the parties, their counsel and the judiciary."[54] Given the large volume of documents and witnesses at issue and the near-total overlap in factual issues, this remains the case even when only a handful of actions are at issue. As this Panel stated in a decision on an MDL request to consolidate four actions, "common factual issues . . . at the core of the four cases [ ] before the Panel" meant "[d]iscovery among these actions regarding defendants' corporate policies therefore will overlap," justifying centralization.[55] Consolidation in one forum will allow efficient resolution of the common core factual issues regarding, among others, Ackerman's billing practices, Wayne LaPierre's alleged personal expenses, the NRA's legal expenditures and the NRA board's oversight of these issues.

**D. Transfer to the Northern District of Texas Would Best Serve the Goals of 28 U.S.C. § 1407.**

Although centralization in any of the four district courts in which the Actions are currently pending would be permissible under 28 U.S.C. § 1407, the NRA respectfully suggests that transfer

---

[53] *See In re Metoprolol Succinate Patent Litig.*, 329 F. Supp. 2d 1368, 1369-70 (J.P.M.L. 2004) (potential for future tag-along actions weighed in favor of centralization).

[54] *In re Treasury Sec. Auction Antitrust Litig.*, 148 F. Supp. 3d 1360, 1362 (J.P.M.L. 2015); *see also* Manual for Complex Litigation (Fourth) § 20.131 (2010) at 219-21 (citing *In re Plumbing Fixture Cases*, 298 F. Supp. 484 (J.P.M.L. 1968)).

[55] *In re Wells Fargo Wage and Hour Emp't Practices Litig. (No. III)*, 804 F. Supp. 2d 1382, 1384 (J.P.M.L. 2011); *see also In re MI Windows & Doors, Inc., Prod. Liab. Litig.*, 857 F. Supp. 2d 1374, 1375 (J.P.M.L. 2012) (consolidating five actions); *In re Radioshack Corp. "ERISA" Litig.*, 528 F. Supp. 2d 1348, 1349 (J.P.M.L. 2007) (consolidating four cases).

14

to the Northern District of Texas would best serve the goals of 28 U.S.C. § 1407. While the Panel uses "no single factor" to select the transferee district, it does consider, among other things, "where the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges."[56]

These factors weigh strongly in favor of a Texas forum. Two of the four Actions—the Ackerman Litigation, and the Stinchfield Litigation—are already pending in the Northern District of Texas. Moreover, these are the most advanced of the four Actions: discovery has already begun in both the Ackerman Litigation and Stinchfield Litigation, whereas the Dell'Aquila Litigation and NYAG Litigation are still at the preliminary motion-practice stage. Many of the NRA's meetings with Ackerman, including those which underlay an aborted real-estate purchase that figures prominently in the NYAG Litigation, occurred in Dallas, Texas. Other Ackerman-related documents and witnesses are clustered in the vicinity of Ackerman's headquarters in nearby Oklahoma City, Oklahoma, and the company's other flagship office in Dallas.[57] Moreover, based on the progress of discovery thus far, Magistrate Judge Toliver, who has been overseeing discovery in the Ackerman Litigation, has demonstrated the requisite skill and experience to handle discovery in these consolidated matters.[58] Judge Toliver has decided hundreds of discovery-related motions during her time on the bench and is already familiar with the complicated facts common to all four Actions.

---

[56] Manual for Complex Litigation, Fourth § 20.131 (2010).

[57] Collins Decl. ¶ 9.

[58] Collins Decl. ¶ 9.

15

The Panel has often considered the location of witnesses and documents to be a compelling, if not overriding, factor in determining the most convenient location for centralization.[59] Many of the Ackerman witnesses are located in Texas or in Oklahoma.

## **CONCLUSION**

For the foregoing reasons, the NRA respectfully requests that this Panel enter an order transferring all of the Actions set forth in the Schedule of Actions, and any actions subsequently filed against the NRA involving the same common issues of fact, to the Northern District of Texas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.

---

[59] *See, e.g., In re Hard Disk Drive Suspension Assemblies Antitrust Litig*., 396 F. Supp. 3d 1374, 1375 (J.P.M.L. 2019) (Northern District of California "is an appropriate transferee forum" because "common documents and witnesses likely will be located in this district"); *In re Ford Motor Co. F-150 and Ranger Truck Fuel Economy Mktg. and Sales Pracs. Litig*., 412 F. Supp. 3d 1355, 1356 (J.P.M.L. 2019) (Eastern District of Michigan was an "appropriate transferee forum" where "Ford, the sole defendant in all actions, has its headquarters in this district, and thus relevant documents and witnesses will be located in this district"); *In re Delphi Corp. Sec., Derivative & "Erisa" Litig*., 403 F. Supp. 2d 1358, 1360 (J.P.M.L. 2005) (selecting district with "a significant nexus to the litigation" because "[t]his district is where many relevant documents and witnesses are likely to be found, inasmuch as [defendant's] principal place of business is located there.").

16

Dated: October 20, 2020

Respectfully submitted,

By:  /s/  *Sarah B. Rogers*
    William A. Brewer III
    wab@brewerattorneys.com
    Sarah B. Rogers
    sbr@brewerattorneys.com

**BREWER, ATTORNEYS & COUNSELORS**
750 Lexington Avenue, 14th Floor
New York, New York 10022
Telephone: (212) 489-1400
Facsimile: (212) 751-2849

**ATTORNEYS FOR MOVANT**
**THE NATIONAL RIFLE ASSOCIATION**

17

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**MDL-_____-- In re NRA Business Expenditures Litigation**

**SCHEDULE OF ACTIONS**

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiffs:**<br>David Dell'Aquila<br>Lorannda Borja<br>Todd Chesney<br>Brent Weber<br><br>**Defendants:**<br>Wayne LaPierre (dismissed)<br>The National Rifle Association of America<br>The NRA Foundation, Inc. (dismissed) | M.D. Tn | 3:19-cv-00679 | William L. Campbell, Jr., referred to Magistrate Judge Jeffery S. Frensley |
| **Plaintiffs:**<br>The National Rifle Association of America<br><br>**Defendants:**<br>Letitia James, New York Attorney General | N.D.N.Y. | 1:20-cv-00889 | Mae A. D'Agostino, referred to Magistrate Judge Therese Wiley Dancks |
| **Plaintiffs:**<br>The National Rifle Association of America<br><br>**Defendants:**<br>Ackerman McQueen Inc.<br>Mercury Group Inc.<br>Henry Martin<br>Jesse Greenberg<br>William Winkler<br>Melanie Montgomery | N.D. Tx. | 3:19−cv−02074−G | A. Joe Fish, referred to Magistrate Judge Renee Harris Toliver |
| **Plaintiff:**<br>Ackerman McQueen Inc.<br><br>**Defendant:**<br>Grant Stinchfield | N.D. Tx. | 3:19-cv-03016-X | Brantley Starr, referred to Magistrate Judge David L. Horan |

**DECLARATION OF SARAH B. ROGERS IN SUPPORT OF THE NATIONAL RIFLE
ASSOCIATION'S MOTION TO TRANSFER CASES FOR CONSOLIDATED
<u>PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407</u>**

I, Sarah B. Rogers, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.　　　I am over twenty-one years of age, and fully competent to make this declaration. I am a partner with the law firm of Brewer, Attorneys & Counselors ("<u>BAC</u>"), 750 Lexington Avenue, 14th Floor, New York, New York 10022.  I am counsel for the National Rifle Association of America (the "<u>NRA</u>") in the matters captioned <u>People v. Nat'l Rifle Ass'n of Am., et al.</u>, Index No. 451625/2020 (Sup. Ct. N.Y. Cnty.) (the "<u>NYAG State Action</u>") and <u>Nat'l Rifle Ass'n of Am. v. James</u>, Civ. No. 1:20-cv-00889 (N.D.N.Y.) (the "<u>NYAG Federal Action</u>" and, collectively with the NYAG State Action, the "<u>NYAG Litigation</u>"). I respectfully submit this declaration in support of the NRA's Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 (the "<u>Consolidation Motion</u>"). Unless otherwise stated, I have personal knowledge of all matters stated herein.

2.　　　In addition to the NYAG Litigation, BAC represents the NRA in the matters captioned <u>Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al.</u>, Civ. Case No. 3-19-cv-02074-G (N.D. Tex.) (the "<u>Ackerman Litigation</u>"), and <u>Dell'Aquila v. LaPierre et al.</u>, Civ. Case No. 3:19-cv-00679 (M.D. Tn.) (the "<u>Dell'Aquila Litigation</u>"), and represents Grant Stinchfield in <u>Ackerman McQueen, Inc. v. Grant Stinchfield</u>, Civ. Case No. 3:19-cv-03016-X (N.D. Tex.) (the "<u>Stinchfield Litigation</u>" and, collectively with the Ackerman Litigation and the Dell'Aquila Litigation, the "<u>Other NRA-Related Federal Actions</u>").

3.     Attached as Exhibit A hereto is true and correct copy of the Amended Verified Complaint filed August 10, 2020, in the NYAG State Action, which is the operative pleading setting forth the government's claims therein.

4.     Attached hereto as Exhibit B is a true and correct copy of the Amended Complaint filed October 09, 2020, in the NYAG Federal Action, which is the operative pleading setting forth the NRA's claims therein.

5.     Attached hereto as Exhibit C is a true and correct copy of the current docket summary for the NYAG State Action, generated via NYSCEF.  Attached hereto as Exhibit D is a true and correct copy of the docket summary for the NYAG Federal Action, generated via PACER/ECF.

6.     Significant issues of fact in the NYAG Litigation include: the NRA's dealings with its former public relations agency, Ackerman McQueen, Inc. ("Ackerman");[1] including knowledge and intent on the part of NRA executives regarding Ackerman's activities and billing;[2] the NRA's stewardship of its finances;[3] the veracity of allegations of misspending by former NRA fiduciaries, including Lt. Col. Oliver North;[4] and, fees incurred by other NRA vendors and professionals.[5]

7.     During 2019-2020, before the commencement of the NYAG Litigation, the New York State Office of the Attorney General (the "NYAG") issued multiple document subpoenas to

---

[1] *See* Ex. B ¶¶ 15, 22; Ex. A ¶¶ 183, 208-215 (regarding an aborted real-estate purchase in Dallas, Texas allegedly orchestrated by or through Ackerman), 249, 266, 297-326.

[2] *See* Ex. B ¶ 15; Ex. A ¶¶ 325, 318-321 (alleging that expenses incurred by Ackerman and its subsidiary, Mercury Group, Inc., were "direct[ed]" or requested by NRA CEO Wayne LaPierre).

[3] *See* Ex. A ¶ 558.

[4] *See* Ex. A ¶¶ 444-471 (North is identified as "Dissident No. 1").

[5] *See* Ex. A ¶¶ 454, 457.

the NRA. Documents produced by the NRA in response to those subpoenas are cited by the NYAG in the NYAG State Action, and it is my expectation that they will constitute (albeit only a portion of) relevant discovery in the NYAG Litigation. Such documents are voluminous, exceeding 88,000 pages. It is my expectation that significant additional discovery will take place as the NYAG Litigation proceeds. Among other things, the 88,000+ documents produced to date fail to encompass any discovery conducted by, or for the benefit of, the NRA. The NRA has identified numerous third parties likely to possess documents and knowledge relevant to the NYAG Litigation. A list of these potential witnesses appears in the first column of Exhibit E to this declaration (discussed below).

8. Discovery in the NYAG Litigation is expected to overlap considerably with discovery in the Other NRA-Related Federal Actions. Indeed, during the NYAG investigation that preceded the NYAG Litigation, this overlap frequently created complications, since documents responsive to NYAG subpoenas were subject to protective orders in the Ackerman litigation or related, predecessor state-court litigation.

9. Attached as Exhibit E to this declaration is a chart that identifies witnesses likely to possess documents or knowledge relevant to the NYAG Litigation, the Ackerman Litigation, the Dell'Aquila Litigation and/or the Stinchfield Litigation. The chart also indicates a location for each witness, as determined by BAC based on available records.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of October 2020 in New York, New York.

/s/ *Sarah  B. Rogers*
Sarah B. Rogers

# **EXHIBIT A**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF
THE STATE OF NEW YORK,

                           Plaintiff,

           v.

THE NATIONAL RIFLE ASSOCIATION OF
AMERICA, INC., WAYNE LAPIERRE,
WILSON PHILLIPS, JOHN FRAZER, and
JOSHUA POWELL,

                          Defendants.

---

Index No.

# Summons

Date Index No. Purchased:
August 6, 2020

TO THE ABOVE NAMED DEFENDANTS:

      You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

      The basis of venue pursuant to CPLR § 503(a) is that Plaintiff is located in New York County, with its address at 28 Liberty Street, New York, New York 10005, and because the office of defendant The National Rifle Association of America, Inc. is in New York County as set forth in its certificate of incorporation, pursuant to N-PCL §§ 1110 and 102(a)(11).

Dated: New York, New York
       August 6, 2020

                       LETITIA JAMES
                       Attorney General of the State of New York
                       *Attorney for Plaintiff*

                       By:
                       James Sheehan
                       Charities Bureau Chief
                       28 Liberty Street
                       New York, New York 10005
                       Tel. (212) 416-8401

THE NATIONAL RIFLE ASSOCIATION OF AMERICA, INC.
11250 Waples Mill Road
Fairfax, Virginia 22030


WAYNE LAPIERRE
c/o The National Rifle Association of America, Inc.
11250 Waples Mill Road
Fairfax, Virginia 22030


WILSON PHILLIPS
*Address withheld for privacy reasons


JOHN FRAZER
c/o The National Rifle Association of America, Inc.
11250 Waples Mill Road
Fairfax, Virginia 22030


JOSHUA POWELL
*Address withheld for privacy reasons

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK, BY
LETITIA JAMES, ATTORNEY GENERAL OF
THE STATE OF NEW YORK,

                                  Plaintiff,

                     v.

THE NATIONAL RIFLE ASSOCIATION OF
AMERICA, INC., WAYNE LAPIERRE,
WILSON PHILLIPS, JOHN FRAZER, and
JOSHUA POWELL

                              Defendants.

Index No.

**Verified Complaint**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

PART ONE - THE PARTIES .................................................................................................6

PART TWO - JURISDICTION AND VENUE.........................................................................8

PART THREE - APPLICABLE LAW.....................................................................................9

I.  Attorney General's Statutory Authority to Bring Actions to Dissolve Not-for-Profit Corporations, to Remove Board Members, and to Seek an Accounting of Misspent Funds.......................................................................................................... 9

II. Legal Requirements for New York Not-for-Profit Corporations and their Officers, Directors and Key Persons................................................................................ 10

III. Registration and Reporting Requirements for New York Not-for-Profit Corporations ...... 13

IV. Legal Obligations Under the New York Prudent Management of Institutional  Funds Act............................................................................................................... 14

PART FOUR - THE NRA'S HISTORY AND INTERNAL GOVERNANCE...........................15

I.  The NRA's History .................................................................................. 15

II. The NRA's Internal Structure and Governance.................................................. 16

    A.  The NRA's Organizational Structure........................................................ 16

    B.  The NRA's Bylaws ................................................................................ 17

    C.  The NRA's Policy and Procedures on Hiring, Spending, Procurement, Travel Reimbursement, Conflicts of Interest, and Related Party Transactions .................... 25

PART FIVE - DEFENDANTS' VIOLATIONS OF NEW YORK LAW....................................34

I.  Widespread Violations of Law of the NRA's Senior Management under the Leadership and Direction of Wayne LaPierre ...................................................... 34

    A.  LaPierre's Improper Spending and Expensing ......................................... 35

    B.  Wilson "Woody" Phillips's Conflicts of Interest, Related Party Transactions, and Self-Dealing ........................................................................................ 52

    C.  Joshua Powell's Conflicts of Interest, Related Party Transactions, and Negligence.. 58

    D.  John Frazer's Negligence and Certifications of False or Misleading Annual Filings 65

    E.  Improper Expenditures by LaPierre's Senior Assistant and Direct Report ............... 68

II. The NRA's Use of Longtime Vendors and Consulting Agreements to Hide Improper Expenditures, Self-Dealing, and Related Party Transactions ............................................ 71

    A.  Ackerman McQueen and Mercury Group ................................................ 71

    B.  Consulting Agreements with Former Employees ....................................... 80

    C.  Related Party Transactions with Board Members .................................... 86

III. The Individual Defendants Received Excessive Compensation that the NRA Did Not Accurately Disclose ................................................................................. 93

i

A.    The NRA Board Failed to Follow an Appropriate Process to Determine Reasonable Compensation for NRA Executives ................................................................... 93

B.    The Officers Compensation Committee and the NRA Board Failed to Consider or Approve LaPierre's and Phillips's Complete Compensation Prior to Making Compensation Determinations ..................................................................... 98

C.    LaPierre Failed to Properly Determine Powell's Compensation ............................. 101

D.    The NRA's Compensation Disclosures to the Attorney General and the Internal Revenue Service Were False or Misleading ............................................. 102

IV.    The NRA's Retaliation Against Dissidents on the Board ................................................. 106

A.    Dissident No. 1 .................................................................................................... 106

B.    Dissident Board Members .................................................................................. 113

V.    The NRA Board's Failures Resulting in Violations of Law ............................................... 114

A.    Audit Committee's Failure to Respond Adequately to Whistleblowers .................. 116

B.    Audit Committee's Failure to Appropriately Review and Approve Related Party Transactions and Conflicts of Interest ...................................................... 119

C.    Audit Committee's Failure to Oversee Adequately the External Auditors ............. 125

D.    The Audit Committee Acted *Ultra Vires* in Indemnifying Officers, Directors, and Employees ....................................................................................................... 128

VI.    The NRA's Failure to Institute an Effective Compliance Program .................................. 129

VII.    The NRA's False Regulatory Filings ................................................................................. 131

VIII.    The NRA's Violation of its Duties under the New York Prudent Management of Institutional Funds Act ................................................................................................ 135

CAUSES OF ACTION ................................................................................................................. 138

PRAYER FOR RELIEF ............................................................................................................... 161

VERIFICATION ........................................................................................................................... 164

ii

The People of the State of New York, by their attorney, Letitia James, Attorney General of the State of New York, respectfully allege as follows:

## PRELIMINARY STATEMENT

1.      For 149 years, the National Rifle Association of America, Inc. (the "NRA" or the "Association") has operated as a New York not-for-profit, charitable membership corporation. As a New York charity, the NRA is legally required to serve the interests of its membership and advance its charitable mission.

2.      For nearly three decades, Wayne LaPierre has served as the chief executive officer of the NRA and has exploited the organization for his financial benefit, and the benefit of a close circle of NRA staff, board members, and vendors. Contrary to his statutory duties of care, loyalty and obedience to the mission of the charity, LaPierre has undertaken a series of actions to consolidate his position; to exploit that position for his personal benefit and that of his family; to continue, by use of a secret "poison pill contract," his employment even after removal and ensuring NRA income for life; and to intimidate, punish, and expel anyone at a senior level who raised concerns about his conduct. The effect has been to divert millions of dollars away from the charitable mission, imposing substantial reductions in its expenditures for core program services, including gun safety, education, training, member services and public affairs. During the period 2015 to 2018, the NRA has reported a reduction in unrestricted net assets by $63 million.

3.      In his role as Executive Vice President, LaPierre has significant discretion and authority in hiring, promoting, and retaining NRA employees, in nominating directors to the NRA Board, and in contracting with vendors. LaPierre has a fiduciary obligation to exercise that discretion and authority in the best interests of the organization. Instead, LaPierre often hired and retained individuals in senior positions at the NRA, or as NRA contractors, whom he believed

1

would aid and enable him to control the organization, regardless of their skills, experience, integrity or contribution to the charitable mission.

4.     Among the senior executives that LaPierre handpicked to facilitate his misuse of charitable assets were Defendants Wilson "Woody" Phillips, Joshua Powell, and John Frazer (together with LaPierre, the "Individual Defendants"). LaPierre hired and retained each of them despite their lack of skills or experience for their respective roles and responsibilities. Despite their lack of experience, LaPierre entrusted them with substantial authority for managing and administering the NRA's charitable assets and bearing responsibility for the NRA's legal compliance. In accordance with the NRA bylaws, each of them was under LaPierre's authority and within the scope of his responsibility. Like LaPierre, each of them regularly ignored, overrode or otherwise violated the bylaws and internal policies and procedures that they were charged with enforcing. As a result of these repeated violations, charitable assets were diverted to benefit NRA insiders and favored vendors.

5.     At LaPierre's direction, Phillips, the former Treasurer and Chief Financial Officer, instituted a practice whereby millions of dollars in entertainment and travel expenses incurred by NRA executives were billed to the NRA as disbursements by the NRA's largest vendor. This practice evaded both the NRA's own accounting and Board-established expense reimbursement process, and IRS requirements for proper expense reimbursement. LaPierre, Phillips, and Powell regularly used this pass-through arrangement to conceal private travel and other costs that were largely personal in nature, wasting substantial charitable resources and exposing the NRA to millions of dollars of potential liability for violation of IRS reporting requirements.

6.     Powell, Chief of Staff and the Executive Vice President of Operations, was given pay increases, at LaPierre's direction, that nearly tripled his salary in a less than three years, despite

2

complaints of abusive behavior, and evidence of illegal conduct and inappropriate spending. Within a year after LaPierre designated Powell to lead the NRA's compliance program, he was fired for falsifying his travel expenses.

7.      LaPierre's choice as General Counsel, Frazer, had only a brief 18-month tenure in private practice and was unprepared to manage the legal and regulatory affairs of the NRA. Frazer also serves as the corporation's Secretary but has little apparent knowledge of the requirements of New York law governing not-for-profit corporations. For example, Frazer repeatedly failed to ensure that the NRA's many related party transactions with NRA insiders were being reviewed or properly considered by NRA officers and directors in accordance with New York law. He also failed to maintain and enforce whistleblower and conflict of interest policies that met the requirements of applicable law.

8.      With the assistance of Phillips, Powell and Frazer, LaPierre abused his position as a fiduciary to the NRA to obtain millions of dollars in personal benefits in the form of undisclosed, excessive compensation, which includes in-kind benefits and reimbursements from the NRA and its vendors. For example,

    a.  LaPierre has spent millions of dollars of the NRA's charitable assets for private plane trips for himself and his family, including trips for his family when he was not present.

    b.  In the last five years, LaPierre and his family have visited the Bahamas by private air charter on at least eight occasions, at a cost of more than $500,000 to the NRA. On many of those trips, LaPierre and his family were gifted the use of a 107-foot yacht owned by an NRA vendor.

    c.  LaPierre received hundreds of thousands of dollars in gifts from another NRA vendor in the form of complimentary safaris in Africa and other world-wide locations for himself and his spouse.

9.      LaPierre, with the aid of Phillips, Powell and Frazer, procured personal financial benefits for board members, vendors and even former employees. In doing so, they violated NRA

3

policy on contracting and business ethics, as well as legal mandates on conflicts of interest, related party transactions, and prohibitions on *ex gratia* payments. For instance, LaPierre and Phillips entered into post-employment agreements with departing officers and employees that provided excessive payments in exchange for little, if any, services and non-disclosure/non-disparagement agreements. Powell secured contracts that benefited his family members without disclosure of his familial relationship. And Frazer permitted the NRA to secretly pay millions of dollars to several board members through consulting arrangements that were neither disclosed to, nor approved by, the NRA Board.

10.     Efforts to question or challenge LaPierre's leadership were quashed or ignored. LaPierre retaliated against the NRA President after personally lobbying him to take on the position. LaPierre withdrew his critical support after the President began to independently assess the governance of the NRA upon learning of complaints by whistleblowers, senior staff and donors. Senior members of the NRA's financial staff jointly made a formal whistleblower complaint to the Audit Committee of the NRA Board in 2018 itemizing numerous practices that abused NRA assets. Employees also complained about Powell's practices and behavior, which LaPierre, himself, described as "abusive." But these complaints were never properly investigated or meaningfully addressed. Defendants failed to comply with, maintain, and ensure compliance with whistleblower policies consistent with New York law and permitted or personally retaliated against those who questioned their wrongdoing.

11.     As a result of these failures, the NRA, at the direction of the Individual Defendants and with a series of failures of required oversight by its Board, has persistently engaged in illegal and unauthorized activities in the conduct and transaction of its business. Individual Defendants— in their roles as officers and directors—routinely circumvented internal controls; condoned or

4

partook in expenditures that were an inappropriate and wasteful use of charitable assets; and concealed or misreported relevant information, rendering the NRA's annual reports filed with the Attorney General materially false and misleading. Defendants abdicated all responsibility for ensuring that the NRA's assets were managed prudently and in good faith.

12. As a result of these persistent violations of law by the Defendants, the Attorney General seeks a finding by this Court that the NRA is liable to be dissolved pursuant to (a) N-PCL § 1101(a)(2) based upon the NRA's pattern of conducting its business in a persistently fraudulent or illegal manner, abusing its powers contrary to public policy of New York and its tax exempt status, and failing to provide for the proper administration of its trust assets and institutional funds; and/or (b) N-PCL § 1102(a)(2) because directors or members in control of the NRA have looted or wasted the corporation assets, have operated the NRA solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner. The Attorney General requests that this Court determine, in the exercise of its discretion under Section 1109(b)(1) of the N-PCL, that the interest of the public and the members of the NRA supports a decision to dissolve the NRA.

13. The Attorney General also seeks an order, pursuant to the Not-for-Profit Corporation Law ("N-PCL"), Estates Powers & Trusts Law ("EPTL"), and Executive Law ("Exec. Law") (i) directing the Individual Defendants to account, make restitution and pay all penalties resulting from the breach of fiduciary duties and their misuse of charitable assets for their own benefit and interests; (ii) removing LaPierre for cause as a director and as Executive Vice President of the NRA; (iii) removing Frazer for cause as a director and Secretary of the NRA; (iv) enjoining the Individual Defendants from future service as an officer, director or trustee, or in any other capacity as a fiduciary of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York, or which solicits charitable donations in the State

of New York, or which holds charitable assets in New York; (v) rescinding related party transactions by the Defendants and directing the Individual Defendants to account for their profits and to pay the NRA up to double the value of each benefit improperly bestowed by such transactions; (vi) directing the NRA to account for its official conduct with respect to management of the NRA's institutional funds; and (vii) ordering restitution from the Individual Defendant to recover illegal, unauthorized or *ultra vires* compensation, reimbursements, benefits or amounts unjustly paid to the Individual Defendants.

## PART ONE - THE PARTIES

14.     The Attorney General is responsible for overseeing the activities of New York not-for-profit corporations and the conduct of their officers and directors, in accordance with the N-PCL, the EPTL, the New York Prudent Management of Institutional Funds Act ("NYPMIFA"), and the New York Executive Law.

15.     The National Rifle Association of America, Inc. is a charitable not-for-profit corporation chartered by a special act of the State of New York Legislature on November 17, 1871. Throughout its history, it has been legally domiciled in the State of New York and is subject to New York law in the governance of its internal affairs. The NRA has members and engages in fundraising throughout the United States, including in New York, where it is registered with the Charities Bureau of the Office of the Attorney General to conduct business and solicit donations.

16.     The NRA's principal place of business is at 11250 Waples Mill Road, Fairfax, Virginia 22030. The NRA is recognized as tax-exempt under Section 501(c)(4) of the Internal Revenue Code.

17.     As set forth in its bylaws, the NRA's stated mission is comprised of five purposes and objectives:

6

a. "To protect and defend the Constitution of the United States, especially with reference to the God-given inalienable right of the individual American citizen guaranteed by such Constitution to acquire, possess, collect, exhibit, transport, carry, transfer ownership of, and enjoy the right to use, keep and bear arms, in order that the people may exercise their individual rights of self-preservation and defense of family, person, and property, and to serve in the militia of all law-abiding men and women for the defense of the Republic and the individual liberty of the citizens of our communities, our states and our great nation;

b. To promote public safety, law and order, and the national defense;

c. To train members of law enforcement agencies, the armed forces, the National Guard, the militia, and people of good repute in marksmanship and in the safe handling and efficient use of small arms;

d. To foster, promote and support the shooting sports, including the advancement of amateur and junior competitions in marksmanship at the local, state, regional, national, international, and Olympic levels; and

e. To promote hunter safety, and to promote and defend hunting as a shooting sport, for subsistence, and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources."

18.    Defendant Wayne LaPierre is the Executive Vice President ("EVP") of the NRA and has held that position since the early 1990s. He acts as the Chief Executive Officer of the NRA. As EVP, LaPierre is responsible, pursuant to the NRA bylaws, Article V, Section 2(c), to "direct all of the affairs of the Association in accordance with the programs and policies established by the Board of Directors." Defendant LaPierre is and has been at all relevant times an *ex officio* member of the Board of Directors, and of the Executive Committee. LaPierre maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

19.    Defendant Joshua Powell was formerly and at all times relevant herein an officer, *de facto* officer or "key person" within the meaning of N-PCL § 102(a)(25), of the NRA and held the positions of Chief of Staff, Executive Director of General Operations, head of Compliance, and "Senior Strategist." As Executive Director of General Operations, Defendant Powell served

7

as an *ex officio* member of the Board of Directors. Defendant Powell's employment with the NRA was terminated in January 2020. Powell retains a residence in Michigan.

20.     Defendant Wilson "Woody" Phillips served as *ex officio* Director, Treasurer and Chief Financial Officer and key person of the NRA between 1993 and 2018, when he retired. Phillips maintains a residence in Texas.

21.     Defendant John Frazer has been the Secretary and General Counsel and *ex officio* director of the NRA since 2015 and has worked at the NRA since 1993. Frazer maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

## PART TWO - JURISDICTION AND VENUE

22.     The Attorney General brings this action on behalf of the People of the State of New York under the EPTL, the N-PCL, NYPMIFA, and the Executive Law.

23.     This Court has personal jurisdiction over the NRA because it is a New York not-for-profit corporation and has purposely availed itself of the opportunity to do business, solicit funds, recruit members and serve its charitable mission and beneficiaries in New York.

24.     This Court has personal jurisdiction over Defendants LaPierre, Powell, Phillips and Frazer pursuant to N-PCL § 309 because "by becoming a director, officer, key person or agent of a corporation [each Individual Defendant] is subject to the personal jurisdiction of the supreme court of the state of New York, and in an action or proceeding by the attorney general under [the N-PCL] the process may be served….as provided in [CPLR § 313]."

25.     This Court also has personal jurisdiction over the Individual Defendants pursuant to CPLR § 302(a). Each of the Individual Defendants, in their roles as officers, directors and key persons of the NRA, has transacted business within the state on behalf of a New York chartered corporation and purposefully availed themselves of the privileges and protections, and assumed the obligations, of New York law. Plaintiff's claims in this matter, as alleged herein against each

8

of the Individual Defendants, including for breach of their fiduciary duties to the NRA, waste of the NRA's charitable assets, participation in prohibited related party transactions, and causing false and materially misleading filings to be made in New York State, among others, arise out of the Individual Defendants' purposeful conduct and transaction of business in New York, and each of the Individual Defendants' conduct has caused harm in New York.

26.     Venue is properly set in New York County pursuant to (a) CPLR § 503 because the Attorney General has an office in the county; and (b) N-PCL §§ 1110 and 102(a)(11), because the office of the NRA is in New York County as set forth in the NRA's certificate of incorporation.

## PART THREE - APPLICABLE LAW

**I.     Attorney General's Statutory Authority to Bring Actions to Dissolve Not-for-Profit Corporations, to Remove Board Members, and to Seek an Accounting of Misspent Funds**

27.     The Attorney General has a wide range of supervisory powers over charitable corporations, and over the trustees of property held for charitable purposes, including over a not-for-profit corporation, such as the NRA, organized in New York as a charity. The NRA, as a 501(c)(4) corporation under the Internal Revenue Code, is a charity under the N-PCL, subject to the authority of the Attorney General. *Citizens United v. Schneiderman*, 882 F. 3d 374 (2d Cir. 2018)

28.     The Attorney General's regulatory oversight of charitable nonprofit corporations, and their officers, directors, and key persons, includes the authority to bring actions under Section 112 and Article 7 of the N-PCL, to dissolve a corporation, remove officers and directors, obtain relief as a result of prohibited related party transactions, ensure adequate protections for whistleblowers, to enforce any right given to members, or an officer or a director of a charitable corporation and, under Section 623(a) of the N-PCL, to bring a derivative action "in the right of a

domestic or foreign corporation" to procure a judgment in favor of the corporation and against officers, directors, or third parties.

29.     New York law further provides the Attorney General with authority over any "trustee" of any not-for-profit corporation organized under the laws of New York for charitable purposes. EPTL § 8-1.4. The Individual Defendants are each a trustee under New York law. The Attorney General has the legal authority "to institute appropriate proceedings...to secure the proper administration of any trust, corporation, or other relationship to which this section applies." EPTL § 8-1.4(m).

30.     In addition, the EPTL provides that the Attorney General is authorized to regulate and investigate trustees and the trustees' administration of property held for charitable purposes, and that authority "shall apply regardless of any contrary provisions of any instrument and shall be liberally construed so as to effectuate its general purposes of protecting the public interest in charitable uses, purposes, and dispositions." EPTL § 8-1.4(n).

## II.     Legal Requirements for New York Not-for-Profit Corporations and their Officers, Directors and Key Persons

31.     New York law sets forth the duties and powers of the NRA as a charitable not-for-profit corporation, and the duties, powers, and liabilities of the NRA's officers, directors, key persons, and members.

32.     The NRA's use of its assets and institutional funds, and the fiduciary duties of its officers and directors with respect to those assets and institutional funds are governed by the N-PCL and the EPTL. The governance and fiduciary duties of its officers and directors generally are governed by the N-PCL; oversight of its charitable assets is generally governed by the EPTL; and its fundraising activities by the Executive Law.

33.     Pursuant to N-PCL §§ 701, 713 and 714, a not-for-profit corporation "shall be managed by its board of directors," which has the power to elect officers and remove them, with or without cause.

34.     Pursuant to N-PCL § 717(a), directors, officers and key persons of not-for-profit entities such as the NRA are required to "discharge the duties of their respective positions in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances."

35.     In addition, N-PCL § 552 require directors and officers of a not-for-profit corporation such as the NRA to act with undivided loyalty to the corporation in the management and investment of the institutional funds of the corporation.

36.     Under N-PCL § 720, directors, officers, or key persons may be compelled to explain or be liable for the "neglect of, or failure to perform, or other violation of [ ] duties in the management and disposition of corporate assets committed to his charge" or "[t]he acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties."

37.     As a New York not-for-profit corporation, the NRA may only pay "compensation in a reasonable amount" to officers, directors, or members for services actually rendered. N-PCL § 515(a).

38.     As a New York not-for-profit corporation, the NRA is barred by law from paying dividends and from distributing "any part of its income or profit to its members, directors, or officers." N-PCL § 515(a). Such distributions exceed the authority conferred upon the NRA by law, is beyond the capacity or power of the NRA under the N-PCL, and could subject it to annulment or dissolution under Sections 112(a)(1) and 1101(a)(2) of the N-PCL.

11

39.     Under N-PCL § 715 and EPTL § 8-1.9, the NRA is prohibited from entering into any related party transaction unless the transaction is determined and documented by the Board or an authorized committee of the Board to be fair, reasonable, and in the corporation's best interest at the time of the determination in compliance with that section.

40.     In addition, every director, officer, trustee, or key employee who has an interest in a related party transaction must disclose in good faith to the Board or an authorized committee of the Board "the material facts concerning such interest," and the corporation must conduct a process before approving a related party transaction and document that process. N-PCL § 715; EPTL § 8-1.9.

41.     Similarly, the NRA's Board is required to adopt, implement and assure compliance with a conflict of interest policy that ensures that the NRA's trustees, directors, officers and key persons act in the corporation's best interest and comply with applicable legal requirements, including those concerning related party transactions. N-PCL § 715-a; EPTL § 8-1.9. The policy must provide for annual conflict of interest disclosures by trustees and directors, and procedures for the disclosure and determination of conflicts of interest, which must prevent the person with the conflict from influencing the determination. *Id.* The policy also imposes recordkeeping requirements on the existence and resolution of conflicts. *Id.*

42.     The NRA and its Board of Directors are also legally required to adopt, oversee and ensure compliance with a policy providing for an effective process to receive and consider whistleblower concerns and for protecting whistleblowers. N-PCL § 715-b; EPTL § 8-1.9. This policy must provide that no director, officer, trustee, employee or volunteer of a corporation who in good faith reports any action or suspected action taken by the corporation that is illegal, fraudulent, or in violation of any adopted policy of the corporation shall suffer, intimidation,

12

harassment, discrimination, or other retaliation. *Id.* The law further requires that a trustee, director, officer or employee be designated to administer the whistleblower policy and to report to the board or an authorized committee. *Id.*

### III. Registration and Reporting Requirements for New York Not-for-Profit Corporations

43. Under New York law, certain not-for-profit organizations, including the NRA, holding charitable assets and operating in New York must register and file accurate and complete reports with the Attorney General. *See* EPTL §§ 8-1.4(d) and (f). The Charities Bureau oversees that function on behalf of the Attorney General. In addition to these registration requirements, charitable organizations soliciting contributions in New York must also register and file accurate and complete annual reports under Article 7-A of the Executive Law. These annual reports, commonly referred to as CHAR500s, must include copies of an organization's annual information return, the IRS Form 990, and, for organizations like the NRA, copies of the organization's audited financial statements.

44. The annual reports filed with the Charities Bureau must also include the identities of the fundraisers with whom an entity contracts, as well as information about the services they provide and the compensation they receive.

45. CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures expressly certify, under penalties of perjury, that the report, including all attachments, is true and accurate.

46. Registration with the Charities Bureau enables the Attorney General to exercise her statutory oversight of not-for-profit entities that conduct activities, hold charitable assets, or solicit charitable contributions in New York. Registration is further required to ensure that any funds

entrusted to such organizations are properly administered and to discourage and prevent misuse of charitable assets and fraud.

47.     In addition, the Attorney General's registry serves as an important source to the public of information concerning not-for-profit organizations. The failure of an organization to file accurate reports impedes the Attorney General's exercise of her statutory authority to oversee such organizations and further deprives New Yorkers of access to truthful information about not-for-profits operating in this State.

48.     Pursuant to Executive Law § 172-d, no person shall "[m]ake any material statement which is untrue in…[a] financial report or any other forms or documents required to be filed" with the Attorney General's office pursuant to Executive Law, Article 7-A.

49.     Pursuant to Executive Law § 175(2), the Attorney General is authorized to bring an action against a charitable organization or any other persons acting for or on its behalf, to, in relevant part, "enjoin such organization and/or persons from continuing the solicitation or collection of funds," whenever "the [A]ttorney [G]eneral shall have reason to believe that the charitable organization or other person has made a material false statement in an application, registration or statement required to be filed pursuant to this article."

## IV.  Legal Obligations Under the New York Prudent Management of Institutional Funds Act

50.     Article 5-a of the N-PCL, NYPMIFA establishes the standard of conduct applicable to the NRA in managing and investing an institutional fund. The NRA is an "institution" as that term is used in NYPMIFA, which holds and manages "institutional funds" as that term is used in NYPMIFA. N-PCL § 551(d) & (e).

51.     Under NYPMIFA, the obligations of the NRA are also imposed upon the governing Board of Directors of the NRA.

14

52.     In managing institutional funds, pursuant to NYPMIFA, the NRA, through its directors and officers, (a) must, subject to the intent of a donor expressed in a gift instrument, consider the purposes of the NRA and the purposes of its institutional funds; and (b) shall manage institutional funds "in good faith and with care an ordinarily prudent person in a like position would exercise under similar circumstances. N-PCL § 552. Each person responsible for the management of institutional funds also has a duty of loyalty to the mission of the corporation, imposed by law. *Id.*

53.     In managing institutional funds, under NYPMIFA, the NRA and the governing Board shall make a reasonable effort to verify facts relevant to management of the fund.

54.     The "institutional funds" of the NRA include investments, cash balances, funds derived from pledging NRA assets or credit, income derived from rents to third parties, and funds held by or paid out to vendors. "Institutional funds" also include funds in the hands of third parties in which the NRA has a valid claim, such as improper payments of personal expenses, funds diverted from the NRA, and funds paid *ultra vires*.

## **PART FOUR - THE NRA'S HISTORY AND INTERNAL GOVERNANCE**

### I.     The NRA's History

55.     The NRA was founded in 1871, immediately following the Civil War "to promote the introduction of a system of army drill and rifle practice, as part of the military drill of the National Guard of this and other states, and for those purposes to provide a suitable range…In the vicinity of the City of New York."

56.     In addition to creating the NRA's corporate existence by a special act, the New York Legislature provided a grant to the NRA of $25,000 of public funds for purchase in 1872 of the Creed farm in Queens County, New York, later known as Creedmoor, as a rifle range for the NRA and the New York National Guard.

15

57.     Over the course of 149 years, the NRA established itself as one of the largest, and oldest, social-welfare charitable organizations in the country. The NRA is exempt from federal and certain state taxation pursuant to Section 501(c)(4) of the Internal Revenue Code and New York law. This tax exemption is conditioned upon compliance with certain statutory requirements. As relevant here, the NRA, as a 501(c)(4) organization, cannot be organized for profit; must be operated exclusively or primarily to further the common good and general welfare of the community; and cannot permit its income to inure to the benefit of any private individual. 26 U.S.C § 501(c)(4).

58.     The NRA has four affiliated tax-exempt charitable organizations that were set up under Section 501(c)(3) of the Internal Revenue Code: the NRA Foundation, the Civil Rights Defense Fund, the Freedom Action Foundation, and the Special Contribution Fund. As 501(c)(3) organizations, each of these affiliated entities must be organized and operated exclusively for charitable purposes and must refrain from engaging in political activities. 26 USC § 501(c)(3). The NRA also has a political action committee, the Political Victory Fund, which contributes money to political candidates.

59.     The NRA's history as an organization is well documented and need not be recited here. For purposes of this complaint, the focus is on the governance of the organization under the leadership of Wayne LaPierre, who over the course of his nearly 30-year tenure as the chief executive of the organization, has consolidated his power and control over the organization.

## II.     The NRA's Internal Structure and Governance

### A.  The NRA's Organizational Structure

60.     The NRA is comprised of several divisions, all of which are overseen by the Executive Vice President. The NRA divisions are: (a) Membership; (b) Affinity and Licensing Programs; (c) Information Services; (d) Publications; (e) Public Affairs; (f) Advancement;

16

(g) Office of the Treasurer; (h) Institute for Legislative Action ("NRA-ILA"); (i) General Operations; (j) Office of the General Counsel, and (k) Human Resources.

61.     NRA-ILA has "sole responsibility to administer the legislative, legal, informational and fundraising activities of the Association relating to the defense or furtherance of the right to keep and bear arms." Funds donated to or designated to be used by NRA-ILA are kept separate from the NRA's General Operations accounts. NRA-ILA is prohibited from making contributions to political campaigns, candidates, and political committees.

**B. The NRA's Bylaws**

62.     Not-for-profit corporations in New York may adopt bylaws under the N-PCL. N-PCL § 602. Bylaws govern the internal affairs of the corporation. For membership organizations like the NRA, bylaws are both a contract between the organization and its members, and among the members themselves. Once properly adopted, bylaws carry the force of law with respect to the corporation's internal affairs. Officers and directors have a legal duty to adhere to a corporation's bylaws. Failure to do so constitutes a breach of the fiduciary duties owed to the corporation and the corporation's members and violates New York law. N-PCL § 717,

63.     Under its bylaws, the NRA has established the following governance structure. The description below is current with the bylaws, as amended, adopted by the NRA Board in September 2019 and annexed as Exhibit 1 to this complaint. The provisions of the bylaws are materially the same from the period of 2014 to 2019, unless otherwise indicated:

**i. Board of Directors**

64.     In accordance with the N-PCL § 701 and the NRA's certificate of incorporation, the NRA is managed by a Board of Directors comprised of 76 directors, 75 of whom are elected for three-year terms, and one of whom is elected for a one-year term at the annual meeting of NRA

members. The Board "shall formulate the policies and govern and have general oversight of the affairs and property of the Association."

65.     The NRA bylaws provide that "[n]o director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof, but all such persons shall be entitled to reimbursement for expenses incurred on behalf of the [NRA]."

### ii.  NRA Officers

66.     The NRA's bylaws establish a leadership structure consisting of eight officers: a President, two Vice Presidents, an Executive Vice President, a Secretary, a Treasurer, and an Executive Director each of General Operations and NRA-ILA. With the exception of the two Executive Directors, the officers are elected annually by the Board.

67.     The Executive Vice President, the Secretary, the Treasurer, the Executive Director of General Operations, and the Executive Director of NRA-ILA are *ex officio* members, with voice but without vote, on all Board committees, except for the Nominating Committee, the Committee on Hearings, the Officers Compensation Committee, and the Committee on Elections.

68.     Officers must "conduct the affairs of their organization…in accordance with their organization bylaws, and such programs and regulations … adopted by the organization." Officers must also "maintain proper records and shall properly render such reports concerning membership, finances, facilities, and activities as may be requested … by the NRA."

### a.     Executive Vice President

69.     The Executive Vice President is functionally the chief executive of the NRA and is elected annually by the NRA Board. The bylaws provide that the Executive Vice President "shall direct all the affairs of the Association in accordance with the programs and policies established by the Board of Directors." The Executive Vice President is empowered to appoint, suspend, or

remove the Executive Directors of General Operations and NRA-ILA; to suspend with pay the Secretary or Treasurer; and to employ, suspend, or dismiss any employee. The Executive Vice President is an *ex officio* member, but without voting power, of the NRA Board and its Committees except for the Nominating Committee, the Committee on Hearings, the Officers Compensation Committee, and the Committee on Elections.

70.     In 2016, the NRA bylaws were amended to expressly provide the Executive Vice President with the authority to set the compensation for the Executive Directors of General Operations and NRA-ILA. Before 2016, there was no explicit statement regarding the Executive Director compensation in the bylaws.

71.     Wayne LaPierre has been the Executive Vice President since he was elected by the Board of Directors to that position in the early 1990s. He has been with the NRA since 1978, where he started with NRA-ILA, the NRA's lobbying arm. LaPierre started out as a state liaison and was subsequently promoted to be NRA-ILA's Director of State & Local Affairs and then its Director of Federal Affairs. In 1986, LaPierre became the Executive Director of NRA-ILA.

72.     In his almost thirty years of leadership, LaPierre has established himself as the individual who is responsible for the affairs of the NRA at every level. Among other responsibilities, LaPierre oversees the charitable assets that the NRA is responsible for managing, in accordance with New York law. On its most recent audited financial statement, the NRA reported responsibility for $197,212,080 in total assets as of December 31, 2018, which, as a New York charity, it is required to use to serve the interests of its membership and to advance its charitable mission.

**b.     President**

73.     The President is an *ex officio* member, with voting power, of the NRA Board and its Committees with the exception of the Nominating Committee, the Committee on Hearings, and

19

the Committee on Elections. The President is empowered, with some exceptions, to appoint members of all of the NRA Board's standing and special committees, and to "establish such special committees…as may be deemed necessary." The President also serves as the Chair of the Officers Compensation Committee, which determines, on an annual basis, the compensations of the Executive Vice President, Secretary, and Treasurer.

74.     The President is also responsible for designating members of the Committee on Elections.

75.     The President serves in an unpaid capacity and has responsibility for oversight of the NRA management, including the Executive Vice President, who manages the day-to-day affairs of the organization.

### c.     Vice Presidents

76.     The NRA's Vice Presidents perform the President's duties in his or her absence or at the request of the President, and, in the event that the Presidency is vacant for whatever reason, the First Vice President takes the Presidency until the next election. The Vice Presidents also serve as *ex officio* members, with voting power, of all committees except the Nominating Committee, the Committee on Hearings, and the Committee on Elections.

### d.     Treasurer / Secretary / Executive Directors

77.     The Treasurer is an *ex officio* member of the NRA Board, and "operate[s] in accordance with the financial policies set forth by the Board of Directors or the Executive Committee, and shall have charge of the books of account and financial operations of the [NRA]." The Treasurer is obligated to regularly report to the NRA Board, Finance Committee, Executive Vice President, and Executive Committee on the financial affairs of the NRA and must also assist the NRA's external auditor with the annual audit. The Treasurer is also required to perform an

20

internal audit of the NRA-ILA once per year and report on its financial condition. Defendant Phillips served as the Treasurer until 2018.

78.     The Secretary is elected by the Board annually and serves under the Executive Vice President. The Secretary is an *ex officio* member of the NRA Board, tasked with having "charge of the archives" of the NRA and attending "to the proper publication of official notices and reports," and also serves as the secretary of the NRA Board's Executive Committee, Nominating Committee, and Committee on Elections. Defendant Frazer has served as the Secretary since 2015.

79.     The Executive Director of General Operations is under the supervision of the Executive Vice President and has "such powers and duties as delegated to him from time to time by the Executive Vice President."

80.     The Executive Director of NRA-ILA is charged with conducting the "legislative, legal, informational, fund raising activities, operational, administrative and financial affairs" of the NRA-ILA under the direction of the Executive Vice President and in accordance with the programs and policies established by the Board. The Executive Director of NRA-ILA also is charged with appointing a fiscal officer to oversee NRA-ILA's finances, which are segregated from the NRA's General Operations accounts, and assist in the annual audit of the NRA.

81.     Both Executive Directors are *ex officio* members, but without voting power, of the Board of Directors and of all NRA Board Committees except for the Nominating Committee, Committee on Hearings, Officers Compensation Committee, and Committee on Elections. They are also not authorized to attend the executive session of any committee unless invited to do so.

### iii.  Standing and Special Committees

82.     The NRA has dozens of standing and special Committees of the Board, but a select few hold the primary governing authority.

### a. Officers Compensation Committee

83.     The Officers Compensation Committee, which consists of the President and Vice Presidents, must establish by resolution each Fall the authorized compensation for all "elected salaried officers." That is, the Executive Vice President, the Secretary, and the Treasurer. All deliberations by the Board about the compensation for these officers "shall be held in an executive session, at which none of the officers whose compensation is to be or is being established may attend, except for the limited time and limited purpose of answering questions asked by any member of the Board of Directors at the meeting."

### b. Executive Committee and Executive Council

84.     The Executive Committee is composed of the President, Vice Presidents, and 20 board members nominated by the Nominating Committee or from the floor at any meeting of the Board. The members are elected annually. The Executive Committee exercises all of the powers of the full Board—with exceptions for powers that are restricted to the full Board, such as the power to repeal or amend the bylaws or authorize indemnification of officers or directors. These limitations are extended to all standing and special committees of the Board.

85.     The Executive Council serves an advisory role to the Executive Committee and is composed of "[a]ny member of [the NRA] whose advice and counsel, in the opinion of the Board of Directors, will be valuable to the continuing welfare of the [NRA]." Members are elected by the Board for life, subject to removal for cause.

### c. Nominating Committee

86.     The NRA Board's Nominating Committee is composed of nine members—only six of whom can be members of the Board or the Executive Council—elected by the Board by secret ballot after the NRA's annual meeting of members.

22

87.     The Nominating Committee is responsible for receiving recommendations from the NRA membership for candidates for the Board, and ultimately prepares the ballot from which the NRA membership votes on board members. Members may also petition to have a candidate added to the ballot by having a sponsor obtain the signatures from members totaling 0.5% of the number of ballots cast in the most recent election.

### d.     Audit Committee

88.     The Audit Committee's responsibilities are set forth in N-PCL § 712, the Audit Committee Charter, the NRA's bylaws, and internal policy. Among the Audit Committee's primary responsibilities are managing external audits, overseeing internal controls, evaluating potential conflicts of interest, and addressing whistleblower complaints.

89.     The Audit Committee Charter, which was adopted by Board resolution, prescribes that the Committee "shall be comprised of five NRA Directors." Members of the Committee are to be independent and should possess a "working familiarity with basic finance and accounting practices." Members are selected annually by the NRA President.

90.     Pursuant to the Audit Committee Charter Mission Statement, "the primary function of the Audit Committee is to assist the Board of Directors in its oversight of the integrity of financial information, its review of the adequacy of the system of internal controls established by the Association, and it's monitoring of the audit process."

91.     In carrying out these functions, the Audit Committee must "review the Association's financial reporting process and internal controls, review and appraise the audit efforts of the Association's independent auditors, and provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association." The Charter also sets forth the Audit Committee's responsibility for overseeing compliance with both regulatory and business ethics requirements.

23

92.     Pursuant to the Audit Committee's charter and the NRA's Policy Manual, the Audit Committee is charged with the oversight of conflicts of interest and related party transactions. "The NRA Audit Committee will review all transactions that involve potential conflicts of interest and determine whether to approve or ratify such transactions."

93.     The Audit Committee is also responsible for collecting and reviewing disclosures of financial interests of officers and directors on a regular basis. NRA policy requires that such disclosures be made "in advance, before any action is taken on the matter." In its 2017 IRS 990, the NRA represents that "Regardless of how they are reported, related party issues and issues of apparent conflict of interest are presented to the body designated by the Board of Directors (the Audit Committee) for approval, disapproval, or precautionary measures as needed."

94.     The Audit Committee is designated as one of several recipients of whistleblower complaints within the NRA under the Statement of Corporate Ethics. The Statement provided the following: "Employees who in good faith believe that an officer or a member of the Board of Directors is engaged in any financial irregularity affecting the Association or has a conflict of interest are encouraged to bring the information on which their belief is based to the attention of the Audit Committee." It also provides that whistleblowers may contact either the Head of Human Resources or the General Counsel.

### iv. Disclosure Requirements and Prohibitions on Private Benefits and Reimbursements Absent Board Approval

95.     The NRA's bylaws require "[a]ny Director, officer, or employee of [the NRA] who is also a member of the governing body of any business, corporate, or other entity (whether as trustee, director, sole-owner, officer, partner, or the like) which receives from [the NRA] any payment(s) for goods or services which total in excess of $2,000 either within a year or pursuant to any contract or contracts originating within a year shall immediately file a written statement of

24

all such business as to the nature and amount thereof, to the best of his or her knowledge, with the Secretary who shall transmit such statement to the Board of Directors at its next meeting and who shall include all such statements in the Secretary's report at the next Annual Meeting of Members."

96.     The NRA's bylaws further provide that "[n]o Director or member of the Executive Council shall receive any salary or other private benefit unless specifically authorized by resolution of the Board of Directors or an authorized committee thereof, but all such persons shall be entitled to reimbursement for expenses incurred on behalf of the Association, to such extent as may be authorized or approved by the Board of Directors."

97.     Under the NRA's bylaws, officers, directors, and members of the Executive Council "shall be entitled to reimbursement for expenses incurred on behalf of the Association," but only "to such extent as may be authorized or approved by the Board of Directors."

### C. The NRA's Policy and Procedures on Hiring, Spending, Procurement, Travel Reimbursement, Conflicts of Interest, and Related Party Transactions

98.     Most of the NRA's policies and procedures are found in one of two documents— the NRA Employee Handbook or the NRA Policy Manual. (A copy of each of the Employee Handbook and the Policy Manual are annexed as, respectively, Exhibits 2 and 3). The Employee Handbook sets out the NRA's policies and procedures on employee selection, compensation, time off, work environment standards, and insurance and pension benefits. The Policy Manual is a compendium of resolutions passed by the NRA Board since the 1960s. Annexed to the Policy Manual are several policies ratified by the Board, including the Audit Committee Charter, Statement of Corporate Ethics, NRA Purchase Policy, and Officer and Board of Directors Policy on Disclosure of Financial Interests.

### i. Contract Review Policy

99.     In a series of resolutions between 1988 and 1998, the Board adopted a policy on contracts and agreements entered into by the NRA and its agents. ("Contract Review Policy"). Under this policy, beginning in 1988, any agreement by the NRA or NRA-ILA in excess of $50,000—later raised in 1991 to $100,000—cannot be executed without the "approval" of the President and one of the two Vice Presidents.

100.     In 1997, the Board adopted a policy that "all contracts involving over $100k in a 12-month period are required to have a business case analysis performed and no contract will begin before the required sign-off approval as is required."

101.     In 1998, the Board adopted a policy that "[a]ll purchase agreements or contracts requiring payments greater than $100,000 in any twelve-month period, must have the prior written approval of the President and the First or Second Vice Presidents before execution or renewal." Certain exceptions exist for routine expenses, but the President, Vice President(s), and Finance Committee chair must be provided with updates about any such exceptions on a quarterly basis.

102.     In 2012, LaPierre issued a memorandum to all NRA staff codifying the procedures for complying with these Board resolutions:

a.  When a contract is in excess of $100,000, "a packet consisting of a copy of the contract, a completed business case analysis, and a contract review signature sheet will be prepared."

b.  Once all of the appropriate in-house approvals are secured, the packet will be presented by the Office of the Secretary to the President and the First and Second Vice Presidents.

c.  The packet will then be returned to the responsible NRA officer for finalization and distribution of the original and/or copies of the packet to (1) the Office of General Counsel; (2) the Office of the Treasurer; (3) the Chief of Staff; and (4) the Office of the Secretary.

103.     These requirements have not changed since the memorandum was issued in 2012.

26

### ii. Employment Policies

104.    The NRA has several policies on hiring, evaluating, and retaining employees. As

relevant here, these policies provide:

a.  Only the Executive Vice President and the Human Resources Division (with approval of the Executive Vice President) has the authority to extend job offers.

b.  The NRA policy is to "conduct reference checks on applicants who are under serious consideration for employment." In certain cases, credit and full background checks of the applicant will also be conducted, depending on the duties and responsibilities of the position.

c.  The reimbursement of relocation expenses for new hires is expressly limited to a 30-day temporary living allowance and $7,500 in moving expenses.

105.    The NRA has no written policy on employee bonuses. Bonuses are generally

awarded on a discretionary basis.

### iii. Independent Contractors

106.    NRA policy provides that an independent contractor should only be retained when

(i) the existing staff does not have the requisite skills to achieve the task; (ii) the nature of the

assignment can be paid by the project, day, or hour; and (iii) the General Counsel has been

consulted and has established that they qualify after being provided a draft contract agreement for

review and sign-off.

### iv. Travel and Business Expense Reimbursement Policy

107.    The stated purpose of the NRA's Travel and Business Expense Reimbursement

Policy is to "incur the lowest practical and reasonable expense while completing the travel process

in an efficient and timely manner. Persons traveling on NRA business have the duty to exercise

care and avoid impropriety, or even the appearance of impropriety in any travel expense." This

policy applies to all employees and non-employees (including volunteers and paid consultants)

traveling on NRA business.

108.    Under this policy, expenses must be business related—that is, "necessary to meet organizational objectives"—and must be in the NRA's interest. The person authorized to approve an employee's expense report is responsible for understanding the need for the expense, substantiating the expense, and determining whether it is appropriate and correctly reported. Furthermore, "[t]ravelers are expected to use the same care in incurring expenses that a prudent person would use while traveling for personal reasons, considering the purpose and amount of the expenditure."

109.    With respect to airfare, "[o]nly coach class tickets … are generally reimbursable for domestic travel." Exceptions must be explained, approved in writing and submitted with the expense report.

110.    With respect to rental cars, "[e]mployees should use public transportation (taxicabs, airport limousines, and local transits) in preference to renting a car when such means of transportation is cost-effective, and there are no other business reasons for renting a car."

111.    As to lodging and meals, "[d]aily expenses are reasonable charges for lodging, meals, tips and other incidental expenses necessary to sustain an employee while…is away from home." Original receipts for expenses over $50.00 must be attached to the expense report.

112.    Reimbursable entertainment expenses "must be directly and principally related to NRA's business, expected to produce a specific business benefit, and attended by both the employee and business associate."

### v.  Statement of Corporate Ethics

113.    Adopted in 2006, the Statement of Corporate Ethics prohibits conflicts of interest, illegal or unethical actions, and requires the maintenance of accurate books and records. The policy requires "[e]mployees who are officers, directors, division directors or activity supervisor[s]" to "insure that these policies are annually communicated to the employees reporting to them";

28

"clarify and explain said policies when necessary"; "monitor compliance there with"; and "report all known (or suspected violations of said policies to the Executive Vice President of the Association, the Treasurer of the Association, and to other persons whom they designate as appropriate."

114.    The policy, which the NRA considered to be its whistleblower policy, provides that "[e]mployees who in good faith believe that a fellow employee, supervisor, manager, or director is in violation of this policy are encouraged to bring the information on which their belief is based to the attention of the General Counsel. Employees who in good faith believe that an officer or member of the Board of Directors is engaged in any financial irregularity affecting the Association or has a conflict of interest are encouraged to bring the information on which their belief is based to the Audit Committee…The taking of such action in good faith will not result in retribution or reprisal against the employment of any employee."

115.    In January 2020, nine months after the Attorney General commenced its investigation, the NRA Board adopted a new version of the Statement of Corporate Ethics that separated out and expanded upon the whistleblower protections therein. Until it did so, the policy was missing provisions required by N-PCL § 715-b regarding whistleblower policies, such as a procedure for maintaining the confidentiality of whistleblower complaints and a requirement that the person who is the subject of a whistleblower complaint not be present during discussions of the complaint. The updated policy is annexed as Exhibit 4.

### vi.  Purchasing Policy

116.    Adopted in 2006, the Purchasing Policy was created to "provide[] general policy guidance for efficient and cost-effective procurement of goods and services necessary to support the goals, objectives and work of the [NRA] while ensuring [NRA] resources are protected and maximized." The policy's stated goal is to provide a system that delivers reasonably priced, high-

29

quality goods and services to end users, while preserving organizational, financial and ethical responsibility."

117.    The policy prohibits NRA employees, officers, and directors from using "their position with the [NRA] in a manner that may create a conflict, or the appearance of a conflict, between the individual's personal interest and those of the Association," and directs that they "refrain from knowingly engaging in any outside matters of financial interest incompatible with the impartial, objective, and effective performance of their duties." The policy also prohibits related party transactions without written authorization by the NRA.

118.    It also provides that "[a]nyone who suspects violations of this code has an obligation to report their concerns to their immediate supervisor, the Office of the Treasurer, the Audit Committee Chair or NRA's General Counsel," and that "[n]o adverse action shall be taken or permitted against anyone for communicating legitimate concerns to the appropriate persons. However, malicious and unfounded accusations will not be tolerated and will be dealt with accordingly."

119.    The policy is missing provisions required by N-PCL § 715-a regarding conflict of interest policies, such as:

   a.  The policy does not require that the person with a conflict of interest not be present at or participate in Board or committee deliberations or vote on the matter giving rise to the conflict of interest;

   b.  The policy does not contain a prohibition against any attempt by the person with the conflict of interest from improperly influencing the deliberation or voting on the matter giving rise to the conflict of interest.

120.    The policy requires the use of a "request for proposal" process when a purchase is contemplated that is equal to or above $100,000, but certain types of purchases are exempt from that process—namely, "[p]urchases or services directly related to legal counsel, political strategy,

public relations, membership, fundraising and marketing." Exempt purchases and services do not require a request for proposal or competitive bid, but must "be reported to Finance Committee on an annual basis."

121.    The Purchasing Policy also sets out levels of approval necessary for contracts exceeding certain thresholds:

a.  If the contract requires payments equal to or greater than $100,000 in any twelve month period, it must have the written approval of the appropriate NRA division director, the Executive Vice President, and the Treasurer, with signatures acknowledging the contract by the President and one Vice President.

b.  If the contract requires payments between $50,000 and $100,000, it must have the written approval of the appropriate NRA division director and one officer (the Executive Vice President, Treasurer, Secretary, or one of the Executive Directors of NRA-ILA or General Operations).

c.  If the contract requires payments under $50,000, it requires the approval of the appropriate NRA division director or his or her staff designated with such approval authority.

### vii.  Officers and Board of Directors Policy – Disclosure of Financial Interests

122.    Adopted in 2007, the "Officers and Board of Directors Policy – Disclosure of Financial Interests" requires NRA officers, board members, and members of the Executive Council to file with the Audit Committee a disclosure of their own and their immediate family members' financial interests.

123.    The Policy requires disclosure of the following:

a.  Any remuneration received from the NRA other than for routine expense reimbursements;

b.  Any relationship with an entity that has a business relationship with, or receives any funds from, the NRA that does or could result in the receipt of remuneration other than routine expense reimbursements;

c.  Any relationship with an entity that is seeking to have a business relationship with or receive funds from the NRA;

31

d. Any gift, gratuity, personal favor or entertainment with either a retail price or fair-market value in excess of $300 received from any entity or person associated with any entity that has a business relationship with, or is seeking to do business with, or receives any funds from the NRA;

e. Any ownership interest in excess of 10% of its class in any entity that has or is seeking to have a business relationship with, or that does or is seeking to receive funds from, the NRA.

124. The policy requires that disclosures related to any of the above be filed in January of each year. Since at least 2008, the NRA has required all officers and directors to fill out and submit a standard questionnaire each year reporting any related party transactions or conflicts of interest that require disclosure under this policy ("Financial Disclosure Questionnaire"). In addition to these annual disclosures, the Executive Vice President has an independent obligation to "report to the Audit Committee any financial interest of an officer or director (or immediate family member) that comes to his knowledge or the knowledge of his office as well as any financial transactions between the NRA…and other individuals and/or organizations that present or might present the possibility of a conflict of interest."

125. The NRA has represented in public filings that the Secretary and General Counsel is responsible for receiving and reviewing the annual conflict of interest questionnaires.

126. The policy does not comply with the requirements of N-PCL § 715-a regarding conflict of interest policies for the same reasons as described in Part Four, Section II(C)(vi) above regarding the NRA's Purchasing Policy.

**viii.  Conflict of Interest and Related Party Transaction Policy**

127. It was not until January 2016 that the NRA Board adopted a comprehensive Conflict of Interest and Related Party Transaction Policy. The policy is not included in the NRA's Employee Handbook and, upon information and belief, is not provided to new employees at the time of hire.

32

128.     With respect to related party transactions, the 2016 policy hews closely to the requirements of N-PCL § 715, and defines conflicts of interest more broadly as any situation where "the interests of the NRA come into conflict with a financial or personal interest of [an officer, director, or key employee], or otherwise whenever [an officer, director, or key employee's] personal or financial interest could be reasonably viewed as affecting his or her objectivity or independence in fulfilling their duties to the NRA."

129.     The policy provides that "[t]he NRA Audit Committee is responsible for providing oversight of the adoption and implementation of, and compliance with this policy."

130.     Under the policy, the Audit Committee must "review all transactions that involve potential conflicts of interest" to "determine whether to approve or ratify such transactions," and "may only approve the [] transaction if it determines that such transaction, under the terms and within the circumstances presented, is fair, reasonable, and in the best interests of the NRA."

131.     The Audit Committee must document its consideration of any conflicts of interest and related party transactions, including, but not limited to, (1) "[a]lternative transactions to the extent available," (2) "[t]he NRA's mission and resources," (3) "[t]he possibility of creating an appearance of impropriety that might impair the confidence in, or the reputation of, the NRA (even if there is no actual conflict or wrongdoing)," and (4) "[w]hether the conflict may result in any private inurement, excess benefit transaction, or impermissible private benefit under laws applicable to tax-exempt organizations."

132.     The Audit Committee's meeting minutes are required to contain certain information concerning the consideration of conflicts of interest and related party transactions, including "the name of the [officer, director, or key employee], the nature of the conflict, and details of the deliberations of the disinterested directors (such as documents reviewed, any alternatives

considered, comparative costs or bids, market value information, and other factors considered in deliberations)."

## PART FIVE - DEFENDANTS' VIOLATIONS OF NEW YORK LAW

### I. Widespread Violations of Law of the NRA's Senior Management under the Leadership and Direction of Wayne LaPierre

133.    Wayne LaPierre has been the Executive Vice President of the NRA since the early 1990s. As the Executive Vice President, LaPierre is responsible for overseeing all of the divisions and the day-to-day affairs of the NRA.

134.    The head of each NRA division reports directly to LaPierre. LaPierre's direct reports include the Treasurer, the Executive Director of NRA-ILA; the Executive Director of General Operations; the Secretary; the General Counsel; the Executive Director of Advancement; the Executive Director of Publications; the Managing Director of Public Affairs; the Executive Director of Membership & Affinity Licensing Programs; the Director of Security; and the Executive Director of Human Resources.

135.    Until recent cuts to its workforce, the NRA had approximately 550 full-time employees.

136.    One of LaPierre's first acts as Executive Vice President was to hire Defendant Wilson "Woody" Phillips to serve as Treasurer—a position that Phillips would hold for the next 26 years, until his retirement in 2018. At all times, LaPierre was responsible for oversight of Phillips.

137.    LaPierre also hired Defendant John Frazer as the NRA's General Counsel in 2015. Frazer was elected Secretary of the NRA by the NRA Board that same year. At all times, LaPierre has been responsible for oversight of Frazer who continues in the role of General Counsel.

34

138.     LaPierre hired Defendant Joshua Powell as his Chief of Staff in 2016 and appointed him the Executive Director of General Operations in January 2017. In December 2018, LaPierre gave Powell the newly created title of "Senior Strategist." Powell was employed by the NRA until he was terminated in January 2020. At all times, LaPierre was responsible for oversight of Powell.

139.     LaPierre, together with his direct reports, including Defendants Phillips, Frazer and Powell, instituted a culture of self-dealing, mismanagement, and negligent oversight at the NRA. They overrode and evaded internal controls to allow themselves, their families, favored board members, employees and vendors to benefit through reimbursed expenses, related party transactions, excess compensation, side deals, and waste of charitable assets without regard to the NRA's best interests.

### A.  LaPierre's Improper Spending and Expensing

140.     LaPierre routinely abused his authority as Executive Vice President of the NRA to cause the NRA to improperly incur and reimburse LaPierre for expenses that were entirely for LaPierre's personal benefit and violated NRA policy, including private jet travel for purely personal reasons; trips to the Bahamas to vacation on a yacht owned by the principal of numerous NRA vendors; use of a travel consultant for costly black car services; gifts for favored friends and vendors; lucrative consulting contracts for ex-employees and board members; and excessive security costs.

141.     LaPierre's misuse of NRA funds involve the Women's Leadership Forum, a special recognition society within the Office of Advancement. LaPierre's wife is the founder and permanent co-chair of the Women's Leadership Forum. LaPierre testified that his wife has served in this role as a volunteer for 15 years. In December 2015, at his wife's behest, LaPierre hired his niece to work on Women's Leadership Forum events and projects.

35

142.     LaPierre had access to, and abused, the budget allocated to the Office of the Executive Vice President ("EVP Office") to fund personal expenses and consulting contracts for NRA insiders. The EVP Office, like each division of the NRA, has its own budget, cost center, and staff. The EVP Office includes LaPierre, his Chief of Staff, and a handful of senior advisors and office assistants. Expenditures associated with the EVP Office, such as EVP Office staff salaries, are allocated to the EVP Office budget. In 2018, the overall EVP Office budget was approximately $16 million.

### i.  LaPierre's Private Flights

143.     The NRA incurs substantial costs for LaPierre's private air travel. LaPierre testified that it is NRA policy that he travel by private aircraft at all times for security reasons. He testified further that he is not aware of any limits under this policy on the kind of plane he can charter, how far he can go, or the amount of money he can spend on the flights.

144.     NRA records show that between June 2016 and February 2018, the organization paid for numerous private flights for LaPierre's wife and extended family when he was not a passenger. LaPierre admitted that he authorized at least some of these flights. Upon information and belief, none of these flights was approved for security reasons, nor were they approved by the NRA Board. Several examples of these flights are highlighted below:

145.     In August 2016, LaPierre authorized a private flight for his niece and her husband to fly from Dallas, TX, to North Platte, NE. LaPierre's niece and her family live in Nebraska about 60 miles from North Platte. Asked why he authorized this flight, LaPierre did not identify any security issues, but testified "I think it's hard. There are not many flights to Kearney….She had a child and I think that [the travel agent] had -- probably NRA, probably me, said that, okay, in this instance, it's okay to get her back that way. Our annual meeting was coming up down there. She

36

was working on the Women's Leadership Forum with people in Dallas and … it's the advantage of the NRA to have her … do that work." The cost of the flight was more than $11,435.

146.     In July 2017, LaPierre authorized a private flight for his niece and her daughter to fly from Dallas, TX, to Orlando, FL. LaPierre testified that this "was another example where I was getting [my niece] together with my wife to work on the Women's Leadership Forum events. She had tried to travel commercial. All the commercial flights they had – there was a mechanical problem. She was stuck there at the airport until 12:30 or 1:00 at night with a child trying to fly commercial." The cost of the flight was more than $26,995.

147.     In October 2016, LaPierre authorized a private flight for his wife to fly alone from Madison, WI, to Kearney, NE. Asked why she did not use a commercial airline, LaPierre testified "I think it was probably easier to fly private, more convenient, and probably the flights -- there probably are not many flights into Kearney from that area and we wanted to get her there, and I thought it was appropriate given the return NRA is getting on" the Women's Leadership Forum program. The cost of the flight was more than $8,800.

148.     In January 2017, LaPierre authorized a private jet to pick up his niece's husband in North Platte, NE, on the way to Las Vegas for a Safari Club convention. LaPierre testified that his niece "was working the entire time" attending various donor meetings at the convention, so he authorized a flight to bring her husband "over [to] help babysit the child while the mother was working because there was nobody else to do it." LaPierre also authorized a private flight to fly his niece's husband back to Nebraska two days before his niece was ready to return. Asked whether this flight, which cost about $15,000, was in the NRA's best interest, LaPierre testified that it was. "[I]t's really almost very hard to get commercial flights back," LaPierre explained, and his niece's

husband "had to get back to work." LaPierre later authorized a private jet to fly his niece back to Nebraska two days later.

149.    In February 2017, LaPierre authorized a private flight for his niece and her daughter to fly from Atlanta, GA, to Kearney, NE. LaPierre testified his niece was in Atlanta for a "planning meeting on the Women's Leadership Forum," and he is "sure [he] authorized it … to get them back." The cost of the flight was more than $15,000.

150.    LaPierre has also repeatedly directed private aircraft to make additional stops in Nebraska to pick up or drop off family members. Upon information and belief, additional stops and additional passengers on a private flight usually increase the cost of the flight.

151.    For example, in November 2018, LaPierre and his wife took a private roundtrip flight from Washington D.C. to Dallas, TX, and stopped in North Platte, NE, on each leg of the trip to pick up and drop off LaPierre's niece and grandniece. These flights cost $59,790.

152.    In March 2019, LaPierre and his wife took a private flight from Washington D.C. to Orlando, FL, and stopped in North Platte, NE, on the way back to drop off his niece and grandniece. These flights cost $78,900. In April 2019, LaPierre and his wife took a private flight from Washington D.C. to Tulsa, OK, making additional stops in Omaha and North Platte, NE. These flights cost $49,535.

153.    The current Treasurer testified that he did not know of any NRA business purpose that would be served by private flights to or from North Platte, NE.

154.    LaPierre has also authorized private flights for NRA employees when he was not a passenger. For example, in February 2018, LaPierre authorized a private flight for an NRA spokesperson, her husband, and an employee of a vendor from Dallas, TX to Fort Lauderdale, FL and Washington D.C. These flights cost $107,775.

155.    From May 2015 to April 2019, the NRA incurred over one million dollars in expenses for private flights when LaPierre was not a passenger. Upon information and belief, these expenditures were neither authorized by nor consented to by the NRA Board.

156.    The current Treasurer testified that, in the fall of 2018, the NRA eliminated "all non-mission-critical travel" to reduce the NRA's expenses. Following the elimination of non-mission critical travel, payments to LaPierre's Travel Consultant dropped by nearly 50%—from $2.9 million in 2017 to $1.5 million in 2019.

157.    In its annual filings with the Attorney General for 2014 to 2018, the NRA asserted that it required substantiation prior to reimbursing these expenses. The Attorney General has not found any evidence that the private flights and related business uses were substantiated prior to reimbursement.

158.    In fact, the current Treasurer learned for the first time that LaPierre's wife travels alone by private charter at the NRA's expense when counsel informed him the night before he was examined by the Attorney General in June 2020.

### ii.    LaPierre's Bahamas and Yachting Trips

159.    Since June 2015, LaPierre and his family took private flights to and from the Bahamas on at least eight occasions. On most of those trips, LaPierre stopped in Nebraska on each leg of the trip to pick up and drop off his niece and her family. The NRA paid over half a million dollars for these flights.

160.    LaPierre testified that he often visits the Bahamas in December to attend a "celebrity retreat" organized by an individual who is, upon information and belief, the principal stakeholder in several businesses that have business relationships with the NRA ("MMP Principal"). These businesses include Associated Television International, Inc. ("ATI"),

Membership Marketing Partners ("MMP"), Allegiance Creative Group ("Allegiance"), and Concord Social & Public Relations ("Concord").

161.    Upon information and belief, MMP, Allegiance, and Concord entered into contracts with the NRA on the same day in December 2011. They also share the same Chief Executive Officer and business address, which is located in the same Fairfax, VA office building where the NRA is headquartered.

162.    Together, MMP, Concord, Allegiance, and ATI have received over $100 million from the NRA.

163.    In recent years, MMP and Concord have been among the NRA's largest vendors. Since 2014, the NRA has paid MMP over $60 million for fundraising, printing, and mailing services. Over the same period, the NRA paid Concord over $22 million for public relations services.

164.    Allegiance has been reported as a professional fundraiser in the NRA's regulatory filings for many years. In its 2018 Form 990, the NRA described Allegiance's services as providing "counsel and promotion planning for marketing and direct response mail and phone programs." Since 2014, the NRA has paid Allegiance over $4.5 million.

165.    ATI partnered with the NRA from 1997 to 2019 to produce and distribute a television series called Crime Strike. Since 2014, the NRA has paid ATI nearly $17 million. For most of its run, Crime Strike was hosted by LaPierre. LaPierre testified he last hosted the program in 2017 or 2018. From January 2018 to May 2019, the NRA paid ATI $4.7 million.

166.    From 2012 to 2018, the NRA paid MMP, Allegiance, Concord, and ATI more than $10 million in fees not contemplated by the terms of the underlying contracts. LaPierre denied

40

having any role in negotiating the contracts with these businesses, but he personally signed most of the contracts on behalf of the NRA.

167.    LaPierre frequently meets with the MMP Principal. According to his reimbursement requests, LaPierre took private flights to California on at least 20 occasions between late 2013 and early 2017—usually staying several days at a five-star historic hotel on Sunset Boulevard in Beverly Hills—to meet with the MMP Principal, often over lunch or dinner. Between 2013 and 2016, the MMP Principal, his wife, and their daughter received over $6,700 in Christmas and birthday gifts from the LaPierres, at the NRA's expense.

168.    LaPierre also regularly attends "celebrity retreats" organized by the MMP Principal. When LaPierre attends these retreats, which are normally held annually in the Bahamas in December, he stays at the Atlantis resort on Paradise Island. His lodging is paid for by the MMP Principal. LaPierre testified that the MMP Principal does not pass these expenses on to the NRA.

169.    LaPierre often visits the Bahamas in the summer as well. During these trips, he stays on a 108-foot yacht owned by the MMP Principal. The yacht, named Illusions, is equipped with four staterooms, a 16-foot jet boat, and two jet skis. LaPierre described Illusions as "a big, big yacht" with a crew that includes a chef. LaPierre testified that "[o]ccasionally one of our other family members" has stayed on the yacht with him and his wife, including his sister and her husband, and perhaps others.

170.    LaPierre has never disclosed his use of the MMP Principal's yacht on the NRA Financial Disclosure Questionnaires that he, as an officer and *ex officio* director of the NRA, must submit to the NRA Secretary annually. Question 4 of this questionnaire asks:

> Have you or any relative received, or do you or any relative expect to receive, any gift, gratuity, personal favor, or entertainment with either a retail price or fair market value in excess of $250 from any person or entity that has or is seeking to have a business relationship with, or received funds from, NRA or any NRA Entity?

41

171.    LaPierre answered no to this question in every questionnaire he submitted from 2008 to 2018 (the most recent questionnaire produced by the NRA to the Attorney General). LaPierre similarly testified that he has never received a gift of value in excess of $250 from an NRA contractor or employee of an NRA contractor.

172.    LaPierre's use of the MMP Principal's yacht constituted a gift from an NRA contractor in excess of $250 requiring disclosure under NRA policy. It also constituted a private benefit to LaPierre in violation of NRA policy.

173.    In his testimony to the Attorney General, LaPierre said that the reason he failed to disclose the use of the yacht was for security reasons and because he considered the yacht to have been used for a legitimate business purpose. Though LaPierre acknowledged that the NRA questionnaires only go to the NRA Secretary, he said he "was concerned about everybody on security, everything leaks." LaPierre also testified that he considered the use of the yacht as "a safe place to do [business], and [] didn't consider it a gift." LaPierre further testified that these trips to the Bahamas were beneficial to the NRA because they provided an opportunity for his wife and niece to discuss the Women's Leadership Forum:

> … any time I get the two of them together anywhere, there is a benefit for the NRA. It could be in Nebraska, it could be like a corporate retreat in Aspen. It could be a -- you know, I mean, I consider it a good thing to get them together. Yeah, they got together in the Bahamas. They – it could have been in Washington. It just -- it's -- it -- but keeping [his wife's] head [in] the game on this and getting her with [my niece], there is a substantial benefit to the NRA that is -- that is in the -- proof is in the dollars that come into the NRA. I mean, did they enjoy being there, yeah. I mean, on the other hand, did NRA get a benefit of them being together, yes, absolutely.

174.    LaPierre testified that neither he nor the NRA paid the MMP Principal for the use of Illusions. He also testified that he has stayed on Illusions during two European trips for the purpose of recruiting celebrities for the NRA.

175.    LaPierre claimed without identifying any evidentiary support that many of the costs incurred in connection with his travel and entertainment expenses—like the trips to the Bahamas and other locations with his wife, niece and family members—were justified as an investment in donor cultivation.

### iii.  LaPierre's Personal Travel Consultant

176.    LaPierre uses his own personal travel consultant to arrange his private air travel and other accommodations. This practice deviates from NRA policy and results in substantial additional expenses to the NRA.

177.    The NRA Travel Policy provides that employees must use the NRA's official travel agent to make travel reservations unless otherwise approved by the Executive Vice President.

178.    Since being elected Executive Vice President, LaPierre has not used the NRA's official travel agent to make his travel arrangements for decades, if ever. Instead, since the 1990s, LaPierre has booked his travel through a travel consultant based in Woodland Hills, CA. The travel consultant bills the NRA through two companies: Inventive Incentive & Insurance Services Inc. and GS2 Enterprises (collectively, "LaPierre's Travel Consultant"). LaPierre testified that when his travel consultant bills services to the NRA, it is for NRA business and in furtherance of the NRA's mission.

179.    Upon information and belief, LaPierre, one of his senior advisors, and the Executive Director of Advancement are the only current NRA employees who have used LaPierre's Travel Consultant to make travel arrangements. LaPierre testified that "some of the [NRA-ILA] people have used her," as well as some board members and donors, but he did not recall who specifically. Asked who would need to authorize that, LaPierre testified "I would usually."

180.    For several years, the NRA has paid LaPierre's Travel Consultant on a fixed-fee basis. In 2014, the fixed fee for the travel agent's services was $15,000 a month, which was billed

through separate monthly invoices to the NRA (for $10,000) and NRA-ILA (for $5,000). Upon information and belief, these invoices were for the same travel booking services. Beginning in May 2015, LaPierre's Travel Consultant's monthly fee increased to $19,000, which continued to be billed through separate monthly invoices to the NRA ($12,000) and NRA-ILA ($7,000). Upon information and belief, the nature and scope of the travel consultant's services remained unchanged during this period.

181.    Upon information and belief, no competitive bidding process was conducted for the services provided by the LaPierre's Travel Consultant until 2019, and no written contract was executed memorializing this increase in her compensation until 2020. From 2016 to early 2019, the NRA paid LaPierre's Travel Consultant a fixed fee of $19,000 a month. The Director of Purchasing testified that, under NRA policy, the procurement of transportation services should go through a competitive bidding process administered by the Purchasing Department, but that during her 27 years at the NRA, that had never occurred.

182.    From 2005 to 2019, the NRA paid LaPierre's Travel Consultant more than $100,000 annually without a written contract, and without written authorization from the NRA President or a Vice President. This arrangement violated the NRA Purchasing Policy. Upon information and belief, LaPierre and Phillips were aware of this arrangement.

183.    From February 2013 to July 2018, Ackerman McQueen ("Ackerman"), the NRA's public relations and advertising marketing firm, also paid LaPierre's Travel Consultant a $4,000 monthly fee at the direction of LaPierre and Phillips, which was in addition to the monthly fees the NRA paid to her directly. Ackerman passed these expenses on to the NRA. Upon information and belief, LaPierre was repeatedly told that his travel consultant charged excessive fees for the services she provided and for the vendors she engaged on behalf of the NRA.

184.    After Defendant Phillips stepped down as Treasurer, in March 2019, the NRA entered into a one-year contract with LaPierre's Travel Consultant increasing her annual pay to $318,000. Upon information and belief, this was the first written contract the NRA entered into with LaPierre's Travel Consultant. In an accompanying business case analysis, it provides that "[f]or the security of our principals, in this sensitive environment we sometimes face, we believe there is no other company that can provide the service and discretion that [LaPierre's Travel Consultant] offers." There is no evidence that the NRA considered bids from competing companies.

185.    The analysis does not address the increase in LaPierre's Travel Consultant's monthly fixed fee from $19,000 to $26,500. Services under the contract "include making travel arrangements as directed by the NRA's Executive Vice President or his designee." On March 15, 2019, LaPierre authorized this contract.

186.    Less than a year later, in early 2020, the NRA conducted a competitive bidding process for the services offered by LaPierre's Travel Consultant. Upon information and belief, the NRA accepted LaPierre's Travel Consultant's bid, under which she provides the same services she previously provided for a fixed monthly fee of $7,000.

187.    LaPierre testified that he was not involved in the business case analysis prepared in early 2019, or the competitive bidding process that was conducted. "[T]he treasurer's office handled it. … I stayed completely, completely out of it."

188.    From August 2014 to January 2020, the NRA paid LaPierre's Travel Consultant more than $13.5 million. In 2018, the NRA paid LaPierre's Travel Consultant $2,630,531.71. In the first six months of 2019 alone, the NRA paid LaPierre's Travel Consultant $1,007,597.80.

### iv. LaPierre's Personal Expense Reimbursements

189. At LaPierre's instigation, the NRA reimbursed him for other expenses that were personal, including gifts to friends and favored employees.

190. Between 2013 and 2017, LaPierre was reimbursed for more than $1.2 million in expenses.

191. From 2013 to 2017, LaPierre was reimbursed over $65,000 for Christmas gifts for his staff, various donors, and friends. Most of his direct reports and executive staff would receive an ice cream gift basket each year from a retailer called Graeters. But those in his inner circle received gifts from retailers like Neiman Marcus and Bergdorf Goodman. For example, at the NRA's expense, in December 2015, LaPierre sent gifts from Neiman Marcus to his travel consultant ($648.55), his senior assistant ($349.80), and his prior Chief of Staff ($413.40). In December 2016, LaPierre sent Christmas gifts to the co-founder of Ackerman ($1,590), his travel consultant ($350), his senior assistant ($350), and Phillips ($377.79). In November 2017, LaPierre expensed gifts to his travel consultant ($443.48), his prior Chief of Staff ($310.65), Phillips ($282.53), and his senior assistant ($238.50), among others. Each of these gifts was substantially in excess of the $25 limit permitted by the IRS for business gifts, and reimbursement for such gifts should have been reported as W-2 income to LaPierre.

192. Gifts were especially common for those affiliated with the Women's Leadership Forum. In December 2014, for example, the executive assistant to LaPierre's spouse received a $381 birthday gift expensed to the NRA. In September 2016, LaPierre expensed $1,500 in birthday, wedding anniversary, and baby shower gifts for five Women's Leadership Forum volunteers. In May 2017, LaPierre expensed a $418.70 gift for the wife of the MMP Principal for her support of the Women's Leadership Forum.

193.    In May 2017, LaPierre's wife was appointed to the Board of Directors of the National Park Service Foundation (NPSF). Over the next few months, LaPierre submitted expense reports for $13,874.46 in expense reimbursements for trips taken with his wife and niece to NPSF events in Alaska and Arizona. This was in addition to the private flights used to get them to the NPSF events, which cost in excess of $150,000.

194.    LaPierre has routinely submitted expense reports seeking reimbursements for his niece's lodging and airfare for events that are allegedly related to NRA business. As an NRA employee, LaPierre's niece was required to follow NRA policies and procedures for seeking approval and reimbursement for her work-related expenses. Instead, LaPierre submitted reimbursement requests for his niece's travel expenses on numerous occasions. For example, in early 2017, LaPierre expensed $12,332.75 for his niece's 8-night stay at the Four Seasons Hotel in Dallas, TX. The nightly rate for the room was $1,350. In 2016 and 2017, LaPierre was reimbursed over $38,000 in expenses for his niece's airfare and lodging.

195.    LaPierre has also been reimbursed for expenses incurred travelling to and from film shoots for Under Wild Skies—a television program discussed in detail in Part V, Section II(A) below—in Europe and Africa. LaPierre had a decades-long friendship with the principal of Under Wild Skies, Inc. ("UWS"), the corporate entity that produces the program. For example, in 2013, LaPierre was reimbursed by the NRA $37,084.66 for airfare, lodging, and related expenses that he and his wife incurred travelling to Botswana and Mozambique for an Under Wild Skies film shoot on safari.

196.    Between 2009 and 2017, LaPierre expensed over a hundred thousand dollars in membership fees for a golf club located in the Washington D.C. area. LaPierre testified that he uses the golf course for both personal and business reasons. In its annual filings with the Attorney

47

General for 2014 to 2018, the NRA asserted that it required substantiation prior to reimbursing these expenses. The Attorney General has not found any evidence that the golf membership fees and related business uses were substantiated prior to reimbursement.

197.    In early 2019, the current Treasurer learned from LaPierre that LaPierre's expense reimbursements were historically handled by NRA-ILA, regardless of whether they related to the activities of that division. Pursuant to the bylaws, NRA-ILA's finances are maintained separately from those of NRA General Operations. LaPierre's expenses were also processed by a lower level employee in NRA-ILA. Because that employee was out of the office on sick leave, the current Treasurer took the opportunity to "reengineer" the process for reviewing LaPierre's expenses to "make it as robust and appropriate" as possible.

198.    But this new process does not capture any personal expenses incurred by LaPierre that are billed by vendors directly to the NRA. So, when LaPierre's travel expenses are billed directly to the NRA, such as by LaPierre's Travel Consultant, as discussed above in Part Five, Section I(A)(iii), they are only subject to review by a lower level employee.

### v.  LaPierre's Consulting Budget

199.    Since at least 1999, the EVP Office has had its own consulting budget ("EVP Consulting Budget"). Historically, this budget has included 20 to 30 consulting arrangements the NRA has entered into at the direction of LaPierre or Phillips, while Phillips was Treasurer. In recent years, the budget has included consulting arrangements totaling $2 to $3 million in annual expenditures.

200.    Upon information and belief, the EVP Consulting Budget is prepared each year by the Financial Services Division ("FSD") based on historical data on what the consultants were paid in the previous calendar year, and guidance from the Finance Director and the Treasurer on what LaPierre wants to keep in the budget for the upcoming calendar year.

201.     Under the NRA Contract Policy in effect since 2012, copies of all contracts in excess of $100,000 annually must be distributed to the Office of the General Counsel and the FSD. Upon information and belief, during Woody Phillips's tenure as Treasurer, such contracts were routinely withheld from the FSD. Consequently, the FSD processed invoices without having access to or knowledge of the terms of the underlying contract, if a contract existed at all. Upon information and belief, when staff in the FSD requested copies of contracts, Phillips often directed his staff to refuse the request on privacy grounds, or on the basis that there was no requirement to furnish them.

202.     For this reason, during Woody Phillips's time as Treasurer, the FSD did not have copies of several consulting agreements that were included in the EVP Consulting Budget.

203.     Upon information in belief, the invoices for several consultants included in the EVP Consulting Budget were processed and paid for several years without written contracts in place or access to contracts if they existed. EVP Office consultants who were regularly paid without written contracts included the consulting firm, McKenna & Associates, Inc. ("McKenna"), several board members, consultants who worked with LaPierre's wife on Women's Leadership Forum-related events, and LaPierre's Travel Consultant. LaPierre disclaimed knowledge of several of the consulting arrangements in the EVP Consulting Budget during his examination by the Attorney General, testifying that the budget and negotiations for those agreements were handled by Phillips.

204.     The EVP Consulting Budget includes several Women's Leadership Forum staff members who worked closely with LaPierre's wife. For example, from 2014 to 2018, a Women's Leadership Forum staff member serving as the executive assistant to LaPierre's wife was paid $594,711.53 for consulting services. From 2016 to 2018, a Women's Leadership Forum staff

member with the title of "Communications Consultant/NRA Special Projects" was paid approximately $250,000 for consulting work.

205.    The EVP Consulting Budget also includes consulting arrangements with several former NRA presidents and board members, which are discussed in detail in Part Five, Section II(C) below. In several instances, the board members were paid for consulting services without a written contract in place. These arrangements were not reviewed and approved by the Audit Committee in advance of their execution, as required by New York law governing related party transactions and NRA policy.

### vi.  LaPierre's Security Costs

206.    From 2013 to 2018, the EVP Office budget allocated several million dollars each year to LaPierre's personal and home security. LaPierre testified that he does not "control the people that manage my security … I let the Director of Security run that and make the decisions." The Director of Security reports directly to LaPierre. LaPierre testified that he does not "know everything [the Director of Security]'s spending money on," but that the "treasurer does."

207.    Upon information and belief, the Director of Security procured an armored vehicle for LaPierre without notifying the Purchasing Division or complying with the NRA Purchasing Policy. The Director of Purchasing testified that this was not the first time the Director of Security had made procurements in contravention of NRA policy, noting that he "has a habit of—he will just go and do whatever he needs to get done."

208.    LaPierre testified that, after the Parkland, FL shooting in February 2018, his Director of Security advised him to leave the Washington D.C. area because of a number of threats that had been made against him. Shortly thereafter, according to LaPierre, the co-founder of Ackerman proposed having a real-estate investment company that he owned purchase a house that LaPierre and his wife could "use … as a safe house from time to time."

209.    Over a three-week period in April 2018, LaPierre and his wife looked at several homes in the Dallas, TX area with a realtor and an Ackerman executive. LaPierre and his wife identified a home in the suburb of Westlake that, at the time, was valued at approximately $6.5 million.

210.    On May 11, 2018, Phillips and an Ackerman executive executed an agreement to establish a limited liability company named WBB Investments, LLC. Under this agreement, the NRA agreed to invest $6,500,000 for a 99% interest in the company.

211.    On May 21, 2018, an Ackerman executive sent an email to the Ackerman CFO, copying LaPierre's wife, stating "[LaPierre's wife] (copied here) and I spoke this morning. Following are my notes from the conversation to assist you in the offer document." The email lists "Equipment/Furnishings to retain as part of offer" on the Westlake home and then provides:

> Also, can we request from owner **a listing of all service vendors** for various aspects of the house. When we last looked, it appeared the homeowner was making a binder of all relevant information-we would like that documentation.
>
> **Home Improvements Prior to move-in:**
>
> - This wouldn't affect the offer, but a security gate needs to be designed and installed for the driveway.
> - The men's master bathroom and closet need some changes. There isn't much closet space and the cabinetry needs to be changed. [LaPierre's wife] will have specific input here and can probably work with the eventual Interior Designer to get this work accomplished.
>
> We need to discuss how to acquire a **Social Membership to the Club**. Is a **July 1 Closing** possible so that an **August move-in** could be anticipated (time to get some rooms furnished and the above improvements completed prior to move-in). **Two vehicles** will need to be purchased prior to move in as well.

212.    The same day, WBB Investments, LLC sent an invoice to the NRA for $70,000 for "Investment in Security Assets." Under NRA policy, the FSD cannot issue payment to a vendor without having a valid Form W-9 on file.

51

213.    Upon receipt of the invoice from WBB Investments, LLC, on May 25, 2018, staff in the FSD informed staff in the Treasurer's Office that a W-9 was needed for WBB Investments before the invoice could be processed.

214.    In response, Phillips and his successor, who had become the CFO by that time, told FSD staff, in sum and substance, that payment was urgent, and to cut the check immediately. The Director of Financial Reporting and Accounting wrote in an email, "[a]s we discussed, cut without w9 for now even though it's against policy per treasurer's office."

215.    On May 30, 2018, WBB Investments, LLC deposited the NRA's check for $70,000. Shortly thereafter, the deal was called off, and the money was returned. LaPierre and Ackerman dispute the reasons why the house sale was not completed. LaPierre claims that it was because he realized that Ackerman wanted the NRA to pay for the house. LaPierre did not explain why Ackerman would have invested in the property for his use.

### B.  Wilson "Woody" Phillips's Conflicts of Interest, Related Party Transactions, and Self-Dealing

216.    From 1992 to 2018, Phillips served as the Treasurer of the NRA. The Treasurer is responsible for overseeing the financial affairs of the NRA. In addition to his own staff, the Treasurer oversees several divisions, including Purchasing, Financial Services, and Information Services. At all times during his tenure at the NRA, Phillips was supervised by and reported directly to LaPierre. As detailed below and throughout this complaint, Phillips failed as Treasurer to adhere to internal financial controls and misused NRA assets to enrich himself and other NRA officers and directors.

217.    In the course of Phillips's successor's transition into the position of Treasurer, he found that Phillips was an absentee Treasurer, and felt that the NRA did not have "boots on the ground as it relates to finance." Phillips's successor also described his predecessor as having a

"non-robust process" for reviewing NRA employees' credit card expenditures, which included having junior employees responsible for reviewing and signing off on the expenses of more senior employees.

218.    In early 2018, an FSD staffer reported to her supervisor that she was worried about being fired for requesting missing receipts from certain NRA staff, and that she would frequently be told, "Woody said to pay this as submitted," or "Josh [Powell] will throw a fit," or "We don't want this to reach Wayne [LaPierre]." Her supervisor handed this report to the head of Human Resources, but was not aware of any action taken by Human Resources in response.

219.    Under Phillips, FSD staff had complaints about being frequently directed to process payments in contravention of NRA policy on the basis that "Woody wants this done," or "Wayne [LaPierre] or Woody or Josh [Powell] said that these are okay."

220.    Ultimately, and as detailed in Part Five, Section V below, several of Phillips's staff became whistleblowers in the summer of 2018, disclosing to the NRA Audit Committee longstanding failures by NRA senior executives, including Phillips and Powell, to comply with NRA financial policies and procedures, and to ensure adequate internal controls. These whistleblowers are collectively referred to hereafter as the "NRA Whistleblowers."

### i.    Phillips's Conflict of Interest with Respect to HomeTelos

221.    From 2014 to 2017, the NRA paid $1.4 million to HomeTelos, L.P, an information technology company based in Dallas, TX. At the time of the contract, Phillips had a longstanding personal relationship with HomeTelos's CEO. Phillips did not disclose that relationship despite NRA policy, which requires that all material facts related to conflicts of interest be disclosed in good faith and in writing to the Audit Committee before any related action.

222.    In September 2014, LaPierre and Phillips authorized the HomeTelos contract. Neither LaPierre nor Phillips disclosed Phillips's potential conflict of interest to the Board before the contract was executed.

223.    LaPierre and Phillips similarly failed to disclose Phillips's potential conflict of interest to those tasked with vetting the HomeTelos contract. Upon information and belief, LaPierre and Phillips failed to disclose this conflict to the then NRA President and First Vice President at the time they provided written authorization for the contract. The Managing Director of Information Services, who assisted Phillips in the contract negotiation, was unaware of the relationship between Phillips and the HomeTelos CEO when he agreed to engage HomeTelos.

224.    Phillips also failed to disclose his personal relationship with the HomeTelos CEO on his conflict of interest disclosure forms for 2016, 2017, and 2018. Phillips answered 'no' to the form's question, "To the best of your knowledge, is there any transaction…in which the NRA is a participant and in which you might have a conflicting interest."

225.    The NRA first questioned the propriety of the HomeTelos contract in spring 2018, after the current Treasurer replaced Phillips as CFO and the agreement ended.

226.    In July 2018, the NRA Whistleblowers identified Phillips's relationship with the HomeTelos CEO as an example of a "'Financial Conflict of Interest at the Senior Management and Board of Directors Level."

227.    Upon information and belief, Phillips disclosed this relationship for the first time in September 2018. On September 6, 2018, the Audit Committee retroactively approved the NRA's engagement of HomeTelos for the period from September 2014 to May 2017, for total compensation of approximately $1.36 million. The Audit Committee acknowledged that Phillips's

relationship with the HomeTelos CEO "posed [a] potential conflict of interest" and "should have been disclosed and approved in advance."

### ii. Phillips's July 2018 Trip on Grand Illusion

228.    In July 2018, while Phillips was still the NRA Treasurer, he organized a trip with several people he knew in the Dallas/Fort Worth area. Part of this trip involved spending one week (July 12-19, 2018) on the Grand Illusion—a yacht owned by the MMP Principal. Although LaPierre testified that Phillips negotiated the millions of dollars of contracts with the MMP Principal's companies, Phillips neither disclosed nor received Board approval for this trip in advance.

229.    In August 2018, after the trip had already occurred, Phillips disclosed the trip in his annual Financial Disclosure Questionnaire, stating that in July 2018 he organized a trip involving the use of "a boat belonging to [the MMP Principal], a contractor in our membership renewal programs." Phillips explained that "[t]he boat is not available for charter," but that he "purchased its use through a $25,000 donation to the MS (Multiple Sclerosis Society)."

230.    Phillips's references to a "boat" in his Financial Disclosure Questionnaire was to the Grand Illusion. In September 2018, the Audit Committee retroactively ratified and approved Phillips's "participation in the July 2018 sailing trip." However, the Audit Committee's approval did not disclose any material details about the trip, including the name of the contractor, the length of the trip, or the value of the trip.

### iii. Phillips's Consulting Agreement

231.    In 2017, the NRA began to plan for Phillips's retirement and the introduction of his replacement. As *ex officio* director, Treasurer and CFO, Phillips's compensation was required to be set by the NRA Board or an authorized committee. He was not permitted to receive any additional compensation without specific Board authorization. However, the NRA's President and

First Vice President gave Phillips a post-employment compensation benefit in the form of a consulting agreement without such authorization.

232.    On May 5, 2018, while Phillips was still the Treasurer of the NRA, Phillips entered into an independent consulting agreement to continue to be paid by the NRA following his retirement. The contract was executed by the NRA President and First Vice President. Pursuant to the contract, the NRA agreed to pay Phillips $30,000 per month for five years for consulting services. In exchange for this monthly payment, Phillips was to "provide advisory services and the benefit of his expertise in all appropriate areas, including, but not limited to, areas related to his prior duties as CFO and Treasurer of the Organization." As a consultant, Phillips would "coordinate activities with the NRA's Executive Vice President, Treasurer and CFO, and Executive Director, Office of Advancement to build and maintain relationships with major gifts donors, identify and cultivate relationships with fundraising partners, and identify prospective high net worth individuals to solicit for major gifts." The contract was signed by the NRA President and one Vice President.

233.    There is no evidence that the Audit Committee reviewed or approved Phillips's consulting contract prior to its execution. The Vice Chair testified that he did not recall the contract coming before the Audit Committee for approval. The Chair did not recall seeing the contract either; he testified that he believed that "it would not be a related party transaction…so, it would not come to the Audit Committee vis-à-vis that." He further testified, "If, in fact, that were a related party transaction…and come to the Audit Committee, I can guarantee you my committee would not have approved that."

234.    Upon information and belief, Phillips has provided no consulting services to the NRA under this agreement. Payments made to Phillips under this agreement are *ex gratia* payments and a waste of charitable assets.

235.    The current Treasurer testified, "[Woody] wasn't my consultant…Woody never consulted for me….I don't have direct conversations with Woody about anything." His understanding was that Phillips was being paid to consult with the Office of Advancement. LaPierre, for his part, claimed he "didn't even know about" the contract until his lawyers told him about it several months after Phillips's departure, and that he did not know whether Phillips provided any consulting services under the contract. The Vice Chair of the Audit Committee testified that Phillips was engaged as a consultant because "he has a lot of institutional knowledge, and that is helpful to… the current treasurer," but admitted that he did not know whether the current Treasurer actually consults with Phillips. He acknowledged that he did not have any knowledge of work performed under the contract.

236.    The Chair of the Audit Committee also testified that Phillips is not paid a flat monthly rate as the May 2018 agreement suggests, but is instead paid a minimal hourly fee that is only for work performed. He testified, "I personally don't like flat-rate contracts unless someone is going to be working a lot…if someone has a flat-rate contract and someone is going to be…working a good number of hours to justify that, that's okay. But as I understood Woody's deal, it was going to be—he was going to be there as—as a consultant for [the Current Treasurer] if and when he ran into issues." The Chair's understanding was that the flat-rate contract was "never triggered," and that it was replaced by an hourly contract.

237.    Phillips has continued to submit monthly invoices to the NRA for $33,500 to be paid to Phillips through a corporate entity called WHIP LLC. These invoices specify that they are

57

for monthly billing under the original contract dated May 5, 2018. In the first 7 months of 2019, NRA records reflect payments to WHIP LLC for $170,692.37.

### C. Joshua Powell's Conflicts of Interest, Related Party Transactions, and Negligence

238.   In 2016, LaPierre hired Powell—who had been a board member of the NRA shortly before he was hired—to be his Chief of Staff. Powell was hired to oversee business practice changes and improvements within the NRA. LaPierre testified that he hired Powell as a "change agent" who would "modernize the NRA" and "improve business practices." LaPierre explained that his "former chief of staff had retired and we were specifically looking for someone with a business background to bring in to work on the … various business aspects of the NRA …." LaPierre believed Powell had good ideas on potential areas of growth for the NRA, and that "along with [his] other business experience," Powell was a "good choice for the NRA." Asked about this other business experience, LaPierre testified that Powell "had a catalog that he had worked with and … as far as I knew, [it] was successful." The catalogues were not successful. Upon information and belief, both ventures were short-lived, neither was profitable, and Powell has been sued numerous times in connection with the catalogues over the non-payment of debt.

239.   Powell came to be—along with NRA outside counsel Brewer, Attorneys & Counselors (the "Brewer firm")—in charge of the NRA's compliance efforts. This was despite Powell's routine disregard for and violation of NRA policies and procedures regarding contracts and expenses, as well as his abusive behavior towards NRA and vendor staff.

240.   Powell held the position of Executive Director of General Operations until December 2018, when he was removed from that position. At that time, he was named "Senior Strategist"—a newly created position—to coordinate with the Brewer firm "in its campaign

against the State of New York." Upon information and belief, Powell retained his then salary, and also retained his position as LaPierre's Chief of Staff.

241.    LaPierre acknowledged that, by the end of 2018, it had become "obvious to [him] that" Powell was "abusive to the way he was treating some employees, and he was not well liked among a lot of employees based on that treatment." But instead of terminating Powell, LaPierre gave him the position of Senior Strategist, which LaPierre described as a promotion in a firmwide announcement.

242.    In January 2020, Powell was terminated for, among other things, misappropriating NRA funds during his entire tenure at the NRA.

### i. Powell's Compensation

243.    Powell's salary was set at the discretion of LaPierre. When he first joined the NRA in June 2016, Powell's salary was set at $250,000. A month later, it was retroactively increased to $500,000 by Phillips and LaPierre. A revised employment agreement memorializing the $500,000 salary was signed by Powell, Phillips, and LaPierre in November 2017. In comparison, Powell's predecessor as Chief of Staff, who had been at the NRA for over 35 years, had a base salary of approximately $350,000 at the time of her retirement.

244.    Powell's November 2017 employment contract included a housing allowance to be negotiated by the NRA and Powell annually. From August 2016 to June 2019, the NRA paid or reimbursed Powell for over $130,000 in rent for his Virginia residence. In 2018 alone, Phillips approved lease payments of $54,000 to Powell's landlord. Powell was also regularly reimbursed for his cellphone, as well as his utilities, parking, cable, and internet charges for his Virginia residence. The NRA policy on relocation expenses provides for a maximum temporary living expense allowance of thirty days and a maximum $7,500 in relocation expense reimbursement.

245.    After Powell had been at the NRA for approximately a year, in the third quarter of 2017, Powell's salary was increased to $650,000, again by Phillips and LaPierre.

246.    In March 2018, Phillips and LaPierre retroactively raised Powell's salary again to $800,000 as of January 1, 2018. There was no change in his position at that time.

### ii. Powell's Spending and Reimbursement Requests

247.    Powell routinely violated the NRA's expense reimbursement requirements and policies concerning travel expenses, both on his NRA-issued credit card and by passing expenses through NRA vendors.

248.    Powell charged expenses for travel and entertainment to his NRA-issued credit card. For example, between mid-February and mid-March 2019 alone, Powell charged approximately $13,000 in lodging, food, and travel to his NRA credit card.

249.    One of the NRA's vendors, Ackerman, in a letter to the current Treasurer also detailed approximately $32,000 in food and travel expenses incurred by Powell—the vast majority of which were incurred at a high-end Italian restaurant in Alexandria, VA—that Ackerman passed through to the NRA between October 2016 and December 2018. After receiving this letter, the current Treasurer sent it to the Brewer firm and did nothing to follow up on the spending allegations.

250.    It was not until October 2019 that the current Treasurer began examining Powell's expenses himself, which, upon information and belief, he did independently of any investigation the Brewer firm was conducting in response to the allegations of excessive spending and reimbursement alleged in the press and the May 2019 Ackerman letter.

251.    The NRA terminated Powell in January 2020 after it claims to have found that, between 2016 and 2019, Powell had charged the NRA over $33,000 in improper travel expenses, including travel for his wife and children; an average of approximately $500 per month in AT&T

60

expenses; and over $4,000 in improper technology expenses, in addition to miscellaneous improper housing, parking, relocation, utility, and other expenses.

252.    Powell ultimately paid the NRA $40,760.20 to settle the dispute over his expenses.

### iii.    Powell's and Phillips's Negligence in Entering into Multimillion-Dollar Verbal Contracts

253.    In or about mid-2017, Powell, Phillips, and LaPierre engaged in discussions with longtime NRA fundraising consultant McKenna about a large-scale project that would encompass (1) a search for a new NRA CFO in anticipation of Phillips's retirement in 2018; (2) a search for a new or refreshed banking relationship for the NRA; and (3) a possible restructuring of the NRA's corporate structure and advancement of its affinity insurance program. The name for the project that encompassed all of this work ultimately became "Project Ben-Hur."

254.    At the direction of Powell, the NRA engaged McKenna to perform the services contemplated by Project Ben-Hur without entering into a written contract or obtaining written approval in advance from the NRA President or Vice Presidents.

255.    McKenna was a consultant for the NRA from approximately 2012 until 2019. Up until the Project Ben-Hur discussions in 2017, McKenna's consulting for the NRA had mostly consisted of donor cultivation work with high net worth individuals. Between 2013 and 2017, the NRA paid McKenna anywhere from approximately $800,000 to $1.8 million per year. In or about June 2017, the NRA and McKenna entered into an amended agreement that lowered the monthly consulting fee paid to McKenna from $40,000 to $20,000 per month.

256.    The fees paid under that written agreement, however, represented a small fraction of what the NRA was paying McKenna.

257.    Upon information and belief, most of the services that McKenna performed for the NRA (and the fees that it charged) were based on oral agreements entered into by LaPierre,

Phillips, and Powell. For example, no written contract regarding Project Ben-Hur was ever executed—instead, Powell and Phillips entered into an oral contract to pay McKenna between $160,000 and $250,000 per month in 2018, in violation of the NRA's contract approval and conflict of interest policies. This monthly fee did not include an additional, approximately $375,000 in legal fees and $200,000 in food, travel, and other out of pocket expenses that McKenna requested reimbursement for from the NRA in 2018.

258.     In 2018, Powell also approved a verbal contract with LookingGlass, a cybersecurity firm that McKenna recommended to him—and in which McKenna is an investor. That verbal contract violated the NRA's contract approval requirements and was for services that were later found to be overpriced. The contract ultimately cost the NRA approximately $500,000 before it could be terminated.

#### iv.  Powell's Conflict of Interest Concerning His Wife's Employment

259.     After Powell became an NRA executive, his wife was employed by McKenna.

260.     As the Project Ben-Hur discussions described above in Part Five, Section I(C)(iii) progressed, on or about December 15, 2017, McKenna hired Powell's wife as an independent contractor, through a newly formed company called SPECTRE, to assist with the project. Although Powell's wife worked on McKenna client accounts apart from the NRA, her monthly consulting fee of $30,000 was passed through in its entirety to the NRA with a $5,000 markup for McKenna beginning in or about January 2018 through approximately December 2018.

261.     Shortly after Powell's wife was hired as an independent consultant for McKenna, Powell authorized a contractual amendment to increase McKenna's monthly retainer for donor cultivation from $20,000 to $25,000 per month for 2018. That written amendment was signed by Phillips and Powell in January 2018.

262.    Prior to signing the amendment, Powell did not disclose the conflict of interest posed by his wife's work for McKenna to the NRA General Counsel or the Audit Committee. In fact, upon information and belief, Powell instructed his wife not to attend meetings when Frazer would be present to avoid drawing Frazer's attention to the fact that she worked at McKenna. In doing so, Powell not only disregarded his disclosure obligations under the NRA's conflict-of-interest policy, but took affirmative steps to hide the conflict from the NRA officer he was supposed to disclose it to.

263.    Upon information and belief, it was not until the current Treasurer confronted Powell about the relationship in mid-2018—as the NRA Whistleblowers were preparing to disclose the conflict to the Audit Committee—that Powell disclosed it to Frazer.

264.    On July 26, 2018—four days before the NRA Whistleblowers presented the NRA Audit Committee with evidence of Powell's conflicts of interest—Powell introduced a "refresher" presentation to NRA upper management on compliance and governance issues, which included training on conflicts of interest and related party transactions.

265.    While NRA officers and board members are required by NRA policy to disclose conflicts of interest on at least an annual basis, Powell did not submit a completed Financial Disclosure Questionnaire for 2018 until September 6, 2018—the date that the NRA Audit Committee discussed and voted on Powell's conflicts.

### v. Powell's Related Party Transaction with His Father

266.    In 2017, Powell requested that Ackerman add his father, a photographer based in Colorado, to its photographer rotation for NRA events. Ackerman complied with Powell's request, and proceeded to pass through at least $93,000 in expenses for his father's services to the NRA. Shortly thereafter, in or about September 2017, Powell instructed NRA personnel to pay his father for his services directly, ultimately resulting in approximately $10,000 being paid to his father.

63

According to NRA personnel, Powell's father's services were more expensive than the quote provided by another photographer. It was not until the NRA Whistleblowers brought the relationship to the attention of the Audit Committee in July 2018 that it was disclosed as a conflict. The Audit Committee then summarily ratified the transaction in September 2018.

### vi. Powell's Record of Alleged Sexual Harassment and Discrimination

267. On June 8, 2017, after having been terminated a week earlier, a former NRA employee, through counsel, lodged a sex discrimination complaint against Powell with the NRA Human Resources Director. The NRA Human Resources Director forwarded the complaint to the General Counsel's Office for investigation.

268. The complainant, a former NRA employee, alleged that Powell disparaged her in front of her colleagues by stating that she sounded like Powell's wife when she asked a question during a meeting. The complainant also alleged that Powell had frozen her out of the NRA by outsourcing her job duties to vendors after she raised concerns about Ackerman's fees during a meeting with its CEO. According to the complainant, Powell directed her to meet him at a bar the following day, where he berated her, accused her of being "emotional," and told her that Ackerman could spend as much money as it wanted, even if the charges were "made up."

269. In or about June 2018, the NRA settled the potential sexual discrimination claim made against the NRA for Powell's conduct for $89,000.

270. Powell was also accused by at least one Ackerman employee of sexual harassment in or about October 2018. That Ackerman employee raised her accusation with LaPierre, which resulted in Powell being removed as the NRA's designated point of contact for Ackerman but otherwise, upon information and belief, did not result in any investigation or disciplinary action regarding Powell's behavior.

### D. John Frazer's Negligence and Certifications of False or Misleading Annual Filings

271.    John Frazer has been the Secretary and General Counsel of the NRA since 2015. LaPierre hired Frazer as General Counsel in January 2015 and the Board appointed him as Secretary in April 2015. In his capacities as Secretary and General Counsel, Frazer reports directly to LaPierre.

272.    Frazer began his career with the NRA in 1993 as an information specialist in the research and information division of NRA-ILA. Frazer was not a lawyer at the time and he was primarily responsible for "answering mail and phone calls from members and the general public about legislative and Second Amendment issues."

273.    Frazer obtained his law degree in 2008 from George Mason University and became licensed to practice in Virginia that same year. While attending law school, Frazer continued his non-legal work for the NRA. Once he became a licensed attorney in 2008, Frazer remained in a non-legal position at the NRA until 2013. During that period, Frazer served as the Director of the research and information division of NRA-ILA.

274.    In September 2013, Frazer left the NRA to work in private practice as a solo practitioner. He practiced independently for approximately a year-and-a-half. During his brief time working in private practice, Frazer practiced firearms-related law. Frazer left private practice in January 2015 and returned to the NRA full-time as General Counsel. Frazer was subsequently appointed by the NRA Board as Secretary in April 2015. At that time, Frazer received a salary of $272,578, along with additional compensation of $55,870. In or around September 2017, Frazer's salary was increased to $360,000, with additional compensation of $54,100.

275.    At the time of his appointment as Secretary and General Counsel, Frazer had been licensed as an attorney for seven years, and had been in private practice in his own firm for 18

65

months. There is no indication from Frazer's seven years with a law license—only 18 months of which entailed representing clients—that he had relevant legal experience in corporate governance, corporate compliance, tax exempt organization requirements, not-for-profit organization requirements, or the law governing boards and board procedure. There is also no indication that Frazer, based on his experience, had familiarity or legal experience with the N-PCL, the governance requirements of the New York Nonprofit Revitalization Act, the EPTL, the requirements of the Internal Revenue Code with respect to 501(c)(3) or (c)(4) nonprofits, reporting, transactions with disqualified persons, or excise tax reporting and payment obligations.

276.     LaPierre hired Frazer as General Counsel without reviewing his qualifications or determining whether he had sufficient legal expertise and experience for the role. LaPierre admitted that he "didn't know" that Frazer hadn't graduated from law school until 2008. LaPierre further admitted that he did not know how familiar Frazer was with New York nonprofit law, or with the law governing tax exempt organizations. LaPierre did not make any inquiry of Frazer to determine whether he had those areas of expertise when hiring him as General Counsel. Instead, LaPierre "assumed, as any other attorney, he would be aware of…general things like that."

277.     LaPierre did not consult an executive search firm to assist in identifying qualified candidates for the General Counsel position prior to hiring Frazer. LaPierre did not ask that a search be conducted of Frazer's prior legal writings or of lawsuits in which he was involved. Nor did LaPierre take steps to ensure that a credit or social-media check was conducted for Frazer before hiring him as General Counsel. LaPierre testified, "I assumed that stuff is done by our human resources department. I didn't do it."

### i.  Failure to Comply with Relevant Governance Requirements

278.     As of July 1, 2014, the New York Nonprofit Revitalization Act of 2013 imposed significant governance requirements on New York charitable corporations, including the NRA.

66

These requirements concerned, among other things, audit oversight by a committee of independent directors, the substance and procedures for addressing related party transactions, and requirements to have conflict of interest and whistleblower policies. In his capacity as Secretary and General Counsel, Frazer had the duty to be aware of these legal requirements, determine what the NRA was required to do to comply with these governance requirements, and ensure that appropriate changes were timely made in the NRA's governance procedures to comply with these requirements.

279.     From 2014 to 2018, Frazer failed to make the necessary changes to board governance procedures, or to advise officers and directors of the needed changes. Frazer repeatedly failed to ensure that related party transactions were being addressed by NRA officers and directors in accordance with N-PCL § 715; failed to enforce compliance with the NRA's Conflict of Interest Policy for years; and failed to ensure that the NRA was in compliance with laws and policies governing whistleblowers. For example, in connection with related party transactions, the Audit Committee Chair testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't."

### ii.   Certification of False or Misleading Annual Filings

280.     In his capacity as Secretary, Frazer is responsible for executing and certifying the NRA's annual CHAR 500, which includes the NRA's IRS Form 990, with the New York Charities Bureau. On an annual basis, Frazer certified under penalty of perjury that he "reviewed this report, together with all attachments," and that to the best of his knowledge and belief "they are true, correct, and complete in accordance with the laws of the State of New York applicable to this report."

281.     In each year from 2015 until the NRA's most recent filing in 2019, Frazer executed an identical certification attesting to the accuracy of the NRA's annual filings. As detailed in Part Five, Section VII below, the NRA made materially false and misleading statements and omissions in its 2016 and 2017 filings with the Attorney General, which Frazer falsely certified were true, correct, and complete. Frazer either knew or negligently failed to learn that the filings of the NRA with the New York Charities Bureau were not "true, correct, and complete in accordance with laws of State of New York applicable to this report."

### E.  Improper Expenditures by LaPierre's Senior Assistant and Direct Report

282.     LaPierre hired one of his longest serving and key employees in 1995 to work in the EVP Office as his assistant. For the last 25 years, this employee has been one of LaPierre's closest and most trusted advisors. This employee is hereinafter referred to as "LaPierre's Senior Assistant."

283.     LaPierre's Senior Assistant joined the NRA with a criminal record of embezzling from a non-profit where she had worked in the 1980s.

284.     LaPierre's Senior Assistant has held various job titles during her NRA career, all of which have entailed working closely with and reporting directly to LaPierre. In general, LaPierre's Senior Assistant acts as a liaison between LaPierre and the NRA Board, attends meetings with LaPierre and also speaks about the NRA or acts as a representative of the NRA at events around the country. LaPierre's Senior Assistant's current salary is $250,000.

285.     At some point in the 2000s, LaPierre's Senior Assistant was accused of diverting money from the NRA to use for personal expenses. This prompted an investigation by the NRA Board and an external auditor, which resulted in LaPierre's Senior Assistant's NRA credit card being taken away. However, even though her corporate credit card was taken away, she continued to have access to and use of other NRA employees' corporate credit cards, including the CFO's.

68

286.    After LaPierre's Senior Assistant's credit card privileges were revoked, LaPierre and Phillips tasked an executive assistant in the Treasurer's Office ("Executive Assistant No. 1") with the responsibility of reviewing LaPierre's Senior Assistant's expenses and reimbursement requests. Executive Assistant No. 1 was more junior than LaPierre's Senior Assistant and lacked sufficient supervision and institutional authority to rein in LaPierre's Senior Assistant's inappropriate spending.

287.    LaPierre's Senior Assistant still had the authority to incur up to approximately $15,000 to $20,000 per month for business travel expenses, sponsorships, and event attendance.

288.    In 2012, upon information and belief, LaPierre's Senior Assistant had the NRA pay for approximately $18,000 in expenses incurred in connection with her son's wedding in Minnesota. Executive Assistant No. 1, who was responsible for processing these expenses, testified that this was consistent with LaPierre's Senior Assistant's longstanding practice of expensing personal items to the NRA that she would later ostensibly reimburse. According to Executive Assistant No. 1, these wedding expenses never were reimbursed by LaPierre's Senior Assistant. In fact, LaPierre's Senior Assistant directed Executive Assistant No. 1 to remove information from the wedding invoices that would identify them as being personal in nature.

289.    LaPierre also authorized his Senior Assistant to book flights and black car services through LaPierre's Travel Consultant, which she frequently did. LaPierre's Senior Assistant abused this privilege and violated the NRA's travel policy. She routinely hired black cars to ferry her to and from airports and NRA events at substantial expense, and often extended this courtesy to her family as well.

290.    As one example, on a single day, LaPierre's Senior Assistant incurred over $1,100 in black car bills for her husband's trips to and from airports.

69

291.    On another occasion, the employee incurred almost $1,300 in black car bills on a single day for her son, to transport him from New York to Washington D.C.

292.    In August 2018, over the course of a two-week fundraising excursion in France, LaPierre's Senior Assistant authorized approximately $100,000 in black car expenses for two chauffeured vehicles.

293.    In January 2019, the Audit Committee learned that LaPierre's Senior Assistant's son had been paid on two occasions as a sound stage manager for the NRA's annual conventions in 2017 and 2018, and on one occasion as a performer at an NRA Advancement event. While the Audit Committee retroactively approved that arrangement—along with approving her son's future services on similar terms—there is no evidence that the Committee reviewed any information that would support its determination that his employment was "fair, reasonable, and in the best interest of the NRA." For example, the Report of the Audit Committee fails to document any review of the usual and customary price for these services, or the price for LaPierre's Senior Assistant's son's travel in connection with his work for the NRA.

294.    LaPierre's Senior Assistant's expenditures were recently called into question again. The current Treasurer learned that LaPierre's Senior Assistant used other NRA employees' credit cards—including the CFO's—to charge personal expenses. When asked about this, LaPierre admitted that there "are some things right now that we are investigating that look to be suspicious."

295.    For the past 25 years, LaPierre's Senior Assistant has reported directly to LaPierre. Her salary and expenses are included in the budget for EVP Office, and she has never answered to a different supervisor. In his role as his Senior Assistant's direct supervisor and the chief executive of the NRA, LaPierre has a fiduciary duty to oversee her. LaPierre's Senior Assistant's

70

misconduct, including her long history of inappropriate spending, reflects negligent oversight on the part of LaPierre.

## II. The NRA's Use of Longtime Vendors and Consulting Agreements to Hide Improper Expenditures, Self-Dealing, and Related Party Transactions

296.    For decades, LaPierre has retained vendors and contractors without appropriate oversight of contract performance, expenses, or payments. During Phillips's tenure at the NRA, he aided and supported LaPierre in these efforts.

### A. Ackerman McQueen and Mercury Group

#### i. The NRA's Decades-Long Relationship with Ackerman

297.    The NRA worked with Ackerman, an Oklahoma-based advertising and public relations firm, for over three decades. The NRA also worked with Mercury Group, a wholly owned subsidiary of Ackerman that is headquartered in Alexandria, VA, since the mid-1990s.

298.    From 1992 to 2018, Ackerman was the NRA's largest vendor. The NRA reported paying Ackerman $20,324,364, in 2017, and $31,994,168, in 2018 for "public relations and advertising" services. Mercury Group separately received over $5.5 million from the NRA in 2017. The NRA did not publicly disclose the fees it paid the Mercury Group in 2018.

299.    In addition, the NRA paid Ackerman $11,739,668 in 2017, and $6,337,508 in 2018 for "out of pocket expenditures" on behalf of the NRA for "media, outside vendor costs, and reimbursement of travel and business expenses." These expenses were incurred in violation of NRA policy, without proper oversight, and in many instances for the personal benefit of NRA insiders.

300.    At the heart of this business relationship was the personal relationship between LaPierre and the co-founder of Ackerman. For decades, LaPierre relied on the Ackerman co-founder for advice on organizational branding, strategic communication, and crisis management.

Until the co-founder's death in 2019, he and LaPierre would often speak on a daily basis and, depending on current events, they might speak multiple times per day.

301.    LaPierre similarly had a close relationship with the president of Mercury Group, who was a personal friend and advisor of LaPierre, dating back 30 years. LaPierre considered him a "brother" and enjoyed a lucrative business relationship with him for years through the entities he led, including Mercury Group and UWS. LaPierre also hired him as a paid consultant to the NRA.

302.    In mid-to-late 2018, the relationship between the NRA and Ackerman/Mercury Group eroded and the NRA and Ackerman/Mercury Group are now engaged in litigation.

### ii.  The NRA's Practices Concerning Ackerman's Budgeting and Invoicing

303.    For at least two decades, the relationship between the NRA and Ackerman was formalized through a written agreement (the "Services Agreement"). The most recent iteration of the Services Agreement was entered into in April 2017 and amended in May 2018.

304.    The Services Agreement provided that LaPierre or his designee were the "only persons within the NRA" with the authority to issue written communications upon which Ackerman was authorized to act.

305.    Upon information and belief, LaPierre was directly involved in managing the scope and cost of Ackerman's services. Upon information and belief, he met annually with Ackerman's co-founder to negotiate the budget for the upcoming fiscal year and Phillips typically joined these meetings.

306.    Ackerman would then develop a budget document that would govern its relationship with the NRA for the upcoming fiscal year. Upon information and belief, the budget was reviewed and approved each year by LaPierre and Phillips.

307.    Once the annual budget was finalized, Ackerman initiated projects and invoiced the NRA monthly for services rendered. Upon information and belief, LaPierre requested that invoices from Ackerman to the NRA FSD contain very little detail about the work performed or services rendered.

308.    Upon information and belief, the NRA failed to conduct adequate oversight of Ackerman's activities and billing. As the NRA itself pleaded in its complaint against Ackerman, "[o]ver the parties' decades-long course of dealing, underlying receipts and other support for [Ackerman's] expenses were not transmitted to the NRA alongside [Ackerman's] invoices, but, rather, were supposedly maintained at [Ackerman's] offices." The NRA agreed to the arrangement, abrogating its oversight responsibility over its primary vendor and facilitating a process whereby it paid invoices with minimal detail and little supporting documentation.

### iii.  NRA Executives' Misuse of Out of Pocket Expenses

309.    In addition to the services that Ackerman provided to the NRA pursuant to the Services Agreement, Ackerman also paid for a variety of unrelated out of pocket expenses and passed those expenses through to the NRA. The NRA used this arrangement to conceal expenditures by NRA executives—including LaPierre and Powell—many of which were personal or lacked documentation required by IRS publication 463 to permit the NRA to avoid reporting such expenses as taxable income.

310.    Upon information and belief, the practice of passing expenses through Ackerman started decades ago as an informal agreement between LaPierre and Ackerman's co-founder, and continued until the two companies severed ties in 2019.

311.    Ackerman billed the NRA for out of pocket expenses by submitting non-particularized invoices that aggregated the expenses into a lump sum amount and provided no details on the nature or purpose of the expenses. The invoices that Ackerman submitted to the

73

NRA typically included a one-line description that read "Out of Pocket Expenses" and a total amount. Upon information and belief, Ackerman took no steps to verify whether the out of pocket expenses were compliant with NRA policies governing travel and entertainment.

312. The expenses billed to the NRA for out of pocket expenses did not comply with IRS requirements governing "accountable plans." As a result, all such expenses should have been included by the NRA in the taxable personal income for each recipient.

313. The NRA's annual budget with Ackerman included an aggregate line-item for "Pass-through Expenses." The amount earmarked for this purpose in the Ackerman/NRA budget increased over time. In 2018, the annual budget allocated $950,000 exclusively for this purpose.

314. The effect of the pass-through expense arrangement was that these expenses would be paid for by the NRA without written approvals, receipts, or supporting business purpose documentation in accordance with NRA policies and procedures, and without disclosure to or internal review by the NRA FSD. Payment of these expenses also violated IRS rules governing reporting of income for each of the recipients on their W-2 forms, exposing the NRA to penalties for false filings and for under-withholding of taxes due. In addition, with respect to LaPierre, the false reporting exposed the NRA to tax and penalty liability for 21% of the amount of his income exceeding $1 million pursuant to the Tax Cuts and Jobs Act, and permitted him to file false personal tax returns with the IRS.

315. Under the umbrella of "Pass-through Expenses," the NRA paid for millions of dollars in entertainment and travel expenses incurred by NRA executives and associates— including LaPierre and Powell—without scrutiny from within the organization. Examples of this practice include, without limitation, the following:

316.     The NRA used the pass-through arrangement with Ackerman to pay for expensive

meals for NRA executives at an upscale Italian restaurant in Alexandria, VA. NRA executives—

including Powell and the Executive Director of Advancement—regularly charged these meals to

the Mercury Group president's account. The charges were then passed on to the NRA. The NRA

also directed Ackerman to purchase several memberships to a members-only cigar bar affiliated

with the upscale Italian restaurant in Alexandria, VA.

317.     Upon information and belief, over a five-year period, Ackerman paid, and the NRA

reimbursed, more than $250,000—at a rate of $4,000 per month—in access fees to LaPierre's

Travel Consultant. Like the other expenses passed through Ackerman, this $4,000 monthly fee

was unrelated to the services that Ackerman provided to the NRA under the Services Agreement.

Upon information and belief, Ackerman itself rarely used LaPierre's Travel Consultant's services.

318.     The NRA used the pass-through arrangement to pay for extensive travel expenses,

including via private aircraft, incurred by the president of Mercury Group on behalf of LaPierre.

Upon information and belief, when the president of Mercury Group travelled with LaPierre, he

travelled by private aircraft at the direction of LaPierre. LaPierre would also direct the president

of Mercury Group to incur various charges—including hotel rooms, meals, cars, tips, and gifts for

himself and VIP donors—and to submit those expenses to the NRA for reimbursement through

the 'out of pocket' arrangement.

319.     In relation to the NRA annual meetings, LaPierre asked the president of Mercury

Group to pay for LaPierre and others—including LaPierre's family—to stay at a luxury private

hotel, apart from the host hotel at which NRA employees and board members were staying. These

costs were paid for by Ackerman and billed to the NRA as pass-through expenses. For example,

in 2016, the president of Mercury Group—at LaPierre's direction—paid $37,337 for "Guest

Lodging confidential per WLP" at a boutique hotel in Louisville, KY for LaPierre's family, guests, and his security guards.

320.    LaPierre also used the pass-through arrangement to conceal private travel and trips that were largely personal in nature. Upon information and belief, LaPierre directed Ackerman to pay for expenses related to NASCAR events, country music events, and even medical visits, and bill those through to the NRA. For example, in 2018, LaPierre asked the president of Mercury Group to accompany him on a visit to a medical clinic. In connection with this visit, the president of Mercury Group and LaPierre flew on a private charter and stayed at the Four Seasons for several days. The cost of this hotel for both the president of Mercury Group and LaPierre was paid for by Ackerman, but ultimately borne by the NRA. The lodging alone cost the NRA $9,550. The NRA also directly paid for the private travel associated with this visit to the medical clinic.

321.    The NRA also directed Ackerman to pay for a variety of other costs in connection with LaPierre's travel and bill those costs to the NRA as pass-through expenses. When he travelled, LaPierre often required an individual from Ackerman to travel with him to provide logistical and administrative support. That individual would be responsible for the payment of meals and gratuities for waiters, drivers, bellhops, hotel concierges, housekeepers, and others. Upon information and belief, the individuals who travelled with LaPierre instituted a practice of taking large cash advances—often several thousand dollars each at a time—to cover the cost of gratuities that LaPierre would direct him to pay.

322.    The NRA's Executive Director of Advancement used the pass-through arrangement to pay for travel and entertainment-related expenses. He possessed an Ackerman-issued corporate credit card and the charges that he incurred on this card were billed to Ackerman and passed through to the NRA. Among other charges, the credit-card statements for the Executive

Director of Advancement frequently included stays at luxury hotels like the Four Seasons, the St. Regis, the Ritz Carlton, and the Beverly Hills Hotel. He routinely stayed in suites costing over $1,500 a night. Upon information and belief, LaPierre was aware of and endorsed these expenses being billed through Ackerman.

323.    In connection with NRA annual meetings and Women's Leadership Forum meetings, LaPierre's wife would incur thousands of dollars of expenses per event for hair and makeup services, which were billed through Ackerman as out of pocket expenses. For example, between May 2016 and May 2017, the NRA paid one artist $16,359 for three events for LaPierre's wife. Upon information and belief, both LaPierre and his wife were aware of the cost of these makeup services.

324.    The NRA also used the pass-through arrangement with Ackerman to pay for expenses related to a charity whose affiliation to the NRA was not through its mission, but rather through LaPierre's wife, who served as the president of its Board of Trustees in 2017 and 2018.

### iv.  The NRA's Failure to Conduct Proper Oversight of Ackerman Billing

325.    Upon information and belief, LaPierre, Phillips, and Powell were fully aware of both the process of passing expenses through Ackerman to the NRA and the nature of the charges that fell into this category of expenses.

326.    Upon information and belief, the NRA's oversight of the out of pocket expenses routed through Ackerman was limited to annual audits by Phillips and the Managing Director of Finance at Ackerman's headquarters in Oklahoma City, OK. This review was conducted off-site at the direction of LaPierre. The NRA did not inform its Audit Committee or its external auditors about the out of pocket arrangement.

### v. The Benefits of Under Wild Skies Television Programming

327.    The president of the Mercury Group was also the president of UWS.

328.    UWS produces a television program of the same name that is focused on hunting and is hosted by the president of Mercury Group and UWS. Upon information and belief, since 2010, the NRA has paid UWS over $18 million.

329.    In 2016, the NRA entered into concurrent advertising and sponsorship agreements with UWS that would govern the relationship for the next nine years. These agreements were both negotiated and executed by LaPierre. These agreements provided for significant payments to UWS in exchange for sponsorships and various forms of advertising during the televised program. For the fiscal year 2019 alone, the NRA's internal records report that it paid UWS $1,957,500 for advertising and sponsorship of the program. UWS also enjoyed the right to free airing of Under Wild Skies on NRA-TV.

330.    LaPierre and his wife regularly appeared in episodes of Under Wild Skies, traveling to and participating in big game hunts in the United States, Botswana, Tanzania, South Africa, Zimbabwe, Mozambique, Argentina, and Uruguay. The expenses associated with these trips—including professional hunter costs, camps, chartered in-continent travel, food and beverages, hunting licenses, trophy fees, and taxidermy—were incurred by UWS. According to the president of Mercury Group and UWS, a single game hunt of this nature could cost upwards of $100,000.

331.    LaPierre also directed the president of Mercury Group and UWS to pay for various NRA board members and officers and their spouses—including the former Executive Director of NRA-ILA and his spouse, current board members, and the Executive Director of Advancement—to participate in big game hunts around the world. Upon information and belief, these trips were not authorized by resolution of the NRA Board or an authorized committee.

332.     These expenses constituted private benefits and gifts in excess of authorized amounts pursuant to NRA policy to LaPierre and his wife. These expenses also constituted private benefits to NRA board members in violation of Article V, Section 5(a) of the NRA bylaws.

### vi. The NRA's Supplemental Income Payments to Under Wild Skies' Principal

333.     In addition to payments related to the Under Wild Skies program, the NRA, with the knowledge and consent of LaPierre and Phillips, also paid the president of Mercury Group and UWS close to $50,000 a month, or approximately $600,000 annually, in "supplemental" fees to identify and cultivate high dollar donors for the NRA. Upon information and belief, the president of Mercury Group and UWS received these fees from approximately 2009 to 2019.

334.     At the instruction of Phillips, this supplemental payment was made to the president of Mercury Group and UWS through the UWS entity, even though the services did not relate to the Under Wild Skies program.

335.     Upon information and belief, this supplemental agreement was never formalized as a written contract. The amount paid to the president of Mercury Group and UWS under this agreement was negotiated exclusively between the president of Mercury Group and UWS, LaPierre and Phillips. No formal bidding process was conducted for the services that the president of Mercury Group and UWS provided under this oral agreement, and the agreement was never approved in writing by either the NRA President or the Vice Presidents.

336.     Payments to the president of Mercury Group and UWS under this supplemental agreement were made every two months, in installments of $97,500. Upon information and belief, Phillips instructed the president of Mercury Group and UWS as to the language to use in the invoices for such payments. The invoices each contain a one-line description that reads "Supplemental Invoice."

337.    In negotiating and approving this arrangement, LaPierre and Phillips violated the NRA's internal policy concerning contracts over $10,000, which are required to be in writing.

### B.  Consulting Agreements with Former Employees

338.    In the last 15 years, LaPierre has directed the NRA to pay officers, directors, and former employees millions of dollars in "consulting" agreements without Board approval and in violation of the bylaw prohibition on salary or other private benefits to directors without Board authorization. In some instances, officers executed such agreements without Board authorization. Such agreements were frequently entered into in violation of NRA policy concerning contract approvals, independent contractors, and procurement and without proper documentation and sign-off. In some cases, former employees were paid far in excess of reasonable compensation and did not actually provide the NRA with corresponding consulting services. In other cases, the NRA failed to properly disclose the compensation in its regulatory filings.

### i.  Consulting Agreement with Former Executive Director of General Operations

339.    In late 2016, Powell, with the authorization of LaPierre, terminated the then Executive Director of General Operations, who had been in that role from 2012 to 2016. Upon information and belief, NRA security personnel publicly escorted him out of the building.

340.    After the Executive Director was terminated, LaPierre directed the NRA to enter into an agreement under which the NRA agreed to pay the former Executive Director $60,000 a month over a two-year period (January 2017 to December 2018) for "consulting services." The agreement also provided for a "final payment for consulting services" of $240,000 to be made by January 31, 2019. In all, the Executive Director was paid approximately $1.8 million under the agreement.

341.    The agreement did not define what the term "consulting services" entailed, nor did it provide any justification for the engagement of the former Executive Director to provide such services, in violation of the NRA's policy on independent contractors, which specifies that such contracts "should be well defined in content, duration and outcome."

342.    The agreement did not undergo a competitive bid process, in violation of the NRA Purchasing Policy, which requires buyers and users "to solicit competitive bids/pricing for goods or services valued at or above $5,000" unless an exception applies, in which case the contract must still be reported to the Finance Committee on an annual basis.

343.    The agreement was signed by Phillips on November 8, 2016. Upon information and belief, the agreement was not supported by a business case analysis and was not approved by the NRA's President and one of the two Vice Presidents, in violation of NRA policy. It also did not receive written approval of the Executive Vice President, as required by NRA policy.

344.    The agreement states: "NRA agrees to make twenty-four (24) monthly payments, payable January 2017 through December 2018, in the amount of $60,000 per month for consulting services." LaPierre, however, testified that he was under the impression that it was a severance agreement, and that he authorized it out of concern that the former Executive Director might disparage the NRA. The agreement had a non-disparagement clause, binding the former NRA officer, his spouse and children, and also imposed a confidentiality obligation. The agreement expressly provided that "Confidentiality and Non-Disparagement are among the important terms of this Agreement. Violation by the Executive Director of [these] terms…shall require [the former Executive Director] to return all payments made" under the agreement. LaPierre explained, "even though…I didn't think he was the right guy, I wanted to treat him fair, so we retained goodwill with him." When asked about the $1.8 million paid under this agreement, he maintained, "I think

81

it…was a prudent use of NRA funds to retain that goodwill on the part of [the former Executive Director] and prevent damage from happening that he could have done in the outdoor community to the NRA."

345.    LaPierre was not aware of any consulting services provided to the NRA pursuant to this agreement. When asked directly whether the former Executive Director provided services after his termination, LaPierre testified, "I don't know whether he did or didn't. I think it was just more of a severance." When the current Treasurer was asked the same question about what consulting services, if any, were provided to the NRA in 2018, he testified, "I don't know if that was consulting or some sort of severance or what it was. I just don't know." Upon information and belief, no consulting services were provided to the NRA under this agreement.

### ii.  Consulting Agreement with Former NRA Employee / NRA Foundation Executive Director

346.    H.W.S. Consulting, Inc. ("H.W.S.") is an entity through which the NRA paid a former NRA employee, who assumed the role of Executive Director of the NRA Foundation after he retired from the NRA in 2008 after more than 35 years as an employee (the "Foundation Executive"). Under a post-retirement consulting agreement, the NRA paid the Foundation Executive $30,000 a month, as a fundraising consultant through H.W.S. In addition to the monthly payment, the consulting agreement provided for a "Variable Success Fee." The minimum amount of the Variable Success Fee was $125,000 annually, according to the consulting agreement. The Foundation Executive was unaware of how this fee was calculated but understood that it was paid to him every year during the term of the agreement. Additionally, the Foundation Executive's "actual reasonable and necessary expenditures, which are directly related to the consulting services" were to be reimbursed.

82

347.    The consulting agreement was entered into without engaging in a competitive bidding process, without proper approval or sign-off, and in violation of NRA policy concerning contract approvals for independent contractors or consultants.

348.    The payments made under the consulting agreement were not disclosed on the NRA's IRS Form 990 as fundraising expenses between 2008 and 2015. The payments made under the agreement were first disclosed on the NRA's IRS Form 990 for the year 2016.

349.    The consulting agreement states that the Foundation Executive was engaged to "provide services in connection with fundraising efforts of the NRA … to build relationships with major gifts donors, identify and cultivate relationships with fundraising partners and identify prospective high net worth individuals to solicit for major gifts."

350.    On July 25, 2016, for the first time, H.W.S. filed a Fundraising Counsel Registration Statement on Form CHAR014 with New York State as a Fundraising Counsel. A fundraising counsel is retained to advise with respect to strategy of fundraising but not to conduct actual solicitation.

351.    The Foundation Executive testified that he conducted fundraising and solicited contributions. He identified three major areas of duties: (1) relationship maintenance or development, (2) strategy around fundraising, and (3) fundraising itself.

352.    The Foundation Executive admitted that he did not keep accurate records of fundraising he conducted. He agreed that his position was not subject to quantifiable outcomes or any form of metrics even though he was paid a success fee.

353.    At the direction of Phillips, from the outset of his consulting agreement, the Foundation Executive would submit a form for expense reimbursements without providing specific receipts (other than a credit card statement) or business purpose for the expense. H.W.S.

did not prepare invoices to the NRA, instead, an NRA employee would prepare the invoice and pay H.W.S. for the amount identified in the invoice. The monthly payments would also be paid in advance of each month.

354.    Under the consulting agreement, "actual reasonable and necessary expenditures, which are directly related to the consulting services" were to be reimbursed. As an example, in 2016, according to H.W.S.'s records, $148,314 worth of expenses were submitted and reimbursed by the NRA. The NRA reimbursed H.W.S for expenses including monthly truck leases, internet service at the Foundation Executive's home, the costs of membership in fraternal organizations including the International Order of St. Hubertus and the Camp Fire Club, and the costs and expenses of attending various hunting trips both domestically and internationally.

355.    When the expense reimbursement policy changed in 2018, the Foundation Executive had difficulty providing receipts for expenses incurred prior to the change in policy. Despite not providing receipts for certain expense reimbursement requests in mid-2018, his expense reimbursements were never denied, only delayed. Finally, the Foundation Executive decided to end his consulting agreement at the conclusion of 2018.

### iii.  Consulting Agreement with Former NRA Managing Director of Affinity and Licensing

356.    The NRA entered into a post-employment incentive compensation agreement with its Managing Director of Affinity and Licensing, which provided for him to receive payments from both the NRA and Lockton Affinity LLC ("Lockton Affinity"), the insurance broker that the NRA had engaged for various purposes over many years, including to administer its Carry Guard program. While at the NRA, the Managing Director was responsible for overseeing the NRA's relationship with Lockton Affinity.

357.    The Managing Director retired from the NRA in January 2016. According to the NRA's Form 990 for that year, he was paid a full year's salary—approximately $630,000. He was also paid by the NRA after his retirement—$713,000 in 2017 and $535,000 in 2018.

358.    During this same period, the Managing Director was also being paid by Lockton Affinity. In 2016, Lockton Affinity paid the Managing Director $455,753, and in 2017, he was paid $522,426.

359.    Payments from the NRA were made pursuant to a July 2014 agreement with the Managing Director. This agreement, which was signed by Phillips, superseded an agreement from October 2012 (signed by both LaPierre and Phillips) and was entered into over a year before the Managing Director retired. The draft of the agreement had a signature line for LaPierre, which was removed prior to being finalized. The agreement provided for an "Employment Longevity Incentive" where the Managing Director would receive "3% of gross affinity revenue for a five year period." In exchange, he agreed to "give assistance to the Director, Affinity and Licensing programs or other related associates at their request, not to exceed 7.5 hours a month." The agreement also recognized that the "NRA has encouraged [you] to and recognizes that you will be consulting for Lockton Affinity on the NRA Program for a 5 year period after your official retirement" and provided that a portion of the money owed under his agreement with the NRA would "be paid monthly to [the Managing Director] by Lockton Affinity under [his] consulting arrangement with them."

360.    This agreement was amended twice and ultimately entitled the Managing Director to receive $43,000 per month starting in February 2018 and ending in January 2022. It also confirmed that prior payments had been "made by Lockton Affinity at our direction."

361.     Payments from Lockton Affinity to the Managing Director were made pursuant to an agreement between Lockton and the NRA that was executed on January 7, 2016. That agreement acknowledged that Lockton Affinity entered into an agreement with the Managing Director to pay him fees and provided that "Client [the NRA] agrees that Lockton shall receive credits against amounts it owes client pursuant to [this agreement] in amounts equal to the [Managing Director's] Fees at such times as [such] Fee is paid to [the Managing Director]."

362.     When LaPierre was asked whether he thought it was prudent for a charitable nonprofit organization to have an executive negotiate with a vendor while also being paid by that vendor, he admitted, "there are serious questions surrounding that type of situation." He further testified, "I think there were problems with that whole area [with the Managing Director]."

363.     In November 2017, the NRA's external tax preparer reviewed the agreement with the Managing Director and commented, "This agreement is not a good agreement and I have never seen such an agreement before and I bet [the NRA employee] who preps the 990 knows nothing about this agreement either…..I think that they got a lot bigger issues than trying to get out of NY State with this agreement alone…."

364.     In 2018, the NRA's external auditors tested the Managing Director's consulting contract as part of test work to see whether the NRA Purchasing Policy was being followed and found, "Approval signatures not identifiable. No business case support available."

### C.  Related Party Transactions with Board Members

365.     The NRA routinely entered into agreements with board members without adhering to applicable requirements under NRA policy and New York law requiring a Board determination in advance that the transaction was fair, reasonable and in the NRA's best interest. Some examples of the many related party transactions that the NRA executed with board members are discussed

below. Additional transactions with board members are discussed in Part Five, Section V below, addressing the Audit Committee's failures to comply with required procedures.

### i. Board Member No. 1

366. Board Member No. 1 is a former professional football player who played in the National Football League from 1973 to 1988. Since his retirement from the NFL, Board Member No. 1 has worked as a freelance motivational speaker and product spokesperson.

367. Board Member No. 1 has served as an NRA board member since at least 2009. For most of his tenure as an NRA director, Board Member No. 1 has been paid $150,000 per year as an "independent contractor." In addition to the flat fee, Board Member No. 1 was also reimbursed for expenses.

368. The agreement between Board Member No. 1 and the NRA was entered into in 2002 and extended in 2016. The 2002 contract was signed by Phillips on behalf of the NRA. It provided that, in exchange for a monthly flat fee of $12,500, Board Member No. 1 would provide consulting services, including conducting fundraising activities and identifying and cultivating new or potential donors.

369. Upon information and belief, Board Member No. 1 never registered as a professional fundraiser or fundraising counsel in New York State.

370. Under the terms of the 2002 contract, Board Member No. 1 was supposed to provide the NRA with "Monthly Status Reports" on his fundraising activities. In response to a subpoena, the NRA failed to provide the Attorney General with any documentation regarding the services actually provided by Board Member No. 1 pursuant to the 2002 contract.

371. Upon information and belief, Board Member No. 1's consulting agreement with the NRA was not approved in advance by the Audit Committee as a related party transaction or by

any other committee of the Board. The unapproved agreement violated the bylaw prohibition on salary or other private benefits to directors unless specifically authorized by the Board.

372.    According to draft meeting minutes for a September 2016 Audit Committee meeting, the Audit Committee considered Board Member No. 1's contract as part of a review of "substantial" related party transactions. The draft minutes reflect the Committee's conclusion that Board Member No. 1 was "uniquely well suited" to perform the tasks set out in his annual contract with the NRA, which, according to the Committee, were "to provide services related to public relations, training, and outreach … to collegiate and professional athletes." The draft minutes do not reflect any discussion or consideration of Board Member No. 1's purported fundraising services. The draft minutes are also silent on the services Board Member No. 1 actually provided to the NRA and on the amount of the contract. The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 1.

373.    In 2018, the NRA reduced Board Member No. 1's annual fee to $100,000.

374.    In February 2019, the Audit Committee passed a resolution to modify Board Member No. 1's compensation from an annual flat-fee basis to a daily event fee of $7,000. According to the Audit Committee Report, "the officers of the NRA have evaluated [Board Member No. 1's] services and determined that a per-appearance fee is more suited to the variable need for [his] services." There is no evidence that the Audit Committee considered whether a daily fee of $7,000 was reasonable in light of the services being performed.

**ii.  Board Member No. 2**

375.    Board Member No. 2 is a retired police officer from Iowa. He has served as an NRA board member since at least 2009. Among other positions, Board Member No. 2 has served as Chair of the Gun Collectors Committee, Vice Chair of the Military and Veteran Affairs

88

Committee, and as a member of the Finance Committee. Board Member No. 2 was not re-nominated in 2020.

376.     Beginning in July 2009, Board Member No. 2 has been paid by the NRA for the provision of consulting services. Under his agreement with the NRA, Board Member No. 2's services were "limited to development activities with potential gifts of firearms on behalf of NRA's Office of Advancement and the National Firearms Museum." In exchange for such services, the NRA agreed to pay Board Member No. 2 a monthly flat fee of $7,500, along with payment for out of pocket business expenses. The agreement provided that, Board Member No. 2 would "act under the direction of and report to the NRA Executive Vice President and the Executive Director, Office of Advancement."

377.     While the NRA's contract with Board Member No. 2 provided for a term that began in January 2010, upon information and belief, it was not signed until January 2016.

378.     Upon information and belief, Board Member No. 2's consulting agreement with the NRA was not approved in advance by the Audit Committee as a related party transaction or by any other committee of the Board. The unapproved agreement violated the bylaw prohibition on salary or other private benefits to directors unless specifically authorized by the Board.

379.     Upon information and belief, the Audit Committee did not consider the Board Member No. 2 arrangement until a September 2016 review of related party transactions. The draft minutes from the meeting reflect the Committee's finding that Board Member No. 2 "has personal relationships in [the gun collecting community] that uniquely qualify him to provide these services, and that his services have been important to the NRA's outreach and related fundraising efforts." The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 2.

89

380.    At the January 11, 2018 Audit Committee meeting, the Audit Committee approved the following motion: "the Committee finds the transaction with [Board Member No. 2] for outreach to gun collectors is fair, reasonable, and in the best interests of the NRA."

### iii.  Board Member No. 3

381.    Board Member No. 3 is a political consultant and NRA Board member. Board Member No. 3 served as NRA president from 2011 to 2013.

382.    Beginning in March 2017, Board Member No. 3 received $4,000 per month for public speaking and consulting. The NRA reported that it paid [Board Member No. 3] $32,000 in 2017 and $40,000 in 2018.

383.    A Consultant List prepared by the NRA for 2019 allocated $48,000 from the EVP budget for Board Member No. 3 for 2019 and indicated that "no contract information" was available for the arrangement.

384.    Upon information and belief, the Audit Committee did not review the arrangement with Board Member No. 3 until after it was already under way. At the January 11, 2018 Audit Committee meeting, the Committee approved the minutes of the December 7, 2017 meeting at which the following motion was adopted: "The Committee finds the transaction with [Board Member No. 3] for public speaking appearances is fair, reasonable, and in the best interest of the NRA." The motion did not document a basis for the Committee's finding—other than the fact that [Board Member No. 3] was "frequently requested as a speaker by NRA-affiliated and outside groups"—and did not document whether any alternative transactions had been considered, as required under New York Law.

385.    On May 15, 2019, another Board Member reached out to the current Treasurer to ask, "What 'back up' is there for [Board Member No. 3's] monthly invoices of $4,000?" Executive Assistant No. 1 informed the current Treasurer, "I do not receive anything. It was reviewed by

90

Audit [Committee] and John Frazer told me we were good to pay. I assumed this had been discussed and he was providing info to the EVP's [O]ffice or Secretary's [O]ffice as to what he was doing each month." When the current Treasurer followed up to ask whether there was a contract between the NRA and Board Member No. 3, the assistant explained, "No contract that I have been privileged to see. That is why the invoice went to John [Frazer] originally when we began the compliance refresh."

### iv. Board Member No. 4

386.    Board Member No. 4 is a lawyer, lobbyist, and NRA Board Member. She has served on the Board since 1992 and is a former president of the NRA.

387.    From 2011 to 2016, the NRA paid Board Member No. 4 $45,180 per year for public speaking services. The NRA paid Board Member No. 4 $39,680 and $13,060 for public speaking services in 2017 and 2018 respectively.

388.    In May 2016, Frazer requested a copy of Board Member No. 4's compensation agreement which was "missing from the contracts safe." The accounts payable manager reported, "We were not furnished a copy of her contract. We pay her $3,765.04 monthly based on invoices submitted by the Treasurer's office, which are approved by Woody/[Woody's assistant]."

389.    Upon information and belief, the Audit Committee did not review the transaction before it was entered into by the NRA. The Committee reviewed the transaction in September 2016 and highlighted Board Member No. 4's "unique qualifications" as justification for why she was properly being compensated by the NRA. The Audit Committee did not issue a resolution at the September 2016 meeting approving the agreement with Board Member No. 4.

390.    At the January 11, 2018 Audit Committee meeting, the Audit Committee approved the minutes of the December 7, 2017 meeting at the following motion was adopted: "the Committee finds that the transaction with [Board Member No. 4] for public speaking services is

91

fair, reasonable, and in the best interests of the NRA." The Committee claimed that Board Member No. 4 had "unique qualifications to provide these outreach services to the NRA." The Committee did not document whether it considered alternative transactions.

391.     Board Member No. 4 also serves as a compensated member of the Board of Directors of Sturm, Ruger & Co. ("Ruger"), "a well-known manufacturer of firearms, which has dealt with the National Rifle Association for many years." Among its dealings with the NRA, Ruger purchases advertising in NRA publications and provides donations and support to NRA programs. The NRA also licenses its logo for use on special promotion Ruger firearms, which results in royalties to the NRA.

392.     At its meeting on April 28, 2019, the Audit Committee resolved that it had reviewed Board Member No. 4's relationship with Ruger and found "no conflict of interest in her continuing service on both Boards," so long as she exerts no control over decisions of the Ruger Board involving the NRA and recuses herself from relevant deliberations or voting.

### v.  Board Member No. 5

393.     Board Member No. 5 is a past NRA President and current NRA board member and has been paid under the EVP Consulting Budget since 2004. From 2014 to 2017, Board Member No. 5 was paid an average of approximately $150,000 a year. In December 2017, LaPierre and Board Member No. 5 executed a one-year contract for $168,000 annually. In April 2018, LaPierre and Board Member No. 5 executed a 10-year contract for $220,000 annually. LaPierre testified that he negotiated these contracts.

394.     Upon information and belief, LaPierre did not notify or receive approval from the Audit Committee in advance of executing the April 2018 contract. Upon information and belief, LaPierre did not receive written approval in advance from the President or a Vice President before executing the December 2017 or April 2018 contracts. Board Member No. 5 also receives

92

compensation from NRA-ILA and through grants paid to an organization called the Unified Sportsmen of Florida. LaPierre testified that, combined, Board Member No. 5 receives about $400,000 in annual compensation from the NRA.

395. LaPierre did not follow appropriate legal and internal procedures, including obtaining proper review and approval by the Audit Committee, in advance of executing contracts with Board Member No. 5.

## III. The Individual Defendants Received Excessive Compensation that the NRA Did Not Accurately Disclose

### A. The NRA Board Failed to Follow an Appropriate Process to Determine Reasonable Compensation for NRA Executives

396. Pursuant to New York law, the NRA may only pay "compensation in a reasonable amount" to its employees for services actually rendered.

397. Federal law similarly limits the NRA to payment of reasonable compensation. The NRA and individual defendants (defined as "disqualified persons") are subject to excise taxes pursuant to 26 U.S.C. § 4958 for compensation that is unreasonable, that is, where "the value of the economic benefit provided exceeds the value of the consideration (including the performance of services) received for providing such benefit."

398. The Internal Revenue Service ("IRS") creates a rebuttable presumption that compensation is reasonable if (1) the authorized body within the organization made up of independent individuals approves the compensation in advance; (2) the authorized body relies on appropriate data as to comparability; and (3) the authorized body adequately and timely documents the basis for their determination concurrently with making that determination. The documentation "should include the terms of the transaction and the date of its approval, the members of the authorized body present during the debate and vote on the transaction, the comparability data

93

obtained and relied upon, the actions of any members of the authorized body having a conflict of interest, and documentation of the basis for the determination."

399. The NRA bylaws require the NRA Board to set annually the authorized compensation for the Executive Vice President, Treasurer and Secretary. Under the bylaws, the Officers Compensation Committee ("OCC"), which consists of the NRA President and First and Second Vice Presidents, is responsible for making a recommendation as to the officers' compensation to the full Board at the fall board meeting each year. At that same meeting, the Board must establish by resolution the authorized compensation for the next budget year.

400. In its official filings, the NRA made misleading representations regarding its practices for setting executive compensation. For example, in its IRS Form 990 for each year from 2015 to 2018, the NRA represented that "compensation of the NRA's top management officials is established by methods including independent compensation consultants, compensation surveys and studies, and comparability data." The NRA further represented in its filings that "[i]n addition, under the NRA Bylaws, compensation of certain elected officers (including the Executive Vice President) must be approved by the Board of Directors, based on recommendations by the compensation committee. All decisions are properly documented."

401. Upon information and belief, contrary to the NRA's representations, the NRA Board set the compensation for LaPierre, Phillips and Frazer during the period 2015 to 2018 without relying upon or properly consulting a compensation consultant, considering reliable compensation surveys or obtaining appropriate comparability data. The Board also did not maintain adequate documentation of the process of determining officer compensation.

402. For example, in or about late August 2017, the OCC hired an executive compensation consultant to prepare a report which would, among other things, compile

94

competitive market compensation levels for NRA executives based on comparable positions in comparable organizations. The report was to be completed for consideration by the OCC at its September 7, 2017 meeting in preparation for making 2018 officer compensation recommendations to the Board as provided in the NRA bylaws. The OCC, however, made a recommendation on salary and bonus awards for LaPierre, Phillips and Frazer without awaiting a report or even comparability data from the consultant prior to making a recommendation.

403.    On September 5, 2017, even though his own salary was being considered, defendant Phillips provided the OCC Chair with compensation information that he prepared for the OCC's analysis and consideration. Phillips's proposal consisted of a handful of trade and business-related entities that he selected for salary comparisons for each executive position. No charitable organizations were considered. Phillips provided his comparability data and "peer comparison" noting to the OCC Chair, "[f]or CEO, we can change some out if you like others instead."

404.    Phillips additionally prepared and provided to the OCC Chair talking points for the Board's consideration of the OCC's recommendations, including a statement that the OCC considered outside compensation consultant reports "[i]n developing its recommendation to the Board," without disclosing that it did not have an executive compensation consultant report for 2017. Upon information and belief, Phillips's proposals were used by the OCC in preparation of its recommendation and presentation to the Board, including the representation that in conducting its due diligence, the OCC relied upon executive compensation consultant reports.

405.    On September 7, 2017, the OCC met and recommended increases in cash compensation for each of LaPierre, Phillips and Frazer. It recommended that LaPierre's compensation be increased from approximately $1.43 million in 2017, to approximately $1.78 million in 2018, which included an increase in his bonus from $150,000, the amount he had been

awarded each year from 2015 to 2017, to $455,000 in 2018. The OCC recommended that Phillips's total compensation be increased from approximately $669,000 in 2017, to approximately $830,000 in 2018, which included a bonus of $210,000. It also recommended that Frazer's compensation be increased from 2017 levels, when his reported total compensation was $375,000 to approximately $414,000 for 2018, which included a bonus of $54,100. No benchmarks or specific performance achievements were set out in regard to the recommended bonuses. Furthermore, as detailed below, the amount reported as compensation in the NRA's IRS Form 990 for 2018 paid to LaPierre, Phillips, and Frazer was more than what was authorized by the OCC. In addition, as also discussed below, the reported amounts did not reflect the full compensation for LaPierre, Phillips, and Frazer.

406. At the September 9, 2017 meeting of the NRA Board, the directors went into executive session for 35 minutes to consider the reports of three committees: the OCC, the Committee on Hearings and the Finance Committee. Board minutes reflect merely that it entirely adopted the OCC's recommendations, including a pay raise of more than $300,000 for LaPierre. There is no evidence that LaPierre's, Phillips's, or Frazer's performance or the overall state of the NRA were considered or that the Board was presented with information about any other aspects of the officers' compensation beyond their base salary and bonus, such as reimbursement for personal expenses and in kind benefits, as discussed below.

407. Upon information and belief, the process that the OCC and the Board followed to determine 2018 officer compensation is just one example of the lack of due diligence, full disclosure, and proper documentation in regard to senior officer compensation at the NRA. Neither the OCC nor the Board performed adequate due diligence in assessing the reasonableness of NRA senior officer compensation or relied upon appropriate comparability data. Nor did they adequately and contemporaneously document the basis for their determinations.

96

408.     A review of NRA records between 2013 and 2018 demonstrates cursory OCC reports to the Board, usually less than a full page, pro forma approval of OCC recommendations, and little time for debate or consideration in executive sessions at Board meetings.

409.     The OCC did not carry out its duties under the NRA bylaws, New York or federal law in regard to ensuring that only reasonable compensation is paid, and exposed the NRA to liability for federal excise tax based upon unreasonable and excessive compensation and distributions to disqualified persons.

410.     Pursuant to the NRA bylaws, the Board has the obligation at the fall Board meeting to approve all compensation, emoluments, or other income paid to certain of its executives. The majority of the Board of Directors in each year alleged herein participated in, authorized, or approved the transactions described herein. Here, the NRA Board did not fully inform themselves about the executive compensation recommendations to the extent reasonably appropriate under the circumstances.

411.     The majority of the NRA Board disregarded their responsibilities under the bylaws and governing law concerning oversight of compensation of corporate officers for the purpose of accommodating defendant LaPierre and his senior officers. Upon information and belief, the NRA Board failed to inquire into excessive and inappropriate payments to LaPierre and Phillips.

412.     Furthermore, LaPierre effectively dominates and controls the NRA Board as a whole through his control of business, patronage and special payment opportunities for board members, and his public allegations to the NRA membership of a "criminal conspiracy" against board members and officers who question his activities.

**B. The Officers Compensation Committee and the NRA Board Failed to Consider or Approve LaPierre's and Phillips's Complete Compensation Prior to Making Compensation Determinations**

413. The OCC and the NRA Board also did not take into account the entirety of LaPierre's compensation when assessing the reasonableness of his compensation.

414. Reimbursement or payment for expenses for NRA employees, including officers, may only be treated as nontaxable if the NRA maintains and complies with an IRS-mandated "Accountable Plan." The plan must, at a minimum, (1) require that reimbursed expenses have a documented business connection; (2) require employees to account for such expenses within a reasonable period of time; and (3) require employees to return any excess reimbursements or allowance within a reasonable period of time.

415. When determining LaPierre's compensation during the period 2015 to 2018, the OCC did not consider the benefits that LaPierre received for the value of personal travel for LaPierre and his family to vacation on the yacht Illusions in the Bahamas, as described above, and other expense reimbursements to LaPierre or on LaPierre's behalf. As discussed above, the NRA paid these expenses without complying with the Accountable Plan requirements of documenting the business purpose of the expense, requiring LaPierre to account for the expense within a reasonable time and requiring him to return excess expense allowances within a reasonable time. The value of the benefit that LaPierre received for payment or reimbursement of these expenses, in whole or substantial part, constituted taxable compensation to LaPierre.

416. The NRA also failed to enforce a reasonable time period for LaPierre to submit other expense reimbursement requests. LaPierre was permitted to submit his expense reimbursement requests months or years after the fact. For example, in June 2019, the employee responsible for handling LaPierre's expenses was still waiting to receive receipts from April of

98

2018. These late reimbursements failed to meet the requirements of an Accountable Plan, and should have been considered taxable income to LaPierre.

417.    The OCC also did not consider payments or expense reimbursements to or on behalf of LaPierre that were passed-through Ackerman McQueen or the Mercury Group, as described in Part Five, Section II(A)(iii).

418.    In addition, the OCC did not consider or disclose the value of a post-employment contract that the NRA gave defendant LaPierre, which provides for payments in excess of $1 million per year after LaPierre's tenure as EVP ends due to retirement or losing a re-election bid.

419.    This post-employment contract was signed in 2013 by the then-NRA President, Phillips, and LaPierre (hereinafter, together with any subsequent amendments or reiterations, the "LaPierre Post-Employment Contract"). Neither the First nor Second Vice President signed the contract, as required by NRA policy governing procurement. There is no evidence that the NRA Board or a designated committee reviewed or approved the LaPierre Post-Employment Contract. LaPierre testified that he did not know whether his post-employment contract was approved by the OCC, or whether it was disclosed to NRA membership or the NRA Board.

420.    Under the terms of the LaPierre Post-Employment Contract, if LaPierre retired or lost reelection in 2014, his annual compensation from the NRA would increase. In each amendment to LaPierre's Post-Employment Contract, which extended the terms and the amount of compensation, the NRA was obligated to continue to pay LaPierre for years after he lost re-election or retired and at a higher rate than his compensation as Executive Vice President. LaPierre testified that he was aware of this feature of the contract: "I noticed that and kind of shook my head at it when I saw it," LaPierre recalled, "I didn't ask for this contract. It's what was presented to me and I signed it and it never went into effect because I stayed on as EVP."

99

421.    By letter agreement dated March 16, 2015, the NRA President extended the term of the LaPierre Post-Employment Contract by two years, to 2020, with annual compensation in 2019 of $1,150,000, and in 2020 of $1,200,000. The letter was signed by the NRA President and Phillips. There is no evidence that any other NRA officer, the NRA Board, the OCC, the Audit Committee or any other Board committee reviewed or approved this letter agreement.

422.    By memorandum dated April 30, 2018, the NRA President advised LaPierre that the NRA "would like to extend and modify" the LaPierre Post-Employment Contract due to, among other things, "security concerns." The memorandum proposes a 7-year compensation schedule paying $1,300,000 in 2019, and $1,500,000 for the next 6 years (2020-2025).

423.    The memorandum further provides that "we continue to believe it is in the best interest of the NRA that we maintain control over your name and likeness. For that reason we seek to contract with you for an additional five years (2026-2030) as a consultant. During this five year period, the NRA will have use of your name and likeness as mutually agreed upon. You agree to make personal appearances that are reasonable in terms of advance notice and convenience of the location." The annual compensation for these consulting services is $1,500,000 per year for three years (2026-2028), followed by $1,300,000 per year for two years (2029-2030). The memorandum agreement is signed by LaPierre, Phillips, the then NRA President, and then NRA Second Vice President. There is no evidence that any other NRA officer, the NRA Board, the OCC, the Audit Committee or any other Board committee reviewed or approved this 2018 extension of the memorandum agreement.

424.    LaPierre testified that this contract extension and modification was prompted by a desire to retain rights over his name and likeness. "They wanted to tie my likeness, my name, my brand, my signature up for years given the fact that the signature raises so much money in terms

of the identity with sportsmen and Second Amendment enthusiasts and all that." LaPierre testified

that he did not have any plans to use his likeness for any other purpose after his departure from the

NRA. The unapproved contracts, and their promise of post-employment payments, violated New

York law and the NRA's bylaws and policies.

425.    The OCC did not consider or disclose the value of Phillips's post-employment

contract with the NRA as described in Part Five, Section I(B)(iii) above. Like LaPierre, there is no

evidence that the NRA Board, including by the OCC, the Audit Committee or any other Board

committee reviewed or approved Phillips's post-employment contract.

426.    Phillips had an NRA-issued credit card, which he allowed other NRA employees

to use to incur personal expenses. Upon information and belief, Phillips may have also used the

credit card for personal uses that were inappropriately reimbursed by the NRA and not reported as

taxable income.

427.    Because of the failure of the OCC and the NRA Board to consider the value of all

of the components of LaPierre's and Phillips's compensation packages, the Board's approval of

their compensation is not entitled to a presumption of reasonableness.

### C.  LaPierre Failed to Properly Determine Powell's Compensation

428.    Pursuant to the NRA bylaws, LaPierre was authorized to determine and approve

Powell's compensation as Chief of Staff, Executive Director of General Operations and Senior

Strategist.

429.    As discussed in Part Five, Section I(C)(i) above, in the course of less than a two-

year period, Powell's salary increased from his June 2016 starting salary, which was $250,000

annually, to $800,000 annually. This salary does not include other benefits and compensation

received by Powell, including those passed through Ackerman as described in Part Five, Section

II(A)(iii) above.

101

430.     The NRA represented in Schedule O to the 2017 IRS Form 990, the first year that the NRA disclosed Powell's compensation as an NRA officer, that "compensation of NRA's top management officials is established by methods including compensation consultants, compensation surveys and studies, and comparability data." The NRA made a similar representation in its IRS Form 990 for 2018. There is no evidence that any such methodology was used by LaPierre in determining Powell's compensation, that all of his benefits and sources of compensation were considered, or that LaPierre adequately and timely documented the basis for his determination of Powell's compensation concurrently with making determinations to raise Powell's compensation.

### D.  The NRA's Compensation Disclosures to the Attorney General and the Internal Revenue Service Were False or Misleading

431.     As a charitable nonprofit, the NRA is required to "report [on the IRS Form 990] compensation for both current and former officers, directors, key employees, and highest compensated employees." The IRS compensation disclosure requirements include, without limitation, base salary, bonuses (paid or deferred during the reporting period), incentive compensation, contributions to retirement plans, the value of benefits such as health, disability, long term care, and life insurance (including split dollar plans), housing and automobile allowances, and taxable travel, meals and entertainment expenses.

432.     The NRA certifies the accuracy of its compensation disclosures in its annual CHAR500 filing with the Attorney General, which annexes the organization's annual IRS Form 990 and all accompanying schedules, including Schedule J, which specifically addresses aspects of the organization's compensation scheme.

102

433. From 2015 to 2018, the NRA reported paying LaPierre $10,191,728 in total compensation, an average of $2,547,932 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of LaPierre's compensation for 2015 through 2018:

|  | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|  | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
|---|---|---|---|---|---|---|
| 2015 | $1,090,515 | $150,000 | $3,810,734 | $19,605 | $40,131 | $5,110,985 |
| 2016 | $1,165,062 | $150,000 | $43,904 | $19,610 | $43,763 | $1,422,339 |
| 2017 | $1,172,166 | $150,000 | $44,522 | $19,680 | $47,609 | $1,433,977 |
| 2018 | $1,267,878 | $455,000 | $427,756 | $20,280 | $53,513 | $2,224,427 |

434. But, as discussed in Part Five, Section I(A)(i), the NRA pays or reimburses LaPierre's personal travel by charter plane, and personal travel for family members. LaPierre is also reimbursed for other expenses that are not submitted within a reasonable time. The value of these travel and other reimbursed expenses constitutes taxable income to LaPierre that was required to be reported.

435. With respect to Powell, from 2017 and 2018, the NRA reported paying Powell $1,699,035 in total compensation, an average of $849,517.50 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Powell's compensation for 2017 and 2018:

|  | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|  | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
|---|---|---|---|---|---|---|
| 2017 | $557,172 | $50,000 | $104,224 | $15,900 | $51,770 | $779,066 |
| 2018 | $782,739 | $0 | $61,398 | $16,500 | $59,332 | $919,969 |

436. As noted above in Part Five, Section I(C)(ii), Powell similarly failed to provide sufficient justification for his reimbursement requests for travel and meal expenditures, and those

expenditures should have been included as taxable income in his compensation because they were paid or reimbursed without complying with an Accountable Plan.

437.    From 2015 to 2018, the NRA reported paying Phillips $3,090,256 in total compensation, an average of $772,564 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Phillips's compensation for 2015 through September 13, 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2015 | $423,048 | $94,265 | $31,956 | $19,610 | $22,328 | $591,207 |
| 2016 | $524,396 | $100,000 | $172,490 | $19,610 | $23,788 | $840,284 |
| 2017 | $525,942 | $100,000 | $38,371 | $19,680 | $26,003 | $709,996 |
| 2018 (ending 9/13/2018) | $573,567 | $210,000 | $116,970 | $20,280 | $27,952 | $948,769 |

438.    From 2015 to 2018, the NRA reported paying Frazer $1,702,798 in total compensation, an average of $425,699.50 a year. In its annual IRS Form 990 filings, the NRA reported the following breakdown of Frazer's compensation for 2015 through 2018:

| | Breakdown of W-2 and/or 1099-MISC compensation | | | Retirement & other deferred compensation | Nontaxable benefits | Total compensation |
|---|---|---|---|---|---|---|
| | Base compensation | Bonus & incentive compensation | Other reportable compensation | | | |
| 2015 | $264,879 | $0 | $7,697 | $15,208 | $40,662 | $328,446 |
| 2016 | $317,716 | $25,000 | $30,557 | $15,900 | $50,295 | $439,468 |
| 2017 | $318,621 | $25,000 | $31,711 | $15,900 | $53,999 | $445,231 |
| 2018 | $325,953 | $54,100 | $33,023 | $16,500 | $60,077 | $489,653 |

439.    The NRA's compensation disclosures in its IRS Form 990s for the period 2015 to 2018 as they related to each of the Individual Defendants' compensation falsely represented the NRA Board's process and deliberations on setting their compensation as officers as described above.

104

440.     The NRA's filings included false or misleading statements relating to compensation and benefits conveyed to top employees and officers. For example, the IRS requires that certain employment benefits provided to persons listed on the IRS Form 990 Part VI as officers or highly compensated employees be reported on Schedule J. The benefits include "first class or charter travel", "travel for companions," and health or social club dues. On Schedule J to the 2018 IRS Form 990, the NRA represented that it provided "first class travel," "travel for companions," and "health or social club dues." For each such benefit the NRA represented that the "organization follow(ed) a written policy regarding payment or reimbursement or provision of all the expenses" listed. This representation, certified by defendant Frazer, was false.

441.     In another example of a false or misleading representation in the NRA's employee benefit disclosures, in the NRA 2017 IRS Form 990, the NRA acknowledged providing "first class or charter travel" and "health or social club dues." "Travel for companions" was not acknowledged as an employee benefit even though the NRA provided "travel for companions" during 2017. For each such benefit, the NRA represented on the 2017 IRS Form 990 that the "organization follow(ed) a written policy regarding payment or reimbursement or provision of all the expenses" listed. This representation, certified by defendant Frazer, was false.

442.     The IRS requires that any "diversion of assets" in excess of $250,000 be reported on IRS Form 990, Section VI. A "diversion of assets" under IRS rules includes "any unauthorized conversion or use of the organization's assets other than for the organization's authorized purposes." The IRS further notes that "[a] diversion of assets can in some cases be inurement of the organization's net earnings. … [I]t can also be an excess benefit transaction under section 4958 and reportable on Schedule L" of the IRS Form 990.

105

443.     During the period 2015 to 2018, the NRA has not reported on its IRS Form 990 a diversion of assets in the form of an excess benefit transactions despite having paid unreasonable compensation to some or all of the Individual Defendants, as alleged in Part Five, Section I above.

## IV.     The NRA's Retaliation Against Dissidents on the Board

### A.  Dissident No. 1

#### i.   LaPierre Recruits Dissident No. 1 as President and Negotiates Ackerman Contract

444.     In spring 2018, LaPierre recruited Dissident No. 1 to run for NRA President. At the time, the plan was for Dissident No. 1 to complete the remainder of the outgoing President's term. He would then be re-nominated by the Board to serve out a full term as President.

445.     At the time Dissident No. 1 was recruited by LaPierre, he had a contract at Fox News to provide multiple episodes of a program called "American Heroes" under which he received significant compensation and health benefits. The NRA bylaws did not permit Dissident No. 1 to receive a salary from the NRA as NRA President, and Fox News was unwilling to retain Dissident No. 1's contract for "American Heroes" if he became President of the NRA.

446.     To persuade Dissident No. 1 to accept the unpaid position, LaPierre negotiated a contract with Ackerman to take over the "American Heroes" program. Under this contract, Dissident No. 1 would be guaranteed a salary and benefits comparable to what he was receiving from Fox. In a December 2019 deposition, Dissident No. 1 testified, "LaPierre suggested as the means of making me the president of the NRA that I take the job with Ackerman McQueen." He further testified that, had he not received a contract from Ackerman providing the requisite benefits, "I would not have taken on the mantle of president of the NRA."

447.     On at least two occasions, LaPierre met with Dissident No. 1 about the request for him to become NRA President and the associated plan for him to be employed by Ackerman. On

106

April 22, 2018, Dissident No. 1 sent LaPierre's Senior Assistant a fax containing the "Deal Points

for NRA & [Dissident No. 1]" and requested that the message be passed "only to the parties we

agreed on 22 April 2018." The deal points articulated a "two phase plan" for Dissident No. 1 to

become employed by Ackerman while also stepping into the role of NRA President, and included

options for employment status, compensation, and benefits. In a December 2019 deposition,

Dissident No. 1 testified that this term sheet "had been discussed twice now at that point with

Wayne LaPierre," and "reflected what [he] wanted me to do for the specified amount of money as

an employee of … Ackerman [] working for NRA-TV … these are the points that came out of

those discussions with Wayne LaPierre in April [2018] before we got to the annual meeting in

May [2018] and they were very well known to certainly the people closest to Wayne."

448.    Before entering into a contract with Dissident No. 1, Ackerman required the NRA

to contractually guarantee it would pay the compensation owed under the contract. On May 6,

2018, the NRA and Ackerman amended their 2017 Services Agreement to provide: "All service

fee billing under this Service Agreement for talent and employees who work through [Ackerman]

for NRA and its affiliates, including, but not limited to [Dissident No. 1] shall be invoiced by

Ackerman …which invoice shall be payable by NRA to Ackerman." The amendment was signed

by Phillips and the outgoing President, and was attested to by the First and Second Vice Presidents.

449.    Eight days later, on May 15, 2018, Dissident No. 1 entered into an employment

contract with Ackerman. Under the terms of the contract, Dissident No. 1 agreed to serve as the

host of an NRA-TV documentary series also titled "American Heroes" for twelve episodes per

year for three years. He would receive a base salary of $2,100,000 in year one, $2,300,000 in year

two, and $2,500,000 in year three. As an employee, Dissident No. 1 would also be entitled to

healthcare and life insurance benefits.

450.    Upon information and belief, Phillips and LaPierre were aware of the material terms of Dissident No. 1's employment agreement with Ackerman at the time it was executed.

451.    In May 2018, Dissident No. 1 was nominated, with LaPierre's support, to be NRA President and was elected by the Board. Dissident No. 1 did not immediately take office because he needed to address outstanding issues concerning his contracts with Fox and Ackerman. Between May 2018, when Dissident No. 1 was elected president, and September 2018, when he took office, an interim President served in his place.

### ii. Dissident No. 1 Undertakes His Fiduciary Responsibilities as NRA President

452.    As duly elected President, Dissident No. 1 viewed it as his fiduciary duty to ensure that the finances of the NRA were being managed prudently. Almost immediately after taking charge as NRA President in September 2018, Dissident No. 1 started looking closely at the operations of the NRA. At this time, he was also alerted to certain problems by internal whistleblowers, NRA board members, and major donors.

453.    In October 2018, Dissident No. 1 convened a group of advisors to "provid[e] advice and recommendations to the President and Executive Vice President on matters crucial to the good governance of the Association." In an agenda for an October 24, 2018 meeting of its members, Dissident No. 1 identified a series of key questions, including: "(a) where did Josh [Powell] come from? who vetted Josh? are rumors about Josh and sexual harassment true; (b) what is the status of the 'whistleblower' accusations; and (d) how is [the current Treasurer] working out as Treasurer?" This agenda provides insight into the types of issues that Dissident No. 1 was trying to address in the performance of his responsibilities as President.

454.     As his presidency progressed, Dissident No. 1 became concerned about the fact that the NRA was paying the Brewer firm about $2 million per month in fees that were not properly authorized or reviewed.

455.     The Brewer firm was initially retained by the NRA in March 2018 to address issues involving NRA affinity partners.

456.     Later in 2018, LaPierre, with the assistance of Frazer and NRA Board Counsel, expanded the mandate of the Brewer Firm, selecting it to undertake a top-down "compliance review" of the NRA. LaPierre did not seek alternative bids to perform this work. LaPierre did not ask any other clients of the firm about their experience. He did not identify any metrics or analytics that he applied in making the decision to retain the Brewer firm for this compliance review. He did not review the financial terms of the Brewer engagement and did not "get into" any consideration of project-based pricing as opposed to hourly-based pricing. Instead, he left any inquiry into these issues to the discretion of the General Counsel's Office.

457.     Despite having less than two years of experience in private practice, and little experience engaging or negotiating with outside counsel for large-scale litigation and internal investigation work, Frazer was responsible for negotiating the engagement letter and the pricing. Frazer prepared the business case analysis, which estimated monthly charges of approximately $1.25 million, based on hourly billing, and indicated that there were no other bidders for the legal services. Frazer was also responsible for reviewing and approving the Brewer firm's invoices while the engagement was ongoing. Between March 2018 and February 2019, the Brewer firm charged the NRA approximately $19,000,000 in legal fees.

458.     By Board resolution adopted on March 8, 2019, the Audit Committee determined that the original contract between the NRA and the Brewer firm did not "comply with the internal

controls and policies established by the NRA." When executing the original engagement letter with the Brewer firm, Frazer did not obtain written approval from the President and a Vice President, as required by NRA policy. When asked why he did not comply with NRA policy in entering into this contract with the Brewer firm, Frazer testified, "It was an error on my part."

459.    In light of the internal control issues with the Brewer firm's engagements and the fees being charged and paid under those engagements, Dissident No. 1 began to demand more comprehensive reviews of the firm's retainer agreements and invoices.

460.    In March 2019, Dissident No. 1 sent a series of letters and memoranda to the NRA Board Counsel, Audit Committee, and General Counsel raising concerns about the Brewer firm's engagement and its billing practices. In a March 11, 2019 letter, Dissident No. 1 directed the NRA Board Counsel to notify the Brewer firm that none of its retainer agreements with the NRA had been reviewed or approved by the NRA's elected non-salaried officers. A few days later, Dissident No. 1 sent a similar letter to Frazer asking him to request from the Brewer firm copies of "all relevant engagement letters."

461.    On March 22, 2019, Dissident No. 1 sent a memo to the Audit Committee raising concerns about the reasonableness and basis of the Brewer firm's legal fees, and requesting that it "initiate an outside, independent review of these expenditures to ensure that such services and fees charged are reasonable and appropriate." And on April 18, 2019, Dissident No. 1, along with the First Vice President, wrote to Frazer and the Audit Committee Chair about the "extraordinary legal fees the NRA has incurred" by the Brewer firm, and reiterating his request that the NRA engage an outside, independent expert to review the payments to Brewer.

462.    Despite Dissident No. 1's demands, neither the Audit Committee nor others on the NRA Board were permitted to conduct a review of the Brewer firm's invoices. Instead, Frazer

retained an outside law firm to review the Brewer engagement. However, the firm's review was limited to determining whether NRA management had the authority to hire the Brewer firm. It did not examine the reasonableness of the legal fees that the firm was charging, or whether the legal services performed were consistent with the scope of the engagement. The firm concluded that the NRA's payments "to the Brewer firm and the services the Brewer firm have provided to the Association to date are … authorized, absent a finding that the legal services were not in fact performed or legal services were performed that exceeded the scope of the engagement." The firm also noted that the NRA "is entitled to review the services … incurred on its behalf by the firm to determine whether they are accurate and within the scope of the engagement," and advised "it may well be in the [NRA]'s interest to obtain a full accounting of the Brewer firm's time charges to date."

### iii. LaPierre Voices Concern about Dissident No. 1's Contract

463.    When Dissident No. 1 began making inquiries into the Brewer firm's billings and the operations of the NRA, LaPierre impeded his participation in the NRA's affairs, and took steps to ensure he would not be reelected as President.

464.    LaPierre believed that Dissident No. 1's inquiries into the NRA's affairs exceeded the purview of the NRA President, which LaPierre sees as a "largely ceremonial" position. LaPierre testified that Dissident No. 1 "started to interfere in … in a lot of things that weren't under the role of the president. They were actually more the day-to-day management stuff." In a September 2019 deposition, LaPierre recalled telling Dissident No. 1 that he "cannot keep interfering in all of the day-to-day affairs … of the NRA. That's my job. And you need to stay out of it to protect yourself, but it's also my job, not yours …."

465.    In late 2018, LaPierre started raising concerns about Dissident No. 1's relationship with Ackerman, which LaPierre had been instrumental in arranging. LaPierre claimed to have been

111

unaware of Dissident No. 1's employment at Ackerman, and ultimately used it to retaliate against Dissident No. 1 and to prevent any scrutiny of Brewer's legal fees.

466.    LaPierre repeatedly denied Dissident No. 1 access to Brewer's retention agreements and invoices. On at least two occasions, LaPierre sent cease-and-desist letters to Dissident No. 1 demanding he stop looking into the matter. LaPierre also repeatedly denied Dissident No. 1's request for an independent audit of Brewer.

467.    In a February 26, 2019 letter to Dissident No. 1, LaPierre wrote that it was his "duty as CEO and EVP to direct the day-to-day affairs of the Association," including to oversee the Brewer investigation, and that Dissident No 1's status as an Ackerman employee posed a "conflict of interest" that precluded him from seeking information about the Brewer engagement. One month later, in late March, LaPierre sent a follow-up letter demanding that Dissident No. 1, as a "highly compensated full-time employee of Ackerman McQueen" with an "obvious conflict of interest, … desist immediately" from his attempts to "burden or obstruct the NRA's engagement of outside counsel on matters pertaining to Ackerman."

468.    On April 24, 2019, LaPierre's Senior Assistant informed Dissident No. 1 that LaPierre "will not support you in [your] term as NRA President." In a September 2019 deposition, LaPierre testified that he withdrew his support after learning that Dissident No. 1 "was working to stack" the Audit Committee to "get[] rid of Brewer," which LaPierre "wasn't going to let [] happen." While the Nominating Committee has formal responsibility under the bylaws for nominating NRA officers, in practice, LaPierre wields tremendous influence over who was elected to the officer positions. As such, his decision not to support Dissident No. 1's re-nomination effectively guaranteed that Dissident No. 1 would not be re-nominated.

469.     On April 25, 2019, Dissident No. 1 wrote to the Executive Committee. He asserted that the NRA was facing "a crisis that could affect its ability to operate as a nonprofit organization" and that it was his "fiduciary duty to respond to this crisis." He stated his intention to form a "Crisis Management Committee" pursuant to NRA bylaw Article V, Section 2. One of the tasks the proposed Crisis Management Committee would undertake would be to "supervise an outside independent review of the invoices submitted by Brewer Attorneys & Counselors, which total more than $24 million over a short period of time."

470.     Just days later, Dissident No. 1 announced his resignation during the NRA's annual meeting in Indianapolis. In a letter read to NRA members, Dissident No. 1 stated, "I hoped to be with you today as NRA president endorsed for re-election. I'm now informed that that will not happen. … There is clearly a crisis. It needs to be dealt with immediately and responsibly, so the NRA can continue to focus on protecting the 2nd Amendment."

471.     Despite resigning from his position as NRA President, Dissident No. 1 did not resign from the NRA wholesale; rather, he continued on the NRA Board and remained part of the NRA's membership. The NRA is currently conducting an internal expulsion proceeding against Dissident No. 1, which, upon information and belief, was undertaken in retaliation for his exercise of fiduciary responsibilities in violation of its whistleblower policy. In June 2020, the NRA filed an action in New York State Court seeking a declaratory judgement that the expulsion of Dissident No. 1 is proper. Litigation related to that action is ongoing.

### B. Dissident Board Members

472.     By a July 22, 2019 letter, four NRA board members requested that an independent audit be conducted into allegations of financial misconduct at the NRA and the payments made to the Brewer firm for legal fees. The board members also requested pursuant to Article IV, Section 2 of the NRA bylaws, that an outside independent special committee be formed to investigate and

address issues the board members describe in their letter. Upon information and belief, the dissenting board members requested additional information concerning compensation paid to other board members, salaries paid to executive officers including Powell, and the justification for expanding the scope of the Brewer firm's engagement.

473.     Upon information and belief, those inquiries were not answered to the satisfaction of the dissenting board members. According to those board members, their requests were rebuffed or ignored and they were "stonewalled, accused of disloyalty, stripped of committee assignments, and denied effective counsel necessary to properly discharge [their] responsibilities as board members."

474.     Upon information and belief, those board members who publicly (either through correspondence or social media posts) expressed concern about the NRA's actions or who called for an independent audit of the NRA, were subsequently denied the committee assignments they requested following the NRA's annual member meeting in 2019.

475.     Subsequently, several board members resigned in the summer of 2019.

## V.     The NRA Board's Failures Resulting in Violations of Law

476.     The culture of noncompliance and disregard for the internal controls was evident within the NRA Audit Committee, which similarly failed to fulfill its obligation to oversee internal controls. This lack of oversight resulted in waste and loss of the NRA's charitable assets and contributed to the NRA reaching its currently deteriorated financial state.

477.     Under New York law, the Audit Committee is responsible for overseeing the accounting and financial reporting processes of the organization and the audit of its financial statements. The Audit Committee may also be the committee designated to oversee the implementation of an organization's conflict of interest and whistleblower policies, and to review and vote on proposed related party transactions. The NRA's Audit Committee was subject to New

114

York law, and, under the NRA's internal policies, was the committee designated with oversight of those policies.

478.    Further, the Mission Statement for the NRA's Audit Committee, set out in its Charter, provides that:

> The primary function of the Audit Committee is to assist the Board of Directors in its oversight of the integrity of financial information, its review of the adequacy of the system of internal controls established by the Association, and its monitoring of the audit process. In performing these functions, the Audit Committee shall review the Association's financial reporting process and internal controls, review and appraise the audit efforts of the Association's independent auditors, and provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association. In addition, the Audit Committee will provide oversight of regulatory compliance and business ethics compliance.

479.    In his testimony to the Attorney General, the Audit Committee Chair said that he had no knowledge of New York law governing audit committees, whistleblowers, or conflicts of interest, and could not recall the last time he had seen the Charter. He also testified that, in his view and contrary to the Charter, the Audit Committee had no role in oversight of internal controls and that its role was significantly more limited than the role set out for the Committee in its Charter. He testified, "Responsibility of the audit committee is to interact with the external auditors. And by that, I mean meet with them, planning the audit. We have one meeting during the pendency of the audit. And then when the audit is over, we have what I refer to as an exit meeting. We discuss their findings. We discuss anything that might be in the management letter, just to see if there's anything that we need to follow up on after they're through auditing."

480.    In practice, the Audit Committee failed to oversee the organization's internal controls. The Committee Chair testified that "there is no internal auditing" within the NRA. When asked why, he testified, "[i]f there is a specific reason, I don't know it. It hasn't had [an internal auditor] the whole nineteen years I've been on the Board."

481.     The Audit Committee Vice Chair testified that on at least two occasions prior to 2018, he had a discussion with Phillips and the Managing Director of Finance in which he proposed creating an internal audit function. The Vice Chair testified that "the thought process was that was very expensive, and I received assurances from both of them that we had solid documentation …" He recalled being told by Phillips and the Managing Director of Finance, "we don't necessarily see a cost benefit to it, and with … the assurances we received from a top tier national accounting firm … they were able to render an opinion based on our system of internal control."

482.     This explanation ignores the fact that the opinions rendered by the NRA's auditors always explicitly stated that the auditors "express no opinion" on the adequacy of the entity's internal controls.

483.     The Vice Chair also testified that discussions about establishing an internal audit function have been "ongoing" between himself, the Audit Committee Chair, and the current Treasurer since whistleblowers came forward in 2018. He admitted, however, that the Audit Committee has not taken any steps to recommend that the Board direct the creation of an internal audit function.

### A.  Audit Committee's Failure to Respond Adequately to Whistleblowers

484.     Under New York law, an organization of the NRA's size must "adopt, and oversee the implementation of, and compliance with, a whistleblower policy to protect from retaliation persons who report suspected improper conduct." N-PCL § 715-b.

485.     Under the NRA's Statement of Corporate Ethics, the Audit Committee was tasked with receiving whistleblower complaints concerning any financial irregularities or conflicts of interest related to NRA employees or board members.

486.     In violation of its obligations under New York law and NRA policy, the Audit Committee failed to respond adequately to whistleblowers. Along with Defendants Powell, Frazer,

116

and Phillips, members of the Audit Committee were on notice of serious complaints by the NRA Whistleblowers and failed to take appropriate action.

487.    While the Audit Committee Chair acknowledged that it was the Committee's responsibility to address whistleblower complaints, when pressing issues concerning the financial mismanagement and failure to follow internal controls of the NRA were brought to its attention, the Audit Committee failed to take appropriate action, instead referring the complaints to their outside counsel, with no effort to follow up thereafter in a timely or meaningful manner.

488.    As detailed above, in late 2017, a group of senior level staff in the Office of the Treasurer (who would go on to become the NRA Whistleblowers) began an independent review of certain transactions and violations of NRA policy. Their work culminated in a memo titled "List of Top Concerns for the Audit Committee" that they prepared in July 2018 (the "Top Concerns Memo"). The Top Concerns Memo enumerated the NRA Whistleblowers' concerns related to financial conflicts of interest, senior management override of internal controls, and vague and deceptive billing practices.

489.    On July 30, 2018, the Audit Committee held an emergency meeting at which the concerns raised in the Top Concerns Memo were presented. According to both the Chair and the Vice Chair of the Audit Committee, there was no dispute that the individuals who presented these concerns had come forward in the capacity of whistleblowers. Wayne LaPierre also testified that he regarded these individuals as whistleblowers.

490.    The Audit Committee Chair testified that he was aware that serious whistleblower concerns would be raised at the July 30, 2018 meeting. Despite this awareness, the Chair left the meeting prior to the presentation from the NRA Whistleblowers.

491.     In connection with this July 30, 2018 meeting, one of the NRA Whistleblowers penned a "personal statement" in which she formally announced herself as a whistleblower and documented her belief that the meeting was "being manipulated in a way as to try to explain away our issues or try to claim the items on the list are 'fixed' before we can present them as whistleblowing." The personal statement described the items in the Top Concerns Memo as "a sample of the types of issues we face daily and not to be considered all inclusive." The personal statement also asserted that, "in the past, our complaints and concerns were dismissed or 'explained away.'"

492.     The Report of the Audit Committee documenting the July 30, 2018 meeting makes no mention of the fact that whistleblowers came forward. In contrast, it was the usual practice of the Audit Committee to expressly note in its committee reports when "there were no instances of whistleblowing reported."

493.     Upon information and belief, NRA personnel took affirmative steps to conceal the nature and scope of the NRA Whistleblower' concerns from its external auditors.

494.     No one from RSM, the NRA's external audit firm, was present at the July 30, 2018 meeting, although the official report of the meeting erroneously indicates that the RSM Audit Partner attended. The Audit Committee also did not inform the NRA's external auditors about the nature and scope of the whistleblowers' complaints, nor did it alert them to the existence, or provide them with a copy, of the Top Concerns Memo. This was in spite of the fact that, as the current Treasurer testified, external auditors would routinely ask about whistleblower concerns during the audit process.

495.     In connection with its audit of the NRA's 2018 financial statements (the "2018 Audit"), RSM conducted interviews of Audit Committee members and finance staff regarding the

risk of fraud and internal control deficiencies. All of the interviews occurred after the July 30, 2018 meeting, so NRA personnel were well aware of the whistleblowers concerns. According to RSM's work papers, none of the NRA personnel interviewed reported any instances of whistleblowing or suspicious activity to the auditors.

496.    In the period following the July 30, 2018 meeting, the Audit Committee relied exclusively on the Brewer firm to investigate the NRA Whistleblowers' claims.

497.    Upon information and belief, the Vice Chair was made aware that at least one of the NRA Whistleblowers felt threatened and harassed because of the whistleblower complaints. The Vice Chair admitted that the Audit Committee did not undertake any measures to determine whether any of the NRA Whistleblowers who came forward at the July 30, 2018 meeting were subject to threats or harassment, including by anyone from the Brewer firm. The Vice Chair further testified that the Brewer firm did not engage in an inquiry as to whether the NRA Whistleblowers were threatened or harassed.

### B.  Audit Committee's Failure to Appropriately Review and Approve Related Party Transactions and Conflicts of Interest

498.    The Audit Committee failed to exercise proper duty of care in reviewing and approving related party transactions and conflicts of interest between the NRA and its officers, directors, and key employees.

499.    The Audit Committee is responsible for supervising the NRA's compliance with its Conflicts of Interest and Related Party Transaction Policy. A "conflict of interest" under the NRA's internal policy is broader than a "related party transaction" as that term is defined in the N-PCL, and encompasses all situations where an officer's, director's, or key employee's "personal or financial interest could be reasonably viewed as affecting his or her objectivity or independence in fulfilling their duties to the NRA."

119

500.    The Audit Committee is responsible for reviewing "all transactions that involve potential conflicts of interest" in order to "determine whether to approve or ratify such transactions. The NRA Audit Committee may only approve the underlying transaction if it determines that such transaction, under the terms and within the circumstances and conditions presented, is fair, reasonable, and in the best interests of the NRA."

501.    When determining the fairness and reasonableness of a transaction, the Audit Committee is required to consider, among other things, alternative transactions to the extent available and the NRA's mission and resources.

502.    The Audit Committee is required to document the disclosure of potential and actual conflicts of interest in its meeting minutes, and must include (1) the name of the person whose conflict is disclosed, (2) the nature of the conflict, and (3) details of the deliberations of the disinterested directors, such as documents reviewed, any alternatives considered, comparative costs or bids, market value information, and other factors considered in deliberations.

503.    Under Section 715 of the N-PCL, the NRA is prohibited from entering into any related party transaction unless the transaction is determined and documented by the Board or a designated committee of the Board to be fair, reasonable, and in the corporation's best interest at the time of the determination. The law also requires that every director, officer, or key person who has an interest in a related party transaction "shall disclose in good faith to the [B]oard … the material facts concerning such interest," and the corporation must undertake a process before approving a related party transaction and document that process.

504.    For years, the Audit Committee failed to adequately address related party transactions or conflicts of interest, in violation of both the N-PCL and the NRA's internal policy governing conflicts of interest. Upon information and belief, the Audit Committee also failed to

put in place procedures to ensure that the NRA would comply with New York Law governing related party transactions in the future. N-PCL § 715(j).

505.    In 2016, for example, according to records of the Audit Committee and the Secretary of the Board, the Audit Committee apparently had notice of at least eight related party transactions amounting to approximately $668,000 to be paid to NRA board members. Among the transactions the Audit Committee had notice of were:

a.    Payments totaling $150,000 to Board Member No. 1;

b.    Payments totaling $45,180 to Board Member No. 4's law firm; and

c.    Payments totaling $256,000 to Board Member No. 5.

506.    Upon information and belief, the Audit Committee maintained no records in 2016 establishing whether the Committee considered market value information, alternative transactions or other information in its deliberations concerning the conflicts of interest and related party transactions. There is no resolution by the Audit Committee approving the transactions on a finding that the transactions were fair, reasonable and in the best interests of the NRA.

507.    According to the NRA's internal documents, in 2017, the Audit Committee had notice of multiple substantive related party transactions amounting to at least $730,000 to be paid to NRA board members and employees in 2017. Among the transactions the Audit Committee had notice of were:

a.    Payments totaling $150,000 to Board Member No. 1;

b.    Payments totaling $123,248.43 to RCR Enterprises, which is owned by a former NRA Vice President;

c.    Payments totaling $40,000 to Board Member No. 3;

d.    Payments totaling $45,180 to Board Member No. 4's law firm; and

e.   Payments totaling $134,000 to Board Member No. 5.

508.    In September 2018, the Audit Committee acknowledged in a committee report that there were "[s]everal instances in which transactions that posed conflicts of interest (and thus, should have been disclosed and approved in advance) were disclosed after the fact." The Audit Committee Chair also testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't. That's the reason we [had] to do them after the fact." He suggested, "It may be that some of these contracts were entered into, and John [Frazer] never knew. They never disclosed it on the form."

509.    The Audit Committee then purported to ratify seven related party transactions and conflicts of interest at its September 2018 meeting, in contravention of both N-PCL § 715 and internal NRA policy. In attempting to retroactively approve the transactions at this meeting, the Audit Committee did not review any documents, including any underlying contracts, before purportedly determining that each was "fair, reasonable, and in the best interest of the NRA." There is no evidence that the Audit Committee considered alternative transactions, the NRA's need for the particular transactions, or whether the amounts NRA directors were charging was comparable to other vendors or to what those directors generally charged for those services.

510.    One of the related party transactions that the Audit Committee ratified at its September 2018 meeting was the contract between Dissident No. 1 and Ackerman.

511.    While the fact of this contract with Ackerman, along with its material terms, was known to both LaPierre and Phillips at the time it was executed, the Audit Committee was not made aware of the arrangement at that time. The Audit Committee did not review the contract prior to its execution as required by the N-PCL § 715 and the NRA Policy Manual.

512.    The Audit Committee Chair also admitted to relying on only a summary of the contract terms presented to it by the NRA Board Counsel. Members of the Audit Committee could not recall whether they were informed of the value of the contract at the time they purported to formally ratify it.

513.    The Audit Committee concluded that it was "fair, reasonable, and in the best interest of the NRA to approve and ratify [Dissident No. 1's] continued participation in the [Ackerman] Contract during his service on the NRA Board and as an NRA officer." When asked how the Audit Committee could determine whether the contract was in the best interest of the NRA if it didn't know the contract's value, the Chair of the Audit Committee testified, "it was a contract between [Ackerman] and [Dissident No. 1], not the NRA" and stated, "We don't care what [Ackerman] was paying [Dissident No. 1].

514.    This characterization of the contract was false, since the payments to the incoming president were ultimately paid for by the NRA, not Ackerman.

515.    At the same meeting on September 6, 2018, the Audit Committee also purported to ratify several other transactions without considering market rate information for the contracted services or otherwise making anything other than a conclusory determination of the fairness, reasonableness and benefits of the transactions to the NRA. These transactions included:

a.  A consulting agreement between the NRA and Board Member No. 5, increasing the board member's fee from $168,000 to $220,000 per year.

b.  The payment of $1.36 million to HomeTelos between September 2014 and May 2017, which, as discussed above, should have been previously disclosed to and approved by the Audit Committee due to Phillips's long term personal relationship with the vendor's Chief Executive Officer.

c.  The engagement of McKenna as a vendor despite Powell's belated disclosure, as discussed above, that his wife had been an independent contractor for McKenna since late 2017. The NRA paid McKenna $25,000 per month pursuant to a written contract in 2018 signed by Powell, and between $160,000 and $250,000 per month pursuant to

123

a verbal contract agreed to by Powell, exclusive of other expenses passed through to the NRA by McKenna.

516.    In 2019 and 2020, the Audit Committee again purported to retroactively approve existing NRA contracts with related parties or that presented conflicts of interest, some dating back to their inception more than fifteen years ago. At the same time, the Committee approved new contracts with many of the same vendors. The Committee, however, did not comply with the requirements of NRA policy and applicable law requiring consideration of alternative transactions and it did not properly document the Audit Committee's determination. The Committee also did not put in place procedures to prevent future related party transactions occurring without obtaining prior Board approval. Examples of the related party transactions and conflicts of interest that were improperly approved by the Audit Committee include:

a.    On April 28, 2019, the Committee retroactively approved approximately $3,692,000 paid by the NRA to Unified Sportsmen of Florida over a *nineteen-year period*. Board Member No. 5 is the Executive Director of Unified Sportsmen of Florida. At the same meeting, the Committee also prospectively approved future payments by the NRA to Unified Sportsmen of Florida.

b.    On April 28, 2019, the Committee retroactively approved approximately $326,000 in grants from the NRA to the New Jersey Rifle and Pistol Clubs, Inc. *over a fourteen-year period*. The president of the New Jersey Rifle and Pistol Clubs, Inc. is a board member of the NRA. At the same meeting, the Committee also prospectively approved new transactions between the New Jersey Rifle and Pistol Clubs, Inc. and the NRA.

c.    On April 28, 2019, the Audit Committee retroactively approved transactions between SpiritWild Productions and the NRA amounting to approximately $120,000 over a two-year period. The President and Director of SpiritWild Productions is the wife of a board member of the NRA. On May 30, 2019, and again on January 9, 2020, the Audit Committee prospectively approved new transactions with SpiritWild Productions.

517.    Upon information and belief, since 2016, with the exception of the agreement with Dissident No. 1, none of the official reports of the Audit Committee reflect a consideration and rejection of a conflict of interest or related party transaction presented to it, and the Audit

124

Committee has never refused to approve prospectively any conflict of interest or related party transaction presented to it.

### C. Audit Committee's Failure to Oversee Adequately the External Auditors

518.    The Audit Committee failed to properly oversee and supervise the NRA's external auditors as mandated by the Committee's Charter and by the requirements of the N-PCL.

519.    The Audit Committee Charter sets forth the Committee's specific responsibilities with respect to "review[ing] and apprais[ing] the audit efforts of the Association's independent auditors." The Charter places the responsibility for "review[ing] the performance of the external auditors" squarely within the purview of the Audit Committee.

520.    RSM was the NRA's external auditor between 2008 and 2019. Over the course of the decade-long relationship, the Audit Committee failed to exercise the requisite level of oversight or accountability prescribed in its Charter and by the N-PCL.

521.    While, pursuant to its Charter, the Audit Committee is supposed to "provide open means of communication between the Directors, the independent auditors, and the financial and senior management of the Association," the Audit Committee itself failed to communicate essential information to RSM that may have materially impacted the quality of the audit.

522.    For example, as detailed above, the Audit Committee never informed RSM about the existence of whistleblower allegations in July 2018. RSM was not invited to participate in the July 30, 2018 emergency Audit Committee meeting. Following the meeting, the Audit Committee failed to inform RSM of the concerns raised by the NRA Whistleblowers and failed to provide RSM with a copy of the Top Concerns Memo. The only information that the Committee conveyed to RSM about the meeting was the fact that various related party transactions had been raised and would be addressed further at the September 2018 meeting. The Audit Committee failed to provide information to RSM relevant to its audit. As the RSM audit partner who was in charge of the

125

engagement acknowledged, had his team been aware of the Top Concerns Memo while the 2018 Audit was ongoing, it likely would have performed additional audit testing around certain transactions.

523. Additionally, upon information and belief, the Audit Committee never communicated to RSM anything about the NRA's practice of passing expenses incurred by NRA executives through Ackerman. RSM was not aware that Ackerman was covering substantial expenses for NRA executives, including travel-related costs incurred by NRA executives and charges on credit cards billed to Ackerman, which the NRA was then reimbursing Ackerman for as "out of pocket expenses."

524. Both the Chair and the Vice Chair of the Audit Committee testified that they were not aware—even as of the dates of their testimony before the Attorney General in June 2020—that RSM never interviewed LaPierre during the course of their external audits. Both expected that a standard audit would include an interview of the CEO. The Audit Committee Chair testified that, as a former auditor, he "[couldn't] imagine that [RSM] would not interview the CEO." The Vice Chair testified that, as a CPA who has conducted audits, he "can't see … not meeting with the chief executive officer. To me, that would not be appropriate."

525. Similarly, both the Chair and the Vice Chair claimed to be unfamiliar with the NRA's practice of not having its CEO sign the management representation letter. They also were unaware that the basis for RSM not insisting that LaPierre sign the letter was because of a standing memo in RSM's work papers, which stated that LaPierre functions only as the NRA's "leading lobbyist", and "is not involved in the daily operations or finances" of the NRA.

126

526.    The Audit Committee further failed to ensure that RSM was undertaking appropriate audit testing, particularly with respect to oversight of senior management, related party transactions, employee expenses and reimbursements, and major vendors.

527.    For example, the Vice Chair of the Audit Committee testified that he did not feel the need to ask RSM for external oversight of LaPierre's expenses because he "personally [had] a great deal of trust in Wayne LaPierre" and he didn't believe that LaPierre "expends money unnecessarily." The Chair of the Audit Committee claimed to have no knowledge of whether RSM ever tested LaPierre's expenses, although he also insisted that he "couldn't imagine" that RSM would not have selected LaPierre's expenses for testing. He also had no recollection of whether the Audit Committee ever asked the external auditors to test LaPierre's expenses, nor did he have a recollection of whether the external auditors ever reported to the Audit Committee on Mr. LaPierre's expenses. In fact, RSM failed to conduct any comprehensive expense testing related to LaPierre.

528.    The Chair of the Audit Committee did not know whether the NRA's external auditors ever tested Ackerman invoices, even though he testified that he would have expected them to be tested in the ordinary course of an audit. He also did not recall ever telling the external auditors to conduct testing on Ackerman.

529.    RSM's annual audit planning presentations informed the Audit Committee that "[a]n audit is not designed to provide assurance on internal control or to identify significant deficiencies or material weaknesses. Our review and understanding of NRA's internal control is not undertaken for the purpose of expressing an opinion on the effectiveness of internal control."

530.    Despite the fact that RSM affirmatively did not test the effectiveness of the NRA's internal controls as part of its annual audits, the Audit Committee Chair and Vice Chair relied on

127

them to do so; the Audit Committee itself did little or nothing else to oversee internal controls themselves. In the testimony that he provided in connection with the Attorney General's investigation, the Vice Chair of the Committee testified, "It is the role of the audit committee to insist that proper controls be followed over any expenditure." When asked what the Committee did to fulfill that role, he explained, "We have an external audit that verifies based on their study and analysis of internal controls that procedures are, in fact, followed." When pressed as to whether the Audit Committee did anything to verify whether policy is followed, he reiterated, "Engage external auditors to do the testing of our transactions." He testified that the Committee did not do anything other than engage the external auditors because it "did not feel the need." As a result, the Audit Committee failed to take adequate action.

531.     The Audit Committee failed to perform its statutory, bylaw, and charter responsibilities as set forth in the preceding paragraphs. As a result, the Board was unable to exercise its responsibilities to maintain a system that was reasonably effective in identifying violations of law. In turn, the Board displayed a sustained and systematic failure to exercise their oversight function and stood by as various laws were violated by the NRA, including violations of the NRA's tax exempt status, false reporting on annual filings with the IRS and the Attorney General's Charities Bureau, improper expense documentation, improper wage reporting, improper income tax withholding, failure to make required excise tax reporting and payment, payments in excess of reasonable compensation to disqualified persons, and waste of NRA assets.

### D.  The Audit Committee Acted *Ultra Vires* in Indemnifying Officers, Directors, and Employees

532.     On March 8, 2019, the Audit Committee met and acted *ultra vires* by resolving to indemnify board members, officers, and employees for legal fees in connection with an investigation being conducted by the U.S. Department of Justice. In accordance with the NRA's

bylaws, the decision to indemnify board members and officers cannot be made by the Audit Committee as a standing committee.

533.    On August 7, 2019, the Audit Committee met and acted *ultra vires* by resolving to indemnify a board member for legal fees. In accordance with the NRA's bylaws, the decision to indemnify a board member cannot be made by the Audit Committee as a standing committee.

## VI.    The NRA's Failure to Institute an Effective Compliance Program

534.    Since at least 2014, the NRA has failed to put in place an effective compliance program to ensure that NRA officers, directors, and employees comply with New York law and the NRA's internal policy.

535.    Upon information and belief, the NRA does not have and has never had a dedicated compliance officer. However, in or about late 2018, LaPierre tasked Powell with handling "compliance issues." Upon information and belief, Powell's tenure in that role lasted until he was suspended in October 2019 from working at the NRA pending an investigation into his improper use of NRA money. The NRA's current Treasurer testified that Powell "certainly … was not a good choice for compliance."

536.    Neither the Chair nor Vice Chair of the Audit Committee could identify or describe an existing compliance program at the NRA. The Vice Chair identified a single presentation developed by the Brewer firm, the Chair referred to "compliance seminars, ethics seminars, whatever you want to call it. We do that," and both the Chair and Vice Chair were not familiar with who in the organization bore responsibility for compliance. The Chair of the Audit Committee identified Defendant Frazer as responsible for "regulatory compliance," whereas the Vice Chair of the Committee admitted "no specific knowledge" of the placement of a compliance function.

537.    Upon information and belief, NRA employees did not receive meaningful training on compliance with the NRA's conflicts of interest or whistleblower policies and procedures. And,

upon information and belief, the Brewer firm's presentation mentioned by the Audit Committee Vice Chair was given to NRA staff by Defendants Powell and Frazer, both of whom, as detailed above in Part 5, Sections I(C) and (D), were ill equipped to train anyone on compliance with New York law, IRS requirements for nonprofit organizations, and the NRA's policy. Both Powell and Frazer lacked the necessary knowledge, training, experience, skills and temperament for senior roles overseeing compliance. Each and failed to comply or enforce NRA policies and procedures, including concerning conflicts of interest.

538.    As detailed in Part Five, Section V(B), the NRA Audit Committee failed to comply with its obligations to diligently review and approve (and document such review and approval of) related party transactions and conflicts of interest between the NRA and NRA officers, directors, and key persons.

539.    In fact, as detailed in Part V, Section V(B), the NRA Audit Committee failed in its basic duty to put in place policies and procedures to ensure (1) that conflicts of interest and related party transactions would be reported to the Audit Committee in the first instance before transactions occurred, and (2) that failures to report any such conflicts of interest or related party transactions to the Audit Committee would not be repeated in the future.

540.    For example, for years, Defendant Frazer failed to comply with his obligation under the NRA bylaws and internal policy to collect and submit to the NRA Audit Committee the annual Financial Disclosure Questionnaires that NRA board members and officers are required to fill out. As the Audit Committee Chair testified, "there were some [related party transactions] that should have been given to us, should have been captured into the [disclosure of financial interest] forms, should have been presented to us by Frazer and they weren't. That's the reason we [had] to [ratify] them after the fact."

541. Relatedly, as detailed in Part Five, Sections I and II, Defendant LaPierre failed in his obligation to "independently report to the Audit Committee any financial interest of an officer or director (or immediate family member) that comes to his knowledge or the knowledge of his office as well as any financial transactions between the NRA … and other individuals and/or organizations that present or might present the possibility of a conflict of interest."

542. As detailed in Part Four, Section II(C), until 2020, the NRA did not have a whistleblower policy that complied with New York law. For example, the Audit Committee was designated to address whistleblower complaints, but the Chair of the Committee testified that he did not know whether there was a procedure through which whistleblowers could submit their complaints anonymously to the Audit Committee.

543. And even with respect to the deficient whistleblower policy that was not modified until the NRA was under investigation by the Attorney General, as detailed in Part Four, Section II(C), the NRA Audit Committee failed to adequately supervise the implementation of that policy. For example, two of the five Audit Committee members—the Chair and the interim President of the NRA—left the July 30, 2018 Audit Committee meeting before the whistleblowers gave their presentation. Also, the minutes for that meeting fail to record the fact and substance of the complaints from whistleblowers. The Committee Chair was not even provided a copy of the Top Concerns Memo by the Vice Chair after the meeting. The Audit Committee has not maintained any record of steps taken to investigate and address the whistleblower complaints, other than to state that the Brewer firm was conducting an investigation.

## VII. The NRA's False Regulatory Filings

544. As a New York not-for-profit corporation holding charitable assets and operating in New York, the NRA must register and file accurate and complete annual reports with the Charities Bureau. In addition to these registration requirements, charitable organizations soliciting

131

contributions in New York must also register and file accurate and complete annual reports under Article 7-A of the Executive Law. These annual reports, commonly referred to as CHAR500s, must include copies of an organization's annual IRS Form 990, and, for organizations like the NRA, copies of the organization's audited financial statements.

545. CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures, certify under penalties of perjury that the report, including all attachments, is true and accurate.

546. Phillips signed the NRA's CHAR500s for 2015 and 2016. Frazer signed the NRA's CHAR500s for 2015, 2016, 2017, and 2018. Frazer and Phillips knew that those CHAR500s, and their attachments, included materially misleading information concerning the NRA's financial condition, and falsely attested to the accuracy of the information provided, under penalty of perjury.

547. Defendant NRA made materially false and misleading statements and omissions in its 2015, 2016, 2017, and 2018 CHAR500 filings with the Attorney General. These statements included, but were not limited to, false statements about compensation and benefits for officers and directors, false statements about diversion of corporate assets, false statements about enforcement of its conflict of interest policy, false statements about its processes for determining compensation of officers, false statements about compensation and benefits to directors, false statements about compensation policies and reviews, and false statements about transactions with interested persons.

548. The false and misleading statements or omissions included, without limitation:

a. **False statements and omissions about transactions with interested persons. For example:**

     i.    Defendant NRA never disclosed any of the numerous payments to officers and directors in the "Related Party Transactions" note to its audited financial statements.

    ii.    In its Forms 990 for 2015, 2016, 2017, and 2018, the NRA falsely reported that it was not a party to business transactions with current or former officers, directors, relatives thereof or entities affiliated therewith and failed to disclose those transactions on Schedules L and/or R of its IRS Forms 990. As set forth above, the NRA has been a party to multiple business transactions with current or former officers, directors, relatives thereof or entities affiliated therewith that the NRA failed to report.

   iii.    In its Forms 990 before 2017, the NRA overstated the number of independent board members because it did not properly omit all board members engaged in a business transaction with the organization for which payments of over $100,000 were received, or board members who were paid more than $10,000 as independent contractors, or board members engaged in a single transaction with the organization over $10,000.

b.  **False statements and omissions regarding compensation and to Officers and Directors. For example:**

     i.    In its Forms 990 for the relevant time period, Defendant NRA failed to disclose the complete amounts paid to LaPierre in the form of gifts from vendors, "out of pocket" expenses originally paid for by Ackerman and then paid for by the NRA, and other forms of compensation.

    ii.    In its Forms 990 for at least 2014 to 2018, the NRA failed to disclose taxable personal income for LaPierre, Phillips, and Powell. For example, as set forth above, LaPierre and Phillips permitted NRA executives and personnel to use vendor credit cards, alter ego accounts, and vendor charges to disguise payments to LaPierre, on LaPierre's behalf, for LaPierre's personal benefit, and as reimbursements of LaPierre's personal and family expenses, inconsistent with the reporting requirements of Section 527 of the Internal Revenue Code.

   iii.    In its Forms 990 for the relevant time period, the NRA failed to disclose in response to question 25a in Part IV of the IRS 990 for each relevant year that it engaged in an excess benefit transaction with a disqualified person during the year, and failed to file Form 4720 reporting such transactions pursuant to Section 4958 of the Internal Revenue Code, which governs excise taxes for excess benefit transactions.

   iv.    Until 2017, Defendant NRA failed to disclose payments made to a former NRA president in the form of payments to Crow Shooting, an entity owned by the former president. While these payments were disclosed in the NRA

Foundation's Form 990 for 2017, the NRA failed to properly disclose these payments in its 2017 Form 990.

v.   In its Form 990 for 2016, Defendant NRA failed to disclose a $455,753 payment by Lockton Affinity to the NRA's Managing Director of Licensing and Marketing.

vi.   In its Forms 990 for 2015, 2016, 2017, and 2018, Defendant NRA answered "No" to the question "Did the organization engage in an excess benefit transaction with a disqualified person during the year?" In fact, Defendant NRA engaged in multiple excess benefit transactions, including without limitation the compensation paid to Defendants LaPierre and Powell, and a former President.

vii.   In its Forms 990 for 2015, 2016, 2017, and 2018, Defendant NRA made false statements in Part VI, line 16 about its process for determining the compensation of officers and directors.

c.   **False statements and omissions regarding payments to vendors. For example:**

i.   In its Forms 990 prior to 2017, Defendant NRA failed to disclose the amount paid to Ackerman McQueen for "out of pocket" expenditures. In in Form 990 for 2017, the NRA disclosed that this amount was over $11 million. At that time, the NRA also disclosed that it had paid over $5 million to Mercury Group, a company wholly owned by Ackerman McQueen. Previous filings therefore significantly underrepresented the total amount that the NRA paid to Ackerman McQueen on an annual basis.

ii.   Until 2017, the NRA failed to disclose in its Form 990 the amount it paid to Under Wild Skies, Inc., even though Defendant LaPierre and his spouse were receiving free services in the form of hunting trips from the company. In its Form 990 for 2017, the NRA disclosed on Schedule O that it had paid $2,635,000 to Under Wild Skies.

d.   **Additional false statements in Part VI of the Form 990 regarding governance, management and disclosure. For example:**

i.   In its Form 990 for 2018, Defendant NRA answered "No" to the question "Did the organization become aware of a significant diversion of the organization's assets." This statement was false, since the organization did become aware of significant diversions through whistleblower reports and its own inquiries into billing by Ackerman and McKenna.

ii.   In its Forms 990 for the relevant time period, Defendant NRA answered "Yes" to the question "Did the organization regularly and consistently monitor enforcement with [its conflict of interest policy]." Based on the evidence

134

gathered in the Attorney General's investigation, as set forth above, this statement was false, as Defendant NRA repeatedly permitted violations of its conflict of interest policy, including, without limitation, by Defendant LaPierre.

iii. In its Forms 990 for the relevant time period, the NRA filed false and/or materially incomplete responses on Schedule J, which reports information on compensation for officers, directors, key employees, and highly compensated employees, including without limitation:

1. Failing to report that the NRA paid for travel for companions until its 2018 Form 990, when in fact the NRA repeatedly paid for travel for LaPierre's wife and other family members;

2. Failing to report that it provided a housing allowance until its 2017 Form 990, when in fact it paid for housing for certain officers; and

3. Reporting that it in fact had a policy regarding tax indemnification and gross-up payments, when, upon information and belief, the NRA had no such written policy.

e. **Failure to disclose all fundraising expenses, fundraisers and amounts paid thereto. For example:**

i. Upon information and belief, in its Forms 990 for the relevant time period, the NRA underreported its spending on fundraising in its allocation of functional expenses, since it failed to fully report fundraising expenses that were routed through third party vendors.

ii. In its 2016 Form 990, the NRA failed to disclose MMP as a fundraiser. MMP is not registered with the OAG as a fundraiser to solicit in New York State. In its 2016 Form 990, the NRA reported that it had paid MMP $10 million in 2016 for fundraising, printing, and mailing, but failed to report MMP or any amounts raised by it in the section dedicated to the NRA's top ten fundraisers. Instead, the NRA listed MMP, which also shares a physical address at NRA Headquarters, as an independent contractor.

**VIII.  The NRA's Violation of its Duties under the New York Prudent Management of Institutional Funds Act**

549.    The NRA is an "institution" as that term is used in Article 5-A, Section 551(d) of NYPMIFA since it is "a person, other than an individual, organized and operated exclusively for charitable purposes."

550.     Under NYPMIFA, the obligations of the NRA are also imposed upon the governing board of directors of the NRA.

551.     The NRA holds and manages "institutional funds" as that term is used in NYPMIFA, Section 551(e).

552.     In managing institutional funds, the NRA must consider the purposes of the NRA and the purposes of its institutional funds.

553.     In managing institutional funds, pursuant to NYPMIFA, the NRA must manage institutional funds in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

554.     In managing institutional funds, under NYPMIFA, the NRA must make a reasonable effort to verify facts relevant to management of the funds.

555.     Each person at the NRA with responsibility for managing and investing institutional funds must comply with the duty of loyalty in exercising that responsibility.

556.     Each person responsible for managing and investing institutional funds is required to manage and invest the funds in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances

557.     The institutional funds of the NRA include investments, cash balances, funds derived from pledging NRA assets, funds obtained by pledging the credit of the NRA, income derived from rents to third parties, and funds held by or paid out to vendors.

558.     The NRA has failed to manage its institutional funds in accordance with the standards set forth in Section 552 of NYPMIFA. Specifically:

   a. It has permitted unrestricted net assets on its balance sheet to decrease from a surplus (unrestricted assets less liabilities) of $27,802,714 at year-end 2015, to a net deficit at year-end 2016 of $14 million, to a net deficit at year-end 2017 of $31,779,599, to a net deficit at year-end 2018 of $36,276,779. The total reduction in unrestricted assets over

136

the three-year period exceeds $63 million. The Board minutes of the NRA do not reflect any consideration of this precipitous decline, or consideration of the factors set forth in NYPMIFA, with respect to this use of institutional funds. The Attorney General, upon information and belief, alleges that this decline in unrestricted assets continues to the present time.

b. The NRA, during the period 2015 to the present, did not manage its institutional funds in good faith, or with the care and prudence an ordinarily prudent person would exercise under similar circumstances.

c. The NRA has failed to incur only costs that are appropriate and reasonable in relation to its assets and the purposes of the NRA.

d. The NRA has failed to make reasonable efforts to verify facts relevant to management of its institutional funds.

e. The NRA has failed to make reasonable efforts to keep its Board and relevant committees of the Board apprised of the financial status, risks, and commitments of institutional funds.

f. The NRA has authorized and expended significant institutional funds (in excess of $54 million) for payments to the Brewer firm without consideration of the factors set forth in 552(e)(1).

g. The NRA has imprudently pledged capital assets to obtain loans for current expenses.

h. The NRA has undertaken covenants associated with its credit agreement and lines of credit agreements, requiring minimum cash and investment balances, and breached such covenants.

i. The NRA has taken loans in excess of $5 million from the separately maintained funds of the NRA-ILA, in violation of its bylaws.

j. The NRA has permitted the use of NRA-ILA funds for payment of travel expenses of LaPierre, outside the NRA expense reimbursement system.

k. The NRA has twice pledged its accounts receivable as collateral in order to obtain two $5 million loans from the related entity NRA Foundation. The second loan has not been repaid, and the NRA has permitted its officers to engage in related party transactions with respect to those transactions, exposing them to liability to the NRA Foundation.

l. The NRA has permitted its Audit Committee to fail to evaluate or report on the requirements of NYPMIFA, and the NRA's compliance with those requirements.

m. The NRA has permitted its auditor to fail to evaluate or report on the requirements of NYPMIFA, and the NRA's compliance with those requirements

137

n.  The NRA has failed to assure that institutional funds are not subject to waste or misappropriation.

o.  The NRA has engaged "faithless fiduciaries" including Defendants LaPierre, Powell, and Phillips, who were given authority to manage and invest institutional funds, but failed to do so prudently.

p.  The NRA has committed the NRA to undertake undisclosed future obligations to senior executives, including a ten-year post-employment obligation to Defendant LaPierre at an amount per year in excess of $1 million, a no-show consulting contract with Defendant Phillips, and a no-show consulting contract with the former Executive Director of General Operations.

559.    The failure of the NRA to perform its duties under NYPMIFA, as described here, require that this Court enter an appropriate order to secure the proper administration of these charitable funds, and to order an accounting by the NRA and appropriate officers, directors or key employees for their official conduct with respect to institutional funds.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Dissolution of the NRA – N-PCL §§ 112(a)(1), 112(a)(5), 1101(a)(2)
### (Against Defendant NRA)

560.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 559 above as though fully set forth herein.

561.    Under N-PCL § 112(a)(1), the Attorney General is authorized to maintain an action or special proceeding to dissolve a corporation that has acted beyond its capacity or power or to restrain it from carrying on unauthorized activities.

562.    Under N-PCL § 112(a)(5), the Attorney General is authorized to maintain an action or special proceeding to dissolve a corporation under Article 11 (Judicial dissolution).

563.    Under N-PCL § 1101(a)(2), the Attorney General may bring an action seeking the dissolution of a charitable corporation when "the corporation has exceeded the authority conferred upon it by law, or … has carried on, conducted or transacted its business in a persistently fraudulent

138

or illegal manner, or by the abuse of its powers contrary to public policy of the state has become liable to be dissolved."

564.    N-PCL § 102(a)(5) bars a not-for-profit corporation from permitting its assets, income or profit to inure to the benefit of an officer or director of the corporation. N-PCL§ 515(a) of the N-PCL prohibits the distribution of any part of the income of a not-for-profit corporation to the directors or officers of the corporation. The NRA violated these provisions by permitting its assets to be used for the benefit of its officers and directors, their families and other insiders.

565.    N-PCL § 515(b) limits a not-for-profit corporation to the payment of reasonable, not excessive, compensation to directors and officers and prohibits any person who may benefit from such compensation from being present or participating in the deliberation or vote to approve compensation. The NRA, through its Compensation Committee as it relates to LaPierre, Phillips and Frazer, and through LaPierre as it relates to Powell, violated these provisions in determining the compensation of the Individual Defendants. The salary, bonuses, other cash and non-cash compensation and other benefits to the Individual Defendants were excessive and constitute a waste of NRA's charitable assets, and an illegal and unauthorized activity under the N-PCL.

566.    Under N-PCL § 715-a and EPTL § 8-1.9(d), the NRA was required to adopt a conflict of interest policy to ensure that its directors and officers act in the corporation's best interest. The NRA failed to adopt and enforce a policy that met the statutory requirements and, accordingly, the NRA violated N-PCL § 715-a and EPTL § 8-1.9(d).

567.    Under N-PCL § 715-b and EPTL § 8-19(e), the NRA was required to adopt a whistleblower policy to protect people who report improper conduct from retaliation. The NRA failed to adopt and enforce a policy that met the statutory requirements and, accordingly, violated N-PCL § 715-b and EPTL § 8-1.9(e).

568.    Pursuant to EPTL §§ 8-1.4(d) and (f), not-for-profit organizations holding charitable assets and operating in New York must register and file annual reports with the Charities Bureau. Charitable organizations soliciting contributions in New York must also register and file annual reports called "CHAR 500s" under Article 7-A of the Executive Law. The CHAR500s must include copies of an organization's annual IRS Form 990, and, for organizations such as the NRA, copies of the organization's audited financial statements. CHAR500s must be signed by: (i) the organization's President or Authorized Officer and (ii) its Chief Financial Officer or Treasurer, both of whom, by their signatures certify, under penalties of perjury, that the report, including all attachments, is true and accurate.

569.    The annual reports filed with the Charities Bureau must also include the identities of the fundraisers with whom an entity contracts, as well as information about the services they provide and the compensation they receive.

570.    Sections 172 and 175 of the Executive Law prohibit material false statements in any application, or any registration required to be filed with the Attorney General pursuant to Article 7-A of the Executive Law.

571.    From 2015 to 2018, the CHAR500s, with accompanying IRS Form 990s, filed by the NRA with the Attorney General contained numerous material false statements.

572.    As detailed in preceding paragraphs, the NRA and its individual trustees, as that term is used in the EPTL, failed to secure the proper administration of the charitable assets in their possession and control, and violated the duties of prudence in the management of institutional funds.

573.    As a result of the foregoing, the NRA has acted beyond its capacity by persistently disregarding the limitations in its certificate of incorporation and the law, and it has conducted its

business in a persistently illegal manner and abused its powers contrary to the public policy of the State of New York by operating without effective oversight or control by its officers and directors.

574.    Accordingly, this Court should dissolve the NRA pursuant to N-PCL § 1109(b)(1) and distribute its remaining and future assets to be applied to charitable uses consistent with the mission set forth in the NRA's certificate of incorporation, pursuant to N-PCL §§ 1115(a) and 1008(a)(15).

**SECOND CAUSE OF ACTION**
**<u>Dissolution of the NRA – N-PCL §§ 112(a)(7), 1102(a)(2)(D)</u>**
**(Against Defendant NRA)**

575.    The Attorney General repeats and re-alleges the allegations in paragraphs 1 through 574 above as though fully set forth herein.

576.    Under N-PCL § 112(a)(7), the Attorney General is authorized to maintain an action or special proceeding to enforce rights granted by statute to a director or officer of a charitable corporation.

577.    Pursuant to N-PCL § 1102(a)(2)(D), directors or members, as authorized, may petition the court for judicial dissolution where the "directors or members in control of the corporation have "looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner."

578.    Directors or members in control of the NRA have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner.

579.    Accordingly, this Court should dissolve the NRA pursuant to N-PCL § 1109(b)(1) and Order that that its remaining and future assets should be applied to charitable uses consistent

141

with the mission set forth in the NRA's certificate of incorporation, pursuant to N-PCL §§ 1115(a) and 1008(a)(15).

### THIRD CAUSE OF ACTION
**For Breach of Fiduciary Duty Under N-PCL §§ 717 and 720 and Removal Under N- PCL §§ 706(d) and 714(c)**
**(Against Defendant LaPierre)**

580.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 579 above as though fully set forth herein.

581.     LaPierre breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and *ex officio* director of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself, his family members and for certain other insiders, including Defendants Phillips and Powell in contravention of NRA bylaws, policies and procedures, and applicable laws.

582.     LaPierre's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted and by exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, failure to report and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code, and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

583.     Accordingly, LaPierre is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including returning the salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, and rescission of any agreements providing for compensation following his employment as Executive Vice President of the NRA, for his conduct in the neglect and violation of his duties in the management and disposition of the

142

NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

584.     LaPierre should be removed for cause under N-PCL §§ 706 and 714 and be barred from re-election of reappointment as a director or officer of the NRA.

## FOURTH CAUSE OF ACTION
### For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720 and Removal Under N-PCL §§ 706(d) and 714(c)
### (Against Defendant Frazer)

585.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 584 above as though more fully set forth herein.

586.     Frazer is an attorney who owes a fiduciary duty to the NRA and is also bound by professional ethics in his conduct towards his client. Frazer failed to discharge his duties as an officer of the NRA, both as General Counsel and as Secretary, with the degree of care, skill, prudence, diligence and undivided loyalty required. Frazer breached his fiduciary duties of loyalty, care and obedience to the NRA.

587.     Upon information and belief, and based on his actions or failures to act on the matters detailed above, Frazer violated his professional responsibility to his client, the NRA, by failing to provide competent representation, in that he failed to act with reasonable diligence in representing the NRA and to use the thoroughness and preparation reasonably necessary for the representation of the NRA throughout his tenure, including by failing to make sufficient inquiry into and analysis of the factual and legal problems under his responsibility, and by failing to use methods and procedures meeting the standards of competent practitioners.

588.     Frazer's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted; exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, and failure to report

and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code; and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

589.    Accordingly, Frazer is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty. Frazer should be removed for cause under N-PCL §§ 706 and 714 and barred from re-election or reappointment as an officer or director of the NRA.

**FIFTH CAUSE OF ACTION**
**For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720**
**(Against Defendant Phillips)**

590.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 589 above as though fully set forth herein.

591.    Phillips breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and *ex officio* director of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself, his personal friends, and other NRA insiders, including Defendants LaPierre and Powell, in contravention of NRA bylaws, policies and procedures and applicable laws.

592.    Phillips's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for non-NRA purposes and be wasted; exposing the NRA to liability for failure to report taxable income, failure to withhold payroll taxes, and failure to

144

report and pay excise taxes due pursuant to Section 4958 of the Internal Revenue Code; and jeopardizing the NRA's tax exempt status and authority to conduct business for failure to comply with regulatory reporting obligations.

593.    Accordingly, Phillips is liable under N-PCL § 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, the rescission of any agreements providing for compensation following his employment as Treasurer and Chief Financial Officer of the NRA, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

### SIXTH CAUSE OF ACTION
### For Breach of Fiduciary Duty to the NRA Under N-PCL §§ 717 and 720
### (Against Defendant Powell)

594.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 593 above as though fully set forth herein.

595.    Powell breached his fiduciary duties of loyalty, care and obedience to the NRA by using his powers as an officer and senior executive of the NRA to obtain illegal compensation and benefits, to convert NRA funds for his own benefit, and to dominate, control, and direct the NRA to obtain private benefit for himself and for his family members in contravention of NRA bylaws, policies and procedures and applicable.

596.    Powell's breaches of fiduciary duty have damaged the NRA by, among other things, causing its assets to be diverted for the benefit of Powell and other individuals and be wasted.

597.     Accordingly, Powell is liable under N-PCL §§ 720(a)(l) to account and pay restitution and/or damages, including the return of salary he received while breaching his fiduciary duties to the NRA, plus interest at the statutory rate of 9%, for his conduct in the neglect and violation of his duties in the management and disposition of the NRA's charitable assets and in causing loss and waste of those assets by his breaches of fiduciary duty.

### SEVENTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant LaPierre)

598.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 597 above as though fully set forth herein.

599.     Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

600.     LaPierre, in his capacity as the Executive Vice President of the NRA was a trustee pursuant to EPTL § 8-1.4 because he held and administered property for charitable purposes in the State of New York.

601.     As set forth in the preceding paragraphs, LaPierre failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, LaPierre should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

## EIGHTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant Frazer)

602.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 601 above as though fully set forth herein.

603.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

604.    Frazer, in his capacity as the Secretary and General Counsel of the NRA, was at all times a trustee pursuant to EPTL § 8-1.4 because he was responsible for holding and administering property for charitable purposes in the State of New York.

605.    As set forth in the preceding paragraphs, Frazer failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Frazer should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

## NINTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant Phillips)

606.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 605 above as though fully set forth herein.

607.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

147

608.    Phillips, in his capacity as the Treasurer and Chief Financial Officer of the NRA was a trustee pursuant to EPTL § 8-1.4 because he held and administered property for charitable purposes in the State of New York.

609.    As set forth in the preceding paragraphs, Phillips failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Phillips should be permanently barred from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

## TENTH CAUSE OF ACTION
### For Breach of EPTL § 8-1.4
### (Against Defendant Powell)

610.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 609 above as though fully set forth herein.

611.    Section 8-1.4(m) of the EPTL authorizes the Attorney General to institute appropriate proceedings to secure the proper administration of any not-for-profit corporation organized under the laws of this State for charitable purposes.

612.    Powell, in his capacity as an officer and a de facto officer, was a trustee pursuant to EPTL § 8-1.4 because he was responsible for holding and administering property for charitable purposes in the State of New York.

613.    As set forth in the preceding paragraphs, Powell failed to administer the charitable assets of the NRA entrusted to his care properly and, as a result, should be ordered to account for his breaches and to make restitution and/or pay damages, plus interest at the statutory rate of 9%, to the NRA. In addition, Powell should be permanently barred from serving as an officer, director

or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

### ELEVENTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4)
### (Against Defendant LaPierre)

614.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 613 above as though fully set forth herein.

615.     As described in detail in the preceding paragraphs, LaPierre caused the NRA to enter into a post-employment contract and amendments thereto as described above (collectively, the "LaPierre Post Employment Contract") in which he had a financial interest without obtaining authorization from the Board or a determination by the Board that the transaction was fair, reasonable and in the NRA's best interest at the time of the transactions.

616.     LaPierre's conduct was willful and intentional with respect to the Post-Employment Contract in that as an officer of the NRA, he fully understood and intended the financial benefits he would derive from the transaction.

617.     By the foregoing acts and omissions, LaPierre is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from the LaPierre Post Employment Contract not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in the LaPierre Post Employment Contract; return assets lost to the NRA as a result of the Post Employment Contract, to the extent not already returned; pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by the LaPierre Post Employment Contract; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

## TWELFTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4)
### (Against Defendant Powell)

618.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 617 above as though fully set forth herein.

619.    Powell caused the NRA to enter into transactions in which he or his family members had a financial interest without obtaining authorization from the Board for those transactions or a determination by the Board that the transactions were fair, reasonable and in the NRA's best interest at the time of the transactions.

620.    Powell's conduct was willful and intentional with respect to these transactions in that as an officer and senior executive of the NRA, he fully understood and intended the financial benefits he and his family members would derive from the transactions.

621.    By the foregoing acts and omissions, Powell is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from related party transactions not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in such transactions; to return assets lost to the NRA as a result of the transactions, to the extent not already returned; to pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by a transaction occurring after July 1, 2014; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

### THIRTEENTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f)
### and EPTL § 8-1.9(c)(4)
### (Against Defendant Phillips)

622.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 621 above as though fully set forth herein.

623.    As described in detail in the preceding paragraphs, Phillips caused the NRA to enter into a consulting agreement with the NRA following his retirement (the "Phillips Post-Employment Consulting Agreement"), in which he had a financial interest without obtaining authorization from the Board or a determination by the Board that the Phillips Post-Employment Consulting Agreement was fair, reasonable and in the NRA's best interest at the time of the transactions.

624.    Phillips's conduct was willful and intentional with respect to the Phillips Post-Employment Consulting Agreement in that as an officer of the NRA, he fully understood and intended the financial benefits he would derive from the transaction.

625.    By the foregoing acts and omissions, Phillips is liable under N-PCL § 715(f) and EPTL § 8-1.9(c), to account for profits from the Phillips Post-Employment Consulting Agreement not already accounted for; to the extent not already paid, pay the NRA the value of charitable assets used in the Phillips Post-Employment Consulting Agreement; to return assets lost to the NRA as a result of the Phillips Post-Employment Consulting Agreement, to the extent not already returned; to pay the NRA an amount up to double the value of the amount of each benefit improperly bestowed by Phillips Post-Employment Consulting Agreement; and should be enjoined from serving as an officer, director or trustee, or in any similar capacity, of any not-for-profit charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York.

## FOURTEENTH CAUSE OF ACTION
### Wrongful Related-Party Transactions – N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4)
### (Against Defendant NRA)

626.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 625 above as though fully set forth herein.

627.     Pursuant to N-PCL § 112(a)(10), the Attorney General may bring an action to "enjoin, void or rescind any related party transaction, seek damages and other appropriate remedies, in law or equity."

628.     N-PCL § 715 and EPTL § 8-1.9 provide that no corporation shall enter into any related party transaction unless the transaction is determined by the Board or an authorized committee to be fair, reasonable, and in the corporation's best interest at the time of the determination.

629.     Under N-PCL § 715 and EPTL § 8-1.9, every director, trustee, officer, and key employee of the NRA who has an interest in a related party transaction is required to disclose in good faith to the Board or an authorized committee the material facts concerning such interest.

630.     Under N-PCL § 715 and EPTL § 8-1.9, the NRA must conduct a process prior to approving a related party transaction and to contemporaneously document that process. For related party transactions that were not subject to advance approval, N-PCL § 715 and EPTL § 8-1.9 require that the NRA conduct a process for ratification of the transaction, to contemporaneously document in writing the nature of the violations of N-PCL § 715 and EPTL 8-1.9, and to put in place procedures to ensure that the NRA complies with the statutory requirements governing related party transactions in the future. For the related party transactions described in this complaint, the processes required by N-PCL § 715 and EPTL § 8-1.9 were not followed prior to

entering the transaction, or in an effort to ratify the transaction, and each such transaction violated these provisions, and was not reasonable and in the best interests of the NRA.

631.    The NRA entered into numerous unlawful related party transactions in violation of N-PCL § 715 and EPTL § 8-1.9, including those detailed above. These transactions were outside of the NRA's authorized corporate purposes.

632.    The Court should enjoin, void or rescind the unlawful related party transactions, and award damages and such other appropriate remedies, in law or equity to ensure compliance with the requirements of the law.

## FIFTEENTH CAUSE OF ACTION
### Violation of the Whistleblower Protections of N-PCL § 715-b and EPTL § 8-1.9
#### (Against Defendant NRA)

633.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 632 above as though fully set forth herein.

634.    N-PCL § 715-b and EPTL § 8-1.9(e) require that the NRA adopt and maintain a policy protecting whistleblowers, and providing that no director, officer, trustee, employee or volunteer of the corporation who in good faith reports any action or suspected action taken by the corporation that is illegal, fraudulent, or in violation of any adopted policy of the corporation shall suffer, intimidation, harassment, discrimination, or other retaliation.

635.    N-PCL § 715-b and EPTL § 8-1.9(e) require that a trustee, director, officer, or employee be designated by the NRA to administer the whistleblower policy and to report to the Audit Committee.

636.    The NRA did not adopt a policy protecting whistleblowers as required. Although the NRA had a purported policy, the NRA and its officers and directors did not comply with the policy. In fact, whistleblowers were harassed and retaliated against. Board members who raised

issues covered by the policy suffered intimidation, harassment, discrimination, or other retaliation, including attempted revocation of NRA membership. Defendant Powell retaliated against suspected whistleblowers. Defendant Frazer failed to perform his responsibilities as the dedicated employee with responsibility for whistleblower reporting. Defendant LaPierre retaliated against directors, including Dissident No.1, who raised issues covered by the policy, by opposing their reelection or by stripping them of committee assignments. The Audit Committee failed to make any record or take any action responding to whistleblower concerns.

637.    The Attorney General seeks removal for cause of each officer, director, and trustee who violated the whistleblower policy required by N-PCL § 715-b and EPTL § 8-1.9.

## SIXTEENTH CAUSE OF ACTION
## For Breach of NYPMIFA, Article 5-A of the N-PCL
### (Against Defendant NRA)

638.    The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 637 above as though fully set forth herein.

639.    Pursuant to Article 5-A of the N-PCL Prudent Management of Institutional Funds Act ("NYPMIFA"), "each person responsible for managing and investing an institutional fund shall manage and invest the fund in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances." N-PCL § 552. Pursuant to Section 557 of the N-PCL, NYPMIFA applied to all institutional funds in existence at the time of its enactment. NYPMIFA, in Section 551 of the N-PCL, defines an institutional fund to include any funds held by a charity, but excludes program-related assets, such as real property owned by a charity that is used for its operations (and not as an investment).

640.    The NRA is an "institution" as that term is used in NYPMIFA and holds and manages "institutional funds" as that term is used in NYPMIFA.

641.     As set discussed above, the NRA has failed to manage its institutional funds in accordance with the standards set forth in Section 552 of NYPMIFA.

642.     The failure of the NRA to perform its duties under NYPMIFA, as described here, requires that this Court enter an appropriate order to secure the proper administration of these charitable funds, and to order an accounting by the NRA and appropriate officers, directors or key employees for their official conduct with respect to institutional funds.

**SEVENTEENTH CAUSE OF ACTION**
**For False Filings Under Executive Law §§ 172-d(1) and 175(2)(d)**
**(Against Defendant NRA and Frazer)**

643.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 642 above as though fully set forth herein.

644.     The NRA made materially false and misleading statements and omissions in the annual reports the organization filed with the Attorney General. Defendant Frazer signed and certified such reports notwithstanding the number of falsehoods therein, of which he was or should have been aware.

645.     As a result, the NRA and Frazer violated Section 172-d(1) of the Executive Law and, pursuant to Section 175(2)(d) of the Executive Law should be enjoined from soliciting or collecting funds on behalf of any charitable organization operating in this State and Frazer should be enjoined from serving as an officer, director or trustee of any not-for-profit or charitable organization incorporated or authorized to conduct business in the State of New York.

**EIGHTEENTH CAUSE OF ACTION**
**For Unjust Enrichment Derivatively in Favor of the NRA Under**
**N-PCL § 623 and common law**
**(Against LaPierre, Phillips, Frazer and Powell)**

646.     The Attorney General repeats and re-alleges the allegations set forth in paragraphs 1 through 645 above as though fully set forth herein.

155

647. Under N-PCL § 112(a)(7), the Attorney General may bring an action to enforce any right given under the N-PCL to members of the Corporation.

648. Under N-PCL § 623, the Attorney General may bring an action to enforce rights given to members of the corporation to procure a judgment in favor of the Corporation. The Attorney General, acting as a member pursuant to N-PCL § 623, may call upon the Board to secure the initiation of an action by the Board of the corporation on behalf of the corporation.

649. Acting pursuant to her authority under N-PCL § 623, the Attorney General initiates this action pursuant to N-PCL § 515, on behalf of the NRA and against Defendants LaPierre, Phillips, Frazer, and Powell for the illegal conduct set forth in this Complaint, including conduct set forth in N-PCL § 720(a).

650. This unjust enrichment claim seeks to recover excessive, unreasonable, and/or unauthorized compensation to Defendants LaPierre, Phillips, Frazer, and Powell, as well as payments or reimbursements to them made in violation of IRS requirements and NRA bylaws and policy.

651. Defendants LaPierre, Phillips, Frazer, and Powell were "disqualified persons" as that term is used in the Internal Revenue Code. Each received payments in excess of reasonable compensation from the NRA.

652. Under Internal Revenue Code Section 4958, "disqualified persons" in a 501 (c)(4) organization who participate in an "excess benefit" transaction are subject to a federal excise tax. The tax on the disqualified person is 25% of the "excess benefit." A tax will also be imposed on an "organization manager" who participated in the excess benefit transaction.

653. Under the Internal Revenue Code Section 4958, the term "disqualified person" means, with respect to any transaction— (a) any person who was, at any time during the 5-year

156

period ending on the date of such transaction, in a position to exercise substantial influence over the affairs of the organization. Defendants LaPierre, Phillips, and Frazer were at all relevant times between 2015 and the present date, disqualified persons under Section 4958. Defendant Powell has been a disqualified person under Section 4958 at least since July 2016, and continues to be a disqualified person.

654.     Payments or reimbursements of travel and entertainment expenses which are not made pursuant to an accountable plan are reportable and treated by the IRS as taxable income. Upon information and belief, a substantial portion of the travel expenses for defendants LaPierre, Phillips, and Powell were not made pursuant to an accountable plan.

655.     Under Section 53-4958-4 of the Internal Revenue Service regulations, amounts paid for travel and entertainment for a disqualified person other than under an accountable plan as that term is used in IRS Publication 463, and the reimbursements or payments to disqualified persons that are not based upon written contemporaneous substantiation are to be treated as automatic "excess benefit transactions" by the Internal Revenue Service. IRS Regulation 53.4958-4(c)(1). In equity and in law, a disqualified person may not receive or retain the proceeds of excess benefits transactions.

656.     The excise tax is due, and the excise tax return must be filed by the organization and each disqualified person owing the tax, whenever an excess benefit is provided by the organization, directly or indirectly to, or for the use of, any disqualified person.

657.     Schedule I of Form IRS 4720 requires reporting of the excess benefit transaction and computation of the tax liability due, a signature under penalty of perjury, and payment of the amount of the excise tax due to the IRS. Defendants were required to file Form 4720 and pay the excise tax due by May 15 following the completion of the calendar year.

Case 3:19-cv-00679     Document 67-1     Filed 10/20/20     Page 190 of 611 PageID #: 583

658.    For each year 2015 to 2018, the NRA represented in response to IRS 990 question 25(a) of Part IV that it was not a party to an excess benefit transaction during the year. Each such representation was false. Plaintiff alleges, upon information and belief, that neither the NRA nor any of Defendants LaPierre, Powell, Phillips, or Frazer filed forms 4720 nor paid the excise tax due on excess benefit transactions.

659.    Defendants LaPierre, Phillips, Powell, and Frazer received illegal compensation by causing the NRA to pay, or permitting themselves to receive, compensation or reimbursements in excess of amounts permitted by law or by the bylaws and policies of the NRA.

660.    Defendants LaPierre, Phillips, Powell, and Frazer obtained a benefit that in equity and good conscience should be paid to the NRA.

661.    As the result of compensation, including salary, bonuses, expense payments, reimbursements and other benefits, which were paid in violation of law and NRA bylaws and policies, Defendants LaPierre, Phillips, Powell, and Frazer were unjustly enriched.

662.    The Attorney General brings this derivative action on behalf of the NRA against Defendants LaPierre, Phillips, Frazer, and Powell to recover excessive, unreasonable compensation and excess benefits.

663.    The Attorney General represents and avers that making demand upon the NRA Board for the initiation of an action by the Board for the benefit of the NRA would be futile, as that term is used in Section 623 of the N-PCL based upon the following facts:

a.  The Board of Directors and its committees did not fully inform themselves about the challenged transactions to the extent reasonably appropriate under the circumstances. These failures to obtain information about the transactions included:

i.   The failure to inquire into excessive and inappropriate payments to or on behalf of Defendant LaPierre, and his family members, even after notice of allegations

158

of such payments in media reports, complaints from some NRA board members, complaints from NRA members, and complaints from NRA employees;

ii.   The failure of the Audit Committee, as set forth in Part Five, Section V to conduct or assure any system of internal controls at the NRA, and the failure of the Board to assure that a system was in place and was being reasonably complied with, including internal controls over payments and expenditures for LaPierre, Phillips, and Powell;

iii.   The failure of the Audit Committee or the Board to address adequately the 2018 memorandum from the NRA Whistleblowers—the Top Concerns Memo—detailing concerns with insider transactions;

iv.   The failure of the OCC to conduct compensation reviews and determinations in the manner described in the NRA's IRS Form 990 reports, as detailed in Part Five, Section III above, the failure of the Board to confirm and document that such reviews and determinations were appropriately conducted and the failure of the Board to set reasonable compensation;

v.    The failure of the NRA Board to address the improper reimbursement of expenses for NRA officers by Ackerman even after being put on notice by the vendor;

vi.   The failure of the NRA Board to address the improper use of credit cards by defendant Phillips even after being put on notice that Phillips had approved improper expenditures on such cards for others;

vii.  The failure to evaluate the necessity for and the lack of oversight of, expenditures made outside the existing contracting and accounts payable process at the discretion of the Director of Security;

viii. The failure to inquire into the false representations set forth on Schedule J of IRS 990s during 2015 to 2018, concerning written policies and reviews relating to charter travel, travel for companions, and social club dues; and

ix.   The failure to record or report in any minutes of any board committee, or the board itself, of the complaints of the NRA Whistleblowers presented to the Audit Committee in July 2018.

b.   The Board of Directors, including allegedly "independent directors" and the relevant committees of the Board, passively rubberstamped the decisions of the officer-defendants, to the detriment of the NRA. For example:

159

i. Defendant LaPierre effectively dominates and controls the Board of Directors as a whole through his control of business, patronage and special payment opportunities for board members, and his public allegations to the NRA membership of a "criminal conspiracy" against board members and officers who question his activities.

ii. As set forth in Part Five, Section III, the board members and the members of the OCC did nothing to evaluate the full extent of the compensation paid to or on behalf of Defendants LaPierre and Phillips;

iii. The failure to conduct reviews of related party transactions specifically required by the N-PCL until September 2018, followed by an Audit Committee "review" and approval of all related party transactions before them, with minimal inquiry or detail;

iv. The failure of the Board to respond to requests by Dissenter No. 1, as well as the First and Second Vice Presidents for an audit or outside review of the bills submitted and compensation paid to its primary outside law firm; and

v. The threats and retaliation by the NRA against Dissenter No. 1, including an action to remove him from membership in the NRA, based upon his requesting an audit or review of the outside law firm payments.

664. The allegations of this complaint involve wrongdoing of substantial magnitude and duration.

665. The NRA exceeded the scope of its authority pursuant to N-PCL § 202, and violated N-PCL § 515, by paying compensation to officers LaPierre, Phillips, Frazer and Powell, in excess of a reasonable amount during the periods of time and for the reasons detailed in the preceding paragraphs.

666. Accordingly, this Court should require Defendants LaPierre, Phillips, Frazer and Powell to repay to the NRA all excessive, unreasonable, and/or unauthorized compensation paid to them, as well as payments or reimbursements to them made in violation of IRS requirements and the NRA's bylaws, policy and procedures, and/or without the authorizations required by the NRA's bylaws, policy, and procedures.

160

## PRAYER FOR RELIEF

WHEREFORE, the Attorney General requests judgment against the Defendants for the following relief:

A.   Dissolving the NRA and directing that its remaining assets and any future assets be applied to charitable uses consistent with the mission set forth in the NRA's certificate of incorporation pursuant to N-PCL §§ 112(a)(1), 112(a)(5), 112(a)(7), 1101(a)(2), 1102(a)(2)(D) and 1109.

B.   Declaring that the NRA has exceeded the authority conferred upon it by law, has carried on, conducted, or transacted its business in a persistently fraudulent or illegal manner, or has abused its powers contrary to the public policy of the State of New York, and determining, in the court's discretion, that it is in the interest of the public to dissolve the NRA pursuant to N-PCL §§ 112(a)(1), 112(a)(5), 1101(a)(2), 1109, and C.P.L.R. § 3001;

C.   Declaring that directors or members in control of the NRA have looted or wasted the NRA's charitable assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner, and determining, in the court's discretion, that it is in the interest of the members to dissolve the NRA pursuant to N-PCL §§ 112(a)(7), 1102(a)(2)(D), 1109 and C.P.L.R. § 3001;

D.   Removing LaPierre for cause from his position as Executive Vice President of the NRA, and permanently barring his re-election or appointment as an NRA officer or director pursuant to N-PCL §§ 706(d), 714(c), and 717 and EPTL §8-1.4;

E.   Removing Frazer for cause from his position as General Counsel and Secretary of the NRA, and permanently barring his re-election or appointment as an NRA officer or director pursuant to N-PCL §§ 706(d), 714(c), and 717, EPTL § 8-1.4, and Executive

161

Law § 175(2)(d);

F.    Permanently barring the Individual Defendants from serving as officers, directors, or trustees of any not-for-profit or charitable organization incorporated or authorized to conduct business or solicit charitable donations in the State of New York pursuant to EPTL §8-1.4;

G.    Directing the Individual Defendants to account for their conduct in failing to perform their duties in managing the NRA's charitable assets; to pay full restitution to the NRA for the waste and misuse of its charitable assets, including the return of salary received while breaching their fiduciary duties to the NRA, plus interest at the statutory rate; and to pay damages to the NRA arising from the breach of fiduciary duties pursuant to N-PCL §§ 720 and EPTL §8-1.4;

H.    Enjoining, voiding or rescinding the related party transactions entered into or proposed by Defendants; directing the Individual Defendants to account for profits made from and the value of charitable assets used in those transactions, to the extent not already paid; and due to their willful and intentional conduct as alleged, directing the Individual Defendants to pay the NRA an amount up to double the value of each benefit improperly bestowed by such transactions occurring after July 1, 2014 pursuant to pursuant to N-PCL §§ 112(a)(10), 715(f) and EPTL § 8-1.9(c)(4);

I.    Enjoining the NRA and Frazer from soliciting or collecting funds on behalf of any charitable organization operating in this State pursuant to Executive Law § 175(2)(d);

J.    Directing the Individual Defendants to pay the NRA restitution for all excessive, unreasonable, and excess benefits that were paid to and unjustly enriched the Individual Defendants in violation of law and NRA bylaws and policies;

162

K.  Directing the NRA, through its governing Board of Directors, to provide an accounting for its official conduct with respect to the NRA's institutional funds pursuant to N-PCL § 552; and

L.  Granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
August 6, 2020

LETITIA JAMES
Attorney General of the
State of New York

By: _____
James Sheehan
Charities Bureau Chief
28 Liberty Street
New York, New York 10005
Tel. (212) 416-8401

JENNIFER LEVY, *First Deputy Attorney General*
MEGHAN FAUX, *Chief Deputy Attorney General for Social Justice*
EMILY STERN, *Co-Chief of Enforcement Section, Charities Bureau*

*Of Counsel*

163

## VERIFICATION

STATE OF NEW YORK )
                          ) ss.:
COUNTY OF NEW YORK )

JAMES SHEEHAN, being duly sworn, deposes and says:

I am an Assistant Attorney General in the office of Letitia James, Attorney General of the State of New York (the "Attorney General"). I am duly authorized to make this verification.

I have read the foregoing complaint and am acquainted with the facts alleged therein based on the Attorney General's investigation of the transactions upon which the complaint is based, the annual filings and other reports made by the National Rifle Association of America, Inc. with the Charities Bureau of the Attorney General's office, and the investigative materials contained in the files of the Attorney General's office. To my knowledge based on such acquaintance with the facts, the complaint is true, except as to those allegations made upon information and belief, and as to those allegations, I believe them to be true.

The reason this verification is not made by plaintiff is that plaintiff is a body politic and the Attorney General is its duly authorized representative.

_James B. Sheehan_
James Sheehan
Charities Bureau Chief

NOTARY PUBLIC

_Roxanne E. Wild_

Sworn to before me this
10th day of August, 2020

ROXANNE E. WILD
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02WI6378871
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES AUG. 6, 2022

*Audio-video*
*8/10/2020 4:44 pm*
*ID - Known to me.*
*JS: Albany County*
*REW: NY County*

*Verification on NRA complaint.*

# **EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff, | § § | CASE NO.  1:20-CV-00889-MAD-TWD |
| v. | § § | |
| LETITIA JAMES, in her individual and official capacity, | § § § | |
| Defendant. | § § § § § § § | |

<u>**NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND**</u>

Plaintiff the National Rifle Association of America (the "NRA" or "Association") files this Amended Complaint and Jury Demand ("Complaint") against Defendant Letitia James, New York State Attorney General ("James"), in her individual capacity and official capacity, upon personal knowledge of its own actions, and upon information and belief as to all other matters, as follows:

**I.**

<u>**PRELIMINARY STATEMENT**</u>

In the wake of violent tragedies, amid a polarized political landscape, a candidate for the New York State Office of the Attorney General ("NYAG") made a stunning campaign promise. If elected, she would "take down the NRA"—not by refuting its policy positions or by advocating for gun control legislation, but by wielding the enforcement powers she hoped to possess if she were elected as NYAG. In short, James promised that, if elected, she would dismantle the NRA as a non-profit corporation.

Page **1** of **42**

James repeatedly made clear during her campaign that she saw "no distinction"[1] between the NRA's charitable existence and its ability to engage in pro-gun political speech (which she characterized as "poisonous" and "deadly propaganda").[2] She maligned the NRA as a "terrorist organization" and a "criminal enterprise." And she was explicit about her plan: her "top issue" would be to leverage her "power as an attorney general to regulate charities" to instigate a fishing expedition into the NRA's "legitimacy . . . to see whether or not they have in fact complied with the not-for-profit law in the State of New York."[3] In other words, she would use her office's dissolution power to seek a corporate death sentence for the NRA in order to silence its political advocacy. She further vowed that financial institutions and donors linked to the NRA would be pursued by law enforcement—akin to supporters of Al Qaeda or the mafia.[4]

James's promise to weaponize New York's law-enforcement apparatus against the NRA, its banks, and its financial supporters echoed prior, similar threats (and actions) by her longtime supporter, Governor Andrew Cuomo. In a stunning course of misconduct that drew dire criticism from the ACLU[5] and instigated another pending First Amendment lawsuit that has withstood

---

[1] *See Annual NRA Fundraiser Sparks Protests*, LI HERALD (Oct. 25, 2018), http://liherald.com/stories/ nassau-protests-nra-fundraiser,107617.

[2] *See* Jon Campbell, *NY AG Letitia James Called the NRA a 'Terrorist Organization.' Will It Hurt Her Case?*, USA TODAY (Aug. 19, 2020), https://www.usatoday.com/story/news/politics/2020/08/19/nra-lawsuit-ny-ag-letitia-james-past-comments/5606437002/.

[3] *See* Jillian Jorgensen, *Letitia James Says She'd Investigate NRA's Not-For-Profit Status If Elected Attorney General*, N.Y. DAILY NEWS (July 12, 2018), https://www.nydailynews.com/news/politics/ny-pol-tish-james-nra- 20180712-story.html.

[4] *See Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018), http://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (emphasis added).

[5] See David Cole, *New York State Can't Be Allowed to Stifle the NRA's Political Speech*, Speak Freely (Aug. 24, 2018), https://www.aclu.org/blog/free-speech/new-york-state-cant-be-

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

multiple motions to dismiss,[6] Cuomo conspired with willing leadership at the New York Department of Financial Services ("DFS") in a campaign to "#BankruptTheNRA"[7] by threatening its financial service providers with retaliatory, invasive investigations. This plan, originally concocted in 2017, called for the Attorney General's office to conduct a parallel "investigation" of the NRA to "find" reasons to commence legal actions against the Association. The NRA became aware of this scheme when the then-New York Attorney General Eric Schneiderman became so troubled by it that he telephoned the NRA with an advance warning. Unfortunately, Schneiderman later resigned, and his successor harbors no similar reservations about weaponizing the powers of her office over non-profits like the NRA.

Shortly after taking office, James commenced her long-promised investigation into the NRA's finances, personnel, operations, and political strategy, all with the purpose of damaging the NRA politically, diverting its corporate resources, and contriving a pretext to dissolve the NRA without ever making a meaningful effort to engage cooperatively with NRA leadership, or making a demand on the NRA Board and giving it a fair opportunity to take appropriate action to address compliance issues raised by the NYAG and correct alleged deficiencies. Instead, the NYAG served voluminous document requests encompassing virtually almost every scrap of digital and hard-copy

---

allowed-stifle-nras-political-speech; *see also* Cheryl Chumley, *ACLU defends NRA - - Yes, You Read That Right*, WASH. TIMES (Aug. 27, 2018) https://www.washingtontimes.com/news/2018/aug/27/aclu-defends-nra-yes-you-read-right/; *see also* Declan McCullagh, *ACLU Sticks Up for the NRA?!*, REASON (Aug. 24, 2018), https://reason.com/2018/08/24/aclu-teams- up-with-nra/.

[6] *Nat'l Rifle Ass'n of Am. v. Cuomo,* Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.). When the NRA filed this action, it designated it as a "related case" to the *Cuomo* proceedings, and the NRA believes these lawsuits are properly so-treated. Dkt. 1.

[7] *See* August 4, 2018 Facebook post by Andrew Cuomo, https://www.facebook.com/andrewcuomo/posts/new-york-is-forcing-the-nra-into-financial-crisis-its-time-to-put-the-gun-lobby-/10155989594858401/.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

data at or pertaining to the NRA, and interfered with the NRA's vendors, professionals, and fiduciaries' obligations to protect the NRA's privileges—without any legal basis.

Notwithstanding that her unconstitutional, retaliatory investigation found no evidence to support her audacious claims, James predictably concluded it by filing a dissolution action on August 6, 2020 (the "State Dissolution Action")[8]. Despite surpassing 160 pages, the State Dissolution Action does not come close to alleging that the NRA is what she had claimed on the campaign trail: namely, a systemically fraudulent, "sham" charity of the kind NYAG has targeted for dissolution in the past. Indeed, the State Dissolution Action does not (and cannot) dispute that the NRA raises and spends hundreds of millions of dollars each year to advance its constitutionally protected and famously effective gun-rights advocacy. Rather, James seeks to shutter a five-million-member political advocacy organization based solely on allegations of misconduct by four individual executives, two of whom no longer work at the NRA (and one of whom was fired by the NRA for many of the same items alleged). Given that it is obviously political, the State Dissolution Action has shocked civil liberties advocates and legal and public policy scholars.[9]

---

[8] The State Dissolution Action was initially filed with a defective verification, rendering it a nullity under New York law. N.Y. CPLR 3022. The NRA promptly provided notice to the NYAG that it was treating it as such. *See* State Dissolution Action Dkt. 10. NYAG filed an amended complaint with a proper verification on August 10, 2020, rendering this case first-filed. State Dissolution Action Dkt. 11.

[9] *See, e.g.*, Editorial, *How Did Caribbean Yacht Vacations Promote the Second Amendment? We May Find Out in Court*, WASH. POST. (Aug. 8, 2020), https://www.washingtonpost.com/opinions/is-this-really-the-right-penalty-for-the-nra/2020/08/07/f81778fc-d8e2-11ea-930e-d88518c57dcc_story.html ("We question whether dissolution is the right penalty, even if the charges are proved in court."); Henry Olsen, *New York's Lawsuit to Dissolve the NRA is Outrageous*, WASH. POST. (Opinion, Aug. 7, 2020), https://www.washingtonpost.com/opinions/2020/08/07/new-yorks-lawsuit-dissolve-nra-is-outrageous/ ("James's allegations . . . would certainly be damning if true. . . . None of this, however, justifies destroying the organization itself. The NRA is still supported by millions of people and has substantial assets. It is neither broke nor derelict."); Ruth Marcus, *The NRA is a*

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

More importantly, it violates freedoms guaranteed by the United States Constitution and the Constitution of the State of New York.

## II.

## PARTIES

1.      The NRA is a non-profit corporation organized under the laws of the State of New York with its principal place of business in Fairfax, Virginia. The NRA is America's leading provider of marksmanship and gun safety education for the military, law enforcement and civilians. It is also the foremost defender of the Second Amendment to the United States Constitution. The NRA has over five million members, and its programs reach millions more.

2.      James is the Attorney General of the State of New York and, at certain times relevant to the Complaint, was acting individually—as she sought political office—and at other

_____

*Cesspool. That Doesn't Mean It Should Be Dissolved*, WASH. POST. (Opinion, Aug. 9, 2020), https://www.washingtonpost.com/opinions/2020/08/09/nra-is-cesspool-that-doesnt-mean-it-should-be-dissolved/; Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Opinion, Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit; David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-has-a-right-to-exist-11598457143?mod=opinion_lead_pos7 ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association in policy debates or political disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA"); Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Opinion, Aug. 8, 2020), https://thehill.com/opinion/judiciary/511155-the-tragic-irony-of-the-new-york-state-lawsuit-against-the-national-rifle-association ("Trying to dissolve an organization engaged in political speech should not occur absent overwhelming proof that it is a criminal enterprise, which is why this has never happened with a group like the NRA."); Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Opinion, Aug. 11, 2020), https://www.lawfareblog.com/attempt-dissolve-nra-threatens-democratic-norms ("I personally can't stand [the NRA] . . . . [b]ut that said . . . . James's attempt to dissolve the NRA in its entirety is a violation of key democratic and rule-of-law norms.").

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

times under color of state law. Her principal place of business is The Capitol, Albany, New York 12224-0341. James is sued in her individual and official capacities.

**III.**

**JURISDICTION AND VENUE**

3.      Pursuant to 28 U.S.C. § 1331, the Court has subject matter jurisdiction because this action involves claims based on the First and Fourteenth Amendments to the United States Constitution, and because this action seeks to prevent state officials from interfering with federal rights. Further, subject matter jurisdiction is conferred on this Court by 28 U.S.C. § 1343(a)(3) because this action is brought to redress deprivations under color of state law of rights, privileges, and immunities secured by the United States Constitution. This Court has supplemental jurisdiction over all state-law claims asserted in this action under 28 U.S.C. § 1367.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b).

5.      There is a present and actual controversy between the parties.

6.      The relief requested is authorized pursuant to 28 U.S.C. § 1343(a)(4) (recovery of damages or equitable relief or any other such relief for the protection of civil rights), 28 U.S.C. § 2201 and 2202 (declaratory and other appropriate relief), 42 U.S.C. § 1983 (deprivation of rights, privileges, and immunities secured by the Constitution), and 42 U.S.C. § 1988 (awards of attorneys' fees and costs).

**IV.**

**STATEMENT OF RELEVANT FACTS**

A.      **The NRA: Support For Gun Safety And A Commitment To Core Political Speech.**

7.      After the Civil War, two Union Army officers created a private association to promote marksmanship among the citizenry. The officers believed that the war would have ended

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

significantly sooner if the northern troops had been able to shoot as well as the Confederate soldiers. They obtained a charter from the State of New York in November of 1871, and thereafter began a proud legacy of marksmanship training and Second Amendment and gun safety advocacy.

8.      From its inception, the NRA received praise from the State of New York for its many public contributions. In 1872, the New York State legislature and the NRA jointly dedicated funds for the creation of a rifle range on Creed Farm, in what is now Queens Village, Queens, New York. For decades, the NRA partnered with the State to advance marksmanship, firearms safety, education, conservation, and other public policy goals. For example, when New York City public schools sought to educate boys in marksmanship and gun safety, NRA co-founder Gen. George Wingate designed and headed the Public Schools Athletic League marksmanship program.[10] In 1949, President Harry Truman lauded this training, observing that it "materially aided our war effort" and that he hoped "the splendid program which the National Rifle Association has conducted for three-quarters of a century will be continued."[11] Also in 1949, the NRA partnered with the State of New York to create the nation's first hunter education program. Similar courses were subsequently adopted by state fish and game departments across the country and in Canada, helping to make hunting among the safest sports in existence.

9.      First among the "Purposes and Objectives" contained in the NRA's bylaws is "[t]o protect and defend the Constitution of the United States." Accordingly, political speech is a major

---

[10] *See e.g.*, STEVEN A. RIESS, SPORTS IN AMERICA FROM COLONIAL TIMES TO THE TWENTY-FIRST CENTURY: AN ENCYCLOPEDIA 736 (Steven A. Riess ed., 2015); ROBERT PRUTER, THE RISE OF AMERICAN HIGH SCHOOL SPORTS AND THE SEARCH FOR CONTROL, 1880-1930 122 (1st ed. 2013); Robert Pruter, *Boys Rifle Marksmanship*, ILLINOIS HIGH SCHOOL ASSOCIATION, http://www.ihsa.org/archive/hstoric/marksmanship_boys.htm?NOCACHE=5:53:58%20PM.

[11] Letter of Pres. Truman to C.B. Lister, NRA Sec.-Treas., Nov. 14, 1945.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

purpose of the NRA and the NRA engages in extensive political speech and legislative advocacy to promote and vindicate the rights of its members and all Americans.

10.     Today, the NRA spends tens of millions of dollars annually distributing pamphlets, fact sheets, articles, electronic materials, and other literature to advocate in support of Second Amendment freedoms and to assist NRA members who engage in national, state, and local firearm dialogue and debate. The NRA's direct mail, television, radio, and digital communications seek to educate the public about issues bearing on the Second Amendment, defend the right of the people to keep and bear arms from infringement, defend the NRA and its members against political and media attacks, and galvanize participation in the political process by NRA members and supporters, and others who care about the right to keep and bear arms, and want to keep it.

11.     To its critics, the NRA is best known as a "superlobby – one of the largest and most . . . conservative lobbying organizations in the country," able to mobilize its millions of members in concerted efforts to protect the Second Amendment rights of all Americans.[12] In addition, the NRA's letter-writing campaigns, peaceable public gatherings, and other grassroots "lobbying" activities constitute precisely the type of political speech which rests "[a]t the core of the First Amendment."[13]

---

[12] Christina Robb, *Handguns and the American Psyche: The Attempted Assassination of a President Brings the Issue into Sharp Focus Once Again. Handguns – What Do They Mean to Americans? To the NRA, They Are a Symbol of Freedom; To Those Frightened of Crime, They Represent Safety – Even if the Owner Doesn't Know How to Use Them; To Gun Control Advocates, They Are Symbols of Ultimate Evil*, BOSTON GLOBE, 1981 WLNR 68847 (June 7, 1981).

[13] *See, e.g.*, *Brown v. Hartlage*, 456 U.S. 45, 52 (1982).

**B.** **Various Elected Officials in New York Target the NRA Based on the Viewpoints Expressed in Its Speech.**

12.     In recent years, the NRA's corporate domicile—New York—has witnessed the ascendancy of governmental officials determined to make the state a dangerous place for Second Amendment advocacy. Although the NRA welcomes fair, full-throated policy debate, it cannot abide the corrupt misuse of government power by certain New York officials attempting to squelch political opposition to benefit themselves and advance their own careers. Unfortunately, this is what has occurred, and is already the subject of another ongoing federal lawsuit.

13.     New York Governor Andrew Cuomo has a longstanding political vendetta against "Second Amendment types,"[14] especially the NRA, which he accuses of exerting a "stifl[ing] . . . stranglehold" over national gun policy.[15] For Cuomo, silencing the NRA is a career strategy. During 2018, Cuomo and several political allies, including the former Superintendent of the Department of Financial Services ("DFS"), orchestrated a campaign of selective enforcement, backroom exhortations, retaliation and public threats designed to coerce financial institutions operating in New York to blacklist pro-gun advocacy groups, especially the NRA. The NRA's

---

[14] On February 15, 2018, Cuomo appeared on the MSNBC program *The Beat with Ari Melber*, where he discussed championing legislation that some believed "trampled the Second Amendment." *Gov. Andrew Cuomo On Background Checks: "Bunch of Boloney* [sic]*" | The Beat with Ari Melber MSNBC*, *available at* https://www.youtube.com/watch?v=Tz8X07fZ39o (last visited June 6, 2020). However, Cuomo lamented that his "favorability rating" had dropped thereafter due to "backlash from conservatives and Second Amendment types." *Id.*

[15] *See* Kenneth Lovett, *Exclusive: Cuomo Fires Back at Jeb Bush for 'Stupid' and 'Insensitive' Gun Tweet*, N.Y. Daily News (Feb. 17, 2016), http://www.nydailynews.com/news/politics/cuomo-blasts-jeb-stupid-insensitive-gun-tweet-article-1.2534528.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

First Amendment claims arising from this conduct have withstood motions to dismiss and are currently pending in the United States District Court for the Northern District of New York.[16]

14.    James's predecessor in office, New York Attorney General Eric Schneiderman, defied his own party loyalties to warn the NRA that he was being urged to use his office in support of these politically motivated efforts. In a telephone call to Tom King, an NRA director, in mid-2017, Schneiderman emphasized while he opposed the NRA's positions on the Second Amendment, he was troubled by recent, extraordinary pressures being placed on him by Cuomo and others to weaken the NRA as a political force in 2020. Schneiderman advised King to "get ready."

15.    Although the NRA believed it was operating in compliance with New York State law, it also understood that a politically driven "compliance audit" was something for which it should carefully prepare. To fortify its defenses, the NRA undertook a top-to-bottom review of its operations and governance.[17] In the process, the NRA met with resistance from a handful of its

---

[16] *Nat'l Rifle Ass'n of Am. v. Cuomo*, Case No. 1:18-cv-00566-TJM-CFH (N.D.N.Y.).

[17] Despite framing the NRA as a fraudulent organization beyond repair, James's own complaint extensively documents that the NRA voluntarily undertook efforts to improve its internal governance functions beginning in 2017, up to the present day. These efforts include replacing Defendant Wilson Phillips with a new treasurer that the complaint repeatedly lauds for engaging in remedial efforts such as a 50% reduction in travel expenses (Ex. A ¶ 156), "reengineering" the process for handling Defendant Wayne LaPierre's expense reimbursements to "make it . . . robust and appropriate" (Ex. A ¶ 197), investigating and terminating a complained-of vendor contract with HomeTelos in the spring of 2018 (Ex. A ¶ 225), examining Defendant Joshua Powell's improper expenses and engaging outside counsel to assist, and confronting Powell regarding improper conflicts of interest in mid-2018, resulting in Powell's removal and repayment of misappropriated monies to the NRA (Ex. A ¶¶ 249-50, 263), and investigating and examining the improper use of a corporate credit card by LaPierre's senior assistant (Ex. A ¶ 294). The NRA engaged outside counsel to do an extensive review of the NRA's relationship with its contractual partners and in service of that effort ultimately commenced litigation against Ackerman to obtain documentation that Ackerman has been withholding. (Ex. A ¶¶ 302, 455). The NRA has further been evaluating the establishment of an internal audit function (Ex. A ¶ 483) and adopted a revised whistleblower policy in January 2020. (Ex. A ¶ 115).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

executives and vendors who did not welcome the NRA Board's push for additional documentation and transparency. Over the ensuing year, the NRA became embroiled in litigation with those it determined had abused its trust. These fights were difficult, but the NRA stuck to its guns, determined to protect its mission, message, members and donors and prepare itself to fend off a political attack from the NYAG if one came.

16.    Months after delivering his warning to Mr. King, Schneiderman resigned from office. Nearly all other candidates to replace him took affirmative steps to distance themselves[18] from Cuomo—who presided over a government that the *New York Times* called "historically corrupt" and "a chamber of ethical horrors."[19] But as the NRA's First Amendment lawsuit against Governor Cuomo received increased coverage during the summer of 2018 (and garnered support from the American Civil Liberties Union),[20] James—whom the *New York Times* expressly declined to endorse due to perceived corrupt ties to Cuomo[21]—adopted Cuomo's plan and made the political prosecution of the NRA a central campaign theme. She embraced Cuomo's endorsement, pursued

---

[18] *See* Jeffery Mays, *Letitia James Has Embraced Andrew Cuomo. Is It Worth It?* N.Y. TIMES (Aug. 13, 2018), https://www.nytimes.com/*2018*/08/13/nyregion/letitia-james-attorney-general-independence.html.

[19] Editorial, *The New York Times Endorses Zephyr Teachout for Attorney General in Thursday's Primary*, N.Y. TIMES (Aug. 19, 2019), https://www.nytimes.com/2018/08/19/opinion/zephyr-teachout-new-york-attorney-general.html.

[20] *See* David Cole, *New York State Can't Be Allowed to Stifle the NRA's Political Speech*, SPEAK FREELY (Aug. 24, 2018), https://www.aclu.org/blog/free-speech/new-york-state-cant-be-allowed-stifle-nras-political-speech; *see also* Cheryl Chumley, *ACLU defends NRA - - Yes, You Read That Right*, WASH. TIMES (Aug. 27, 2018) https://www.washingtontimes.com/news/2018/aug/27/aclu-defends-nra-yes-you-read-right/; *see also* Declan McCullagh, *ACLU Sticks Up for the NRA?!*, REASON (Aug. 24, 2018), https://reason.com/2018/08/24/aclu-teams- up-with-nra/.

[21] Editorial, *The New York Times Endorses Zephyr Teachout for Attorney General in Thursday's* Primary, N.Y. TIMES (Aug. 19, 2019), https://www.nytimes.com/2018/08/19/opinion/zephyr-teachout-new-york-attorney-general.html.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

contributions from his donors,[22] and promised to apply the same unconstitutional tactics against the NRA. On September 6, 2018, James announced that, if elected, she would follow Cuomo's financial-blacklisting campaign by "put[ting] pressure upon the banks that finance the NRA" in order to choke off support for its Second Amendment speech.[23] She also reiterated her attacks on the NRA's legitimacy as a not-for-profit corporation.[24]

**C.      James Maliciously Defames the NRA to Create a Pretext for Law Enforcement Action.**

17.     To create air cover for her campaign against the NRA (which had begun to attract bipartisan criticism),[25] James coordinated actively with Everytown for Gun Safety ("Everytown"), an activist organization richly endowed by Michael Bloomberg whose explicit political mission is to oppose the NRA. The group has played a similar role in support of James's attacks on the NRA's legitimacy as a charitable organization.

18.     Everytown funds a digital media outlet known as *The Trace*, which dedicates itself to publishing salacious anti-NRA articles. During late summer and early fall 2018, as James pledged that she would wield state power to "see whether or not the[] [NRA] ha[d] in fact complied

---

[22] *Id.*

[23] *See Attorney General Candidate, Public Advocate Letitia James* OUR TIME PRESS (Sept. 6, 2018), https://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/.

[24] *Id.*

[25] *See, e.g.*, Matt Ford, *The NRA Is Not a Domestic Terrorist Organization*, THE NEW REPUBLIC (Sept. 17, 2019), https://newrepublic.com/article/155085/nra-not-domestic-terrorist-organization; Jim Geraghty, *For Americans' Gun Rights, the Stakes in 2020 Are as High as Ever*, NAT'L REV. (Apr. 25, 2019), https://www.nationalreview.com/the-morning-jolt/for-americans-gun-rights-the-stakes-in-2020-are-as-high-as-ever/ ("Even if the IRS doesn't find the Bloomberg group's complaint compelling, New York State's new attorney general, Letitia James, pledged to investigate whether the NRA is complying with the requirements for nonprofit organizations. James, a fierce proponent of gun control, may very well be driven by political ambitions …").

Page **12** of 42

with the not-for-profit law," *The Trace* began to publish articles that purported to focus on governance, spending, and personnel issues at the NRA.[26]

19.      Importantly, James began to publicize false, defamatory assertions that the NRA engaged in criminal activity. On September 4, 2018, during a debate between Democratic candidates, James stated that, if elected, her "top issue" would be "going after the NRA because ***it is a criminal enterprise***."[27] Two days later, James doubled down on this assertion, and elaborated: "We need to again take on the NRA, which holds itself out as a charitable organization. But in fact, they are not. ***They are nothing more than a criminal enterprise.*** We are waiting to take on all of the banks that finance them, their investors."[28] James maliciously accused the NRA of criminal conduct in the hope of damaging its goodwill among existing and potential members, donors, and business partners, as well as its access to funds. James's "criminal enterprise" language, accompanied by references to collateral action against financiers and bankers, deliberately invoked a determination to ensnare and punish anyone who supported the NRA. The

---

[26] *See* Mike Spies, *Tom Selleck Quits NRA Board*, THE TRACE (Sept. 18, 2018), https://www.thetrace.org/2018/09/tom-selleck-quits-nra-board/; *see also* Mike Spies & John Cook, *Top NRA Executive's Trail of Business Flops and Unpaid Debt*, THE TRACE (Oct. 1, 2018), https://www.thetrace.org/ 2018/10/nra-josh-powell/; *see also* Mike Spies & John Cook, *For the Second Time in Two Years, the NRA Will Raise Dues on Members*, THE TRACE (Aug. 27, 2018), https://www.thetrace.org/2018/08/nra-membership-dues-increase/; *see also* Alex Yablon & Mike Spies, *FAQ: Is the NRA Going Broke?*, THE TRACE (Aug. 9, 2018), https://www.thetrace.org/2018/08/nra-financial-health-new-york-state-lawsuit-carry-guard/; *see also* Brian Freskos, *We Translated Maria Butina's Russian Blog Posts. Here's What They Reveal About Her Obsession with the NRA*, THE TRACE (July 24, 2018), https://www.thetrace.org/2018/07/maria-butina-nra-russian-blog-post-translation/.

[27] *See* New York City Bar Association, *Forum for the Democratic Attorney General Primary Candidates*, (Sept. 4, 2018), *available at* https://www.youtube.com/ watch?v=6n2_LHNEUW0 (statement at the 17:50 mark).

[28] *See Attorney General Candidate, Public Advocate Letitia James*, OUR TIME PRESS (Sept. 6, 2018), https://www.ourtimepress.com/attorney-general-candidate-public-advocate-letitia-james/ (emphasis added).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

purpose and effect of James's statement was to induce a belief that the NRA engaged in criminal activity that placed its banks and business counterparties at risk of law-enforcement action.

20.     Similarly, on October 31, 2018, in an interview with *Ebony Magazine*, James stated that "the NRA holds [itself] out as a charitable organization, but in fact, [it] really [is] a **terrorist organization**."[29] Against the backdrop of similar statements that were routinely couched in references to specific laws and promises of law-enforcement action, this statement was not mere heated political rhetoric. Rather, it was intended to reiterate and reinforce James's false, malicious assertion that the NRA had committed serious crimes, including crimes for which its financial backers might face repercussions.

21.     Unsurprisingly, amid such wild accusations, investigative reporters from outlets other than *The Trace* began to inquire whether James's claims against the NRA had any merit. The NRA engaged patiently and extensively with Pulitzer Prize-winning journalists from both *The Wall Street Journal* and *The New York Times* to rectify lies about its governance.

22.     Although confident in the propriety of its own finances and governance, the NRA sought to leave no stone unturned in the face of James's threats. Accordingly, the NRA began to prepare for the predictable outcome of a James victory in the NYAG election: a pretextual investigation into its compliance with New York law. As it pursued its own internal review, the NRA determined that a relatively small group of vendors, executives and fiduciaries were not complying with NRA policies and/or reporting requirements. As such, the Association took steps to bring all into full compliance. On April 11, 2019, for example, the NRA filed an action for

---

[29] *See* Teddy Grant, *Letitia 'Tish' James on Becoming New York's Next Attorney General*, EBONY (Oct. 31, 2018), https://www.ebony.com/news/letitia-tish-james-on-becoming-new-yorks-next-attorney-general/ (emphasis added).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

specific performance against its then-largest vendor, the advertising agency Ackerman McQueen, which had refused to comply with the NRA's requests for documents under a contractual record-inspection right. Rather than support the NRA's efforts, James coordinated with Everytown to undermine them. On April 17, 2019, Everytown filed complaints with the IRS and New York State targeting the NRA's tax-exempt status.[30] The sole source cited in those complaints was a *New Yorker* article published the same day—authored by *Trace* staffer Mike Spies—which replicated Everytown's claims.

23.     Ten days later, on April 27, 2019, James delivered on the first part of her campaign promise to target the NRA. Within months of her inauguration, the NYAG predictably launched a sweeping investigation.

### D.     The NYAG's Pretextual "Investigation" Underscores James's Plan to Destroy the NRA.

24.     Even though James defamed and inveighed against the NRA, the NRA initially offered to cooperate with any good-faith inquiry into its finances.[31] After all, the NYAG is the supervising regulator for all New York non-profits, including the NRA.

25.     Rather than accept the NRA's offer of cooperation in good faith, James's staff secretly subpoenaed the NRA's accounting firm, demanding reams of sensitive records, including

---

[30] *See* Press Release, *Everytown Files Complaint About NRA's Tax-Exempt Status With IRS, Calls for Federal and State Investigations into the NRA* (Apr. 18, 2019), https://everytown.org/press/everytown-files-complaint-about-nras-tax-exempt-status-with-irs-calls-for-federal-and-state-investigations-into-the-nra/.

[31] Gabriela Resto-Montero, *New York's Attorney General Opens Investigation into the NRA as Its President Steps Down*, Vox, (Apr. 28, 2019), https://www.vox.com/policy-and-politics/2019/4/27/18519685/nra-ceo-accuses-president-extortion-wayne-lapierre-oliver-north ("A lawyer for the NRA said the organization will 'fully cooperate' with the investigation, and added, 'The NRA is prepared for this, and has full confidence in its accounting practices and commitment to good governance.'").

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

names of NRA members and donors—and tried to forbid the firm from alerting the NRA, despite its obligation under the Internal Revenue Code to do so. When the NRA requested that confidential documents produced to the NYAG Charities Bureau be maintained in confidence for purposes of James's purported charitable-compliance investigation—and not given to other NYAG staff who were adverse to the NRA on Second Amendment matters—the NYAG flatly refused.

26.      A state attorney general is obligated to seek justice and not just "win at all costs." As counsel for a state executive branch agency, the attorney general owes duties similar to prosecutors in criminal cases,[32] and she is bound by the so-called "Neutrality Doctrine" even in civil litigation. The United States Supreme Court has stated that a government attorney "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore is not that it shall win a case, but that justice shall be done."[33] This state's highest court has similarly held that "conscious discrimination by public authorities taints the integrity of the legal process to the degree that no court should lend itself to adjudicate the merits of the enforcement action."[34]

---

[32] *See* Model Rules of Professional Conduct 3.8 cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."); *see also "The Right Thing" Ethical Guidelines for Prosecutors*, District Attorneys Association of the State of New York (2016), http://www.daasny.com/wp-content/uploads/2016/02/2016-Ethics-Handbook.pdf ("District Attorneys . . . shall not . . . Misuse their public positions for the purpose of obstructing or furthering the political activities of any political party or candidate."); *see also* U.S. Department of Justice Manual § 9-27.260 ("In determining whether to commence or recommend prosecution or take other action against a person, the attorney for the government should not be influenced by: The person's . . . political association, activities or beliefs . . . [or] The attorney's own personal feelings concerning the person [or] the person's associates . . . .").

[33] *See Berger v. United States*, 295 U.S. 78, 88 (1935) (criminal case).

[34] *303 West 42nd St. v. Klein*, 46 N.Y.2d 686, 693 (1979).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

27.     Courts have recognized that this principle also applies in civil cases and have held that a "government lawyer in a civil action or administrative proceedings has the responsibility to seek justice and develop a full and fair record, and he should not use his position or the economic power of the government to harass parties or to bring about unjust settlements or results."[35] A government lawyer in such a scenario is held to a higher standard than a lawyer in private practice and "should refrain from instituting or continuing litigation that is obviously unfair."[36]

28.     Put differently, a government attorney "'may prosecute with earnestness and vigor—indeed, he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones.'"[37] Additionally, a government lawyer "has obligations that might sometimes trump the desire to pound an opponent into submission."[38] Courts have expressly recognized that a state attorney general "is to decline the use of individual passions, and individual malevolence."[39]

29.     As a pillar of her campaign platform, James boasted that she would strike blows against the NRA and pound the NRA into submission. She vowed that she would use the NYAG's enforcement powers for the precise purpose of stanching political speech ("deadly propaganda") with which she and Cuomo disagree. She has begun to deliver on her campaign promises to

---

[35] *See People ex rel. Clancy v. Superior Court*, 39 Cal.3d 740, 746 (1985) (quoting Model Code of Professional Responsibility EC 7–14 (1981)).

[36] *Freeport McMoRan Oil & Gas Co. v. F.E.R.C.*, 962 F.2d 45, 47 (D.C. Cir. 1992) (quoting Model Code of Professional Responsibility EC 7–14 (1981)).

[37] *Berger v United States*, 295 U.S. 78, 88 (1935). *See also DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600 (E.D.N.Y. 2017) *reconsideration denied sub nom. DaCosta v. Tranchina*, 285 F. Supp. 3d 566 (E.D.N.Y 2018).

[38] *Freeport McMoRan Oil & Gas Co*., 962 F.2d 45, 48 (D.C. Cir. 1992).

[39] *State of R.I. v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428 (R.I. 2008) (quoting *Foute v. State*, 4 Tenn. (3 Hayw.) 98, 99 (1816)).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

retaliate against the NRA for constitutionally protected speech on issues that James opposes. As NYAG, James has regrettably succumbed to "individual passions, and individual malevolence."

30.     In truth, James's Charities Bureau investigation is nothing more than a pretext for her goal of depriving the NRA, its members, and its donors of their constitutional rights to freedom of speech and association under the First Amendment, and to the right to keep and bear arms under the Second Amendment.

## E.     James Seeks the Extraordinary and Unprecedented Relief of Dissolution Based Solely on Alleged Executive Misconduct.

31.     On the evening of August 5, 2020, James teased a press conference the following morning regarding a "major national" announcement.[40] The next day, she took to the stage to announce that she would sue to dissolve the NRA. At the same time, the NRA commenced this lawsuit. A copy of the dissolution complaint and its exhibits is attached hereto as Exhibits A and B. Notably (and to the apparent surprise of one reporter attending the press conference), James made no attempt to settle her purported grievances against the NRA or monitor or reform the NRA to remedy the alleged corruption.[41] Of course, improving the NRA's governance is not James's goal—dissolving a political enemy is.

32.     The same day, in an obviously coordinated effort, the Attorney General for the District of Columbia also filed suit against the NRA and the NRA's 501(c)(3) arm, the NRA

---

[40] *See New York Attorney General to Deliver 'Major National Announcement,"* WASH. EXAMINER (Aug. 5, 2020), https://www.washingtonexaminer.com/news/new-york-attorney-general-to-deliver-major-national-announcement

[41] *See* Transcript of James's press conference at 20:13, *available at* https://www.rev.com/blog/transcripts/ny-attorney-general-letitia-james-sues-nra-press-conference-august-6.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

Foundation, which is domiciled there.[42] The DCAG's complaint alleges similar misconduct but does not seek dissolution.

33.    Although the State Dissolution Action vaguely purports to indict "the NRA" for actions it elsewhere alleges were undertaken by individual defendants and actively concealed from oversight by others,[43] it contains no allegations of fraud or intentional illegality by the employees of the NRA broadly, or by the NRA Board of Directors or any Committee of the Board. Instead, construed deferentially, the complaint at most accuses the NRA and its Board of failing to maintain fulsome records and of lax oversight. Specifically, the complaint alleges that: (i) although the Board did have a compensation committee[44] and hire compensation consultants,[45] it did not adequately benchmark peer compensation[46] or memorialize "evidence" of scrutiny given to executive performance;[47] (ii) forms filed with the IRS failed to properly account for expense reimbursements as compensation,[48] and failed to adopt the NYAG's view that the NRA's widely-disclosed executive salaries amounted to *per se* improper excess-benefit transactions;[49] (iii) the Audit Committee "failed to exercise a proper duty of care" in approving related party transactions

---

[42] *District of Columbia v. NRA Foundation et al.*, Case No. 2020-CA-003454 (Sup. Ct. D.C.).

[43] *See, e.g.*, Ex. A. ¶¶ 144, 158, 197, 201-03, 205, 207, 227, 228, 233, 262, 266, 286, 293, 307, 309-24, 326, 335, and 337.

[44] Ex. A ¶ 402.

[45] Ex. A ¶¶ 396-417.

[46] Ex. A ¶ 403.

[47] Ex. A ¶ 406.

[48] *See, e.g.*, Ex. A ¶ 434.

[49] Ex. A ¶ 443.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

and conflicts of interest,[50] and failed to diligently supervise or audit the NRA's outside auditors[51]; (iv) the Audit Committee made an *ultra vires* decision to indemnify a board member for legal fees in 2019, a decision that should have been left to the full Board[52]—although the complaint fails to allege that the Board was unaware of, or did not duly ratify, the Audit Committee's indemnification resolution; and (v) the Audit Committee failed to implement an effective compliance program,[53] although no specific inadequacies or deficiencies in the NRA's current compliance training regime are identified. (The State Dissolution Action does take issue with one individual defendant's erstwhile involvement in administering compliance training, but concedes that he was fired by the NRA for the same issues raised in the complaint).[54]

34.     The NRA disputes the legitimacy of even these allegations, but viewed in the worst possible light, they cannot justify James's decision to commence a dissolution action. The dissolution causes of action were brought under New York Not-for-Profit Corporation Law Sections 1101 and 1102. Section 1101 authorizes the NYAG to commence a dissolution action where a corporation "has exceeded the authority conferred upon it by law, or has violated any provision of law whereby it has forfeited its charter, or carried on, conducted or transacted its business in a persistently fraudulent or illegal manner, or by the abuse of its powers contrary to

---

[50] Ex. A ¶ 498. Notably, the NYAG nowhere alleges in the State Dissolution Action that any of these related-party transactions were not for the NRA's benefit or in furtherance of the NRA's corporate mission; rather, the NYAG alleges only disagreements about the prices paid for these transactions and failure to follow appropriate procedures for authorizing them. NRA policy did not prohibit such transactions.

[51] Ex. A ¶¶ 518-31.

[52] Ex. A ¶¶ 532-33

[53] Ex. A ¶¶ 532-43.

[54] Ex. A. ¶ 251.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

public policy of the State." Section 1102 gives the NYAG the right to commence the equivalent of a derivative action by a director, who may seek dissolution where "directors or members in control of the corporation have looted or wasted the corporate assets, have perpetuated the corporation solely for their personal benefit, or have otherwise acted in an illegal, oppressive or fraudulent manner." Despite the wording of Section 1102, New York's highest court has ruled that dissolution under this section is only available in cases of "egregious" conduct, which "go far beyond charges of waste, misappropriation and illegal accumulations of surplus, which might be cured by a derivative action for injunctive relief and an accounting."[55]

35.     As such, this extreme remedy is reserved for non-profits that themselves were deemed to be a *sham*—a word that appears nowhere in the NYAG's complaint. Cases where a puppy rescue organization was really a puppy mill,[56] cancer charities performed no such work,[57] a leukemia foundation spent less than one percent of its revenue to help children suffering from

_____

[55] *Liebert v. Clapp*, 13 N.Y.2d 313, 316 (1963).

[56] *See* Press Release, *A.G. Schneiderman Obtains Consent Order Shuttering Long Island Puppy Flipper* (Mar. 16, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-obtains-consent-order-shuttering-long-island-puppy-flipper.

[57] *See Coalition Against Breast Cancer Dissolved By New York Attorney General's Office*, CHARITY WATCH (May 7, 2013), https://www.charitywatch.org/charity-donating-articles/coalition-against-breast-cancer-dissolved-by-new-york-attorney-general39s-office; Press Release, *A.G. Schneiderman Announces Settlement with Two Sham Cancer Charities That Bilked More Than $75 Million From Donors* (Mar. 30, 2016), https://ag.ny.gov/press-release/2016/ag-schneiderman-announces-settlement-two-sham-cancer-charities-bilked-more-75; Press Release, *A.G. Schneiderman Announces $350,000 Settlement with Sham Breast Cancer Charity* (Jun. 16, 2017), https://ag.ny.gov/press-release/2017/ag-schneiderman-announces-350000-settlement-sham-breast-cancer-charity.

Page **21** of 42

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

cancer,[58] a tobacco industry-funded non-profit spread disinformation about tobacco's health effects,[59] or a non-profit was a front for the child pornography outfit NAMBLA.[60]

36.     The State Dissolution Action nowhere alleges that the NRA does not conduct activities consistent with its stated corporate purposes, nor that it fails to honor requests by donors regarding the specific application of their gifts. The complaint is also silent with regard to the NRA's finances and whether any alleged looting or waste by the individual defendants rendered the NRA insolvent or incapable of continuing to carry out its stated purpose.

37.     To the NRA's knowledge, since at least 1999 and perhaps for its entire existence, the New York Attorney General's Office has never sought dissolution of a non-profit corporation on the sole basis of alleged self-dealing or related-party transactions engaged in by corporate executives, whether known or unknown to the corporation's board and regardless of whether those transactions were approved and regardless of how substantially those transactions diminished corporate assets. Not when NARAL Pro-Choice's president looted hundreds of thousands of dollars for personal expenses and intimidated others into staying quiet to perpetuate the fraud.[61]

---

[58] *See New York Attorney General Schneiderman Announces $1 Million Settlement with Officials of So-Called Children's Leukemia Foundation and Their Auditor, National Association of Charity Officials,* NASCO (Dec. 17, 2015), https://www.nasconet.org/2015/12/new-york-attorney-general-schneiderman-announces-1-million-settlement-with-officials-of-so-called-childrens-leukemia-foundation-and-their-auditor/.

[59] *See* Bill McAllister, *N.Y. Judge Places Tobacco Institute Under Control of Receiver*, WASH. POST (May 3, 1998), https://www.washingtonpost.com/archive/politics/1998/05/03/ny-judge-places-tobacco-institute-under-control-of-receiver/fd082867-5a96-4f8b-9d7c-202d4eb88701/.

[60] *People v. Zymurgy, Inc.*, 233 A.D.2d 178 (1 Dept. 1996).

[61] *See* Press Release, *New York Attorney General Sues Former NARAL President for Siphoning Over $250,000 from Charity for Personal Use* (Jun 29, 2012), https://ag.ny.gov/press-release/2012/office-attorney-general-sues-former-naral-president-siphoning-over-250000-charity.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

Not when the leader of the National Arts Club was found to have "systematically abused his authority" to steal millions for himself and his brother.[62] Not when the Thoroughbred Retirement Foundation was found to be so "dysfunctional" that it was driven into insolvency by the "reckless" actions of its board and caused the suffering and death of horses in its charge.[63] Not when the former president of the New York Legal Assistance Group was found to have diverted millions over 15 years to other entities he controlled, *with board approval*, and NYLAG was found to have filed "materially misleading" financial statements.[64] Not when NYAG found a "shocking" "breakdown in governance" at the Victor E. Perley Fund that allowed its leader to loot over a million dollars and waste the fund's *entire* investment portfolio.[65] Not when former executives of the Metropolitan Council on Jewish Poverty were indicted for grand larceny, money laundering, tax fraud and criminal conspiracy for taking millions through an illegal insurance-inflation scheme stretching back 20 years.[66] Nor in any of the more than two dozen other instances since 1999 when

---

[62] *See* Press Release, *A.G. Schneiderman Obtains $950k Settlement from Former National Arts Club Leaders for Years of Self-Dealing* (Jul. 10, 2013), https://ag.ny.gov/press-release/2013/ag-schneiderman-obtains-950k-settlement-former-national-arts-club-leaders-years.

[63] *See* Press Release, *A.G. Schneiderman Sues to Remove Board of Thoroughbred Retirement Foundation That Put Horses in Danger and Finances in Ruin* (May 3, 2012), https://ag.ny.gov/press-release/2012/ag-schneiderman-sues-remove-board-thoroughbred-retirement-foundation-put-horses.

[64] *See* Press Release, *A.G. Schneiderman Announces Settlement of Lawsuit Against Yisroel Schulman, Former Director of NYLAG, For Breaching His Fiduciary Duty to NYLAG and Other Charities* (Nov. 29, 2017), https://ag.ny.gov/press-release/2017/ag-schneiderman-announces-settlement-lawsuit-against-yisroel-schulman-former.

[65] *See* Press Release, *A.G. Schneiderman Announces $1.025 Million Settlement with Trustees of Nonprofit that Squandered Assets Intended for Underprivileged Children* (Apr. 29, 2015), https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-1025-million-settlement-trustees-nonprofit-squandered.

[66] *See* Press Release, *A.G. Schneiderman & Comptroller DiNapoli Announce Agreement with Met Council to Restore Charity's Operations* (Dec. 19, 2013), https://ag.ny.gov/press-release/2013/ag-schneiderman-comptroller-dinapoli-announce-agreement-met-council-restore.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

NYAG alleged self-dealing by non-profit executives. In every single one of those cases, NYAG considered the non-profit a *victim* and engaged in collaborative discussions with the organizations to implement measures designed to tighten internal controls.

38.     A survey of non-profit enforcement by the National Association of State Charity Officials, a consortium of attorneys general similarly demonstrates that, for the past two years, almost none of the actions categorized as "Governance and Breach of Fiduciary Duty" sought dissolution.[67] Even where they did, the remedy was sought in the alternative only if other, less-severe injunctive relief was not obtained.[68] It is notable that the Attorney General of the District of Columbia, which commenced an action on the same day as James making similar allegations against the NRA and one of its D.C.-domiciled foundations, *did not seek dissolution* of the foundation. When asked during her August 6, 2020 press conference what precedent existed for this action, James offered only two, neither of which were sought on the basis of fraudulent expenditures by management.[69] The first, the Federation of Multicultural Programs, ran a series of

---

[67]     *See* NASCO's 2019 and 2020 annual reports, *available at https://www.nasconet.org/annual-reports/*, at 11-15 (2019, identifying the Trump Foundation action as the only one seeking dissolution); and 7-10 (identifying only the Trump Foundation and two sham charity actions where looting also occurred as dissolution actions).

[68]     *Id.* Michael West, the senior attorney at the New York Council of Nonprofits, called the dissolution action "unprecedented." *See* Alex Yablon, *Get Ready for a Feeding Frenzy Over the NRA's Corpse*, SLATE (Sept. 3, 2020). Anne Milgram, former Attorney General for the State of New Jersey similarly noted on the Café Insider podcast after learning of this lawsuit, "The thing I kept thinking about as somebody who's overseen charities, is that, as a rule, you, you know there were instances where we took the most aggressive actions were instances where charities have already been given an opportunity to reform, or they'd been identified as being problematic and flagged for and basically told 'You're going to lose your status unless you do this.'" CAFÉ INSIDER PODCAST, August 11, 2020 at 42:00, *available at* https://cafe.com/insider-podcast/cafe-insider-8-11-the-executives-privilege/.

[69]     *See* Transcript of James's press conference at 14:46, *available at* https://www.rev.com/blog/transcripts/ny-attorney-general-letitia-james-sues-nra-press-conference-august-6.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

homes and programs for the disabled, had accumulated 27 safety violations, was determined to be actively harming patients in its care because of a lack of funds, and had been warned repeatedly by the New York State Office for People With Disabilities for five years before it was shut down.[70] The second, the Trump Foundation, was an action in which the dissolution claim was premised not on waste or misspending, but because the Foundation, *unlike the NRA*, was prohibited from engaging in political activity but had been found to operate as little more than a "checkbook" that was "co-opted" by a presidential campaign.[71] It was notably already in the process of winding down its affairs.

39.     The difference here is James's well-documented animus against the NRA. James's radical departure from precedent to pursue dissolution cannot therefore be reasonably viewed as anything other than abuse of the non-profit laws to silence a political enemy.

40.     The dissolution action has rightfully drawn widespread condemnation as a blatant abuse of power and a threat to democratic principles from both sides of the political spectrum, including the American Civil Liberties Union, the New Republic, and other voices not traditionally aligned with the NRA.[72]

---

[70] *See* Russ Buetner, *An Operator of Group Homes Keeps State Aid Despite Faults*, N.Y. TIMES (Dec. 27, 2011), https://www.nytimes.com/2011/12/28/nyregion/operator-of-ny-group-homes-thrived-despite-lapses-in-care.html.

[71] *People v. Donald J. Trump*, et al., Index No. 451130/2018, Dkt. 1 ¶¶ 108, 116 ("The Foundation exceeded the authority conferred to it in its certificate of incorporation and acted in a persistently illegal manner by repeatedly intervening in Mr. Trump's campaign for president in 2016 . . ." and "[the Foundation] has conducted its business in a persistently illegal manner and abused its powers contrary to the public policy of the State of New York by operating without any oversight or control by a board of directors.").

[72] *See, e.g.*, Editorial, *How Did Caribbean Yacht Vacations Promote the Second Amendment? We May Find Out in Court*, WASH. POST. (Aug. 8, 2020), https://www.washingtonpost.com/opinions/is-this-really-the-right-penalty-for-the-nra/2020/08/07/f81778fc-d8e2-11ea-930e-d88518c57dcc_story.html ("We question whether dissolution is the

41.     NYAG's decision to seek this severe remedy—effectively seizure of the NRA's remaining assets and annulment of its existence—constitutes impermissible selective enforcement of the New York Not-for-Profit Corporation Law by NYAG. Both the U.S. and New York constitutions prohibit the government from applying or enforcing a valid law "with an evil eye and an unequal hand."[73] Such behavior "taints the integrity of the legal process to the degree that no court should lend itself to adjudicate the merits of the enforcement action," "even though the party … may well have been guilty of violating the law."[74] Discrimination on the basis of political

---

right penalty, even if the charges are proved in court."); Henry Olsen, *New York's Lawsuit to Dissolve the NRA is Outrageous*, WASH. POST. (Opinion, Aug. 7, 2020), https://www.washingtonpost.com/opinions/2020/08/07/new-yorks-lawsuit-dissolve-nra-is-outrageous/ ("James's allegations . . . would certainly be damning if true. . . . None of this, however, justifies destroying the organization itself. The NRA is still supported by millions of people and has substantial assets. It is neither broke nor derelict."); Ruth Marcus, *The NRA is a Cesspool. That Doesn't Mean It Should Be Dissolved*, WASH. POST. (Opinion, Aug. 9, 2020), https://www.washingtonpost.com/opinions/2020/08/09/nra-is-cesspool-that-doesnt-mean-it-should-be-dissolved/; Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Opinion, Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit; David Cole, *The NRA Has a Right to Exist*, WALL ST. J. (Opinion, Aug. 26, 2020), https://www.wsj.com/articles/the-nra-has-a-right-to-exist-11598457143?mod=opinion_lead_pos7 ("The American Civil Liberties Union rarely finds itself on the same side as the National Rifle Association in policy debates or political disputes. Still, we are disturbed by New York Attorney General Letitia James's recent effort to dissolve the NRA"); Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Opinion, Aug. 8, 2020), https://thehill.com/opinion/judiciary/511155-the-tragic-irony-of-the-new-york-state-lawsuit-against-the-national-rifle-association ("Trying to dissolve an organization engaged in political speech should not occur absent overwhelming proof that it is a criminal enterprise, which is why this has never happened with a group like the NRA."); Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Opinion, Aug. 11, 2020), https://www.lawfareblog.com/attempt-dissolve-nra-threatens-democratic-norms ("I personally can't stand [the NRA] . . . . [b]ut that said . . . . James's attempt to dissolve the NRA in its entirety is a violation of key democratic and rule-of-law norms.").

[73] See *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886); *303 West 42nd St. v. Klein*, 46 N.Y.2d 686 (1979).

[74] *303 West 42nd St. v. Klein*, 46 N.Y.2d 686 (1979).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

speech is such an impermissible standard.[75] If "'conscious, intentional discrimination'" exists, then [defendant] will be entitled to a dismissal of the prosecution as a matter of law."[76]

42.     Here, both James's documented animus against the NRA and more than 20 years' worth of action by NYAG against non-profits make clear that the dissolution causes of action are included for no reason other than to punish a political enemy and stifle its speech. The record on James's—as well as her boss, Governor Cuomo's—hatred of the NRA is extensive. While campaigning, James repeatedly called the NRA a "terrorist organization" and a "criminal enterprise" and called its constitutionally protected Second Amendment agenda "poisonous." She stated explicitly that, once elected, she would use the New York Not-for-Profit Corporation Law to "target" the NRA. A similar federal lawsuit against her boss for other actions taken against the NRA has sustained a motion to dismiss.

43.     As the New York Court of Appeals has acknowledged, proof of intent in these matters is often hard for a defendant to come by, but here it permeates the public record. Proof of intent may also be found by a "showing of a grossly disproportionate incidence of nonenforcement against others similarly situated in all relevant respects save for" the impermissible motive.[77] While the totality of NYAG's enforcement history against non-profits is not a matter of easily searchable public record, an exhaustive search of its press releases, consent orders, publicly filed enforcement actions, and news articles stretching back more than 20 years yields not a single example where the NYAG has sought outright dissolution of any non-profit corporation (or a for-profit one, for that matter), based solely on allegations of executive misconduct and lack of

---

[75] *Id.*; *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999).

[76] *People v. Utica Daw's Drug Co.*, 16 A.D.2d 12, 19 (4 Dep't 1962).

[77] *303 West 42nd St. Corp. v. Klein*, 46 N.Y.2d 686 (1979).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

oversight. Regardless of whether the looting was board-sanctioned or not, regardless of whether the transgressor allegedly controlled the board, regardless of whether the corporation had deficient policies and procedures, regardless of the amount allegedly looted, regardless of whether the looting *completely depleted the assets of the corporation*, regardless of whether it was tied to illegal activity such as kickback schemes and money laundering, regardless of whether the individual defendants pled guilty to crimes, regardless of whether it resulted in false filings made with State regulators, and regardless of whether the corporation was no longer able to continue its purpose. James could not identify one at her press conference. The NRA has not identified a single such action where dissolution was sought on the basis that governance reforms would be futile.

44.     The State Dissolution Action identifies no basis for its extreme departure from prior enforcement practice. The NRA is unaware of any similar pending actions and to the NRA's knowledge the NYAG has not announced any.

**F.      N.Y.'s Not-for-Profit Law's Dissolution Provisions are Unconstitutional As-Applied to Political Entities Like the NRA.**

45.     Although NYAG has never before alleged, and no New York court has ever held, that executive misconduct alone constitutes the persistent corporate fraud necessary to sustain a dissolution action, James now seeks a dissolution order based on this theory.

46.     Given the NRA's constitutionally protected activity, NYAG must demonstrate that dissolution is "the least restrictive means of achieving a compelling state interest."[78]

47.     The State Dissolution Action identifies no compelling state interest; it relies on the general *parens patriae* principles underlying non-profit laws that ensure charities perform in the

---

[78] *Thomas v. Review Bd. of Indiana Employment Sec.*, 450 U.S. 707, 719 (1981).

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

public interest. Nor does NYAG explain how dissolving rather than reforming the NRA will be in the interest of its millions of members, who will find themselves deprived of their political voice.

48.    NYAG's long enforcement history demonstrates that dissolution is not the least restrictive means to ensuring that non-profits serve the public interest.[79] In every prior instance where non-profit executives were accused of looting corporate assets, NYAG has always worked with the non-profit to implement reform measures that strengthen corporate governance in order to prevent looting from occurring in the future and to allow the non-profit to continue performing its charitable purpose.

49.    The State Dissolution Action contains only one sentence concerning NRA reform, stating without any supporting facts that reform would be "futile."[80] Such an allegation is

---

[79] This has also been the consensus of various legal commentators. As constitutional scholar Jonathan Turley noted, where other instances of self-dealing and even outright racketeering at identified by officials at politically-engaged non-profits The United Way and the Teamsters Union, "[n]o prosecutor would have dreamed of dissolving [them]." And indeed no dissolution was sought in either case. Jonathan Turley, *The Tragic Irony of the New York State Lawsuit Against the NRA*, THE HILL (Op-Ed). Alan Z. Rozenshtein of Lawfare noted, "a lawsuit threatening to destroy any major political group should be held to a high standard. In particular, the government should bend over backwards, even while it enforces the law, to preserve the institution if at all possible . . . [b]ut the priority should be reform, not dissolution. To seek dissolution, especially out of the gate, is to ignore the millions of Americans for whom the NRA is a vital avenue for political participation. . . . [S]eeking such a radical remedy every time that occurs clearly go beyond what the legislature intended, and what good public policy countenances. The breadth of the law only makes sense if paired with discretion on the part of those who enforce it."" Alan Z. Rozenshtein, *The Attempt to Dissolve the NRA Threatens Democratic Norms*, LAWFARE (Aug. 11, 2020). Noah Feldman, another constitutional law scholar noted that "If an organization has really fallen into a condition of fundamental corruption, a state attorney general can demand it get new leaders, or replace its board of directors and its management in their entirety . . . . But asking the court not to order reform of the organization, but to dismantle and dissolve it altogether, creates the impression that the attorney general is trying to use the legal system to intervene in the very political dispute in which the NRA is such an important player: the fight over Second Amendment rights and gun control." Noah Feldman, *New York's Attorney General Shouldn't Dismantle the NRA*, BLOOMBERG (Aug. 6, 2020), https://www.bloomberg.com/opinion/articles/2020-08-06/new-york-s-attorney-general-shouldn-t-dismantle-nra-in-lawsuit.

[80] Ex. A ¶ 663.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

contradicted by the remainder of the State Dissolution Action. Indeed, the setup of the NRA's governance structure is so extensive the State Dissolution Action complaint requires over 70 paragraphs just to describe it.[81] The organization encompasses 11 divisions, each overseen by the Executive Vice President.[82] The NRA's bylaws establish a 76-member board of directors to have general oversight of the organization.[83] The bylaws also establish a leadership structure of eight officers, six of whom are elected annually by the Board.[84] Five of these officers are ex officio members of the Board but lack voting power.[85] The Board is aided by "dozens of standing and Special Committees," including an officer compensation committee, a nominating committee, an executive committee, and an audit committee (with its own charter).[86] The NRA has formalized policies maintained in an employee handbook and a Board policy manual, including policies and procedures on employee selection, compensation, time off, work standards, insurance and pension benefits, a statement of corporate ethics, purchase policy, a contract review policy, travel and business expense reimbursement policy, and an officer and board of directors policy on disclosure of conflicts of interest, a conflict of interest and related party transaction policy that requires financial and conflict of interest disclosures by directors, officers and employees, and a new whistleblower policy.[87]

---

[81] Ex. A ¶¶ 60-132.

[82] Ex. A ¶ 62.

[83] Ex. A ¶ 64.

[84] Ex. A ¶ 66.

[85] Ex. A ¶ 67.

[86] Ex. A ¶¶ 82-94.

[87] Ex. A ¶ 98 and Ex. B.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

50.     Despite framing the NRA as a fraudulent organization beyond repair, the NYAG's own complaint extensively documents and makes the case that the NRA has undertaken efforts to improve its internal governance functions up to the present day. The State Dissolution Action is moreover replete with allegations concerning dissident board members who acted as whistleblowers and were focused on reform as well as the introduction of more robust policies in recent years; and avers the current treasurer has been investigating the alleged malfeasance by the former treasurer and has implemented stricter controls.[88]

**G.     The Damage Done.**

51.     James's threatened, and actual, regulatory and civil reprisals are a blatant and malicious retaliation campaign against the NRA and its constituents based on her disagreement with the content of their speech. This wrongful conduct threatens to destabilize the NRA and chill the speech of the NRA, its members, and other constituents.

52.     Notwithstanding that the NRA was already in the process of undertaking an expensive internal audit of its compliance with New York's non-profit law, James commenced her crusade against the NRA with the sole purpose of seeking to dissolve a political enemy. Its pretextual "investigation" not only caused the NRA to incur millions of dollars in unnecessary expenditures, James then turned around and used those expenditures as the basis to claim a violation of New York's Prudent Management of Institutional Funds Act in support of the NRA's dissolution. The NRA will now further incur more needless debt litigating a dissolution action that, in essence, will require litigation regarding actions the NRA has already commenced against vendors and other wrongdoers like Ackerman McQueen.

---

[88] *E.g.* Ex. A. ¶¶ 115, 156, 197, 225, 249-50, 263, 294, 302, 455, 483.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

## V.

## COUNT ONE

### Violation of the NRA's First and Fourteenth Amendment Rights
### Under 42 U.S.C. § 1983 by Retaliating Against the NRA Based on Its Speech

53.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

54.     The First Amendment, which applies to James by operation of the Fourteenth Amendment secures the NRA's right to free speech, including its right to express political beliefs concerning the constitutionally protected right to keep and bear arms.

55.     The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although James disagrees with and opposes the NRA's political views, the NRA's freedom to express its views is a fundamental right protected by the First Amendment.

56.     James's actions as NYAG—including, but not limited to, the investigation into the NRA's tax-exempt status—were done under color of state law and undertaken directly in response to and substantially motivated by the NRA's political speech regarding the right to keep and bear arms. James has acted with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech, which is protected by the First Amendment.

57.     James maintains discretion in determining whether and how to carry out her actions, including the decision to initiate a wrongful investigation into the NRA's business practices and whether to seek dissolution. James chose to exercise her discretion to harm the NRA based on the content of the NRA's speech regarding the Second Amendment.

58.     James's unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

59.     The remedy of dissolution is not the least restrictive means of achieving any such interest.

60.     James's intentional actions have resulted in significant damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

61.     The NRA is entitled to a declaratory judgment that James has violated its First Amendment rights.

62.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

63.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

64.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free speech, the NRA will suffer irrecoverable loss and irreparable harm.

**VI.**

**COUNT TWO**

**Violation of the NRA's Rights
Under Article I, Section 8 of the New York State Constitution
by Retaliating Against the NRA Based on Its Speech**

65.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

66.     Article I, Section 8 of the New York State Constituion secures the NRA's right to free speech, including its right to express political beliefs concerning the constitutionally protected right to keep and bear arms.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

67. The NRA has a longstanding history of political advocacy advancing the Second Amendment rights of all Americans. Although James disagrees with and opposes the NRA's political views, the NRA's freedom to express its views is a fundamental right protected by the New York Constitution.

68. James's actions as NYAG—including, but not limited to, the investigation into the NRA's tax-exempt status—were done under color of state law and undertaken directly in response to and substantially motivated by the NRA's political speech regarding the right to keep and bear arms. James has acted with the intent to obstruct, chill, deter, and retaliate against the NRA's core political speech, which is protected by the New York Constitution.

69. James maintains discretion in determining whether and how to carry out her actions, including the decision to initiate a wrongful investigation into the NRA's business practices and whether to seek dissolution. James chose to exercise her discretion to harm the NRA based on the content of the NRA's speech regarding the Second Amendment.

70. James's unlawful and intentional actions are not justified by a substantial or compelling government interest and are not narrowly tailored to serve any such interest.

71. The remedy of dissolution is not the least restrictive means of achieving any such interest.

72. James's intentional actions have resulted in significant damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

73. The NRA is entitled to a declaratory judgment that James has violated its rights under the New York State Constitution.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

74.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

75.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

76.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free speech, the NRA will suffer irrecoverable loss and irreparable harm.

## VII.

## COUNT THREE

### Violation of the NRA's First and Fourteenth Amendment Rights
### Under 42 U.S.C. § 1983 by Retaliating Against the NRA
### Based on Its Members' Exercise of Association Rights

77.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

78.     The First Amendment, which applies to James by operation of the Fourteenth Amendment recognizes and protects the right to freedom of association.

79.     The NRA's more than five million members are an association that desires to engage in advocacy, expression and protection of Second Amendment rights.

80.     James's intentional actions are designed to punish the NRA and its members for associating to engage in Second Amendment advocacy and to chill NRA members' future exercise of such freedom of association and have resulted in and will continue to result in significant damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

81.     The NRA is entitled to a declaratory judgment that James has violated its First Amendment rights.

82.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

83.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

84.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free association, the NRA will suffer irrecoverable loss and irreparable harm.

## VIII.

## COUNT FOUR

### Violation of the NRA's Rights Under Article I, Section 9
### of the New York State Constitution by Retaliating Against the NRA
### Based on Its Members' Exercise of Association Rights

85.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

86.     Article I, Section 9 of the New York State Constitution recognizes and protects the right to freedom of association.

87.     The NRA's more than five million members are an association that desires to engage in advocacy, expression and protection of Second Amendment rights.

88.     James's intentional actions are designed to punish the NRA and its members for associating to engage in Second Amendment advocacy and to chill NRA members' future exercise of such freedom of association and have resulted in and will continue to result in significant

damage to the NRA, including, but not limited to, damage due to reputational harm, as well as injury to the NRA's trade, business, or profession.

89.     The NRA is entitled to a declaratory judgment that James has violated its rights under the New York State Constitution.

90.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

91.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

92.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's rights to free association, the NRA will suffer irrecoverable loss and irreparable harm.

## IX.

## COUNT FIVE

### Selective Enforcement of N.Y. Not-for-Profit Corporation Law
### Against the NRA in Violation of the Fourteenth Amendment

93.     The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

94.     The Equal Protection Clause of the Fourteenth Amendment prohibits State actors from uneven application of the law based on an impermissible standard. Discrimination based on political speech is such an impermissible standard.

95.     James's decision to seek dissolution on the sole basis of executive misconduct for the very first time against the NRA despite more than two decades of non-enforcement against similarly situated non-profits demonstrates selective enforcement of the not-for-profit law.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

James's repeated hostile statements regarding the NRA demonstrate that this selective enforcement has occurred on the impermissible basis of the NRA's disfavored political speech.

96.     NYAG routinely announces investigations it is conducting, and since James took office, NYAG has announced no other investigations into other New York-based non-profits for similar alleged misconduct.

97.     The NRA is entitled to a declaratory judgment that James has violated its Fourteenth Amendment rights.

98.     The NRA is also entitled to dismissal of the dissolution actions.

99.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

100.    The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

101.    In addition to the above-described damages, absent an injunction against James's violation of the NRA's equal protection rights, the NRA will suffer irrecoverable loss and irreparable harm.

## X.

## COUNT SIX

**Selective Enforcement of N.Y. Not-for-Profit Corporation Law
Against the NRA in Violation of Article I, Section 11
of the New York State Constitution**

102.    The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

103.     Article I, Section 11 of the New York State Constitution prohibits State actors from uneven application of the law based on an impermissible standard. Discrimination based on political speech is such an impermissible standard.

104.     James's decision to seek dissolution on the sole basis of executive misconduct for the very first time against the NRA despite more than two decades of non-enforcement against similarly situated non-profits demonstrates selective enforcement of the not-for-profit law. James's repeated hostile statements regarding the NRA demonstrate that this selective enforcement has occurred on the impermissible basis of the NRA's disfavored political speech.

105.     NYAG routinely announces investigations it is conducting, and since James took office, NYAG has announced no other investigations into other New York-based non-profits for similar alleged misconduct.

106.     The NRA is entitled to a declaratory judgment that James has violated its rights under the New York State Constitution.

107.     The NRA is also entitled to dismissal of the dissolution actions.

108.     The NRA is also entitled to an award of damages in an amount to be determined by the trier of fact.

109.     The NRA is also entitled to an award of attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and New York Civil Practice Law and Rules § 8601.

110.     In addition to the above-described damages, absent an injunction against James's violation of the NRA's equal protection rights, the NRA will suffer irrecoverable loss and irreparable harm.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

## XI.

## COUNT SEVEN

## Declaratory Judgment

111.    The NRA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully set forth herein.

112.    The First Amendment requires that state action infringing on such a right be warranted by a compelling state interest and accomplished by the least restrictive means.

113.    Dissolving an entity like the NRA that is engaged in constitutionally protected activity is not warranted by a compelling state interest and is not the least restrictive means of achieving any alleged compelling state interest.

114.    NYAG seeks, under color of state law, to impute the actions of four individuals to over five million members and subject them to statutory dissolution liability on a theory of corporate fraud or alternately under laws allowing dissolution where executives have looted a corporation, despite clear court precedent disallowing such a severe remedy. Any such reading of New York's Not-for-Profit Law Sections 1101 or 1102 would be unconstitutional when applied to organizations such as the NRA that are engaged in constitutionally protected speech.

115.    The NRA is entitled to a declaratory judgment that allegations of executive misconduct do not constitute corporate fraud or criminality and that Sections 1101 and 1102 are unconstitutional as-applied to the NRA absent such a showing.

## XII.

## DEMAND FOR JURY TRIAL

116.    The NRA hereby demands a trial by jury on all issues so triable.

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

## XIII.

## REQUEST FOR RELIEF

WHEREFORE the NRA respectfully requests that the Court enter judgment in the Plaintiff NRA's favor and against Defendant James, as follows:

a.     Declaring, pursuant to 28 U.S.C. § 2201, that James violated the NRA's rights to free speech under both the Federal and New York State Constitutions;

b.     Declaring, pursuant to 28 U.S.C. § 2201, that James violated the NRA's equal protection rights under both the Federal and New York State Constitutions;

c.     Declaring, pursuant to 28 U.S.C. § 2201, that James violated the NRA members' rights to free association under both the Federal and New York State Constitutions;

d.     Declaring that Sections 1101 and 1102(d) of New York's Not-for-Profit Law are unconstitutional insofar as they may be used—as the NYAG attempts to do here—to dissolve organizations engaged in constitutionally protected activities based solely on allegations of executive looting;

e.     Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, preventing NYAG from further pursuing its dissolution causes of action;

f.     Granting a preliminary and permanent injunction, pursuant to 28 U.S.C. § 1651(a), 42 U.S.C. § 1983, and Rule 65 of the Federal Rules of Civil Procedure, ordering James, the Charities Bureau, its agents, representatives, employees and servants and all persons and entities in concert or participation with it and James (in her official capacity), to immediately cease and refrain from engaging in any further conduct or activity which has the purpose or effect of

interfering with the NRA's exercise of the rights afforded to it under the First Amendment to the United States Constitution and Sections 8, 9 and 11 of the New York State Constitution;

g.   Granting such other injunctive or equitable relief to which the NRA is entitled;

h.   Awarding the NRA actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

i.   Awarding the NRA exemplary or punitive damages;

j.   Awarding the NRA pre-judgment and post-judgment interest at the highest lawful rates;

k.   Awarding the NRA such costs and disbursements as are incurred in prosecuting this action, including reasonable attorneys' and experts' fees; and

l.   Granting the NRA such other and further relief as this Court deems just and proper.


Dated: October 9, 2020

                              Respectfully submitted,


                              By:   _/s/ William A. Brewer III_____
                                 William A. Brewer III
                                 wab@brewerattorneys.com
                                 Sarah B. Rogers
                                 sbr@brewerattorneys.com
                                 Jennifer H. Blecher
                                 jhb@brewerattorneys.com

                              **BREWER, ATTORNEYS & COUNSELORS**
                              750 Lexington Avenue, 14th Floor
                              New York, New York 10022
                              Telephone: (212) 489-1400
                              Facsimile: (212) 751-2849

                              **ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA**


Page **42** of 42

NATIONAL RIFLE ASSOCIATION OF AMERICA'S
AMENDED COMPLAINT AND JURY DEMAND

# EXHIBIT C

**Case Caption:** **People of the State of New York, by Letitia James, Attorney General of the State of New York v. The National Rifle Association of America, Inc. et al**

**Judge Name:** **Joel M Cohen**

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|---|---|---|---|---|
| 1 | SUMMONS + COMPLAINT | Processed | 08/06/2020 | Stern, E. |
| 2 | NO FEE AUTHORIZATION (LETTER/ORDER/AFFIRMATION) | Processed | 08/06/2020 | Stern, E. |
| 3 | EXHIBIT(S) Bylaws | Processed | 08/06/2020 | Stern, E. |
| 4 | EXHIBIT(S) Employee Handbook | Processed | 08/06/2020 | Stern, E. |
| 5 | EXHIBIT(S) Policy Manual | Processed | 08/06/2020 | Stern, E. |
| 6 | EXHIBIT(S) Updated Corporate Ethics Policy | Processed | 08/06/2020 | Stern, E. |
| 7 | RJI -RE: OTHER Assignment to Commercial Division | Processed | 08/06/2020 | Stern, E. |
| 8 | ADDENDUM - COMMERCIAL DIVISION (840C) | Processed | 08/06/2020 | Stern, E. |
| 9 | NOTICE OF APPEARANCE (PRE RJI) | Processed | 08/06/2020 | Wang, W. |
| 10 | NOTICE OF REJECTION | Processed | 08/09/2020 | Rogers, S. |
| 11 | COMPLAINT (AMENDED) Corrected Verification ONLY | Processed | 08/10/2020 | Stern, E. |
| 12 | STIPULATION - SERVICE Stipulation of Service and Extension of Time to Answer as to Def. Wilson Phillips | Processed | 08/19/2020 | Connell, M. |
| 13 | STIPULATION - SERVICE Stipulation of Service and Extension of Time to Answer as to Def. Joshua Powell | Processed | 08/21/2020 | Wang, W. |
| 14 | NOTICE OF APPEARANCE (POST RJI) - *Corrected* Notice of Appearance - James Sheehan | Processed | 08/26/2020 | Wang, W. |
| 15 | AFFIRMATION/AFFIDAVIT OF SERVICE Affidavit of Service on Defendant John Frazer | Processed | 08/25/2020 | Wang, W. |
| 16 | AFFIRMATION/AFFIDAVIT OF SERVICE | Processed | 08/29/2020 | Connell, M. |
| 17 | EXHIBIT(S) Affidavit of Attempted Service | Processed | 08/29/2020 | Connell, M. |
| 18 | EXHIBIT(S) Affidavits of Service Upon Home | Processed | 08/29/2020 | Connell, M. |
| 19 | EXHIBIT(S) Affidavits of Service on Business | Processed | 08/29/2020 | Connell, M. |
| 20 | STIPULATION - TIME TO ANSWER | Processed | 09/02/2020 | Rogers, S. |
| 21 | NOTICE OF APPEARANCE (POST RJI) | Processed | 09/11/2020 | Fleming, W. |
| 22 | NOTICE OF APPEARANCE (POST RJI) | Processed | 09/14/2020 | Fleming, W. |

| Doc# | Document Type/Information | Status | Date Received | Filed By |
|------|---------------------------|--------|---------------|----------|
| 23 | STIPULATION - OTHER - ( REQUEST TO SO ORDER ) STIPULATION AND REQUEST TO SO ORDER ENLARGEMENT OF PAGE LIMITS | Processed | 09/14/2020 | Rogers, S. |
| 24 | STIPULATION - TIME TO ANSWER | Processed | 09/15/2020 | Rogers, S. |
| 25 | STIPULATION - TIME TO ANSWER | Processed | 09/16/2020 | Fleming, W. |
| 26 | LETTER APPLICATION TO ADMINISTRATIVE JUDGE REQUESTING ASSIGNMENT TO COMMERCIAL DIVISION | Processed | 09/16/2020 | Rogers, S. |
| 27 | STIPULATION - SO ORDERED | Processed | 09/16/2020 | Court User |
| 28 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 09/16/2020 | Fleming, W. |
| 29 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 09/18/2020 | Stern, E. |
| 30 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 09/18/2020 | Rogers, S. |
| 31 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 09/23/2020 | Rogers, S. |
| 32 | LETTER / CORRESPONDENCE TO JUDGE | Processed | 09/23/2020 | Liggio, C. |
| 33 | NOTICE OF APPEARANCE (POST RJI) | Processed | 09/24/2020 | Brewer, W. |
| 34 | STIPULATION - TIME TO ANSWER | Processed | 09/24/2020 | Rogers, S. |
| 35 | STIPULATION - TIME TO ANSWER | Processed | 09/29/2020 | Stern, E. |
| 36 | NOTICE OF APPEARANCE (POST RJI) | Processed | 09/30/2020 | Correll, P. |
| 37 | ADMINISTRATIVE ORDER GRANTING/DENYING REQUEST TO ASSIGN CASE TO COMMERCIAL DIVISION | Processed | 10/02/2020 | Court User |
| 38 | STIPULATION - TIME TO ANSWER | Processed | 10/16/2020 | Fleming, W. |

# **EXHIBIT D**

# U.S. District Court
# Northern District of New York - Main Office (Syracuse) [NextGen CM/ECF Release 1.3 (Revision 1.3.6)] (Albany)
# CIVIL DOCKET FOR CASE #: 1:20-cv-00889-MAD-TWD

| | |
|---|---|
| National Rifle Association of America v. James | Date Filed: 08/06/2020 |
| Assigned to: U.S. District Judge Mae A. D'Agostino | Jury Demand: Plaintiff |
| Referred to: Magistrate Judge Therese Wiley Dancks | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983 Civil Rights Act | Jurisdiction: Federal Question |

## Plaintiff

**National Rifle Association of America**     represented by   **Sarah Rogers**
Brewer Attorneys & Counselors
750 Lexington Avenue, Floor 14
New York, NY 10022
212-489-1400
Email: sbr@brewerattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William A Brewer , III**
Brewer, Attorneys & Counselors
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4000
Email: wab@brewerattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

## Defendant

**Letitia James**
*both individually and in her official capacity*                  represented by   **Monica Anne Connell**
New York State Attorney General - New York Office
28 Liberty Street
New York, NY 10005
212-416-8965
Fax: 212-416-6009
Email: monica.connell@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephen Thompson**
Office of Attorney General - NY Office
28 Liberty Street
New York, NY 10005
212-416-6183

Email: stephen.thompson@ag.ny.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/06/2020 | 1 | COMPLAINT against Letitia James (Filing fee $400 receipt number ANYNDC-5196425) filed by National Rifle Association of America. (Attachments: # 1 Civil Cover Sheet) (mgh) (Entered: 08/06/2020) |
| 08/06/2020 | 2 | Summons Issued as to Letitia James. (mgh) (Entered: 08/06/2020) |
| 08/06/2020 | 3 | G.O. 25 FILING ORDER ISSUED: Initial Conference set for 11/4/2020 09:30 AM before Magistrate Judge Therese Wiley Dancks. Civil Case Management Plan must be filed and Mandatory Disclosures are to be exchanged by the parties on or before 10/28/2020. All conferences are conducted by telephone. Plaintiff's attorney will initiate the call (unless the Court directs differently) and shall contact Judge Dancks' Chambers at 315-234-8618 (a dedicated line solely for telephone conferences) once all parties are on the line. Counsel may use a teleconferencing service for assistance initiating conference calls to the Court. For cases involving pro se parties, the Court will initiate the call for the Rule 16 Conference. Pro se parties are instructed to provide the Court with a telephone number where they may be reached for a conference call. (Pursuant to Local Rule 26.2, mandatory disclosures are to be exchanged among the parties but are NOT to be filed with the Court.) (mgh) (Entered: 08/06/2020) |
| 08/06/2020 | 4 | TEXT-ONLY NOTICE REGARDING JUDGE D'AGOSTINO CASE DISPOSITION PILOT - Please refer to the Individual Rules and Practices of the Hon. Mae A. D'Agostino, U.S. District Judge, for guidance regarding the Case Disposition Pilot. https://www.nynd.uscourts.gov/sites/nynd/files/MAD_Rules_of_Practice_04_14_2020.pdf. (mgh) (Entered: 08/06/2020) |
| 08/11/2020 | 5 | AFFIDAVIT of Service for Summons, Complaint, Civil Cover sheet and Notice from Court served on Letitia James, in her Official Capacity on 8/10/20, filed by National Rifle Association of America. (Rogers, Sarah) (Entered: 08/11/2020) |
| 08/11/2020 | 6 | AFFIDAVIT of Service for Summons, Complaint, Civil Cover sheet and Notice from Court served on Letitia James, in her Individual Capacity on 8/21/20 (Pursuant NY CPLR 308(2), service shall be complete 10 days after filing this proof of service), filed by National Rifle Association of America. (Rogers, Sarah) (Entered: 08/11/2020) |
| 08/12/2020 | | ***Answer due date updated for Letitia James answer due 8/31/2020. (mgh) (Entered: 08/12/2020) |
| 08/31/2020 | 7 | NOTICE of Appearance by Stephen Thompson on behalf of Letitia James (Thompson, Stephen) (Entered: 08/31/2020) |
| 08/31/2020 | 8 | Pre-Motion Letter by Letitia James requesting a pre-motion conference submitted to Judge D'Agostino. MAD Pre-Motion Response Deadline 9/3/2020 (Thompson, Stephen) (Entered: 08/31/2020) |
| 09/01/2020 | 9 | NOTICE of Appearance by Monica Anne Connell on behalf of Letitia James (Connell, Monica) (Entered: 09/01/2020) |
| 09/08/2020 | | TEXT NOTICE of Teleconference: A Telephone Pre-motion Conference is set for 9/18/2020 at 12:00 PM in Albany before U.S. District Judge Mae A. D'Agostino;The parties are directed to dial in at 1-877-336-1829, Access code 4142594, Security code 1234.(ban) (Entered: 09/08/2020) |

| 09/18/2020 | | TEXT Minute Entry for Telephone Pre-Motion Conference held on 9/21/2020 before U.S. District Judge Mae A. D'Agostino: Appearances by Sarah Rogers, Esq. for the Plaintiff; Monica Anne Connell, AAG, Stephen Thompson, AAG, and Yael Fuchs, AAG for the defendants; Judge D'Agostino addresses counsel regarding their pre-motion letters; Plaintiff's counsel informs the Court that they intend to amend their complaint - the Court grants the request to amend. The plaintiff should file their amended complaint ASAP; The defendant's have permission to file a motion to dismiss - Judge D'Agostino directs defendants to hold off on filing their motion to dismiss, until the plaintiff files an amended complaint. (Court Reporter Theresa Casal, CRD Britney Norton [Time 12:09 p.m. - 12:30 p.m.]) (ban) Modified on 9/21/2020 - corrected hearing date to 9/18/20 (ban). (Entered: 09/21/2020) |
| 09/29/2020 | 10 | TEXT ORDER: Court has reviewed docket and notes that District Judge D'Agostino granted Plaintiff's request to amend complaint during the 9/18/2020 pre-motion conference. Plaintiff to file amended complaint by 10/5/2020. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 9/29/2020. (sg ) (Entered: 09/29/2020) |
| 10/05/2020 | 11 | Letter Motion from Sarah B. Rogers for National Rifle Association of America requesting Extension of time to file amended complaint submitted to Judge Dancks . (Rogers, Sarah) (Entered: 10/05/2020) |
| 10/05/2020 | 12 | TEXT ORDER granting Plaintiff's 11 Letter Request for extension of time to file amended complaint for the reasons stated therein. Plaintiff to file amended complaint by 10/9/2020. SO ORDERED by Magistrate Judge Therese Wiley Dancks on 10/5/2020. (sg ) (Entered: 10/05/2020) |
| 10/09/2020 | 13 | AMENDED COMPLAINT against Letitia James filed by National Rifle Association of America. (Attachments: # 1 Exhibit(s) State Dissolution Action Complaint and Exhibit 1 and 2, # 2 Exhibit(s) State Dissolution Action Exhibits 3 and 4 to the Complaint)(Rogers, Sarah) (Entered: 10/09/2020) |

| **PACER Service Center** | | | |
| --- | --- | --- | --- |
| **Transaction Receipt** | | | |
| 10/19/2020 10:16:33 | | | |
| **PACER Login:** | srogers2883 | **Client Code:** | 2277-20/sbr |
| **Description:** | Docket Report | **Search Criteria:** | 1:20-cv-00889-MAD-TWD |
| **Billable Pages:** | 3 | **Cost:** | 0.30 |

# EXHIBIT E

| Persons Likely to Possess Relevant Knowledge And / Or Documents - Current NYAG Litigation and Other Federal Actions | | | | | |
|---|---|---|---|---|---|
| Name | Location | NYAG | AMc | Stinchfield | Dell'Aquila |
| 5.11 Tactical, Corporate Representative | Irvine, CA | X | X | X | |
| Ackerman McQueen, Inc. | Oklahoma City, OK | X | X | X | X |
| Adcor Defense, Corporate Representative | Highland, MD | X | X | X | |
| Aitken, Michael | Manassas, VA | X | X | X | |
| Allegiance Creative Group, Corporate Representative | Fairfax, VA | X | X | X | X |
| Almand, Travis | Allen, TX | X | X | X | |
| American Clean Skies Foundation, Corporate Representative | Washington, DC | X | X | X | |
| Associated Television International, Corporate Representative | Los Angeles, CA | X | X | X | X |
| Atlantis Resort, Corporate Representative | Paradise Island, Bahamas | X | | | X |
| Autaubo, Rodney | Dallas, TX | X | X | X | |
| Azato, Dennis | Manassas, VA | X | X | X | |
| Bach, Scott | Newfoundland, NJ | X | X | X | X |
| Baggett, Don | Atlanta, GA | X | | | |
| Berthelot, Charles | Fort Worth, TX | X | X | X | |
| Betts, Gina | Dallas, TX | X | X | X | |
| Boren, Dan | Edmond, OK | X | X | X | X |
| Borja, Lorannda | Lawrenceburg, TN | X | | | X |
| Brown, Robert | Boulder, CO | X | X | X | X |
| Brownell, Pete | Montezuma, IA | X | X | X | X |
| Butz, Dave | Swansea, IL | X | X | X | X |
| Cabela's Outdoor Fund, Corporate Representative | Sidney, NE | X | X | X | |
| Campbell, Chester | Richardson, TX | X | X | X | |
| Chesapeake Energy Corporation, Corporate Representative | Oklahoma City, OK | X | X | X | |
| Chesney, Todd | Chino Valley, AZ | X | | | X |
| Chestnut, Mark | Jenks, OK | X | X | X | |
| Childress, Richard | Lexington, NC | X | X | X | X |
| Collins, Idehen (aka Colin Noir) | Dallas, TX | X | X | X | |
| Colt Manufacturing, Corporate Representative | West Hartford, CT | X | X | X | |
| Compass Real Estate Corporate Representative | Austin, TX | X | X | | |
| Concord Social & Public Relations, Corporate Representative | Fairfax, VA | X | X | X | X |
| Cors, Alan | McLean, VA | X | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| Cotton, Charles | Dallas, TX | X | X | X | X |
| Cox, Christopher | Alexandria, VA | X | X | X | X |
| Cox, Courtney | Alexandria, VA | X | | | |
| Coy, David | Adrian, MI | X | X | X | X |
| Cremer, Lacey | Dallas, TX | X | X | X | X |
| Crow Shooting Supply Inc., Corporate Representative | Montezuma, IA | X | | | |
| Cummins, Emily | Virginia Beach, VA | X | X | X | X |
| CXIII Rex, Corporate Representative | Alexandria, VA | X | X | X | X |
| Darley, Brian | Dallas, TX | X | X | X | |
| Dell'Aquila, David | Nashville, TN | X | | | X |
| Detwiler, Amy | Dallas, TX | X | X | | |
| Foster, Natalie | El Dorado, AR | X | X | X | |
| Froman, Sandra | Tucson, AZ | X | X | X | X |
| Gallagher, Coleen | New Buffalo, MI | X | | | X |
| Golob, Julie | Kearney, MO | X | X | X | X |
| GPI-M Uptown, LP, Corporate Representative | Dallas, TX | X | X | X | |
| Graeter's Ice Cream, Corporate Representative | Cincinnati, OH | X | | | |
| Greater Oklahoma City Chamber of Commerce, Corporate Representative | Oklahoma City, OK | X | X | X | |
| Greenberg, Jesse | Dallas, TX | X | X | X | X |
| GS2 Enterprises, Corporate Representative | Woodland Hills, CA | X | X | X | X |
| Hammer, Marion | Tallahassee, FL | X | X | X | X |
| Hart, Steve | Washington DC | X | X | X | X |
| HBC Auditors & Advisors, Corporate Representative | Oklahoma City, OK | X | X | X | |
| Himes, Josh | Dallas, TX | X | X | X | |
| HomeTelos, LP, Corporate Representative | Dallas, TX | X | | | X |
| Hornady Manufacturing Company, Corporate Representative | Grand Island, NE | X | X | X | |
| HWS Consulting Inc., Corporate Representative | Grasonville, MD | X | | | |
| Integris Health, Inc., Corporate Representative | Oklahoma City, OK | X | X | X | |
| International Order of St. Hubertus, Corporate Representative | Washington DC | X | | | X |
| Inventive Incentive & Insurance Services Inc., Corporate Representative | Woodland Hills, CA | X | X | X | X |
| Ives, Michael | Memphis, TN | X | X | X | |

| | | | | | |
|---|---|---|---|---|---|
| Keene, David | Washington, MD | X | X | X | X |
| Knight, Timothy | Signal Mountain, TN | X | X | X | X |
| Landini Brothers Restaurant, Corporate Representative | Alexandria, VA | X | X | X | X |
| Landini, Noe | Alexandria, VA | X | X | X | X |
| LaPierre, Susan | Great Falls, VA | X | X | X | X |
| Leapfrog Enterprises, Corporate Representative | Emeryville, CA | X | X | X | |
| Lee, Willes | Fairfax, VA | X | X | X | X |
| Ling, Il | Meridian, ID | X | X | X | X |
| Lipe, Rodney | Dallas, TX | X | X | X | |
| Lockton Affinity LLC, Corporate Representative | Overland Park, KS | X | X | | |
| Loesch, Chris | Southlake, TX | X | X | X | |
| Loesch, Dana | Southlake, TX | X | X | X | |
| Makris, Anthony | Alexandria, VA | X | X | X | X |
| Maloney, Sean | Liberty Township, OH | X | X | X | X |
| Marcellin, Michael | Leesburg, VA | X | | | X |
| Martin, Edmund | Edmond, OK | X | X | X | X |
| Martin, Henry | Dallas, TX | X | X | X | X |
| McKenna & Associates, Corporate Representative | Arlington, VA | X | X | | |
| McKenzie, David | Los Angeles, CA | X | X | X | X |
| McKenzie, Laura | Los Angeles, CA | X | X | X | X |
| McQueen, Katie | Oklahoma City, OK | X | X | X | X |
| McQueen, Revan | Oklahoma City, OK | X | X | X | X |
| Meadows, Carolyn | Atlanta, GA | X | X | X | X |
| Membership Marketing Partners, Corporate Representative | Fairfax, VA | X | X | X | X |
| Mercury Group, Inc. | Oklahoma City, OK (AMc headquarters) | X | X | X | X |
| Mitchell, Guy | Celina, TX | X | X | X | |
| Mojack Distributors, Corporate Representative | Wichita, KS | X | X | X | |
| Montgomery, Melanie | Dallas, TX | X | X | X | |
| Mossberg Corporation, Corporate Representative | North Haven, CT | X | X | X | |
| New Jersey Rifle and Pistol Clubs, Inc., Corporate Representative | Highland Lakes, NJ | X | | | |
| North, Oliver | Bluemont, VA | X | X | X | X |
| Nosler, Inc., Corporate Representative | Bend, OR | X | X | X | |
| Nosler, Robert | Bend, OR | X | X | X | X |

| | | | | | |
|---|---|---|---|---|---|
| Nugent, Shemane | China Spring, TX | X | X | X | X |
| Nugent, Ted | China Spring, TX | X | X | X | X |
| Oklahoma Department of Tourism and Recreation, Corporate Representative | Oklahoma City, OK | X | X | X | |
| Oklahoma Gas & Electric, Corporate Representative | Oklahoma City, OK | X | X | X | |
| Oklahoma State University Foundation, Corporate Representative | Stillwater, OK | X | X | X | |
| Olson, Lance | Marengo, IA | X | X | X | X |
| Omni Air Transport, Corporate Representative | Hartford, CT | X | X | X | X |
| Payne, Tammy | Oklahoma City, OK | X | X | X | |
| Phillips, Woody | Dallas, TX | X | X | X | X |
| Plunkett, Jaqueline | Washington DC | X | X | X | X |
| Popp, John | Springfield, VA | X | X | X | |
| Porter, James | Birmingham, AL | X | X | X | X |
| Powell, Jim | Plainview, MI | X | X | X | |
| Powell, Josh | New Buffalo, MI | X | X | X | X |
| RCR Enterprises, Inc., Corporate Representative | Lexington, NC | X | | | |
| Remington Firearms, Corporate Representative | Madison, NC | X | X | X | |
| Rendon Group, Corporate Representative | Washington, DC | X | X | X | X |
| Richards, Nancy | Dallas, TX | X | | | X |
| RSM, Corporate Representative | Chicago, IL | X | X | X | X |
| Schmeits, Ron | Raton, NM | X | X | X | X |
| Schneider, Esther | Driftwood, TX | X | X | X | X |
| Selfridge, Edward | Dillwyn, VA | X | X | X | |
| Senior Star, Corporate Representative | Tulsa, OK | X | X | X | |
| Sheets, Wayne | Grasonville, MD | X | | | X |
| Simone, Ginny | Naples, FL | X | X | X | |
| Sinisi, Denise | Colleyville, TX | X | X | X | |
| Six Flags of America, Corporate Representative | Bowie, MD | X | X | X | |
| Sloan, Gurney | Colorado Springs, CO | X | X | X | X |
| Smith & Wesson, Corporate Representative | Springfield, MA | X | X | X | |
| SPECTRE, Corporate Representative | New Buffalo, MI | X | | | |
| SpiritWild Productions, Corporate Representative | China Spring, TX | X | | | X |

| | | | | | |
|---|---|---|---|---|---|
| Stanford, Gayle | Woodland Hills, CA | X | X | X | X |
| Sterner, Colleen | Merna, NE | X | X | X | X |
| Sterner, Terry | Merna, NE | X | X | X | X |
| Stinchfield, Grant | Dallas, TX | X | X | X | |
| Sturm, Ruger & Co., Corporate Representative | Newport, NH | X | | | |
| Szucs, George | McKinney, TX | X | X | X | |
| Tavangar, Nader | Alexandria, VA | X | X | X | |
| Titus, Kristy | Prineville, OR | X | X | X | |
| Turner, Clay | Colorado Springs, CO | X | X | X | |
| Under Wild Skies, Corporate Representative | Alexandria, VA | X | X | X | X |
| Unified Sportsmen of Florida, Corporate Representative | Tallahassee, FL | X | | | |
| Valinski, David | Palm Coast, FL | X | X | X | X |
| Varney, Alexander | Wylie, TX | X | X | X | |
| Vista Outdoor Inc., Corporate Representative | Anoka, MN | X | X | X | |
| Walters, Ian | West Accokeek, MD | X | X | | |
| Warner, Carl | Dallas, TX | X | X | X | |
| Weaver, Kyle | Missoula, MT | X | X | X | X |
| Weber, Brent | Andover, KS | X | | | X |
| Whatcott, Jace | Dallas, TX | X | X | X | |
| WHIP LLC, Corporate Representative | Austin, TX | X | | | |
| Williams Companies, Inc., Corporate Representative | Tulsa, OK | X | X | X | |
| Winkler, Brandon | Dallas, TX | X | X | X | X |
| Winkler, William | Edmund, OK | X | X | X | X |
| Workamajig, Inc., Corporate Representative | Oakhurst, NJ | X | X | X | |
| WPX Energy, Corporate Representative | Tulsa, OK | X | X | X | |

# DECLARATION OF MICHAEL J. COLLINS IN SUPPORT OF THE NATIONAL RIFLE ASSOCIATION'S MOTION TO TRANSFER CASES FOR CONSOLIDATED PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

I, Michael J. Collins, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.     I am over twenty-one years of age, and fully competent to make this declaration. I am a partner with the law firm of Brewer, Attorneys & Counselors ("BAC"), 1717 Main Street, 59th Floor, Dallas, Texas 75201. I respectfully submit this declaration in support of the NRA's Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 (the "Consolidation Motion"). Unless otherwise stated, I have personal knowledge of all matters stated herein.

2.     I am counsel for the National Rifle Association of America (the "NRA") in the matter captioned Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al., Civ. Case No. 3-19-cv-02074-G (N.D. Tex.) (the "Ackerman Litigation"). I am also counsel for the NRA in connection with a previous, and now stayed group of consolidated lawsuits in Virginia State Court between Ackerman McQueen, Inc. ("Ackerman") and the NRA (such lawsuits, the "Previous Virginia Ackerman Litigation").[1] On March 18, 2020, the Previous Virginia Ackerman Litigation was stayed by the Circuit Court for the City of Alexandria, Virginia during the midst of fact discovery, on the ground that it overlapped with, and posed a risk of inconsistent adjudications in light of, the federal Ackerman Litigation.[2]

---

[1] See National Rifle Association of America v. Ackerman McQueen, Inc., and Mercury Group, Inc., Cons. Case Nos. CL19002067; CL19001757; CL19002886 (Va. Cir. Ct.) (the "Previous Virginia Ackerman Litigation").

[2] See Order granting Defendants' Motion to Stay Proceedings, filed in Case Nos. CL19001757, CL19002067, and CL19002886, dated March 18, 2020.

3. Attached as Exhibit A hereto is true and correct copy of Plaintiff's First Amended Complaint, filed on October 25, 2019, in the Ackerman Litigation, which is the operative pleading setting forth the NRA's claims therein.

4. Attached hereto as Exhibit B is a true and correct copy of Defendants' Amended Answer And Defendant/Counter-Plaintiff Ackerman McQueen, Inc.'s Amended Counterclaim And Third-Party Complaint, filed on November 15, 2019, in the Ackerman Litigation, which is the operative pleading setting forth Ackerman's counterclaims and affirmative defenses therein.

5. Attached hereto as Exhibit C is a true and correct copy of the current docket summary for the Ackerman Litigation, generated via PACER/ECF.

6. The Ackerman Litigation is currently in the discovery phase. Attached as Exhibit D hereto is a true and correct copy of the Scheduling Order entered on October 13, 2020 by the court.

7. Although the COVID-19 pandemic delayed discovery in the Ackerman Litigation during the first half of 2020, the Previous Virginia Ackerman Litigation, which involved similar parties and issues, provides a preview of the volume and breadth of witnesses and documents likely to be relevant to the Ackerman Litigation. In the Previous Virginia Ackerman Litigation, 59,880 pages of documents had been produced at the time the action was stayed, and 15 depositions had occurred, with at least 5 additional depositions anticipated. In the Ackerman Litigation, 36 third-party subpoenas were issued. A list of third-party witnesses likely to have relevant knowledge or documents is attached hereto as Exhibit E.

8. The NRA's principal place of business is located in Fairfax, Virginia, and many witnesses referenced on Exhibit E are located in Fairfax, Virginia. Therefore, Virginia state court

could reasonably have been expected to provide a convenient forum for the Previous Virginia Ackerman Litigation. However, the United States District Court for the Northern District of Texas is an efficient forum for litigating the same issues and accessing relevant witnesses.

9.     Upon information and belief, Ackerman is headquartered in Oklahoma City, Oklahoma, and during the relevant time period maintained an office in Dallas, Texas. Many of the allegations in the Ackerman Litigation involve a digital streaming service known as NRATV which was produced and administered by Ackerman, with most relevant functions conducted out of Ackerman's Dallas office. Therefore, key witnesses and documents exist in convenient proximity to the Northern District of Texas. The ability to subpoena witnesses nationwide, rather than domesticate subpoenas state-by-state, has also proved useful given the multiplicity of witnesses scattered across the country. In addition, Magistrate Judge Renee H. Toliver is overseeing discovery.

10.     Significant issues of fact in the Ackerman Litigation include: the NRA's dealings with its former public relations agency, Ackerman McQueen, Inc. ("Ackerman"),[3] including knowledge and intent on the part of NRA executives regarding Ackerman's activities and billing;[4] the NRA's stewardship of its finances;[5] and the veracity of allegations of misspending by former NRA fiduciaries· including Lt. Col. Oliver North.[6]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

---

[3] *See* Ex. A ¶¶ 14-20.

[4] *See* Ex. A ¶¶ 130-136.

[5] *See* Ex. B, p. 77 ¶¶ 1-4.

[6] *See* Ex. A, ¶¶ 64-69.

Executed this 20th day of October 2020 in Dallas, Texas.

/s/
_____
Michael J. Collins

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **NATIONAL RIFLE ASSOCIATION OF AMERICA,** §<br>§<br>**Plaintiff and Counter-Defendant,** §<br>§<br>**and** §<br>§<br>**WAYNE LAPIERRE,** §<br>§<br>**Third-Party Defendant,** §<br>§<br>**v.** §<br>§<br>**ACKERMAN MCQUEEN, INC.,** §<br>§<br>**Defendant and Counter-Plaintiff,** §<br>§<br>**and** §<br>§<br>**MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG,** §<br>§<br>§<br>§<br>**Defendants.** §<br>§ | **Civil Action No. 3:19-cv-02074-G** |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff the National Rifle Association of America (the "NRA" or the "Association") files this First Amended Complaint against defendants Ackerman McQueen, Inc. ("Ackerman"), Mercury Group, Inc. ("Mercury" and, together with Ackerman, "AMc"), Henry Martin ("Martin"), William Winkler ("Winkler"), Melanie Montgomery ("Montgomery"), and Jesse Greenberg ("Greenberg," together with Martin, Winkler, Montgomery and AMc, the "Defendants"), on personal knowledge as to its own actions and on information and belief as to all other matters, as follows:

1

## I.

## PRELIMINARY STATEMENT

The NRA adds these additional allegations and claims in order to expose a stunning pattern of corruption, fraud, and retaliation by Defendants that continues to come to light. Since the NRA terminated its relationship with AMc last Spring, newly unearthed text messages, emails, and interviews with former AMc employees, customers, and others have made two things abundantly clear: *First*, AMc exploited decades of trust and confidence in order to siphon assets from the NRA, lining the agency's pockets at the expense of its client and in violation of the law. *Second*, AMc went to outrageous lengths to conceal and sustain its fraud, deploying scorched-earth tactics against anyone who dared to scrutinize its conduct. When the NRA's CEO, Wayne LaPierre, threw his weight behind efforts to gain transparency into AMc's business practices, the agency tried to oust him from the NRA in a desperate final salvo. That scheme failed. AMc now faces a long-overdue reckoning.

Until recently, the NRA could never have predicted that it would find itself at odds with its longtime advisor and vendor. Since at least the 1980s, the NRA relied on AMc as its agent to develop messaging, place advertising, and assist it in times of crisis. AMc's pugnacious messaging, reflected in its work with former NRA president Charlton Heston, favorably impressed NRA stakeholders. However, by 2017, the NRA was paying tens of millions to AMc annually, and many within the Association had grown suspicious that its experiment with a branded digital media platform was not working. The experiment had begun at the inducement of AMc in 2016 and with the intent to foster NRA membership growth, generate revenue and donations, and create a forum for singularly promoting the NRA's viewpoint on Second Amendment issues. This became known as NRATV.

2

As AMc's bills grew ever larger, NRATV's messaging strayed from the Second Amendment to themes which some NRA leaders found distasteful and racist.[1]  One particularly damaging segment featured children's cartoon characters adorned in Ku Klux Klan hoods. Unfortunately, attempts by the NRA to "rein in" AMc and its messaging were met with responses from AMc that ranged from evasive to hostile.  At the same time, when NRA executives sought performance metrics for NRATV, AMc contrived a pretext to demand that each interlocutor be sidelined or fired.  Simultaneously, in closed-door meetings with Mr. LaPierre (which AMc insisted remain "confidential"), the agency presented fabricated and inflated sponsorship and viewership claims.  The simple request for the number of "unique visitors" to the site was not answered, despite multiple attempts by Mr. LaPierre and other NRA executives.  In fact, AMc's representations to the NRA leadership regarding the viewership for the digital platform it created, presented, and administered were, by 2017, intentionally (and wildly) misleading.  Tellingly, when NRATV finally shut down in June 2019, no one missed it: not a single sponsor or viewer even called, confirming what at least some NRA executives suspected—the site had limited visibility and was failing the accomplish any of its goals.

Sadly, it is also now known that AMc's abuse of the trust placed in the agency neither began nor ended with NRATV.  Since commencing its investigation into AMc's alleged abuses, the NRA has acquired documents and information indicating that AMc fraudulently double-billed the NRA (and perhaps other clients) for professional time and equipment needs, among other things.  For example, during 2018, AMc billed the NRA for time spent by one of its highest-paid

---

[1] *See, e.g.*, Danny Hakim, *Incendiary N.R.A. Videos Find New Critics: N.R.A. Leaders*, THE NEW YORK TIMES (Mar. 11, 2019), https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

3

employees, Lt. Col. Oliver North ("North"), for filming an NRATV documentary series.  However, very little filming took place—because North was negligent in his contractual duties, as he focused time and energy in 2018 attempting to derail the NRA's inquiries into AMc's business and billing practices.  Those attempts culminated in an extortion threat delivered during the NRA's Annual Meeting in April 2019, when AMc, via North, demanded that unless Mr. LaPierre immediately withdrew the pending lawsuit against it and resigned from office, AMc would publicize portions of confidential documents misleadingly curated to cause maximum reputational harm to the NRA.  After Mr. LaPierre rebuffed AMc's threat and reported it to the entire Board of Directors of the NRA in an open letter, one of the agency's co-conspirators lamented privately: "[h]e is kicking our side's ass," and stated that Mr. LaPierre's challengers would benefit from "leak[ing] AMc's info."  Immediately, in stark violation of its contractual and fiduciary duties, AMc proceeded to "leak" the threatened documents.  To this day, AMc continues to breach its nondisclosure obligations and wage false, punitive reputational attacks against the NRA and Mr. LaPierre.  Considering the multi-faceted scheme perpetrated on the NRA, it is beyond doubt that AMc and the other Defendants believe they are above the law.

Notwithstanding the termination of the parties' Services Agreement, AMc and the other Defendants continue to improperly refer, directly and indirectly, to the NRA on AMc's website and to use the NRA's intellectual property rights.  Those references and use of associated intellectual property rights are not only unauthorized and unlicensed, but also falsely suggest that the NRA endorses AMc's services in connection with NRATV, which it does not.

AMc's website also includes references to other failed client representations—to create the false impression that *all* of the featured campaigns were successful, including NRATV.  Many of these campaigns, which cost clients tens of millions of dollars, were shut down because of their

4

ineffectiveness, costliness, and Defendants' reluctance to provide specific performance data in accordance with its obligations.  Accordingly, the NRA brings claims to enjoin AMc and the other Defendants from continuing to falsely make claims in public regarding their services to the NRA. In addition, the NRA brings this action to enjoin any further infringing and unauthorized or unlicensed use of its brand or its copyrights on the part of AMc.

Finally, the NRA seeks to redress AMc's breaches, and subdue AMc's ongoing bad acts, so that it can close this regrettable chapter of its history.

## II.

## PARTIES AND RELEVANT NON-PARTIES

### A.    Plaintiff And Counter-Defendant The NRA

1.     Plaintiff the NRA is a not-for-profit corporation organized under the laws of the State of New York with its principal place of business located in Fairfax, Virginia.  The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement.  It is also the foremost defender of the Second Amendment of the United States Constitution.  A 501(c)(4) tax-exempt organization, the NRA has approximately five million members, hundreds of thousands of donors, and many millions more who support its legendary advocacy.

2.     The NRA is the Counter-Defendant to the Counterclaims and Third-Party Claims filed by AMc on October 1, 2019.

5

B.     **Defendants**

3.     Ackerman is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City, Oklahoma.[2]  It admits that is an advertising and public relations agency that counted the NRA as its largest client for more than thirty years.[3]  Ackerman maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced.  That office is located at 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202.  Ackerman is a Defendant in the original action filed by the NRA on August 30, 2019, as well as a Defendant to the additional causes of action asserted in this First Amended Complaint.  It is also a Counterclaimant and Third-Party Plaintiff in connection with the Counterclaims and Third-Party Claims it filed on October 1, 2019.

4.     Defendant Mercury is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Alexandria, Virginia. Mercury is a wholly-owned subsidiary of Ackerman and specializes in public communications strategy, including on behalf of advocacy groups such as the NRA.  Mercury was a party to the Services Agreement (defined below) with the NRA.  Mercury maintains a principal office in Dallas, Texas, from which it serviced the NRA's account.  In particular, that office is located at the same address as Ackerman's Dallas office—1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202.  Mercury engaged in all the wrongful conduct detailed in this amended complaint.

5.     Defendant Winkler resides in Edmond, Oklahoma. Winkler is affiliated with business entities located in this District, including DJ Investments LLC, which operates in this District under the assumed name of 3905 Amherst Ave UPT, LLC and owned property at 3905

---

[2]  ECF No. 12 at p. 4 (Answer to ¶ 7).

[3]  ECF No. 12 at p. 4 (Answer to ¶ 7).

6

Amherst Ave Dallas (University Park), Texas 75225, and WBB Investments LLC, a Texas limited liability company. During the relevant time period, Winkler served in the senior leadership of Ackerman as Chief Financial Officer. He is also a certified public accountant. During the relevant time period, Winkler and other senior AMc officers and employees travelled to this District for meetings with NRA officials at Ackerman's Dallas offices and/or other locations within this District. These activities are relevant to the claims asserted herein because they concerned, among other things, AMc's billing practices and representations about NRATV's performance and viewership. Winkler engaged in wrongful conduct detailed in this amended complaint.

6.      Defendant Montgomery resides in Dallas County, Texas with her place of business located at Ackerman's Dallas, Texas offices. During the relevant time period, Montgomery held several roles, including the Executive Vice President/Management Supervisor, and, as stated on Ackerman's website, has "work[ed] on the [NRA] account."[4]  Montgomery engaged in wrongful conduct detailed in this amended complaint.

7.      Defendant Martin is an individual who resides in Dallas County, Texas. Martin has served as Ackerman's Chief Creative Officer since 2010. During the relevant time period, Martin participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

8.      Defendant Greenberg is an individual who resides in Dallas County, Texas. During the relevant time period, Greenberg served as Ackerman's Chief Strategy Officer. Greenberg participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

---

[4] *See Melanie Montgomery Bio*, https://www.am.com/our-team/?id=melanie-montgomery.

7

C.      **Unnamed, Non-Party Co-Conspirators And Relevant Non-Parties.**

9.      Dan Boren is an individual who is an executive of the Chickasaw Nation and not an employee of AMc.  Mr. Boren entered into an agreement, combination, and/or conspiracy with the Defendants for the purpose of carrying out the fraudulent behavior, the attempt to de-railing the resulting NRA investigation, and the attempt to extort Mr. LaPierre and the NRA alleged herein.  In addition, there exists a small group comprising former vendors, professionals, and consultants of the NRA whose economic incentives, like AMc's, were challenged by the NRA investigation and, like Mr. Boren, joined the agreement, combination, and/or conspiracy.

10.     Oliver North is an individual who resides in South Carolina and/or the Commonwealth of Virginia.  Mr. North is a former president of the NRA. Unbeknownst to the NRA until recently, North is also a full-time employee of Ackerman.

### III.

### JURISDICTION AND VENUE

11.     The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, because this is a civil action involving claims arising under the laws of the United States.

12.     The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims are sufficiently related to the other claims in the action subject to original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.  As stated above, during the relevant time period, NRA senior officers and employees would regularly travel to this

8

District to hold meetings with Defendants.  These meetings are relevant to claims asserted herein and concerned Defendants billing practices and NRATV.  Defendant AMc has also admitted that it maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced.[5] Three Individual Defendants work out of that office, which also doubles as a corporate office for Defendant Mercury.

**IV.**

**FACTUAL BACKGROUND**

### A.  For Decades, The NRA Relied On Ackerman To Perform Public Affairs Services Requiring A High Level of Trust.

14.    The NRA and AMc worked closely together for more than 30 years. In 2017 alone, the NRA paid more than $40 million to AMc. Over that decades-long relationship, the NRA reposed extensive trust and confidence in AMc to perform a wide range of services, including public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the management of NRATV, a digital-media platform frequently perceived by the public as the "voice" of the NRA.[6]  By its nature, this work was publicly and politically sensitive and required the NRA to entrust AMc with confidential (and often privileged) information.

15.    AMc's work on behalf of the NRA was governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed

---

[5] ECF No. 12 at p. 4 (Answer to ¶ 7).

[6] *See, e.g.*, Jeremy W. Peters & Katie Benner, *Where The N.R.A. Speaks First and loudest*, THE NEW YORK TIMES (Feb. 21, 2018), https://www.nytimes.co m/2018 /02/21/us/politics/nratv-nra-news-media-operation.html.

9

by Ackerman should be budgeted and billed. Each Services Agreement provided that certain categories of services, such as Owned Media and Internet Services, would be compensated with an agreed annual fee, while other services were required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA.  Consistent with the sensitive nature of AMc's services, the Services Agreement strictly limits[7] use and disclosure by AMc, and its individual employees (who were themselves fiduciaries of the NRA), of information acquired during AMc's work on behalf of the NRA.

16.    Specifically, Section IV of the Services Agreement provides that AMc "shall not disclose, directly or indirectly, to any third party, any ... data, materials or information ... made known to AMc as a result of AMc's providing [contracted-for services] . . . without the prior express written permission of [the] NRA."[8]  AMc may use the NRA's confidential information "only for the limited purpose of providing its [s]ervices to the NRA,"[9] and AMc "warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors."[10]

17.    Notably, AMc served as the NRA's agent for several purposes pursuant to the Services Agreement and as a consequence of the trust and confidence placed in AMc by the Association. Therefore, AMc owed fiduciary duties to the NRA. For example, the Services Agreement provided for AMc to act "on [the] NRA's behalf," and subject to the NRA's control,

---

[7] AMc's confidentiality obligations survive termination of the 2017 version of the Services Agreement.  *See* Services Agreement § X.E.

[8] *Id.* at § IV.A.I.

[9] *Id.* at § IV.A.3.

[10] *Id.* at § IV.A.4.

10

with respect to purchasing, planning, and placement of media[11]—activities that required the NRA to entrust AMc with nonpublic information about its communication strategy.  In its capacity as the NRA's agent, AMc was required to demonstrate "the same high standard of good faith and loyalty" to the NRA as would be "required ... of an attorney to his client."  Indeed, owing to the parties' decades of close collaboration, their relationship of trust and confidence existed prior to, and apart from, the execution of the Services Agreement. AMc's common-law duties of loyalty were further codified and buttressed by contractual confidentiality provisions.

18.     AMc monthly invoiced the NRA for a wide variety of expenses.  Consistent with the substantial scope and dollar value of the services rendered by AMc for the NRA, the Services Agreement contained detailed guidelines identifying categories of expenses that could be invoiced to the NRA, and conditions for their reimbursement.  For example, hotel and meal expenses were required to be authorized in writing, in advance, by the NRA.  Over the parties' decades-long course of dealing, underlying receipts and other support for AMc's expenses were not transmitted to the NRA alongside AMc's invoices but, rather, were supposedly maintained at AMc's offices. This practice was followed at AMc's suggestion, in order to ensure that AMc's work pertaining to matters such as donor development, strategic planning, and legal items remained confidential.

19.     Of course, the NRA was *repeatedly* assured that appropriate documentation was retained by AMc and could be audited anytime at the NRA's request. Indeed, AMc offered elaborate assurances not only that its recordkeeping was secure and accurate, but that AMc was the *most* secure repository for travel itineraries and other documents raising potential security issues.  It is now known that these representations were false when made, with a specific intent to

---

[11]  *Id.* at §§ I.C, II.B. I.

11

induce the NRA to maintain or increase its reliance on AMc.  The NRA has only recently discovered that for years *no one* kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA.

20.     Given its responsibilities, AMc took an active role in shaping the public image of the NRA's principals and executives, including Mr. LaPierre.  Based on AMc's advice, and subject to billing procedures AMc recommended and established, Mr. LaPierre, over a fifteen-year period, incurred wardrobe and related expenses for countless television appearances, filming of commercials, and other outward-facing brand-development activities. The majority of those activities were specifically directed, choreographed and produced by AMc.  As such, expenses were initiated at AMc's direction and records relating thereto were to be maintained by AMc. Of course, AMc should not have incurred (let alone sought reimbursement for) any expenses which it believed inappropriate.

**B.     Branded News—The Growth of NRATV.**

21.     During the late 1990s, under the leadership of its then-president, AMc decided to radically alter its business from that of a traditional ad agency to a creator and broadcaster of original media content.  AMc saw the growth of digital networks as an opportunity for large entities to craft and advance their own brand messaging through television production.  It saw the content-production business as lucrative, exciting, and cutting-edge, but did not consider or care whether its clients would actually benefit from such services.    If AMc could hawk "television-style production" at a profit, it would do so—and it did.

22.     AMc touted its new business philosophy as follows:

> EVERY BUSINESS AND INDIVIDUAL HAS THE ABILITY TO
> BECOME A MEDIA COMPANY

12

> If you have an audience that cares about what you have to say, you can create and distribute content with complete autonomy. No one else should capture or distribute those stories better than you. And in this era of communication, it has never been more affordable or efficient for you to begin.

23. Of course, fundamental to AMc's optimism about its "new" direction was its belief that it could convince its largest client, the NRA, to "buy into" the concept. Thus, in the early 2000s, AMc set out to induce the NRA to finance the creation of its own branded news platform. Plying the NRA with glowing prognostications about the lucrative benefits of "owned media," AMc persuaded the NRA to launch its initial digital-video platform known as "NRA News" in 2004. The NRA had long relied on AMc to place advertising via traditional media, including conventional television channels. To AMc, the funds remitted to real media outlets were funds available for the Association "to invest" in building studios and other assets from which AMc might profit. NRA News was the beginning of that effort.

24. The annual budget for NRA News quickly, substantially climbed, from $1.6 million in 2004 to $4.594 million by 2014. For example, from 2004 through 2014, there was some evidence that NRA News was attracting the viewership AMc promised: even late at night, live programs with call-in components seemed to be generating promising call volume. AMc generated glossy, confidential PowerPoint presentations—which it would display for the NRA during meetings but would refuse to provide "in writing"—that claimed that NRA News generated tens of millions of valuable engagements and views.

25. Based on the reported success of NRA News, the NRA agreed to experiment with an expanded version of the platform. Beginning in 2016, AMc CEO Angus McQueen ("McQueen") began lobbying Mr. LaPierre with glowing projections about the benefits of expanded programming on an NRA-branded digital platform. Seeking to induce Mr. LaPierre to

13

substantially increase the NRA's investment in the media segment to over $10 million dollars, McQueen seized on the rise of digital media and persuasively claimed that developing such a digital platform was simply "part of being a 21st century company" and that "we can't let the status quo continue."  Emphasizing the need to act quickly, McQueen stated that the "NRA needs to lead change in the marketplace" and "not become a follower."  Tying his themes together, McQueen asserted that the NRA "must put its message in all delivery systems," including the expanded digital platform.

26.     Highlighting the concept's financial viability, McQueen pressed that "we must vastly modernize the entire economic under-performance of [the] NRA."  Ultimately, he pointedly emphasized that the "NRA needs to find new ways to make money" and that the digital platform concept presented "a good opportunity to generate revenue."  Indeed, Defendants assured the NRA that its substantial investment would "pay for itself" in short order, via a combination of "soft" and "hard" monetization, including paid commercial sponsorships for live programs.  In fact, AMc assured the NRA that based on its experiences for other clients that this substantial investment would "pay for itself" within three years max.  In reliance on these representations, the digital platform was launched in 2016 under the brand NRATV.

27.     Although the creative content generated for NRATV constituted work for hire for copyright purposes (and was owned by the NRA), NRATV was managed and controlled—its talent hired and supervised, and its programming scripted—by AMc.  From the outset, NRATV was expensive, costing more than $12 million in its first year.  However, AMc claimed that the largest subset of this expense, which pertained to live programming, was "the key" to the success of the platform.  Having served the NRA for decades, AMc knew what its client desired in the digital media space: (1) outreach to new potential members (especially of a younger generational

14

cohort), (2) a self-sustaining platform, and (3) a vehicle to advance its mission and Second Amendment advocacy.  AMc represented that NRATV would be built and managed to serve these purposes.

28.     Within NRATV's first year, AMc falsely reported that the platform generated millions of "engagements" and views. Noting the NRA's keen interest in the platform's viewership and sponsorship figures, AMc promised to bring consulting a firm, Performance Improvement Partners ("PIP"), to provide "data analytics and insights" tracking NRATV's performance.  In the interim, AMc purported to update the NRA regularly on NRATV's metrics.  During meetings held on the following dates, at the following locations, AMc staff—generally consisting of Nader Tavangar, Peter Farrel, Revan McQueen, and Defendants—delivered PowerPoint presentations boasting that NRATV consistently generated millions of views, including "completed" and "engaged" views:

| Meeting Date | Meeting Location |
| --- | --- |
| October 24, 2017 | Teleconference/Polycom |
| November 28, 2017 | Mercury Group Offices |
| January 3, 2018 | Ackerman Offices (Dallas, Texas) |
| February 1, 2018 | Las Vegas, Nevada |
| February 19, 2018 | Ackerman Offices (Dallas, Texas) |
| April 11, 2018 | Ackerman Offices (Dallas, Texas) |
| September 4, 2018 | Teleconference/Polycom |
| October 11, 2018 | Ackerman Offices (Dallas, Texas) |
| October 23, 2018 | Teleconference/Polycom |
| October 30, 2018 | Ackerman Offices (Dallas, Texas) |
| November 28, 2018 | Teleconference/Polycom |
| December 5, 2018 | Teleconference/Polycom |
| January 18, 2019 | Ackerman Offices (Dallas, Texas) |

15

29.     In these closed-door meetings (which Ackerman insisted upon, ostensibly for reasons of "confidentiality"),[12] with Mr. LaPierre and sometimes others from the NRA leadership in attendance, Defendant Montgomery and others made purposely inflated sponsorship and viewership claims now known to be false in order to induce the NRA to continue investing millions upon millions in NRATV and, by extension, AMc.  In each of the thirteen meetings listed in the above chart, Defendants led the NRA to believe that NRATV's viewership numbered in the millions and that Defendants were generating many millions of dollars in value for the NRA. They did so not with facts or evidence but through a carefully coordinated scheme to present misleading, out-of-context, and conjured-up statistics for the consumption of the NRA leadership.

30.     Of course, viewership is the *raison d'etre* of digital advertising and content creation. By creating attention-catching content, digital creators and their marketing firms aim to develop a base of loyal viewers who will eventually support the organizations who create it.  This, in turn, attracts advertisers and sponsors for the programming or other digital content, which pay based on the number of *unique* "eyeballs" or "click-throughs" provided by the content.  As digital marketing has become increasingly important for businesses and non-profits alike, an entire industry has arisen which collects, aggregates, analyzes, and presents viewership data.  That data— which can be so granular as to identify *distinct individual viewers* of digital media—can provide valuable insight to organizations seeking to develop their brand and win the loyalty of the viewing public. However, due to content creators' heavy reliance on these digital metrics, inaccuracies can be consequential and damning. [13]

---

[12] This was despite the fact that the NRA owned the NRATV platform and associated data.

[13] For example, Facebook recently paid $40 million to settle a lawsuit by advertisers who alleged that it inflated view counts for certain videos—pleading that they relied extensively and

16

31.     Over the course of more than thirteen meetings and countless emails, Defendants systematically misrepresented and overstated the viewership performance of NRATV.  In response to the consistent inquiries of NRA leadership generally, and Mr. LaPierre specifically, Defendants fabricated or massaged data in an intentionally misleading fashion to falsely suggest a robust, growing viewership for NRATV. In reality, AMc knew—based on underlying, unvarnished, fulsome metrics that it intentionally withheld from the NRA—that NRATV was an abject failure.

32.     AMc's contrived, cherry-picked figures misrepresented NRATV's viewership data in at least two respects.

33.     *First,* the figures presented by Defendants fraudulently misrepresented or omitted the number of distinct viewers of NRATV content.  It is fundamental that the nominal quantity of "clicks," or "views," achieved by particular digital content is of minimal informative value, including because each "click" or "view" does not necessarily represent a unique user.  For example, a user's web browser might automatically refresh a video or a page at routine intervals, simulating hundreds or thousands of views; less egregiously, a single user might intentionally click on a piece of content multiple times—which is favorable, but not as valuable as clicks from several separate viewers.  Accordingly, responsible media companies disaggregate their total click figures and discern, using data provided by Google and other analytics services, the total number of distinct users.  AMc declined to do that.  Instead of providing an accurate account of the number of distinct users—a number which AMc knew would raise the alarm that NRATV was failing— AMc provided only aggregate data, thereby creating the false impression that NRATV had

---

detrimentally on Facebook's false figures.  David Paul Morris, *Facebook to Pay $40 Million to Settle Advertiser Lawsuit Over Inflated Video Views*, TIME (Oct. 8, 2019), http://time.com/5694910/facebook-settle-advertiser-lawsuit-videos/.

substantially more unique viewers than it actually did.  That false representation was intended to induce the NRA to continue its investment in NRATV and, by extension, AMc.

34.     *Second*, the figures presented by Defendants fraudulently inflated NRATV's viewership figures by failing to rigorously differentiate between genuine views and merely incidental ones.  Genuine views represent instances in which a user encounters content and then volitionally interacts with it in some way—rather than immediately navigating elsewhere.  Merely incidental views, by contrast, are "views" which occur only because an individual user happens to scroll past NRATV content on a webpage.  The importance of this distinction is obvious. While genuine viewers represent those who actually watch NRATV content and thus are exposed to the NRA's messaging and ideas, merely incidental viewers are not.  Although AMc occasionally purported to distinguish total views from "engaged" views, its calculations overrepresented the number of "engaged" views.

35.     The presentation made by senior corporate executives of AMc to the NRA leadership in October 11, 2018 (one of the meetings identified in the chart) is illustrative of the agency's efforts to hoodwink the NRA through tortured, fraudulent statistics and misleading generalizations about the platform's performance.  Just as they had done in previous meetings, AMc produced a glossy PowerPoint presentation which purported to, in the words of Defendant Montgomery, present "all things NRATV," including its "analytics." It did nothing of the kind. Rather than candidly discuss NRATV's disastrous performance, known internally to Defendants, Defendant Montgomery falsely touted its success.  For example, the presentation asserted that NRATV was "the strongest media outlet covering the Second Amendment," and that NRATV had seen "tremendous increase[s] in [the] time spent on the site."  Each of these representations was accompanied by a bevy of out-of-context and misleading statistics.  Not once did Defendant

Montgomery or any other Ackerman employee disclose the crucial actual and unique viewership data that would contradict her misleading statements about the performance of NRATV.  Among the outrageous representations made was that the total viewership of NRATV, in a mere eight months, had received over *two-hundred million views*, thereby suggesting that NRATV content had reached two-thirds of the United States.  This representation, like the many others made during the course of AMc's meetings with NRA executives regarding NRATV, was fraudulent and false—and AMc knew it.

36.    Apparently not content to hide from the NRA the platform's actual viewership figures, Defendants also concocted a series of "valuations" which had no basis in reality. For example, in Q3 2018, representatives from the NRA and AMc, including Defendants Montgomery, Martin, and Greenberg, held a meeting to discuss the valuation of NRATV.  At the meeting, Defendants touted a proprietary "AM Conservative Approach" formula, which it insisted provided a conservative estimate of the Earned Media Value (EMV) generated by NRATV in excess of $13 million.  Adopting a separate, less-conservative formula, Defendants represented that NRATV should actually be valued at $45 million annually, a figure justified by citing "total views" of NRATV content.  In addition to being based on "total view" figures that Defendants knew to be misleading for the reasons discussed above, the more fundamental problem with these "valuations" is that they have no basis in fact.  Rather, by presenting these valuations and contending they are based on a proprietary formula, Defendants intentionally deceived the NRA into believing that its substantial investment in NRATV was generating outstanding returns when, in fact, the primary beneficiary of the initiative were the Defendants.

37.    Further illustrating the slipshod and dishonest approach to valuation, in a meeting held on October 11, 2018, at AMc's offices in Dallas, Texas, and in correspondence dated May

13, 2019, Defendant Montgomery made representations that purported to calculate the value of the NRA's digital media presence.  Using a formula based solely on the "cost to get . . . published"—that is, the cost to AMc—Montgomery presented a valuation based, not on the value the NRA received, but on putative costs incurred by AMc.  In doing so, Montgomery effectively represented on behalf of Defendants that, in paying AMc to conduct digital media operations, the NRA was receiving substantial value on its investment.  That representation was not based upon any reliable measure of the benefit the NRA received due to its digital media presence; the sole measure of the "value" used by AMc was its own profitability.[14]

## C.    Troubled Waters: The Demise of NRATV.

38.    By 2017, the annual budget for NRATV grew to over $20 million annually—a number that was viewed by NRA leadership as unsustainable without tangible proof that the platform would soon monetize itself.  As described above, the Association began, in 2017, to press AMc for actual, reliable proof that the platform was reaching its projected objectives or deliverables—membership growth, actual unique viewership information, and/or signs that others (*e.g.,* advertisers or sponsors) would invest in the platform.

39.    At the same time, the leadership of the NRA—especially Mr. LaPierre—began to question whether the messaging associated with NRATV's live programming actually served as a benefit to the Association's mission.  As NRATV often became viewed as a dystopian cultural rant that deterred membership growth, NRA leadership requested greater directional control and coordination over the content of NRATV programming.

---

[14] To inflate the NRATV bills sent to the Association, it is now known that AMc senior executives hired a plethora of friends, family, and significant others for positions at NRATV for which they lacked the requisite qualifications and experience.

20

40.     As these factors coalesced, the ownership at AMc—fearing the loss of its most important income-producing activity—became increasingly secretive, hostile and determined to "protect" its "economics" with the NRA.

41.     In what has turned out to be an unfortunate "public reveal" of AMc, it is now known that NRATV was, by the dawn of 2018, a reflection of what AMc itself had become—an economic burden to the NRA.  Infected by a bizarre sense of entitlement, by 2018, the leadership of AMc seemed to believe that it was "entitled" to an unfettered flow of tens of millions of dollars from the NRA—whether or not it actually served the best interests of its client.  Although the agency had, undeniably, provided benefits to the Association for many years, by 2018 it is now known that AMc was riddled with corruption, driven by the greed of its leadership and determined to entrench its "cash flow" from the NRA.

42.     As the trial in this matter will reveal, the NRA was victimized by its most trusted vendor.  And in many ways, the unravelling of NRATV provides useful insight into the demise of AMc.

43.     Importantly, AMc had reason to know that even its most conservative projections for NRATV were fanciful.  By 2016, when NRATV debuted, another AMc client had already agreed to experiment with the "owned media" concept—and it was an unmitigated failure.   The American Clean Skies Foundation ("ACSF"), an energy-industry advocacy group, hired AMc in 2008, and was promptly sold a bill of goods similar to the one pitched by AMc to the NRA, including an "owned media" digital-video channel.   ACSF's ensuing experience with AMc, and the resulting "Clean Skies TV" product, was so disastrous that ACSF's former general counsel contacted the NRA and offered assistance with this lawsuit, noting: "I'm pleased to see [AMc] get called on their practices finally." After ACSF's reasonable requests for information about Clean

21

Skies TV's budgets and operations went unanswered, ACSF fired AMc in 2009.  Even as it made elaborate representations to the NRA that digital video "owned media" was the future of public relations, and that the steep costs associated with NRATV would easily be recouped, AMc concealed the failure of Clean Skies TV.

44.     On. May 13, 2019, AMc finally responded in writing to the latest of numerous requests for unique live viewership figures for NRATV.  Incredibly, AMc's response still did not disclose unique viewers for NRATV platforms.  Instead, an accompanying letter from Defendant Montgomery disclaimed years of assurances regarding the monetization potential of NRATV.   In the most direct response offered by AMc to date regarding the NRA's requests for unique-viewer data, Montgomery simply stated: "[L]ive production is in place for several reasons, *not one of which was to accumulate massive live viewership numbers*."  Of course, this is nonsense: since 2016, AMc touted NRATV's purported viewership numbers as a primary driver of its claimed valuation.  Of course, there was no other logical reason for the NRA to invest in NRATV than to gain large viewership numbers, without them, none of the stated goals of increased membership and sponsors would be possible. And it did not. It was all a hoax.

45.     Ultimately, facing a "wind-down" of its services and cessation of payments from the NRA, AMc finally admitted that the NRA "could conceivably stop the live stream component of NRATV without significantly affecting the network's viewership performance[.]"  In other words, the most expensive component of NRATV (and thus the most profitable for AMc) was generating de minimis value, if any, with respect to primary metric of interest to the NRA: viewership.

22

46.     During 2019, *The New York Times* reportedly reported on an independent assessment of NRATV's unique viewership figures.  That assessment determined that NRATV's "web traffic was miniscule, with 49,000 unique visitors in January [2019]"[15]—compared to the millions of visitors claimed by AMc.  It is now known that those paltry numbers—stunningly small when compared to AMc's representations regarding viewership—are overstated.  In fact, when the Association shut down NRATV in June 2016, not a single reaction emerged.

**D.     The NRA's Transparency Efforts and Ackerman's Response.**

47.     In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items. After updating its internal policies and controls to reflect these amendments, the NRA undertook to strengthen its procedures for documentation and verification of compliance by vendors with their contracts. Beginning in August 2018, the NRA sent letters to more than a hundred vendors—including AMc—that set forth updated invoice-support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

48.     Simultaneously, as the NRA's now-former Treasurer and CFO prepared to retire and the NRA leadership ranks shifted, multiple employees began to voice recommendations regarding opportunities for improvement at the NRA.  Combined with the NRA's compliance efforts, numerous employees came forward with complaints about AMc.

49.     Specifically, the NRA was compelled to investigate multiple concerns about AMc:

---

[15] Danny Hakim, *N.R.A. Shuts Down Production of NRATV, and Its No. 2 Official Resigns*, THE NEW YORK TIMES (June 25, 2019), https://www.nytimes.com/2019/06/25/us/nra-nratv-ackerman-mcqueen.html.

23

- "Out of pocket" expenses that lacked meaningful documentation of NRA approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Immense growth in AMc's annual budgets, coupled with a lack of transparency regarding how the budgets were calculated or whether AMc adhered to them;

- Lack of transparency regarding AMc's compliance with its contractual obligation to ensure that services were provided at "fair market value";

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to *non*-NRA clients; and

- Refusal by AMc to provide data "in writing" (such as unique visitors, viewership numbers, clickthrough rates, or related performance metrics) that enable the NRA to analyze the return on its substantial investment since 2016 in NRATV.[16]

50.     Consistent with the broad scope and critical nature of the services performed by AMc for the NRA, the NRA bargained for transparency into AMc's files, books and records pursuant to the Services Agreement. Both the previous Services Agreement and the current iteration incorporate Records-Examination Clauses that require AMc to open its files for the NRA's inspection upon reasonable notice. The full text of the Records-Examination Clause in the Services Agreement appears below:

| Services Agreement |
|---|
| • Dated April 30, 2017 (as amended May 6, 2018)<br>• Between the NRA and "AMc" (defined to include both Ackerman and Mercury) |

---

[16] In addition, certain NRA stakeholders were also concerned that NRATV's messaging— on topics far afield of the Second Amendment—deviated from the NRA's core mission and values.

24

> **VIII. EXAMINATION OF RECORDS**
> During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

51.     During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance parties' mutual interests relating to an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on concerns regarding AMc's business and accounting practices, AMc became evasive and even hostile.

52.     In August 2018, within days after the NRA announced that it would now require supporting documentation to be transmitted contemporaneously with vendor invoices, a media outlet quoted "an anonymous source at Ackerman McQueen"[17]–creating serious concerns about AMc's compliance with its confidentiality obligations.

53.     On August 27, 2018, Defendant Winkler sent a letter to the NRA which purported to comply with the NRA's request for a more comprehensive audit of Ackerman's expense records. The letter pointedly identified several categories of items, some relating to travel and entertainment, which it warned would be encompassed in a full production of those records— perhaps believing that the threat of such disclosure would dampen the NRA's demands for transparency. However, the NRA was undeterred, and insisted upon reviewing and verifying details of expenses incurred.

---

[17] Dylan Matthews, *The National Rifle Association, America's most powerful lobby, claims it's in financial crisis. What?*, VOX (Aug. 3, 2018, 4:50pm), https://www.vox.com/2018/8/3/17648960/nra-national-rifle-association-companies-support-boycott-new-york-lawsuit.

25

54.     In September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage it produced and for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees were incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel then made a startling statement: "Ackerman views the relationship as adverse."

55.     Around the same time, an NRA executive asked AMc for a copy of an audit purportedly conducted by PIP, one of the independent digital-analytics vendors purportedly retained by AMc, regarding the value of NRATV.  Departing sharply from prior conversations, AMc cursorily informed the executive that no audit had been performed, and no copies of any documents would be provided.  Rather than audit AMc's reported viewership metrics, AMc explained that PIP had "worked with" AMc to create a purported "dashboard" of digital analytics; AMc promised it would "go through all of that" during an upcoming live meeting.

56.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including by embarking on a campaign to "kill the messenger" when the NRA continued to seek access to documents or proposed reductions in AMc's budget.  At first, AMc scapegoated the NRA's outside counsel—refusing to interface with counsel.  Then, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate.

26

Unfortunately, that pledge of cooperation was short-lived, as AMc purported to forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets against which AMc was invoicing. When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

57.     As AMc continued to stonewall the NRA's requests for documents and tensions between the parties rose, the NRA was contacted with increasing frequency by journalists acting on purported "leaks" relating to matters on which AMc had worked.  The contents of these "leaks" reflected a malicious, out-of-context use of the NRA's confidential information, with an apparent intent to damage the NRA.

58.     To resolve its concerns regarding these disclosures, on May 6, 2019, the NRA requested that several key AMc employees execute sworn declarations attesting that they had not violated their confidentiality obligations under the Services Agreement. The NRA tailored its request narrowly—seeking declarations only from senior executives who had exposure to the information at issue—and demanded simply that these executives affirm they had complied, and would continue to comply, with their clear legal duties.  To the NRA's dismay, AMc flatly refused to provide any cooperation or assurances whatsoever.

E.     **Among the Records Unlawfully Withheld By AMc: A Major Related-Party Contract.**

59.     Non-party North is a veteran of the United States Marine Corps and the Reagan Administration.  North is also a member of the NRA Board of Directors.  During May 2018, the NRA announced that North was slated to serve as its next President—a largely ceremonial but high-profile position famously occupied by Charlton Heston during the late 1990s.  As Col. North prepared to assume the presidency of the NRA, he separately discussed a potential engagement by AMc as the host of an NRATV documentary series.  On May 6, 2018, the NRA and AMc amended the Services Agreement (such amendment, the "May 2018 Amendment") to affirm that any

27

contract between AMc and North would be considered an AMc-Third Party NRA Contract, for which outstanding compensation would be owed by the NRA to AMc if the Services Agreement was terminated.  Importantly, the amendment treated North as a third-party contractor—but not, necessarily, an employee—of AMc.

60.    North and AMc assured the NRA that North's profile and "brand" would be actively leveraged to elicit sponsorships for the documentary series.  This was of material interest because during recent years, the NRA had spent substantial sums on NRATV based on AMc's advice and representations regarding achievable benefits of an owned-media platform.  However, measured against any of the desired outcomes, the returns on the NRA's investment in NRATV were non-existent.  Accordingly, if the North documentary series attracted sponsorships or sparked viewership and membership growth, then the costs associated with NRATV could be defrayed.

61.    New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant."[18]  Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest;[19] and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

---

[18] *See* N.Y. N-PCL § 715.

[19] *Conflicts of Interest Policies Under the Not-for-Profit Corporation Law*, CHARITIES BUREAU, N.Y. STATE OFFICE OF THE ATTORNEY GENERAL (2018), https://www.charitiesnys.com/pdfs/Charities_Conflict_of_Interest.pdf, at 3.

28

62.     Aware that North entered into a contract with AMc (the "North Contract"), the NRA, with the cooperation and authority of the Audit Committee, diligently sought to comply with its obligations concerning analysis and approval of the North Contract.  During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

63.     At the time Audit Committee ratified North's continued service as an NRA director and President given his relationship with AMc, it was assured that the NRA's counsel would review the North Contract in full.  But that turned out to be false, at least for the duration of 2018, as AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause.  Meanwhile, North indicated via counsel that he could only disclose a copy of the contract to the NRA subject to AMc's consent.  This back-and-forth persisted for nearly six months.

64.     Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live" review of the North Contract (but no retention of any copies) by the General Counsel of the NRA.  This review raised concerns about whether the previous summary of the North Contract which was provided to the Audit Committee had been complete and accurate.  Among other things, the NRA's brief, limited review of the North Contract—along with other information disclosed for the first time by North—gave rise to questions regarding: (i) whether North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that supersede his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on North that prevent him from communicating fully and honestly with other NRA fiduciaries about

29

AMc.  Against the backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

65.     By separate letters dated March 25 and 26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and related business arrangements, as well as copies of other material business records pursuant to the Services Agreement.  Specifically, the NRA requested:

- A chance to conduct a follow-up review of the North Contract (the NRA's General Counsel even volunteered to conduct the review at AMc's attorney's offices, for AMc's convenience);

- Information about any additional costs relating to AMc's engagement of North, to the extent that such costs were being "passed through" to the NRA;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by the NRA, and business records sufficient to show whether these personnel were in fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic accountants.

66.     The NRA made clear that it sought the above information "in whatever form [wa]s most convenient" for AMc and hoped to obtain access to ordinary-course business records as contemplated under the Records-Examination Clause.  Although AMc immediately acknowledged receipt of the letters and promised to respond substantively, it did not.

67.     Meanwhile, the NRA began to suspect that the information it previously received regarding the North Contract was misleading.  The May 2018 Amendment classified North as a third-party contractor of AMc—but in actuality, the North Contract treated him as a full-time employee, with legal duties to Ackerman that superseded his duties to the NRA.  Moreover, AMc originally advised the NRA that it had contracted North to host "[t]welve feature-length episodes" of a digital documentary series, to be produced "during each 12 months of a three-year [a]greement," commencing during or about May 2018.  Yet by April 22, 2019—eleven months into North's engagement—only three episodes were available, and none were "feature-length."

68.     On April 11, 2019, North finally disclosed a copy of his contract to the NRA—even as AMc continued to rebuff the NRA's requests for material information about the contract.  AMc has also withheld documentation regarding sponsorships secured for the North documentary series, and the NRA has no evidence that any substantial sponsorships exist. Viewed in light of the series' production shortfalls, these facts have troubling implications.  The NRA agreed to shoulder a specific financial burden in connection with a specific digital-media project—not to allow its President to be compensated by a for-profit advertising agency for performing generic leadership functions.  Importantly, the NRA's Bylaws do not provide for the President to receive a salary.

69.     In the wake of these developments, the NRA again requested that AMc allow it to examine business records that would shed light on "what, exactly, [the NRA] is paying for—and what it is getting."  AMc never responded.

**F.     The NRA Takes Legal Action, AMc And North Respond With Illegal Extortion.**

70.     On April 12, 2019, having exhausted its good faith efforts to access key records pursuant to the Services Agreement, the NRA filed a narrowly tailored action in Virginia State court seeking specific performance by AMc of its obligation to share relevant records with the NRA.  In retaliation, rather than provide the requested records directly to the NRA (as the NRA

31

had sought for months), AMc conspired with others to disseminate select, out-of-context portions of those records—many obsolete or dated—to a subset of the NRA Board of Directors, in order to sow false impressions regarding the NRA's spending and lend support for a possible executive coup.

71.     On April 22, 2019, days before the NRA's Annual Meeting of Members, Defendant Winkler doubled down on the tactic he previewed in his August 27, 2018 letter.[20] In communications to select NRA executives, he referenced and excerpted certain expense records which had previously been withheld from the NRA. Importantly, Winkler did not contend—nor does the NRA believe—that any of the referenced expenses were improper.[21] Nonetheless, they were obviously selected by Defendants to foster salacious, misleading impressions of the NRA's spending practices. Winkler's letters carried an implicit threat, made explicit in a subsequent series of telephone calls: If the NRA failed to withdraw its lawsuit seeking access to AMc's records, AMc would publicize portions of those records tailored to cause maximum reputational damage to the leadership of the NRA. In other words, the agency would deploy a smear campaign with malicious intent to damage the NRA.

72.     On April 24, 2019, AMc caused its employee, North, to telephone an aide of Mr. LaPierre and relay the contents of yet another letter that AMc purportedly planned to disseminate. North emphasized that the letter would be "bad" for Mr. LaPierre and the NRA, and he described a laundry list of allegations the letter would contain: an unfavorable (and untrue) depiction of the

---

[20] *See* discussion *supra* at ¶ 53.

[21] Indeed, if Winkler or anyone at AMc had believed the expenses were improper, then AMc's fiduciary obligations required it to inform the NRA of suspected accounting improprieties. Instead, for more than a decade, AMc invoiced the NRA for the expenses without any such comment.

NRA's finances; sexual harassment accusations against an NRA staff member; and, as previewed in Defendant Winkler's letters, excerpts of wardrobe, travel, and entertainment expenses paid by AMc and then invoiced by it to the Association over the years.

73.     Tellingly, several categories of information referenced by North consisted of the same information the NRA had tried, but failed, to elicit from AMc under the Record-Examination Clause.  After withholding this information for more than six months in an attempt to stonewall the NRA's compliance efforts, AMc now threatened to strategically, selectively publicize the information in a manner calculated to cause harm to Mr. LaPierre and the Association. North stated that AMc would forbear from publicizing the "bad" letter if Mr. LaPierre agreed to withdraw the NRA's lawsuit seeking access to AMc's records, resign immediately from the NRA, and support North's continued tenure as NRA President.  If Mr. LaPierre cooperated, North indicated that he could "negotiate with" Ackerman co-founder Angus McQueen to secure an "excellent retirement" for Mr. LaPierre.

74.     The NRA does not take kindly to threats, and neither did Mr. LaPierre. Rather than accede to AMc's extortion, Mr. LaPierre wrote a letter to the NRA's Board of Directors that gave a transparent account of AMc's threat and concluded "so long as I have your confidence . . .  I will not back down." As became widely publicized, Mr. LaPierre prevailed—and AMc's coup attempt failed.

### G.    Extortion's Aftermath:  Documents Vindicate the NRA's Concerns, And AMc Continues Its Attacks.

75.     The NRA hoped that in the wake of these events, AMc would resume faithfully serving the NRA as the parties' contract and Virginia law required. Unfortunately, the NRA continued to receive media inquiries that strongly suggest there are misleading, defamatory "leaks" emanating from AMc. In other words, the NRA believes that AMc is now delivering on its

33

extortion threat. Tellingly, much of the information "leaked" by AMc concerns travel, wardrobe, and other expenses incurred in connection with AMc projects, based on AMc's advice, or on trips with itineraries crafted by AMc. Although it disseminates select portions of these records in an effort to convey misleading impressions about spending activities by the NRA's leadership, AMc knows full well that these particular expenses were proper because it was deeply involved in their occurrence.

76.     Discovery has corroborated one of the NRA's worst fears about AMc's billing practices—specifically, that AMc was double-billing multiple clients for the same work, or simply billing the NRA for time logged by its employees on non-NRA projects. Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, admitted by email dated April 15, 2019: "I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts."

77.     The NRA is informed and believes that AMc has fraudulently billed it, and perhaps other clients, for equipment as well as personnel. Over the duration of the Services Agreement, AMc billed the NRA for at least $2.7 million in fixed assets consisting of audiovisual equipment and the like.

78.     Defendants' campaign of attempted coercion and intimidation of the NRA and Mr. LaPierre rose its ugly head again in the days before the NRA Board of Directors meeting in September 2019. For the purpose of intimidating and undermining the leadership of the NRA, as well as potentially laying the ground work for a second attempted coup, on September 13, 2019, Defendants issued a corporate "press release" to the general public—but in fact intended for consumption by the members of the NRA Board of Directors—that attempted to cast doubt on the

judgment of the NRA's  leadership and to re-position Defendants as "the good guys."  In reality, this so-called "press release" was nothing more than a gaggle of lies, including the following misrepresentations:

- "Ackerman McQueen cooperated with every single audit NRA requested";

- "Ackerman McQueen never overcharged the NRA and retains records of all the work to prove it";

- "Every expense incurred on behalf of the [NRA] was directed by the NRA at the highest level, always with personal knowledge and approval of Wayne LaPierre;" and

- Outside counsel for the NRA "pursues . . . frivolous lawsuits" against AMc "for PR purposes and to serve as a distraction from the failure of NRA executives and its board to properly fulfill its oversight duties."

79.     The pattern of attempted extortion, coercion, and intimidation (oftentimes based on outright falsehoods) undertaken for the purpose of shuttering the NRA's legitimate and ongoing investigation into Defendants' fraudulent activities and ousting the current NRA leadership dedicated to enhanced compliance is clear as day.  No reasonable basis exists for the NRA to believe this campaign will stop in the foreseeable future and abate resorting to criminal malfeasance that risks harming not only the NRA, but Defendants' other clients as well.  The NRA brings this action to discover the full extent of AMc's breaches and frauds, recover its documents and property, and attain compensation for the damage it has sustained.

**H.     The Services Agreement Provides That The NRA Is The Owner Of All Creative Works And Intellectual Property Previously Developed And Used By AMc.**

80.     As noted above, the NRA and AMc worked together since the 1980s. Over that time, the NRA placed significant trust and confidence in AMc to perform public relations and

35

strategic marketing services, media planning and placement, and management of digital media and websites, including the management of NRATV.   Since at least 1999, AMc's work on behalf of the NRA was governed by successive incarnations of the Services Agreement, which specified the types of work that AMc performed for the NRA.

81.    Section VI of the Services Agreement is entitled "Ownership of Products."   In particular, it provides "[a]ll creative works developed by AMc in fulfilling its obligations under this Services Agreement . . . shall be the property of the NRA."   It continues: "All other, and further, intellectual property . . .   created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA . . . ."

82.    Section VI of the Services Agreement also requires AMc to transfer and assign to the NRA the ownership of the copyright to all creative works developed by AMc for the NRA if those works are not otherwise encompassed by the Copyright Act.

83.    In addition, the NRA separately owns numerous copyrights, including for "NRA" and "National Rifle Association."

I.    **Despite The Termination Of The Services Agreement, Defendants Continue To Prominently Reference The NRA And NRATV On AMc's Website.**

84.    By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately."   Notably, AMc also purported to terminate the agreement by letter dated June 27, 2019, effective "immediately."

85.    Despite the termination of the Services Agreement, continued and/or continue to make unauthorized and unlicensed references, directly and indirectly, to the NRA and NRATV on its website, and continued and/or continue to make unlicensed and unauthorized use of the NRA's intellectual property rights.   Attached hereto as Exhibits A and C are depictions of those NRA

36

references and associated intellectual property rights on AMc's website as of August 29, 2019 and, for additional graphics added since that date, as of October 17, 2019, respectively.

86.      Specifically, AMc's website, directly and indirectly, references in an unauthorized an unlicensed manner the NRA and/or NRATV and uses its associated intellectual property rights, as follows:

- On the homepage, in describing who it is and what it does, AMc mentions its work with a "gun rights organization" and states that it "built media companies on behalf of … the Second Amendment to the Constitution";

- On a page entitled "Our Media Evolution," the website provides a timeline of AMc's projects for its clients, and also contains videos and photos relating to NRA TV;

- On a page entitled "Our Team," a photo appears with the caption "NRA Life of Duty," which was part of what Ackerman touts in its Counterclaims/Third Party Complaint as a "robust," "money-making, [and] profitable" advertising and branding campaign;[22] and

- On pages entitled "Gallery" and "Clients," a total of fifteen different references to the NRA and NRATV appear, which represents a greater number of references compared to any other AMc client.

87.      The portions of the AMc website submitted by Defendants in the Appendix supporting their Motion to Dismiss support this conclusion.

---

[22]  ECF No. 10 ¶¶ 7, 11.

37

88.     The references on AMc's website to the NRA and NRATV and the use of closely associated intellectual property are unauthorized in light of the termination of the Services Agreement and unlicensed generally.  In addition, the multitude of such references and related intellectual property, alone and taken together, foster consumer and customer confusion insofar as they falsely suggest to the public that the NRA remains an AMc client and endorses the services provided by AMc.  To the contrary, the NRA is not an AMc client and does not endorse AMc's services.

89.     For example, AMc's website falsely proclaims that NRATV is the "world's most comprehensive video coverage of freedom-related news, events and culture," which creates the misimpression that NRATV was a successful endeavor that the NRA endorses.  In actuality, the NRA recently concluded, despite years of false reporting and subterfuge from Defendants, that NRATV was a failed endeavor under any appropriate performance metric.  In fact, on or about June 25, 2019, the NRA suspended the "live TV" programming of NRATV.

90.     AMc's website also prominently features unauthorized and unlicensed NRA-owned photos and references to the NRA with greater frequency than any other AMc client.  That prominent display of the NRA and its associated intellectual property on AMc's website provides a strong inference that wrongly suggests to the public—and creates consumer and customer confusion—that the NRA presently endorses the services that AMc provides and that the NRA is currently AMc client, neither of which is true.  The fact that in the *past* AMc and the NRA had a commercial relationship does not alter, and ultimately has no bearing on, this conclusion.

91.     Defendants now contend that "the current version of AMc's website includes the word 'legacy' in connection with references to the 'NRA,'" and appear to imply that the NRA's

false association claim under the Lanham Act is somehow "moot," to use Defendants' words.[23] As shown in the Appendix submitted by Defendants in connection with their Motion to Dismiss,[24] the meaning and implication of the word "legacy" in the context used is, at best, ambiguous, compounds confusion, and far from clearly demonstrates that the NRA is no longer a client of AMc. For example, rather than expressly specifying a separate webpage or portion of thereof for "Legacy Clients," Defendants merely slapped the word "legacy" in the bottom right-hand corner of the NRA's graphics, without providing any further context. For these reasons, the use of the "legacy" verbiage does not save Defendants from having created a knowingly false portrayal that the NRA continues to remain an AMc client. To the contrary, the slap-dash and belated "fix" only amplifies the problem more.

92.     In any event, even assuming that the word "legacy" was appended to the bottom right-hand corner of the NRA graphics on or about October 1, 2019, and that one magic word could somehow "moot" any false association claims after that date, the word does not "moot" the NRA's false association claims arising *before* that date.[25]    That is, the false association and resulting public confusion manufactured by Defendants, undertaken for the purpose of gaining customers and increasing profits in the wake of losing its largest client, the NRA, began well before "legacy" was oddly shoehorned into the NRA's graphics.

93.     Nor does Defendants' transparent attempt to short-circuit NRA's false association Lanham Act claim impact the NRA's other false association theory. The supposedly talismanic

---

[23] ECF No. 10 ¶ 25.

[24] ECF No. 11 ¶ 5.

[25] ECF No. 10 ¶ 4. Tellingly, Defendants do not state in their Motion to Dismiss the precise date the word "legacy" was buried in the bottom right-hand corner of the NRA's graphics.

39

words of "legacy" and "moot" have no bearing on the NRA's claim that AMc's and Individual Defendants Martin's and Greenberg's unlicensed use of NRA intellectual property associated with NRATV on its website creates the false impression and attendant consumer and customer confusion that the NRA endorses, sponsors, and/or approves of NRATV, when in fact it does not. That theory does not turn at all on whether Ackerman has at some belated and unidentified point in time jammed the word "legacy" in the bottom corner of NRA graphics and intellectual property, because the NRA could, or could not, endorse, sponsor, and/or approve of NRATV either before *or* after it ceased being a client.  Nor do the supposed magic words impact either the NRA's copyright infringement claims and alternative claim for conversion.

## V.

## CLAIMS FOR RELIEF

**A.**    **Count One: Claims For False Association Under The Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Against All Defendants).**

94.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

95.    By intentionally maintaining numerous references to, and images of, the NRA and NRATV on AMc's website, Defendants are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the NRA with AMc, or as to the NRA's approval of the services or commercial activities by Defendants, in violation 15 U.S.C. § 1125(a)(1)(A).

96.    Defendants are involved in interstate commerce.

97.    Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to provide or otherwise create the false impression that the NRA (1) remains

or continued to be an AMc client after the termination of the Services Agreement and (2) endorses the services provided by AMc, in particular NRATV.

98.    The foregoing misconduct is without any legal justification and constitutes a knowing and willful violation of applicable law, including 15 U.S.C. § 1125(a)(1)(A).

99.    The NRA falls within the zone of interests protected by the Lanham Act, a lenient and flexible standard where doubts are resolved in favor of the plaintiff.  The NRA's interests are sufficiently related to the interests protected under 15 U.S.C. §§ 1125(a)(1)(A) and 1127 because Defendants used words, statements, and reproductions of the NRA's intellectual property in an unauthorized and unlicensed manner to create a false association between the NRA and AMc as to whether the NRA (1) remains or continues to be an AMc client and (2) endorses or approves of the services provided by AMc—in particular NRATV.  The NRA is suing not as a deceived consumer or as a direct competitor to Defendants, but as a person engaged in commerce within the control of Congress whose commercial position has suffered economic and/or reputational injury proximately caused by Defendants' false associations outlined above and their acts of unfair competition.  These interests plainly fall within the zone of interests protected by the Lanham Act, in keeping with the Supreme Court's holding that "most of enumerated" purposes of the Act "are relevant to false association cases." *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

100.    The NRA has been injured and has suffered damages by the unauthorized and unlicensed words, statements, and/or use of NRA intellectual property that created the false impression of association with AMc and the false endorsement of AMc's services.  Defendants placed their own financial interest in acquiring new customers and gaining additional profits through engaging in deceptive conduct, at a time when it had lost its largest client, the NRA.  It

41

did so at the expense of the NRA's lawful right to restrict and to limit the use of its name and related intellectual property rights in a non-misleading manner, thereby diminishing their value and causing financial injury to the NRA, including lost royalties, both presently and in the future. In addition, Defendants' Lanham Act violations. caused and/or will likely cause the NRA to suffer reputational harm and the loss of goodwill.   Accordingly, the NRA has suffered injuries that negatively impact its ability to compete in the marketplace.

101.    Such bad faith misconduct should be preliminarily and permanently enjoined, (even absent proof of damages), and the NRA should be awarded damages and/or equitable relief, including but not limited to forfeiture and disgorgement in the form of returning the ill-gotten revenues and/or profits earned by Defendants as a result of their violation(s) of 15 U.S.C. § 1125(a)(1)(A), in an amount to be proven at trial. *See, e.g.*, §§ 1116-1117.

102.    In addition, as a result of such misconduct, the NRA has been required to retain the undersigned counsel to prosecute the claims herein.  Pursuant to 15 U.S.C. § 1117, the NRA seeks to recover its attorneys' fees and costs incurred in this action.

**B.    Count Two: Copyright Infringement Under 17 U.S.C. § 101 *et seq.* (Against All Defendants).**

103.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

104.    The NRA owns numerous copyrights, including for "NRA" and "National Rifle Association."  In addition, the NRA owns or is the assignee of the copyright to all creative works developed for the NRA by AMc pursuant to the Services Agreement, some of which are present on AMc's website and can be found in Amended Exhibit A attached hereto.

42

105.     Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to use and publish unauthorized and unlicensed copyrighted works owned by the NRA.

106.     Defendants' unauthorized and unlicensed continued publication of the NRA's copyrighted works constitute unlawful copyright infringement.

107.     The NRA is entitled to preliminary and permanent injunctive relief requiring Defendants to immediately and forever remove from their website and return all the NRA's copyrighted works.  This remedy is necessary to return and restore to the NRA the legal right to decide for itself whether and, if so, how to license, restrict, or otherwise limit the dissemination of its copyrighted material in commerce.

108.     In addition, the NRA is entitled to an award of actual damages and forfeiture and disgorgement of Defendants' ill-gotten revenues and/or profits, unpaid royalties, and/or statutory damages, for their infringing use and publication of the NRA's copyrighted works in an amount to be proven at trial.

109.     Pursuant to 17 U.S.C. § 505, the NRA is also entitled to recover its attorneys' fees and costs incurred in this action.

**C.     Count Three: Conversion (Against All Defendants).**

110.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

111.     In the alternative to its claims for false association under the Lanham Act and infringement under the Copyright Act, the NRA asserts the cause of action of conversion.

112.     The NRA is the exclusive owner of, and holds all right, title, and interest to, all creative works and intellectual property developed and used by AMc in fulfilling its obligations to the NRA under the Services Agreement.

43

113.     Despite the NRA's demands (see, for example, Exhibit B), Defendants have refused to remove from its website and return all such creative works and intellectual property.  As a result, Defendants unlawfully and without authorization continue to exercise control and dominion over the NRA's valuable creative works and intellectual property.

114.     Defendants' unauthorized use and publication of the NRA's creative works and intellectual property constitute intentional acts causing substantial interference, if not outright destruction, of the NRA's valuable property rights, to the detriment and harm of the NRA.

115.     In addition, the NRA is entitled to an award of damages, including damages for the full value of the stolen property and punitive damages, attributable to defendants' wrongful refusal to return its valuable creative works and intellectual property in an amount to be proven at trial.

116.     The tort of conversion is not pre-empted by the Copyright Act.  The rights that the copyright owner—here, the NRA—seeks to enforce under the common law doctrine of conversion are *not* equivalent to or the same as the rights sought or provided pursuant to the Copyright Act. Here, the NRA seeks the ***total value*** of the intellectual property "converted," property that will never return.

117.     In contrast, in conjunction with its claim for copyright infringement the NRA seeks the effective return to the copyright holder of all the property rights inherent in copyright, specifically the right to control the use of the copyrighted material, the right to obtain payment of royalties in exchange for its use, or other damages to compensate the copyright holder for the diminution of and infringement on its rights.  Put differently, the principal features of relief for copyright infringement represent: (1) an injunction prohibiting further use of the property, (2) effective return of the property to the copyright holder, and (3) compensation for the lost royalties and/or the diminution in value associated with the unauthorized use.

44

118.    *None* of those remedies apply to the relief afforded and sought by the NRA with respect to its claim of conversion. In sharp contrast, the law of conversion in the context of remedies provides that the tortfeasor (1) keeps and uses the subject property for his/her own benefit, (2) does not to return the converted property to its rightful owner, and (3) pays damages for the total loss of value for the property, and *not* to pay for the *diminution or loss* of the property's value (as is the case for copyright infringement).  In short, the elements and remedies associated with a claim for federal copyright infringement and for common law conversion are *not* equivalent or substantially the same and serve two very different purposes, thereby precluding any notion that the Copyright Act could pre-empt the NRA's alternative claim for conversion.

**D.    Count Four: Fraud (Against All Defendants).**

119.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

120.    As alleged above, Defendants have engaged in an overarching scheme to defraud and extort plaintiff NRA, thereby causing it harm and putting it (and other AMc clients) at imminent risk of harm.  Accordingly, Defendants are liable for their misleading representations and/or non-disclosure of material facts.

121.    Beginning in at least 2016 and continuing through 2018 Defendants, in connection with the "annual budgeting process,"[26] described by Ackerman, Defendants—and in particular Defendants Winkler and Montgomery, as well as former CEO Angus McQueen—represented on multiple occasions that appropriate back-up documentation was retained by AMc for purposes of justifying and substantiating their billing statements and that such documentation could be audited

---

[26] ECF No. 12, at p. 23 ¶ 11.

45

at the NRA's request.  Defendants—in particular, Defendants Winkler and Montgomery—and McQueen likewise represented that their record-keeping was accurate.  These representations were made with the specific intent to have the NRA maintain or increase the annual budget for Ackerman and were made over the course of this "annual budgeting process," which occurred in the fourth quarter of the preceding budgetary year (i.e., the process for the 2017 budget would have occurred in Q4 2016).

122.    These representations were false when made, with a specific intent to induce the NRA to maintain or increase the annual budget for Ackerman.  As the NRA later discovered, for years **no one** at AMc kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA.  In addition, absent such record-keeping, a complete audit could not occur.  For these reasons, AMc's record-keeping was not accurate, contrary to Defendants' representations.

123.    McQueen and Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and payments" to the NRA.[27]  Accordingly, there is more than ample reason to believe that they must have known about, or consciously disregarded, the gross failure to maintain reasonable backup and supporting document in connection with their billing practices.

124.    These representations were material and reasonably and justifiably relied upon insofar as the NRA would never have agreed to a budget, much less the same or a greater budget, had the it known the complete truth.

---

[27] ECF No. 12, at p. 23 ¶ 12.

125.    Defendants also failed to disclose certain facts to the NRA during the "annual budgeting process."  In particular, they knowingly failed to disclose the fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees supposedly "dedicated" the NRA account for work they performed on non-NRA projects.  As Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, revealed by email dated April 15, 2019: "I bet Ackerman is in trouble on this one.  They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts."  Defendants also failed to disclose that AMc had fraudulently billed the NRA, and perhaps other clients, for equipment in addition to personnel.  By failing to disclose these facts, Defendants intended to induce the NRA to maintain or increase the amounts NRA paid to Defendants.

126.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement and (2) they had the obligation not to tell "half-truths."

127.    Defendants knew that the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

128.    Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and

47

payments" with respect to the NRA account.[28]  Therefore, there is more than a reasonable basis to believe that they knew about, consciously disregarded, the practice of overbilling with regards to personnel and equipment.   Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.  For similar reasons, they knew that the information that they did not disclose to the NRA and were deliberately silent when they had a duty to speak.

129.    These false representations and/or fraudulent non-disclosures were material and actually, reasonably, and justifiably relied on upon the NRA.  As a result, the NRA has suffered injury and damages, in an amount to be proven at trial.  Had it known the complete truth, the NRA would never have agreed to an annual budget, much less the same or a greater budget, would have terminated AMc as its agent, and would have ceased conducting business with the agency.

130.    ***Fraudulent Billing.***  Beginning in at least 2016 and continuing through 2019, Defendants and AMc-employee Nader Tavangar would on at least a monthly basis (and sometimes more often) issue and send billing statements and invoices to their NRA counterparts representing that the NRA owed AMc certain amounts of money.  Given the fraudulent nature of the annual budgeting process, it should come as no surprise that many of the emailed billing statements were not only inaccurate, but false and misleading. These representations were made with the specific intent to have the NRA pay the amounts it purportedly owed.

131.    The billing statements were misleading in three principal respects.   First, Defendants caused sham bills to be sent that purported to seek payment for services that were never provided to the NRA.  Second, they caused bills to be sent to the NRA which sought to seek

---

[28] ECF No. 12, at p. 23 ¶ 12.

48

reimbursements in excess of the actual cost to AMc. Third, they caused bills to be sent to the NRA that were wholly unsubstantiated by any receipt or document, or any other shred of evidence.

132.     As an example, on September 17, 2018, Defendants emailed NRA Chief Financial Officer ("CFO") and Treasurer Craig Spray three "production invoices for [the month]"  Upon review of the vague, cursory, and unsubstantiated invoices, Spray responded and advised Defendants that they may not be following "best practices/compliance requirements," where "typically [a] three-way match process for processing a vendor invoice is required."  As explained to Defendants, the objective of "an audit compliant process" is "to ensure" that a vendor's request for payment "is complete and accurate" and "to highlight any discrepancies" in the supporting documentation.  At the time, Spray found Defendants' slip-shod billing practices concerning.  And for good reason.  Absent necessary backup documentation, a vendor has no factual basis to justify requesting the amounts of money provided on the billing statement or invoice.

133.     Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement  and (2) they had the obligation not to tell "half-truths."

134.     Defendants knew the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

135.     Defendants and AMc employee Tavangar were responsible for the routine generation and transmission of fraudulent billing statements to the NRA and Defendants Winkler and Montgomery were specifically responsible for "budgetary compliance, invoicing, and

49

payments" with respect to the NRA account.[29]  Therefore, there is more than a reasonable basis to believe that they knew, or consciously disregarded, the truth, particularly with respect to the issuance of fraudulent billing statements and invoices that were wholly unsubstantiated due to the lack of back-up documentation.  Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.  For similar reasons, Defendant knew the information that they did not disclose to the NRA and remained deliberately silent when they had a duty to speak.

136.    These false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damages, in an amount to be proven at trial.  Had it known the complete truth, the NRA would never have agreed to pay the billing statements and invoices, would have terminated AMc as its agent, and would have ceased conducting business with the agency.  For these reasons, these representations and/or non-disclosures were material and actually, reasonably, and justifiably relied upon by the NRA.

137.    ***NRATV Fraudulent Misstatements and Non-Disclosures.***  Beginning in at least 2016 and continuing through 2019 Defendants—including but not limited to Defendants Montgomery, Martin, and Greenberg—made various fraudulent statements and/or failed to disclose material information in connection with NRATV.  Among other things, as alleged herein, Defendants in early 2016 made multiple representations to the NRA that the proposed  "owned media" digital platform known as NRATV presented "a good opportunity to generate revenue" and that developing and launching such a platform would "pay for itself," including paid commercial sponsorships for live programs.  In addition, at the thirteen specific meetings and in

---

[29] ECF No. 12, at p. 23 ¶ 12.

50

other communications to the NRA identified above, including communications made on May 13, 2019 and late October 2018, Defendants touted NRATV's performance and represented that the platform had certain valuations and generated millions of engagements and views.  These statements were made for the purpose of inducing the NRA to expand its investment in NRATV, to the benefit of AMc.

138.    These representations and omissions were false and misleading for multiple reasons.  First, the NRATV digital platform did not generate revenue and was never going to pay for itself, as demonstrated by the dismal viewership and sponsorship numbers that it generated in reality, consistent with the previous failure of a similar project with The American Clean Skies Foundation, a fact that Defendants did not disclose.   In addition, Defendants' repeated representations that the NRATV platform generated millions of viewers and touting of the platform's performance and valuation were in fact based on out-of-context statistics predicated on, among other things, aggregate viewership numbers that failed to differentiate between genuine views and merely incidental ones and counted all of the views from an individual, rather than the distinct number of viewers of NRATV content.  At no point did Defendants disclose that their purported viewership numbers were not based on actual data of the number of unique and genuine viewers.    Moreover, Defendants' inconsistent and contradictory viewership statistics and statements on the purpose of viewership numbers and the actual numbers themselves demonstrate the falsity of the statements.

139.    Defendants knew about failure of the similar digital platform that AMc had developed and operated for The American Clean Skies Foundation and, therefore, also knew that embarking upon a similar venture for the NRA would not present a good opportunity for revenue generation or pay for itself.  Defendants understood that their development (in particular, their

51

creation by Defendant Greenberg) and subsequent touting of NRATV viewership performance and valuations was not based on actual data comprising *unique* views, and likewise understood such data is readily available from third-party vendors given that Defendants hold themselves out as ostensible experts in digital marketing and advertising.  Therefore, there is more than a reasonable basis to believe that Defendants knew, or consciously disregarded, the truth about these matters.  Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.

140.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement  and (2) had the obligation not to tell "half-truths."

141.    Defendants knew that the NRA was unaware of these facts and did not have an equal opportunity to discovery the facts.

142.    The false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damage, in an amount to be proven at trial.  Had it known the complete truth about NRATV, the NRA would never have invested a dollar in the project, and would have terminated AMc as its agent, and ceased conducting business with the agency.  For these reasons, these representations and/or non-disclosures were material and were actually, reasonably, and justifiably relied upon by the NRA.

**E.    Count Five:  Breaches of Fiduciary Duties (Against All Defendants).**

143.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

144.    Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc.  Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

145.    In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement.  For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

146.    Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

147.    Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.

148.    Furthermore, because they acted in a fiduciary capacity, Defendants had a duty of candor and to disclose all material facts to the NRA regarding the advice and services it provided. Defendants breached their fiduciary duties when they failed to disclose material facts to the NRA, including but not limited to failing to disclose in the following instances:

- Facts regarding AMc's billing and invoicing practices—for example by failing to disclose that appropriate support documentation was not retained by AMc and could not be audited by NRA at any time;

53

- Facts regarding NRATV performance, by withholding crucial performance metrics like "unique" and "genuine" individualized viewership data, and relatedly failing to disclose material facts regarding the inaccurate valuation of NRATV;

- Facts regarding the prior and failed "owned-media" project, Clean Skies TV.

- Fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees who were supposed to be fully "dedicated" to the NRA;

- Facts that AMc used equipment, billed to the NRA, for other clients' projects;

- Fact that bills emailed and mailed to the NRA contained inaccurate and false information, for example, bills seeking reimbursement for services that were never performed, that were in excess of the actual costs to AMc, and that were wholly unsubstantiated by supporting documentation; and

- Facts regarding the North Contract—for example including the fact that North had legal duties to AMc that superseded those he had to the NRA while NRA President, and the failure to comply with the digital documentary series requirements.

149.    In addition, Defendants as fiduciaries of the NRA had a duty of fair, honest dealing and a duty to act with integrity of the strictest kind.  Defendants breached these fiduciary duties when they engaged in the following conduct:

- Attempt to obstruct or to stop an investigation of Ackerman and its billing practices and NRATV by the NRA, including by repeatedly and flatly refusing to respond to legitimate and basic information requests from NRA executives;

- The first attempt of extortion undertaken by Defendant Winkler on August 27, 2018, which amounted to a violation of the criminal laws.[30]

- The second attempt of extortion undertaken by Defendant Winkler on April 22, 2019, which amounted to a violation of the criminal laws.[31]

- The attempted extortion undertaken by Oliver North on April 24, 2019, which amounted to a violation of the criminal laws.[32]

150.    As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

151.    The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendant on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

## F.    Count Six: Conspiracy (Against All Defendants).

152.    Each Defendant was a member of a combination or conspiracy involving two or more persons, one of whom, Dan Boren, was an individual not employed by Defendants.

153.    The object of the combination or conspiracy was to commit the fraudulent behavior, the attempts to de-railing the resulting NRA investigation, and the attempts to extort Mr. LaPierre

---

[30] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486.

[31] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486; In. Code §§ 35-45-2-1, 35-43-4-2, 35-43-4-2.

[32] Tex. Penal Code §§ 15.01, 31.01, 31.03; Va. Code Ann. §§ 18.2-26, 18.2-28, 18.2-59; Ok. Stat. Ann. §§ 1481-83, 1486; In. Code §§ 35-45-2-1, 35-43-4-2, 35-43-4-2.

55

and the NRA alleged herein.  The members of the combination or conspiracy had a meeting of the minds concerning the object of the combination or conspiracy or the course action.

154.    One of the members committed an unlawful and overt act to further the object or course of action, including but not limited to the Defendants' fraudulent acts described in Count Four and the breaches of fiduciary duty described in Count Five.

155.    The NRA has suffered injury and sustained damages as a result of the conspiracy, in an amount to be proven at trial.

**G.    Count Seven: Breach of Fiduciary Duty of Loyalty (Against All Defendants).**

156.    In the alternative, the NRA asserts the claims for breach of fiduciary duty and breach of contract that are currently at issue in the Virginia state court litigation ("the Virginia Claims").   Through the filing of its Counterclaim and Third-Party Complaint, *see* ECF No. 12, however, Ackerman has broadened this dispute to encompass a host of subject matters not directly raised in the Original Complaint.  Ackerman broadly contends that the NRA's original claims in this action "mandate[ ] . . . an inquiry into the NRA's and LaPierre's conduct" allegedly comprising "sinister and intentional efforts to destroy AMc's business" and "makes relevant an examination of the real reasons behind termination of the parties' [Services Agreement] . . . and an examination of the creation, operation and [allegedly] unquestioned success of NRATV."[33]   According to Ackerman, this "mandate[d]" inquiry includes the three allegedly "frivolous" lawsuits comprising the Virginia Claims.[34]  Based on Ackerman's logic, the NRA's Virginia Claims likely arise out of the same transactions or occurrences that are the subject matters of Ackerman's Counterclaim and Third-Party Complaint, and it is likely that the Virginian Claims would be considered compulsory

---

[33] ECF No. 12 p. 19, ¶ 1.

[34] *Id.* at p. 19 ¶ 2, pp. 31-32 ¶ 35.

56

counterclaims to this action.  In short, the Virginia Claims have been put at issue by Ackerman's Counterclaim and Third-Party Complaint

157.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

158.    Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc.  Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

159.    In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement.  For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

160.    Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

161.    Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.  Defendants breached this duty on multiple occasions AMc breached its fiduciary duty when it conspired to effect an out-of-context, partial disclosure of certain NRA confidential information to (i) a handpicked group of outside directors of the NRA., as well as (ii) the news media as part of its attempted extortion plot and to end the NRA's

57

investigation into AMc for the malicious purpose of smearing the NRA's reputation and facilitating its ultimately foiled coup plot.

162.    As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

163.    The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

164.    The NRA also seeks injunctive relief to prevent future disclosures of the NRA's confidential information.

## H.    Count Eight:  Breach of Contract (Against Defendants AMc).

165.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

166.    For the reasons explained in paragraph ___, supra, in the alternative, the NRA asserts this breach of contract claim that is also part of Virginia Claims.

167.    The Services Agreement is a legally enforceable contract, and the NRA has performed all of its obligations under the Services Agreement.

168.    *The Records-Inspection Clause*.  The Records-Examination Clause is unambiguous.  The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

169.    Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement. Specifically, Ackerman-acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement-has repeatedly failed or refused to permit the NRA

to examine specified categories of books and records with respect to matters covered under the Services Agreement.

170.   There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement.  The information sought by the NRA pursuant to the Records-Examination Clause resides uniquely within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

171.   The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts, including the North Contract; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in the paragraphs above.

172.   Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission. Moreover, AMc's continued and baseless refusal to disclose material information relating to the North Contract threatens to impede the NRA's corporate governance.

173.    By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

174.    *The Confidentiality Clause.*   Defendants have breached the provisions of Section IV of the Services Agreement by directly or indirectly disclosing, to third parties, information made known to AMc as a result of AMc's providing Services (as defined under the Services Agreement).

175.    Defendants' breaches have damaged the NRA. Among other things, the NRA has incurred significant reputational damage, and professional fees, as a result of Defendants' bad faith, out-of-context "leaks" to reporters. For example, the NRA's attorneys and public affairs professionals have spent extensive hours fielding inquiries from journalists in an effort to correct the misleading impressions sown by AMc.

176.    Defendants' breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed. The NRA is entitled to injunctive relief to avert or minimize this inseparable harm.

177.    Moreover, AMc's breaches are material—by seeking to destroy the NRA's reputation, AMc has destroyed the purpose of the parties' contract. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

178.    *The Return-of-Property Clause.*   The provisions of Section XI.E. of the Services Agreement are unambiguous and bind "AMc" (defined to include both Ackerman and Mercury).

179.    The NRA seeks possession of its property, fixed assets, materials, documents, and confidential information as defined in the Services Agreement.

180.    Both the NRA and AMc have provided notice of the immediate termination of the Services Agreement; thus, the NRA has an immediate right to possession of the NRA's property.

181.    The NRA's property is capable of identification. The NRA's property is defined in the Services Agreement and the NRA provided a partial list of its property in AMc's possession in the NRA's letter dated July 22, 2019, to AMc.

182.    In its July 22 letter, the NRA provided values for some of its fixed assets in AMc's possession. In addition, the NRA's confidential information and materials provided to AMc during their contractual relationship have monetary value.

183.    AMc is in possession of the NRA's Property and has wrongfully refused to return the NRA's Property.

184.    AMc has breached the provisions of Section XI.E. of the Services Agreement by failing to provide the immediate return of the NRA's Property.

185.    AMc has also breached the implied covenant of good faith and fair dealing ignoring the NRA's repeated requests to return the NRA's Property.

186.    AMc's breaches have damaged the NRA in an amount to be proven at trial

187.    Moreover, AMc's breaches are material. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

## VI.

## DEMAND FOR JURY TRIAL

188.    The NRA hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

61

## VII.

## <u>PRAYER</u>

189.     For all the foregoing reasons, the NRA requests that the Court enter judgment in its

favor and award it the following relief against AMc and the other Defendants:

a.     Preliminary and permanent injunctive relief prohibiting Defendants, and
each of their agents, servants and employees, and those persons in active
concert or participation with any of them, from in an unauthorized and
unlicensed manner: (1) showing any references to the NRA on AMc's
website and in any other form of media; (2) using or displaying any logos
or symbols affiliated with the NRA in connection with advertising,
distribution, or display for sale of any product or service associated with
AMc; (3) making in any manner whatsoever any statement or
representation, or performing any act, likely to lead members of the public
to believe that AMc is in any manner, currently directly or indirectly,
associated, affiliated, connected with, authorized or approved by the NRA;
and (4) taking any action, directly or indirectly, in any form or manner
whatsoever that is likely to tarnish or disparage the business reputation of
the NRA;

b.     Compensatory damages for injuries sustained as a result of Defendants'
wrongful conduct, in at least the amount of $40 million.

c.     Punitive or exemplary damages in an amount to be determined at trial;

d.     Forfeiture and disgorgement in an amount to be determined by the Court;

e.     Costs of court;

f.     Reasonable and necessary attorneys' fees;

62

g.   Pre-judgment and post-judgment interest at the highest lawful rate; and

h.   Such other relief, at law or in equity, to which it may be justly entitled.

190.   In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Return-of-Property Clause in the Services Agreement:

a.   Ordering that the NRA has proven its ownership rights and that AMc shall return the NRA's property immediately;

b.   Granting a pre-trial seizure of NRA property in the possession of AMc;

c.   Ordering the sheriff or other proper officer to seize NRA property and deliver the same to the NRA *pendente lite* under circumstances deemed appropriate;

d.   Granting NRA preliminary and permanent injunctive relief;

e.   Alternatively, granting NRA specific performance of the return of the NRA's Property or compensatory damages for a material, total breach of contract;

f.   Granting NRA punitive or exemplary damages; and

g.   Granting such other and further relief as the Court deems just and proper.

191.   In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Confidentiality Clause in the Services Agreement and the breach of the fiduciary duty of loyalty:

a.   Granting it preliminary and permanent injunctive relief, as well as other equitable relief such as disgorgement or forfeiture;

63

      b.      Granting it compensatory damages for material, total breach of contract, and breach of the fiduciary duty of loyalty, totaling $40 million;

      c.      Granting it punitive or exemplary damages; and

      d.      Granting such other and further relief as the Court deems just and proper.

192.      In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following on the breach of the Records-Examination Clause in the Services Agreement:

      a.      A judgment against each of Ackerman and Mercury for breach of contract;

      b.      An award of specific performance to the NRA requiring that:

          a.      AMc furnish copies of all AMc-Third Party NRA Contracts to the NRA within three (3) business days of the entry of such order; and

          b.      Within ten (10) business days of the entry of such order, AMc furnish to the NRA:

             i.      Copies of annual budgets for the years 2016-2018, which AMc alleges were approved by the NRA and were previously provided to the NRA's forensic accountants;

             ii.      A list of all current NRA-Dedicated Personnel (as defined in the NRA's letter correspondence) and, for each such employee, copies of business records sufficient to show the amount or percentage of the employee's time that was dedicated to NRA projects during the period from January 1, 2018, to present;

64

         iii.      Copies business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

              1.     The production of the NRATV documentary series "American Heroes;" or

              2.     Cash or non-cash compensation to North or North-related Staff; or

              3.     Office space of other perquisites provided to North or North-related Staff; and

              4.     Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

    c.     Copies of business records (if any) reflecting North's availability to film American Heroes, any modifications to the American Heroes production schedule during the period from May 2018 to present, and the reasons for those modifications; and

    d.     Such other and further relief to which the NRA may be entitled at law or in equity.

65

Dated:  October 25, 2019                    Respectfully submitted,

                                            **BREWER, ATTORNEYS &**
                                            **COUNSELORS**


                                            By: */s/ Michael J. Collins*
                                                Michael J. Collins
                                                State Bar No. 00785493
                                                mjc@brewerattorneys.com
                                                Jason C. McKenney
                                                State Bar No. 24070245
                                                jcm@brewerattorneys.com
                                                1717 Main Street, Suite 5900
                                                Dallas, Texas 75201
                                                Telephone: (214) 653-4000
                                                Facsimile: (214) 653-1015

                                            **ATTORNEYS FOR PLAINTIFF THE**
                                            **NATIONAL RIFLE ASSOCIATION OF**
                                            **AMERICA**

66

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon counsel of record in the above cause via ECF in accordance with the Federal Rules of Civil Procedure and the Local Rules on this 25th day of October 2019.

_/s/ Michael J. Collins_____
Michael J. Collins

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | § § § | |
| Plaintiff and Counter-Defendant, | § § | |
| and | § § | |
| WAYNE LAPIERRE, | § § | |
| Third-Party Defendant, | § § | |
| v. | § § | Case No. 3:19-cv-02074-G |
| ACKERMAN MCQUEEN, INC., | § § § | |
| Defendant and Counter-Plaintiff, | § § | |
| and | § § | |
| MERCURY GROUP, INC., HENRY MARTIN, WILLIAM WINKLER, MELANIE MONTGOMERY, AND JESSE GREENBERG, | § § § § | |
| Defendants. | § § | |

## DEFENDANTS' AMENDED ANSWER
## AND DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.'S
## AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

Subject to and without waiving Defendants' pending Motion to Dismiss (Doc. 38), come

now Ackerman McQueen, Inc. ("*AMc*"), Mercury Group, Inc. ("*Mercury*"), Henry Martin

("*Martin*"), William Winkler ("*Winkler*"), Melanie Montgomery ("*Montgomery*"), and Jesse

Greenberg ("*Greenberg*") (collectively, "*Defendants*"), and file this, their *Amended Answer to*

*Plaintiff's First Amended Complaint* (the "*Complaint*") and *Counter-Plaintiff AMc's Amended*

*Counterclaim* (the "*Counterclaim*") and *Amended Third-Party Complaint* against Wayne LaPierre

("***LaPierre***") ("***Third-Party Complaint***") and respectfully show the Court as follows:

# I.     RESPONSE TO "PRELIMINARY STATEMENT"

The NRA adds these additional allegations and claims in order to expose a stunning pattern of corruption, fraud, and retaliation by Defendants that continues to come to light. Since the NRA terminated its relationship with AMc last Spring, newly unearthed text messages, emails, and interviews with former AMc employees, customers, and others have made two things abundantly clear: *First*, AMc exploited decades of trust and confidence in order to siphon assets from the NRA, lining the agency's pockets at the expense of its client and in violation of the law. *Second*, AMc went to outrageous lengths to conceal and sustain its fraud, deploying scorched-earth tactics against anyone who dared to scrutinize its conduct. When the NRA's CEO, Wayne LaPierre, threw his weight behind efforts to gain transparency into AMc's business practices, the agency tried to oust him from the NRA in a desperate final salvo. That scheme failed. AMc now faces a long-overdue reckoning.

> **ANSWER:  Defendants deny the entirety of the first unnumbered paragraph of the Amended Complaint's Preliminary Statement.  Although Defendants admit that the relationship has indeed terminated, it was AMc who initially terminated the Services Agreement with the NRA.**

Until recently, the NRA could never have predicted that it would find itself at odds with its longtime advisor and vendor. Since at least the 1980s, the NRA relied on AMc as its agent to develop messaging, place advertising, and assist it in times of crisis. AMc's pugnacious messaging, reflected in its work with former NRA president Charlton Heston, favorably impressed NRA stakeholders. However, by 2017, the NRA was paying tens of millions to AMc annually, and many within the Association had grown suspicious that its experiment with a branded digital media platform was not working. The experiment had begun at the inducement of AMc in 2016 and with the intent to foster NRA membership growth, generate revenue and donations, and create a forum

for singularly promoting the NRA's viewpoint on Second Amendment issues. This became known as NRATV.

> **ANSWER:** Defendants admit that, until recently, the parties have had a favorable longstanding business relationship since the 1980s. Defendants lack knowledge or information sufficient to admit or deny what the NRA "could have predicted" or of what conduct it had "grown suspicious." Defendants specifically deny the remaining factual allegations in the second unnumbered paragraph of the Amended Complaint's Preliminary Statement.

As AMc's bills grew ever larger, NRATV's messaging strayed from the Second Amendment to themes which some NRA leaders found distasteful and racist. One particularly damaging segment featured children's cartoon characters adorned in Ku Klux Klan hoods. Unfortunately, attempts by the NRA to "rein in" AMc and its messaging were met with responses from AMc that ranged from evasive to hostile. At the same time, when NRA executives sought performance metrics for NRATV, AMc contrived a pretext to demand that each interlocutor be sidelined or fired. Simultaneously, in closed-door meetings with Mr. LaPierre (which AMc insisted remain "confidential"), the agency presented fabricated and inflated sponsorship and viewership claims. The simple request for the number of "unique visitors" to the site was not answered, despite multiple attempts by Mr. LaPierre and other NRA executives. In fact, AMc's representations to the NRA leadership regarding the viewership for the digital platform it created, presented, and administered were, by 2017, intentionally (and wildly) misleading. Tellingly, when NRATV finally shut down in June 2019, no one missed it: not a single sponsor or viewer even called, confirming what at least some NRA executives suspected—the site had limited visibility and was failing the accomplish any of its goals.

> **ANSWER:** Defendants deny the entirety of the third unnumbered paragraph of the Amended Complaint's Preliminary Statement.

Sadly, it is also now known that AMc's abuse of the trust placed in the agency neither began nor ended with NRATV. Since commencing its investigation into AMc's alleged abuses,

the NRA has acquired documents and information indicating that AMc fraudulently double-billed the NRA (and perhaps other clients) for professional time and equipment needs, among other things. For example, during 2018, AMc billed the NRA for time spent by one of its highest-paid employees, Lt. Col. Oliver North ("North"), for filming an NRATV documentary series. However, very little filming took place—because North was negligent in his contractual duties, as he focused time and energy in 2018 attempting to derail the NRA's inquiries into AMc's business and billing practices. Those attempts culminated in an extortion threat delivered during the NRA's Annual Meeting in April 2019, when AMc, via North, demanded that unless Mr. LaPierre immediately withdrew the pending lawsuit against it and resigned from office, AMc would publicize portions of confidential documents misleadingly curated to cause maximum reputational harm to the NRA. After Mr. LaPierre rebuffed AMc's threat and reported it to the entire Board of Directors of the NRA in an open letter, one of the agency's co-conspirators lamented privately: "[h]e is kicking our side's ass," and stated that Mr. LaPierre's challengers would benefit from "leak[ing] AMc's info." Immediately, in stark violation of its contractual and fiduciary duties, AMc proceeded to "leak" the threatened documents. To this day, AMc continues to breach its nondisclosure obligations and wage false, punitive reputational attacks against the NRA and Mr. LaPierre. Considering the multi-faceted scheme perpetrated on the NRA, it is beyond doubt that AMc and the other Defendants believe they are above the law.

**ANSWER: Defendants deny the entirety of the fourth unnumbered paragraph of the Amended Complaint's Preliminary Statement.**

Notwithstanding the termination of the parties' Services Agreement, AMc and the other Defendants continue to improperly refer, directly and indirectly, to the NRA on AMc's website and to use the NRA's intellectual property rights. Those references and use of associated intellectual property rights are not only unauthorized and unlicensed, but also falsely suggest that

the NRA endorses AMc's services in connection with NRATV, which it does not.

**ANSWER:** **Defendants admit that the parties' Services Agreement has terminated, but specifically deny that AMc "improperly" references the NRA on its website in any manner, engages in any "unauthorized" or "unlicensed" use of NRA intellectual property, or "falsely suggest[s]" NRA's endorsement of AMc's services.**

AMc's website also includes references to other failed client representations—to create the false impression that *all* of the featured campaigns were successful, including NRATV. Many of these campaigns, which cost clients tens of millions of dollars, were shut down because of their ineffectiveness, costliness, and Defendants' reluctance to provide specific performance data in accordance with its obligations. Accordingly, the NRA brings claims to enjoin AMc and the other Defendants from continuing to falsely make claims in public regarding their services to the NRA. In addition, the NRA brings this action to enjoin any further infringing and unauthorized or unlicensed use of its brand or its copyrights on the part of AMc.

**ANSWER:** **Defendants deny all factual allegations within the sixth unnumbered paragraph of the Amended Complaint's Preliminary Statement, particularly the suggestion that its website contains references to "other failed" relationships or that campaigns were "shut down." Defendants admit that the NRA seeks injunctive relief in the present action, but denies that they have engaged in any infringement, false claims, or other improper conduct that would entitle the NRA to such relief. Defendants deny that the NRA is entitled to any of the relief sought in the Amended Complaint.**

Finally, the NRA seeks to redress AMc's breaches, and subdue AMc's ongoing bad acts, so that it can close this regrettable chapter of its history.

**ANSWER:** **While Defendants agree that the events forming the basis of this lawsuit are indeed "regrettable," Defendants specifically deny any "breaches" or "bad acts" that would entitle the NRA to the relief it seeks, and deny that the NRA is entitled to any of the relief sought in the Amended Complaint.**

## II.   PARTIES AND RELEVANT NON-PARTIES

### A.   Plaintiff and Counter-Defendant the NRA

1.     Plaintiff the NRA is a not-for-profit corporation organized under the laws of the

State of New York with its principal place of business located in Fairfax, Virginia. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution. A 501(c)(4) tax-exempt organization, the NRA has approximately five million members, hundreds of thousands of donors, and many millions more who support its legendary advocacy.

> **ANSWER:** Defendants admit those portions of paragraph 1 that are factual in nature. Defendants can neither admit nor deny the self-laudatory opinions expressed therein and therefore deny same.[1]

2. The NRA is the Counter-Defendant to the Counterclaims and Third-Party Claims filed by AMc on October 1, 2019.

> **ANSWER:** Defendants admit the allegations in paragraph 2.

**B.    Defendants**

3. Ackerman is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City, Oklahoma. It admits that is an advertising and public relations agency that counted the NRA as its largest client for more than thirty years. Ackerman maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced. That office is located at 1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202. Ackerman is a Defendant in the original action filed by the NRA on August 30, 2019, as well as a Defendant to the additional causes of action asserted in this First Amended Complaint. It is also a Counterclaimant and Third-Party Plaintiff in connection with the

---

[1] It should be noted that the reference to hundreds of thousands of donors creates a misleading impression. *See* Class Action brought by a major NRA donor as class representative, on behalf of others similarly situated, casting serious doubt on these and other self-congratulatory offerings by the NRA. Case No. 3:19-cv-00679, styled *David Dell Aquila v. Wayne LaPierre, the National Rifle Ass'n, and the NRA Foundation*, in the Middle District of Tennessee; *see also* https://www.thedailybeast.com/national-rifle-association-fundraising-letter-we-could-shutter-very-soon (reporting on $55 million reduction in annual donations 2015-2017).

Counterclaims and Third-Party Claims it filed on October 1, 2019.

> **ANSWER:** Defendants admit the allegations in the first, fifth, and sixth sentences of paragraph 3. Defendants deny that the NRA was AMc's "largest client for more than thirty years." Defendants also deny that the NRA was "serviced" exclusively out of AMc's Dallas office, and instead was serviced from several other AMc offices in addition. Finally, Plaintiff alleges the incorrect address for AMc's Dallas office.

4.      Defendant Mercury is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Alexandria, Virginia. Mercury is a wholly-owned subsidiary of Ackerman and specializes in public communications strategy, including on behalf of advocacy groups such as the NRA. Mercury was a party to the Services Agreement (defined below) with the NRA. Mercury maintains a principal office in Dallas, Texas, from which it serviced the NRA's account. In particular, that office is located at the same address as Ackerman's Dallas office—1717 McKinney Avenue, Suite 1800, Dallas, Texas 75202. Mercury engaged in all the wrongful conduct detailed in this amended complaint.

> **ANSWER:** Defendants admit that Mercury is AMc's subsidiary, that it is located in Alexandria, Virginia, that it provides active public communications strategy, and that as AMc's subsidiary, it was a party to the Services Agreement with the NRA. Defendants deny that Mercury maintains any type of corporate office in Dallas, Texas, and denies that the corporate address listed for AMc is correct. Defendants further deny that Mercury has engaged in any "wrongful conduct," either in connection with its performance under the Services Agreement or otherwise.

5.      Defendant Winkler resides in Edmond, Oklahoma. Winkler is affiliated with business entities located in this District, including DJ Investments LLC, which operates in this District under the assumed name of 3905 Amherst Ave UPT, LLC and owned property at 3905 Amherst Ave Dallas (University Park), Texas 75225, and WBB Investments LLC, a Texas limited liability company. During the relevant time period, Winkler served in the senior leadership of Ackerman as Chief Financial Officer. He is also a certified public accountant. During the relevant time period, Winkler and other senior AMc officers and employees travelled to this District for

meetings with NRA officials at Ackerman's Dallas offices and/or other locations within this District. These activities are relevant to the claims asserted herein because they concerned, among other things, AMc's billing practices and representations about NRATV's performance and viewership. Winkler engaged in wrongful conduct detailed in this amended complaint.

**ANSWER: Defendants deny that Winkler is affiliated with any entity called 3905 Amherst Ave UPT, LLC, and further deny that Winkler ever traveled to the Dallas office of AMc to discuss "AMc's billing practices" or "representations about NRATV's performance and viewership." Defendants deny that Winkler engaged in any wrongful conduct. Defendants admit the remaining allegations in paragraph 5.**

6.      Defendant Montgomery resides in Dallas County, Texas with her place of business located at Ackerman's Dallas, Texas offices. During the relevant time period, Montgomery held several roles, including the Executive Vice President/Management Supervisor, and, as stated on Ackerman's website, has "work[ed] on the [NRA] account." Montgomery engaged in wrongful conduct detailed in this amended complaint.

**ANSWER:   Defendants admits the allegations in the first two sentences paragraph 6, denying the remaining allegations.**

7.      Defendant Martin is an individual who resides in Dallas County, Texas. Martin has served as Ackerman's Chief Creative Officer since 2010. During the relevant time period, Martin participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

**ANSWER: Defendants admit the allegations in the first sentence of paragraph 7, denying the remaining allegations.**

8.      Defendant Greenberg is an individual who resides in Dallas County, Texas. During the relevant time period, Greenberg served as Ackerman's Chief Strategy Officer. Greenberg participated in the conduct which forms the basis of this suit, including, but not limited to, his participation and work in connection with the NRATV website and digital platform.

**ANSWER:** Defendants admit the allegations in the first two sentences of paragraph 8, denying the remaining allegations.

**C.** **Unnamed, Non-Party Co-Conspirators and Relevant Non-Parties**

9.     Dan Boren is an individual who is an executive of the Chickasaw Nation and not an employee of AMc. Mr. Boren entered into an agreement, combination, and/or conspiracy with the Defendants for the purpose of carrying out the fraudulent behavior, the attempt to de-railing the resulting NRA investigation, and the attempt to extort Mr. LaPierre and the NRA alleged herein. In addition, there exists a small group comprising former vendors, professionals, and consultants of the NRA whose economic incentives, like AMc's, were challenged by the NRA investigation and, like Mr. Boren, joined the agreement, combination, and/or conspiracy.

**ANSWER:** Defendants admit that Dan Boren is not an employee of AMc and deny the remaining allegations in paragraph 9.

10.     Oliver North is an individual who resides in South Carolina and/or the Commonwealth of Virginia. Mr. North is a former president of the NRA. Unbeknownst to the NRA until recently, North is also a full-time employee of Ackerman.

**ANSWER:** Defendants admit the allegations in the first two sentences of paragraph 10, denying the remaining allegations.

## III.     JURISDICTION AND VENUE

11.     The Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338, because this is a civil action involving claims arising under the laws of the United States.

**ANSWER:** Defendants admit the allegations in paragraph 11.

12.     The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367, because the state law claims are sufficiently related to the other claims in the action subject to original jurisdiction that they form part of the same case or

controversy under Article III of the United States Constitution.

**ANSWER:  Defendants admit the allegations in paragraph 12.**

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District. As stated above, during the relevant time period, NRA senior officers and employees would regularly travel to this District to hold meetings with Defendants. These meetings are relevant to claims asserted herein and concerned Defendants billing practices and NRATV. Defendant AMc has also admitted that it maintains a principal office in Dallas, Texas, out of which the NRA's account was serviced. Three Individual Defendants work out of that office, which also doubles as a corporate office for Defendant Mercury.

**ANSWER:  Defendants admit the allegations in paragraph 13, except to deny any suggestion or implication that Mercury maintains a principal office or any type of corporate presence in Dallas County, Texas.**

## IV.     FACTUAL BACKGROUND

### A.     For Decades, The NRA Relied On Ackerman To Perform Public Affairs Services Requiring A High Level of Trust

14.     The NRA and AMc worked closely together for more than 30 years. In 2017 alone, the NRA paid more than $40 million to AMc. Over that decades-long relationship, the NRA reposed extensive trust and confidence in AMc to perform a wide range of services, including public relations and strategic marketing; planning and placement of media; management of digital media and websites; and the management of NRATV, a digital-media platform frequently perceived by the public as the "voice" of the NRA. By its nature, this work was publicly and politically sensitive and required the NRA to entrust AMc with confidential (and often privileged) information.

**ANSWER:  Defendants admit that AMc performed a wide range of services for the NRA during the parties' multi-decade business relationship, but lack**

knowledge as to the level of trust and confidence "reposed" in AMc during that time. Defendants deny that the NRA paid "more than $40 million" to AMc, to the extent that such allegation implies that the sums paid were for services actually rendered by AMc. Defendants deny that AMc was entrusted with "privileged" information as part of its performance under the Services Agreement.

15.     AMc's work on behalf of the NRA was governed by successive incarnations of a Services Agreement containing detailed specifications for how various types of work performed by Ackerman should be budgeted and billed. Each Services Agreement provided that certain categories of services, such as Owned Media and Internet Services, would be compensated with an agreed annual fee, while other services were required to be invoiced on an *ad hoc* basis based on estimates furnished by AMc and approved by the NRA. Consistent with the sensitive nature of AMc's services, the Services Agreement strictly limits use and disclosure by AMc, and its individual employees (who were themselves fiduciaries of the NRA), of information acquired during AMc's work on behalf of the NRA.

**ANSWER:  Defendants admit the allegations of paragraph 15 and that the Services Agreement speaks for itself, except that Defendants deny the legal conclusion that AMc or any of its individual employees were fiduciaries of the NRA.**

16.     Specifically, Section IV of the Services Agreement provides that AMc "shall not disclose, directly or indirectly, to any third party, any ... data, materials or information ... made known to AMc as a result of AMc's providing [contracted-for services] . . . without the prior express written permission of [the] NRA." AMc may use the NRA's confidential information "only for the limited purpose of providing its [s]ervices to the NRA," and AMc "warrants and agrees to prevent disclosure of Confidential Information by its employees, agents, successors, assigns and subcontractors."

**ANSWER:  Defendants admit that the referenced Services Agreement speaks for itself.**

17.     Notably, AMc served as the NRA's agent for several purposes pursuant to the Services Agreement and as a consequence of the trust and confidence placed in AMc by the Association. Therefore, AMc owed fiduciary duties to the NRA. For example, the Services Agreement provided for AMc to act "on [the] NRA's behalf," and subject to the NRA's control, with respect to purchasing, planning, and placement of media—activities that required the NRA to entrust AMc with nonpublic information about its communication strategy. In its capacity as the NRA's agent, AMc was required to demonstrate "the same high standard of good faith and loyalty" to the NRA as would be "required ... of an attorney to his client." Indeed, owing to the parties' decades of close collaboration, their relationship of trust and confidence existed prior to, and apart from, the execution of the Services Agreement. AMc's common-law duties of loyalty were further codified and buttressed by contractual confidentiality provisions.

>    **ANSWER:  Defendants lack knowledge sufficient to admit or deny the NRA's level of "trust and confidence" in AMc, and therefore deny same.  Defendants specifically dispute and deny the legal conclusion that AMc or any of its employees were agents or fiduciaries of the NRA at any point during the parties' business relationship.**

18.     AMc monthly invoiced the NRA for a wide variety of expenses. Consistent with the substantial scope and dollar value of the services rendered by AMc for the NRA, the Services Agreement contained detailed guidelines identifying categories of expenses that could be invoiced to the NRA, and conditions for their reimbursement. For example, hotel and meal expenses were required to be authorized in writing, in advance, by the NRA. Over the parties' decades-long course of dealing, underlying receipts and other support for AMc's expenses were not transmitted to the NRA alongside AMc's invoices but, rather, were supposedly maintained at AMc's offices. This practice was followed at AMc's suggestion, in order to ensure that AMc's work pertaining to matters such as donor development, strategic planning, and legal items remained confidential.

>    **ANSWER:  Defendants admit the allegations in the first sentence of paragraph**

**18, denying the remaining allegations.**

19.     Of course, the NRA was *repeatedly* assured that appropriate documentation was retained by AMc and could be audited anytime at the NRA's request. Indeed, AMc offered elaborate assurances not only that its recordkeeping was secure and accurate, but that AMc was the *most* secure repository for travel itineraries and other documents raising potential security issues.  It is now known that these representations were false when made, with a specific intent to induce the NRA to maintain or increase its reliance on AMc. The NRA has only recently discovered that for years *no one* kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA.

        <u>ANSWER:</u>  **Defendants deny the allegations in paragraph 19.**

20.     Given its responsibilities, AMc took an active role in shaping the public image of the NRA's principals and executives, including Mr. LaPierre.  Based on AMc's advice, and subject to billing procedures AMc recommended and established, Mr. LaPierre, over a fifteen-year period, incurred wardrobe and related expenses for countless television appearances, filming of commercials, and other outward-facing brand-development activities. The majority of those activities were specifically directed, choreographed and produced by AMc. As such, expenses were initiated at AMc's direction and records relating thereto were to be maintained by AMc. Of course, AMc should not have incurred (let alone sought reimbursement for) any expenses which it believed inappropriate.

        <u>ANSWER:</u>  **Defendants deny the allegations of paragraph 20, except to admit that AMc took an active role in shaping the public image of LaPierre.**

B.      <u>Branded News—The Growth of NRATV</u>

21.     During the late 1990s, under the leadership of its then-president, AMc decided to

---

radically alter its business from that of a traditional ad agency to a creator and broadcaster of original media content. AMc saw the growth of digital networks as an opportunity for large entities to craft and advance their own brand messaging through television production. It saw the content-production business as lucrative, exciting, and cutting-edge, but did not consider or care whether its clients would actually benefit from such services. If AMc could hawk "television-style production" at a profit, it would do so—and it did.

**ANSWER:** **Defendants deny the allegations in paragraph 21.**

22. AMc touted its new business philosophy as follows:

EVERY BUSINESS AND INDIVIDUAL HAS THE ABILITY TO BECOME A MEDIA COMPANY

If you have an audience that cares about what you have to say, you can create and distribute content with complete autonomy. No one else should capture or distribute those stories better than you. And in this era of communication, it has never been more affordable or efficient for you to begin.

**ANSWER:** **Defendants admit that the quoted language in paragraph 22 can be found on AMc's website. Defendants deny its characterization as a "new business philosophy" but respond that it is simply describing one of the many types of services offered by AMc.**

23. Of course, fundamental to AMc's optimism about its "new" direction was its belief that it could convince its largest client, the NRA, to "buy into" the concept. Thus, in the early 2000s, AMc set out to induce the NRA to finance the creation of its own branded news platform. Plying the NRA with glowing prognostications about the lucrative benefits of "owned media," AMc persuaded the NRA to launch its initial digital-video platform known as "NRA News" in 2004. The NRA had long relied on AMc to place advertising via traditional media, including conventional television channels. To AMc, the funds remitted to real media outlets were funds available for the Association "to invest" in building studios and other assets from which AMc might profit. NRA News was the beginning of that effort.

**ANSWER:  Defendants deny the allegations in paragraph 23, except to admit that AMc did indeed, at various times, "place advertising via traditional media, including conventional television channels," for the NRA.**

24.     The annual budget for NRA News quickly, substantially climbed, from $1.6 million in 2004 to $4.594 million by 2014. For example, from 2004 through 2014, there was some evidence that NRA News was attracting the viewership AMc promised: even late at night, live programs with call-in components seemed to be generating promising call volume. AMc generated glossy, confidential PowerPoint presentations—which it would display for the NRA during meetings but would refuse to provide "in writing"—that claimed that NRA News generated tens of millions of valuable engagements and views.

**ANSWER:  Defendants deny the allegations in paragraph 24.**

25.     Based on the reported success of NRA News, the NRA agreed to experiment with an expanded version of the platform. Beginning in 2016, AMc CEO Angus McQueen ("*McQueen*") began lobbying Mr. LaPierre with glowing projections about the benefits of expanded programming on an NRA-branded digital platform.  Seeking to induce Mr. LaPierre to substantially increase the NRA's investment in the media segment to over $10 million dollars, McQueen seized on the rise of digital media and persuasively claimed that developing such a digital platform was simply "part of being a 21st century company" and that "we can't let the status quo continue."  Emphasizing the need to act quickly, McQueen stated that the "NRA needs to lead change in the marketplace" and "not become a follower." Tying his themes together, McQueen asserted that the NRA "must put its message in all delivery systems," including the expanded digital platform.

**ANSWER: Defendants deny the allegations in paragraph 25.**

26.     Highlighting the concept's financial viability, McQueen pressed that "we must vastly modernize the entire economic under-performance of [the] NRA."  Ultimately, he pointedly

emphasized that the "NRA needs to find new ways to make money" and that the digital platform concept presented "a good opportunity to generate revenue." Indeed, Defendants assured the NRA that its substantial investment would "pay for itself" in short order, via a combination of "soft" and "hard" monetization, including paid commercial sponsorships for live programs. In fact, AMc assured the NRA that based on its experiences for other clients that this substantial investment would "pay for itself" within three years max. In reliance on these representations, the digital platform was launched in 2016 under the brand NRATV.

**ANSWER: Defendants deny the allegations in paragraph 26.**

27.     Although the creative content generated for NRATV constituted work for hire for copyright purposes (and was owned by the NRA), NRATV was managed and controlled—its talent hired and supervised, and its programming scripted—by AMc. From the outset, NRATV was expensive, costing more than $12 million in its first year. However, AMc claimed that the largest subset of this expense, which pertained to live programming, was "the key" to the success of the platform. Having served the NRA for decades, AMc knew what its client desired in the digital media space: (1) outreach to new potential members (especially of a younger generational cohort), (2) a self-sustaining platform, and (3) a vehicle to advance its mission and Second Amendment advocacy. AMc represented that NRATV would be built and managed to serve these purposes.

**ANSWER: Defendants deny the factual allegations and legal conclusions in paragraph 27, except to admit that AMc hired and supervised talent and programming for NRATV.**

28.     Within NRATV's first year, AMc falsely reported that the platform generated millions of "engagements" and views. Noting the NRA's keen interest in the platform's viewership and sponsorship figures, AMc promised to bring consulting a firm, Performance Improvement Partners ("PIP"), to provide "data analytics and insights" tracking NRATV's performance. In the

interim, AMc purported to update the NRA regularly on NRATV's metrics. During meetings held on the following dates, at the following locations, AMc staff—generally consisting of Nader Tavangar, Peter Farrel, Revan McQueen, and Defendants—delivered PowerPoint presentations boasting that NRATV consistently generated millions of views, including "completed" and "engaged" views:

| Meeting Date | Meeting Location |
|---|---|
| October 24, 2017 | Teleconference/Polycom |
| November 28, 2017 | Mercury Group Offices |
| January 3, 2018 | Ackerman Offices (Dallas, Texas) |
| February 1, 2018 | Las Vegas, Nevada |
| February 19, 2018 | Ackerman Offices (Dallas, Texas) |
| April 11, 2018 | Ackerman Offices (Dallas, Texas) |
| September 4, 2018 | Teleconference/Polycom |
| October 11, 2018 | Ackerman Offices (Dallas, Texas) |
| October 23, 2018 | Teleconference/Polycom |
| October 30, 2018 | Ackerman Offices (Dallas, Texas) |
| November 28, 2018 | Teleconference/Polycom |
| December 5, 2018 | Teleconference/Polycom |
| January 18, 2019 | Ackerman Offices (Dallas, Texas) |

**ANSWER:  Defendants deny the factual allegations in paragraph 28, except to admit that the referenced meetings did occur.**

29.     In these closed-door meetings (which Ackerman insisted upon, ostensibly for reasons of "confidentiality"), with Mr. LaPierre and sometimes others from the NRA leadership in attendance, Defendant Montgomery and others made purposely inflated sponsorship and viewership claims now known to be false in order to induce the NRA to continue investing millions upon millions in NRATV and, by extension, AMc. In each of the thirteen meetings listed in the above chart, Defendants led the NRA to believe that NRATV's viewership numbered in the millions and that Defendants were generating many millions of dollars in value for the NRA. They

did so not with facts or evidence but through a carefully coordinated scheme to present misleading, out-of-context, and conjured-up statistics for the consumption of the NRA leadership.

**ANSWER:  Defendants deny the allegations in paragraph 29.**

30.     Of course, viewership is the *raison d'etre* of digital advertising and content creation. By creating attention-catching content, digital creators and their marketing firms aim to develop a base of loyal viewers who will eventually support the organizations who create it. This, in turn, attracts advertisers and sponsors for the programming or other digital content, which pay based on the number of *unique* "eyeballs" or "click-throughs" provided by the content. As digital marketing has become increasingly important for businesses and non-profits alike, an entire industry has arisen which collects, aggregates, analyzes, and presents viewership data.  That data—which can be so granular as to identify *distinct individual viewers* of digital media—can provide valuable insight to organizations seeking to develop their brand and win the loyalty of the viewing public. However, due to content creators' heavy reliance on these digital metrics, inaccuracies can be consequential and damning.

**ANSWER:  Defendants deny the allegations in paragraph 30.**

31.     Over the course of more than thirteen meetings and countless emails, Defendants systematically misrepresented and overstated the viewership performance of NRATV.  In response to the consistent inquiries of NRA leadership generally, and Mr. LaPierre specifically, Defendants fabricated or massaged data in an intentionally misleading fashion to falsely suggest a robust, growing viewership for NRATV. In reality, AMc knew—based on underlying, unvarnished, fulsome metrics that it intentionally withheld from the NRA—that NRATV was an abject failure.

**ANSWER:  Defendants deny the allegations in paragraph 31.**

32.     AMc's contrived, cherry-picked figures misrepresented NRATV's viewership data in at least two respects.

**ANSWER:** Defendants deny the allegations in paragraph 32.

33.     *First*, the figures presented by Defendants fraudulently misrepresented or omitted the number of distinct viewers of NRATV content. It is fundamental that the nominal quantity of "clicks," or "views," achieved by particular digital content is of minimal informative value, including because each "click" or "view" does not necessarily represent a unique user. For example, a user's web browser might automatically refresh a video or a page at routine intervals, simulating hundreds or thousands of views; less egregiously, a single user might intentionally click on a piece of content multiple times—which is favorable, but not as valuable as clicks from several separate viewers. Accordingly, responsible media companies disaggregate their total click figures and discern, using data provided by Google and other analytics services, the total number of distinct users. AMc declined to do that. Instead of providing an accurate account of the number of distinct users—a number which AMc knew would raise the alarm that NRATV was failing— AMc provided only aggregate data, thereby creating the false impression that NRATV had substantially more unique viewers than it actually did. That false representation was intended to induce the NRA to continue its investment in NRATV and, by extension, AMc.

**ANSWER:** Defendants deny the allegations in paragraph 33.

34.     *Second*, the figures presented by Defendants fraudulently inflated NRATV's viewership figures by failing to rigorously differentiate between genuine views and merely incidental ones. Genuine views represent instances in which a user encounters content and then volitionally interacts with it in some way—rather than immediately navigating elsewhere. Merely incidental views, by contrast, are "views" which occur only because an individual user happens to scroll past NRATV content on a webpage. The importance of this distinction is obvious. While genuine viewers represent those who actually watch NRATV content and thus are exposed to the NRA's messaging and ideas, merely incidental viewers are not. Although AMc occasionally

purported to distinguish total views from "engaged" views, its calculations overrepresented the number of "engaged" views.

**ANSWER:  Defendants deny the allegations in paragraph 34.**

35.    The presentation made by senior corporate executives of AMc to the NRA leadership in October 11, 2018 (one of the meetings identified in the chart) is illustrative of the agency's efforts to hoodwink the NRA through tortured, fraudulent statistics and misleading generalizations about the platform's performance. Just as they had done in previous meetings, AMc produced a glossy PowerPoint presentation which purported to, in the words of Defendant Montgomery, present "all things NRATV," including its "analytics." It did nothing of the kind. Rather than candidly discuss NRATV's disastrous performance, known internally to Defendants, Defendant Montgomery falsely touted its success. For example, the presentation asserted that NRATV was "the strongest media outlet covering the Second Amendment," and that NRATV had seen "tremendous increase[s] in [the] time spent on the site." Each of these representations was accompanied by a bevy of out-of-context and misleading statistics. Not once did Defendant Montgomery or any other Ackerman employee disclose the crucial actual and unique viewership data that would contradict her misleading statements about the performance of NRATV. Among the outrageous representations made was that the total viewership of NRATV, in a mere eight months, had received over *two-hundred million views*, thereby suggesting that NRATV content had reached two-thirds of the United States.  This representation, like the many others made during the course of AMc's meetings with NRA executives regarding NRATV, was fraudulent and false—and AMc knew it.

**ANSWER:  Defendants deny the allegations in paragraph 35, except to admit that a meeting did occur on October 11, 2018.  Defendants deny that any such presentation was given at this meeting.**

36.    Apparently not content to hide from the NRA the platform's actual viewership

figures, Defendants also concocted a series of "valuations" which had no basis in reality. For example, in Q3 2018, representatives from the NRA and AMc, including Defendants Montgomery, Martin, and Greenberg, held a meeting to discuss the valuation of NRATV. At the meeting, Defendants touted a proprietary "AM Conservative Approach" formula, which it insisted provided a conservative estimate of the Earned Media Value (EMV) generated by NRATV in excess of $13 million. Adopting a separate, less-conservative formula, Defendants represented that NRATV should actually be valued at $45 million annually, a figure justified by citing "total views" of NRATV content. In addition to being based on "total view" figures that Defendants knew to be misleading for the reasons discussed above, the more fundamental problem with these "valuations" is that they have no basis in fact. Rather, by presenting these valuations and contending they are based on a proprietary formula, Defendants intentionally deceived the NRA into believing that its substantial investment in NRATV was generating outstanding returns when, in fact, the primary beneficiary of the initiative were the Defendants.

**ANSWER:** Defendants deny the allegations in paragraph 36.

37. Further illustrating the slipshod and dishonest approach to valuation, in a meeting held on October 11, 2018, at AMc's offices in Dallas, Texas, and in correspondence dated May 13, 2019, Defendant Montgomery made representations that purported to calculate the value of the NRA's digital media presence. Using a formula based solely on the "cost to get . . . published"— that is, the cost to AMc—Montgomery presented a valuation based, not on the value the NRA received, but on putative costs incurred by AMc. In doing so, Montgomery effectively represented on behalf of Defendants that, in paying AMc to conduct digital media operations, the NRA was receiving substantial value on its investment. That representation was not based upon any reliable measure of the benefit the NRA received due to its digital media presence; the sole measure of the "value" used by AMc was its own profitability.

**ANSWER:** Defendants deny the allegations in paragraph 37, except to admit that a meeting did occur on October 11, 2018.

**C.     Troubled Waters: The Demise of NRATV**

38.     By 2017, the annual budget for NRATV grew to over $20 million annually—a number that was viewed by NRA leadership as unsustainable without tangible proof that the platform would soon monetize itself.  As described above, the Association began, in 2017, to press AMc for actual, reliable proof that the platform was reaching its projected objectives or deliverables—membership growth, actual unique viewership information, and/or signs that others (*e.g.,* advertisers or sponsors) would invest in the platform.

**ANSWER:** Defendants deny the allegations in paragraph 38.

39.     At the same time, the leadership of the NRA—especially Mr. LaPierre—began to question whether the messaging associated with NRATV's live programming actually served as a benefit to the Association's mission. As NRATV often became viewed as a dystopian cultural rant that deterred membership growth, NRA leadership requested greater directional control and coordination over the content of NRATV programming.

**ANSWER: Defendants deny the allegations in paragraph 39. To the extent that NRATV became viewed as a "dystopian cultural rant," responsibility for the "deterred membership growth," if any, is due to the acts and omissions of Plaintiff NRA and Third-Party Defendant LaPierre, himself.**

40.     As these factors coalesced, the ownership at AMc—fearing the loss of its most important income-producing activity—became increasingly secretive, hostile and determined to "protect" its "economics" with the NRA.

**ANSWER:** Defendants deny the allegations in paragraph 40.

41.     In what has turned out to be an unfortunate "public reveal" of AMc, it is now known that NRATV was, by the dawn of 2018, a reflection of what AMc itself had become—an economic burden to the NRA. Infected by a bizarre sense of entitlement, by 2018, the leadership of AMc

seemed to believe that it was "entitled" to an unfettered flow of tens of millions of dollars from the NRA—whether or not it actually served the best interests of its client. Although the agency had, undeniably, provided benefits to the Association for many years, by 2018 it is now known that AMc was riddled with corruption, driven by the greed of its leadership and determined to entrench its "cash flow" from the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 41.**

42.     As the trial in this matter will reveal, the NRA was victimized by its most trusted vendor. And in many ways, the unravelling of NRATV provides useful insight into the demise of AMc.

**ANSWER:  Defendants lack the knowledge to admit or deny whether AMc was Plaintiff's "most trusted vendor," and therefore deny same.  Defendants deny the remaining allegations in paragraph 42.**

43.     Importantly, AMc had reason to know that even its most conservative projections for NRATV were fanciful. By 2016, when NRATV debuted, another AMc client had already agreed to experiment with the "owned media" concept—and it was an unmitigated failure. The American Clean Skies Foundation ("ACSF"), an energy-industry advocacy group, hired AMc in 2008, and was promptly sold a bill of goods similar to the one pitched by AMc to the NRA, including an "owned media" digital-video channel. ACSF's ensuing experience with AMc, and the resulting "Clean Skies TV" product, was so disastrous that ACSF's former general counsel contacted the NRA and offered assistance with this lawsuit, noting: "I'm pleased to see [AMc] get called on their practices finally." After ACSF's reasonable requests for information about  Clean Skies TV's budgets and operations went unanswered, ACSF fired AMc in 2009. Even as it made elaborate representations to the NRA that digital video "owned media" was the future of public relations, and that the steep costs associated with NRATV would easily be recouped, AMc concealed the failure of Clean Skies TV.

**ANSWER:** Defendants deny the allegations in paragraph 43.

44.    On. May 13, 2019, AMc finally responded in writing to the latest of numerous requests for unique live viewership figures for NRATV. Incredibly, AMc's response still did not disclose unique viewers for NRATV platforms. Instead, an accompanying letter from Defendant Montgomery disclaimed years of assurances regarding the monetization potential of NRATV. In the most direct response offered by AMc to date regarding the NRA's requests for unique-viewer data, Montgomery simply stated: "[L]ive production is in place for several reasons, *not one of which was to accumulate massive live viewership numbers*." Of course, this is nonsense: since 2016, AMc touted NRATV's purported viewership numbers as a primary driver of its claimed valuation. Of course, there was no other logical reason for the NRA to invest in NRATV than to gain large viewership numbers, without them, none of the stated goals of increased membership and sponsors would be possible. And it did not. It was all a hoax.

**ANSWER:** Defendants deny the allegations in paragraph 44.

45.    Ultimately, facing a "wind-down" of its services and cessation of payments from the NRA, AMc finally admitted that the NRA "could conceivably stop the live stream component of NRATV without significantly affecting the network's viewership performance[.]" In other words, the most expensive component of NRATV (and thus the most profitable for AMc) was generating de minimis value, if any, with respect to primary metric of interest to the NRA: viewership.

**ANSWER:** Defendants deny the allegations in paragraph 45.

46.    During 2019, *The New York Times* reportedly reported on an independent assessment of NRATV's unique viewership figures. That assessment determined that NRATV's "web traffic was miniscule, with 49,000 unique visitors in January [2019]"—compared to the millions of visitors claimed by AMc.  It is now known that those paltry numbers—stunningly small

when compared to AMc's representations regarding viewership—are overstated. In fact, when the Association shut down NRATV in June 2016, not a single reaction emerged.

**ANSWER:  Defendants deny the allegations in paragraph 46, except to admit that the referenced article was published.**

**D.    The NRA's Transparency Efforts and Ackerman's Response**

47.    In recent years, the State of New York amended its Not-for-Profit Corporation Law (the "NPCL") to clarify requirements for director independence and the ratification of related-party contracts, among other items. After updating its internal policies and controls to reflect these amendments, the NRA undertook to strengthen its procedures for documentation and verification of compliance by vendors with their contracts. Beginning in August 2018, the NRA sent letters to more than a hundred vendors—including AMc—that set forth updated invoice-support requirements and provided detailed guidance regarding, for example, expense reimbursement procedures.

**ANSWER:   Defendants lack knowledge to admit or deny the allegations contained within paragraph 47, including any changes to New York law, the updating of NRA internal policies and controls, or whether the NRA sent letters to other vendors besides AMc. Defendants admit that AMc received a letter like the one described in paragraph 47 but deny that it provided the "detailed guidance" Plaintiff alleges.**

48.    Simultaneously, as the NRA's now-former Treasurer and CFO prepared to retire and the NRA leadership ranks shifted, multiple employees began to voice recommendations regarding opportunities for improvement at the NRA. Combined with the NRA's compliance efforts, numerous employees came forward with complaints about AMc.

**ANSWER:  Defendants lack knowledge or information sufficient to admit or deny the allegations in paragraph 48.**

49.    Specifically, the NRA was compelled to investigate multiple concerns about AMc:

- "Out of pocket" expenses that lacked meaningful documentation of NRA

approvals, receipts, or other support, despite the requirements set forth in the Services Agreement;

- Immense growth in AMc's annual budgets, coupled with a lack of transparency regarding how the budgets were calculated or whether AMc adhered to them;

- Lack of transparency regarding AMc's compliance with its contractual obligation to ensure that services were provided at "fair market value";

- Concerns that AMc was invoicing the NRA for the entire salaries attributable to NRA-Dedicated Personnel, despite certain NRA-Dedicated Personnel allocating substantial time to *non*-NRA clients; and

- Refusal by AMc to provide data "in writing" (such as unique visitors, viewership numbers, click through rates, or related performance metrics) that enable the NRA to analyze the return on its substantial investment since 2016 in NRATV.

**<u>ANSWER:</u> Defendants lack knowledge sufficient to admit or deny what the NRA felt "compelled" to do. Defendants deny the allegations and implications in paragraph 49.**

50. Consistent with the broad scope and critical nature of the services performed by AMc for the NRA, the NRA bargained for transparency into AMc's files, books and records pursuant to the Services Agreement. Both the previous Services Agreement and the current iteration incorporate Records-Examination Clauses that require AMc to open its files for the NRA's inspection upon reasonable notice. The full text of the Records-Examination Clause in the Services Agreement appears below:

| Services Agreement |
| --- |
| • Dated April 30, 2017 (as amended May 6, 2018) <br> • Between the NRA and "AMc" (defined to include both Ackerman and Mercury) |

> **VIII. EXAMINATION OF RECORDS**
> During the term of this Services Agreement, AMc authorizes NRA, upon reasonable notice, to examine AMc and Mercury's files, books and records, with respect to matters covered under this Services Agreement.

**ANSWER: Defendants deny the allegations contained in paragraph 50, except to admit that the most recent Services Agreement contained the quoted clause.**

51.    During early- and mid-2018, the NRA sought information from AMc pursuant to the Records-Examination Clause on a common-interest basis to advance parties' mutual interests relating to an ongoing lawsuit. However, after the NRA began to request access to records that would shed light on concerns regarding AMc's business and accounting practices, AMc became evasive and even hostile.

**ANSWER:  Defendants deny the allegations in paragraph 51.**

52.    In August 2018, within days after the NRA announced that it would now require supporting documentation to be transmitted contemporaneously with vendor invoices, a media outlet quoted "an anonymous source at Ackerman McQueen" [footnote omitted] –creating serious concerns about AMc's compliance with its confidentiality obligations.

**ANSWER:  Defendants cannot admit or deny whether the NRA experienced "serious concerns" about anything, and therefore deny same.  Defendants deny all other allegations in paragraph 52.**

53.    On August 27, 2018, Defendant Winkler sent a letter to the NRA which purported to comply with the NRA's request for a more comprehensive audit of Ackerman's expense records. The letter pointedly identified several categories of items, some relating to travel and entertainment, which it warned would be encompassed in a full production of those records—perhaps believing that the threat of such disclosure would dampen the NRA's demands for transparency. However, the NRA was undeterred, and insisted upon reviewing and verifying details of expenses incurred.

**ANSWER:  Defendants lack knowledge sufficient to admit or deny whether**

the NRA was "undeterred" in the manner it describes, and therefore deny same. Defendants admit that Winkler sent a letter to the NRA on the referenced date, but deny all other factual allegations and implications in paragraph 53.

54.     In September 2018, for the first time in the parties' decades-long course of dealing, AMc demanded that its outside counsel supervise any document review conducted under the Records-Examination Clause, then demanded payment of outside counsel's legal fees as a precondition for delivery of video footage it produced and for which AMc had already invoiced the NRA. During a telephone call on September 19, 2018, after AMc's counsel insisted that the NRA pay AMc's legal fees without any insight into why the fees were incurred, the NRA's counsel observed that AMc's posture seemed more consistent with an adverse than a common-interest relationship. AMc's counsel then made a startling statement: "Ackerman views the relationship as adverse."

**ANSWER: Defendants deny the allegations in paragraph 54.**

55.     Around the same time, an NRA executive asked AMc for a copy of an audit purportedly conducted by PIP, one of the independent digital-analytics vendors purportedly retained by AMc, regarding the value of NRATV. Departing sharply from prior conversations, AMc cursorily informed the executive that no audit had been performed, and no copies of any documents would be provided. Rather than audit AMc's reported viewership metrics, AMc explained that PIP had "worked with" AMc to create a purported "dashboard" of digital analytics; AMc promised it would "go through all of that" during an upcoming live meeting.

**ANSWER: Defendants deny the allegations in paragraph 55.**

56.     Thereafter, AMc strenuously resisted the NRA's efforts to enforce the Services Agreement, including by embarking on a campaign to "kill the messenger" when the NRA continued to seek access to documents or proposed reductions in AMc's budget. At first, AMc

scapegoated the NRA's outside counsel—refusing to interface with counsel. Then, over ensuing months, AMc also refused to respond to basic information requests from NRA executives. After the NRA retained a third-party forensic accounting firm to interface with AMc in an effort to appease AMc and gain its compliance in January 2019, AMc indicated it would cooperate. Unfortunately, that pledge of cooperation was short-lived, as AMc purported to forbid the accountants from disclosing simple, material information to the NRA—including copies of annual budgets against which AMc was invoicing. When the NRA's General Counsel sought additional information in follow-up to the forensic audit, AMc ignored his letters.

> **ANSWER:** Defendants deny the allegations in paragraph 56.

57.     As AMc continued to stonewall the NRA's requests for documents and tensions between the parties rose, the NRA was contacted with increasing frequency by journalists acting on purported "leaks" relating to matters on which AMc had worked. The contents of these "leaks" reflected a malicious, out-of-context use of the NRA's confidential information, with an apparent intent to damage the NRA.

> **ANSWER:** Defendants lack sufficient knowledge to admit or deny whether Plaintiff was contacted by journalists, and therefore deny same. Defendants deny the remaining allegations in paragraph 57.

58.     To resolve its concerns regarding these disclosures, on May 6, 2019, the NRA requested that several key AMc employees execute sworn declarations attesting that they had not violated their confidentiality obligations under the Services Agreement. The NRA tailored its request narrowly—seeking declarations only from senior executives who had exposure to the information at issue—and demanded simply that these executives affirm they had complied, and would continue to comply, with their clear legal duties. To the NRA's dismay, AMc flatly refused to provide any cooperation or assurances whatsoever.

> **ANSWER:**     Defendants admit that a request for certain onerous and

unreasonable "sworn declarations" was made on the referenced date, but deny the remaining allegations in paragraph 58.

## E.    Among the Records Unlawfully Withheld By AMc: A Major Related-Party Contract

59.    Non-party North is a veteran of the United States Marine Corps and the Reagan Administration. North is also a member of the NRA Board of Directors. During May 2018, the NRA announced that North was slated to serve as its next President—a largely ceremonial but high-profile position famously occupied by Charlton Heston during the late 1990s. As Col. North prepared to assume the presidency of the NRA, he separately discussed a potential engagement by AMc as the host of an NRATV documentary series.  On May 6, 2018, the NRA and AMc amended the Services Agreement (such amendment, the "May 2018 Amendment") to affirm that any contract between AMc and North would be considered an AMc-Third Party NRA Contract, for which outstanding compensation would be owed by the NRA to AMc if the Services Agreement was terminated. Importantly, the amendment treated North as a third-party contractor—but not, necessarily, an employee—of AMc.

> **ANSWER:**  Defendants admit the first three sentences of paragraph 39. With regard to the fourth sentence, Defendants deny that North "separately discussed" the engagement with AMc as the details of his engagement were personally negotiated by Wayne LaPierre and Woody Phillips.  Defendants neither admit nor deny the allegations in the fifth sentence, which purport to interpret a legal document that best speaks for itself.  Defendants deny the remaining allegations and legal conclusion in paragraph 59.

60.    North and AMc assured the NRA that North's profile and "brand" would be actively leveraged to elicit sponsorships for the documentary series. This was of material interest because during recent years, the NRA had spent substantial sums on NRATV based on AMc's advice and representations regarding achievable benefits of an owned-media platform. However, measured against any of the desired outcomes, the returns on the NRA's investment in NRATV were non-existent.  Accordingly, if the North documentary series attracted sponsorships or sparked

viewership and membership growth, then the costs associated with NRATV could be defrayed.

**ANSWER:  Defendants deny the allegations in paragraph 60.**

61.    New York law requires that the NRA Board of Directors, or an authorized committee thereof, review and approve "any transaction, agreement, or any other arrangement in which [a director or officer of the NRA] has a financial interest and in which the [NRA or an affiliate] is a participant." Guidance published by the New York Attorney General notes that a board of directors may define additional restrictions on transactions giving rise to potential conflicts of interest; and, consistent with best practices, the NRA's Conflict of Interest Policy requires disclosure of contracts between NRA leadership and vendors, like AMc, that receive funds from the NRA.

**ANSWER:  Defendants neither admit nor deny the legal conclusions contained within the first and second sentences of paragraph 61, which require no response.  Defendants lack knowledge sufficient to admit or deny allegations regarding the NRA's internal policies regarding disclosure of contracts, and therefore deny same.**

62.    Aware that North entered into a contract with AMc (the "North Contract"), the NRA, with the cooperation and authority of the Audit Committee, diligently sought to comply with its obligations concerning analysis and approval of the North Contract. During September 2018, the Audit Committee of the NRA Board of Directors (the "Audit Committee") reviewed a purported summary of the material terms of the North Contract and ratified the relationship pursuant to New York law—subject to carefully drawn provisos designed to avoid any conflicts of interest.

**ANSWER:  Defendants admit that Colonel North entered into a contract with AMc and that the NRA Audit Committee reviewed, approved, and ratified that contract.  Defendants are without sufficient information to admit or deny the remaining allegations in paragraph 62, and therefore deny same.**

63.    At the time Audit Committee ratified North's continued service as an NRA director

and President given his relationship with AMc, it was assured that the NRA's counsel would review the North Contract in full. But that turned out to be false, at least for the duration of 2018, as AMc continued to refuse to provide the North Contract pursuant to the Records-Examination Clause. Meanwhile, North indicated via counsel that he could only disclose a copy of the contract to the NRA subject to AMc's consent. This back-and-forth persisted for nearly six months.

**ANSWER:** **Defendants deny the allegations in paragraph 63.**

64. Eventually, in February 2019, AMc acceded to a brief, circumscribed, "live" review of the North Contract (but no retention of any copies) by the General Counsel of the NRA. This review raised concerns about whether the previous summary of the North Contract which was provided to the Audit Committee had been complete and accurate. Among other things, the NRA's brief, limited review of the North Contract—along with other information disclosed for the first time by North—gave rise to questions regarding: (i) whether North was a third-party contractor of AMc or, conversely, a full-time employee with fiduciary duties to AMc that supersede his duties to the NRA; (ii) whether the previously disclosed costs borne by the NRA in connection with the North Contract were complete and accurate; and (iii) whether the contract imposed obligations on North that prevent him from communicating fully and honestly with other NRA fiduciaries about AMc. Against the backdrop of escalating concerns about AMc's compliance with the Services Agreement and applicable law, the NRA became determined to resolve these issues.

**ANSWER:** **Defendants deny the allegations in paragraph 64, except to admit that the NRA's General Counsel indeed reviewed the North Contract.**

65. By separate letters dated March 25 and 26, 2019, the NRA's General Counsel again sought visibility regarding the North Contract and related business arrangements, as well as copies of other material business records pursuant to the Services Agreement. Specifically, the NRA requested:

- A chance to conduct a follow-up review of the North Contract (the NRA's General Counsel even volunteered to conduct the review at AMc's attorney's offices, for AMc's convenience);

- Information about any additional costs relating to AMc's engagement of North, to the extent that such costs were being "passed through" to the NRA;

- Copies of any additional AMc-Third Party NRA Contracts currently in existence;

- Information about which AMc personnel purportedly constituted "NRA-Dedicated Personnel," such that their salaries or severance were alleged to be reimbursable by the NRA, and business records sufficient to show whether these personnel were in fact dedicated to NRA projects; and

- Copies of the annual budget documents provided to the NRA's forensic accountants.

**ANSWER: Defendants admit that AMc received letters from the NRA's General Counsel on the alleged dates requesting certain information related to the North Contract. Defendants deny the purported characterization and validity of those letters and respond that the documents best speak for themselves.**

66. The NRA made clear that it sought the above information "in whatever form [wa]s most convenient" for AMc and hoped to obtain access to ordinary-course business records as contemplated under the Records-Examination Clause. Although AMc immediately acknowledged receipt of the letters and promised to respond substantively, it did not.

**ANSWER: Defendants admit that they received letters from the NRA General Counsel and acknowledge receipt of same. Defendants deny the remaining allegations in paragraph 66.**

67. Meanwhile, the NRA began to suspect that the information it previously received regarding the North Contract was misleading. The May 2018 Amendment classified North as a

third-party contractor of AMc—but in actuality, the North Contract treated him as a full-time employee, with legal duties to Ackerman that superseded his duties to the NRA. Moreover, AMc originally advised the NRA that it had contracted North to host "[t]welve feature-length episodes" of a digital documentary series, to be produced "during each 12 months of a three-year [a]greement," commencing during or about May 2018. Yet by April 22, 2019—eleven months into North's engagement—only three episodes were available, and none were "feature-length."

> **ANSWER:** Defendants deny the allegations in paragraph 67, except to admit that three episodes were available by April 22, 2019.[2] Defendants assert that any fault for the length or timing of production of these episodes lies with Plaintiff NRA and Third-Party Defendant Wayne LaPierre.

68.     On April 11, 2019, North finally disclosed a copy of his contract to the NRA—even as AMc continued to rebuff the NRA's requests for material information about the contract. AMc has also withheld documentation regarding sponsorships secured for the North documentary series, and the NRA has no evidence that any substantial sponsorships exist. Viewed in light of the series' production shortfalls, these facts have troubling implications. The NRA agreed to shoulder a specific financial burden in connection with a specific digital-media project—not to allow its President to be compensated by a for-profit advertising agency for performing generic leadership functions. Importantly, the NRA's Bylaws do not provide for the President to receive a salary.

> **ANSWER:** Defendants deny the allegations in paragraph 68, except to admit that North disclosed his contract to the NRA.

69.     In the wake of these developments, the NRA again requested that AMc allow it to examine business records that would shed light on "what, exactly, [the NRA] is paying for—and what it is getting." AMc never responded.

> **ANSWER:** Defendants deny the allegations in paragraph 69.

---

[2] A date chosen by Plaintiff for obvious tactical reasons as the *fourth* episode was released the very next day, April 23, 2019.

**F.**    <u>The NRA Takes Legal Action, AMc and North Response With Illegal Extortion</u>

70.     On April 12, 2019, having exhausted its good faith efforts to access key records pursuant to the Services Agreement, the NRA filed a narrowly tailored action in Virginia State court seeking specific performance by AMc of its obligation to share relevant records with the NRA. In retaliation, rather than provide the requested records directly to the NRA (as the NRA had sought for months), AMc conspired with others to disseminate select, out-of-context portions of those records—many obsolete or dated—to a subset of the NRA Board of Directors, in order to sow false impressions regarding the NRA's spending and lend support for a possible executive coup.

> **ANSWER:** **Defendants deny the allegations in paragraph 70, except to admit that the NRA filed an action in Virginia seeking to obtain a document it already had in its possession.**

71.     On April 22, 2019, days before the NRA's Annual Meeting of Members, Defendant Winkler doubled down on the tactic he previewed in his August 27, 2018 letter. In communications to select NRA executives, he referenced and excerpted certain expense records which had previously been withheld from the NRA. Importantly, Winkler did not contend—nor does the NRA believe—that any of the referenced expenses were improper. Nonetheless, they were obviously selected by Defendants to foster salacious, misleading impressions of the NRA's spending practices. Winkler's letters carried an implicit threat, made explicit in a subsequent series of telephone calls: If the NRA failed to withdraw its lawsuit seeking access to AMc's records, AMc would publicize portions of those records tailored to cause maximum reputational damage to the leadership of the NRA. In other words, the agency would deploy a smear campaign with malicious intent to damage the NRA.

> **ANSWER:** **Defendants deny the allegations in paragraph 71.**

72.     On April 24, 2019, AMc caused its employee, North, to telephone an aide of Mr.

LaPierre and relay the contents of yet another letter that AMc purportedly planned to disseminate. North emphasized that the letter would be "bad" for Mr. LaPierre and the NRA, and he described a laundry list of allegations the letter would contain: an unfavorable (and untrue) depiction of the NRA's finances; sexual harassment accusations against an NRA staff member; and, as previewed in Defendant Winkler's letters, excerpts of wardrobe, travel, and entertainment expenses paid by AMc and then invoiced by it to the Association over the years.

**ANSWER:** Defendants deny the allegations in paragraph 72.

73.     Tellingly, several categories of information referenced by North consisted of the same information the NRA had tried, but failed, to elicit from AMc under the Record-Examination Clause. After withholding this information for more than six months in an attempt to stonewall the NRA's compliance efforts, AMc now threatened to strategically, selectively publicize the information in a manner calculated to cause harm to Mr. LaPierre and the Association. North stated that AMc would forbear from publicizing the "bad" letter if Mr. LaPierre agreed to withdraw the NRA's lawsuit seeking access to AMc's records, resign immediately from the NRA, and support North's continued tenure as NRA President. If Mr. LaPierre cooperated, North indicated that he could "negotiate with" Ackerman co-founder Angus McQueen to secure an "excellent retirement" for Mr. LaPierre.

**ANSWER: Defendants lack knowledge sufficient to admit or deny communications between North and the NRA, and therefore deny same. Defendants deny the remaining allegations in paragraph 73.**

74.     The NRA does not take kindly to threats, and neither did Mr. LaPierre. Rather than accede to AMc's extortion, Mr. LaPierre wrote a letter to the NRA's Board of Directors that gave a transparent account of AMc's threat and concluded "so long as I have your confidence . . . I will not back down." As became widely publicized, Mr. LaPierre prevailed—and AMc's coup attempt failed.

> **ANSWER:** Defendants lack knowledge sufficient to admit or deny the contents of a letter from LaPierre to the NRA, or whether the NRA "does not take kindly to threats," and therefore deny same. Defendants deny the remaining allegations in paragraph 74.

## G. Extortion's Aftermath: Documents Vindicate the NRA's Concerns, And AMc Continues Its Attacks.

75. The NRA hoped that in the wake of these events, AMc would resume faithfully serving the NRA as the parties' contract and Virginia law required. Unfortunately, the NRA continued to receive media inquiries that strongly suggest there are misleading, defamatory "leaks" emanating from AMc. In other words, the NRA believes that AMc is now delivering on its extortion threat. Tellingly, much of the information "leaked" by AMc concerns travel, wardrobe, and other expenses incurred in connection with AMc projects, based on AMc's advice, or on trips with itineraries crafted by AMc. Although it disseminates select portions of these records in an effort to convey misleading impressions about spending activities by the NRA's leadership, AMc knows full well that these particular expenses were proper because it was deeply involved in their occurrence.

> **ANSWER:** Defendants lack knowledge sufficient to admit or deny what the NRA "hoped" or what it now "believes," and therefore deny same. Defendants deny the remaining allegations in paragraph 75.

76. Discovery has corroborated one of the NRA's worst fears about AMc's billing practices—specifically, that AMc was double-billing multiple clients for the same work, or simply billing the NRA for time logged by its employees on non-NRA projects. Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, admitted by email dated April 15, 2019: "I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts."

> **ANSWER:** Defendants lack knowledge sufficient to admit or deny admit or

**deny communications between Boren and the NRA, and therefore deny same. Defendants deny the remaining allegations in paragraph 76.**

77.     The NRA is informed and believes that AMc has fraudulently billed it, and perhaps other clients, for equipment as well as personnel. Over the duration of the Services Agreement, AMc billed the NRA for at least $2.7 million in fixed assets consisting of audiovisual equipment and the like.

<u>**ANSWER:**</u>  **Defendants deny the allegations in paragraph 77.**

78.     Defendants' campaign of attempted coercion and intimidation of the NRA and Mr. LaPierre rose its ugly head again in the days before the NRA Board of Directors meeting in September 2019. For the purpose of intimidating and undermining the leadership of the NRA, as well as potentially laying the ground work for a second attempted coup, on September 13, 2019, Defendants issued a corporate "press release" to the general public—but in fact intended for consumption by the members of the NRA Board of Directors—that attempted to cast doubt on the judgment of the NRA's leadership and to re-position Defendants as "the good guys." In reality, this so-called "press release" was nothing more than a gaggle of lies, including the following misrepresentations:

- "Ackerman McQueen cooperated with every single audit NRA requested";

- "Ackerman McQueen never overcharged the NRA and retains records of all the work to prove it";

- "Every expense incurred on behalf of the [NRA] was directed by the NRA at the highest level, always with personal knowledge and approval of Wayne LaPierre;" and

- Outside counsel for the NRA "pursues . . . frivolous lawsuits" against AMc "for PR purposes and to serve as a distraction from the failure of NRA executives and

its board to properly fulfill its oversight duties."

**ANSWER: Defendants admit that AMc issued a press release on the alleged date containing the quoted language alleged in paragraph 78. Defendants deny all other allegations in paragraph 78.**

79.     The pattern of attempted extortion, coercion, and intimidation (oftentimes based on outright falsehoods) undertaken for the purpose of shuttering the NRA's legitimate and ongoing investigation into Defendants' fraudulent activities and ousting the current NRA leadership dedicated to enhanced compliance is clear as day. No reasonable basis exists for the NRA to believe this campaign will stop in the foreseeable future and abate resorting to criminal malfeasance that risks harming not only the NRA, but Defendants' other clients as well. The NRA brings this action to discover the full extent of AMc's breaches and frauds, recover its documents and property, and attain compensation for the damage it has sustained.

**ANSWER: Defendants lack knowledge sufficient to admit or deny allegations as to what the NRA believes, and therefore deny same. Defendants deny the remaining factual allegations in paragraph 79 and further deny that the NRA is entitled to documents, compensation, or any other relief it seeks.**

**H.     The Services Agreement Provides That The NRA Is The Owner Of All Creative Works And Intellectual Property Previously Developed And Used By AMc.**

80.     As noted above, the NRA and AMc worked together since the 1980s. Over that time, the NRA placed significant trust and confidence in AMc to perform public relations and strategic marketing services, media planning and placement, and management of digital media and websites, including the management of NRATV. Since at least 1999, AMc's work on behalf of the NRA was governed by successive incarnations of the Services Agreement, which specified the types of work that AMc performed for the NRA.

**ANSWER:     Defendants admit to the longstanding business relationship between AMc and the NRA and that the variety of services performed by AMc for the NRA have been governed by various Services Agreements, which have evolved through time to reflect the changing objectives and scope of services sought by the NRA. Defendants lack sufficient knowledge to admit or deny**

**whether the NRA placed "significant trust and confidence" in AMc, and therefore deny same.**

81.      Section VI of the Services Agreement is entitled "Ownership of Products." In particular, it provides "[a]ll creative works developed by AMc in fulfilling its obligations under this Services Agreement . . . shall be the property of the NRA." It continues: "All other, and further, intellectual property . . . created or developed by AMc in fulfilling its obligations under this Services Agreement, are NRA's sole and exclusive property, and AMc does hereby assign all right, title and interest in same to NRA . . . ."

> **ANSWER:  Defendants admit that the document speaks for itself.  Defendants deny the remaining allegations in paragraph 81.**

82.      Section VI of the Services Agreement also requires AMc to transfer and assign to the NRA the ownership of the copyright to all creative works developed by AMc for the NRA if those works are not otherwise encompassed by the Copyright Act.

> **ANSWER:  Defendants admit that the document speaks for itself.  Defendants deny the remaining allegations in paragraph 82.**

83.      In addition, the NRA separately owns numerous copyrights, including for "NRA" and "National Rifle Association."

> **ANSWER:  Defendants cannot admit or deny the allegations in paragraph 83, and therefore deny same.**

**I.      Despite The Termination Of The Services Agreement, Defendants Continue To Prominently Reference The NRA And NRATV On AMc's Website.**

84.      By letter dated June 25, 2019, the NRA terminated the Services Agreement effective "immediately." Notably, AMc also purported to terminate the agreement by letter dated June 27, 2019, effective "immediately."

> **ANSWER:  Defendants admit the allegations in paragraph 84 but respond that, prior to the alleged dates, AMc gave contractual notice of termination under the Services Agreement to the NRA on May 29, 2019.**

85.    Despite the termination of the Services Agreement, continued and/or continue to make unauthorized and unlicensed references, directly and indirectly, to the NRA and NRATV on its website, and continued and/or continue to make unlicensed and unauthorized use of the NRA's intellectual property rights. Attached hereto as Exhibits A and C are depictions of those NRA references and associated intellectual property rights on AMc's website as of August 29, 2019 and, for additional graphics added since that date, as of October 17, 2019, respectively.

**ANSWER:**  **Defendants admit that AMc's website identifies the NRA as a "legacy" client.  Defendants deny all other factual allegations and legal conclusions in paragraph 85 and assert the defense of fair use.**

86.    Specifically, AMc's website, directly and indirectly, references in an unauthorized an unlicensed manner the NRA and/or NRATV and uses its associated intellectual property rights, as follows:

- On the homepage, in describing who it is and what it does, AMc mentions its work with a "gun rights organization" and states that it "built media companies on behalf of … the Second Amendment to the Constitution";

- On a page entitled "Our Media Evolution," the website provides a timeline of AMc's projects for its clients, and also contains videos and photos relating to NRA TV;

- On a page entitled "Our Team," a photo appears with the caption "NRA Life of Duty," which was part of what Ackerman touts in its Counterclaims/Third Party Complaint as a "robust," "money-making, [and] profitable" advertising and branding campaign; and

- On pages entitled "Gallery" and "Clients," a total of fifteen different references to the NRA and NRATV appear, which represents a greater number of references

compared to any other AMc client.

**ANSWER:  Defendants admit that Plaintiff's allegations include quoted language from AMc's website.  Defendants deny the remaining allegations in paragraph 86 and assert the defense of fair use.**

87.     The portions of the AMc website submitted by Defendants in the Appendix supporting their Motion to Dismiss support this conclusion.

**ANSWER:  Defendants admit that Plaintiff included text and images from AMc's website and that they speak for themselves, but deny that any of the text and images support any wrongdoing on the part of Defendants.**

88.     The references on AMc's website to the NRA and NRATV and the use of closely associated intellectual property are unauthorized in light of the termination of the Services Agreement and unlicensed generally. In addition, the multitude of such references and related intellectual property, alone and taken together, foster consumer and customer confusion insofar as they falsely suggest to the public that the NRA remains an AMc client and endorses the services provided by AMc. To the contrary, the NRA is not an AMc client and does not endorse AMc's services.

**ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 88.**

89.     For example, AMc's website falsely proclaims that NRATV is the "world's most comprehensive video coverage of freedom-related news, events and culture," which creates the misimpression that NRATV was a successful endeavor that the NRA endorses. In actuality, the NRA recently concluded, despite years of false reporting and subterfuge from Defendants, that NRATV was a failed endeavor under any appropriate performance metric. In fact, on or about June 25, 2019, the NRA suspended the "live TV" programming of NRATV.

**ANSWER:  Defendants deny the allegations in paragraph 89.**

90.     AMc's website also prominently features unauthorized and unlicensed NRA-

---

owned photos and references to the NRA with greater frequency than any other AMc client. That prominent display of the NRA and its associated intellectual property on AMc's website provides a strong inference that wrongly suggests to the public—and creates consumer and customer confusion—that the NRA presently endorses the services that AMc provides and that the NRA is currently AMc client, neither of which is true. The fact that in the *past* AMc and the NRA had a commercial relationship does not alter, and ultimately has no bearing on, this conclusion.

> **ANSWER:** **Defendants deny the factual allegations and legal conclusions in paragraph 90.**

91.     Defendants now contend that "the current version of AMc's website includes the word 'legacy' in connection with references to the 'NRA,'" and appear to imply that the NRA's false association claim under the Lanham Act is somehow "moot," to use Defendants' words. As shown in the Appendix submitted by Defendants in connection with their Motion to Dismiss, the meaning and implication of the word "legacy" in the context used is, at best, ambiguous, compounds confusion, and far from clearly demonstrates that the NRA is no longer a client of AMc. For example, rather than expressly specifying a separate webpage or portion of thereof for "Legacy Clients," Defendants merely slapped the word "legacy" in the bottom right-hand corner of the NRA's graphics, without providing any further context. For these reasons, the use of the "legacy" verbiage does not save Defendants from having created a knowingly false portrayal that the NRA continues to remain an AMc client. To the contrary, the slap-dash and belated "fix" only amplifies the problem more.

> **ANSWER:** **Defendants admit that AMc's website now identifies the NRA as a "legacy" client and that Plaintiff's Lanham Act claim is indeed "moot." Defendants deny all other factual allegations and legal conclusions in paragraph 91.**

92.     In any event, even assuming that the word "legacy" was appended to the bottom right-hand corner of the NRA graphics on or about October 1, 2019, and that one magic word

could somehow "moot" any false association claims after that date, the word does not "moot" the NRA's false association claims arising *before* that date. That is, the false association and resulting public confusion manufactured by Defendants, undertaken for the purpose of gaining customers and increasing profits in the wake of losing its largest client, the NRA, began well before "legacy" was oddly shoehorned into the NRA's graphics.

**ANSWER: Defendants deny all factual allegations and legal conclusions in paragraph 92.**

93.     Nor does Defendants' transparent attempt to short-circuit NRA's false association Lanham Act claim impact the NRA's other false association theory.  The supposedly talismanic words of "legacy" and "moot" have no bearing on the NRA's claim that AMc's and Individual Defendants Martin's and Greenberg's unlicensed use of NRA intellectual property associated with NRATV on its website creates the false impression and attendant consumer and customer confusion that the NRA endorses, sponsors, and/or approves of NRATV, when in fact it does not. That theory does not turn at all on whether Ackerman has at some belated and unidentified point in time jammed the word "legacy" in the bottom corner of NRA graphics and intellectual property, because the NRA could, or could not, endorse, sponsor, and/or approve of NRATV either before *or* after it ceased being a client. Nor do the supposed magic words impact either the NRA's copyright infringement claims and alternative claim for conversion.

**ANSWER:  Defendants deny the factual allegations and legal conclusions in paragraph 93.**

## V.     CLAIMS FOR RELIEF

### A.     Count One: Claims For False Association Under The Lanham Act, 15 U.S.C. § 1125(a)(1)(A) (Against All Defendants)

94.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.

95.     By intentionally maintaining numerous references to, and images of, the NRA and NRATV on AMc's website, Defendants are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of the NRA with AMc, or as to the NRA's approval of the services or commercial activities by Defendants, in violation 15 U.S.C. § 1125(a)(1)(A).

**ANSWER:** Defendants deny the allegations in paragraph 95.

96.     Defendants are involved in interstate commerce.

**ANSWER:** Defendants admit the allegations in paragraph 96.

97.     Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to provide or otherwise create the false impression that the NRA (1) remains or continued to be an AMc client after the termination of the Services Agreement and (2) endorses the services provided by AMc, in particular NRATV.

**ANSWER:** Defendants deny the allegations in paragraph 97.

98.     The foregoing misconduct is without any legal justification and constitutes a knowing and willful violation of applicable law, including 15 U.S.C. § 1125(a)(1)(A).

**ANSWER:** Defendants deny the allegations in paragraph 98 and deny that Plaintiff has standing under the cited statute.

99.     The NRA falls within the zone of interests protected by the Lanham Act, a lenient and flexible standard where doubts are resolved in favor of the plaintiff. The NRA's interests are sufficiently related to the interests protected under 15 U.S.C. §§ 1125(a)(1)(A) and 1127 because Defendants used words, statements, and reproductions of the NRA's intellectual property in an unauthorized and unlicensed manner to create a false association between the NRA and AMc as to whether the NRA (1) remains or continues to be an AMc client and (2) endorses or approves of

the services provided by AMc—in particular NRATV. The NRA is suing not as a deceived consumer or as a direct competitor to Defendants, but as a person engaged in commerce within the control of Congress whose commercial position has suffered economic and/or reputational injury proximately caused by Defendants' false associations outlined above and their acts of unfair competition. These interests plainly fall within the zone of interests protected by the Lanham Act, in keeping with the Supreme Court's holding that "most of enumerated" purposes of the Act "are relevant to false association cases." *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).

**ANSWER:** **Defendants deny the factual allegations and legal conclusions in paragraph 99.**

100. The NRA has been injured and has suffered damages by the unauthorized and unlicensed words, statements, and/or use of NRA intellectual property that created the false impression of association with AMc and the false endorsement of AMc's services. Defendants placed their own financial interest in acquiring new customers and gaining additional profits through engaging in deceptive conduct, at a time when it had lost its largest client, the NRA. It did so at the expense of the NRA's lawful right to restrict and to limit the use of its name and related intellectual property rights in a non-misleading manner, thereby diminishing their value and causing financial injury to the NRA, including lost royalties, both presently and in the future. In addition, Defendants' Lanham Act violations caused and/or will likely cause the NRA to suffer reputational harm and the loss of goodwill. Accordingly, the NRA has suffered injuries that negatively impact its ability to compete in the marketplace.

**ANSWER:** **Defendants deny the allegations in paragraph 100.**

101. Such bad faith misconduct should be preliminarily and permanently enjoined, (even absent proof of damages), and the NRA should be awarded damages and/or equitable relief,

including but not limited to forfeiture and disgorgement in the form of returning the ill-gotten revenues and/or profits earned by Defendants as a result of their violation(s) of 15 U.S.C. § 1125(a)(1)(A), in an amount to be proven at trial. *See, e.g.*, §§ 1116-1117.

**ANSWER:  Defendants deny the allegations in paragraph 101 and deny that the NRA is entitled to equitable relief or damages.**

102.    In addition, as a result of such misconduct, the NRA has been required to retain the undersigned counsel to prosecute the claims herein.  Pursuant to 15 U.S.C. § 1117, the NRA seeks to recover its attorneys' fees and costs incurred in this action.

**ANSWER:  Defendants admit that the Brewer firm has filed the instant lawsuit.  Defendants deny that the NRA is entitled to recover attorney's fees and costs, or any other relief.**

**B.    Count Two: Copyright Infringement Under 17 U.S.C. § 101 *et seq.* (Against All Defendants)**

103.    The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:  Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

104.    The NRA owns numerous copyrights, including for "NRA" and "National Rifle Association." In addition, the NRA owns or is the assignee of the copyright to all creative works developed for the NRA by AMc pursuant to the Services Agreement, some of which are present on AMc's website and can be found in Amended Exhibit A attached hereto.

**ANSWER:  Defendants deny the allegations in paragraph 104.**

105.    Defendants directly participated in, or are at least the moving force behind, AMc's website continuing to use and publish unauthorized and unlicensed copyrighted works owned by the NRA.

**ANSWER:  Defendants admit that AMc continues to make fair use of the images displayed on its website related to the NRA but deny the allegation that**

such use is "unauthorized" or "unlicensed."

106. Defendants' unauthorized and unlicensed continued publication of the NRA's copyrighted works constitute unlawful copyright infringement.

**ANSWER:** **Defendants deny the allegations in paragraph 106.**

107. The NRA is entitled to preliminary and permanent injunctive relief requiring Defendants to immediately and forever remove from their website and return all the NRA's copyrighted works. This remedy is necessary to return and restore to the NRA the legal right to decide for itself whether and, if so, how to license, restrict, or otherwise limit the dissemination of its copyrighted material in commerce.

**ANSWER:** **Defendants deny the allegations in paragraph 107.**

108. In addition, the NRA is entitled to an award of actual damages and forfeiture and disgorgement of Defendants' ill-gotten revenues and/or profits, unpaid royalties, and/or statutory damages, for their infringing use and publication of the NRA's copyrighted works in an amount to be proven at trial.

**ANSWER:** **Defendants deny the allegations in paragraph 108.**

109. Pursuant to 17 U.S.C. § 505, the NRA is also entitled to recover its attorneys' fees and costs incurred in this action.

**ANSWER:** **Defendants deny the allegations in paragraph 109.**

C. **Count Three: Conversion (Against All Defendants)**

110. The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:** **Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

111. In the alternative to its claims for false association under the Lanham Act and

infringement under the Copyright Act, the NRA asserts the cause of action of conversion.

**ANSWER:** **Defendants admit that Plaintiff has brought these alternative claims for relief, but deny that Plaintiff is entitled to any relief it seeks.**

112.    The NRA is the exclusive owner of, and holds all right, title, and interest to, all creative works and intellectual property developed and used by AMc in fulfilling its obligations to the NRA under the Services Agreement.

**ANSWER:** **Defendants deny that the NRA owns all of AMc's creative works. Defendants further deny the factual and legal allegations in paragraph 112, except that Defendants are unable to admit or deny the allegations construing the Services Agreement, as the document speaks for itself.**

113.    Despite the NRA's demands (see, for example, Exhibit B), Defendants have refused to remove from its website and return all such creative works and intellectual property.  As a result, Defendants unlawfully and without authorization continue to exercise control and dominion over the NRA's valuable creative works and intellectual property.

**ANSWER:**  **Defendants deny the allegations in paragraph 113.**

114.    Defendants' unauthorized use and publication of the NRA's creative works and intellectual property constitute intentional acts causing substantial interference, if not outright destruction, of the NRA's valuable property rights, to the detriment and harm of the NRA.

**ANSWER:**  **Defendants deny the allegations in paragraph 114.**

115.    In addition, the NRA is entitled to an award of damages, including damages for the full value of the stolen property and punitive damages, attributable to defendants' wrongful refusal to return its valuable creative works and intellectual property in an amount to be proven at trial.

**ANSWER:**  **Defendants deny the allegations in paragraph 115 and deny that the NRA is entitled to the relief it seeks.**

116.    The tort of conversion is not pre-empted by the Copyright Act. The rights that the copyright owner—here, the NRA—seeks to enforce under the common law doctrine of conversion

are *not* equivalent to or the same as the rights sought or provided pursuant to the Copyright Act. Here, the NRA seeks the ***total value*** of the intellectual property "converted," property that will never return.

> **ANSWER:** Defendants deny the factual allegations and legal conclusions in paragraph 116.

117.     In contrast, in conjunction with its claim for copyright infringement the NRA seeks the effective return to the copyright holder of all the property rights inherent in copyright, specifically the right to control the use of the copyrighted material, the right to obtain payment of royalties in exchange for its use, or other damages to compensate the copyright holder for the diminution of and infringement on its rights. Put differently, the principal features of relief for copyright infringement represent: (1) an injunction prohibiting further use of the property, (2) effective return of the property to the copyright holder, and (3) compensation for the lost royalties and/or the diminution in value associated with the unauthorized use.

> **ANSWER:** Defendants admit that the NRA is seeking the relief stated in the first sentence of paragraph 117 (with regard to its claims of copyright infringement), but deny that it is entitled to such relief. The balance of the paragraph contains legal conclusions not requiring a response.

118.     ***None*** of those remedies apply to the relief afforded and sought by the NRA with respect to its claim of conversion. In sharp contrast, the law of conversion in the context of remedies provides that the tortfeasor (1) keeps and uses the subject property for his/her own benefit, (2) does not to return the converted property to its rightful owner, and (3) pays damages for the total loss of value for the property, and *not* to pay for the *diminution or loss* of the property's value (as is the case for copyright infringement). In short, the elements and remedies associated with a claim for federal copyright infringement and for common law conversion are *not* equivalent or substantially the same and serve two very different purposes, thereby precluding any notion that the Copyright Act could pre-empt the NRA's alternative claim for conversion.

**ANSWER: Defendants deny that Plaintiff has accurately stated the law of conversion under any cognizable legal standard and likewise deny the improper legal conclusions drawn therefrom.**

D.     **Count Four: Fraud (Against All Defendants)**

119.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER: Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

120.     As alleged above, Defendants have engaged in an overarching scheme to defraud and extort plaintiff NRA, thereby causing it harm and putting it (and other AMc clients) at imminent risk of harm. Accordingly, Defendants are liable for their misleading representations and/or non-disclosure of material facts.

**ANSWER: Defendants deny the allegations in paragraph 120.**

121.     Beginning in at least 2016 and continuing through 2018 Defendants, in connection with the "annual budgeting process," described by Ackerman, Defendants—and in particular Defendants Winkler and Montgomery, as well as former CEO Angus McQueen—represented on multiple occasions that appropriate back-up documentation was retained by AMc for purposes of justifying and substantiating their billing statements and that such documentation could be audited at the NRA's request. Defendants—in particular, Defendants Winkler and Montgomery—and McQueen likewise represented that their record-keeping was accurate. These representations were made with the specific intent to have the NRA maintain or increase the annual budget for Ackerman and were made over the course of this "annual budgeting process," which occurred in the fourth quarter of the preceding budgetary year (i.e., the process for the 2017 budget would have occurred in Q4 2016).

**ANSWER: Defendants deny the allegations in paragraph 121, except to admit that representations were made to the NRA regarding the accuracy of AMc's**

**recordkeeping.**

122.    These representations were false when made, with a specific intent to induce the NRA to maintain or increase the annual budget for Ackerman. As the NRA later discovered, for years *no one* at AMc kept or maintained reasonable documentation that would justify or support the accuracy of the sums of money AMc represented it was owed in the billing statements it sent to the NRA. In addition, absent such record-keeping, a complete audit could not occur. For these reasons, AMc's record-keeping was not accurate, contrary to Defendants' representations.

**ANSWER:  Defendants deny the allegations in paragraph 122.**

123.    McQueen and Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and payments" to the NRA. Accordingly, there is more than ample reason to believe that they must have known about, or consciously disregarded, the gross failure to maintain reasonable backup and supporting document in connection with their billing practices.

**ANSWER:  Defendants admit the first sentence relating to the responsibilities of Defendants Winkler and Montgomery. Defendants deny the remaining allegations in paragraph 123.**

124.    These representations were material and reasonably and justifiably relied upon insofar as the NRA would never have agreed to a budget, much less the same or a greater budget, had the it known the complete truth.

**ANSWER:  Defendants deny the allegations in paragraph 124.**

125.    Defendants also failed to disclose certain facts to the NRA during the "annual budgeting process." In particular, they knowingly failed to disclose the fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees supposedly "dedicated" the NRA account for work they performed on non-NRA projects.  As Dan Boren, an executive of Ackerman's second-largest client, the Chickasaw Nation, revealed by email

dated April 15, 2019: "I bet Ackerman is in trouble on this one. They can't produce the backup to the invoices and were allocating full salary to these employees that may have been working on our [Chickasaw Nation's] accounts." Defendants also failed to disclose that AMc had fraudulently billed the NRA, and perhaps other clients, for equipment in addition to personnel. By failing to disclose these facts, Defendants intended to induce the NRA to maintain or increase the amounts NRA paid to Defendants.

<u>**ANSWER:**</u> **Defendants deny the allegations in paragraph 125.**

126. Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement and (2) they had the obligation not to tell "half-truths."

<u>**ANSWER:**</u> **Defendants deny the factual allegations and legal conclusions in paragraph 126.**

127. Defendants knew that the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

<u>**ANSWER:**</u> **Defendants deny the allegations in paragraph 127.**

128. Defendants Winkler and Montgomery held senior executive positions at AMc and, as Ackerman admits, were specifically responsible for "budgetary compliance, invoicing, and payments" with respect to the NRA account. Therefore, there is more than a reasonable basis to believe that they knew about, consciously disregarded, the practice of overbilling with regards to personnel and equipment. Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth. For similar reasons, they knew that the information

that they did not disclose to the NRA and were deliberately silent when they had a duty to speak.

**ANSWER:  Defendants admit the first sentence relating to the responsibilities of Defendants Winkler and Montgomery. Defendants deny the remaining allegations in paragraph 128.**

129.    These false representations and/or fraudulent non-disclosures were material and actually, reasonably, and justifiably relied on upon the NRA. As a result, the NRA has suffered injury and damages, in an amount to be proven at trial.  Had it known the complete truth, the NRA would never have agreed to an annual budget, much less the same or a greater budget, would have terminated AMc as its agent, and would have ceased conducting business with the agency.

**ANSWER:  Defendants deny the allegations in paragraph 129.**

130.    *Fraudulent Billing.* Beginning in at least 2016 and continuing through 2019, Defendants and AMc-employee Nader Tavangar would on at least a monthly basis (and sometimes more often) issue and send billing statements and invoices to their NRA counterparts representing that the NRA owed AMc certain amounts of money. Given the fraudulent nature of the annual budgeting process, it should come as no surprise that many of the emailed billing statements were not only inaccurate, but false and misleading. These representations were made with the specific intent to have the NRA pay the amounts it purportedly owed.

**ANSWER:  Defendants admit that AMc sent invoices to the NRA during this time but deny the remaining allegations in paragraph 130.**

131.    The billing statements were misleading in three principal respects. First, Defendants caused sham bills to be sent that purported to seek payment for services that were never provided to the NRA.  Second, they caused bills to be sent to the NRA which sought to seek reimbursements in excess of the actual cost to AMc. Third, they caused bills to be sent to the NRA that were wholly unsubstantiated by any receipt or document, or any other shred of evidence.

**ANSWER:  Defendants deny the allegations in paragraph 131.**

132.    As an example, on September 17, 2018, Defendants emailed NRA Chief Financial Officer ("CFO") and Treasurer Craig Spray three "production invoices for [the month]" Upon review of the vague, cursory, and unsubstantiated invoices, Spray responded and advised Defendants that they may not be following "best practices/compliance requirements," where "typically [a] three-way match process for processing a vendor invoice is required." As explained to Defendants, the objective of "an audit compliant process" is "to ensure" that a vendor's request for payment "is complete and accurate" and "to highlight any discrepancies" in the supporting documentation. At the time, Spray found Defendants' slip-shod billing practices concerning. And for good reason. Absent necessary backup documentation, a vendor has no factual basis to justify requesting the amounts of money provided on the billing statement or invoice.

**ANSWER:** **Defendants admit that the referenced invoices and communications were exchanged, but deny the remaining allegations and inferences in paragraph 132, especially any implication that Spray was somehow alluding to well-established billing guidelines, which did not exist at that time.[3]**

133.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement and (2) they had the obligation not to tell "half-truths."

**ANSWER:** **Defendants deny the allegations in paragraph 133.**

134.    Defendants knew the NRA was ignorant of these facts and did not have an equal opportunity to discovery the facts.

---

[3] In fact, rather than referencing any established NRA billing guideline, Spray's out-of-context comment was simply a suggestion based on billing requirements from his former work in the furniture-delivery business.

**ANSWER:  Defendants deny the allegations in paragraph 134.**

135.    Defendants and AMc employee Tavangar were responsible for the routine generation and transmission of fraudulent billing statements to the NRA and Defendants Winkler and Montgomery were specifically responsible for "budgetary compliance, invoicing,   and payments" with respect to the NRA account. Therefore, there is more than a reasonable basis to believe that they knew, or consciously disregarded, the truth, particularly with respect to the issuance of fraudulent billing statements and invoices that were wholly unsubstantiated due to the lack of back-up documentation. Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth. For similar reasons, Defendant knew the information that they did not disclose to the NRA and remained deliberately silent when they had a duty to speak.

**ANSWER:  Defendants admit the first sentence relating to the responsibilities of Defendants Winkler and Montgomery.  Defendants deny the remaining allegations in paragraph 135.**

136.    These false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damages, in an amount to be proven at trial. Had it known the complete truth, the NRA would never have agreed to pay the billing statements and invoices, would have terminated AMc as its agent, and would have ceased conducting business with the agency. For these reasons, these representations and/or non-disclosures were material and actually, reasonably, and justifiably relied upon by the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 136.**

137.    ***NRATV Fraudulent Misstatements and Non-Disclosures.*** Beginning in at least 2016 and continuing through 2019 Defendants—including but not limited to Defendants Montgomery, Martin, and Greenberg—made various fraudulent statements and/or failed to disclose material information in connection with NRATV. Among other things, as alleged herein,

Defendants in early 2016 made multiple representations to the NRA that the proposed "owned media" digital platform known as NRATV presented "a good opportunity to generate revenue" and that developing and launching such a platform would "pay for itself," including paid commercial sponsorships for live programs. In addition, at the thirteen specific meetings and in other communications to the NRA identified above, including communications made on May 13, 2019 and late October 2018, Defendants touted NRATV's performance and represented that the platform had certain valuations and generated millions of engagements and views. These statements were made for the purpose of inducing the NRA to expand its investment in NRATV, to the benefit of AMc.

**ANSWER: Defendants deny the allegations in paragraph 137.**

138.     These representations and omissions were false and misleading for multiple reasons. First, the NRATV digital platform did not generate revenue and was never going to pay for itself, as demonstrated by the dismal viewership and sponsorship numbers that it generated in reality, consistent with the previous failure of a similar project with The American Clean Skies Foundation, a fact that Defendants did not disclose. In addition, Defendants' repeated representations that the NRATV platform generated millions of viewers and touting of the platform's performance and valuation were in fact based on out-of-context statistics predicated on, among other things, aggregate viewership numbers that failed to differentiate between genuine views and merely incidental ones and counted all of the views from an individual, rather than the distinct number of viewers of NRATV content. At no point did Defendants disclose that their purported viewership numbers were not based on actual data of the number of unique and genuine viewers. Moreover, Defendants' inconsistent and contradictory viewership statistics and statements on the purpose of viewership numbers and the actual numbers themselves demonstrate the falsity of the statements.

**ANSWER:  Defendants deny the allegations in paragraph 138.**

139.    Defendants knew about failure of the similar digital platform that AMc had developed and operated for The American Clean Skies Foundation and, therefore, also knew that embarking upon a similar venture for the NRA would not present a good opportunity for revenue generation or pay for itself. Defendants understood that their development (in particular, their creation by Defendant Greenberg) and subsequent touting of NRATV viewership performance and valuations was not based on actual data comprising *unique* views, and likewise understood such data is readily available from third-party vendors given that Defendants hold themselves out as ostensible experts in digital marketing and advertising. Therefore, there is more than a reasonable basis to believe that Defendants knew, or consciously disregarded, the truth about these matters. Accordingly, the false representations were made knowingly or recklessly and without knowledge of the truth.

**ANSWER:  Defendants deny the allegations in paragraph 139.**

140.    Defendants had a duty to disclose these facts because (1) they were fiduciaries of the NRA, as was AMc, in light of the (a) contractual language in the Services Agreement appointing it the agent of the NRA for purposes of public relations and advertising and/or (b) the longstanding relationship of trust and confidence in which the NRA relied on AMc that was separate and apart from the Services Agreement  and (2) had the obligation not to tell "half-truths."

**ANSWER:  Defendants deny the allegations in paragraph 140.**

141.    Defendants knew that the NRA was unaware of these facts and did not have an equal opportunity to discovery the facts.

**ANSWER:  Defendants deny the allegations in paragraph 141.**

142.    The false representations and/or fraudulent non-disclosures have caused the NRA to suffer injury and damage, in an amount to be proven at trial. Had it known the complete truth

about NRATV, the NRA would never have invested a dollar in the project, and would have terminated AMc as its agent, and ceased conducting business with the agency. For these reasons, these representations and/or non-disclosures were material and were actually, reasonably, and justifiably relied upon by the NRA.

**ANSWER:** **Defendants deny the allegations in paragraph 142.**

E.   **Count Five: Breaches of Fiduciary Duties (Against All Defendants)**

143.   The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:** **Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

144.   Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc. Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

**ANSWER:** **Defendants admit to the longstanding business relationship between the parties, but deny the legal conclusion that AMc or any of its employees were fiduciaries of the NRA at any time. Defendants can neither admit nor deny what level of "trust and confidence" the NRA "reposed" in AMc, and therefore deny same.**

145.   In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement. For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

**ANSWER:** **Defendants admit that AMc acted on behalf of the NRA in performing its duties under the Services Agreement but deny the remaining factual allegations and legal conclusions in paragraph 145.**

146.    Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

**ANSWER:  Defendants deny the allegations in paragraph 146.**

147.    Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA.

**ANSWER:  Defendants deny the allegations in paragraph 147.**

148.    Furthermore, because they acted in a fiduciary capacity, Defendants had a duty of candor and to disclose all material facts to the NRA regarding the advice and services it provided. Defendants breached their fiduciary duties when they failed to disclose material facts to the NRA, including but not limited to failing to disclose in the following instances:

- Facts regarding AMc's billing and invoicing practices—for example by failing to disclose that appropriate support documentation was not retained by AMc and could not be audited by NRA at any time;

- Facts regarding NRATV performance, by withholding crucial performance metrics like "unique" and "genuine" individualized viewership data, and relatedly failing to disclose material facts regarding the inaccurate valuation of NRATV;

- Facts regarding the prior and failed "owned-media" project, Clean Skies TV.

- Fact that AMc often double-billed multiple clients for the same work, or simply billed the NRA for time logged by employees who were supposed to be fully "dedicated" to the NRA;

- Facts that AMc used equipment, billed to the NRA, for other clients' projects;

- Fact that bills emailed and mailed to the NRA contained inaccurate and false information, for example, bills seeking reimbursement for services that were never performed, that were in excess of the actual costs to AMc, and that were wholly unsubstantiated by supporting documentation; and

- Facts regarding the North Contract—for example including the fact that North had legal duties to AMc that superseded those he had to the NRA while NRA President, and the failure to comply with the digital documentary series requirements.

**ANSWER: Defendants deny the allegations in paragraph 148.**

149.     In addition, Defendants as fiduciaries of the NRA had a duty of fair, honest dealing and a duty to act with integrity of the strictest kind. Defendants breached these fiduciary duties when they engaged in the following conduct:

- Attempt to obstruct or to stop an investigation of Ackerman and its billing practices and NRATV by the NRA, including by repeatedly and flatly refusing to respond to legitimate and basic information requests from NRA executives;

- The first attempt of extortion undertaken by Defendant Winkler on August 27, 2018, which amounted to a violation of the criminal laws.

- The second attempt of extortion undertaken by Defendant Winkler on April 22, 2019, which amounted to a violation of the criminal laws.

- The attempted extortion undertaken by Oliver North on April 24, 2019, which amounted to a violation of the criminal laws.

**ANSWER:  Defendants deny the allegations in paragraph 149.**

150.     As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

**ANSWER:** Defendants deny the allegations in paragraph 150.

151.     The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendant on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

**ANSWER:** Defendants deny the allegations in paragraph 151.

**F.     Count Six: Conspiracy (Against All Defendants)**

152.     Each Defendant was a member of a combination or conspiracy involving two or more persons, one of whom, Dan Boren, was an individual not employed by Defendants.

**ANSWER:** Defendants deny the allegations in paragraph 152.

153.     The object of the combination or conspiracy was to commit the fraudulent behavior, the attempts to de-railing the resulting NRA investigation, and the attempts to extort Mr. LaPierre and the NRA alleged herein. The members of the combination or conspiracy had a meeting of the minds concerning the object of the combination or conspiracy or the course action.

**ANSWER:** Defendants deny the allegations in paragraph 153.

154.     One of the members committed an unlawful and overt act to further the object or course of action, including but not limited to the Defendants' fraudulent acts described in Count Four and the breaches of fiduciary duty described in Count Five.

**ANSWER:** Defendants deny the allegations in paragraph 154.

155.     The NRA has suffered injury and sustained damages as a result of the conspiracy, in an amount to be proven at trial.

**ANSWER:** Defendants deny the allegations in paragraph 155.

**G.     Count Seven: Breach of Fiduciary Duty of Loyalty (Against All Defendants)**

156.     In the alternative, the NRA asserts the claims for breach of fiduciary duty and

breach of contract that are currently at issue in the Virginia state court litigation ("the Virginia Claims"). Through the filing of its Counterclaim and Third-Party Complaint, *see* ECF No. 12, however, Ackerman has broadened this dispute to encompass a host of subject matters not directly raised in the Original Complaint. Ackerman broadly contends that the NRA's original claims in this action "mandate[ ] . . . an inquiry into the NRA's and LaPierre's conduct" allegedly comprising "sinister and intentional efforts to destroy AMc's business" and "makes relevant an examination of the real reasons behind termination of the parties' [Services Agreement] . . . and an examination of the creation, operation and [allegedly] unquestioned success of NRATV." According to Ackerman, this "mandate[d]" inquiry includes the three allegedly "frivolous" lawsuits comprising the Virginia Claims. Based on Ackerman's logic, the NRA's Virginia Claims likely arise out of the same transactions or occurrences that are the subject matters of Ackerman's Counterclaim and Third-Party Complaint, and it is likely that the Virginian Claims would be considered compulsory counterclaims to this action. In short, the Virginia Claims have been put at issue by Ackerman's Counterclaim and Third-Party Complaint.

**ANSWER: Defendants admit that, prior to filing the instant lawsuit and Plaintiff's Amended Complaint, Plaintiff filed actions in Virginia state court involving similar or identical claims. Defendants admit that Defendants' Answer, Counterclaim, and Third-Party Claim speak for themselves.**

157. The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER: Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.**

158. Over the course of more than thirty years of close collaboration (including decades that precluded the Services Agreement), the NRA reposed extensive trust and confidence in, and relied upon, AMc. Defendants, therefore, owed fiduciary duties to put the NRA's interests first when rendering services to the NRA.

**ANSWER: Defendants admit to the longstanding business relationship between the parties, but deny the legal conclusion that AMc or any of its employees were fiduciaries of the NRA at any time. Defendants can neither admit nor deny what level of "trust and confidence" the NRA "reposed" in AMc, and therefore deny same.**

159.     In addition, AMc incurred fiduciary duties to the NRA when it acted as the NRA's agent pursuant to multiple provisions of the Services Agreement. For example, on the NRA's behalf and subject to the NRA's control, AMc entered into contracts and arrangements for the purchase, planning, and placement of media—activities that required AMc to be entrusted with sensitive confidential information pertaining to the NRA.

**ANSWER: Defendants deny the allegations in paragraph 159.**

160.     Given their high-ranking positions at AMc and the importance of the NRA as its biggest client, Defendants were aware of the Services Agreement and understood the substance of its provisions and, therefore, served as agents and fiduciaries too.

**ANSWER: Defendants deny the allegations in paragraph 160.**

161.     Because they acted in a fiduciary capacity, Defendants had a duty of loyalty to the NRA which forbade it from misusing the NRA's confidential information—especially with the malicious intent to damage the NRA. Defendants breached this duty on multiple occasions AMc breached its fiduciary duty when it conspired to effect an out-of-context, partial disclosure of certain NRA confidential information to (i) a handpicked group of outside directors of the NRA., as well as (ii) the news media as part of its attempted extortion plot and to end the NRA's investigation into AMc for the malicious purpose of smearing the NRA's reputation and facilitating its ultimately foiled coup plot.

**ANSWER: Defendants deny the allegations in paragraph 161.**

162.     As a direct and proximate cause of Defendants' breaches of their fiduciary duties, the NRA has suffered injury and incurred damages in an amount to be proven at trial.

**ANSWER:** Defendants deny the allegations in paragraph 162.

163.     The NRA also seeks forfeiture and disgorgement of all amounts wrongfully obtained by Defendants on account of their breaches of their fiduciary duties, including, without limitation, all fees paid by the NRA to AMc since the date such breaches began, and at minimum forfeiture and disgorgement of any ill-gotten gain.

> **ANSWER:** Defendants deny the allegations in paragraph 163 or that Plaintiff is entitled to the relief sought.

164.     The NRA also seeks injunctive relief to prevent future disclosures of the NRA's confidential information.

> **ANSWER:** Defendants deny the allegations in paragraph 164 or that Plaintiff is entitled to the relief sought.

**H.     Count Eight: Breach of Contract (Against Defendants AMc)**

165.     The NRA incorporates the allegations in the preceding paragraphs as if fully set forth herein.

> **ANSWER:**   Defendants can neither admit nor deny as the "preceding paragraphs" are not specifically enumerated.

166.     For the reasons explained in paragraph ___, supra, in the alternative, the NRA asserts this breach of contract claim that is also part of Virginia Claims.

> **ANSWER:**   Defendants can neither admit nor deny as the referenced paragraph is not specifically enumerated.

167.     The Services Agreement is a legally enforceable contract, and the NRA has performed all of its obligations under the Services Agreement.

> **ANSWER:** Defendants neither admit nor deny the allegation regarding the enforceability of the Services Agreement, which is a legal conclusion requiring no response.   Defendants deny that the NRA has performed all of its obligations under the Services Agreement, including its failure to pay all outstanding invoices due and owing to AMc and its failure to post a $3 million bond as required under the Services Agreement.

168. *The Records-Inspection Clause*. The Records-Examination Clause is unambiguous. The NRA has performed all of its obligations under the Services Agreement, including its obligation to provide reasonable notice pursuant to the Records-Examination Clause.

**ANSWER: Defendants deny the allegations in paragraph 168.**

169. Ackerman and Mercury have breached the Records-Examination Clause of the Services Agreement. Specifically, Ackerman-acting at all times on behalf of both itself and Mercury, pursuant to the Services Agreement-has repeatedly failed or refused to permit the NRA to examine specified categories of books and records with respect to matters covered under the Services Agreement.

**ANSWER: Defendants deny the allegations in paragraph 169.**

170. There is no adequate remedy at law for AMc's refusal to permit examination of records (whether they reside at Ackerman or Mercury) pursuant to the Services Agreement. The information sought by the NRA pursuant to the Records-Examination Clause resides uniquely within the possession of Ackerman and/or Mercury, and cannot be acquired by the NRA on the open market for any sum of money.

**ANSWER: Defendants deny the allegations in paragraph 170.**

171. The nature of the obligation imposed by the Records-Examination Clause makes specific performance equitable and practical because the Court need only order AMc to furnish to the NRA: (i) copies of any AMc-Third Party NRA Contracts, including the North Contract; and (ii) business records, in whatever form they were generated in the ordinary course of AMc's business, which are sufficient to convey the information sought by the NRA as described in the paragraphs above.

**ANSWER: Defendants deny the allegations in paragraph 171 and deny that the NRA is entitled to the relief it seeks, particularly with regard to the North Contract, which it already has in its possession.**

172.    Defendants' breaches of the Services Agreement have damaged—and threaten to imminently, irreparably harm—the NRA's legitimate operational interests as a not-for-profit organization. By denying the NRA access to basic information regarding the nature of the services being performed, the putative budgets for these services, and the material terms of third-party contracts for which the NRA is purportedly liable, Defendants have jeopardized the NRA's ability to steward its funds in pursuit of its public mission. Moreover, AMc's continued and baseless refusal to disclose material information relating to the North Contract threatens to impede the NRA's corporate governance.

**ANSWER:  Defendants deny the allegations in paragraph 172.**

173.    By reason of the foregoing, the NRA requests that this Court order specific performance by Defendants of their obligations pursuant to the Records-Examination Clause of the Services Agreement.

**ANSWER:  Defendants deny that Plaintiff is entitled to the relief it seeks in paragraph 173.**

174.    ***The Confidentiality Clause.*** Defendants have breached the provisions of Section IV of the Services Agreement by directly or indirectly disclosing, to third parties, information made known to AMc as a result of AMc's providing Services (as defined under the Services Agreement).

**ANSWER:  Defendants deny the allegations in paragraph 174.**

175.    Defendants' breaches have damaged the NRA. Among other things, the NRA has incurred significant reputational damage, and professional fees, as a result of Defendants' bad faith, out-of-context "leaks" to reporters. For example, the NRA's attorneys and public affairs professionals have spent extensive hours fielding inquiries from journalists in an effort to correct the misleading impressions sown by AMc.

**ANSWER:  Defendants deny the allegations in paragraph 175.**

176.     Defendants' breaches are escalating, and there can be little doubt that if its collaborator of multiple decades continues to maliciously disseminate its confidential information, the NRA will be irreparably harmed. The NRA is entitled to injunctive relief to avert or minimize this inseparable harm.

**ANSWER:  Defendants deny the allegations in paragraph 176 or that the NRA is entitled to the relief it seeks.**

177.     Moreover, AMc's breaches are material—by seeking to destroy the NRA's reputation, AMc has destroyed the purpose of the parties' contract. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

**ANSWER:  Defendants deny the allegations in paragraph 177.**

178.     *The Return-of-Property Clause.* The provisions of Section XI.E. of the Services Agreement are unambiguous and bind "AMc" (defined to include both Ackerman and Mercury).

**ANSWER:   Defendants deny the allegations and legal conclusions in paragraph 178.**

179.     The NRA seeks possession of its property, fixed assets, materials, documents, and confidential information as defined in the Services Agreement.

**ANSWER:  Defendants admit that Plaintiff is asking for this relief.**

180.     Both the NRA and AMc have provided notice of the immediate termination of the Services Agreement; thus, the NRA has an immediate right to possession of the NRA's property.

**ANSWER:  Defendants admit that the Services Agreement has terminated, but deny that Plaintiff is entitled to the relief it requests in paragraph 180.**

181.     The NRA's property is capable of identification. The NRA's property is defined in the Services Agreement and the NRA provided a partial list of its property in AMc's possession

in the NRA's letter dated July 22, 2019, to AMc.

**ANSWER:  Defendants admit the allegations in paragraph 181 but respond that AMc is prohibited from providing from providing the requested items pending the investigation of the NRA by the New York Attorney General's office and that all documents and information must be held by AMc for the duration of the investigation.**

182.    In its July 22 letter, the NRA provided values for some of its fixed assets in AMc's possession. In addition, the NRA's confidential information and materials provided to AMc during their contractual relationship have monetary value.

**ANSWER:  Defendants admit that AMc received a letter with the referenced date, but deny the remaining allegations in paragraph 182.**

183.    AMc is in possession of the NRA's Property and has wrongfully refused to return the NRA's Property.

**ANSWER:  Defendants deny the allegations in paragraph 183.**

184.    AMc has breached the provisions of Section XI.E. of the Services Agreement by failing to provide the immediate return of the NRA's Property.

**ANSWER:  Defendants deny the allegations in paragraph 184.**

185.    AMc has also breached the implied covenant of good faith and fair dealing ignoring the NRA's repeated requests to return the NRA's Property.

**ANSWER:  Defendants deny the allegations in paragraph 185.**

186.    AMc's breaches have damaged the NRA in an amount to be proven at trial.

**ANSWER:  Defendants deny the allegations in paragraph 186.**

187.    Moreover, AMc's breaches are material. Accordingly, the NRA is entitled to damages based on all of its remaining rights to performance under the Services Agreement.

**ANSWER:  Defendants deny the allegations in paragraph 187 and further deny that Plaintiff is entitled to the relief requested.**

## VI.  DEMAND FOR JURY TRIAL

188.    The NRA hereby demands a trial by jury on all issues of fact to which it is entitled

to a jury trial in this action.

> **ANSWER:  The demand set forth in paragraph 188 reflects an entitlement
> afforded to all parties and is not susceptible to admission or denial.**

## VII.  PRAYER

189.    For all the foregoing reasons, the NRA requests that the Court enter judgment in its

favor and award it the following relief against AMc and the other Defendants:

  a.    Preliminary and permanent injunctive relief prohibiting Defendants, and
        each of their agents, servants and employees, and those persons in active
        concert or participation with any of them, from in an unauthorized and
        unlicensed manner: (1) showing any references to the NRA on AMc's
        website and in any other form of media; (2) using or displaying any logos
        or symbols affiliated with the NRA in connection with advertising,
        distribution, or display for sale of any product or service associated with
        AMc; (3) making in any manner whatsoever any statement or
        representation, or performing any act, likely to lead members of the public
        to believe that AMc is in any manner, currently directly or indirectly,
        associated, affiliated, connected with, authorized or approved by the NRA;
        and (4) taking any action, directly or indirectly, in any form or manner
        whatsoever that is likely to tarnish or disparage the business reputation of
        the NRA;

  b.    Compensatory damages for injuries sustained as a result of Defendants'
        wrongful conduct, in at least the amount of $40 million.

c. Punitive or exemplary damages in an amount to be determined at trial;

d. Forfeiture and disgorgement in an amount to be determined by the Court;

e. Costs of court;

f. Reasonable and necessary attorneys' fees;

g. Pre-judgment and post-judgment interest at the highest lawful rate; and

h. Such other relief, at law or in equity, to which it may be justly entitled.

**<u>ANSWER:</u>  Defendants deny that the NRA is entitled to recover against Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through h of paragraph 189.**

190.    In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Return-of-Property Clause in the Services Agreement:

a. Ordering that the NRA has proven its ownership rights and that AMc shall return the NRA's property immediately;

b. Granting a pre-trial seizure of NRA property in the possession of AMc;

c. Ordering the sheriff or other proper officer to seize NRA property and deliver the same to the NRA *pendente lite* under circumstances deemed appropriate;

d. Granting NRA preliminary and permanent injunctive relief;

e. Alternatively, granting NRA specific performance of the return of the NRA's Property or compensatory damages for a material, total breach of contract;

f. Granting NRA punitive or exemplary damages; and

g. Granting such other and further relief as the Court deems just and proper.

**<u>ANSWER:</u>  Defendants deny that the NRA is entitled to recover against**

**Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through g of paragraph 190.**

191. In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following concerning the breach of the Confidentiality Clause in the Services Agreement and the breach of the fiduciary duty of loyalty:

> a. Granting it preliminary and permanent injunctive relief, as well as other equitable relief such as disgorgement or forfeiture;
>
> b. Granting it compensatory damages for material, total breach of contract, and breach of the fiduciary duty of loyalty, totaling $40 million;
>
> c. Granting it punitive or exemplary damages; and
>
> d. Granting such other and further relief as the Court deems just and proper.

**ANSWER: Defendants deny that the NRA is entitled to recover against Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through d of paragraph 191.**

192. In the alternative, the NRA requests judgment in its favor against Defendants with respect to the following on the breach of the Records-Examination Clause in the Services Agreement:

> a. A judgment against each of Ackerman and Mercury for breach of contract;
>
> b. An award of specific performance to the NRA requiring that:
>
>> a. AMc furnish copies of all AMc-Third Party NRA Contracts to the NRA within three (3) business days of the entry of such order; and
>>
>> b. Within ten (10) business days of the entry of such order, AMc furnish to the NRA:
>>
>>> i. Copies of annual budgets for the years 2016-2018, which AMc alleges were approved by the NRA and were

previously provided to the NRA's forensic accountants;

ii.      A list of all current NRA-Dedicated Personnel (as defined in the NRA's letter correspondence) and, for each such employee, copies of business records sufficient to show the amount or percentage of the employee's time that was dedicated to NRA projects during the period from January 1, 2018, to present;

iii.     Copies business of records sufficient to show the extent of any costs invoiced to the NRA or the NRA Foundation, during the period from January 1, 2018, to April 1, 2019, which costs were incurred by reason of:

1.     The production of the NRATV documentary series "American Heroes;" or

2.     Cash or non-cash compensation to North or North-related Staff; or

3.     Office space of other perquisites provided to North or North-related Staff; and

4.     Whether each item was billed specifically to the NRA, the NRA Foundation, or both entities; and

c.     Copies of business records (if any) reflecting North's availability to film American Heroes, any modifications to the American Heroes production schedule during the period from May 2018 to present, and the reasons for those modifications; and

d. Such other and further relief to which the NRA may be entitled at law or in equity.

**ANSWER: Defendants deny that the NRA is entitled to recover against Defendants and deny that the NRA is entitled to any of the relief sought in subparagraphs a through d of paragraph 192.**

## VIII. AFFIRMATIVE DEFENSES

### First Affirmative Defense
### (Authorization)

193. Plaintiff has authorized, through writing, verbally and through its actions, the displaying of NRA, any of its trademarks, and its name and that of NRATV on AMc's website.

### Second Affirmative Defense
### (Fair Use)

194. AMc's display of any information related to the NRA or NRATV constitutes fair use, both descriptive and nominative, as those terms are used by Supreme Court and 5th Circuit authority.

### Third Affirmative Defense
### (Justification)

195. AMc is justified in its use of materials allegedly converted.

### Fourth Affirmative Defense
### (Conditions Precedent)

196. The NRA has failed to satisfy conditions precedent to its entitlement to recoup any of its alleged intellectual property.

### Fifth Affirmative Defense
### (Mitigation)

197. The NRA's damages, if any, are self-inflicted and, in any event, the NRA has failed to mitigate its damages, if any exist.

## Sixth Affirmative Defense
### (Unclean Hands)

198.    The NRA is not entitled to any relief herein, particularly equitable relief because it comes into court with unclean hands.

## Seventh Affirmative Defense
### (Waiver)

199.    The NRA has waived any entitlement to complain about the presence of its name or any reference to the NRA or NRATV by virtue of its long-standing approval and acquiescence therein.

## Eighth Affirmative Defense
### (Estoppel; Mootness)

200.    The NRA, by its conduct and actions and words, is estopped from complaining about the matters made the basis of its lawsuit.  For years, AMc has displayed its NRA connection on its website with NRA concurrence.  After the NRA raised an objection—and then, only to serve as its false pretense for bringing this lawsuit—AMc added the word "legacy" to references to the NRA, thus confirming that its use of the term "NRA" or "NRATV" constitutes legally permissible fair use.  AMc's website is, in all respects, correct, accurate, and truthful.[4]

## Ninth Affirmative Defense
### (Truth)

201.    The NRA cannot show any *falsehood* to support its claim for false association or false endorsement because it is undisputed that the NRA is a former client of AMc.

## Tenth Affirmative Defense
### (Ratification)

---

[4] That this assertion – indeed this lawsuit – is a gross overstatement is demonstrated by the fact that the NRA's own law firm (formerly Bickel & Brewer) itself a client of AMc, has been featured on AMc's website for several years, without complaint.

202.    The NRA has ratified actions taken by AMc in connection with its website.

### Eleventh Affirmative Defense
### (No Standing)

203.    The NRA lacks standing to pursue claims under either the Lanham Act, 15 USC § 1125(a), or under the copyright laws of 17 USC § 101, *et seq*.

### Twelfth Affirmative Defense
### (Plaintiff's Fault)

204.    The NRA's own actions and omissions caused or contributed to its injury.

### Thirteenth Affirmative Defense
### (Fraud)

205.    The NRA, by and through the conduct of its Executive Vice President, Wayne LaPierre, made false representations to AMc regarding the nature of monies paid by AMc and used by LaPierre for his own personal benefit.  To the extent that any expense presented by AMc to the NRA lacks proper supporting documentation, it is exclusively due to the affirmative conduct of LaPierre himself and his false representations, specifically, that every expense he instructed AMc to incur was a legitimate charge for the NRA's benefit.  Although numerous members of the NRA board of directors knew about LaPierre's gross mismanagement of NRA member funds, his actions were tacitly approved and thereby ratified by the NRA's board of directors—at least those members who were willing to look the other way.  Those board members who questioned the propriety of LaPierre's spending were branded as "co-conspirators" and swiftly removed from the board.  Now surrounded by an assembly of yes-men, LaPierre continues to indulge in unmitigated use of NRA member funds as his own personal piggy bank.

## AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT

## I.  PRELIMINARY STATEMENT

**A.  Amended Counterclaim.**

1.      Beneath its benign veneer, the instant case is driven by the intentional efforts of LaPierre and current NRA board members to destroy AMc's business in a desperate attempt to deflect attention from the NRA's gross financial mismanagement at the hands of LaPierre, the longtime Executive Vice President and *de facto* leader of the NRA.  The NRA's lawsuit invites—or rather, necessitates—inquiry into the conduct of LaPierre and other NRA board members.  The NRA's victim narrative will not withstand fact-based scrutiny of the real reasons why the parties' operating agreement (the "***Services Agreement***," as amended)[5] was terminated, or any meaningful examination of the creation, operation, and unquestioned success of NRATV (a digital network dedicated to the advancement of Second Amendment issues), and any allegation that NRATV was somehow a "failed endeavor."

2.      Despite the parties' decades-long relationship, two events combined to cause the NRA to switch from friend to foe: (1) the advent of the law firm of Brewer, Attorneys and Counselors (the "***Brewer Firm***"), and its principal Bill Brewer ("***Brewer***") (son-in-law and brother-in-law to the principals and owners of AMc), whose ascendency within the NRA has caused the NRA to embark on a reckless and self-destructive path, in the process taking down important service providers, longtime legal counsel, and dedicated NRA leaders who had been powerful Second Amendment advocates; and (2) AMc's refusal to cover up or acquiesce in the financial adventurism and organizational mismanagement of the NRA's rogue leader, LaPierre.

3.      This action—the *fourth* frivolous lawsuit launched by the NRA against AMc in the

---

[5] *See* Ex. A (Services Agreement); Ex. B (Amendment No. 1 to Services Agreement).

last six months—is simply more of LaPierre and Brewer's frivolous litigation tactics, inflammatory public-relations maneuvers, and wasteful misuse of NRA resources. And AMc is in good company. Under Brewer's influence since at least early 2018, the NRA has brought lawsuits against (1) Andrew Cuomo, the Governor of New York and New York's Chief Insurance Regulator; (2) the Lockton Companies; (3) Lt. Col. Oliver North ("***North***"), the NRA's one-time President; (4) Letitia James, the New York Attorney General; and (5) the City of San Francisco. These lawsuits have resulted in the voluntary resignation of several NRA board members who were unwilling to watch LaPierre ignore his fiduciary duties to the NRA or to be labeled a "co-conspirator" for publically questioning his actions.[6]

4.      Now forcing AMc to defend itself on yet a fourth front, LaPierre and Brewer, enabled by the remaining NRA board members, appear intent on extorting their desired outcome through a cocktail of vexatious litigation, Rambo-style media exploits, and strong-arm coercion tactics. In sharp contrast to Plaintiff's Amended Complaint, the facts supporting this Amended Counterclaim show that AMc has been victimized by the machinations of LaPierre and Brewer—not the other way around.

**B.      Third Party Action**

5.      The NRA's lawsuit requires, in defense, an exposition of the fraudulent conduct of LaPierre; his profligate misuse of NRA funds for personal and family benefit; his flaunting of non-profit corporation law; and the reckless abandon with which he and his enabler Brewer have run roughshod over the NRA Board of Directors and the NRA Foundation Board of Directors in multiple respects (including failure to obtain prior board approval for his lawsuits against AMc

---

[6] *See e.g.*, news articles describing this recent frenetic activity and Brewer's role: Non Profit News Quarterly, (https://nonprofitquarterly.org/why-someone-should-make-the-NRA-into-a-tv-series; Washington Post, https://www.washingtonpost.com/politics/how-a-hard-charging-attorney-helped.fuel-a-civil-war-inside-the-NRA); https://www.nytimes.com/2019/08/22/us/politics/nra-guns-wayne-lapierre.html.

and firing the Board's general counsel).

6.  Brewer was an odd but convenient choice for leading a scorched-earth attack on AMc. Being related to AMc executives, he could be expected to trade personal information about his father-in-law, Angus McQueen, which indeed occurred on at least one occasion 2018 when Brewer was interviewing AMc employees. Now deceased, Mr. McQueen was, at the time, fighting cancer and needing the full support, as well as the discretion, of his family. Instead, Brewer partnered with LaPierre in an attempt to scapegoat someone who would be unable to properly defend himself.

7.  LaPierre will also be exposed individually for libelous statements against AMc, his intentional interference with third-party NRA contracts, and the fraud he has perpetrated on AMc, particularly with respect to NRATV. This lawsuit will reveal that the true driving force behind LaPierre's plan to scapegoat AMc is to not only deflect attention from his own wrongdoing, but also to inflict maximum damage on AMc in retribution for its "disloyalty," apparently defined by LaPierre as an unwillingness to follow him blindly. It is LaPierre, with Brewer's assistance, whose artifice has caused AMc serious business and reputational injury, for which he must now be held accountable.

8.  This Amended Counterclaim and Third-Party Complaint seek to not only restore AMc's reputation, but to hold the NRA and LaPierre accountable for their reckless actions and the profound collateral damage inflicted upon AMc as a result.

## II.   PARTIES

9.  Counter-Plaintiff has appeared herein by contemporaneously filing this Amended Answer, Amended Counterclaim, and Third-Party Counterclaim against Wayne LaPierre, individually.

10.     Counter-Defendant has appeared herein and is before the Court for all purposes.

11.     Third Party Defendant Wayne LaPierre is a resident of the State of Virginia who may be served with citation at his place of business, 11250 Waples Mill Rd., Fairfax, Virginia 22030.

## III.     JURISDICTION AND VENUE

12.     The counterclaims asserted herein include compulsory and permissive actions. Venue is proper in the Northern District of Texas, Dallas Division.

## IV.     BACKGROUND FACTS

**A.     Decades of Harmony Coincide with the Emergence of LaPierre.**

13.     For nearly four decades, AMc expertly served the NRA, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  The beginning of the relationship followed NRA management's decision to completely outsource its public relations work to AMc.  AMc effectively crafted the NRA message and burnished its image as the most visible Second Amendment advocacy group in the United States.

14.     LaPierre, a one-time Democratic legislative aide, began his NRA career in 1977 as a lobbyist.  Described in news reports as "reserved" and "awkward,"[7] he was seemingly ill-suited to head what many describe as a strident advocacy group.  Aside from his mild personality, AMc personnel found him to be uncomfortable with AMc-developed branding programs such as "NRA Life of Duty," a program created to tell stories about American military and law enforcement professionals who defend the United States domestically and abroad.  LaPierre often exhibited defensiveness, possibly stemming from his lack of military service and multiple deferments

---

[7] *See e.g.*, https://www.thetrace.org/features/nra.financial.misconduct.ackerman.mcqueen.

obtained during the Vietnam conflict. Even today, LaPierre knows little about guns or how to actually use them.

15. In the wake of the tragedy at Sandy Hook in 2012, LaPierre personally sought to avoid public scrutiny[8] and to cease being the only voice of the organization. He turned to AMc, which created the commentator program for that purpose. Within a short period of time, AMc—at LaPierre's request and with his approval—hired or contracted with several nationally recognized talents whose job was to deliver hard-hitting commentary on Second Amendment and American freedom issues. This marked the beginning of LaPierre's personal involvement in assessing and approving salaries and capabilities of those talents as, ultimately, those fees would be passed through to the NRA.

16. LaPierre also tasked AMc to develop programs that would broaden NRA's reach. To that end, AMc developed the theme "Stand and Fight," which became the banner brand for the NRA. The NRA continues to use the theme today.

17. By contrast, certain offensive messaging, which disgraced the NRA was created by other vendors at LaPierre's direction. For example, in 1994, LaPierre and his membership-recruitment firm (not AMc) created the now infamous direct-mailer line, "jack-booted thugs." LaPierre routinely urged AMc to give him "more gasoline," knowing that this kind of incendiary advocacy would create notoriety for the NRA . . . and, of course, enhance his personal brand. AMc refused all directives that, in its professional opinion, would bring harm to the NRA brand.

18. Despite AMc's efforts to appeal to a broader audience, LaPierre's polarizing rhetoric appeared to be taking its toll. In 2014, the NRA experienced funding problems, causing LaPierre and the NRA Treasurer, Woody Phillips ("***Phillips***"), to travel to Dallas to announce a

---

[8] LaPierre flew to the Bahamas during this time to avoid having to comment on Sandy Hook.

budget cut for AMc during calendar year 2015.[9]  With the figurative stroke of a pen, LaPierre cut funding for NRA Life of Duty, in the process neutering a valuable, patriotic, and profitable program as well as funding for additional sponsored programming.  When confronted about the decision to cut programs that had active sponsors, LaPierre directed AMc to "fake it," *i.e.*, make it appear that the NRA Life of Duty program and others remained robust despite the significant funding loss.  AMc refused the edict to "fake it," and instead came up with creative alternative concepts that would serve the NRA members with a smaller budget.

**B.    Agreed Protocols, Now Conveniently Ignored, Are Developed.**

19.    During this multi-decade relationship, the parties developed working arrangements, such as negotiating annual budgets covering a variety of tasks.  LaPierre and Phillips controlled the process, operating with full knowledge of line items.  As projects were initiated, invoices would issue, and payment would follow without complaint.  LaPierre participated in those negotiations and approved each annual budget.  The NRA itself well understood that keeping hourly time records as the basis of billing was not the contractual measure of payment—AMc was paid for its *results*.  Reflecting the understanding that strategy and creative value are determined by outcome rather than an amount of time spent, the annual budget developed and agreed upon by the parties was results-based in nature and determined by the fair market value[10] of each proposed objective. The type of time-based detail that the NRA now claims to be missing had simply never been

---

[9] Curiously, the costs cut were associated with NRA video channels; left untouched were many of LaPierre's and other NRA officials' out-of-pocket expenditures.

[10] AMc invoicing for services rendered consists primarily of "Fair Market Value" for services such as video programming production for NRATV, video support, Freedom's Safest Place production, Annual Meetings event planning/coordination/execution, and America's First Freedom print magazine production (all of which are listed on the 2019 Approved Budget).  Some additional services AMc provided consisted of specific talent/personnel, employed by AMc specifically on NRA's behalf.  These personnel were identified individually to NRA, along with their salary, a specified overhead factor for each, and a profit factor for each which concluded with a total for each employee. These transparent and approved salary allocations were the basis of the billing for what NRA refers to as "virtual employees," not the amount of time and/or hours these employee spent working.  Any services rendered outside of the annual approved budget were approved by Woody Phillips (and later, Craig Spray).

required.

20.     LaPierre, with input from AMc CEO, Angus McQueen ("*Angus*"), directed that these working arrangements be set in place. The entities' senior officers, Phillips (NRA) and Winkler and/or Montgomery (AMc) were involved in the negotiations and oversaw budgetary, invoicing, and payment issues.

21.     The parties abided by these protocols steadfastly and without disagreement for many years as the relationship grew. Budgets would be set for specific work, AMc sent an invoice, the NRA paid the amount budgeted for the invoiced task, and AMc completed the objective. The relationship between the organizations was harmonious and mutually beneficial, as both parties grew into leaders in their respective spaces. Given the transparency and fairness of the annual budgeting process, never in their long history did either party express mistrust of the other side's financial dealings—until political pressure on LaPierre began mounting, that is.

**C.    NRA Asks AMc to Front Activities; LaPierre's Passion for Secrecy.**

22.     One of the defining characteristics of the NRA/AMc relationship was the frequency with which LaPierre and others acting at his direction asked AMc to "front" activities and expenses for the NRA. For example, AMc would engage third parties to perform work for the NRA at LaPierre and other NRA officials' request, pay for the work performed by those third party(ies), and then submit an invoice for reimbursement by the NRA. These expense reimbursements (as opposed to charges for work actually performed by AMc) amounted to several millions of dollars annually.[11] LaPierre's rationale for running these expenses through AMc: it was necessary for security and "discretion" reasons. In fact, on many occasions, he told AMc that he didn't trust his

---

[11] Press reports influenced by the NRA have incorrectly asserted that the NRA "paid" AMc $40 million in 2017. In fact, a substantial amount of the 2017 budget was spent on expensive national broadcast advertising and talent AMc retained for NRA projects at the NRA's request, specifically, at the request of LaPierre.

own accounting department within the NRA.

23.     LaPierre, beset by apparent paranoia and a passion for secrecy, adopted a dictatorial, micromanagement style.  He began displaying an obsession with privacy, distancing himself from the public eye and exhibiting panic at the thought of public scrutiny.  At the same time, he was heavily involved in the formulation of policy and protocols for dealing with third parties, including vendors like AMc.  Even NRATV, now the scourge of the NRA, was created and expanded at the sole direction of LaPierre.  Not only did he sign off on every performance metric of NRATV, he extolled the success of NRATV in public speeches and made numerous presentations to the Board of Directors in support of NRATV, which seem to have been favorably received.  One board member observed, "If you took a poll of most board members, they'll tell you they like NRATV."[12]

24.     LaPierre repeatedly made two things clear: (1) he was the only person with ultimate authority to speak for the NRA and direct the AMc relationship on behalf of the NRA, unless he specifically designated someone in writing to perform that task; and (2) any expenses he incurred, whether personally or through AMc, were legitimate NRA expenses, and therefore subject to reimbursement to AMc.  As AMc has now learned, LaPierre's broad representations regarding the legitimacy of his expenses were often false.

**D.     The Services Agreement.**

25.     Over the course of years, the parties formalized their working arrangements, embodying their protocols in a "Services Agreement," the first of which they executed in 1999. The latest version was updated in 2017[13] and amended in 2018[14] to confirm the protocol for the

---

[12] http://www.wsj.com/articles/nra.files.suit.against.ad.agency.in.rift.with.key.partner.
[13] Ex. A.
[14] Ex. B.

hiring, compensation, and reimbursements due to AMc under employment agreements involving North and Dana Loesch ("***Loesch***"). At the NRA's request, through LaPierre, AMc formally employed both of these individuals as "talents" for NRATV, the ambitious digital broadcast network created, staffed, and administered in its most recent form (at LaPierre's request) by AMc.

26. The Services Agreement also contained other key clauses related to the duties imposed upon AMc to maintain the confidentiality of the NRA's sensitive information, a provision designating the sole NRA authority for communicating with and issuing directives to AMc, and numerous other substantive provisions, which the NRA's Amended Complaint has now placed at issue.

### i. Termination and Reimbursement Provisions.

27. The 2018 Amendment contains two provisions expressly designed to protect AMc in the event of its expiration or termination of that agreement. *First*, the NRA was required to secure and post a $3,000,000.00 letter of credit for AMc's benefit to secure payment of outstanding invoices over 30 days old.[15] *Second*, "all non-cancellable" contracts entered into between AMc and third parties for the benefit of the NRA, including the North and Loesch contracts (referred to therein as the "***AMc Third Party NRA Contracts***"), obligated the NRA to pay the "compensation payable" under the Third Party NRA Contracts.[16]

28. The 2018 Amendment was significant for other reasons as well. As described herein, LaPierre on multiple occasions lauded AMc's work on NRATV, including during a meeting in Dallas on October 11, 2018. Starting at that meeting and continuing over the next two months, LaPierre approved NRATV for the 2019 budget year, including Dan Bongino's $1.5 million contract (which Mr. Bongino ultimately turned down). As he had done in May 2018 when

---

[15] Ex. B ¶ 2.
[16] Ex. B ¶ 3.

the 2018 Amendment was signed, LaPierre voiced his continuing support for AMc's work and the performance of commentators like North and Loesch. These statements, like the written commitment to reimburse AMc for North and Loesch's salaries, were false, were known by LaPierre to be false when made, and were relied upon by AMc, resulting in damages.

29.     Under the 2017 Services Agreement and the 2018 Amendment, the NRA has the contractual ability to terminate the Agreement at any time with 90-days' notice.  The termination of the Services Agreement triggers Sections XI.B, D, E, and/or F, under which the NRA will owe AMc termination payments, which are currently estimated to approach thirty-five million ($35,000,000) in severance payments and other termination fees.

### ii.     Authorized Contacts.

30.     Additionally, Section IX of the Services Agreement provides as follows:

AMc is authorized to act upon written communications received from the NRA Executive Vice President or his designee. He or his designee are the ***only persons*** within NRA who have the actual authority to issue such communications.[17]

31.     At all relevant times, LaPierre was (and remains) the NRA Executive Vice President.  As the Executive Vice President, only LaPierre or his designee could demand that AMc provide access to any information or documents to anyone, including the NRA itself.

32.     Pursuant to Section IX of the Services Agreement imposed by the NRA, AMc could act only if it received a "written communication" from LaPierre or his designee.  By like token, only LaPierre could designate persons "within NRA" who have the actual authority to issue directives to AMc relative to the request for, or release of, documents.  For this reason, certain document demands from other sources purporting to act on behalf of the NRA were unauthorized and therefore invalid under the Services Agreement.

---

[17] Ex. A, Section IX (emphasis added).

## E. NRATV: LaPierre's Brainchild.

33. NRATV, now assailed by the NRA as an "abject failure" and a "failed endeavor," has been anything but. Officially launched as a full network production featuring gun-related topics, political commentary, and other NRA-friendly topics, it had its actual beginnings in the early 1990's.

34. The network's earliest iteration featured a spokesperson, Ginny Simone, providing monthly reports on VHS for the NRA Board of Directors. That evolved into Ginny Simone Special Report Video Magazines in 1996, then expanded as follows:

> 2000: NRA Live Launch
>
> 2004: NRA News Launch, including the debut of "Cam & Co.," the NRA's first talk show host
>
> 2010: NRA Life of Duty Network Launch
>
> 2012: NRA Women Network Launch
>
> 2014: NRA Freestyle Network Launch
>
> 2015: Super Channel Launch under NRA News
>
> 2016: NRATV Official Launch

35. Throughout NRATV's evolution, AMc developed and administered the network's content (subject to NRA approval) and hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment "guaranteed" by the NRA). NRATV was featured by the NRA to its members and directors as one of its proudest and most successful projects. Each annual budget increased the agreed-upon amounts dedicated by the organization to what became its proprietary flagship. Each budget also received board approval.

36. Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRATV analytics from 2016 to 2018, repeatedly told AMc

personnel how well the network was performing and that the NRA would continue its support, financially and otherwise.

**F.      NRATV as a "Super Channel" with Political Clout.**

37.    Throughout 2015, AMc worked to create both the "Super Channel" and "Freedom's Safest Place."  The so-called "Super Channel" would be streamed online, and "Freedom's Safest Place" would be on the "Super Channel" and on national television.

38.    When Donald Trump ("*Trump*") became the Republican presidential nominee front-runner heading into the NRA convention in 2016, it became clear that the NRA needed to support his campaign, given the alignment between his base and the NRA's base.  LaPierre bristled at the thought of openly supporting Trump so early.  He continued his cynicism regarding Trump during the entire presidential election, noting on multiple occasions that he did not believe Trump could win.  In the fall of 2016, LaPierre approved new live programming to launch under the new brand NRATV that he believed would be crucial during what he anticipated would be a Hillary Clinton presidency.

39.    Despite LaPierre's negativity regarding Trump's candidacy, the NRA, with the advantage of Chris Cox's[18] relationships, placed their support behind Trump.  Freedom's Safest Place ads had become an impressive success for the organization.  They were routinely used to solicit high donor donations, and they aired throughout the 2016 election.  Once Trump became President, LaPierre routinely referred to the Trump presidency as the "Trump slump"[19] and opted to use Freedom's Safest Place to continue to solicit donations throughout 2017 and into 2018 while keeping the ads running on Fox News.

---

[18] Former Executive Director of NRA Institute for Legislative Action and Chief Lobbyist.
[19] The "Trump slump" is LaPierre's reference to the decrease in NRA membership revenue caused by the lack of a "common enemy," "threat," or other fear-based drivers of NRA membership.

40.     In the successful deployment of broad messaging about freedom that resonated with the NRA's constituency, LaPierre sought to increase NRATV's live presence.  He personally courted Loesch to join the channel full-time.  Her show launched in 2018 right after the tragedy in Parkland, Florida.

41.     Loesch appeared on the CNN Town Hall instead of LaPierre, and he routinely confirmed that her appearance was a huge success, helping the NRA to raise millions of dollars. What's more, NRATV was going live multiple times throughout the day with messaging intended to counter the narrative coming from gun control groups.  In one monetization effort, NRATV was able to generate almost $500,000 in a matter of some 35 days, the bulk of which occurred over a ten-day period.

The following graphic illustrates the successful fund-raising effort:



### G.    LaPierre Fails to Calm Stormy Seas.

42.    In the wake of Parkland, the NRA was becoming more and more publically vilified. Much of the executive leadership became extremely agitated about impending investigations. Tension mounted.   Threats took the form of "forensic accounting teams taking over whole floors in New York City to bury the NRA" and "the loss of all the organization's insurance."

43.    Seeking to stabilize his rudderless ship, and with repeated resignation threats from Pete Brownell,[20] LaPierre personally recruited North to become the next president of the organization and appear on NRATV.  North had been doing pro bono work for the NRA ever since the launch of NRA Life of Duty.  North was also one of the most effective voices in the Freedom's Safest Place campaign.  Everything culminated at the 2018 Dallas Annual Meetings where AMc representatives had multiple meetings with Phillips,[21] Steve Hart,[22] and LaPierre to discuss North's contract as well as the announcement of his presidency.  Amidst the mounting political pressure, the North presidency provided the NRA with much needed stability and increased public respect.

44.    Despite North's short-lived stabilizing effect, AMc began to have serious concerns about the NRA's direction under LaPierre's leadership. First was the Carry Guard debacle. Originally an admirable concept intended to fill a gap in the NRA's portfolio of member services, Carry Guard was designed to provide concealed-carry insurance and firearms training for its subscribers.  AMc was hired to develop the training component and to provide public-relations and branding services for the program.[23]   However, it was the NRA's responsibility, led by Josh Powell ("***Powell***"),[24] to develop and administer the entire Carry Guard program, including the

---

[20] President of NRA Board of Directors at that time.
[21] Treasurer of NRA at that time.
[22] General Counsel of NRA Board of Directors at that time.
[23] AMc engaged multiple third-party contractors consisting of elite special operations personnel to develop training programs that the NRA believed it could not do on its own.
[24] At AMc's insistence, Powell was eventually removed from contact with AMc employees due to his sexual harassment of an AMc employee.

insurance portion.

45.     On multiple occasions, the program's mismanagement was made obvious.  For example, Powell tried to convince the NRA to acquire USCCA, the leading competitor in the space, going so far as to enter into negotiations with the USCCA president entirely without approval from the NRA Board.  Powell appeared to be freelancing—a prospect that, from AMc's perspective, boded poorly for the ultimate success of the project.  Moreover, in meetings with AMc, Powell seemed generally dismissive of the training component of the program and kept referring to Carry Guard as nothing but an "insurance scheme."  AMc, however, wanted nothing to do with a "scheme."  As Powell pressed forcefully to launch a premature program, AMc expressed reservations about promoting anything that the NRA would be unable to deliver as promised.  This created the first visible signs of schism in the relationship, with Powell upset that AMc would not follow his direction.

46.     The next issue that started to unfold was the Russia investigation by the NRA.  Initially, the NRA asked an experienced contractor, Elaine Lammert,[25] to lead the internal investigation.  But quickly, she was stonewalled.  NRA officials even implied that they were more concerned with hiding the facts of the investigation than with bringing the entire story to light.  AMc wanted nothing to do with those at the NRA who were trying to stifle the truth.  The extent to which the NRA was willing to prioritize the personal protection of LaPierre and other members of the Board—a whitewash effort the organization is stridently pursuing even today—was becoming evident to AMc.

47.     It is against this backdrop of chaos that the NRA still needed AMc to do its increasingly important job of managing the public-facing brand, while the NRA scrambled to

_____

[25] Former Deputy General Counsel for the FBI.

protect itself from what appeared to the outside world to be a massive case of mismanagement. AMc's disagreement with the NRA's rollout and administration of the Carry Guard program and issues such as AMc's vocal objection over how the Russia investigation was handled became additional "grist for the mill" of retaliation led by LaPierre.

## H.    The NRA: Wayne's World.

48.    From its founding in 1871, the NRA grew to become a respected and powerful voice for Second Amendment rights in America. Then came Wayne LaPierre. Now built on the unstable foundation of LaPierre's personality, today's NRA bears little resemblance to its earlier incarnations. As the lawsuits against AMc and others have continued to unfold, it has become clear that LaPierre himself is his first priority, as opposed to the Second Amendment.

### i.    Personal Spending: Party On.

49.    Throughout his tenure with the NRA, LaPierre has routinely used third-party vendors like AMc to conceal his penchant for personal spending, seemingly with the NRA's blessing. By establishing an annual line-item budget for pass-through expenses, he created a veritable black hole for unchecked spending that, in turn, appeared to be a legitimate vendor expense for purposes of NRA records.

50.    AMc has discovered that some of LaPierre's out-of-pocket expenses reimbursed to AMc by the NRA, which were both requested and approved by LaPierre, appear to be personal in nature: a $5,000 monthly rental for an apartment to be used by a female NRA intern; a retainer for a travel agent who was facilitating personal travel for LaPierre and his family; and the use of an AMc credit card by LaPierre and other NRA employees for LaPierre's personal benefit. In theory, the backup documentation for many of these charges should still be in LaPierre's possession.

51.    AMc first became suspicious of LaPierre's misuse of funds when AMc was asked

to facilitate and help structure the financing of a personal home for LaPierre and his wife. Ostensibly for "safety" reasons, LaPierre began looking for a home where he would be better protected than his current residence. As the search expanded, LaPierre passed over numerous safe housing options in favor of a $6 million mansion with no greater safety benefits. At that point, AMc refused to continue participating in the house transaction.

52. Upon information and belief, other vendors are being protected who are willing to hide LaPierre's spending. AMc became a target only after refusing to allow for these pass-through line-items in the parties' most recent annual budget. Indeed, other service providers and board members who challenged LaPierre's use of funds have now also been pushed out and attacked by the NRA as "co-conspirators."

53. LaPierre has also structured certain "back-scratching" relationships to siphon money to pet projects that the NRA would otherwise be prohibited from contributing to. Upon information and belief, the NRA makes charitable contributions to a third-party charity, who in turn donates that money to Youth for Tomorrow, an organization for which LaPierre's wife, Susan LaPierre, acted as President.

**ii.     "Funny Money": Filling the Coffers.**

54. In order to continue supporting LaPierre's spending habits, the NRA had to continue fundraising successfully. To artificially boost these efforts, LaPierre intentionally misled members using fear-based promotions designed to drive donations. For example, the NRA's recent plea for donations to fight Andrew Cuomo (citing the danger of losing its insurance), or claims that the NRA was "going out of business," were intentionally misleading to drive donation and membership dollars. AMc likewise refused to be a part of any promotion or publicity stunt that was misleading to NRA members.

55.     LaPierre also boosted NRA revenue through the creation of shell programs that the NRA never had any intention or meaningful ability to execute (or execute competently).  Examples of these programs include Carry Guard and School Shield.[26]  By appealing to members' hearts or promising benefits that were never delivered, the NRA raised millions of dollars of "funny money"—LaPierre's affectionate term for brand sponsorship funds.

### iii.     Wasteful Litigation: The Best Defense Is A Good Offense.

56.     Sometime in early 2018, LaPierre became preoccupied with going to jail, a fact that alarmed AMc given the frequency with which he reiterated this concern.  This is approximately the time when Brewer and his law firm entered the picture.  In a clear effort to deflect attention from the potential discovery of LaPierre's pervasive misuse of member funds, LaPierre and Brewer initiated numerous lawsuits around the country—each making its own media splash and presenting an opportunity for LaPierre to paint the NRA as an innocent victim of someone else (which, as a bonus, also drives donation dollars).  LaPierre and Brewer actually agreed upon this specific plan, as shown in an excerpt from the Brewer Fee Agreement, where Brewer was hired to perform services—

> —in connection with litigation and strategic needs arising from **the termination or potential termination of key corporate relationships by contract counterparties in response to political pressure**.[27]

57.     As the lawsuits exploded, so did legal fees payable to the Brewer Firm.

---

[26] School Shield was developed in the wake of the Sandy Hook tragedy in 2012.  The goal was to provide schools, through grants from the NRA, with threat assessments to determine the school's vulnerability, prepare a plan to make schools more secure, and help locate qualified armed safety officials.  Although this program raised millions of dollars, it was little more than a media stunt.  By the end of 2014, School Shield had issued a paltry five (5) grants.  After North became President in 2018, he demanded that the NRA "make it real."

[27] Ex. C (April 18, 2019 Correspondence from North to NRA Board of Directors) (emphasis added).

### iv. Wayne's Way or the Highway.

58.     Throughout the last year, the NRA has seen the exodus of once-devoted board members, legal counsel, chief lobbyist, North (the Board's President), and longtime vendor, AMc—each dedicated to defending the Second Amendment, each unwilling to blindly follow LaPierre, and each attacked as "conspiring" against LaPierre.  It has become clear to many within the NRA that LaPierre does not truly care if board member are devoted to the Second Amendment—he cares if they are devoted to *him*.

## I.     Litigation Abuse.

59.     Beginning spring of 2018, AMc learned that the NRA had hired Brewer.  The retention of Brewer was baffling given his long history of supporting anti-gun proponents and members of the Democratic Party, including Beto O'Rourke (a proponent of gun confiscation), Hillary Clinton, and Barack Obama.  It was even more puzzling in light of Brewer's familial relationship with Angus McQueen (Brewer's father-in-law) and Revan McQueen (brother-in-law).[28]  It also began an onslaught of "scorched earth" tactics.[29]  Since his entry onto the scene, Brewer and his firm, with the approval of LaPierre, has filed no less than eight lawsuits, four of which (including the instant case) are directed against AMc.  Three of the cases against AMc now reside in state court in the City of Alexandria, Virginia, and among other claims involve mutual charges of breach of the Services Agreement.  The fee agreement between Brewer and LaPierre, supposedly on behalf of the NRA, predicted litigation in precisely this manner.

60.     In addition, Brewer has filed suit against the Governor of New York, Andrew Cuomo, and its chief insurance regulator; the Lockton Companies, designer of Carry Guard

---

[28] Recognizing the deeply personal information involved, and to obviate any exploitation of the family relationship, AMc raised this conflict and ultimately had Brewer replaced as direct AMc contact.

[29] https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fuel.a.civil.war.

insurance, which has now been found to be in violation of New York and at least one other state's laws; Col. North, in the Supreme Court of New York; New York Attorney General, Letitia James; and a lawsuit against the City of San Francisco.

61.     When Brewer entered the scene in early 2018, Brewer entered the scene offering the NRA legal services while vying for the public relations work then being handled by AMc. Brewer is now using his hallmark (yet ethically questionable) "Rambo tactics" to target his family's business.

62.     In addition to his "truth neutral"[30] legal services, Brewer promotes his law firm as one that also offers public-relations services in house.  Contemporaneous with Brewer's attacks on his in-laws' public relations firm, Brewer published a legal article advocating that public relations services should be performed by law firms (instead of firms like AMc):

> As many clients realize, crafting a public narrative can no longer fall solely under the purview of public relations agencies or a corporation's in-house communications department.
>
> According to recent press reports, the legal community has awakened to the "new" normal: issues and crisis management should be a fundamental component of any high-stakes advocacy plan. There are many advantages for clients when that function is managed by law firms.[31]

63.     According to numerous reports, over the course of approximately one year, the Brewer Firm has billed the NRA $24 million (a number that has since grown), translating to (according to one report) some $97,000 per day.[32]

**J.     Ouster of AMc:  The Plan is Formalized**

64.     It appears that LaPierre set out on the course to eliminate AMc as a principal vendor

---

[30] *See* https://www.texastribune.org/2019/09/19/dallas-lawyer-william-brewer-iii-helped-fuel-civil-war-inside-nra/.

[31] *See* Excerpts from William A. Brewer III, Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management, TEXAS LAWYER (May 6, 2019).

[32] *See e.g.*, http://www.washingtonpost.com/politics/nascar.owner.resigns-from-NRA-board.

to the NRA sometime in early 2018.  Brewer and the Brewer Firm have actively assisted LaPierre in that endeavor.  Indeed, comments made by LaPierre to AMc officials reveal that LaPierre believes he is simply acting as, what LaPierre has characterized, "a pawn in Brewer's game of chess."

65.  As stated, the Brewer Fee Agreement, dated March 2018, summarizes the services to be rendered for the NRA: "**litigation and strategic needs arising from the termination . . . of key corporate relationships . . . in response to political pressure**."[33]  A fair reading of this excerpt reveals a dramatic truth never shared with AMc and in fact guarded by LaPierre and Brewer: Brewer was hired to assist in terminating, including via litigation, AMc's long-tenured relationship with the NRA, well before any allegations of misconduct existed.  This discovery has helped explain the NRA's abrupt change in attitude towards AMc, and its chameleon-like change from friend to foe.

66.  The Brewer Firm's Fee Agreement reveals another truth as well:  LaPierre was intent on severing ties with AMc as early as the spring of 2018, no doubt because AMc had begun to question directives received from LaPierre, along with the adversarial nature of his demands, and because of AMc's unwillingness to accommodate some of those demands—long before most of the acts underlying the NRA's claim against AMc.  These included AMc's refusal to participate in LaPierre's plea for donations from members under the false guise of a "shutdown."[34]  Unbeknownst to AMc, LaPierre was already plotting litigation against AMc in September 2018, consistent with that express objective in the Brewer Fee Agreement.

67.  LaPierre's actions during the entirety of 2018 and into 2019, wherein he repeatedly

---

[33] Ex. C (emphasis added).
[34] Ex. D (March 4, 2019 NRA Notice of Shutdown).  Not only did the NRA not shutdown, but despite whatever financial woes LaPierre may have concocted, recent NRA tax filings reveal that LaPierre's compensation actually *increased* in 2018 by 55% to $2.2 million.

represented to AMc personnel that: (1) NRATV would continue to be funded; (2) the NRA would continue to reimburse AMc for its third-party contracts; and (3) the NRA was committed to working through issues raised by the Brewer Firm, were false statements of fact. LaPierre and others within the organization knew such statements to be false when made. AMc relied upon these repeated assurances and continued to make financial commitments (including the North Contract) in reliance thereon.

## K. Brewer Supplants AMc in its Work for the NRA.

68. Over the course of several months, beginning with Brewer's retention and consistent with the recently publicized engagement letter, the NRA took an increasingly aggressive stance against its long-time vendor, first insisting on information that had never been a source of controversy in the past; insisting on documents that had never been required in the parties' dealings; demanding justification for its pricing, which had long-since been preapproved in annual budgets by the NRA and LaPierre; demanding interviews of AMc personnel; and conducting three separate audits (one of which lasted longer than one week), purportedly under auspices of the Services Agreement.

69. LaPierre set out to destroy the NRA's relationship with AMc by using vexatious litigation in order to oust AMc in favor of the Brewer Firm's public-relations/crisis-management advocacy. Indeed, the Brewer Firm has now supplanted AMc as the NRA's public relations lead communication strategist. According to LaPierre, Brewer, his new PR manager, is going to "keep him out of jail" as the pressure on the NRA has continued to mount under demands for greater transparency into the NRA's financial management.

## L. Smoke and Mirrors: Pretexts for Termination.

70. Throughout its cavalcade of litigation, the NRA has spun several false narratives in

a bad-faith attempt to create the appearance of a valid reason for terminating the Services Agreement, thereby escaping the contractual consequences of termination.

71.     Paragraph XI.C of the Services Agreement speaks to these consequences:

> This Services Agreement may be terminated by NRA immediately upon written notice if: (1) **AMc fails to diligently and in good faith perform any of its obligations contemplated hereunder; (2) AMc breaches any term, promise or covenant hereunder** . . .[35] If NRA so terminates the Services Agreement, **<u>NRA shall have no obligation to make payments</u>** except that NRA shall, pursuant to Section III [that section dealing with ordinary course or special assignment payments] reimburse AMc for expenses incurred up to the date of said notice of termination. (Emphasis added).

72.     Thus, by creating the false appearance of one of these breach events, the NRA stood to avoid the many millions of dollars it would otherwise owe—and in fact owes—to AMc in the form of severance and cancellation fees, as well as an unliquidated "Termination Fee" described in Section XI.F of the Services Agreement.[36]

73.     Once AMc was chosen to become the NRA's "fall guy" in its impending media and legal debacle, the Services Agreement with AMc would of course need to be terminated, thus requiring a false pretext for both termination and subsequent litigation.  The NRA quickly began weaving narratives that AMc had failed to perform "its obligations under the contract" or had breached one or more "term, promise or covenant" under the Services Agreement. The following subparagraphs describe these false narratives in greater detail.

**i.     The "Amendments" to New York Not-for-Profit Law.**

74.     As a preliminary matter, the Amended Complaint asserts that changes in New York

---

[35] Other breach/default events not relevant to the current action have been omitted.

[36] "In consideration of the dedication of a substantial number of personnel and resources to provide the services under this Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination.  Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement." Ex. A, Section XI.F (Services Agreement).

nonprofit laws were the motivation for the NRA's requests for documents and audits of AMc's financial records.[37] This argument is a red herring: the "recent" changes in the rules occurred in 2014, and those changes did not alter the longstanding requirement that the NRA's Board carefully consider related-party contracts as a non-profit incorporated in New York State.

75. Effective July 1, 2014, the New York Non-Profit Revitalization Act amended the N-PCL, including the provisions governing related-party transactions and conflict of interest policies. Further amendments to those provisions were made in 2015 and 2016. However, New York law has contained specific rules regarding related-party transactions, which rules have been in place since at least 1970.

76. NRA's compliance (or lack thereof) with the related-party-transaction rules rests squarely on the NRA itself.

77. AMc has complied with all of the NRA's properly authorized requests to review AMc's books and records. AMc in no way has impaired the NRA's ability to fulfill its duties with respect to its own related-party transactions or any other duty required under New York law.

**ii.     The Document Demand.**

78. Beginning in May 2018, AMc began receiving "demands" for various documents by persons purporting to be acting on behalf of the NRA. However, the NRA often failed to abide by the contractual requirement to communicate directives to AMc through Executive Vice President (LaPierre) or his formally declared designee as required by Section IX of the Services Agreement. In response to document demands, AMc repeatedly responded that the NRA was not following the requirements of the Services Agreement and that the demands issued to AMc were improper and ineffective.

---

[37] Amended Complaint ¶ 47.

79.     Moreover, the NRA has historically conducted annual audits of its vendors.  AMc has openly provided NRA access to financial and other information (including pricing) to NRA accountants and officers, including the Treasurer, Chief Financial Officer, and Board Legal Counsel, on an annual basis.  These true audits have been conducted almost yearly without complaint or adverse findings by the NRA for more than twenty-five years.  However, on several occasions, LaPierre would specifically instruct AMc not to disclose certain information to certain auditors, such as Rick Tedrick in the NRA accounting department.  Naturally, directives like this presented a conflict for AMc, who both desired to comply with the Services Agreement and with the auditors.

80.     NRA had three to six auditors in AMc's Oklahoma City office reviewing AMc files, records, and documents for approximately nine (9) days in February 2019.  Another auditor examined the records of AMc in November 2018 for an entire day.  These audits were preceded by another "audit" in September 2018 by the Brewer Firm, a process AMc complied with in good faith.

81.     At no time did the auditors claim to AMc that documents were withheld from review.  It is AMc's understanding that even LaPierre himself does not believe any documents requested by the auditors/examiners were deliberately withheld by AMc.

82.     John Frazer ("*Frazer*"), the NRA's general counsel, twice expressed his gratitude for AMc's compliance with the NRA audit: first, in an email on March 4, 2019, and again on March 25, 2019.  Frazer also characterized the NRA audit of AMc as "productive" in a letter to AMc counsel on March 14, 2019.

83.     AMc has complied with every authorized demand for examination of its documents, and the NRA's allegations to the contrary are nothing but an attempt to manufacture

the appearance of a contractual breach.

### iii. The Confidentiality Provision.

84. The NRA has also made unsubstantiated and ambiguous claims of "leaks" to the press by AMc, or someone acting on its behalf. The NRA's claims are replete with words like "malicious" and "defamatory" but otherwise thin in substance, whether with respect to the content of the leak, the identity of the person who may have been the leak, or any damage sustained by the NRA as a result.

85. In one recent Virginia lawsuit, the NRA alleged identical confidentiality breaches against AMc. After conducting discovery and multiple depositions, the NRA has yet to adduce any evidence of this supposed breach.

86. On the other hand, just as plausibly, a well-timed "leak" by someone associated with the NRA might also be helpful in creating the appearance of a contractual breach, generating media attention, shifting focus away from LaPierre and other NRA board members, and supporting a parade of vexatious and abusive litigation against its chosen scapegoat—precisely the job Brewer was hired to do.

### iv. The Analytics Gambit.

87. Newly-formulated complaints by the NRA, characterizing NRATV as a "failed endeavor," also qualify as a "made for litigation" stalking horse. Analytics were central to NRATV operations (essentially, viewership numbers). As set forth in greater detail in AMc's third-party action against LaPierre, periodic reports containing detailed analytics were regularly provided to LaPierre during the period 2016 (year of launch) through May 13, 2019, one month after the NRA filed its first lawsuit against AMc (which in part complained falsely about non-receipt of NRATV analytics). LaPierre personally approved the development of a customized

dashboard, which accumulated data from all platforms running NRATV content. He also sent NRA employee, Todd Grable, to review AMc's analytics and methodology, which were approved as a result of that meeting. Furthermore, AMc invited LaPierre on numerous occasions that, if he was ever concerned about the analytics, he was welcome to have a third-party company, such as Deloitte Digital or Accenture, audit and report on AMc's practices as well.

88.     LaPierre personally attended meetings to be briefed on NRATV analytics on the following occasions: October 24, 2017; November 28, 2017; January 3, 2018; February 1 and 19, 2018; April 11, 2018; September 4, 2018; October 11[38] and 23, 2018; November 28, 2018; December 5, 2018; and January 18, 2019. During each visit, AMc personnel shared in-depth analyses of viewership analytics that were three levels deep. LaPierre openly lauded AMc's performance. That too was false, because three days after his last scheduled visit regarding analytics on April 9, 2019 (when LaPierre abruptly and unexpectedly "had to leave" before the presentation could be made), the NRA filed its first lawsuit against AMc. Among other things, the NRA alleged that AMc had refused to provide the NRA with NRATV analytics – the very subject of the April 9 meeting!

**M.     The Onslaught Goes Public.**

    **i.     The NRA Discloses AMc's Proprietary Information.**

89.     On March 11, 2019, the New York Times ran an article in which the author revealed the existence of the North Contract and certain features thereof, including AMc's involvement with North.[39] The article misrepresented the facts and disparaged AMc. The New York Times article attributed certain factual assertions to Brewer as the source speaking on behalf of the NRA.

90.     Later, LaPierre, in a writing to the NRA Board, confirmed his authorization given

---

[38] Although a presentation was prepared for this meeting, it was not actually made that day.
[39] *See* https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

to Brewer to communicate with the New York Times.

91.     The NRA's deliberately false statements to the media regarding AMc's confidential information represented a change in the parties' relationship as well as the fundamental protocol for dealing with the parties' confidential information that had been in existence and honored for decades.

92.     AMc immediately expressed its strong objection to the NRA's false statements, doing so by letter to NRA General Counsel, Frazer, on March 12, 2019.

93.     Frazer's March 14, 2019 response did not deny that the NRA had leaked the information to the New York Times.  Instead, Frazer for the first time asserted the NRA's position that only AMc, and not the NRA, had restrictions on the use of a party's confidential information.  The NRA claimed it could disclose AMc's information with impunity while AMc was contractually prohibited from any reciprocal freedom to use NRA information.

94.     The exchange of correspondence signaled NRA's claim that it could deliberately misuse AMc's confidential information and thereby violate NRA's duty of good faith and fair dealing inherent within the terms of the Services Agreement.

95.     Current and prospective clients, financial institutions, and insurance providers have begun questioning AMc employees in light of the New York Times article, this Lawsuit, and consequent media reports.

     **ii.     Litigation as a Spectator Sport.**

96.     The NRA, with Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant.  The NRA's waste of courts' limited docket space has ranged from a glorified discovery dispute to three additional lawsuits in different jurisdictions covering similar

sets of factual and legal allegations.  In fact, between the one Texas and three Virginia actions,[40] all of the NRA's factual and legal claims are currently being litigated in at least two lawsuits.

97.    Each of these suits portrays the NRA as a victim, each has been filed without any attempt at a good faith "meet and confer" negotiation, and each has been accompanied by carefully orchestrated leaks and false self-serving press releases.  In fact, the Defendants in this lawsuit first learned that they were sued from news reports in advance of being served.  The repetitive and persistent nature of these filings merely underscores the fact that the NRA (and its counsel) have no real interest in resolution, but a protracted public spectacle.

### iii.    Disparaging Remarks Turn Libelous.

98.    Consistent with his approach of "lawyer as public advocate" for his client,[41] Brewer, with the approval of LaPierre and assistance from other NRA personnel, has become the *de facto* NRA spokesman and has fashioned a narrative that has brought AMc into disrepute. Contemporaneous with the filing of the NRA's lawsuits against AMc, Brewer and other NRA representatives have frequently attempted to spin the NRA message as one in which it is faultless and AMc is a rogue entity, bent on frustrating the NRA's legitimate efforts at obtaining disclosure.

99.    All of this is a transparent attempt to transfer attention from LaPierre's mismanagement of the NRA and possible civil and criminal exposure, and to wreak havoc within an organization that the Brewer Firm now directly competes with.  Examples abound where NRA representatives, including Brewer, have disparaged AMc, portrayed it as a miscreant, divulged its

---

[40] *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19001757, pending in the Circuit Court for the City of Alexandria, Virginia (filed on April 12, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19002067, pending in the Circuit Court for the City of Alexandria, Virginia (filed on May 22, 2019); *National Rifle Association of America v. Ackerman McQueen, Inc. and Mercury Group, Inc.*, Civil Case No. CL19002886, pending in the Circuit Court for the City of Alexandria, Virginia (filed on September 5, 2019).
[41] *See* Excerpts from William A. Brewer III, Advocacy as Art: Lawyers Must Engage in Issues and Crisis Management, TEXAS LAWYER (May 6, 2019).

confidential information, and trampled over AMc's rights and entitlements.

100. The most damaging of these public comments have been press reports quoting LaPierre accusing AMc of "extortion," which Brewer and others have parroted in the media. This false accusation of criminal wrongdoing has been repeated by other NRA representatives. In the process, AMc's purported role has moved from that of being North's alleged facilitator to the one performing the act of extortion.[42]

101. LaPierre also asserted that AMc "appears to have responded indirectly by trying to oust me." LaPierre's assertion concerning AMc's purported involvement, since then repeated, is false. In fact, AMc faced repeated demands by the NRA for backup on LaPierre's charges that the NRA had reimbursed, such as apartment rent for an NRA intern previously approved by LaPierre, and a number of LaPierre private aircraft and other transportation, hotel, and Landini Brothers (popular Alexandria, Virginia restaurant) charges. To obtain such backup, AMc sent letters to several sources (including LaPierre himself) asking for such records to enable AMc to respond to NRA demands.

102. "Extortion," under Virginia statute § 18.2-59 ("Extortion of money, property or pecuniary benefit") defines the offense as including "threaten[ing] injury to the character, person or property of another . . ." and can be punishable by up to 10 years in prison. Code 1950, §18.1-184; 2010, Chapter 298. Making such a reckless accusation, false as it is, is a clear example of the

---

[42] The following are examples of the many claims of AMc's alleged wrongdoing spoken by NRA representatives: https://www.washington.post.com/politics/documents-show-nra-discussions-to-purchse-luxury-mansion (AMc as "wrongdoer;) civil.war (Brewer in discussin aMc, accused it of trying to purge NRA of LaPierre by "extortion," him Wall Street Journal, April 27, 2019 "Extortion Allegation Riles Top NRA Ranks" (citing LaPierre's claim of extortion in letter to NRA Board); https://www.washington.post.com/news/2019/sep/10/who's-behind-attacks- national-rifle-association. "Behind the latest attack is a former NRA contractor". "The contractor refused [a financial review]; the contractor . . . delivered an ultimatum in the form of this threat . . ..; https://www.washingtonpost.com/politics/how.a.hard.charging.lawyer.helped.fund.a.civil.war; and Wall Street Journal article, April 27, 2019 @http://wsj.extortion.allegation.riles.top.nra.ranks; http://www.washingtonpost.com/politicsnra.shakes.up.legal.team.amid.intensifying.civil.war/2019/08/22/72fa460a-c52d-11e9-b5e4-54aa56d5b7cestory.html

---

malice shown by LaPierre and the NRA towards AMc.

## N.   One-Sided Services Agreement.

103.   Each of the actions brought by the NRA, including the instant case, either directly involves or tangentially implicates the Services Agreement and the respective rights and obligations of the NRA and AMc.  In fact, the first two Virginia cases are centered on alleged breaches of that agreement by AMc.  AMc has counterclaimed in Virginia alleging that it is the NRA, not AMc, that is in breach of that Services Agreement.

104.   It is now appropriate for this Court to consider whether, by its many actions, including several lawsuits filed against AMc, the NRA has waived its rights to continue to insist on the viability of one particular provision of that agreement:  the confidentiality section.[43]

105.   The NRA featured the confidentiality section of the Services Agreement not only in the Virginia litigation, but it also waived the provision by its disclosure of confidential information belonging to AMc and by disclosure of its own purportedly confidential information.  For example, it was the NRA that disclosed the existence and content of the AMc agreement with North, confidential to both AMc and the NRA.[44]  LaPierre admitted that he authorized the Brewer Firm to communicate with the New York Times.  When AMc complained and demanded a retraction, NRA counsel took the absurd position that confidentiality applied only to AMc.  Under that theory, the NRA can divulge AMc's confidential material with impunity; AMc has no reciprocal right.

106.   Additionally, the NRA has liberally quoted from the Services Agreement, including in the instant case.  Having previously taken the position that the Services Agreement itself is confidential, it cannot now hope to preserve that status.

---

[43] Ex. A, Section IV.
[44] *See* https://www.nytimes.com/2019/03/11/us/nra-video-streaming-nratv.html.

107.   If this is truly a proper reading of the Services Agreement, then under those circumstances, AMc is entitled to a declaration that such provision has been waived by the conduct of the NRA.  Alternatively, it qualifies as an unconscionable agreement under the provisions of Virginia § 8.2-302, which provides in pertinent part:

> If the Court finds as a matter of law the contract or any clause thereof to have been unconscionable at the time made, the court may refuse to enforce the contract, or to ignore the unconscionable provision, or it may limit its application in order to avoid as unconscionable result. Code of Virginia § 8.2-302.[45]

108.   As dependent as the NRA is on certain provisions of the Services Agreement, it conveniently overlooks its obligation to pay a "fair and equitable termination fee," recognizing the "inevitable severances and other reasonable costs" associated with termination, and the concurrent requirement to negotiate such costs in good faith.[46]

## O.   The NRA and LaPierre Destroy AMc's Third Party NRA Contracts.

109.   At the NRA's bidding, AMc entered into employment agreements with two well-known personalities, North and Loesch.  They, and at least one other talent, at the request of the NRA, were formally employed by AMc.  The 2018 Amendment to the Services Agreement made clear the NRA's responsibility for their compensation.  As previously noted, under that amendment, the NRA took responsibility for reimbursing AMc for the cost associated with the NRATV talents.  The NRA also effectively "guaranteed" its Third Party NRA Contract obligations by committing, among other things, to provide a $3 million letter of credit to backstop those commitments.[47]

110.   Until the NRA began its campaign of belligerence against AMc, the reimbursement

---

[45] Pursuant to Section XII.A of the Services Agreement, all disputes "arising thereunder shall be governed by and construed solely under the laws of the Commonwealth of Virginia, or if applicable by federal law."  *See* Ex. A.
[46] *See* Ex. A, Sections XI.E-F.
[47] *See* Ex. B, Section 2, 3.

system worked as well as it always had throughout the years, including reimbursement for third-party contracts. Indeed, even as the NRA ramped up its campaign of harassment against AMc, it continued to observe its obligations to AMc and, by third party beneficiary extension, to the talents.

111. LaPierre injected himself personally into the recruitment of North. He negotiated the North Contract, and despite his current denials, he was intimately involved in all material aspects thereof, including the designation of North as an "employee" instead of a "contractor." LaPierre's turnaround efforts to oust North as President of the NRA demonstrate his intent to interfere with the North Contract and damage AMc in the process.

112. When the NRA precipitously initiated its litigation campaign against AMc, leading to the eventual shutdown of NRATV at the end of June 2019, the NRA used the opportunity to cease reimbursement for the compensation of the Third Party NRA Contracts. This, despite its clear obligation to reimburse AMc for "fronting" the salaries and benefits for North, Loesch, and the other talent.

113. The result of the NRA's cutting off of funds, quite naturally, left AMc in the untenable position where it was unable to manage the compensation requirements of the Third Party NRA Contracts. One of those talents has now initiated legal proceedings against AMc for discontinuing that person's compensation.

114. The NRA and LaPierre not only knew of the Third Party Contracts, they expressly approved each of them and acknowledged their existence and the NRA's obligations to pay for those contracts in the 2018 Services Agreement Amendment. In the face of that knowledge and acknowledgement, the NRA has now steadfastly refused to honor its obligation at the urging of and with the approval of LaPierre, in the process tortiously interfering with those third party contracts.

## P.     A Compendium of Missteps.

115.     Many events have led to the rupture of this once-thriving relationship.  Most have been chronicled in press reports: Brewer; LaPierre's lavish wardrobe expenditures; LaPierre's (and his wife Susan's) extravagant trips and vacations paid for with NRA funds; the LaPierre family's use of AMc personnel as personal valets; LaPierre's attempted purchase of a Texas mansion, foiled by AMc's reluctance to see it through; and sexual harassment charges against LaPierre's Chief of Staff Powell, to name the most prominent.  These were by no means the exclusive causes of the termination.

116.     Indeed, other factors have contributed:

- The NRA's suspicious behavior relating to federal and state investigations;

- AMc's cessation of LaPierre's (or other on his behalf) incursion expenses that were personal in nature;

- The "Russia trip" and LaPierre's and the NRA's dishonest treatment of that issue;

- LaPierre's preoccupation with possible criminal charges and a "dissolution resolution";

- The NRA tolerating sexual harassment committed by a high-ranking member of its management;

- Orchestrated leaks of confidential information, purposely painting AMc in an unfavorable light;

- Clear lack of board oversight; and

- Deliberate purging of right-minded NRA directors, officers, and attorneys.

117.     In the span of two short years, the NRA, with LaPierre leading the charge, has destroyed or attempted to destroy what was built over decades.  The NRA has experienced massive personnel disruptions, enormous expenses, loss of economic opportunity, loss of profits, and reputational harm that may be irreparable, or at least will take enormous time and effort to repair.

118.    Through this Counterclaim and Third-Party Complaint, AMc seeks to begin the rebuilding process.

## V.    CAUSES OF ACTION

### Count One
### (Libel *Per Se* – *NRA and LaPierre*)

119.    The allegations of fact set forth in paragraphs 1 through 118 are incorporated as though copied verbatim herein.

120.    As set forth hereinabove, NRA representatives, including LaPierre, have repeatedly intentionally and falsely defamed AMc, a private figure, by accusing AMc of the criminal act of extortion.  The NRA has published this accusation as fact and has done so publicly.  The NRA is not a member of the print, broadcast, or electronic media.

121.    LaPierre and other members of NRA leadership have identified AMc directly by name, and the accusations of commission of a criminal act are per se defamatory.  Such accusations are unambiguous and have held AMc up to calumny and public ridicule.

122.    The subject matter of these false factual assertion is a decidedly private matter, despite the NRA's attempts to alter its status to that of a matter of public concern.

123.    AMc has suffered injury as a direct result of these false statements in amounts as yet undetermined, but estimated to exceed $40 million, for which AMc seeks recovery.

124.    Due to the intentional, malicious nature of the NRA and LaPierre's conduct, AMc also seeks exemplary damages in this matter in an amount to be determined at trial.

### Count Two
### (Tortious Interference with Contract – *NRA and LaPierre*)

125.    The allegations of fact set forth in paragraphs 1 through 124 are incorporated as though copied verbatim herein.

126.    The NRA, and LaPierre, individually, intentionally and with full knowledge of their

existence, has tortiously interfered with AMc's employment agreements with NRATV talents, including those of North and Loesh. Each such contract is valid, having been entered into at the behest of, and approved by, the NRA. Each such contract is denominated in the Services Agreement as a "Third Party NRA Contract."

127.    The NRA has refused its contractual commitment to reimburse AMc for the costs associated with the Third Party NRA Contracts, thus preventing AMc from funding salaries and costs associated therewith.

128.    The NRA's refusal to reimburse AMc has caused said contracts to lapse due to non-payment, thereby proximately causing injury to AMc and to the talents affected who themselves are third party beneficiaries of the Services Agreement.

129.    The NRA's actions constitute tortious interference with contract, and have proximately caused AMc financial harm in precise amounts yet to be determined, for which AMc now sues.

**Count Three**
**(Declaratory Judgment – *NRA*)**
**(28 USC §2201 *et. seq.*)**

130.    The allegations of fact set forth in paragraphs 1 through 129 are incorporated as though copied verbatim herein.

131.    AMc seeks a declaration that, by its actions, the NRA has waived and/or is estopped from claiming that the confidentiality provision of the Services Agreement applies only to AMc. Holding AMc to such one-sided interpretation prevents AMc from freely and fully responding to allegations made by the NRA.

132.    The NRA has taken the position that the referenced contractual provision is one-sided and binding only on AMc. AMc disagrees with the NRA's position, and a real and justiciable

controversy regarding this issue exists.  AMc seeks a declaration that the NRA has waived such provision, or by its action it is estopped from enforcing it.

133.    Alternatively, AMc seeks a declaration by this Honorable Court that the confidentiality provision of the Services Agreement is unconscionable under Code of Virginia § 8.2-302 as interpreted by the NRA.

134.    AMc is entitled to, and seeks, its reasonable and necessary attorney's fees incurred in the prosecution of this claim.

**Count Four**
**(Fraud – *LaPierre*)**

135.    The allegations of fact set forth in paragraphs 1 through 134 are incorporated as though copied verbatim herein.

136.    Statements of fact made to AMc personnel by LaPierre on the dates specified hereinabove, and those made repeatedly throughout the duration of the parties' relationship, but particularly during the four (4) years leading up to the filing of this lawsuit, concerning NRATV's performance analytics, commentators, and the Third Party NRA Contracts, were false, were known by LaPierre to be false, were made with intent to deceive AMc and to lure it into exposing itself to financial obligations, were relied upon by AMc to its detriment, and, as a result, AMc has suffered damages in excess of $40 million for which it now sues.

137.    Due to the intentional, malicious nature of the NRA and LaPierre's conduct, AMc also seeks exemplary damages in this matter in an amount to be determined at trial.

**Count Five**
**(Breach of Contract – *NRA*)**

138.    The allegations contained in paragraphs 1 through 137 are incorporated as though copied verbatim herein.

139.     Under the 2018 Amendment to the Services Agreement, the NRA is required to make timely payments in response to invoices received from AMc. The Amendment states:

> NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit (the "LOC") for the benefit of AMc. The LOC shall continue in existence for the term of the Agreement and shall be maintained at $3,000,000 at all times.

140.     The NRA has failed to make timely payments on AMc's invoices. Specifically, the NRA failed to pay the following fee service invoices within the 30-day time period required by the Services Agreement:

> Invoice 158196 for $451,201.63 dated June 1, 2018
> Invoice 158197 for $894,075.80 dated June 1, 2018
> Invoice 158198 for $299,297.00 dated June 1, 2018
> Invoice 158174 for $190,443.00 dated June 1, 2018
> Invoice 159037 for $190,443.00 dated July 1, 2018
> Invoice 159056 for $451,201.63 dated July 1, 2018
> Invoice 159057 for $894,075.80 dated July 1, 2018
> Invoice 159058 for $299,297.00 dated July 1, 2018

141.     The NRA's failure to make these eight fee payments within the contractually required 30-day period after the invoice date caused substantial damage to AMc.

**Breach of NRA's Obligations to Pay for Services Rendered During Litigation.**

142.     Following the NRA's first lawsuit in Virginia, the NRA continued to request services from AMc, AMc performed those services, but the NRA has failed and refused to pay the monthly invoices submitted by AMc.

143.     On Tuesday, April 30, 2019, Nader Tavangar, EVP/Managing Director of Mercury sent the May Monthly Fee invoices (dated May 1, 2019) to the NRA (Treasurer Craig Spray, Rick Tedrick, Lisa Supemaugh, and Duane Reno) via email, as per normal course of business.

144.     Craig Spray is the NRA Treasurer with responsibility for receiving and paying the

AMc invoices.

145.     The invoices that were dated May 1, 2019 and emailed on April 30, 2019 contained eight invoices to the NRA totaling $1,696,466.95 and three invoices to the NRA Foundation totaling $375,000. The NRA Foundation paid its $375,000 invoice without question. The NRA failed to pay any portion of its invoices totaling $1,696,466.95.

146.     These eleven invoices are accurately summarized in the chart below:

| Invoice Number | Job Number | Job Title | Invoice Amount |
|---|---|---|---|
| **NRA** | | | |
| 166339 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 166340 | 19-NR-001 | Talent Fee | $680,355.45 |
| 166341 | 19-NR-002 | NRATV Programming C4 | $185,416.67 |
| 166342 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |
| 166343 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 166344 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 166345 | 19-NR-006 | Business Intelligence/Data Resources/Analytics | $35,416.66 |
| 166346 | 19-NRAF-002 | A1F 8/19 ISSUE | $124,583.33 |
| **Total** | | | **$1,696,466.95** |
| **NRA Foundation** | | | |
| 166347 | 19-NRF-001 | NRATV Programming C3 | $250,000.00 |
| 166348 | 19-NRF-002 | Monthly Video Support C3 | $62,500.00 |
| 166349 | 19-NRF-003 | FSP Production Ongoing C3 | $62,500.00 |
| **Total** | | | **$375,000.00** |

147.     These monthly, annualized fee invoices are sent every month per the approved 2019 budget.

148.     Per the Services Agreement, Section III.E provides the following relevant requirements:

> All sums payable to AMc under this Services Agreement shall be payable to AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date . . . NRA shall notify AMc of any questions concerning any invoices within 10 business days after receipt.

149. Consistent with the NRA's practice in all prior months of the year, AMc did not receive any questions or concerns regarding such invoices during the 10 business days following the NRA's receipt of the invoices.

150. The NRA failed to pay the eight invoices issued to it on May 1, 2019 within the required 30-day time period.

151. As of June 3, 2019, AMc had not received payment from the NRA for the $1,696,466.95 in monthly fee invoices.

152. On June 3, 2019, AMc's Chief Financial Officer, Winkler, personally called and emailed NRA Treasurer Craig Spray regarding this missed payment. Spray did not return the email message or call.

153. On the afternoon of June 3, 2019, Melanie Montgomery, EVP/Management Supervisor at AMc, called Spray leaving a detailed voicemail reminding him the past due invoices covered May fees for April services which were never questioned. Spray did not return her call.

154. On June 4, 2019, AMc's Chief Financial Officer sent by email a letter addressing the now past due invoices and demanded that the NRA pay the $1,696,466.95 and post the $3 million Letter of Credit, as required under the Services Agreement.

155. On June 5, 2019, AMc received a letter from NRA's designee, Andrew Arulanandam, with a copy to LaPierre, Spray, and Frazer stating that the NRA declines to post the Letter of Credit.

156. Rather than pay the invoices or post a Letter of Credit, the NRA began a series of correspondences wherein they sought to belatedly request additional and irrelevant information about the invoices, long after the ten-day period for questioning the invoices had expired, as provided in Section III.E of the Services Agreement.

**Supplemental Claim for Breach of the NRA's Obligation to Pay Invoices for Services Prior to Termination.**

157.   AMc issued additional invoices for work performed up to the date of termination of the Services Agreement and those invoices remain past due and unpaid, as shown in the table below:

| Invoice Number | Invoice Date | Job Number | Job Title | Invoice Amount |
|---|---|---|---|---|
| **NRA** | | | | |
| 166104 | 4/15/2019 | 18-NR-296 | '19 *A/M* Travel | $1,935.08 |
| 166106 | 4/15/2019 | 19-NR-049 | '20 *A/M* Logo | $10,000.00 |
| 166107 | 4/15/2019 | 19-NR-051 | '19 *A/M* Radio | $5,488.25 |
| 166108 | 4/15/2019 | 19-NR-062 | Publications Google Ad Manager Website Staging & Integration | $5,500.00 |
| 166109 | 4/15/2019 | NR-LEGAL | Legal Fees | $81,810.84 |
| 166110 | 4/15/2019 | NR-TRAV | Travel Expenses | $13,725.51 |
| 166339 | 5/1/2019 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 166340 | 5/1/2019 | 19-NR-001 | Talent Fee | $680,355.45 |
| 166341 | 5/1/2019 | 19-NR-002 | NRA TV Programming C4 | $185,416.67 |
| 166342 | 5/1/2019 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |
| | | | | |
| 166343 | 5/1/2019 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 166344 | 5/1/2019 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 166345 | 5/1/2019 | 19-NR-006 | Business Intelligence/Data Resources/Analytics | $35,416.66 |
| 166346 | 5/1/2019 | 19-NRAF-002 | AIF ISSUE | $124,583.33 |
| 166804 | 5/17/2019 | 18-NR-431 | '19 *A/M* Signage -Mechanical | $22,235.89 |
| 166805 | 5/17/2019 | 19-NR-010 | Fundraising Consulting State Registrations | $230.00 |
| 166806 | 5/17/2019 | 19-NR-045 | '19 *A/M* Backstage Signage | $1,009.75 |
| 166807 | 5/17/2019 | 19-NR-051 | '19 *A/M* Radio | $14.81 |
| 166808 | 5/17/2019 | 19-NR-056 | '19 *A/M* Media Kit Premium | $1,422.16 |
| 166809 | 5/17/2019 | NR-TRAV | Travel Expenses | $3,401.82 |
| 167007 | 5/17/2019 | 18-NR-296 | '19 *A/M* Travel | $21,936.68 |
| 167037 | 6/1/2019 | 19-MG/NR-001 | Strategic Management | $258,613.17 |
| 167038 | 6/1/2019 | 19-NR-001 | Talent Fee | $680,355.45 |
| 167039 | 6/1/2019 | 19-NR-002 | NRA TV Programming C4 | $185,416.67 |
| 167040 | 6/1/2019 | 19-NR-003 | Monthly Video Support C4 | $104,166.67 |

| | | | | |
|---|---|---|---|---|
| 167041 | 6/1/2019 | 19-NR-004 | Support Staff Fee | $200,702.50 |
| 167042 | 6/1/2019 | 19-NR-005 | Online/Digital Management Fee | $107,212.50 |
| 167043 | 6/1/2019 | 19-NR-006 | Business Intelligence/Data Resources/ Analytics | $35,416.66 |
| 167044 | 6/1/2019 | 19-NRAF-003 | AIF ISSUE | $124,583.33 |
| 167453 | 6/12/2019 | 18-NR-296 | '19 *A/M* Travel | $24.77 |
| 167454 | 6/12/2019 | 18-NR-431 | '19 *A/M* Signage - Mechanical | $33,572.64 |
| 167455 | 6/12/2019 | 18-NR-441 | '19 *A/M* Photography | $18,350.00 |
| 167456 | 6/12/2019 | 18-NR-443 | '19 *A/M* NRA TV Set Production | $1,352.98 |
| 167457 | 6/12/2019 | 18-NR-445 | '19 *A/M* Podium Signage | $10,588.50 |
| 167458 | 6/12/2019 | 19-NR-031 | '19 *A/M* GROF Presentation | $650.00 |
| 167448 | 6/12/2019 | 19-NRM-001 | '19 *A/M* Digital Media | $7,915.03 |
| 167449 | 6/12/2019 | 19-NR-029 | '19 *A/M* Media | ($13,689.50) |
| 168015 | 7/9/2019 | 19-NR-010 | Fundraising Consulting State Registrations | $204.98 |
| 169524 | 9/30/2019 | NR-LEGAL | Legal Fees | $264,008.09 |
| **Total** | | | | **$3,884,622.18** |
| **NRA Foundation** | | | | |
| 167045 | 6/1/2019 | 19-NRF-001 | NRATV Programming C3 | $250,000.00 |
| 167046 | 6/1/2019 | 19-NRF-002 | Monthly Video Support C3 | $62,500.00 |
| 167047 | 6/1/2019 | 19-NRF- FSP | Production Ongoing C3 | $62,500.00 |
| **Total** | | | | **$375,000.00** |
| **Total A/R** | | | | **$3,995,614.09** |

158.     The NRA has failed and refused to pay those invoices. Such failure is another

breach of contract by the NRA.

**Supplemental Claim for the NRA's Breach of Indemnification Clause of the Services Agreement.**

159.     Section V.B.1 of the Services Agreement also requires the NRA to indemnify and

reimburse AMc for any expenses it may incur that arise from a government agency seeking

equitable or other relief against the NRA or that relate to actions that AMc has taken at the direction

of the NRA.

160.     The NRA has been the subject of various government inquiries that have imposed

costs and expenses on AMc to produce records, negotiate with government investigators, seek

waivers of confidentiality from the NRA, and generally cooperate to the extent that the NRA allows AMc to cooperate.

161.    AMc's expenses relating to the government inquiries continue to grow as government focus on the NRA becomes more intense, and the NRA's resistance to such investigations becomes more adversarial.  The full amount of such indemnification damages will be presented at trial.

162.    The NRA's refusal to pay indemnification expenses relating to government investigations constitutes an additional breach of the Services Agreement.

**Breach of NRA's Obligation to Post a $3 Million Letter of Credit.**

163.    The 2018 Agreement expressly provided for a remedy to avoid substantial harm to AMc in the event that the NRA is delinquent in paying AMc's invoices.

164.    Per the 2018 Amendment, Section II.E, provides the following relevant requirement:

> NRA acknowledges that its failure to pay such an invoice within 30 days will cause substantial financial damage to AMc. Accordingly, if at any time NRA fails to timely pay the invoice, NRA agrees that it shall post a $3,000,000 letter of credit for the benefit of AMc.

165.    The NRA failed to comply with the contract requirement that it "shall" post a $3 million LOC for the benefit of AMc in the event that it is late on a single payment of fees.

**Breach of NRA's Obligation to Pay Invoices Timely**

166.    Section V, Billing and Payment, contains the following Subsection E:

> All sums payable to AMC under this Services Agreement shall be payable at AMc's corporate headquarters in Oklahoma City, Oklahoma within 30 days of the invoice date. Any amounts not received by AMc within 60 days from the date of the invoice shall bear interest at the rate of 1.0 percent per month from the date of the invoice until paid.

167.     In addition to the late payment of fees listed, supra, the NRA routinely was substantially late with respect to reimbursing AMc for other expenses.  For example, the NRA took 133 days to pay for the cost of CG Magazine '18, Issue 5 invoiced for $269,000. The NRA also delayed 133 days before paying $90,000 for Website Unification.

168.     The NRA was late in paying at least 80 separate invoices issued by AMc during the second half of 2018.

169.     Pursuant to the terms of Section V.E, the NRA owes AMc interest at the rate of 1 percent per month on all late paid invoices.  Despite the contractual requirement to pay interest, the NRA has failed to pay any such interest and such failure is a material breach of the Services Agreement.

170.     Based on the contractual rate of 1 percent per month, the NRA owes AMc an amount in excess of $38,000 in unpaid interest that it has failed to pay with respect to invoices issued during 2018, and an amount that continues to accrue.

171.     During 2019, the NRA was late and still has not paid invoices for AMc services prior to the termination of the Services Agreement.  Interest on such unpaid invoices continues to accrue while the invoices are unpaid.  AMc will present evidence of pre-judgment interest at trial with respect to all unpaid invoices.

172.     Under the Services Agreement, if the "NRA fails to diligently and in good faith perform any of its obligations," AMc may terminate the Services Agreement.  The NRA has failed to perform its payment obligations with diligence and good faith, and it has failed to fulfill the contractual obligations to post a $3 million letter of credit and pay interest on late payments.

**Obligation to Pay Costs to Return NRA Property.**

173.     Section XI.E of the Services Agreement mandates that "All charges for

accumulating [any and all NRA property] shall be approved and paid in advance of receipt by the NRA."

174.     AMc worked diligently to catalogue and define the "NRA's property, materials, documents, Confidential Information, etc. that may be in AMc's possession."  AMc reported that the digital files alone exceed 1.7 petabytes (one petabyte is one million gigabytes).

175.     AMC issued an invoice for the accumulation charges for physical and digital assets of the NRA.  The NRA has failed to pay the $1.5 million invoiced amount that is the prerequisite for the return of the NRA property and has therefore breached Section XI.E of the Services Agreement.

**Breach of Obligation to Pay a Termination Fee**

176.     AMc terminated the Services Agreement pursuant to the 90-day notice provision on May 29, 2019 and began to prepare for the orderly wrap up of services it was performing for the NRA, including identifying NRA assets and preparing for the downsizing of its workforce.

177.     Section XI.F of the Services Agreement provides as follows:

> In consideration of the dedication of a substantial number of personnel and resources to provide the services under the Agreement (and the necessity to maintain such staffing levels and resource allocations to enable AMc to continue to provide such services upon any renewals hereof), the NRA agrees to pay AMc a fair and equitable termination fee to compensate it for the inevitable severances and other reasonable costs incurred in conjunction with such expiration or termination. Such termination fees shall be negotiated in good faith by the parties and paid to AMc no later than the last day of this Agreement.

178.     The NRA failed and refused to engage in any good faith negotiations required under the Services Agreement to wrap up the relationship between AMc and the NRA.  Such failure is another breach by the NRA of the Services Agreement.

179.     The NRA failed to pay any termination fee and is in breach of this provision of the

Services Agreement.

180.    The NRA was obligated to pay this termination fee no later than the last day of the Services Agreement.

181.    The NRA breached its payment obligations under the Services Agreement long before any alleged breach by AMc articulated by the NRA in its Amended Complaint.

182.    The breaches that occurred have caused AMc to incur damages, the amount of which are not yet fully calculated.

183.    The breaches by the NRA are material as that term is defined under the Code of Virginia, § 59-1-507.1.

184.    AMc, on its behalf and on behalf of its subsidiary Mercury Group, seeks recovery of contract damages and severance remedies in the amount not less than $50 million and such other relief as this Court deems just.

## VI.    JURY DEMAND

185.    AMc demands a trial by jury on all contested issues of fact.

## VII.    CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, AMc, as Counter-Plaintiff and Third-Party Plaintiff, prays that upon hearing, it be awarded judgment for damages as prayed for herein, pre- and post-judgment interest, attorney's fees and costs, and such other relief to which it may be entitled.

Dated: November 15, 2019.

Respectfully submitted,

*/s/ G. Michael Gruber*
**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com

**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR DEFENDANT/COUNTER-PLAINTIFF ACKERMAN MCQUEEN, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2019, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel and/or pro se parties of record by a manner authorized by Federal Rules of Civil Procedure 5(b)(2).

*/s/ G. Michael Gruber*
G. MICHAEL GRUBER

# EXHIBIT C

# U.S. District Court
# Northern District of Texas (Dallas)
# CIVIL DOCKET FOR CASE #: 3:19-cv-02074-G-BK

National Rifle Association of America v. Ackerman McQueen Inc et al

Assigned to: Senior Judge A. Joe Fish

Referred to: Magistrate Judge Renee Harris Toliver

Cause: 15:1125 Trademark Infringement (Lanham Act)

Date Filed: 08/30/2019

Jury Demand: Both

Nature of Suit: 890 Other Statutes: Other Statutory Actions

Jurisdiction: Federal Question

## Plaintiff

**National Rifle Association of America**      represented by

**Michael J Collins**
Brewer, Attorneys & Counselors
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4875
Fax: 214-653-1015
Email: mjc@brewerattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alessandra Pia Allegretto**
Brewer Attorneys & Counselors
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4013
Email: apa@brewerattorneys.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Claudia Victoria Colon Garcia-Moliner**
Brewer Attorneys & Counselors
750 Lexington Avenue
14th Floor
New York, NY 10012
212-489-1400
Fax: 212-751-2849
Email: cvm@brewerattorneys.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jason C McKenney**
Brewer Attorneys & Counselors
1717 Main St.
Suite 5900
Dallas, TX 75201
214-653-4837

Fax: 214-653-1015
Email: jcm@brewerattorneys.com
*TERMINATED: 03/26/2020*
*Bar Status: Admitted/In Good Standing*

**Jordan Andrew Welch**
Brewer Attorneys & Counselors
2525 Elm Street
Apartment 203
Dallas, TX 75226
720-550-0910
Email: JAW@brewerattorneys.com
*TERMINATED: 09/02/2020*
*Bar Status: Admitted/In Good Standing*

**Matthew K Felty**
Lytle Soule & Felty PC
119 N Robinson Ave
Suite 1200
Oklahoma City, OK 73102
405-235-7471
Fax: 405-232-3852
Email: mkfelty@lytlesoule.com
*TERMINATED: 05/28/2020*
*Bar Status: Not Admitted*

**William A Brewer , III**
Brewer Storefront PLLC
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4000
Fax: 214-653-1010
Email: wab@brewerattorneys.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Defendant**

Ackerman McQueen Inc                 represented by **J Brian Vanderwoude**
                                      Dorsey & Whitney LLP
                                      300 Crescent Ct.
                                      Suite 400
                                      Dallas, TX 75201
                                      214-981-9953
                                      Fax: 214-853-5095
                                      Email: vanderwoude.brian@dorsey.com
                                      *LEAD ATTORNEY*
                                      *ATTORNEY TO BE NOTICED*
                                      *Bar Status: Admitted/In Good Standing*

                                      **Brian E Mason**

Dorsey & Whitney LLP
300 Crescent Court
Suite 400
Dallas, TX 75201
214-981-9900
Fax: 214-981-9901
Email: mason.brian@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
Dorsey & Whitney LLP
300 Crescent Court
Suite 400
Dallas, TX 75201
214-981-9900
Fax: 214-981-9901
Email: carroll.christina@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
Dorsey & Whitney LLP
Thanksgiving Tower
300 Crescent Court, Suite 400
Dallas, TX 75201
214-981-9985
Fax: 214-981-9901
Email: lang.doug@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
Dorsey & Whitney LLP
300 Crescent Court
Suite 400
Dallas, TX 75201
214-981-9900
Fax: 214-981-9901
Email: gruber.mike@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
Dorsey & Whitney LLP
300 Crescent Court
Suite 400
Dallas, TX 75201
214-981-9900
Fax: 214-981-9901
Email: madrid.jay@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**Mercury Group Inc**                         represented by   **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
Dorsey & Whitney LLP

300 Crescent Court
Suite 400
Dallas, TX 75201
214-981-9900
Fax: 214-981-9901
Email: madrid.jay@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**Henry Martin**                              represented by   **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**Jesse Greenberg**　　　　　represented by　**J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**William Winkler**　　　　　represented by　**J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Defendant**

**Melanie Montgomery**      represented by   **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Interested Party**

**William A Brewer, III**      represented by   **Daniel D Tostrud**
Cobb Martinez Woodward PLLC
1700 Pacific
Suite 3100
Dallas, TX 75201
214-220-5220
Fax: 214-220-5270
Email: dtostrud@cobbmartinez.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew Eric Last**

Cobb Martinez Woodward PLLC
1700 Pacific Avenue, Suite 3100
Dallas, TX 75201
214-220-5224
Fax: 214-220-5274
Email: mlast@cobbmartinez.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**William D Cobb , Jr**
Cobb Martinez Woodward PLLC
1700 Pacific Avenue, Suite 3100
Dallas, TX 75201
214-220-5201
Fax: 214-220-5251
Email: wcobb@cobbmartinez.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Interested Party**

**Brewer Attorneys & Counselors**                    represented by **Daniel D Tostrud**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew Eric Last**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**William D Cobb , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Objector**

**DJ Investments LLC**                    represented by **C Randal Johnston**
Johnston Tobey Baruch PC
12377 Merit Drive
Suite 880
Dallas, TX 75251
214/741-6260
Fax: 214/741-6248
Email: coytrandal@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Karen K Fitzgerald**
Fitzgerald Law, PLLC

8150 North Central Expressway, 10th Floor
Dallas, TX 75206
214-265-9958
Email: karen@fitzgerald.law
*Bar Status: Admitted/In Good Standing*

**ThirdParty Plaintiff**

**Jesse Greenberg**                    represented by **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**ThirdParty Plaintiff**

**William Winkler**                    represented by **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**ThirdParty Plaintiff**

Ackerman McQueen Inc       represented by **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**ThirdParty Plaintiff**

Melanie Montgomery       represented by **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**ThirdParty Plaintiff**

**Mercury Group Inc**                 represented by   **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**ThirdParty Plaintiff**

**Henry Martin**                       represented by   **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**ThirdParty Defendant**

**Wayne Lapierre**                    represented by **Michael J Collins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Matthew K Felty**
(See above for address)
*TERMINATED: 05/28/2020*
*Bar Status: Not Admitted*

**Counter Claimant**

**Jesse Greenberg**                    represented by **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**

(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**William Winkler**         represented by    **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**Ackerman McQueen Inc**        represented by    **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**

(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**Melanie Montgomery**        represented by    **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**Mercury Group Inc**        represented by    **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**

(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Counter Claimant**

**Henry Martin**                          represented by   **J Brian Vanderwoude**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Christina M Carroll**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Douglas Steward Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid ,**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

V.

**Counter Defendant**

**National Rifle Association of America**      represented by   **Michael J Collins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Alessandra Pia Allegretto**
(See above for address)
*ATTORNEY TO BE NOTICED*

*Bar Status: Admitted/In Good Standing*

**Claudia Victoria Colon Garcia-Moliner**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jason C McKenney**
(See above for address)
*TERMINATED: 03/26/2020*
*Bar Status: Admitted/In Good Standing*

**Jordan Andrew Welch**
(See above for address)
*TERMINATED: 09/02/2020*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**William A Brewer , III**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/30/2019 | 1 | COMPLAINT WITH JURY DEMAND against All Defendants filed by National Rifle Association of America. (Filing fee $400; Receipt number 0539-10230413) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Cover Sheet Cover Sheet) (Collins, Michael) (Entered: 08/30/2019) |
| 08/30/2019 | 2 | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Toliver). Clerk to provide copy to plaintiff if not received electronically. (sre) (Entered: 08/30/2019) |
| 08/30/2019 | 3 | Summons Issued as to Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc. (sre) (Entered: 08/30/2019) |
| 09/03/2019 | 4 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by National Rifle Association of America. (Collins, Michael) (Entered: 09/03/2019) |
| 09/03/2019 | 5 | ORDER: No later than 20 days after this order is filed, plaintiff must comply with Rule 3.1(c) or 3.2(e) so that the court can ensure that recusal is not required in this case. (Ordered by Senior Judge A. Joe Fish on 9/3/2019) (axm) (Entered: 09/04/2019) |
| 09/03/2019 | 6 | ***PLEASE DISREGARD, FILED IN ERROR*** MEMORANDUM OPINION AND ORDER: The Court GRANTS Defendants' Motions to dismiss to the extent venue in this |

| | | |
|---|---|---|
| | | District is improper. The Court DENIES Defendants' Motions as to dismissing this action for improper venue. In the interest of justice, the Court hereby transfers this case to the Western District of Oklahoma. (Ordered by Judge Ed Kinkeade on 9/3/2019) (aaa) Modified docket text on 9/5/2019 (aaa). (Entered: 09/04/2019) |
| 09/13/2019 | 7 | SUMMONS Returned Executed as to Ackerman McQueen Inc, served on 9/6/2019; Mercury Group Inc, served on 9/6/2019. (axm) (Entered: 09/13/2019) |
| 09/13/2019 | 8 | SUMMONS Returned Executed as to Jesse Greenberg, served on 9/10/2019; Henry Martin, served on 9/10/2019. (axm) (Entered: 09/13/2019) |
| 10/01/2019 | 9 | ***WITHDRAWN PER 22 ORDER*** Motion to Dismiss for Failure to State a Claim filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc (Vanderwoude, J) Modified docket text and termed pending motion on 10/31/2019 (aaa). (Entered: 10/01/2019) |
| 10/01/2019 | 10 | Brief/Memorandum in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc re 9 Motion to Dismiss for Failure to State a Claim (Vanderwoude, J) (Entered: 10/01/2019) |
| 10/01/2019 | 11 | Appendix in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc re 9 Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4, # 5 Exhibit(s) 5) (Vanderwoude, J) (Entered: 10/01/2019) |
| 10/01/2019 | 12 | ANSWER to 1 Complaint with Jury Demand filed by Ackerman McQueen Inc. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. **THIRD PARTY COMPLAINT** against Wayne Lapierre filed by Ackerman McQueen Inc. **COUNTERCLAIM** against National Rifle Association of America filed by Ackerman McQueen Inc. (Madrid, Jay) Modified text on 10/3/2019 (rekc). (Entered: 10/01/2019) |
| 10/01/2019 | 13 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Ackerman McQueen Inc. (Madrid, Jay) (Entered: 10/01/2019) |
| 10/21/2019 | 14 | Unopposed MOTION to Extend Time of deadlines filed by National Rifle Association of America (Collins, Michael) (Entered: 10/21/2019) |
| 10/22/2019 | 15 | ORDER granting 14 Motion to Extend Time. The deadline for plaintiff NRA to amend its complaint pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure and respond to defendant Ackerman McQueen, Inc.'s counterclaim and third-party complaint, is EXTENDED from October 22, 2019, to October 25, 2019. Plaintiff NRA's deadline to respond to defendants' motion to dismiss filed pursuant to FED. R. CIV. P. 12(b)(6), is EXTENDED from October 22, 2019, to October 29, 2019. (Ordered by Senior Judge A. Joe Fish on 10/22/2019) (aaa) (Entered: 10/22/2019) |
| 10/25/2019 | 16 | NOTICE of Attorney Appearance by Jason C McKenney on behalf of National Rifle Association of America. (Filer confirms contact info in ECF is current.) (McKenney, Jason) (Entered: 10/25/2019) |
| 10/25/2019 | 17 | ANSWER to Counterclaim filed by National Rifle Association of America. Related document: 12 Answer to Complaint, Counterclaim. (Collins, Michael) (Entered: 10/25/2019) |
| 10/25/2019 | 18 | AMENDED COMPLAINT against Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Melanie Montgomery, William Winkler filed by National Rifle Association of America. Clerk to issue summons(es). Unless exempted, attorneys who are not admitted |

| | | to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Collins, Michael) (Entered: 10/25/2019) |
|---|---|---|
| 10/29/2019 | 19 | Summons Issued as to Melanie Montgomery, William Winkler. (mla) (Entered: 10/29/2019) |
| 10/29/2019 | 20 | RESPONSE filed by National Rifle Association of America re: 9 Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Proposed Order) (Collins, Michael) (Entered: 10/29/2019) |
| 10/30/2019 | 21 | MOTION for relief to deem pending motion to dismiss as withdrawn filed by National Rifle Association of America (Collins, Michael) (Entered: 10/30/2019) |
| 10/30/2019 | 22 | STIPULATION AND ORDER ON DEFENDANTS' PENDING MOTION TO DISMISS. The court hereby orders that: 1. Defendants' Motion to Dismiss for Failure to State a Claim, see ECF Nos. 9-10, shall be deemed withdrawn; and 2. The parties shall meet and confer concerning a reasonable schedule for briefing any additional motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and present such schedule to the court no later than 11/1/2019, for the court's approval. (Ordered by Senior Judge A. Joe Fish on 10/30/2019) (aaa) (Entered: 10/31/2019) |
| 11/01/2019 | 23 | Joint STIPULATION *on Briefing Schedule* by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc. (Vanderwoude, J) (Entered: 11/01/2019) |
| 11/05/2019 | 24 | Request for Clerk to issue Summons on Wayne LaPierre filed by Ackerman McQueen Inc. (Madrid, Jay) (Entered: 11/05/2019) |
| 11/05/2019 | 26 | ORDER ON STIPULATED BRIEFING SCHEDULE: Defendants Melanie Montgomery and Bill Winkler's responsive pleadings, including any answers and/or FRCvP 12(b) motions to the National Rifle Association of America's First Amended Complaint, shall be filed no later than 11/15/2019 (Ordered by Senior Judge A. Joe Fish on 11/5/2019) (twd) (Entered: 11/06/2019) |
| 11/06/2019 | 25 | Summons Issued as to Wayne Lapierre. (ndt) (Entered: 11/06/2019) |
| 11/06/2019 | 27 | NOTICE of Attorney Appearance by Brian E Mason for G. Michael Gruber and Brian E. Mason on behalf of Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler. (Mason, Brian) (Entered: 11/06/2019) |
| 11/15/2019 | 28 | Motion to Dismiss for Failure to State a Claim filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Vanderwoude, J) (Entered: 11/15/2019) |
| 11/15/2019 | 29 | Brief/Memorandum in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 28 Motion to Dismiss for Failure to State a Claim (Vanderwoude, J) (Entered: 11/15/2019) |
| 11/15/2019 | 30 | Appendix in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 28 Motion to Dismiss for Failure to State a Claim, 29 Brief/Memorandum in Support of Motion (Vanderwoude, J) (Entered: 11/15/2019) |
| 11/15/2019 | 31 | ANSWER to 18 Amended Complaint,, with Jury Demand filed by Jesse Greenberg, William Winkler, Ackerman McQueen Inc, Mercury Group Inc, Henry Martin. Unless exempted, attorneys who are not admitted to practice in the |

| | | |
|---|---|---|
| | | Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge., Amended THIRD PARTY COMPLAINT against Wayne Lapierre filed by Jesse Greenberg, William Winkler, Ackerman McQueen Inc, Melanie Montgomery, Mercury Group Inc, Henry Martin. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge., Amended COUNTERCLAIM against National Rifle Association of America filed by Jesse Greenberg, William Winkler, Ackerman McQueen Inc, Melanie Montgomery, Mercury Group Inc, Henry Martin (Gruber, G) (Entered: 11/15/2019) |
| 11/21/2019 | 32 | SUMMONS Returned Executed as to Wayne Lapierre ; served on 11/20/2019. (Gruber, G) (Entered: 11/21/2019) |
| 12/03/2019 | 33 | MOTION to Quash *Subpoena* filed by DJ Investments LLC with Brief/Memorandum in Support. (Attachments: # 1 Exhibit A, # 2 Exhibit B)Attorney Karen K Fitzgerald added to party DJ Investments LLC(pty:obj) (Fitzgerald, Karen) (Entered: 12/03/2019) |
| 12/05/2019 | 34 | Agreed MOTION to Extend Time to Modify Deadlines Regarding Defendants' Pending Motion to Dismiss and Amended Third Party Complaint filed by National Rifle Association of America (Collins, Michael) (Entered: 12/05/2019) |
| 12/06/2019 | 35 | NOTICE of Attorney Appearance by Karen K Fitzgerald for Randy Johnston on behalf of DJ Investments LLC. (Fitzgerald, Karen) (Entered: 12/06/2019) |
| 12/06/2019 | 36 | ORDER granting 34 Motion to Extend Time. Responses to 28 , 31 due by 12/20/2019. Replies to 28 due by 1/17/2020. (Ordered by Senior Judge A. Joe Fish on 12/6/2019) (ndt) (Entered: 12/06/2019) |
| 12/06/2019 | 37 | ORDER OF REFERENCE: Non-party DJ Investments LLC's 33 motion to quash subpoena is hereby REFERRED to United States Magistrate Judge Renee Harris Toliver for a hearing, if necessary, and for determination. (Ordered by Senior Judge A. Joe Fish on 12/6/2019) (mla) (Entered: 12/09/2019) |
| 12/20/2019 | 38 | Joint MOTION to Extend Time Short Extension of Deadlines Pending Motion to Dismiss and Defendant Counter Plaintiff's Amended Third Party Complaint and Amended Counterclaims filed by National Rifle Association of America (McKenney, Jason) (Entered: 12/20/2019) |
| 12/23/2019 | 39 | AGREED STIPULATION FOR SHORT EXTENSION OF DEADLINES REGARDING DEFENDANTS' PENDING MOTION TO DISMISS AND DEFENDANT AND COUNTER-PLAINTIFF'S AMENDED THIRD PARTY COMPLAINT AND AMENDED COUNTERCLAIMS: Responses due by 12/23/2019. Replies due by 1/21/2020. (Ordered by Senior Judge A. Joe Fish on 12/23/2019) (ykp) (Entered: 12/23/2019) |
| 12/23/2019 | 40 | ANSWER to Third Party Complaint filed by Wayne Lapierre. Related document: 31 Answer to Amended Complaint, Third Party Complaint, Counterclaim. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the |

| | | |
|---|---|---|
| | | presiding judge. Attorney Michael J Collins added to party Wayne Lapierre(pty:3pd) (Collins, Michael) (Entered: 12/23/2019) |
| 12/23/2019 | 41 | ANSWER to Counterclaim filed by National Rifle Association of America. Related document: 31 Answer to Amended Complaint, Third Party Complaint, Counterclaim. (Collins, Michael) (Entered: 12/23/2019) |
| 12/23/2019 | 42 | RESPONSE AND OBJECTION filed by National Rifle Association of America re 28 Motion to Dismiss for Failure to State a Claim (Attachments: # 1 Exhibit(s) 1, # 2 Exhibit(s) 2, # 3 Exhibit(s) 3, # 4 Exhibit(s) 4, # 5 Exhibit(s) 5) (Collins, Michael) Modified event text on 12/27/2019 (axm). (Entered: 12/23/2019) |
| 12/24/2019 | 43 | RESPONSE filed by National Rifle Association of America re: 33 MOTION to Quash *Subpoena* (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E) (Collins, Michael) (Entered: 12/24/2019) |
| 12/31/2019 | 44 | Proof of Service for a Subpoena served on Forensic Risk Alliance on 12/2/2019. (ykp) (Entered: 01/02/2020) |
| 01/07/2020 | 45 | REPLY filed by DJ Investments LLC re: 33 MOTION to Quash *Subpoena* (Johnston, C) (Entered: 01/07/2020) |
| 01/20/2020 | 46 | REPLY filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 28 Motion to Dismiss for Failure to State a Claim (Mason, Brian) (Entered: 01/20/2020) |
| 01/22/2020 | 47 | MOTION to Compel *and for Sanctions* filed by National Rifle Association of America (McKenney, Jason) (Entered: 01/22/2020) |
| 01/22/2020 | 48 | Brief/Memorandum in Support filed by National Rifle Association of America re 47 MOTION to Compel *and for Sanctions* (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E) (McKenney, Jason) (Entered: 01/22/2020) |
| 02/04/2020 | 49 | ORDER OF REFERENCE: Under the authority of 28 U.S.C. § 636(b), the plaintiff National Rifle Association of America's Motion to Compel and Motion for Sanctions (docket entry 47 ) is hereby REFERRED to United States Magistrate Judge Renee Harris Toliver for a hearing, if necessary, and for determination. (Ordered by Senior Judge A. Joe Fish on 2/4/2020) (ctf) (Entered: 02/05/2020) |
| 02/11/2020 | 50 | MOTION for Protective Order *For Non-Parties* filed by National Rifle Association of America (McKenney, Jason) (Entered: 02/11/2020) |
| 02/12/2020 | 51 | RESPONSE filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 47 MOTION to Compel *and for Sanctions* (Gruber, G) (Entered: 02/12/2020) |
| 02/12/2020 | 52 | ***UNFILED per 88 Electronic Order*** (Document Restricted) Motion for Leave to File under Seal Certain Exhibits to their Response to Plaintiffs Motion to Compel (Sealed pursuant to motion to seal) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Attachments: # 1 Proposed Order) (Gruber, G) Modified on 4/2/2020 (ndt). (Entered: 02/12/2020) |
| 02/20/2020 | 53 | RESPONSE filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 50 MOTION for Protective Order *For Non-Parties* (Gruber, G) (Entered: 02/20/2020) |
| 02/26/2020 | 54 | MOTION to Compel *and Motion for Sanctions* filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler |

| | | |
|---|---|---|
| | | (Attachments: # 1 Proposed Order) (Gruber, G) (Entered: 02/26/2020) |
| 02/26/2020 | 55 | Brief/Memorandum in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 54 MOTION to Compel *and Motion for Sanctions* (Gruber, G) (Entered: 02/26/2020) |
| 02/26/2020 | 56 | Appendix in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 55 Brief/Memorandum in Support of Motion, 54 MOTION to Compel *and Motion for Sanctions* (Gruber, G) (Entered: 02/26/2020) |
| 02/26/2020 | 57 | (Document Restricted) Motion for Leave to File under Seal Certain Exhibits to their Motion to Compel Plaintiffs Document Production and Motion for Sanctions (Sealed pursuant to motion to seal) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Attachments: # 1 Proposed Order) (Gruber, G) (Entered: 02/26/2020) |
| 02/26/2020 | 58 | REPLY filed by National Rifle Association of America re: 51 Response/Objection (McKenney, Jason) (Entered: 02/26/2020) |
| 02/26/2020 | 59 | Appendix in Support filed by National Rifle Association of America re 58 Reply *in Support of Motion to Compel Production of Documents from Defendants and Motion for Sanctions* (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E, # 6 Exhibit(s) F, # 7 Exhibit(s) G, # 8 Exhibit(s) H, # 9 Exhibit(s) I, # 10 Exhibit(s) J, # 11 Exhibit(s) K) (McKenney, Jason) (Entered: 02/26/2020) |
| 02/27/2020 | 60 | STANDING ORDER OF REFERENCE: Under authority of 28 U.S.C. § 636(b), ALL discovery matters in this case are hereby REFERRED to United States Magistrate Judge Rene Harris Toliver for a hearing, if necessary, and for determination. (Ordered by Senior Judge A. Joe Fish on 2/27/2020) (ndt) (Entered: 02/28/2020) |
| 03/04/2020 | 61 | RESPONSE filed by National Rifle Association of America re: 50 MOTION for Protective Order *For Non-Parties* (Attachments: # 1 Exhibit(s) Exhibit A NRA TX PO Non Parties, # 2 Exhibit(s) Exhibit B NRA TX Draft PO sent to Dorsey, # 3 Exhibit(s) Exhibit C Carter Decl., # 4 Exhibit(s) Exhibit D Services Agreement, # 5 Exhibit(s) Exhibit E Revan Bio, # 6 Exhibit(s) Exhibit F Article, # 7 Exhibit(s) Exhibit G VA po) (Collins, Michael) (Entered: 03/04/2020) |
| 03/10/2020 | 62 | STANDING ORDER ON ALL DISCOVERY MATTERS. (Ordered by Magistrate Judge Renee Harris Toliver on 3/10/2020) (mcrd) (Entered: 03/10/2020) |
| 03/10/2020 | 63 | ELECTRONIC ORDER: The Court **GRANTS** Defendants' *Motion for Leave to File Under Seal Certain Exhibits to their Response to Plaintiff's Motion to Compel*, Doc. 52 , and Defendants' *Motion for Leave to File Under Seal Certain Exhibits to their Motion to Compel Plaintiff's Document Production and Motion for Sanctions*, Doc. 57 . Defendants must file the corresponding documents with the clerk. (Ordered by Magistrate Judge Renee Harris Toliver on 3/10/2020) (chmb) (Entered: 03/10/2020) |
| 03/11/2020 | 64 | ***UNFILED per 88 Electronic Order*** (Document Restricted) Sealed Exhibits to Defendants' Response to Plaintiff's Motion to Compel (Sealed pursuant to order dated 3/10/2020) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Mason, Brian) Modified on 4/2/2020 (ndt). (Entered: 03/11/2020) |
| 03/11/2020 | 65 | (Document Restricted) Sealed Exhibits to Defendants' Motion to Compel Plaintiff's Document Production and Motion for Sanctions (Sealed pursuant to order dated |

| | | 3/10/2020) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Mason, Brian) (Entered: 03/11/2020) |
|---|---|---|
| 03/17/2020 | 66 | MOTION for Extension of Time to File Response/Reply to 54 MOTION to Compel *and Motion for Sanctions* filed by National Rifle Association of America (Collins, Michael) (Entered: 03/17/2020) |
| 03/18/2020 | 67 | ELECTRONIC ORDER:Plaintiff's *Unopposed Motion for Short Extension of Deadline to Respond to Defendants' Motion to Compel*, Doc. 66 , is **GRANTED**. Accordingly, Plaintiff's deadline to respond is extended from March 18, 2020 to March 20, 2020. (Ordered by Magistrate Judge Renee Harris Toliver on 3/18/2020) (chmb) (Entered: 03/18/2020) |
| 03/20/2020 | 68 | MOTION for Extension of Time to File Response/Reply to 54 MOTION to Compel *and Motion for Sanctions* filed by National Rifle Association of America (Collins, Michael) (Entered: 03/20/2020) |
| 03/20/2020 | 69 | MOTION to Withdraw as Attorney *Jason C. McKenney* filed by National Rifle Association of America (McKenney, Jason) (Entered: 03/20/2020) |
| 03/23/2020 | 70 | RESPONSE filed by National Rifle Association of America re: 54 MOTION to Compel *and Motion for Sanctions* (Collins, Michael) (Entered: 03/23/2020) |
| 03/23/2020 | 71 | Appendix in Support filed by National Rifle Association of America re 70 Response/Objection (Attachments: # 1 Exhibit(s) Exhibit 1, # 2 Exhibit(s) Exhibit 2, # 3 Exhibit(s) Exhibit A, # 4 Exhibit(s) Exhibit B, # 5 Exhibit(s) Exhibit C, # 6 Exhibit(s) Exhibit D, # 7 Exhibit(s) Exhibit E, # 8 Exhibit(s) Exhibit F, # 9 Exhibit(s) Exhibit G) (Collins, Michael) (Entered: 03/23/2020) |
| 03/25/2020 | 72 | MOTION for Extension of Time to File Response/Reply to 61 Response/Objection, filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 03/25/2020) |
| 03/26/2020 | 73 | ELECTRONIC ORDER: Before the court is the Plaintiff National Rifle Association of America's Unopposed Motion for Further Extension of Deadline to Respond to Defendant's Motion to Compel (docket entry 68 ). The motion is GRANTED. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 3/26/2020) (chmb) (Entered: 03/26/2020) |
| 03/26/2020 | 74 | ELECTRONIC ORDER: Before the court is the Motion for Jason C. McKenney to Withdraw as Counsel for Plaintiff (docket entry 69) The motion is GRANTED. It is ORDERED that Jason C. McKenney is permitted to withdraw as counsel for plaintiff and shall be removed as an ECF-filing recipient in this action, and that Michael J. Collins will continue to serve as counsel for plaintiff in this action. Attorney Jason C. McKenney terminated (Ordered by Senior Judge A. Joe Fish on 3/26/2020) (chmb) (Entered: 03/26/2020) |
| 03/26/2020 | 75 | ELECTRONIC ORDER: Before the court is the Defendants' Unopposed Motion for Short Extension of Deadline to Respond to Plaintiff's Motion for Entry of an Alternative Protective Order for the Parties ("Motion")(docket entry 72). The motion is GRANTED. It is therefore ORDERED that the defendants' deadline to respond to the motion is extended from March 25, 2020 to March 27, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 3/26/2020) (chmb) (Entered: 03/26/2020) |
| 03/27/2020 | 76 | MOTION for Extension of Time to File Response/Reply to 61 Response/Objection, filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Mason, Brian) (Entered: 03/27/2020) |
| 03/27/2020 | 77 | ELECTRONIC ORDER: Before the court is the Defendants' Unopposed Motion for |

| | | |
|---|---|---|
| | | Further Extension of Deadline to Respond to Plaintiff's Motion of Entry of an Alternative Protective Order for the Parties (docket entry 76). The motion is GRANTED. It is hereby ORDERED that the defendants' deadline to file a response to Plaintiff's Motion for Entry of an Alternative Protective Order for the Parties is extended to March 30, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 3/27/2020) (chmb) (Entered: 03/27/2020) |
| 03/30/2020 | 78 | MOTION Disqualify Plaintiff's Counsel filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 03/30/2020) |
| 03/30/2020 | 79 | (Document Restricted) Sealed Motion for Leave to Temporarily File under Seal Brief in Support of Motion to Disqualify, and (2) Motion for Leave to Publicly File Unredacted Brief, or in the Alternative, Redacted Brief in Support of Motion to Disqualify Plaintiffs Counsel (Sealed pursuant to motion to seal) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Gruber, G) (Entered: 03/30/2020) |
| 03/30/2020 | 80 | Appendix in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 78 MOTION Disqualify Plaintiff's Counsel (Gruber, G) (Entered: 03/30/2020) |
| 03/30/2020 | 81 | (Document Restricted) Sealed Motion for Leave to File Under Seal Certain Exhibits to their Motion to Disqualify Plaintiffs Counsel (Sealed pursuant to motion to seal) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Attachments: # 1 Exhibits A-2 through A-29, # 2 Exhibits A-32 through A-67) (Gruber, G) (Entered: 03/30/2020) |
| 03/30/2020 | 82 | RESPONSE filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 61 Response/Objection, (Mason, Brian) (Entered: 03/30/2020) |
| 04/01/2020 | 83 | MOTION to Quash Third Party Subpoena on Integris Health, Inc. filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler. (Western District of Oklahoma case 20-MC-001-HE) (mcrd) (Entered: 04/01/2020) |
| 04/01/2020 | 84 | RESPONSE filed by National Rifle Association of America re: 83 MOTION to Quash Third-Party Subpoena. (mcrd) (Entered: 04/01/2020) |
| 04/01/2020 | 85 | Copy of Docket Sheet for Western District of Oklahoma[LIVE] (Oklahoma City)CIVIL DOCKET FOR CASE #: 5:20-mc-00001-HE. (mcrd) (Entered: 04/01/2020) |
| 04/01/2020 | 86 | ORDER. The Motion to Quash is TRANSFERRED to the United States District for the Northern District of Texas, Dallas Division. Signed by Honorable Joe Heaton on 3/26/2020. (mcrd) (Entered: 04/01/2020) |
| 04/01/2020 | 87 | Unopposed MOTION to Withdraw 51 Response/Objection, 64 Sealed and/or Ex Parte Document, 52 (Document Restricted) Motion for Leave to File under Seal Certain Exhibits to their Response to Plaintiffs Motion to Compel (Sealed pursuant to motion to seal) *Regarding Exhibit B-9* filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 04/01/2020) |
| 04/02/2020 | 88 | ELECTRONIC ORDER: Before the court is the Defendants' Unopposed Motion to Withdraw Exhibit B-9 from Defendants' Response to Plaintiff's Motion to Compel (docket entry 87). The motion is GRANTED as follows: it is ORDERED that docket entries 52 and 64 are to be stricken from the record of this case, and the clerk is directed |

| | | |
|---|---|---|
| | | to note on the docket that the documents have been unfiled. The defendants may re-file these documents with Exhibit B-9 redacted by no later than April 9, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 4/2/2020) (chmb) (Entered: 04/02/2020) |
| 04/02/2020 | 89 | ELECTRONIC ORDER: Before the court are two motions: the Defendants' (1) Motion for Leave to Temporarily File Under Seal Brief in Support of Motion to Disqualify, and (2) Motion for Leave to Publicly File Unredacted Brief, or in the Alternative, Redacted Brief in Support of Motion to Disqualify Plaintiff's Counsel (docket entry 79); and the Defendants' Motion for Leave to File Under Seal Certain Exhibits to Their Motion to Disqualify Plaintiffs Counsel (William A. Brewer III and Brewer Attorney & Counselors) (docket entry 81). The court sets the following expedited briefing schedule for both motions: The plaintiff shall file a response to the motions no later than Thursday, April 9. The defendants shall file their reply no later than Monday, April 13. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 4/2/2020) (chmb) (Entered: 04/02/2020) |
| 04/06/2020 | 90 | REPLY filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 54 MOTION to Compel *and Motion for Sanctions* (Mason, Brian) (Entered: 04/06/2020) |
| 04/06/2020 | 91 | Appendix in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 90 Reply (Mason, Brian) (Entered: 04/06/2020) |
| 04/08/2020 | 92 | (Document Restricted) Sealed Exhibits to Defendants' Response to Plaintiff's Motion to Compel (Refiled Pursuant to Order ECF 88) (Sealed pursuant to order dated 4/2/2020) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 04/08/2020) |
| 04/09/2020 | 93 | RESPONSE filed by National Rifle Association of America re: 81 (Document Restricted) Sealed Motion for Leave to File Under Seal Certain Exhibits to their Motion to Disqualify Plaintiffs Counsel (Sealed pursuant to motion to seal), 79 (Document Restricted) Sealed Motion for Leave to Temporarily File under Seal Brief in Support of Motion to Disqualify, and (2) Motion for Leave to Publicly File Unredacted Brief, or in the Alternative, Redacted Brief in Support of Motion to Disqualify (Attachments: # 1 Declaration(s) Declaration of Michael Collins) (Collins, Michael) (Entered: 04/09/2020) |
| 04/11/2020 | 94 | MOTION for Extension of Time to File Response/Reply to 78 MOTION Disqualify Plaintiff's Counsel filed by National Rifle Association of America (Collins, Michael) (Entered: 04/11/2020) |
| 04/13/2020 | 95 | ELECTRONIC ORDER: The Plaintiff's Unopposed Motion to Extend Deadline to Respond to Defendant's Motion to Disqualify Plaintiff's Counsel (William Brewer III and Brewer Attorneys & Counselors) (docket entry 94) is GRANTED. The plaintiff's deadline to file a response to the defendant's motion to disqualify (docket entry 78) is hereby extended through and including Monday, April 27, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 4/13/2020) (chmb) (Entered: 04/13/2020) |
| 04/13/2020 | 96 | REPLY filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: Sealed RE Motion for Leave to Temporarily File Under Seal Brief in Support of Motion to Disqualify; Motion for Leave to Publicly File Unredacted Brief, or in the Alternative, Redacted Brief in Support of Motion to Disqualify (ECF 79); and Motion for Leave to File Under Seal Certain Exhibits to their Motion to Disqualify Plaintiffs Counsel (ECF 81) (Mason, Brian) (Entered: 04/13/2020) |

| 04/13/2020 | 97 | MOTION for Extension of Time to File Response/Reply to 61 Response/Objection, 50 MOTION for Protective Order *For Non-Parties* filed by National Rifle Association of America (Collins, Michael) (Entered: 04/13/2020) |
|---|---|---|
| 04/14/2020 | 98 | ELECTRONIC ORDER: The plaintiff's unopposed motion for short extension of its deadline to file a reply in support of its pending Motion for Entry of an Alternative Protective Order (docket entry 97) is GRANTED. The plaintiff shall electronically file its reply by no later than April 15, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 4/14/2020) (chmb) (Entered: 04/14/2020) |
| 04/14/2020 | 99 | ELECTRONIC ORDER: Under the authority of 28 U.S.C. § 636(b), the plaintiff's Motion to Enter Proposed Protective Order for Non-Parties (docket entry50) is hereby REFERRED to United States Magistrate Judge Renee HarrisToliver for a hearing, if necessary, and for determination. (Ordered by Senior Judge A. Joe Fish on 4/14/2020) (chmb) (Entered: 04/14/2020) |
| 04/14/2020 | 100 | ORDER: Before the court are (A) the "Defendants' (1) Motion for Leave to Temporarily File Under Seal Brief in Support of Motion to Disqualify, and (2) Motion for Leave to Publicly File Unredacted Brief, or in the Alternative, Redacted Brief in Support of Motion to Disqualify Plaintiff's Counsel" (docket entry 79 ), and (B) the Defendants' Motion for Leave to File Under Seal Certain Exhibits to Their Motion to Disqualify Plaintiff's Counsel (William A. Brewer III and Brewer Attorney & Counselors) (docket entry 81 ). The motions are GRANTED as follows. Docket Entry 79 : the defendants are hereby granted leave to file their brief in support of the defendants' motion to disqualify under seal. The defendants are also granted leave to file their redacted brief in support of their motion publicly. Docket Entry 81 : the defendants are hereby granted leave to file under seal the exhibits in support of the defendants' motion to disqualify. The defendants shall electronically file these documents by Friday 4/17/2020. (Ordered by Senior Judge A. Joe Fish on 4/14/2020) (ctf) (Entered: 04/15/2020) |
| 04/15/2020 | 101 | ***PLEASE DISREGARD, FILED IN ERROR***ELECTRONIC ORDER: The parties having advised the court that this case has been settled, it is ORDERED that the final judgment or order of dismissal be presented for entry by May 15, 2020. If it is not, then the case will be subject to dismissal. (Ordered by Senior Judge A. Joe Fish on 4/15/2020) (chmb) Modified on 4/15/2020 (ctf). (Entered: 04/15/2020) |
| 04/15/2020 | 102 | ***PLEASE DISREGARD, ATTORNEY WILL RE-FILE*** Modified on 4/16/2020 (ctf). (Entered: 04/15/2020) |
| 04/15/2020 | 103 | REPLY filed by Wayne Lapierre, National Rifle Association of America re: 50 MOTION for Protective Order *For Non-Parties* (Collins, Michael) (Entered: 04/15/2020) |
| 04/15/2020 | 104 | Appendix in Support filed by Wayne Lapierre, National Rifle Association of America re 103 Reply *In Support of its Motion for Entry of an Alternative Protective Order* (Attachments: # 1 Declaration(s) Declaration of Michael J. Collins, # 2 Exhibit(s) Exhibit 1, # 3 Exhibit(s) Exhibit 2, # 4 Exhibit(s) Exhibit 3) (Collins, Michael) (Entered: 04/15/2020) |
| 04/16/2020 | 105 | Brief/Memorandum in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 78 MOTION Disqualify Plaintiff's Counsel *[REDACTED]* (Gruber, G) (Entered: 04/16/2020) |
| 04/16/2020 | 106 | MOTION to Disqualify the Law Firm of Dorsey & Whitney filed by National Rifle Association of America (Collins, Michael) (Entered: 04/16/2020) |
| 04/16/2020 | 107 | Brief/Memorandum in Support filed by National Rifle Association of America re 106 MOTION to Disqualify the Law Firm of Dorsey & Whitney (Collins, Michael) (Entered: 04/16/2020) |

| 04/16/2020 | 108 | Appendix in Support filed by National Rifle Association of America re 107 Brief/Memorandum in Support of Motion *to Disqualify the Law Firm of Dorsey & Whitney* (Attachments: # 1 Declaration(s) Declaration of Michael Collins, # 2 Exhibit(s) Exhibit 1, # 3 Exhibit(s) Exhibit 2, # 4 Exhibit(s) Exhibit 3, # 5 Exhibit(s) Exhibit 4, # 6 Exhibit(s) Exhibit 5, # 7 Exhibit(s) Exhibit 6, # 8 Exhibit(s) Exhibit 7, # 9 Exhibit(s) Exhibit 8, # 10 Exhibit(s) Exhibit 9, # 11 Exhibit(s) Exhibit 10, # 12 Exhibit(s) Exhibit 11, # 13 Exhibit(s) Exhibit 12, # 14 Exhibit(s) Exhibit 13, # 15 Exhibit(s) Exhibit 14, # 16 Exhibit(s) Exhibit 15, # 17 Exhibit(s) Exhibit 16, # 18 Exhibit(s) Exhibit 17, # 19 Exhibit(s) Exhibit 18, # 20 Exhibit(s) Exhibit 19, # 21 Exhibit(s) Exhibit 20, # 22 Exhibit(s) Exhibit 21, # 23 Exhibit(s) Exhibit 22, # 24 Exhibit(s) Exhibit 23, # 25 Exhibit(s) Exhibit 24) (Collins, Michael) (Entered: 04/16/2020) |
|---|---|---|
| 04/16/2020 | 109 | (Document Restricted) Plaintiff's Motion for Leave to File Under Seal A Certain Exhibit to Their Motion to Disqualify the Law Firm Dorsey & Whitney LLP (Sealed pursuant to motion to seal) filed by National Rifle Association of America (Attachments: # 1 Exhibit(s) 20) (Collins, Michael) (Entered: 04/16/2020) |
| 04/16/2020 | 110 | ELECTRONIC ORDER: The PLAINTIFF NATIONAL RIFLE ASSOCIATION OF AMERICA'S MOTION FOR LEAVE TO FILE UNDER SEAL A CERTAIN EXHIBIT TO THEIR MOTION TO DISQUALIFY THE LAW FIRM DORSEY & WHITNEY LLP AS COUNSEL FOR DEFENDANTS AND FOR OTHER APPROPRIATE SANCTIONS AND RELIEF (docket entry 109) is GRANTED. The plaintiff National Rifle Association of America is hereby granted leave to file the exhibit contemplated in the plaintiff's motion under seal, and shall do so soon as practicable, but no later than Monday, April 20, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 4/16/2020) (chmb) (Entered: 04/16/2020) |
| 04/17/2020 | 111 | (Document Restricted) Sealed Brief/Memorandum in Support re: 78 Motion for Miscellaneous Relief (Sealed pursuant to order dated 4/15/2020) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 04/17/2020) |
| 04/17/2020 | 112 | (Document Restricted) Sealed Exhibits in Support of Defendants' Motion to Disqualify Plaintiff's Counsel (Sealed pursuant to order dated 4/15/2020) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 04/17/2020) |
| 04/20/2020 | 113 | MOTION for Extension of Time to File Response/Reply to 78 MOTION Disqualify Plaintiff's Counsel filed by National Rifle Association of America (Collins, Michael) (Entered: 04/20/2020) |
| 04/20/2020 | 114 | ELECTRONIC ORDER: The plaintiff's unopposed motion to extend the deadline to respond to the defendants' motion to disqualify plaintiff's counsel (docket entry 113) is GRANTED. The plaintiff shall file its response by no later than May 4, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 4/20/2020) (chmb) (Entered: 04/20/2020) |
| 04/22/2020 | 115 | NOTICE of Attorney Appearance by Alessandra Pia Allegretto on behalf of National Rifle Association of America. (Filer confirms contact info in ECF is current.) (Allegretto, Alessandra) (Entered: 04/22/2020) |
| 04/29/2020 | 116 | MOTION for Extension of Time to File Response/Reply to 106 MOTION to Disqualify the Law Firm of Dorsey & Whitney filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 04/29/2020) |
| 04/29/2020 | 117 | ELECTRONIC ORDER: The Defendants' Unopposed Motion for Extension of Deadline |

| | | |
|---|---|---|
| | | to Respond to Plaintiff's Motion to Disqualify the Law Firm of Dorsey & Whitney as Counsel for Defendants (docket entry 116) is GRANTED. The defendants shall electronically file their response by no later than May 21, 2020. (Ordered by Senior Judge A. Joe Fish on 4/29/2020) (chmb) (Entered: 04/29/2020) |
| 05/01/2020 | 118 | ELECTRONIC ORDER: The court is advised by the clerk of court that Matthew K. Felty ("counsel") is not a member of the Bar of the Northern District of Texas. Accordingly, within 20 days of the date of this order, counsel shall either (1) provide to the court, and to the clerk of court, satisfactory documentation of membership* or (2) apply for membership in the Bar of this court or for admission pro hac vice for this case. (*A letter stating the date of counsel's admission to the Bar of this court is satisfactory documentation.) (Ordered by Senior Judge A. Joe Fish on 5/1/2020) (chmb) (Entered: 05/01/2020) |
| 05/04/2020 | 119 | NOTICE of Attorney Appearance by Daniel D Tostrud, William D Cobb, Jr, Matthew Eric Last on behalf of William A. Brewer III, Brewer, Attorneys & Counselors. (Filer confirms contact info in ECF is current.) (Tostrud, Daniel) (Entered: 05/04/2020) |
| 05/04/2020 | 120 | OBJECTION filed by National Rifle Association of America re: 78 MOTION Disqualify Plaintiff's Counsel (Collins, Michael) (Entered: 05/04/2020) |
| 05/04/2020 | 121 | RESPONSE filed by National Rifle Association of America re: 78 MOTION Disqualify Plaintiff's Counsel (Collins, Michael) (Entered: 05/04/2020) |
| 05/04/2020 | 122 | Appendix in Support filed by National Rifle Association of America re 121 Response/Objection *In Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel* (Collins, Michael) (Entered: 05/04/2020) |
| 05/04/2020 | 123 | (Document Restricted) Plaintiff's Motion for Leave to File Under Seal Certain Exhibits to Their Memorandum of Law in Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (Sealed pursuant to motion to seal) filed by National Rifle Association of America (Attachments: # 1 Declaration(s) Declaration of Michael Collins, # 2 Exhibit(s) 31, # 3 Exhibit(s) 32, # 4 Exhibit(s) 33, # 5 Exhibit(s) 34) (Collins, Michael) (Entered: 05/04/2020) |
| 05/08/2020 | 124 | MOTION for Extension of Time to File Response/Reply to 78 MOTION Disqualify Plaintiff's Counsel filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 05/08/2020) |
| 05/11/2020 | 125 | NOTICE of Attorney Appearance by Jordan Andrew Welch on behalf of National Rifle Association of America. (Filer confirms contact info in ECF is current.) (Welch, Jordan) (Entered: 05/11/2020) |
| 05/11/2020 | 126 | ELECTRONIC ORDER: The defendants' unopposed motion for extension of deadline to file reply in support of defendants' motion to disqualify plaintiff's counsel (docket entry 124) is GRANTED. The defendants' deadline to electronically file a reply is hereby extended until June 1, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 5/11/2020) (chmb) (Entered: 05/11/2020) |
| 05/21/2020 | 127 | RESPONSE filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 106 MOTION to Disqualify the Law Firm of Dorsey & Whitney (Gruber, G) (Entered: 05/21/2020) |
| 05/21/2020 | 128 | Appendix in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 127 Response/Objection (Gruber, G) (Entered: 05/21/2020) |
| 05/21/2020 | 129 | (Document Restricted) Sealed Motion for Leave to File Under Seal Certain Exhibits to |

| | | |
|---|---|---|
| | | Their Responseto Plaintiffs Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and for Other Appropriate Sanctions and Relief (Sealed pursuant to motion to seal) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 05/21/2020) |
| 05/21/2020 | 130 | OBJECTION filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 122 Appendix in Support, 121 Response/Objection (Gruber, G) (Entered: 05/21/2020) |
| 05/22/2020 | 131 | ELECTRONIC ORDER: The defendants' motion for leave to file certain exhibits under seal (docket entry 129) is GRANTED. The defendants shall file Exhibits A-2, A-3, A-4, B, and D and Appendix A under seal by no later than May 27, 2020. (The requesting party must file the documents with the clerk.) (Ordered by Senior Judge A. Joe Fish on 5/22/2020) (chmb) (Entered: 05/22/2020) |
| 05/25/2020 | 132 | RESPONSE filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 123 (Document Restricted) Plaintiff's Motion for Leave to File Under Seal Certain Exhibits to Their Memorandum of Law in Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (Sealed pursuant to motion to seal) (Gruber, G) (Entered: 05/25/2020) |
| 05/26/2020 | 133 | ELECTRONIC ORDER: The Plaintiff's Motion for Leave to File Under Seal Certain Exhibits to Their Memorandum of Law in Opposition to Defendants' Motion to Disqualify Plaintiff's Counsel (docket entry 123) is GRANTED. The plaintiff is permitted to file under seal the following exhibits: (1) Deposition Excerpt of Millie Hallow in the Virginia Lawsuits; (2) Exhibit 15 to the Deposition of Millie Hallow in the Virginia Lawsuits; (3) Deposition Excerpt of Carolyn Meadows in the Virginia Lawsuits; and (4) Exhibit 10 to the Deposition of Carolyn Meadows in the Virginia Lawsuits. The plaintiff shall file these exhibits under seal by no later than June 1, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 5/26/2020) (chmb) (Entered: 05/26/2020) |
| 05/26/2020 | 134 | Unopposed MOTION for Extension of Time to File Plaintiffs Reply in Support Motion to Disqualify the Law Firm Dorsey & Whitney LLP as Counsel for Defendants, MOTION for Extension of Time to File Response/Reply to 127 Response/Objection, 78 MOTION Disqualify Plaintiff's Counsel () filed by National Rifle Association of America (Collins, Michael) (Entered: 05/26/2020) |
| 05/27/2020 | 135 | ELECTRONIC ORDER: The Plaintiff's Unopposed Motion to Extend Deadline to File Plaintiff's Reply in Support of its Motion to Disqualify the Law Firm Dorsey & Whitney LLP as Counsel for Defendants (docket entry 134) is GRANTED. The plaintiff shall electronically file its reply by no later than June 18, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 5/27/2020) (chmb) (Entered: 05/27/2020) |
| 05/27/2020 | 136 | (Document Restricted) Sealed Exhibits to Defendants' Response to Plaintiff's Motion to Disqualify (Sealed pursuant to order dated 5/22/2020) filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 05/27/2020) |
| 05/28/2020 | 137 | ELECTRONIC ORDER: On May 1, 2020, the court issued an order regarding the status of Matthew K. Felty, shown on the docket sheet to be an attorney for the plaintiff in this case. There having been no compliance with that order, it is hereby ORDERED that attorney Matthew K. Felty is terminated as a counsel for plaintiff and shall have no further participation in this case. (Ordered by Senior Judge A. Joe Fish on 5/28/2020) (ctf) (Entered: 05/28/2020) |
| 05/28/2020 | 138 | MOTION for Extension of Time to File Response/Reply to 78 MOTION Disqualify |

| | | |
|---|---|---|
| | | Plaintiff's Counsel filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Gruber, G) (Entered: 05/28/2020) |
| 05/29/2020 | 139 | ELECTRONIC ORDER: The defendants' unopposed motion for an extension of time to file a reply in support of their motion to disqualify plaintiff's counsel is GRANTED. The defendants shall electronically file their reply brief by no later than June 3, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 5/29/2020) (chmb) (Entered: 05/29/2020) |
| 06/03/2020 | 140 | REPLY filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 78 MOTION Disqualify Plaintiff's Counsel (Gruber, G) (Entered: 06/03/2020) |
| 06/03/2020 | 141 | Appendix in Support filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re 140 Reply *in Support of Motion to Disqualify Plaintiff's Counsel* (Gruber, G) (Entered: 06/03/2020) |
| 06/03/2020 | 142 | OBJECTION filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 121 Response/Objection (Gruber, G) (Entered: 06/03/2020) |
| 06/03/2020 | 143 | OBJECTION filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 121 Response/Objection (Gruber, G) (Entered: 06/03/2020) |
| 06/03/2020 | 144 | RESPONSE filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 120 Response/Objection (Gruber, G) (Entered: 06/03/2020) |
| 06/10/2020 | 145 | Unopposed MOTION to Extend Time to File Reply to Motion to Disqualify Dorsey filed by National Rifle Association of America (Collins, Michael) (Entered: 06/10/2020) |
| 06/11/2020 | 146 | ELECTRONIC ORDER: The plaintiff's unopposed motion for an extension of time to file a reply in support of the plaintiff's motion to disqualify the defendant's counsel (docket entry 145) is GRANTED. The plaintiff shall electronically file its reply by no later than June 25, 2020. NO FURTHER EXTENSIONS SHALL BE GRANTED. (Ordered by Senior Judge A. Joe Fish on 6/11/2020) (chmb) (Entered: 06/11/2020) |
| 06/22/2020 | 147 | ORDER: Non-party DJ Investments, LLCs Motion to Quash Subpoena, Doc. 33, is GRANTED. (Ordered by Magistrate Judge Renee Harris Toliver on 6/22/2020) (mcrd) (Entered: 06/22/2020) |
| 06/22/2020 | 148 | ORDER denying 50 NRA's Motion for Protective Order. The Court adopts Defendants' proposed protective order, Doc. 51 at 31-48, which will be issued separately. (Ordered by Magistrate Judge Renee Harris Toliver on 6/22/2020) (axm) (Entered: 06/22/2020) |
| 06/22/2020 | 149 | PROTECTIVE ORDER. (Ordered by Magistrate Judge Renee Harris Toliver on 6/22/2020) (axm) (Entered: 06/22/2020) |
| 06/25/2020 | 150 | NOTICE of Attorney Appearance by Claudia Victoria Colon Garcia-Moliner on behalf of National Rifle Association of America. (Filer confirms contact info in ECF is current.) (Colon Garcia-Moliner, Claudia) (Entered: 06/25/2020) |
| 06/25/2020 | 151 | REPLY filed by National Rifle Association of America re: 106 MOTION to Disqualify the Law Firm of Dorsey & Whitney (Attachments: # 1 Declaration(s) Declaration of J. McCormack) (Collins, Michael) (Entered: 06/25/2020) |
| 06/26/2020 | 152 | MOTION to Strike 140 Reply *in Support of Their Motion to Disqualify* filed by National |

| | | Rifle Association of America (Collins, Michael) (Entered: 06/26/2020) |
|---|---|---|
| 06/26/2020 | 153 | Brief/Memorandum in Support filed by National Rifle Association of America re 152 MOTION to Strike 140 Reply *in Support of Their Motion to Disqualify* (Collins, Michael) (Entered: 06/26/2020) |
| 07/10/2020 | 154 | AFFIDAVIT of Service for Subpoena served on The National Rifle Association of America on 7/8/2020. (hml) (Entered: 07/10/2020) |
| 07/17/2020 | 155 | RESPONSE filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler re: 152 MOTION to Strike 140 Reply *in Support of Their Motion to Disqualify* (Gruber, G) (Entered: 07/17/2020) |
| 07/30/2020 | 156 | AFFIDAVIT of Service for Subpoena served on CXIIIREX and Landini Brothers Inc on 7/17/2020. (jmg) (Entered: 07/31/2020) |
| 07/31/2020 | 157 | REPLY filed by National Rifle Association of America re: 152 MOTION to Strike 140 Reply *in Support of Their Motion to Disqualify* (Collins, Michael) (Entered: 07/31/2020) |
| 08/03/2020 | 158 | ELECTRONIC ORDER: The plaintiff's motion to strike the defendants' reply in support of the defendants' motion to disqualify plaintiff's counsel, or in the alternative, motion for leave to file sur-reply (docket entry 152), is DENIED in part and GRANTED in part. The plaintiff's motion to strike is DENIED. The court is advised of the plaintiff's objections to the arguments and evidence included in the defendants' reply in support of the defendants' motion to disqualify plaintiff's counsel. The court will address those objections, as necessary, in ruling on the defendants' motion to disqualify the plaintiff's counsel. The plaintiff's alternative motion for leave to file a sur-reply is GRANTED. The plaintiff shall file a sur-reply, not to exceed ten pages, by no later than Friday August 7, 2020. (Ordered by Senior Judge A. Joe Fish on 8/3/2020) (chmb) (Entered: 08/03/2020) |
| 08/07/2020 | 159 | (Document Restricted) Sealed Motion for Leave to File Sur-Reply (Sealed pursuant to motion to seal) filed by National Rifle Association of America (Attachments: # 1 Proposed Order) (Collins, Michael) (Entered: 08/07/2020) |
| 08/07/2020 | 160 | ***UNSEALED PER ELECTRONIC ORDER NO. 162*** Sur-reply re: 78 Motion for Miscellaneous Relief (Sealed pursuant to SO 19-1, statute, or rule) filed by National Rifle Association of America (Attachments: # 1 Declaration(s) Michael J. Collins) (Collins, Michael) Modified security on 8/11/2020 (ctf). (Entered: 08/07/2020) |
| 08/07/2020 | 161 | (Document Restricted) Sealed Appendix in Support re: 160 Sealed and/or Ex Parte Reply/Sur-reply, (Sealed pursuant to SO 19-1, statute, or rule) filed by National Rifle Association of America (Attachments: # 1 Declaration(s) Michael J. Collins, # 2 Declaration(s) Michael Trahar, # 3 Declaration(s) Susan Dillon, # 4 Declaration(s) James McCormack) (Collins, Michael) (Entered: 08/07/2020) |
| 08/10/2020 | 162 | ELECTRONIC ORDER: The plaintiff's motion for leave to file certain documents under seal (docket entry 159) is GRANTED in part and DENIED in part. The plaintiff's sealed appendix in support of the plaintiff's sur-reply (docket entry 161) shall remain sealed and is hereby deemed filed. The court concludes, however, that the plaintiff's request to file docket entry 160 under seal is without merit. Should the plaintiff wish to withdraw docket entries 160 and 161 from the docket, the plaintiff may do so today, August 10, 2020. Otherwise, the clerk's office is directed to unseal docket entry 160 on August 11, 2020. SO ORDERED. (Ordered by Senior Judge A. Joe Fish on 8/10/2020) (chmb) (Entered: 08/10/2020) |
| 09/01/2020 | 163 | MOTION to Withdraw as Attorney *Jordan A. Welch as Counsel for Plaintiff The National Rifle Association* filed by National Rifle Association of America (Allegretto, Alessandra) (Entered: 09/01/2020) |

| 09/02/2020 | 164 | ELECTRONIC ORDER: Before the court is the plaintiff the National Rifle Association's ("NRA") motion to withdraw Jordan A. Welch as counsel for the NRA ("Motion"). The motion is GRANTED. IT IS ORDERED that: (1) Jordan A. Welch is permitted to withdraw as Counsel for plaintiff, and (2) Jordan A. Welch shall be removed as an ECF-filing recipient in this action. (Ordered by Senior Judge A. Joe Fish on 9/2/2020) (chmb) (Entered: 09/02/2020) |
| 09/14/2020 | 165 | Memorandum Opinion and Order: In accordance with the foregoing, the defendants' motion to dismiss (docket entry 28 ) is GRANTED in part and DENIED in part. Specifically, the NRA's claims for copyright infringement (count 2), conversion (count 3), fraud and conspiracy (insofar as that claim is premised on fraudulent conduct) against Mercury (counts 4 and 6), and breach of fiduciary duty against the individual defendants (counts 5 and 7) are DISMISSED. The defendants' motion is DENIED with respect to the NRA's claim for false association (count 1). (Ordered by Senior Judge A. Joe Fish on 9/14/2020) (ndt) (Entered: 09/15/2020) |
| 09/14/2020 | 166 | Memorandum Opinion and Order: Before the court is the defendants' motion to disqualify the plaintiff's counsel, William A. Brewer III ("Brewer") and Brewer, Attorneys & Associates ("BAC") (docket entry 78 ), and the Brief in Support of Defendants' Motion to Disqualify Plaintiff's Counsel ("Motion") (docket entry 111 ). For the reasons set forth below, the motion to disqualify Brewer and BAC is DENIED; however, it is ORDERED that Brewer is prohibited from appearing on behalf of the plaintiff at any hearing or trial in this case. (Ordered by Senior Judge A. Joe Fish on 9/14/2020) (ndt) (Entered: 09/15/2020) |
| 09/14/2020 | 167 | Memorandum Opinion and Order: Before the court is the motion to disqualify the law firm of Dorsey & Whitney LLP ("Dorsey") as counsel for the defendants, filed by the plaintiff the National Rifle Association of America ("NRA") (docket entry 106 ), and the Plaintiff National RifleAssociation of America's Memorandum of Law in Support of Plaintiff's Motion to Disqualify the Law Firm of Dorsey & Whitney LLP as Counsel for Defendants and for Other Appropriate Sanctions and Relief ("Motion") (docket entry 107 ). For the reasons set forth herein, the motion is denied. (Ordered by Senior Judge A. Joe Fish on 9/14/2020) (ndt) (Entered: 09/15/2020) |
| 09/15/2020 | 168 | JOINT STATUS REPORT ORDER: Status Report due by 10/5/2020. (Ordered by Senior Judge A. Joe Fish on 9/15/2020) (oyh) (Entered: 09/15/2020) |
| 09/23/2020 | 169 | ORDER denying without prejudice 47 , 54 Motions to Compel. The Court DIRECTS the parties to file a Joint Status Report by 10/9/2020, to advise the Court what, if any, discovery disputes remain. (Ordered by Magistrate Judge Renee Harris Toliver on 9/23/2020) (axm) (Entered: 09/23/2020) |
| 10/03/2020 | 170 | Joint MOTION to Extend Time (), MOTION for Extension of Time to File Response/Reply to 169 Order on Motion to Compel, filed by National Rifle Association of America (Attachments: # 1 Proposed Order) (Allegretto, Alessandra) (Entered: 10/03/2020) |
| 10/05/2020 | 171 | ELECTRONIC ORDER *Joint Motion for Extension of Deadline to File Joint Status Report Regarding the Parties' Motions to Compel*, Doc. 170 , is **GRANTED**. Accordingly, the deadline to file a Joint Status Report is extended to October 23, 2020. (Ordered by Magistrate Judge Renee Harris Toliver on 10/5/2020) (chmb) (Entered: 10/05/2020) |
| 10/05/2020 | 172 | Joint STATUS REPORT filed by National Rifle Association of America. (Collins, Michael) (Entered: 10/05/2020) |
| 10/07/2020 | 173 | ELECTRONIC ORDER terminating 170 Motion to Extend Time to File Response/Reply. |

| | | |
|---|---|---|
| | | *See* Doc. 171 . (Ordered by Magistrate Judge Renee Harris Toliver on 10/7/2020) (chmb) (Entered: 10/07/2020) |
| 10/13/2020 | [174](#) | ORDER ESTABLISHING SCHEDULE AND CERTAIN PRETRIAL REQUIREMENTS: Trial set for four-week docket beginning 9/7/2021 before Senior Judge A. Joe Fish. Joinder of Parties due by 12/18/2020. Amended Pleadings due by 12/18/2020. Motions due by 4/30/2021. Discovery due by 6/1/2021. Pretrial Order due by 8/27/2021. Pretrial Materials due by 8/27/2021. Pretrial Conference set for 9/3/2021 10:30 AM before Senior Judge A. Joe Fish. (Ordered by Senior Judge A. Joe Fish on 10/13/2020) (jmg) (Entered: 10/14/2020) |
| 10/15/2020 | [175](#) | NOTICE of *Plaintiff the National Rifle Association and Third-Party Defendant Wayne LaPierre's Rule 26 Initial Disclosure Statement* filed by National Rifle Association of America (Allegretto, Alessandra) (Entered: 10/15/2020) |
| 10/15/2020 | [176](#) | NOTICE of *Defendants' Rule 26 Initial Disclosures* filed by Ackerman McQueen Inc, Jesse Greenberg, Henry Martin, Mercury Group Inc, Melanie Montgomery, William Winkler (Mason, Brian) (Entered: 10/15/2020) |

# **EXHIBIT D**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NATIONAL RIFLE ASSOCIATION OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| WAYNE LAPIERRE, | ) | |
| | ) | |
| Third-Party Defendant, | ) | |
| | ) | CIVIL ACTION NO. |
| VS. | ) | |
| | ) | 3:19-CV-2074-G |
| ACKERMAN MCQUEEN, INC., | ) | |
| | ) | |
| Defendant and Counter-Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MERCURY GROUP, INC., ET AL., | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ESTABLISHING SCHEDULE AND
## CERTAIN PRETRIAL REQUIREMENTS

The court, having considered the status report submitted by the parties, finds

that the following order should be entered, pursuant to Rule 16(b), FED. R. CIV. P.,

and the local rules of this court (except as modified herein), to schedule this case for disposition and, if disposition by a trial is needed, to expedite the trial.

Unless otherwise ordered or specified herein, all limitations and requirements of the Federal Rules of Civil Procedure, as amended, must be observed.

1.      Pursuant to Local Rule 16.3(a), the parties to this case shall enter settlement negotiations as early as possible.  If the parties do not report by **February 12, 2021,** that this case has been settled, it will be ordered to mandatory but non-binding mediation.  *See* Rules 1, 16, Fed. R. Civ. P.; 28 U.S.C. § 473(a)(6), (b)(4); Civil Justice Expense and Delay Reduction Plan of the Northern District of Texas ¶ III (1993); Texas Civil Practice and Remedies Code §§ 154.001 *et seq.* (Vernon Supp. 1997).

2.      This case is **<u>set for trial</u>** on this court's four-week docket beginning **September 7, 2021.**  Counsel and the parties shall be ready for trial on two (2) days notice at any time during this four-week period.  Any potential conflicts must be called to the attention of the court **<u>in writing</u>** within **<u>ten (10) days</u>** from the date of this order.

3.      a. By **December 18, 2020,** all motions requesting **<u>joinder</u>** of additional parties or **<u>amendments</u>** of pleadings shall be filed.  Rule 16(b)(1), F.R. Civ. P.

- 2 -

b. By **April 30, 2021**, all motions that would dispose of all or any part of this case (including motions for **summary judgment**), shall be filed. (Modification of Local Rule 56.1).

c. Responses to motions must be filed within **twenty-one (21) days** (Local Rule 7.1(e)).

d. The deadlines in this paragraph 3 may be extended only by **formal motion** to the court.  **Any extension requested shall not affect the trial or pretrial dates**.

4.    Unless otherwise stipulated or directed by order, the plaintiffs shall file a written designation of the name and address of each **expert witness** who will testify at trial and shall otherwise comply with Rule 26(a)(2), FED. R. CIV. P. ("Rule 26(a)(2)"), on or before **April 9, 2021**.

Each defendant or third party shall file a written designation of the name and address of each **expert witness** who will testify at trial for that party and shall otherwise comply with Rule 26(a)(2) on or before **April 23, 2021**.

If the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B), the disclosures required under Rule 26(a)(2) shall be made within **30 days** after the disclosure made by the other party.

- 3 -

5.     Unless otherwise directed by order, the parties must make the disclosures required by Rule 26(a)(3)(A)-(B), FED. R. CIV. P., by **July 2, 2021**.

Within **14 days thereafter**, a party must serve and file a list disclosing (i) any objections to the use under Rule 32(a) of a deposition designated by another party under Rule 26(a)(3)(A)(ii) and (ii) any objection, together with the grounds therefor, that may be made to the admissibility of materials identified under Rule 26(a)(3)(A)(iii), if any.

6.     By **June 1, 2021**, all **discovery** -- including discovery concerning expert witnesses -- shall be completed.  The parties may agree to extend this discovery deadline, provided (1) the extension does not affect the trial or pretrial date and (2) **written notice** of the extension is given to the court.

7.     By **August 27, 2021**, all **pretrial materials** shall be filed.  Specifically, by this date:

> a. **A proposed joint pretrial order** that covers each of the matters listed in Local Rule 16.4 and states the **estimated length of trial** and whether the case is **jury or non-jury** shall be submitted by the plaintiffs' attorney to Fish_Orders@txnd.uscourts.gov.  (The proposed joint pretrial order should not be filed on the docket sheet.)  If an attorney for either party does not participate in the preparation of the joint pretrial order, the opposing attorney shall submit a separate pretrial order with an explanation of why the joint order was not submitted (so that the court can impose sanctions, if appropriate).  However, failure to agree upon content or language is **not an excuse for submitting separate pretrial orders** -- since each party may present its version of any disputed

- 4 -

matter in the joint pretrial order (Modification of Local Rule 16.4).  When the joint pretrial order is approved by the court, it will filed and will control all subsequent proceedings in this case.

b.  **A list of witnesses** shall be filed by each party -- which divides the persons listed into groups of "**probable witnesses**," "**possible witnesses**," "**experts**" and "**record custodians**" which provides:

(i)     the **name and address** of each witness; and

(ii)    a brief **narrative summary** of the testimony to be covered by each witness.

(Modification of Local Rule 26.2(b) and FED. R. CIV. P. 26(a)(3)(A)).

Pursuant to Rule 16(c)(15), FED. R. CIV. P., and Section VII of the United States District Court for the Northern District of Texas Civil Justice Expense and Delay Reduction Plan, the court intends to impose a reasonable limit on the time allowed for presenting evidence in this case.  Accordingly, the parties must also state the **expected duration of direct and cross-examination of each witness**.  *See* Commentary - 1993 Amendment to the Federal Rules of Civil Procedure (court should ordinarily impose time limits only after receiving appropriate submissions from the parties).

c.  **A list of exhibits** and a **designation of portions of depositions** to be offered at trial shall be filed by each party.  The list of exhibits shall describe the documents or things in numbered sequence.  The documents or things to be offered as exhibits shall be numbered by attachment of gummed labels to correspond with the sequence on the exhibit list.  In addition, counsel for each party intending to offer exhibits shall **exchange a complete set** of marked exhibits with opposing counsel; and shall deliver, on the

- 5 -

day the case is called for trial, a set of marked exhibits to the court's chambers (except large or voluminous items that cannot be easily reproduced).  (Modification of Local Rule 26.2(b), (c) and FED. R. CIV. P. 26(a)(3)(B)).

d.  Additional copies of the **list of witnesses** and the **list of exhibits** (as required by Local Rule 26.2(b)) shall be **<u>delivered</u>** by each party, **on the day the case is called for trial**, to the **<u>court reporter</u>**.

e.  **<u>Requested jury instructions (annotated)</u>**[1] shall be filed by each party (Modification of Local Rule 51.1).

f.  **<u>Proposed findings of fact and conclusions of law (annotated)</u>**[2] in a non-jury case shall be filed by each party having the burden of persuasion on an issue.  Within 5 days thereafter, any opposing party shall serve his **<u>proposed findings and conclusions (annotated)</u>**[3] on that issue, numbered in paragraphs corresponding to those earlier filed, in which the earlier version shall either be admitted or the responding party's version given, if it differs from that served earlier (Modification of Local Rule 52.1).

g.  **<u>Motions in limine</u>**, if any, shall be filed by each party -- these will not be considered unless they are limited to matters actually in dispute, after conference with opposing counsel, as required by Local Rule 7.1(a) -- and

---

[1]   "Annotated " means that ***each*** proposed instruction or conclusion of law shall be accompanied by citation to statutory or case authority (and/or pattern instructions).  It is not sufficient to submit a proposed instruction or conclusion of law without citation to supporting authority.  Because Fifth Circuit and Supreme Court cases are the only precedent binding on this court, the parties should -- to the extent possible -- rely on these sources (and/or Fifth Circuit pattern instructions in proposing jury instructions).

[2]   *See* footnote 1.

[3]   *See* footnote 1.

- 6 -

any **proposed voir dire questions** which the court is
requested to ask during its examination of the jury panel.

h. **Trial briefs, if any**, shall be filed by each party.
In the absence of a specific order of the court, trial briefs
are not required, but are welcomed.  They should
concentrate on Fifth Circuit and Supreme Court authority
on the issues the parties anticipate will arise at trial.

**NOTE**:      Deadlines in this order are dates for the **filing**
or **delivery** of pretrial material, **not mailing**
dates.

8.      The exhibit list contemplated by paragraph 7(c) shall be accompanied,

when it is filed, by a written statement, signed by counsel for each party (other than

the party who will be offering an exhibit) that, as to each exhibit shown on the list,

(a)  the parties agree to the admissibility of the
exhibit, or

(b)  the admissibility of the exhibit is objected to,
identifying the nature and legal basis of any objection to
admissibility and the name(s) of the party or parties urging
the objection.

All parties shall cooperate in causing such statements to be prepared in a timely

manner for filing with the exhibit lists.  Counsel for the party proposing to offer an

exhibit shall be responsible for coordinating activities related to preparation of such a

statement as to the exhibit he proposes to offer.  The court may exclude any exhibit

offered at trial unless such a statement regarding the exhibit has been filed in a timely

manner.

- 7 -

9.    (a)  At least **ten (10) days** before the pretrial conference, the parties and their respective lead counsel shall hold a face-to-face meeting to discuss settlement of this case.  Individual parties and their counsel shall participate in person, not by telephone or other remote means.  All other parties shall participate by a representative or representatives, in addition to counsel, who shall have unlimited settlement authority and who shall participate in person, not by telephone or other remote means.  If a party has liability insurance coverage as to any claim made against that party in this case, a representative of each insurance company providing such coverage, who shall have full authority to offer policy limits in settlement, shall be present at, and participate in, the meeting in person, not by telephone or other remote means.  At this meeting, the parties shall comply with the requirements of Local Rule 16.3.

(b)  Within **seven (7) days** after such meeting, the parties shall jointly prepare and file a written report, which shall be signed by counsel for each party, detailing the date on which the meeting was held, the persons present (including the capacity of any representative), a statement regarding whether meaningful progress toward settlement was made, and a statement regarding the prospects of settlement.

10.    **A pretrial conference** in the case is set for **Friday, September 3, 2021**, at **10:30 a.m.**  Each party shall be represented by at least one attorney who will conduct the trial and who has authority to enter into stipulations and admissions

- 8 -

that would facilitate the admission of evidence and reduce the time and expenses of trial. FED. R. CIV. P. 16(d). All pretrial motions not previously decided will be resolved at that time, and procedures for trial will be discussed. At the final pretrial conference, it should be possible to assign the specific date for trial during the four-week docket. **Telephone calls about the probable trial date prior to the final pretrial conference will usually do nothing more than waste the time of counsel and the court staff**.

11.     This order shall control the disposition of this case unless it is modified by the court upon a showing of good cause and by leave of court. FED. R. CIV. P. 16(b). Any request that the **trial date** of this case be modified must be made (i) **in writing** to the court, (ii) **before** the deadline for completion of discovery and (iii) **in accordance with the United States District Court for the Northern District of Texas Civil Justice Expense and Delay Reduction Plan ¶ V and Local Rule 40.1** (motions for continuance must be signed by the party as well as by the attorney of record).

12.     Should any party or counsel fail to cooperate in doing anything required by this order, such party or counsel or both may be subject to sanctions, including dismissal or entry of default without further notice. *See* FED. R. CIV. P. 16(f).

13.     Counsel should be mindful that a last-minute trial cancellation inconveniences all the citizens who have come to serve as jurors and wastes taxpayer

- 9 -

money.  To avoid such a cancellation, counsel should complete settlement

negotiations at least one day prior to the date scheduled for trial and should notify

the court immediately if a settlement is reached.

14.     Questions relating to this scheduling order or any other matters shall be

directed to **chambers (214.753.2310)**.

**SO ORDERED.**

October 13, 2020.

A. JOE FISH
**Senior United States District Judge**

# **EXHIBIT E**

| Persons Likely to Possess Relevant Knowledge And / Or Documents – Ackerman McQueen | |
|---|---|
| **Name** | **Location** |
| 5.11 Tactical, Corporate Representative | Irvine, CA |
| Ackerman McQueen, Inc. | Oklahoma City, OK |
| Adcor Defense, Corporate Representative | Highland, MD |
| Aitken, Michael | Manassas, VA |
| Allegiance Creative Group, Corporate Representative | Fairfax, VA |
| Almand, Travis | Allen, TX |
| American Clean Skies Foundation, Corporate Representative | Washington, DC |
| Associated Television International, Corporate Representative | Los Angeles, CA |
| Autaubo, Rodney | Dallas, TX |
| Azato, Dennis | Manassas, VA |
| Bach, Scott | Newfoundland, NJ |
| Berthelot, Charles | Fort Worth, TX |
| Betts, Gina | Dallas, TX |
| Boren, Dan | Edmond, OK |
| Brown, Robert | Boulder, CO |
| Brownell, Pete | Montezuma, IA |
| Butz, Dave | Swansea, IL |
| Cabela's Outdoor Fund, Corporate Representative | Sidney, NE |
| Campbell, Chester | Richardson, TX |
| Chesapeake Energy Corporation, Corporate Representative | Oklahoma City, OK |
| Chestnut, Mark | Jenks, OK |
| Childress, Richard | Lexington, NC |
| Collins, Idehen (aka Colin Noir) | Dallas, TX |
| Colt Manufacturing, Corporate Representative | West Hartford, CT |
| Compass Real Estate Corporate Representative | Austin, TX |
| Concord Social & Public Relations, Corporate Representative | Fairfax, VA |
| Cors, Alan | McLean, VA |
| Cotton, Charles | Dallas, TX |
| Cox, Christopher | Alexandria, VA |
| Coy, David | Adrian, MI |
| Cremer, Lacey | Dallas, TX |
| Cummins, Emily | Virginia Beach, VA |
| CXIII Rex, Corporate Representative | Alexandria, VA |
| Darley, Brian | Dallas, TX |

| | |
|---|---|
| Detwiler, Amy | Dallas, TX |
| Foster, Natalie | El Dorado, AR |
| Froman, Sandra | Tucson, AZ |
| Golob, Julie | Kearney, MO |
| GPI-M Uptown, LP, Corporate Representative | Dallas, TX |
| Greater Oklahoma City Chamber of Commerce, Corporate Representative | Oklahoma City, OK |
| Greenberg, Jesse | Dallas, TX |
| GS2 Enterprises, Corporate Representative | Woodland Hills, CA |
| Hammer, Marion | Tallahassee, FL |
| Hart, Steve | Washington DC |
| HBC Auditors & Advisors, Corporate Representative | Oklahoma City, OK |
| Himes, Josh | Dallas, TX |
| Hornady Manufacturing Company, Corporate Representative | Grand Island, NE |
| Integris Health, Inc., Corporate Representative | Oklahoma City, OK |
| Inventive Incentive & Insurance Services Inc., Corporate Representative | Woodland Hills, CA |
| Ives, Michael | Memphis, TN |
| Keene, David | Washington, MD |
| Knight, Timothy | Signal Mountain, TN |
| Landini Brothers Restaurant, Corporate Representative | Alexandria, VA |
| Landini, Noe | Alexandria, VA |
| LaPierre, Susan | Great Falls, VA |
| Leapfrog Enterprises, Corporate Representative | Emeryville, CA |
| Lee, Willes | Fairfax, VA |
| Ling, Il | Meridian, ID |
| Lipe, Rodney | Dallas, TX |
| Lockton Affinity LLC, Corporate Representative | Overland Park, KS |
| Loesch, Chris | Southlake, TX |
| Loesch, Dana | Southlake, TX |
| Makris, Anthony | Alexandria, VA |
| Maloney, Sean | Liberty Township, OH |
| Martin, Edmund | Edmond, OK |
| Martin, Henry | Dallas, TX |
| McKenna & Associates, Corporate Representative | Arlington, VA |
| McKenzie, David | Los Angeles, CA |
| McKenzie, Laura | Los Angeles, CA |
| McQueen, Katie | Oklahoma City, OK |

| | |
|---|---|
| McQueen, Revan | Oklahoma City, OK |
| Meadows, Carolyn | Atlanta, GA |
| Membership Marketing Partners, Corporate Representative | Fairfax, VA |
| Mercury Group, Inc. | Oklahoma City, OK (AMc headquarters) |
| Mitchell, Guy | Celina, TX |
| Mojack Distributors, Corporate Representative | Wichita, KS |
| Montgomery, Melanie | Dallas, TX |
| Mossberg Corporation, Corporate Representative | North Haven, CT |
| North, Oliver | Bluemont, VA |
| Nosler, Inc., Corporate Representative | Bend, OR |
| Nosler, Robert | Bend, OR |
| Nugent, Shemane | China Spring, TX |
| Nugent, Ted | China Spring, TX |
| Oklahoma Department of Tourism and Recreation, Corporate Representative | Oklahoma City, OK |
| Oklahoma Gas & Electric, Corporate Representative | Oklahoma City, OK |
| Oklahoma State University Foundation, Corporate Representative | Stillwater, OK |
| Olson, Lance | Marengo, IA |
| Omni Air Transport, Corporate Representative | Hartford, CT |
| Payne, Tammy | Oklahoma City, OK |
| Phillips, Woody | Dallas, TX |
| Plunkett, Jaqueline | Washington DC |
| Popp, John | Springfield, VA |
| Porter, James | Birmingham, AL |
| Powell, Jim | Plainview, MI |
| Powell, Josh | New Buffalo, MI |
| Remington Firearms, Corporate Representative | Madison, NC |
| Rendon Group, Corporate Representative | Washington, DC |
| RSM, Corporate Representative | Chicago, IL |
| Schmeits, Ron | Raton, NM |
| Schneider, Esther | Driftwood, TX |
| Selfridge, Edward | Dillwyn, VA |
| Senior Star, Corporate Representative | Tulsa, OK |
| Simone, Ginny | Naples, FL |
| Sinisi, Denise | Colleyville, TX |
| Six Flags of America, Corporate Representative | Bowie, MD |
| Sloan, Gurney | Colorado Springs, CO |

| | |
|---|---|
| Smith & Wesson, Corporate Representative | Springfield, MA |
| Stanford, Gayle | Woodland Hills, CA |
| Sterner, Colleen | Merna, NE |
| Sterner, Terry | Merna, NE |
| Stinchfield, Grant | Dallas, TX |
| Szucs, George | McKinney, TX |
| Tavangar, Nader | Alexandria, VA |
| Titus, Kristy | Prineville, OR |
| Turner, Clay | Colorado Springs, CO |
| Under Wild Skies, Corporate Representative | Alexandria, VA |
| Valinski, David | Palm Coast, FL |
| Varney, Alexander | Wylie, TX |
| Vista Outdoor Inc., Corporate Representative | Anoka, MN |
| Walters, Ian | West Accokeek, MD |
| Warner, Carl | Dallas, TX |
| Weaver, Kyle | Missoula, MT |
| Whatcott, Jace | Dallas, TX |
| Williams Companies, Inc., Corporate Representative | Tulsa, OK |
| Winkler, Brandon | Dallas, TX |
| Winkler, William | Edmund, OK |
| Workamajig, Inc., Corporate Representative | Oakhurst, NJ |
| WPX Energy, Corporate Representative | Tulsa, OK |

**DECLARATION OF WILLIAM A. BREWER IN SUPPORT OF THE NATIONAL RIFLE ASSOCIATION'S MOTION TO TRANSFER CASES FOR CONSOLIDATED PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407**

I, William A. Brewer, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am over twenty-one years of age, and fully competent to make this declaration. I am an associate with the law firm of Brewer, Attorneys & Counselors ("BAC"), 750 Lexington Avenue, 14th Floor, New York, New York 10022. I am counsel for the National Rifle Association of America (the "NRA") in the matter captioned Dell'Aquila v. LaPierre et al., Civ. Case No. 3:19-cv-00679 (M.D. Tn.) (the "Dell'Aquila Litigation"). I respectfully submit this declaration in support of the NRA's Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 (the "Consolidation Motion"). Unless otherwise stated, I have personal knowledge of all matters stated herein.

2.      Attached as Exhibit A hereto is true and correct copy of the Second Amended Complaint. Attached as Exhibit B hereto is a true and correct copy of the NRA's Answer and Affirmative Defenses. These documents collectively constitute the operative pleadings in the Dell'Aquila Litigation. Attached as Exhibit C hereto is a true and correct copy of the current docket summary for the Dell'Aquila Litigation, generated via PACER/ECF.

3.      The Initial Case Management Conference in the Dell'Aquila Litigation is scheduled to take place on November 6, 2020 (Docket No. 65). Fact discovery will begin shortly and will be voluminous. Attached hereto as Exhibit D is a list of individuals or entities likely to have relevant information or documents.

4. Significant issues of fact in the Dell'Aquila Litigation include: the NRA's dealings with its former public relations agency, Ackerman McQueen, Inc. ("Ackerman"), including knowledge and intent on the part of NRA executives regarding Ackerman's activities and billing;[1] the NRA's stewardship of its finances;[2] the veracity of allegations of misspending by former NRA fiduciaries including Lt. Col. Oliver North;[3] and, the NRA's legal fees.[4]

5. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of October 2020 in New York, New York.

William A. Brewer

---

[1] *See* Ex. A ¶¶ 49, 74.

[2] *See* Ex. A ¶¶ 41-54, 74.

[3] *See* Ex. A ¶¶ 44-54.

[4] *See* Ex. A ¶¶ 46-48, 74.

# **EXHIBIT A**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

DAVID DELL'AQUILA, LORANNDA
BORJA, TODD CHESNEY, and
BRENT WEBER, on behalf of
themselves and all others similarly
situated,

     Plaintiffs,

v.

WAYNE LaPIERRE, the NATIONAL
RIFLE ASSOCIATION OF AMERICA, a
New York not-for-profit corporation, and
the NRA FOUNDATION, INC., a
Washington, D.C. not-for-profit
corporation,

     Defendants.

Case No. 3:19-cv-00679

Judge William L. Campbell, Jr.

Magistrate Jefferey S. Frensley

JURY TRIAL DEMANDED

## SECOND AMENDED COMPLAINT

  The Plaintiffs, David Dell'Aquila, Lorannda Borja, Todd Chesney and Brent Weber, on behalf of themselves and all those similarly situated, file this Amended Complaint, by and through counsel, against Wayne LaPierre, the National Rife Association of America, a New York not-for-profit corporation, and the NRA Foundation, Inc., a Washington, D.C. not-for-profit corporation. In support hereof, the Plaintiffs state as follows:

## Parties & Jurisdiction

  1. Plaintiff, David Dell'Aquila, is an adult individual residing at 862 Bresslyn Road, Nashville, TN 37205.

  2. Plaintiff, Lorannda Borja, is an adult individual residing at 405 Stella Avenue, Lawrenceburg, TN 38464.

  3. Plaintiff, Todd Chesney, is an adult individual residing at Todd Chesney, 678 North Fire Sky Lane, Chino Valley, Arizona 86323.

4. Plaintiff, Brent Weber, is an adult individual residing at 1502 W. Browning Street, Andover, Kansas 67002.

5. Defendant, Wayne LaPierre, is the Chief Executive Officer of the National Rifle Association ("LaPierre"). He maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

6. Defendant, National Rifle Association of America, is a New York not-for-profit corporation (the "NRA"). The NRA has a registered office at c/o Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

7. Defendant, the NRA Foundation, Inc., is a Washington, D.C. not-for-profit corporation (the "NRA Foundation"). The NRA Foundation has a registered office at c/o Corporation Service Company, 1090 Vermont Avenue, N.W., Washington, D.C. 20005.

8. The Plaintiffs are asserting jurisdiction in this Court pursuant to 28 U.S.C. § 1332.

### Background

9. This is a class action lawsuit for fraud in the solicitation of donations by the Defendants Wayne LaPierre, the National Rifle Association of America, and the NRA Foundation, Inc.

10. The National Rifle Association, commonly referred to as the "NRA," holds itself out as the premier gun rights lobbying organization in the United States.

11. The NRA solicits donations by means of web pages, e-mail solicitations, and solicitations through the United States postal service. For example, the NRA's website makes the following claims:

**WHAT IS THE NRA?**

The NRA is America's preeminent gun rights organization, made up of nearly five million members. Together, we fight and win the toughest battles

for the Second Amendment, all while offering the best firearms educational programs in the country.

Every day, the NRA fights back against politicians, judges, and bureaucrats who want to regulate, restrict, and ultimately, destroy your Second Amendment freedom.

That's why you need to join the NRA RIGHT NOW.[1]

12. The NRA sells annual memberships in the organization through the United States postal service and the NRA's website. The cost of an annual membership, as of December 2019, is $45 per year. A lifetime membership sells for $1,500. The NRA has approximately five million dues paying or lifetime members.

13. The NRA claims that membership dues are used for gun education in the United States, and to lobby for gun ownership rights. Specifically, the NRA's website states as follows:

**How does the NRA use my membership dues?**

Your support will help us defend your Second Amendment freedom whenever and wherever it comes under attack.

In addition, your membership dues will help the NRA cultivate the next generation of sportsmen and women through our youth firearms trainings…empower women with our self-defense programs…and support our police officers with our world-class law enforcement training programs.

**What is the NRA's history?**

The National Rifle Association was founded in 1871 by U.S. Army veterans Col. William C. Church and Gen. George Wingate to "promote and encourage rifle shooting on a scientific basis." In the following decades, the NRA has provided world-class firearms instruction to thousands of gun owners across the country.

When anti-gun lobbyists and politicians began their war on the Second Amendment four decades ago, the NRA fought back. And over the years, we've defeated hundreds of attempts on the national, state and local levels to infringe on your Right to Keep and Bear Arms.

---

[1] https://membership.nra.org/FAQ?gclid=Cj0KCQiAgKzwBRCjARIsABBbFuiB0tmcEPvesgbB3SMTCyJ7lAf4Vd2hKSg_PrNE4Io5-0QfojZTryQaAqjwEALw_wcB

[3] Id.

Today, the NRA stands as America's oldest civil rights organization. Every time there's a threat to your gun rights, the NRA is there to defend your freedom. We also provide firearms training and gun safety programs to gun owners from all walks of life.[3]

14.     The NRA's website contains a "Uniform Disclosure Statement" concerning the activities of the organization.  The NRA also provides a printed copy of the Uniform Disclosure Statement to donors by means of the United States mails.  Specifically, the Uniform Disclosure Statement states as follows:

On behalf of The National Rifle Association of America, Inc. (NRA), 11250 Waples Mill Road, Fairfax, Virginia, 22030, this charitable solicitation is being made by the NRA. Contributions raised will be used to advance the mission of the NRA.[4]

15.     Donations to the NRA are not tax deductible, since the organization is engaged in lobbying efforts.

16.     In 1990, the NRA created a separate tax-deductible organization.  That organization is the NRA Foundation, chartered in the District of Columbia.

17.     According to its website, the NRA Foundation focuses on promoting shooting sports and education.  The website for the NRA Foundation describes its mission as follows:

For more than two decades, The NRA Foundation has served the needs of freedom-loving Americans across this great nation. We continue to teach freedom through programs that instill knowledge about our nation's great history. We build partnerships with leaders in our communities and provide grants that are instrumental in funding programs that support our shared vision.

Since our establishment in 1990, we've awarded nearly $398 million in grant funding in support of the shooting sports. These grants provide essential funding that benefits programs such as youth education, law enforcement training, hunter education, conservation, firearms and marksmanship training and safety, and much more.[5]

---

[4] https://www.nra.org/NRA-UniformDisclosureStatement.pdf

[5] https://www.nrafoundation.org/

18.     The NRA Foundation describes its mission as threefold: freedom, family and future. The Foundation claims to promote freedom by "protecting our Second Amendment freedoms with activities that promote safe and responsible firearms ownership." The Foundation claims to promote family by "bringing families together through hunting and shooting sport traditions and Friends of NRA activities." Finally, the Foundation claims to promote the future by "investing in the next generation of America's leaders, a significant majority of The NRA Foundation grants support youth shooting sports programs."[6]

19.     The NRA Foundation offers to provide grants to eligible organizations in the United States. The Foundation's website describes this offer as follows:

> The NRA Foundation provides financial support to eligible projects, programs and organizations through its Grant Program. Each year, volunteer committees from across the country tirelessly raise charitable dollars and generous donors make gifts that are in turn awarded as grants in support of educational and public service programs relating to the shooting sports in our communities.
>
> The general focus of Foundation grants is to:
>
> - Promote, advance and encourage firearms, shooting sports and hunting safety.
>
> - Educate individuals with respect to firearms, firearms history, participation in the shooting sports, hunting safety, and marksmanship.
>
> - Conduct research in furtherance of improved firearms safety and marksmanship facilities and techniques.[7]

20.     The website for the NRA Foundation contains a "Donor Bill of Rights." It states that all donors to the NRA Foundation have the following rights:

> To be informed of the organization's mission, of the way the organization intends to use donated resources, and of its capacity to use donations effectively for their intended purposes.

---

[6] Id.

[7] https://www.nrafoundation.org/grants/

> To be informed of the identity of those serving on the organization's governing board and <u>to expect the board to exercise prudent judgment in its stewardship responsibilities</u>.
>
> To have access to the organization's most recent financial statements.
>
> <u>To be assured your gifts will be used for the purposes for which they are given</u>.[8]

21.     Defendants NRA and NRA Foundation have maintained the above statements -- or similar statements -- on their websites during the applicable time period for this case, from November 30, 2015 through January 26, 2019.

22.     Archives of Defendants' websites are available online through the Internet Archive. The Internet Archive is a non-profit organization which preserves digital images of websites, captured at specific moments in time.

23.     The Internet Archive indicates that Defendants have continually published statements about themselves that are similar or identical to the statements currently on their websites.  For example, on January 6, 2016, Defendant NRA made the following statement about its mission on its website:

> <u>While widely recognized today</u> as a major political force and <u>as America's foremost defender of Second Amendment rights</u>, the NRA has, since its inception, been the premier firearms education organization in the world. But our successes would not be possible without the tireless efforts and countless hours of service our nearly five million members have given to champion Second Amendment rights and support NRA programs. As former Clinton spokesman George Stephanopoulos said, "Let me make one small vote for the NRA. They're good citizens. They call their congressmen. They write. They vote. They contribute. And they get what they want over time."[9]

24.     Defendant Wayne LaPierre has served as the Chief Executive Officer of the NRA. since 1991.

---

[8] https://www.nrafoundation.org/a-donor-bill-of-rights/ (emphasis added).

[9] https://web.archive.org/web/20160202235054/https://home.nra.org/about-the-nra/ (emphasis added).

25.     LaPierre uses his position with the NRA to encourage donations to both the NRA and to the NRA Foundation.  For example, on July 21, 2014, LaPierre sent an e-mail to the NRA donor base, stating as follows:

> On November 4, you and I are facing the biggest election of our lives.
>
> If Obama wins control of Congress, he'll have the unstoppable power to disarm American gun owners and destroy our freedom. But if you and I can defeat Obama's hand-picked gun-ban candidates, he'll go home at the end of his second term without EVER signing a major gun-ban bill into law.
>
> The stakes couldn't be higher. But we CAN'T WIN this election without your immediate support.
>
> That's why I'm asking you to renew your NRA membership today or even become a Life Member of the NRA. And to make it easier for you to make one of these commitments, we've created a special membership account for you here at NRA.
>
> *   *   *
>
> This is our opportunity to hand Obama the biggest defeat of his political career. But if we lose this election battle, our guns and our rights will be as good as gone.
>
> Victory starts with you – and your decision to upgrade or extend your membership today.
>
> Please access your special NRA membership account immediately to see the credits and discounts waiting for you – and to see the gifts you can receive when you upgrade or renew.
>
> Thanks in advance for standing tall with me in the most important election in freedom's history.
>
> Wayne LaPierre

26.     As of July 18, 2019, Defendant LaPierre was continuing to solicit donations on behalf of the NRA, based on its gun rights mission.  On that day, LaPierre sent an e-mail to the NRA donor base stating:

> You and I are now fighting the toughest and most consequential election battles of our lives – and I need you shoulder-to-shoulder with me like never before.

The news media is now attacking NRA 24/7, with a nonstop barrage of fake news and lies. Billionaire Michael Bloomberg is pledging to spend AT LEAST $500 million electing a gun-ban extremist to the White House next year.

And we're facing the most radical anti-gun candidates in the history of American politics – gun-hating zealots who want to LICENSE and FINGERPRINT gun owners, OUTLAW magazines holding more than 10 rounds, and BAN and CONFISCATE every semi-automatic rifle in America.

*  *  *

That's why – to prepare for these massive battles AND say thank you for your past support – I want to offer you a generous membership discount. Make no mistake: If you and I and our fellow NRA members don't band together and fight with all our strength, we will LOSE this election, a gun-ban fanatic will SEIZE the White House, and our guns and freedom will be GONE forever.

27.    Defendants also solicited funds from the Plaintiffs by means of the United States postal service.

28.    For example, on April 28, 2016, Laura Evans, from the NRA Office of Advancement, sent a letter to Dell'Aquila stating:  "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment.  For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

29.    On May 8, 2017, Laura Evans, from the NRA Office of Advancement, sent a letter to Dell'Aquila stating:  "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment.  For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

30.    March 15, 2018, the Executive Director of the NRA sent a letter to Plaintiff Dell'Aquila, stating "Your leadership is vital to the future of the Second Amendment.  It is the dedication of patriots like you that inspires others to stand up for freedom."

31.     On May 23, 2018, Laura Evans, from the NRA Office of Advancement, sent a letter to Dell'Aquila stating:  "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment.  For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

32.     On July 3, 2018, Wayne LaPierre sent a personal letter to Dell'Aquila stating "Your leadership inspires so many to stand up and fight for the values we hold dear."  His letter intended to solicit additional donations to the NRA and the NRA Foundation.

33.     On July 11, 2018, Christopher Cox, the Executive Director of the NRA, sent a letter to Dell'Aquila stating:

> With the help of dedicated advocates like you, we've been able to restore the Second Amendment in ways we wouldn't have hoped for more than four decades ago. . . .  However, the battleground is shifting now.  The antigun opposition is more organized, better funded, and more ruthless that at any time in our nation's history. . .  That is why your support is more necessary and meaningful than ever.  New fronts are opening in the war on your rights every day, and there is no cavalry coming to save us.  You are freedom's last stand, and I couldn't be prouder to stand with you.  Together, we will prevail.

34.     Each year, the NRA sends a dues renewal notification to all of its members through the United States postal service.  Each of the Plaintiffs Dell'Aquila, Borja, Chesney, Weber received such a notice from the NRA.  The renewal statement serves as a reminder that dues are currently due.  It also includes the Uniform Disclosure Statement, which states:  "Contributions raised will be used to advance the mission of the NRA."

35.     Plaintiffs David Dell'Aquila, Lorannda Borja, Todd Chesney, and Brent Weber were exposed to the marketing messages of Defendants NRA, NRA Foundation and Wayne LaPierre.

36.     Plaintiffs Dell'Aquila, Borja, Chesney, and Weber reasonably relied upon Defendants' solicitations, and made donations to the NRA and the NRA Foundation.

37.     During the period from November 30, 2015 through January 26, 2019, Plaintiff Todd Chesney made the following donations to the NRA, on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 2/16/2017 | NRA | $20 |
| 6/18/2018 | NRA | $50 |

38.     During the period from November 30, 2015 through January 26, 2019, Plaintiff Lorannda Borja made the donations to the NRA by purchasing special "NRA" license plates through the Tennessee Department of Motor Vehicles each year.  Whenever she made a purchase of license plates, $35 from the fee would be donated by Borja -- through the Tennessee DMV -- to the NRA.  Borja made donations of the following amounts on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 11/30/2015 | NRA | $35 |
| 12/8/2016 | NRA | $35 |
| 12/4/2017 | NRA | $35 |
| 12/10/2018 | NRA | $35 |

39.     During the period from November 30, 2015 through January 26, 2019, Plaintiff Dell'Aquila made the following donations to the following Defendants:

| Date | Payee | Amount |
|------|-------|--------|
| 3/22/16 | NRA | $1,000 |
| 3/14/16 | NRA | $100 |
| 3/30/16 | NRA | $1,000 |
| 4/18/16 | NRA | $250 |

10

Case 3:19-cv-00679 Document 67-1   Filed 10/20/20   Page 510 of 611 PageID #: 4903
Case 3:19-cv-00679 Document 37-1   Filed 01/02/20   Page 510 of 611 PageID #: 4903

| | | |
|---|---|---|
| 6/2/16 | NRA Foundation | $20,000 |
| 9/2/16 | NRA | $90 |
| 10/25/16 | NRA | $100 |
| 11/1/16 | NRA | $100 |
| 3/9/17 | NRA | $2,000 |
| 3/9/17 | NRA | $2,500 |
| 4/3/17 | NRA | $100 |
| 4/16/17 | NRA | $100 |
| 4/27/17 | NRA | $100 |
| 4/28/17 | NRA | $100 |
| 4/28/17 | NRA | $218 |
| 4/28/17 | NRA Foundation | $500 |
| 5/16/17 | NRA | $100 |
| 6/5/17 | NRA Foundation | $20,000 |
| 10/4/17 | NRA | $100 |
| 10/4/17 | NRA | $60 |
| 2/10/18 | NRA | $2,500 |
| 2/24/18 | NRA | $250 |
| 2/25/18 | NRA | $2,000 |
| 2/28/18 | NRA Foundation | $80 |
| 3/6/18 | NRA | $250 |
| 3/30/18 | NRA | $104 |
| 6/12/18 | NRA | $2,500 |

| 9/25/18 | NRA Foundation | $20,000 |
|---------|----------------|---------|
| 1/26/19 | NRA            | $2,500  |

40.     Plaintiff Brent Weber is a benefactor member of the NRA.  During the period from November 30, 2015 through January 26, 2019, Weber donated funds to the NRA for membership upgrades, and to help with its lobbying efforts.

41.     In 2019, Plaintiffs Dell'Aquila, Borja, Chesney and Weber learned that Defendants' solicitations were materially and intentionally false.

42.     Instead of spending the donated money on the solicited purposes, Defendants used significant portions of the donated funds for purposes unrelated to the NRA's core mission.

43.     Plaintiffs learned this information from media reports, following an investigation conducted by the NRA's former President, Lt. Col. Oliver North ("North").

44.     North served as President of the NRA from September 2018 through April 2019.

45.     After becoming President of the NRA, North learned of possible material financial misconduct by the NRA.

46.     In early 2019, North learned that the NRA was paying its outside counsel, Texas attorney William Brewer, *about $2 million per month*.  These expenditures had not been properly authorized by the NRA, or documented by the Brewer law firm.  North further learned that the NRA had paid roughly $20 million to Brewer from April 2018 through March 2019. When North and others requested to see the invoices relating to these extraordinary payments, Defendants LaPierre and the NRA repeatedly denied North access to the information.

47.     On April 17, 2019, North learned of allegations in the New Yorker magazine that raised concerns about possible mismanagement of NRA funds. The New Yorker article quoted a former head of the IRS Exempt Organizations division as stating: "The litany of red flags is just

12

Case 3:19-cv-00679 Document 31-1 Filed 10/20/20 Page 512 of 611 PageID #: 905
Case 3:19-cv-00679 Document 31-1 Filed 01/21/20 Page 14 of 27 PageID #: 166

extraordinary;" and "The materials reflect one of the broadest arrays of likely transgressions that I've ever seen."

48.     On April 18, 2019, North wrote a letter to the General Counsel of the NRA and to the Chairman of the Audit Committee, explaining his concerns with the NRA's multi-million dollar monthly payments to attorney Brewer.  In that letter, North requested that the NRA conduct an outside, independent review of the millions of dollars in payments to Brewer.

49.     On April 22, 2019, the NRA's former public relations firm, Ackerman Brewer, disclosed that it had hundreds of thousands of dollars for clothing and private travel for Wayne LaPierre, and then billed the expenses back to the NRA.  These reimbursements were not included as part of LaPierre's compensation on IRS Form 990, filed by the NRA.

50.     North pressed the NRA to investigate the above allegations.  North initially raised his concerns through internal-NRA channels, including the NRA's Audit Committee.

51.     On April 25, 2019, North wrote another letter -- this time to the Executive Committee of the NRA Board of Directors.  In that letter, North stated his intention to form a "Crisis Management Committee," to investigate the allegations of extraordinary spending by the NRA.

52.     Each time that North raised concerns about potential financial misconduct and tried to retain professionals to correct any wrongdoing, North's efforts were thwarted by Defendant LaPierre and the NRA's outside counsel, Brewer.  Ultimately, LaPierre managed to shut down North's Crisis Management Committee.  As of this date, there has been no independent investigation of the NRA's spending.

53.     Meanwhile, LaPierre retaliated against North for attempting to investigate the organization's spending.

54.     Ultimately, Wayne LaPierre forced North out, as President of the NRA.

13

## Class Action Allegations

55.     Pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, the Plaintiff brings this action on behalf of himself and two nationwide classes of Plaintiffs.

56.     The first class of similarly situated persons is defined as:  all persons residing in the United States who have donated funds to the NRA from November 30, 2015 through January 26, 2019 (the "NRA Class").

57.     The second class of similarly situated persons is defined as:  all persons residing in the United States who have donated funds to the NRA Foundation from November 30, 2015 to January 26, 2019 (the "NRA Foundation Class").

58.     Excluded from each nationwide class are the Defendants, their legal representatives, heirs, successors, and assigns of Defendants, and all judges who may ever adjudicate this case.

59.     This action is brought as a class action and may be so maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure.  The Plaintiff reserves the right to modify the two nationwide classes.

60.     <u>Numerosity of the Nationwide Classes</u>:  Each nationwide Class is so numerous that the individual joinder of all members, in this or any action is impracticable. The exact number of Class members is presently unknown to the Plaintiff; however, it is believed that the NRA Class numbers at least five million persons.  The identity of the members of each class and their addresses maybe ascertained from the business records maintained by the NRA and the NRA Foundation.  Class members may be informed of the pendency of this action by a combination of e-mail and/or public notice.

61.     <u>Commonality</u>:  There is a well-defined community of interest in the questions of law and fact involved affecting the members of each Class. These common legal and factual questions for the case involving the NRA Class include:

14

Case 3:19-cv-00679 Document 637-1  Filed 10/20/20   Page 514 of 611 PageID #: 18907
Case 3:19-cv-00679 Document 37-1  Filed 01/01/20   Page 14 of 17 PageID #: 680

a. Whether the Plaintiffs gave money to the NRA with the expectation that such funds would be spent to promote the NRA's core mission.

b. Whether the NRA misspent such money, on matters unrelated to the NRA's core mission described in Defendants' solicitations.

c. Whether Defendants LaPierre and the NRA should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

62.    These common legal and factual questions for the case involving the NRA Foundation Class include:

a. Whether the Plaintiffs gave money to the NRA Foundation with the expectation that such funds would be spent to promote the NRA's core mission.

b. Whether the NRA Foundation misspent such money, on matters unrelated to the NRA's core mission described in Defendants' solicitations.

c. Whether Defendants LaPierre and the NRA Foundation should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

63.    <u>Typicality</u>:  The claims of Plaintiffs Dell'Aquila, Borja, Chesney and Weber are typical of the claims of the members of the NRA Class and the NRA Foundation Class. Dell'Aquila, Borja, Chesney and Weber and each member of the NRA Class has, by definition, given funds to the NRA during the period from November 30, 2015 through January 26, 2019.

64.    Dell'Aquila and each member of the NRA Foundation Class has, by definition, given funds to the NRA Foundation during the period from November 30, 2015 through January 26, 2019.

65.    All members of the each class have suffered similar harm arising from Defendants' violations, as alleged herein.

66.    <u>Adequacy</u>:  Plaintiffs Dell'Aquila, Borja, Chesney and Weber are adequate representatives of the NRA Class because their interests do not conflict with the interests of the

members of the classes he seeks to represent. Plaintiff Dell'Aquila is an adequate representatives of the NRA Foundation Class because his interests do not conflict with the interests of the members of that class.

67. Plaintiffs Dell'Aquila, Borja, Chesney and Weber intend to prosecute this action vigorously. Dell'Aquila, Borja, Chesney and Weber will fairly and adequately protect the interests of the members of each Class.

68. <u>Predominance and Superiority</u>: This suit may also be maintained as a class action under pursuant to Rule 23(b)(3) of the Federal Rule of Civil Procedure because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member, depending on the circumstances, may be relatively small or modest, especially given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Furthermore, it would be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Moreover, even if Class members themselves could afford such individual litigation, the court system could not. Individual litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expenses to all parties and the court system presented by the complex legal issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

16

# COUNT I

## Fraud

### Dell'Aquila, Borja, Chesney
### and Weber and NRA Class
### v. LaPierre and the NRA

69.     The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

70.     During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja and each member of the NRA Class.

71.     When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

72.     Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

73.     As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

74.     Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA used the solicited funds for alternative purposes, including without limitation, the following:

> a.     By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

17

Case 3:19-cv-00679 Document 67-1 Filed 10/20/20 Page 517 of 611 PageID #: 7910
Case 3:19-cv-00679 Document 37-1 Filed 01/22/20 Page 17 of 27 PageID #: 719

b. By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

c. By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

d. By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

e. By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

f. By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

g. By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

h. By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

i. By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

j. By paying for private jet travel for Wayne LaPierre on a regular basis.

k. By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

75. Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

76. Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

77. The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

18

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter an order (a) certifying the NRA Class as a Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys fees.

## COUNT II

### Fraud

### Dell'Aquila and NRA Foundation Class
### v. LaPierre and the NRA Foundation

78.     The Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

79.     During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

80.     When soliciting such funds, Defendants LaPierre and the NRA Foundation advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

81.     Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

82.     As a result of such reliance, Plaintiff Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

19

Case 3:19-cv-00679 Document 37-1 Filed 10/20/20 Page 519 of 611 PageID #: 7912
Case 3:19-cv-00679 Document 37-1 Filed 10/20/20 Page 519 of 611 PageID #: 7912

83.     Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

a.     By transferring approximately $80 million from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible lobbying organization) over a ten-year period.

b.     By paying $425,000 *per year* for nine years to the Speedway Children's Charity, a non-profit organization not related to the NRA's core mission.

c.     By paying at least $125,000 to Youth for Tomorrow, a non-profit organization not related to the NRA's core mission.  Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

84.     Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

85.     Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

86.     The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter an order (a) certifying the NRA Foundation Class as Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Plaintiff Dell'Aquila and each member of the NRA Foundation Class damages equal to the amounts such persons donated to the NRA Foundation during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys fees.

20

Case 3:19-cv-00679 Document 63-1 Filed 01/02/20 Page 520 of 611 PageID #: 913
Case 3:19-cv-00679 Document 73-1 Filed 10/20/20 Page 20 of 27 PageID #: 4913

# COUNT III

## Violation of RICO

### Dell'Aquila, Borja, Chesney, Weber
### and the NRA Class
### v. LaPierre and the NRA

87. The Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

88. During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja and each member of the NRA Class.

89. Defendants solicited funds from Plaintiffs Dell'Aquila, Borja, Chesney, Weber, and each member of the NRA Class by means of the United States postal service.

90. When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

91. Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

92. As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

93. Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, the NRA used the solicited funds for alternative purposes, including without limitation, the following:

a.   By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

b.   By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

c.   By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

d.   By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

e.   By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

f.   By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

g.   By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

h.   By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

i.   By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

j.   By paying for private jet travel for Wayne LaPierre on a regular basis.

k.   By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

94.   Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

95.   Plaintiffs Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

22

Case 3:19-cv-00679 Document 67-1 Filed 10/20/20 Page 522 of 611 PageID #: 7915
Case 3:19-cv-00679 Document 67-1 Filed 01/01/20 Page 2 of 27 PageID #: 7015

96.     The above course of conduct constitutes racketeering activity, as defined in 18 U.S.C. § 1961.  Specifically, the activity constitutes mail fraud, as defined in 18 U.S.C. § 1341.

97.     According to 18 U.S.C. § 1962(c), it is also unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to engage in any sort of racketeering activity.   Defendant LaPierre is employed by the NRA, which is an enterprise engaged in interstate commerce.  Defendant NRA is associated with Defendant NRA Foundation, which is an enterprise engaged in interstate commerce.  All three Defendants are therefore proscribed from engaging in racketeering activity, pursuant to the law.

98.     Defendants LaPierre and NRA have violated 18 U.S.C. § 1962(c) by engaging in racketeering activity.

99.     According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

100.    The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys fees.

23

Case 3:19-cv-00679 Document 67-1  Filed 10/20/20   Page 523 of 611 PageID #: 7916
Case 3:19-cv-00679 Document 67-1  Filed 01/02/20   Page 23 of 27 PageID #: 791

# COUNT IV

## Violation of RICO

### Dell'Aquila and NRA Foundation Class
### v. LaPierre and the NRA Foundation

101.    The Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

102.    During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

103.    Defendants solicited funds from Plaintiff and each member of the NRA Class by means of the United States postal service.

104.    When soliciting such funds, Defendants LaPierre and the NRA Foundation advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

105.    Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

106.    As a result of such reliance, Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

107.    Defendants' statements concerning the use of the solicited funds were materially and intentionally false.  In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

        a.      By transferring approximately $80 million from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible

24

Case 3:19-cv-00679 Document 31-1 Filed 01/02/20 Page 24 of 27 PageID #: 917
Case 3:19-cv-00679 Document 67-1 Filed 10/20/20 Page 524 of 611 PageID #: 7917

lobbying organization) over a ten-year period. Such funds then became subject to the financial improprieties described in Count I of this Complaint and jeopardized the tax-deductibility of the donations made by Plaintiffs.

b.  By paying $425,000 *per year* for nine years to the Speedway Children's Charity, a non-profit organization <u>not</u> related to the NRA's core mission.

c.  By paying at least $125,000 to Youth for Tomorrow, a non-profit organization <u>not</u> related to the NRA's core mission. Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

108.  Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

109.  Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

110.  The above course of conduct constitutes racketeering activity, as defined in 18 U.S.C. § 1961. Specifically, the activity constitutes mail fraud, as defined in 18 U.S.C. § 1341.

111.  According to 18 U.S.C. § 1962(c), it is also unlawful for any person employed by or associated with an enterprise engaged in interstate commerce to engage in any sort of racketeering activity. Defendant LaPierre is employed by the NRA, which is an enterprise engaged in interstate commerce. Defendant NRA Foundation is associated with the NRA, which is an enterprise engaged in interstate commerce. All three Defendants are therefore proscribed from engaging in racketeering activity, pursuant to the law.

112.  Defendants LaPierre and NRA have violated 18 U.S.C. § 1962(c) by engaging in racketeering activity.

113.  According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United

25

Case 3:19-cv-00679 Document 67-1 Filed 10/20/20 Page 525 of 611 PageID #: 7918
Case 3:19-cv-00679 Document 37-1 Filed 01/02/20 Page 25 of 37 PageID #: 918

States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

114.    The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court awarding to Plaintiff Dell'Aquila and each member of the NRA Foundation Class damages equal to three times the amounts such persons donated to the NRA Foundation during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys fees.

Respectfully submitted,


By: /s/ Elliott Schuchardt
      Elliott J. Schuchardt, Esq.
      B.P.R. No. 027016

SCHUCHARDT LAW FIRM
6223 Highland Place Way, Suite 201
Knoxville, TN 37919
Phone:  (865) 304-4374
E-mail:  elliott016@gmail.com

*Counsel for the Plaintiffs*

26

Case 3:19-cv-00679 Document 37-1  Filed 01/02/20  Page 526 of 611 PageID #: 1919
Case 3:19-cv-00679 Document 37-1  Filed 01/02/20  Page 26 of 27 PageID #: 180

## <u>VERIFICATION</u>

I, David Dell'Aquila, hereby swear and affirm that I have read the foregoing Amended Complaint, and that the allegations and facts set forth in the Complaint are true and correct, to the best of my knowledge, information and belief.

<u>/s/ David Dell'Aquila</u>
David Dell'Aquila

# **EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| DAVID DELL'AQUILA, LORANNDA | ) | |
| BORJA, TODD CHESNEY, and BRENT | ) | |
| WEBER, on behalf of | ) | |
| themselves and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No: 3:19-cv-00679 |
| - against - | ) | Judge William L. Campbell Jr. |
| | ) | |
| NATIONAL RIFLE   ASSOCIATION | ) | Magistrate Judge Chip Frensley |
| OF AMERICA. | ) | |
| | ) | |
| Defendant. | ) | |

**NRA'S ANSWER AND AFFIRMATIVE DEFENSES**

Defendant National Rifle Association of America (the "NRA"), by and through undersigned counsel, respectfully submits the following Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint [Doc. 43]:

**<u>Parties & Jurisdiction</u>**

1. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 1.

2. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 2.

3. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 3.

4. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 4.

5. The NRA denies that Wayne LaPierre is a Defendant in this case because the claims against him have been dismissed. The NRA admits the remaining allegations in Paragraph 5.

6. Admitted.

1

7.  The allegations in Paragraph 7 refer to claims that have been dismissed and require no response.

8.  Admitted.

## Background

9.  Admitted.

10. Denied. The NRA is America's leading provider of gun-safety and marksmanship education for civilians and law enforcement. It is also the foremost defender of the Second Amendment of the United States Constitution.

11. The NRA admits that it encourages donations by many channels, including by use of web pages, email, and mail. The NRA admits that its website contains the quoted text. The NRA denies the remaining allegations in Paragraph 11.

12. The NRA denies the allegations in the first sentence of Paragraph 12. The NRA admits the allegations in the second and last sentences of Paragraph 12. The NRA admits that a lifetime membership costs $1,500.

13. The NRA admits that its website contains the quoted text. The NRA denies the remaining allegations in Paragraph 13.

14. The NRA admits that its website contains a "Uniform Disclosure Statement." The NRA admits that it has provided copies of the "Uniform Disclosure Statement" to donors. The NRA admits that the "Uniform Disclosure Statement" contains the quoted text. The NRA denies the remaining allegations in Paragraph 14.

15. The NRA admits that donations to the NRA are not tax deductible. The NRA denies the remaining allegations in Paragraph 15.

16. Admitted.

17. The allegations in Paragraph 17 refer to claims that have been dismissed and require no response.

18. The allegations in Paragraph 18 refer to claims that have been dismissed and require no response.

19. The allegations in Paragraph 19 refer to claims that have been dismissed and require no response.

20. The allegations in Paragraph 20 refer to claims that have been dismissed and require no response.

21. The NRA admits that the three statements identified in the preceding paragraphs appeared on the NRA website for at least part of the time between November 30, 2015 through January 26, 2019. The NRA denies the remaining allegations in Paragraph 21.

22. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 22.

23. The NRA admits that the quoted text appears on the website cited by Plaintiffs and appears to show that the quoted text appeared on the NRA website on February 2, 2016. The NRA denies the remaining allegations in Paragraph 23.

24. The NRA admits that Wayne LaPierre has served as the Executive Vice President and Chief Executive Officer of the NRA since 1991. Wayne LaPierre is no longer a Defendant in this case.

25. The NRA admits that Wayne LaPierre has encouraged donations to the NRA. The NRA admits that, on July 21, 2014, an email was sent from Wayne LaPierre's email address to NRA members that contained the quoted text. The NRA denies the remaining allegations in Paragraph 25.

3

26. The NRA admits that, on July 18, 2019, an email was sent from Wayne LaPierre's email address to NRA members that contained the quoted text. The NRA denies the remaining allegations in Paragraph 26.

27. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 27.

28. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 28.

29. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 29.

30. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 30.

31. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 31.

32. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 32.

33. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 33.

34. The NRA admits that it has provided copies of the "Uniform Disclosure Statement" to members. The NRA lacks sufficient information to admit or deny the remaining allegations in Paragraph 34.

35. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 35.

36. Denied.

37. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 37.

38. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 38.

39. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 39.

40. The NRA lacks sufficient information to admit or deny the allegations in Paragraph 40.

41. Denied.

42. Denied.

43. Denied.

44. Admitted.

4

45. Denied.

46. Denied.

47. The NRA admits that, on April 17, 2019, an article appeared in the New Yorker with the quoted text. The NRA denies the remaining allegations in Paragraph 47.

48. The NRA admits that it received a letter, dated April 18, 2019, signed by Oliver North, that refers to the allegations contained in Paragraph 48. The NRA denies the remaining allegations in Paragraph 48.

49. The NRA admits that Ackerman McQueen, Inc. made allegations as referenced in Paragraph 49. The allegation in the second sentence characterizes a document to which no response is required. The NRA denies the remaining allegations in Paragraph 49.

50. The NRA admits that Oliver North made allegations as alleged in the preceding paragraphs. The NRA denies the remaining allegations in Paragraph 50.

51. The NRA admits that the NRA Board of Directors received a letter, dated April 25, 2019, signed by Oliver North, that stated his alleged intention to form a "Crisis Management Committee" with the stated purpose of investigating the allegations referenced in Paragraph 51. The NRA denies the remaining allegations in Paragraph 51.

52. Denied.

53. Denied.

54. Denied.

## Class Action Allegations

55. The NRA admits that Plaintiffs bring this action on behalf of themselves and a single nationwide putative class. The NRA denies the remaining allegations in Paragraph 55.

56. Denied.

5

57. The allegations in Paragraph 57 refer to claims that have been dismissed and require no response.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. The allegations in Paragraph 62 refer to claims that have been dismissed and require no response.

63. Denied.

64. The allegations in Paragraph 64 refer to claims that have been dismissed and require no response.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

## COUNT I

### Fraud

### Dell'Aquila, Borja, Chesney and Weber and NRA Class v. LaPierre and the NRA

69. The NRA incorporates by reference its responses to the preceding paragraphs.

70. The NRA admits that, during the time period November 30, 2015 to January 26, 2019, it encouraged donations. The NRA lacks sufficient information to admit or deny the remaining allegations in Paragraph 70.

71. Denied.

72. Denied.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

77. Denied.

## COUNT II

### Fraud

### Dell'Aquila and NRA Foundation Class v. LaPierre and the NRA Foundation

78. The NRA incorporates by reference its responses to the preceding paragraphs.

79. The allegations in Paragraph 79 refer to claims that have been dismissed and require no response.

80. The allegations in Paragraph 80 refer to claims that have been dismissed and require no response.

81. The allegations in Paragraph 81 refer to claims that have been dismissed and require no response.

82. The allegations in Paragraph 82 refer to claims that have been dismissed and require no response.

83. The allegations in Paragraph 83 refer to claims that have been dismissed and require no response.

84. The allegations in Paragraph 84 refer to claims that have been dismissed and require no response.

7

85. The allegations in Paragraph 85 refer to claims that have been dismissed and require no response.

86. The allegations in Paragraph 86 refer to claims that have been dismissed and require no response.

## COUNT III

### Violation of RICO

### Dell'Aquila, Borja, Chesney, Weber and the NRA Class v. LaPierre and the NRA

87. The NRA incorporates by reference its responses to the preceding paragraphs.

88. The allegations in Paragraph 88 refer to claims that have been dismissed and require no response.

89. The allegations in Paragraph 89 refer to claims that have been dismissed and require no response.

90. The allegations in Paragraph 90 refer to claims that have been dismissed and require no response.

91. The allegations in Paragraph 91 refer to claims that have been dismissed and require no response.

92. The allegations in Paragraph 92 refer to claims that have been dismissed and require no response.

93. The allegations in Paragraph 93 refer to claims that have been dismissed and require no response.

94. The allegations in Paragraph 94 refer to claims that have been dismissed and require no response.

8

95. The allegations in Paragraph 95 refer to claims that have been dismissed and require no response.

96. The allegations in Paragraph 96 refer to claims that have been dismissed and require no response.

97. The allegations in Paragraph 97 refer to claims that have been dismissed and require no response.

98. The allegations in Paragraph 98 refer to claims that have been dismissed and require no response.

99. The allegations in Paragraph 99 refer to claims that have been dismissed and require no response.

100. The allegations in Paragraph 100 refer to claims that have been dismissed and require no response.

## COUNT IV

### Violation of RICO

### Dell'Aquila and NRA Foundation Class v. LaPierre and the NRA Foundation

101. The NRA incorporates by reference its responses to the preceding paragraphs.

102. The allegations in Paragraph 102 refer to claims that have been dismissed and require no response.

103. The allegations in Paragraph 103 refer to claims that have been dismissed and require no response.

104. The allegations in Paragraph 104 refer to claims that have been dismissed and require no response.

9

105. The allegations in Paragraph 105 refer to claims that have been dismissed and require no response.

106. The allegations in Paragraph 106 refer to claims that have been dismissed and require no response.

107. The allegations in Paragraph 107 refer to claims that have been dismissed and require no response.

108. The allegations in Paragraph 108 refer to claims that have been dismissed and require no response.

109. The allegations in Paragraph 109 refer to claims that have been dismissed and require no response.

110. The allegations in Paragraph 110 refer to claims that have been dismissed and require no response.

111. The allegations in Paragraph 111 refer to claims that have been dismissed and require no response.

112. The allegations in Paragraph 112 refer to claims that have been dismissed and require no response.

113. The allegations in Paragraph 113 refer to claims that have been dismissed and require no response.

114. The allegations in Paragraph 114 refer to claims that have been dismissed and require no response.

## Affirmative Defenses

### First Affirmative Defense

Plaintiffs' claim is barred by the doctrine of waiver.

## Second Affirmative Defense

Plaintiffs' claim is barred by the doctrine of estoppel.

## Third Affirmative Defense

Plaintiffs' claim is barred by the doctrine of unclean hands.

## Fourth Affirmative Defense

Plaintiffs' claim is barred by the doctrine of laches.

## Jury Demand

The NRA hereby demands a trial by jury on all claims and issues so triable

WHEREFORE, the NRA respectfully requests that this court dismiss this action in its entirety with prejudice, with Plaintiffs to bear the costs of all parties, and any other just and equitable relief this court deems appropriate.

By:       _W. Allen McDonald_
          W. Allen McDonald
          LACY, PRICE & WAGNER PC
          249 N. Peters Rd., Suite 101
          Knoxville, TN 37923
          (865)-246-0800

          BREWER, ATTORNEYS &
          COUNSELORS
          William A. Brewer IV (admitted *pro hac vice*)
          750 Lexington Avenue, 14th Floor
          New York, NY 10022
          (212)-489-1400

          *ATTORNEYS FOR THE NATIONAL RIFLE ASSOCIATION OF AMERICA*

11

## CERTIFICATE OF SERVICE

I, W. Allen McDonald, hereby certify that I served a true and correct copy of the

foregoing Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint on the

following parties on October 19, 2020 by means of the Court's CM/ECF system, which will send

notification to all counsel of record as listed below.

William A. Brewer, Esq.
Email: wbb@brewerattorneys.com
*Co-Counsel for Wayne LaPierre and*
*National Rifle Association*

Aubrey B. Harwell , Jr., Esq.
Email: aharwell@nealharwell.com
*Counsel for NRA Foundation, Inc.*

John E. Quinn
Email: jquinn@nealharwell.com
*Counsel for NRA Foundation, Inc.*

William J. Harbison , II, Esq.
Email: jharbison@nealharwell.com
*Counsel for NRA Foundation, Inc.*

Elliott J. Schuchardt
Email: elliott016@gmail.com
*Counsel for Plaintiffs*

Date:  October 19, 2020

*/s/ W. Allen McDonald*

12

# **EXHIBIT C**

<span style="color:red">CASE-REFERRED,FRENSLEY</span>

# U.S. District Court
## Middle District of Tennessee (Nashville)
## CIVIL DOCKET FOR CASE #: 3:19-cv-00679

Dell'Aquila v. LaPierre et al                          Date Filed: 08/06/2019
Assigned to: District Judge William L. Campbell, Jr     Jury Demand: Both
Referred to: Magistrate Judge Jeffery S. Frensley       Nature of Suit: 370 Other Fraud
Demand: $9,999,000                                      Jurisdiction: Diversity
Cause: 28:1332 Diversity-Fraud

**Plaintiff**

**David Dell'Aquila**                    represented by   **Elliott J. Schuchardt**
*on behalf of himself and all others similarly*           Schuchardt Law Firm
*situated*                                                6223 Highland Place Way
                                                          Suite 201
                                                          Knoxville, TN 37919
                                                          (865) 304-4374
                                                          Fax: (703) 232-1044
                                                          Email: elliott016@gmail.com
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Lorannda Borja**                        represented by   **Elliott J. Schuchardt**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Todd Chesney**                          represented by   **Elliott J. Schuchardt**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Brent Weber**                           represented by   **Elliott J. Schuchardt**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Wayne LaPierre**                        represented by   **Wallace A. McDonald**
*TERMINATED: 09/30/2020*                                  Lacy, Price & Wagner, P.C.
                                                          249 N. Peters Rd.
                                                          Suite 101
                                                          Knoxville, TN 37923
                                                          865-246-0800
                                                          Fax: 865-690-8199
                                                          Email: amcdonald@lpwpc.com
                                                          *ATTORNEY TO BE NOTICED*

William A. Brewer
Brewer, Attorneys & Counselors
750 Lexington Ave.
14th Floor
New York, NY 10022
(212) 527-3024
Fax: (212) 751-2849
Email: wbb@brewerattorneys.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**National Rifle Association of America**     represented by   **Wallace A. McDonald**
*a New York not-for-profit corporation*                           (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

                                                 **William A. Brewer**
                                                 (See above for address)
                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**NRA Foundation, Inc.**     represented by   **Aubrey B. Harwell , Jr.**
*a Washington D.C. not-for-profit*                           Neal & Harwell, PLC
*corporation*                                             1201 Demonbreun Street
*TERMINATED: 09/30/2020*                               Suite 1000
                                                 Nashville, TN 37203
                                                 (615) 244-1713
                                                 Fax: (615) 726-0573
                                                 Email: aharwell@nealharwell.com
                                                 *TERMINATED: 09/30/2020*

                                                 **John E. Quinn**
                                                 Neal & Harwell, PLC
                                                 1201 Demonbreun Street
                                                 Suite 1000
                                                 Nashville, TN 37203
                                                 (615) 244-1713
                                                 Fax: (615) 726-0573
                                                 Email: jquinn@nealharwell.com
                                                 *TERMINATED: 09/30/2020*

                                                 **William J. Harbison , II**
                                                 Neal & Harwell, PLC
                                                 1201 Demonbreun Street
                                                 Suite 1000
                                                 Nashville, TN 37203
                                                 (615) 238-3650
                                                 Fax: (615) 726-0573
                                                 Email: jharbison@nealharwell.com
                                                 *TERMINATED: 09/30/2020*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/06/2019 | 1 | COMPLAINT against Wayne LaPierre, NRA Foundation, Inc., National Rifle Association |

| | | |
|---|---|---|
| | | of America (Filing fee paid $400, Receipt number 34675055872), filed by David Dell'Aquila. (Attachments: # 1 Attachment Civil Cover Sheet, # 2 Attachment Receipt) (gb) (Entered: 08/07/2019) |
| 08/07/2019 | 2 | NOTICE/INFORMATION regarding Consent of the Parties to the Magistrate Judge. (gb) (Entered: 08/07/2019) |
| 08/07/2019 | 3 | NOTICE of Business Entity Disclosure Statement filing requirement. (gb) (Entered: 08/07/2019) |
| 08/07/2019 | | NOTICE mailed to pro se party regarding filing of new case (docket sheet & certificate of service form included). (gb) (Entered: 08/07/2019) |
| 08/08/2019 | 4 | *** VACATED PER ORDER 59 *** ORDER REFERRING CASE. This action is REFERRED to the magistrate judge to oversee service of process on the defendants, to enter a scheduling order for the management of the case, to dispose or recommend disposition of any pretrial motions. Signed by District Judge William L. Campbell, Jr on 8/8/19. (xc:Pro se party by regular mail.) **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(gb) Modified on 3/11/2020 (gb). (Entered: 08/08/2019) |
| 10/11/2019 | 5 | AMENDED COMPLAINT against Wayne LaPierre, NRA Foundation, Inc., National Rifle Association of America, filed by David Dell'Aquila. (gb) (Entered: 10/15/2019) |
| 10/11/2019 | 6 | Summons issued as to Wayne LaPierre, NRA Foundation, Inc., National Rifle Association of America. (gb) (Entered: 10/15/2019) |
| 11/05/2019 | 7 | SUMMONS returned executed by David Dell'Aquila. Wayne LaPierre served on 10/30/2019. (gb) (Entered: 11/06/2019) |
| 11/05/2019 | 8 | SUMMONS returned executed by David Dell'Aquila. National Rifle Association of America served on 10/21/2019. (gb) (Entered: 11/06/2019) |
| 11/05/2019 | 9 | SUMMONS returned executed by David Dell'Aquila. NRA Foundation, Inc. served on 10/25/2019. (gb) (Entered: 11/06/2019) |
| 11/08/2019 | 10 | NOTICE of Appearance by Wallace A. McDonald on behalf of Wayne LaPierre, National Rifle Association of America (McDonald, Wallace) (Entered: 11/08/2019) |
| 11/08/2019 | 11 | BUSINESS ENTITY DISCLOSURE STATEMENT filed by National Rifle Association of America. (McDonald, Wallace) (Entered: 11/08/2019) |
| 11/08/2019 | 12 | ***DISREGARD - FILED IN ERROR*** BUSINESS ENTITY DISCLOSURE STATEMENT filed by Wayne LaPierre. (McDonald, Wallace) Modified on 11/12/2019 (gb). (Entered: 11/08/2019) |
| 11/11/2019 | 13 | NOTICE of Appearance by William J. Harbison, II on behalf of NRA Foundation, Inc. (Harbison, William) (Entered: 11/11/2019) |
| 11/11/2019 | 14 | NOTICE of Appearance by Aubrey B. Harwell, Jr on behalf of NRA Foundation, Inc. (Harwell, Aubrey) (Entered: 11/11/2019) |
| 11/11/2019 | 15 | NOTICE of Appearance by John E. Quinn on behalf of NRA Foundation, Inc. (Quinn, John) (Entered: 11/11/2019) |
| 11/11/2019 | 16 | MOTION for Extension of Time to File Response/Reply as to 5 Amended Complaint by NRA Foundation, Inc. (Harbison, William) (Entered: 11/11/2019) |
| 11/11/2019 | 17 | AMENDED NOTICE of Appearance by Wallace A. McDonald on behalf of National Rifle Association of America (McDonald, Wallace) (Entered: 11/11/2019) |

| 11/12/2019 | | TN State Bar status verified as active for William J. Harbison, II, Aubrey B. Harwell, Jr, John E. Quinn and Wallace A. McDonald. (gb) (Entered: 11/12/2019) |
|---|---|---|
| 11/12/2019 | 18 | ORDER granting 16 Motion for Extension of Time to File Response/Reply. Extension to 12/30/2019. Signed by Magistrate Judge Jeffery S. Frensley on 11/12/19. (xc:Pro se party by regular mail.) (gb) (Entered: 11/12/2019) |
| 11/12/2019 | 19 | MOTION for attorney William A. Brewer to Appear Pro Hac Vice (paid $100 PHV fee; receipt number 0650-3029626) by National Rifle Association of America. (Attachments: # 1 Attachment Declaration of William A. Brewer, # 2 Attachment Certificate of Good Standing)(McDonald, Wallace) (Entered: 11/12/2019) |
| 11/12/2019 | 20 | MOTION to Dismiss for Failure to State a Claim by National Rifle Association of America. (McDonald, Wallace) (Entered: 11/12/2019) |
| 11/12/2019 | 21 | MEMORANDUM in Support of 20 MOTION to Dismiss for Failure to State a Claim filed by National Rifle Association of America. (McDonald, Wallace) (Entered: 11/12/2019) |
| 11/13/2019 | | NY State Bar status verified as active for William A. Brewer. (gb) (Entered: 11/13/2019) |
| 11/13/2019 | | NOTICE TO FILER re DE# 19 : The pending pro hac vice motion does not comply with the Court's local rules, because the declaration fails to state whether any disciplinary proceedings **or criminal charges** have been instituted against the attorney seeking pro hac vice admission. Local Rule 83.01(b)(2). By no later than five (5) business days from the date of this docket annotation, the pro hac vice motion must be supplemented by the filing of a statement under oath of the attorney seeking pro hac vice admission disclosing whether any disciplinary proceedings or criminal charges have been instituted against the attorney, and if so, providing complete details about the proceeding or charges, including outcome. Failure to do so will result in denial of the pro hac vice motion. (gb) (Entered: 11/13/2019) |
| 11/13/2019 | 22 | DECLARATION of William A. Brewer filed by National Rifle Association of America re: 19 MOTION for attorney William A. Brewer to Appear Pro Hac Vice (paid $100 PHV fee; receipt number 0650-3029626). (Attachments: # 1 Attachment Certificate of Good Standing)(McDonald, Wallace) (Entered: 11/13/2019) |
| 11/15/2019 | 23 | ORDER granting 19 Motion for William A. Brewer to Appear Pro Hac Vice. Signed by Kirk L. Davies on 11/15/19. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(Davies, Kirk) (Entered: 11/15/2019) |
| 11/20/2019 | 24 | NOTICE of Appearance by Wallace A. McDonald on behalf of Wayne LaPierre (McDonald, Wallace) (Entered: 11/20/2019) |
| 11/20/2019 | 25 | MOTION for Extension of Time to File Response/Reply as to 5 Amended Complaint *through December 16, 2019* by Wayne LaPierre. (McDonald, Wallace) (Entered: 11/20/2019) |
| 11/20/2019 | 26 | BUSINESS ENTITY DISCLOSURE STATEMENT filed by Wayne LaPierre. (McDonald, Wallace) (Entered: 11/20/2019) |
| 11/22/2019 | 27 | ORDER granting 25 Motion for Extension of Time to File Answer. Defendant Wayne LaPierre Answer due 12/16/2019. Signed by Magistrate Judge Jeffery S. Frensley on 11/22/2019. (xc:Pro se party by regular mail. ) **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(hb) (Entered: 11/22/2019) |
| 11/26/2019 | 28 | MOTION for Extension of Time to File Response as to 20 MOTION to Dismiss for Failure to State a Claim by David Dell'Aquila. (Attachments: # 1 Attachment Proposed |

| | | |
|---|---|---|
| | | Order)(gb) (Entered: 11/27/2019) |
| 12/03/2019 | 29 | ORDER granting 28 Motion for Extension of Time to File Response/Reply re 20 MOTION to Dismiss for Failure to State a Claim. Signed by Magistrate Judge Jeffery S. Frensley on 12/3/19. (xc:Pro se party by regular mail.) (gb) (Entered: 12/03/2019) |
| 12/04/2019 | 30 | Unopposed MOTION for Extension of Time to File Response as to 20 MOTION to Dismiss for Failure to State a Claim by David Dell'Aquila. (Attachments: # 1 Attachment Proposed Order)(gb) (Entered: 12/05/2019) |
| 12/06/2019 | 31 | ORDER: Pending before the Court is the pro se Plaintiff's unopposed motion to set a briefing schedule on the motion to dismiss filed by the National Rifle Association ("NRA"). 30 The Motion is GRANTED. The Plaintiff shall file his response to the NRAs Motion to Dismiss on or before January 2, 2020. The NRA may file an optional reply on or before January 15, 2020. Signed by Magistrate Judge Jeffery S. Frensley on 12/6/19. (xc:Pro se party by regular mail.) (gb) (Entered: 12/06/2019) |
| 12/16/2019 | 32 | MOTION to Dismiss for Failure to State a Claim by Wayne LaPierre. (McDonald, Wallace) (Entered: 12/16/2019) |
| 12/16/2019 | 33 | MEMORANDUM in Support of 32 MOTION to Dismiss for Failure to State a Claim filed by Wayne LaPierre. (McDonald, Wallace) (Entered: 12/16/2019) |
| 12/19/2019 | 34 | NOTICE of Appearance by Elliott J. Schuchardt on behalf of David Dell'Aquila (Schuchardt, Elliott) (Entered: 12/19/2019) |
| 12/30/2019 | 35 | MOTION to Dismiss for Failure to State a Claim by NRA Foundation, Inc. (Harwell, Aubrey) (Entered: 12/30/2019) |
| 12/30/2019 | 36 | MEMORANDUM in Support of 35 MOTION to Dismiss for Failure to State a Claim filed by NRA Foundation, Inc. (Harwell, Aubrey) (Entered: 12/30/2019) |
| 01/02/2020 | 37 | MOTION to Amend/Correct *Complaint* by David Dell'Aquila. (Attachments: # 1 Exhibit A - Proposed Amended Complaint, # 2 Attachment Proposed Order)(Schuchardt, Elliott) (Entered: 01/02/2020) |
| 01/02/2020 | 38 | MEMORANDUM in Support re 37 Motion to Amend/Correct filed by David Dell'Aquila. (Schuchardt, Elliott) Modified text on 1/31/2020 (gb). (Entered: 01/02/2020) |
| 01/16/2020 | 39 | RESPONSE to Motion re 37 MOTION to Amend/Correct *Complaint* filed by NRA Foundation, Inc. (Harwell, Aubrey) (Entered: 01/16/2020) |
| 01/16/2020 | 40 | RESPONSE to Motion re 37 MOTION to Amend/Correct *Complaint* filed by Wayne LaPierre, National Rifle Association of America. (McDonald, Wallace) (Entered: 01/16/2020) |
| 01/17/2020 | 41 | RESPONSE in Opposition re 35 MOTION to Dismiss for Failure to State a Claim, 32 MOTION to Dismiss for Failure to State a Claim, 20 MOTION to Dismiss for Failure to State a Claim filed by David Dell'Aquila. (Schuchardt, Elliott) (Entered: 01/17/2020) |
| 01/22/2020 | 42 | ORDER: Plaintiff's Motion to Amend ( 37 ) is GRANTED. In light of the Amended Complaint, the Defendants' Motions to Dismiss ( 20 , 32 and 35 ) are Denied without prejudice as moot. Signed by Magistrate Judge Jeffery S. Frensley on 1/22/2020. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(gb) (Entered: 01/22/2020) |
| 01/22/2020 | 43 | SECOND AMENDED COMPLAINT against Wayne LaPierre, NRA Foundation, Inc., National Rifle Association of America, filed by David Dell'Aquila, Loranda Borja, Brent Weber, Todd Chesney. (gb) (Entered: 01/22/2020) |

| 01/22/2020 | | TN State Bar status verified as active for Elliott J. Schuchardt. (gb) (Entered: 01/22/2020) |
|---|---|---|
| 01/27/2020 | 44 | Consent MOTION for Extension of Time to File Answer by NRA Foundation, Inc. (Harbison, William) (Entered: 01/27/2020) |
| 01/28/2020 | 45 | ORDER granting 44 Motion for Extension of Time to Answer. Signed by Magistrate Judge Jeffery S. Frensley on 1/28/2020. (gb) (Entered: 01/28/2020) |
| 02/19/2020 | 46 | MOTION to Dismiss for Failure to State a Claim by NRA Foundation, Inc. (Harwell, Aubrey) (Entered: 02/19/2020) |
| 02/19/2020 | 47 | MEMORANDUM in Support of 46 MOTION to Dismiss for Failure to State a Claim filed by NRA Foundation, Inc. (Harwell, Aubrey) (Entered: 02/19/2020) |
| 02/19/2020 | 48 | MOTION to Dismiss for Lack of Jurisdiction, MOTION to Dismiss for Failure to State a Claim by National Rifle Association of America. (McDonald, Wallace) (Entered: 02/19/2020) |
| 02/19/2020 | 49 | MEMORANDUM in Support of 48 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by National Rifle Association of America. (McDonald, Wallace) (Entered: 02/19/2020) |
| 02/19/2020 | 50 | MOTION to Dismiss for Lack of Jurisdiction, MOTION to Dismiss for Failure to State a Claim by Wayne LaPierre. (McDonald, Wallace) (Entered: 02/19/2020) |
| 02/19/2020 | 51 | MEMORANDUM in Support of 50 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by Wayne LaPierre. (McDonald, Wallace) (Entered: 02/19/2020) |
| 03/02/2020 | 52 | MOTION for Extension of Time to File Response/Reply as to 48 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim, 50 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim, 46 MOTION to Dismiss for Failure to State a Claim by David Dell'Aquila. (Attachments: # 1 Attachment Proposed Order)(Schuchardt, Elliott) (Entered: 03/02/2020) |
| 03/04/2020 | 53 | RESPONSE in Opposition re 48 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim, 50 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim, 46 MOTION to Dismiss for Failure to State a Claim filed by Lorannda Borja, Todd Chesney, David Dell'Aquila, Brent Weber. (Schuchardt, Elliott) (Entered: 03/04/2020) |
| 03/04/2020 | 54 | BRIEF filed by Lorannda Borja, Todd Chesney, David Dell'Aquila, Brent Weber re 53 Response in Opposition to Motion. (Schuchardt, Elliott) (Entered: 03/04/2020) |
| 03/05/2020 | | NOTICE TO FILER re DE# 48 , 49 , 50 & 51 : Pursuant to Local Rule 5.01, Certificates of Service shall identify by name the person served, what was served, the method of service, and date of service. Counsel did not include all Counsel on the certificates of service. Please FILE a conformed Certificate of Service for these documents. (gb) (Entered: 03/05/2020) |
| 03/05/2020 | 55 | CERTIFICATE of service of prior filings filed by Wayne LaPierre, NRA Foundation, Inc. re 51 Memorandum in Support filed by Wayne LaPierre, 48 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by National Rifle Association of America, 49 Memorandum in Support filed by National Rifle Association of America, 50 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by Wayne LaPierre. (McDonald, Wallace) (Entered: 03/05/2020) |
| 03/09/2020 | 56 | Consent MOTION for Extension of Time to File Response/Reply as to 46 MOTION to |

| | | |
|---|---|---|
| | | Dismiss for Failure to State a Claim by NRA Foundation, Inc. (Harbison, William) (Entered: 03/09/2020) |
| 03/09/2020 | 57 | Consent MOTION for Extension of Time to File Response/Reply as to 54 Brief (non-appeal), 53 Response in Opposition to Motion, by Wayne LaPierre, National Rifle Association of America. (McDonald, Wallace) (Entered: 03/09/2020) |
| 03/11/2020 | 58 | ORDER: Pending before the Court are Plaintiff's Motion for Extension of Time to File Response to Defendants' Motion to Dismiss ( 52 ), Defendant NRA Foundation, Inc.'s Motion for Extension of Time to File Reply ( 56 ), and Defendant National Rifle Association of Americas Motion for Extension of Time to File Reply ( 57 ). Plaintiff filed his Response within the time frame prescribed. Plaintiff's Motion is therefore DENIED as moot. Defendants' motions are GRANTED. Defendants' replies must be filed on or before March 18, 2020. Signed by District Judge William L. Campbell, Jr on 3/11/2020. (gb) (Entered: 03/11/2020) |
| 03/11/2020 | 59 | ORDER: By Order entered August 8, 2019 ( 4 ), this case was referred to the Magistrate Judge for consideration of all pretrial matters, including submission of proposed findings of fact and recommendations for disposition of dispositive motions. The previous referral Order ( 4 ) is hereby VACATED, and the case is REFERRED to the Magistrate Judge for further case management in accordance with Local Rule 16.01. Signed by District Judge William L. Campbell, Jr on 3/11/2020. (gb) (Entered: 03/11/2020) |
| 03/18/2020 | 60 | REPLY to Response to re 46 MOTION to Dismiss for Failure to State a Claim filed by NRA Foundation, Inc. (Harwell, Aubrey) (Entered: 03/18/2020) |
| 03/18/2020 | 61 | REPLY to Response to re 50 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by Wayne LaPierre. (McDonald, Wallace) (Entered: 03/18/2020) |
| 03/18/2020 | 62 | REPLY to Response to re 48 MOTION to Dismiss for Lack of Jurisdiction MOTION to Dismiss for Failure to State a Claim filed by National Rifle Association of America. (McDonald, Wallace) (Entered: 03/18/2020) |
| 09/30/2020 | 63 | MEMORANDUM OPINION OF THE COURT. Signed by District Judge William L. Campbell, Jr on 9/30/2020. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(kc) (Entered: 09/30/2020) |
| 09/30/2020 | 64 | ORDER: Pending before the Court are motions to dismiss the Second Amended Complaint 43 filed separately by each of the three defendants: the National Rifle Association of America ("NRA"), the NRA Foundation, Inc., and Wayne LaPierre 46 , 48 and 50 . For the reasons stated in the accompanying Memorandum, the NRA Foundation's Motion to Dismiss 46 is GRANTED; Wayne LaPierre's Motion to Dismiss 50 is GRANTED; and the NRA's Motion to Dismiss 48 is GRANTED in part, DENIED in part. Signed by District Judge William L. Campbell, Jr on 9/30/2020. (kc) (Entered: 09/30/2020) |
| 10/03/2020 | 65 | ORDER: An Initial Case Management Conference is scheduled for November 6, 2020 at 9:30 a.m. via telephone. All parties shall call 1-877-336-1831, and when prompted for the access code, enter 7039387# to participate in the Case Management Conference. Signed by Magistrate Judge Jeffery S. Frensley on 10/3/2020. **(DOCKET TEXT SUMMARY ONLY-ATTORNEYS MUST OPEN THE PDF AND READ THE ORDER.)**(vh) (Entered: 10/05/2020) |
| 10/19/2020 | 66 | ANSWER to 43 Amended Complaint by National Rifle Association of America. (McDonald, Wallace) (Entered: 10/19/2020) |

# **EXHIBIT D**

| Persons Likely to Possess Relevant Knowledge And / Or Documents – Dell'Aquila | |
|---|---|
| **Name** | **Location** |
| Ackerman McQueen, Inc. | Oklahoma City, OK |
| Allegiance Creative Group, Corporate Representative | Fairfax, VA |
| Associated Television International, Corporate Representative | Los Angeles, CA |
| Atlantis Resort, Corporate Representative | Paradise Island, Bahamas |
| Bach, Scott | Newfoundland, NJ |
| Boren, Dan | Edmond, OK |
| Borja, Lorannda | Lawrenceburg, TN |
| Brown, Robert | Boulder, CO |
| Brownell, Pete | Montezuma, IA |
| Butz, Dave | Swansea, IL |
| Chesney, Todd | Chino Valley, AZ |
| Childress, Richard | Lexington, NC |
| Concord Social & Public Relations, Corporate Representative | Fairfax, VA |
| Cors, Alan | McLean, VA |
| Cotton, Charles | Dallas, TX |
| Cox, Christopher | Alexandria, VA |
| Coy, David | Adrian, MI |
| Cremer, Lacey | Dallas, TX |
| Cummins, Emily | Virginia Beach, VA |
| CXIII Rex, Corporate Representative | Alexandria, VA |
| Dell'Aquila, David | Nashville, TN |
| Froman, Sandra | Tucson, AZ |
| Gallagher, Coleen | New Buffalo, MI |
| Golob, Julie | Kearney, MO |
| Greenberg, Jesse | Dallas, TX |
| GS2 Enterprises, Corporate Representative | Woodland Hills, CA |
| Hammer, Marion | Tallahassee, FL |
| Hart, Steve | Washington DC |
| HomeTelos, LP, Corporate Representative | Dallas, TX |
| International Order of St. Hubertus, Corporate Representative | Washington DC |
| Inventive Incentive & Insurance Services Inc., Corporate Representative | Woodland Hills, CA |
| Keene, David | Washington, MD |
| Knight, Timothy | Signal Mountain, TN |
| Landini Brothers Restaurant, Corporate Representative | Alexandria, VA |

| | |
|---|---|
| Landini, Noe | Alexandria, VA |
| LaPierre, Susan | Great Falls, VA |
| Lee, Willes | Fairfax, VA |
| Ling, Il | Meridian, ID |
| Makris, Anthony | Alexandria, VA |
| Maloney, Sean | Liberty Township, OH |
| Marcellin, Michael | Leesburg, VA |
| Martin, Edmund | Edmond, OK |
| Martin, Henry | Dallas, TX |
| McKenzie, David | Los Angeles, CA |
| McKenzie, Laura | Los Angeles, CA |
| McQueen, Katie | Oklahoma City, OK |
| McQueen, Revan | Oklahoma City, OK |
| Meadows, Carolyn | Atlanta, GA |
| Membership Marketing Partners, Corporate Representative | Fairfax, VA |
| Mercury Group, Inc. | Oklahoma City, OK (AMc headquarters) |
| North, Oliver | Bluemont, VA |
| Nosler, Robert | Bend, OR |
| Nugent, Shemane | China Spring, TX |
| Nugent, Ted | China Spring, TX |
| Olson, Lance | Marengo, IA |
| Omni Air Transport, Corporate Representative | Hartford, CT |
| Phillips, Woody | Dallas, TX |
| Plunkett, Jaqueline | Washington DC |
| Porter, James | Birmingham, AL |
| Powell, Josh | New Buffalo, MI |
| Rendon Group, Corporate Representative | Washington, DC |
| Richards, Nancy | Dallas, TX |
| RSM, Corporate Representative | Chicago, IL |
| Schmeits, Ron | Raton, NM |
| Schneider, Esther | Driftwood, TX |
| Sheets, Wayne | Grasonville, MD |
| Sloan, Gurney | Colorado Springs, CO |
| SpiritWild Productions, Corporate Representative | China Spring, TX |
| Stanford, Gayle | Woodland Hills, CA |
| Sterner, Colleen | Merna, NE |

| | |
|---|---|
| Sterner, Terry | Merna, NE |
| Under Wild Skies, Corporate Representative | Alexandria, VA |
| Valinski, David | Palm Coast, FL |
| Weaver, Kyle | Missoula, MT |
| Weber, Brent | Andover, KS |
| Winkler, Brandon | Dallas, TX |
| Winkler, William | Edmund, OK |

**DECLARATION OF IAN SHAW IN SUPPORT OF THE NATIONAL RIFLE
ASSOCIATION'S MOTION TO TRANSFER CASES FOR CONSOLIDATED
<u>PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407</u>**

I, Ian Shaw, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.       I am over twenty-one years of age, and fully competent to make this declaration. I am an associate with the law firm of Brewer, Attorneys & Counselors ("<u>BAC</u>"), 1717 Main Street, 59th Floor, Dallas, Texas 75201. I am counsel for Grant Stinchfield in the matter captioned <u>Ackerman McQueen, Inc. v. Grant Stinchfield</u>, Civ. Case No. 3:19-cv-03016-X (N.D. Tex.) (the "<u>Stinchfield Litigation</u>"). I respectfully submit this declaration in support of the National Rifle Association of America (the "<u>NRA</u>")'s Motion to Transfer Cases for Consolidated Pre-Trial Proceedings Pursuant to 28 U.S.C. § 1407 (the "<u>Consolidation Motion</u>"). Unless otherwise stated, I have personal knowledge of all matters stated herein.

2.       Attached as Exhibit A hereto is true and correct copy of the Plaintiff's Original Complaint in the Stinchfield Litigation, which sets forth the plaintiff's claims therein. Attached as Exhibit B hereto is a true and correct copy of the Defendant's Amended Answer to Plaintiff's Original Complaint, which sets forth Stinchfield's affirmative defenses. These documents collectively constitute the operative pleadings in the Stinchfield Litigation. Attached as Exhibit C hereto is a true and correct copy of the current docket summary for the Stinchfield Litigation, generated via PACER/ECF.

3.       The Stinchfield  Litigation is currently in the discovery phase.  A scheduling order was entered on April 17, 2020, a true and correct copy of which is attached hereto as Exhibit D. A protective order was entered on October 16, 2020, and it is anticipated that the voluminous fact discovery sought by both sides will move forward shortly now that parties producing documents

have the ability to make confidentiality designations. Attached hereto as Exhibit E is a list of witnesses likely to possess facts or documents relevant to the Stinchfield Litigation.

4.  Significant issues of fact in the Stinchfield Litigation include: the NRA's dealings with its former public relations agency, Ackerman McQueen, Inc. ("Ackerman"),[1] including what Ackerman disclosed to the NRA and what NRA executives knew;[2] the nature of the expenses that Ackerman billed to the NRA[3] and the authorization obtained therefor.[4] It is expected that discovery will overlap considerably with discovery in other NRA-related litigation including: People v. Nat'l Rifle Ass'n of Am., et al., Index No. 451625/2020 (Sup. Ct. N.Y. Cnty.) (the "NYAG State Action") and Nat'l Rifle Ass'n of Am. v. James, Civ. No. 1:20-cv-00889 (N.D.N.Y.) (the "NYAG Federal Action" and, collectively with the NYAG State Action, the "NYAG Litigation"); Dell'Aquila v. LaPierre et al., Civ. Case No. 3:19-cv-00679 (M.D. Tn.) (the "Dell'Aquila Litigation"); and, Nat'l Rifle Ass'n of Am. v. Ackerman McQueen, Inc., et al., Civ. Case No. 3-19-cv-02074-G (N.D. Tex.) (the "Ackerman Litigation").

5.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of October 2020 in Dallas, Texas.

/s/ _____

Ian Shaw

---

[1] See Ex. A ¶¶ 1-2; 9-22; See Ex. B ¶¶ 1-2, 9-22.

[2] See Ex. A ¶¶ 22-29.

[3] See Ex. A ¶¶ 11,14, 23, 26-30;  See Ex. B ¶¶ 23-25.

[4] See Ex. A ¶¶ 14-15, 22-24, 30; See Ex. B ¶¶ 24, 30.

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC. | § | |
| | § | |
| v. | § | Case No. _____ |
| | § | |
| GRANT STINCHFIELD | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff, Ackerman McQueen, Inc. ("**AMc**"), files its Original Complaint against

Defendant, Grant Stinchfield ("**Defendant**"), as follows:

**PRELIMINARY STATEMENT**

1.     This is an action to recover money damages based on false and disparaging

statements regarding AMc made by Defendant in order to hurt AMc's standing, and

improve the National Rifle Association of America, Inc.'s (the "NRA") standing, in the

eyes of the American public.  The instant case is driven by the NRA, its increasing

vulnerable public face, Wayne LaPierre, and their sinister and intentional efforts to

destroy AMc's business.  When the NRA decided to sever ties with AMc earlier in 2019,

the NRA pulled the plug on its online video channel, NRATV, where Defendant served

as a host of a current events program called "Stinchfield."   At the time, Defendant

lamented the demise of NRATV, stating publicly that he was disheartened to see the end

of NRA's live programming and that he had "never been so proud to work for an

organization than I have at NRA TV."

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 1**

2.     Now, however, Defendant has now decided to align himself with the NRA and LaPierre, whose smear campaign against AMc is designed to deflect attention from the civil investigation by the New York State Attorney General into the NRA's and LaPierre's spending habits, which place LaPierre's livelihood and the NRA's nonprofit tax-exempt status in jeopardy.  Defendant now finds himself right in the trough with the NRA and LaPierre, having publicly disseminated maliciously false statements regarding AMc and its business in support of the ongoing smear campaign.  Defendant's wrongful conduct, which includes publication to the media of demonstrably false accusations about AMc, constitutes libel *per se* and business disparagement and has caused financial and reputational injury to AMc.  AMc accordingly seeks compensation for all damages incurred.

## NOTICE OF RELATED CASE

3.     In accordance with Local Rule 3.3, AMc hereby provides notice that there is a related case, as defined by LR 3.3(b)(1), (b)(2), or (b)(3).  The related case is Case No. 3:19-cv-02074-G, styled *National Rifle Association of America v. Ackerman McQueen, Inc., et al.*, and is pending before the Hon. A. Joe Fish.

## PARTIES

4.     AMc is a for-profit business corporation organized under the laws of the State of Oklahoma with its principal place of business located in Oklahoma City,

PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 2

Oklahoma.  It is an advertising and public relations agency that, until recently, counted the NRA as one of its clients.

5.      Defendant is an individual who resides in the City of Dallas, Dallas County, Texas.  Until recently, he was employed by AMc, where he was a host on the NRA's streaming channel, NRATV.  He may be served with process at his residence located at 6217 Goliad Ave., Dallas, Texas 75214.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

7.      This Court has personal jurisdiction over Defendant because he is domiciled in this District, which is also where the events giving rise to this complaint took place.

8.      Venue is proper in this Court pursuant to 28 U.S.C § 1391 because a substantial part of the events or omissions giving rise to AMc's claims occurred in this District.

## FACTUAL BACKGROUND

**A.      The relationship between AMc and the NRA.**

9.      The NRA and AMc worked together since the 1980s.  Over that time, the NRA engaged AMc to perform public relations and strategic marketing services,

PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 3

including media planning and placement and management of digital media platforms and websites.  For almost four decades, AMc served the NRA expertly, helping the gun rights organization navigate troubled political and societal waters as its principal communication strategist and crisis manager.  AMc helped create some of the NRA's most memorable messaging, including former NRA president Charlton Heston's famous rallying cry: "I'll give you my gun when you pry it from my cold, dead hands."

10.    The relationship between AMc and the NRA was managed at the direction of LaPierre, with input from his AMc counterpart, Angus McQueen, the long-time CEO of AMc.  LaPierre, a one-time Democratic legislative aide, began his NRA career in 1977 as a lobbyist.  Described in news reports as "reserved" and "awkward," he seemed ill suited to head what many describe as a strident advocacy group.  Nevertheless, he was the NRA's choice to lead the organization, where he has served as Executive Vice President and Chief Executive since 1991.

**B.    The creation and evolution of what became NRATV.**

11.    Beginning in the early 2000s, AMc assisted the NRA in the development of its own branded media platform, in addition to placing advertisements in traditional media.  It began with the NRA's webcast, NRA Live, in 2000.  In 2004, the NRA began offering NRA News, which provided video content available via smartphone applications, web browsers, and streaming devices that was billed as "the most comprehensive video coverage of Second Amendment issues, events, and culture

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 4**

anywhere in the world."  The platform expanded to include various targeted networks such as NRA Women, a network designed for female gun enthusiasts, and NRA Freestyle, a network that featured TV shows and a daily blog aimed at reaching the new generation of gun owners in America.

12.    Throughout 2015, AMc worked to create both a "Super Channel" that could be streamed online and a program called "Freedom's Safest Place," a newly created campaign developed by AMc to offset the loss of earlier profitable programs that would be available on the "Super Channel" as well as on national television.

13.    In 2016, AMc and the NRA launched NRATV, an expanded version of the platform that brought most of these ventures under the same umbrella and was frequently perceived by the public as the "voice" of the NRA.  NRATV, suddenly now the scourge of the NRA, LaPierre, and Defendant, was created and expanded at the sole direction of LaPierre.  It was supposed to be the future of the NRA's modern media presence—a dynamic, slickly produced digital platform that would reach millions of viewers and develop more dues-paying members for the NRA.

14.    Throughout NRATV's evolution, AMc developed and administered the network's content (subject to NRA approval) and hired its high-profile talent (at NRA's request with salary and other costs reimbursed and payment guaranteed by the NRA). Within a short period, AMc – at LaPierre's request and with his approval – hired or contracted with several locally, regionally, and/or nationally recognized talents,

including Defendant, whose job it was to deliver hard-hitting commentary on Second Amendment and American freedom issues.

**C.     The NRA touted NRATV as one of its most successful projects.**

15.     For several years, the NRA touted NRATV to its members and directors as one of its proudest and most successful projects.  Indeed, LaPierre, during his frequent visits to Dallas and other locations to meet with AMc personnel and discuss NRATV analytics, repeatedly told AMc personnel how well the network was performing and that the NRA would continue to support NRATV, financially and otherwise.  Not only did LaPierre sign off on every performance metric of NRATV, he also made numerous presentations to his Board in support of NRATV that were, from all appearances, favorably received.  Indeed, one board member observed, "If you took a poll of most board members, they'll tell you they like NRATV."  NRATV was going live multiple times throughout the day with messaging intended to counter the narrative coming from gun control groups and others.

**D.     Defendant was proud of AMc and NRATV, too.**

16.     Defendant was a proponent of AMc and NRATV, too.  He disparages and defames AMc now, yet he previously said that "working for [AMc] is truly an honor" and that he was "proud to be part of an amazing organization."

17.     Defendant was the host of a current events program on NRATV for which he seemed to be very proud.  He routinely retweeted clips from the program on his

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 6**

personal Twitter account and posted them on his Facebook page.  He liked to brag about the viewership of NRATV, too.  As one example, after NRATV posted a clip of Defendant interviewing Sig Sauer's Tom Taylor, Defendant sent Mr. Taylor an email stating, "Did you see this clip of one of our segments?  Its got 240K views!"

18.     He also praised the mission of NRATV, noting that *The New York Times*, *The Washington Post*, MSNBC, and CNN "know that to get to the Second [Amendment], they have to go straight through the NRA, and who do you think is on the front lines of that information war?  NRATV."  He defended NRATV's messaging as well.  When the NRA decided to pull the plug on NRATV citing concerns about NRATV's programming becoming too far removed from the NRA's core mission of defending the Second Amendment, Defendant issued his own statement: "If you think I'm too blunt, our words are too strong, quit your whining, get serious about this fight or move over and let someone else fight for you."  "Make no mistake," he continued, "all the issues we face today, from immigration to spending to the battle over our guns to the war on terror and free speech, they are all connected.  If you only fight for the Second [Amendment], you ignore the others."

**E.      Defendant becomes a pawn in the NRA's and LaPierre's game.**

19.     It is curious then that Defendant has now decided to align himself with the NRA and LaPierre and their smear campaign against NRATV.  His allegiance to the NRA seemingly increased in the summer of 2019, after the NRA cancelled NRATV, doing away

Defendant's lucrative salary in the process.  In July 2019, Defendant requested to be released from his employment with AMc, as it was posing a problem for a potential new employer – an employer he has since admitted was the NRA.  On October 4, 2019, he resigned from his employment with AMc, purportedly with an effective date of August 31, 2019, to become a pawn in the NRA's and LaPierre's game.

20.     To that end, AMc recently received a copy of an "affidavit" signed by Defendant on December 10, 2019, in which he makes numerous false statements about AMc.  Curiously, the so-called affidavit was not filed with a court of law or other tribunal.  Instead, it was sent directly to the media, and appears to have been created for the sole purpose of disseminating it to the media in order to further defame AMc.

21.     Defendant states in the so-called affidavit that "PowerPoint presentations, digital dashboards, and other 'metrics' that I understand were presented by Ackerman executives to describe the performance and viewership of NRATV . . . were distorted and did not tell the whole story of how few actual live viewers we had."  Of course, this is the same person who bragged to Sig Sauer's Tom Taylor about the 240,000 views of their interview together using the very same analytics he now decries.

22.     In truth, the analytics are not only legitimate, they are impressive across all of the same platforms that media companies everywhere use to judge success in engagement and reach.  Periodic reports containing detailed analytics were regularly provided to LaPierre from 2016 through May 13, 2019.  LaPierre himself personally

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 8**

approved the development of a customized dashboard that accumulated data from all the platforms running NRATV content.  NRA and LaPierre had the opportunity to audit the analytics in any way that they wished.  The NRA even sent Todd Grable, the NRA's head of membership, to review AMc's analytics and methodology in October 2018, after which the NRA approved the AMc budget for 2019.

23.     The notion that AMc's metrics presented a distorted view of live viewership is completely false.  The analytics presented to the NRA accurately tracked metrics such as engaged views, completed views, total views, and age and gender demographics.  And, while Defendant claims the analytics presented a distorted picture of live viewership, the NRA never even requested a metric regarding "live viewership."  The NRA understood that the value of NRATV was based on engagement and reach.[1]

24.     Defendant's written statement also claims that AMc "aggressively sought to limit interaction between NRATV talent and NRA leadership" and that the late Angus McQueen instructed Defendant that AMc, not the NRA, would set the agenda for NRATV's programming, determine the messaging, and decide how NRATV would

_____

[1] Notably, some of the presentations contained media valuations for on-air talent, including Dana Loesch and Dan Bongino, both of whom regularly appeared as guests on Fox News, CNN, other media outlets.  Defendant was never included as part of the valuations of on-air talent because LaPierre viewed Defendant as a loose cannon who could not be trusted to do unscripted media appearances.  LaPierre's concerns appeared to be well founded.  Just as an example, Defendant and NRATV came under severe scrutiny in 2017 after Defendant made a so-called "joke" encouraging North Korea to launch a nuclear attack on Sacramento, California.

PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 9

broadcast it.  Defendant even claims that Mr. McQueen went so far as to tell him, "the NRA is not your boss – I am."

25.     The documented proof, however, shows that Defendant was grateful for and respected the late Mr. McQueen's leadership and the manner in which NRATV's programming was developed.  In fact, Defendant himself admitted that "Angus has always said he would never make me read anything I'm not comfortable with." Furthermore, Defendant was allowed to generate his own content and pitch ideas to the NRA, often times with direct input from and interaction with the NRA's leadership.  He was given autonomy to conduct his own research, rewrite scripts that others prepared for him, set up meetings with potential sponsors, and the like.  Reality is a far cry from the portrait Defendant attempts to paint in his written statement regarding the work environment at NRATV.

26.     Defendant also states in his written statement that he began to question the cost-effectiveness of live programming in late 2017 and into 2018, but Mr. McQueen "harshly dismissed" the idea of using targeted videos on YouTube, Facebook, and Twitter in favor of expanding the footprint of NRATV.  He claims Mr. McQueen did so because AMc "was intent upon transforming itself from an ad agency into a live television newsroom, and using the NRA to finance this goal."

27.     The documented proof shows that Defendant had little concern about the cost-effectiveness of NRATV's live programming, however, and instead was mainly

concerned with increasing NRATV's costs by way of increasing his own salary. The main cost of live programming is the talent, i.e., the salaries and other compensation paid to the on-air personalities, including Defendant. At NRATV, those costs were well into seven figures. Defendant feigns concern about NRATV becoming more cost-effective, yet Defendant asked for an increase in pay in late 2017, with a one-year guaranteed salary. Then, in late 2018, he asked for yet another raise, this time requesting a three-year guaranteed deal with 15% automatic raises built in each year. Thus, he did not express concerns about NRATV's costs. He was seeking to increase NRATV's live programming costs by demanding more and more money.

28.    The charges for live streaming that Defendant claims he was concerned about are miniscule in comparison to the amounts paid to on-air talent. Additionally, the pre-produced programming that Defendant claims he fought for actually costs more to produce because you not only have the costs of the talent, but the post-production editing expenses as well. Defendant's hollow cries regarding the expenses of live streaming simply do not ring true.

29.    In addition, costs are not the only consideration. Live programming was the quickest way to get messaging out after a tragedy. The analytics presented to NRA showed that NRATV, including Defendant's program, became a go-to source for information after the Parkland school shooting, when an armed school resource officer

stopped a school shooting in Maryland, and after other similar events of national importance.

30.     Furthermore, AMc did not seek to expand NRATV's live programming with the intent of transforming AMc into a newsroom, much less with the intent of financing its metamorphosis using the NRA's money.   As indicated above, AMc expanded the footprint of NRATV at the NRA's and LaPierre's express direction and approval, including approval of NRATV's budget.

31.     Lastly, Defendant's written statement contains false and disparaging statements regarding AMc's position with respect to two programs created by the NRA, Carry Guard and School Shield.  Carry Guard was designed to provide concealed-carry insurance and firearms training for its subscribers.  School Shield is the NRA's program for providing best practices in security infrastructure, technology, personnel, training, and policy to schools.  Defendant contends in his written statement that AMc is now disparaging the two programs, whereas AMc used to be an enthusiastic proponent of the programs.

32.     The impetus for Defendant's statement in this regard is a pleading filed by AMc in a separate lawsuit involving the NRA, LaPierre, AMc, and others.  AMc noted in its pleading that it began to have concerns about the NRA's direction under LaPierre's leadership beginning in 2018, after the NRA engaged AMc to develop the training component of the Carry Guard program and provide public relations and branding

support.  Again, the program was designed to have two components: (a) a training component, which was AMc's responsibility to develop, and (b) a liability insurance component, which was entirely the NRA's responsibility.  The NRA's Josh Powell was trying to get AMc to promote the insurance portion of the program, but was simultaneously referring to Carry Guard as nothing but an "insurance scheme."  AMc wanted nothing to do with a "scheme."  AMc was and always had been an enthusiastic proponent of Carry Guard's training programs, however.  Indeed, Defendant himself ran a segment on NRATV called "Carry Guard Daily" that focused on the training aspect of the Carry Guard program, which LaPierre and other executives systematically disassembled.

33.      Defendant also misconstrues AMc's position with respect to School Shield. School Shield is the program the NRA developed in the wake of the Sandy Hook tragedy in 2012 to provide schools, through grants from the NRA, with threat assessments to determine the school's vulnerability, plans to make schools more secure, and help to locate qualified armed safety officials.  AMc has not disparaged School Shield.  AMc has expressed frustration with respect to way the NRA treated School Shield.

34.      The NRA and LaPierre, for a time, showed no intention to execute the program's mission.  Although the NRA raised millions of dollars through the program, School Shield had issued a paltry five grants as of the end of 2014.  The NRA was ignoring School Shield's mission, causing AMc to express reservations about promoting

something that the NRA was failing to deliver as promised.  When Oliver North became

President of the NRA in 2018, however, he demanded that the NRA "make it real."  At

that point, AMc became a willing participant in promoting the School Shield program.

The assertion that AMc is disparaging Carry Guard and School Shield is, therefore, false.

**E.     The motivation for Defendant's maliciously false written statement.**

35.     Importantly, although styled as an affidavit, Defendant's maliciously false

written statement has not been filed in connection with any type of lawsuit.  Rather,

Defendant, in conjunction with the public relations arm of the NRA's law firm, Brewer

Attorneys & Counselors, published the affidavit directly to the press as part of the smear

campaign against AMc.  In fact, the recipients of the written statement used it to generate

negative press about AMc just days after Defendant signed it.

36.     For example, *The Daily Beast* ran an article on December 18, 2019, under the

headline: "NRATV Wanted to Become a 24/7 Newsroom Using NRA Funds: Ex-Host."[2]

The article quotes directly from Defendant's written statement, including the portions in

which Defendant falsely stated that AMc sought to turn itself into a live television

newsroom using NRA funds, sought to limit NRATV's interaction with the NRA and

controlled the agenda for programming, and prepared metrics for NRA leadership that

were "distorted" and failed to "tell the whole story of how few live viewers" NRATV

---

[2]     Available    at    https://www.thedailybeast.com/nratv-wanted-to-become-a-real-newsroom-using-nra-funds-says-ex-host-grant-stinchfield (last accessed Dec. 19, 2019).

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 14**

actually had. *Newsweek* ran a similar story the same day that quoted directly from Defendant's written statement.[3]

37.     Defendant's past actions regarding NRATV, detailed above, baldly contradict his current stance regarding AMc and NRATV.  The contrived notion that NRATV was a failed endeavor for which AMc should be held accountable has only lately emerged as part of the NRA's and LaPierre's assault on AMc – an assault that is designed to deflect attention from LaPierre's gross financial mismanagement of the NRA and the New York State Attorney General's civil investigation and potential criminal charges against the NRA and LaPierre.

38.     Defendant's written statement, which was disseminated directly to the press, is simply the latest of LaPierre's and Brewer's inflammatory public relations maneuvers.  Over the course of several months beginning with the NRA's retention of Brewer in 2018, the NRA has taken an increasingly aggressive stance against its long-time vendor, AMc.  LaPierre set about to intentionally destroy the relationship between the parties, not only through the conduct of vexatious litigious activity, but through the ouster of AMc in favor of the Brewer firm's public relations/crisis management arm.

39.     The NRA, with Brewer at the helm, has moved from a non-profit gun-rights organization to a serial litigant who is determined to litigate its case it the media rather

---

[3] Available at https://www.newsweek.com/nratv-ackerman-mcqueen-nra-guns-1477939 (last accessed Dec. 19, 2019).

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 15**

than in the courtroom.  The NRA has filed numerous different lawsuits against AMc and others in recent months, and each has been accompanied by carefully orchestrated leaks and false, self-serving press releases.  Defendant's written statement is but another transparent attempt to deflect attention from the NRA's own factual and legal shortcomings and to wreak havoc within an advertising organization with which the Brewer public relations machine now competes.

## CAUSES OF ACTION

### Count One – Defamation

40.     AMc incorporates the paragraphs above as though copied verbatim herein.

41.     As set forth hereinabove, Defendant intentionally and maliciously defamed AMc, a private figure, by falsely accusing AMc of (a) presenting "distorted" analytics to the NRA in order to (b) improperly use (i.e., steal) the NRA's funds to transform itself into a "live television newsroom" and otherwise use the NRA's funds in an inefficient, wasteful manner and (c) wrest control of the NRATV platform and its messaging to the detriment of the NRA.

42.     Defendant published these accusations as statements of fact, and did so publicly to third parties, including members of the press.  Alternatively, Defendant published the statements to the Brewer PR machine under circumstances where a reasonable person would recognize that his actions created an unreasonable risk that the defamatory statements would be communicated to other parties.

43.     Defendant is a non-media defendant, as he was not acting as a member of the print, broadcast, or electronic media at the time.

44.     In the maliciously false written statement, Defendant identified AMc directly by name, and the accusations of commission of a criminal act are defamatory per se.  Defendant's false accusations have exposed AMc to public scrutiny and ridicule, have wrongfully impeached AMc's honesty, integrity, and reputation, and caused AMc to suffer financial injury.  Furthermore, they have injured AMc in its professional capacity as an advertising and public relations agency.

45.     The subject matter of Defendant's false factual statements is a decidedly private matter, despite the NRA's, LaPierre's, and Brewer's attempts to make it a matter of public concern.

46.     Defendant published his false statements maliciously, with knowledge of or with reckless disregard for their falsity.  Alternatively, Defendant published them negligently.

47.     AMc has suffered injury as a direct result of Defendant's false statements in a yet undetermined amount, for which AMc seeks recovery.

### Count Two – Business Disparagement

48.     AMc incorporates the paragraphs above as though copied verbatim herein.

49.     As set forth above, Defendant published false and disparaging statements about AMc's economic interests.

**PLAINTIFF'S ORIGINAL COMPLAINT – PAGE 17**

50.     He published them directly to third parties, including members of the press, or he published them to the Brewer PR machine under circumstances where a reasonable person would recognize that his actions created an unreasonable risk that the disparaging statements would be communicated to other parties.

51.     The statements were disparaging because they cast doubt about the quality of AMc's services and the character of its business, and Defendant knew that his statements would cast doubt and create a false and defamatory impression.

52.     The statements are demonstrably false, as detailed above.

53.     Defendant knew the statements were false, acted with reckless disregard for whether the statements were true, acted with ill will, and/or intended to interfere with AMc's economic interests.

54.     Defendant communicated the statements without privilege.

55.     The publication of the disparaging statements has caused actual and special damages, including but not limited to expenses of counteracting the publication.

56.     AMc has suffered injury as a direct result of Defendant's false statements in a yet undetermined amount, for which AMc seeks recovery.

## DEMAND FOR JURY TRIAL

57.     AMc hereby demands a trial by jury on all issues of fact to which it is entitled to a jury trial in this action.

## PRAYER

58.     For all the foregoing reasons, AMc requests that this court enter judgment

in its favor and award it the following relief against Defendant:

   a.     actual damages in any amount to be proven at trial;

   b.     special damages, including loss of past and future income;

   c.     exemplary damages;

   b.     costs of court;

   c.     pre-judgment and post-judgment interest at the highest lawful rate; and

   d.     such other relief; at law or in equity, to which AMc may be justly entitled.

Dated: December 20, 2019.

Respectfully submitted,

/s/ Brian Vanderwoude

**Jay J. Madrid, Esq.**
Texas Bar No. 12802000
madrid.jay@dorsey.com
**G. Michael Gruber, Esq.**
Texas Bar No. 08555400
gruber.mike@dorsey.com
**J. Brian Vanderwoude, Esq.**
Texas Bar No. 24047558
vanderwoude.brian@dorsey.com
**Brian E. Mason, Esq.**
Texas Bar No. 24079906
mason.brian@dorsey.com

**DORSEY & WHITNEY LLP**
300 Crescent Court, Suite 400
Dallas, Texas 75201
(214) 981-9900 Phone
(214) 981-9901 Facsimile

**ATTORNEYS FOR PLAINTIFF**
**ACKERMAN MCQUEEN, INC.**

JS 44   (Rev. 06/17) - TXND (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Ackerman McQueen, Inc.

**DEFENDANTS**
Grant Stinchfield

**(b)**  County of Residence of First Listed Plaintiff   Oklahoma County, OK
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Dallas County, TX
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Dorsey & Whitney, LLP, 300 Crescent Court, Suite 400, Dallas, TX 75201, (214) 981-9900

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
        Plaintiff

☐ 3   Federal Question
        *(U.S. Government Not a Party)*

☐ 2   U.S. Government
        Defendant

☒ 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                 *and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment
     & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted
     Student Loans
     (Excludes Veterans)
☐ 153 Recovery of Overpayment
     of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product
     Liability
☐ 320 Assault, Libel &
     Slander
☐ 330 Federal Employers'
     Liability
☐ 340 Marine
☐ 345 Marine Product
     Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle
     Product Liability
☐ 360 Other Personal
     Injury
☐ 362 Personal Injury -
     Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury -
     Product Liability
☐ 367 Health Care/
     Pharmaceutical
     Personal Injury
     Product Liability
☐ 368 Asbestos Personal
     Injury Product
     Liability
**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal
     Property Damage
☐ 385 Property Damage
     Product Liability

### FORFEITURE/PENALTY
☐ 625 Drug Related Seizure
     of Property 21 USC 881
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards
     Act
☐ 720 Labor/Management
     Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical
     Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement
     Income Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal
     28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated
     New Drug Application
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff
     or Defendant)
☐ 871 IRS—Third Party
     26 USC 7609

### OTHER STATUTES
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC
     3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and
     Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/
     Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information
     Act
☐ 896 Arbitration
☐ 899 Administrative Procedure
     Act/Review or Appeal of
     Agency Decision
☐ 950 Constitutionality of
     State Statutes

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### CIVIL RIGHTS
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/
     Accommodations
☐ 445 Amer. w/Disabilities -
     Employment
☐ 446 Amer. w/Disabilities -
     Other
☐ 448 Education

### PRISONER PETITIONS
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate
     Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee -
     Conditions of
     Confinement

### IMMIGRATION
☐ 462 Naturalization Application
☐ 465 Other Immigration
     Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
      Proceeding
☐ 2  Removed from
      State Court
☐ 3  Remanded from
      Appellate Court
☐ 4  Reinstated or
      Reopened
☐ 5  Transferred from
      Another District
      *(specify)*
☐ 6  Multidistrict
      Litigation -
      Transfer
☐ 8  Multidistrict
      Litigation -
      Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A **CLASS ACTION**
   UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE   Fish
DOCKET NUMBER   3:19-cv-02074-G

DATE
12/20/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Brian Vanderwoude

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

# **EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **ACKERMAN MCQUEEN.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **GRANT STINCHFIELD,** | § | **CIVIL ACTION NO. 3:19-CV-03016-X** |
| | § | |
| **Defendant.** | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |

## DEFENDANT'S AMENDED ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT

Defendant Grant Stinchfield ("Stinchfield") submits this Answer to the Original Complaint (the "Complaint") filed by Plaintiff Ackerman McQueen ("Plaintiff" or "AMc"), wherein Stinchfield denies each and every allegation contained in the Complaint except as may be hereinafter admitted, qualified, or explained, and states and alleges as follows:

### I.     PRELIMINARY STATEMENT

Grant Stinchfield is a four-time Emmy Award winning investigative reporter who has never been sued for voicing the truth—until now.  In another pending litigation,[1] Stinchfield provided truthful testimony regarding the corrupt business practices of his former employer, the disgraced advertising agency AMc.   Unable to answer Stinchfield's testimony on its merits (let alone impeach his credibility), AMc filed this disingenuous lawsuit as a retaliatory gambit to

---

[1] *National Rifle Association of America v. Ackerman McQueen, Inc, Mercury Group, Inc, Henry Martin, and Jessee Greenberg*, Civil Action No.3:19-cv-02074-G (N.D.Tex.) (J. Fish).

silence Stinchfield and deter the dozens of other AMc employees from speaking the truth. Unfortunately for AMc, truth is a defense to defamation, and Mr. Stinchfield looks forward to litigating the truth about AMc's practices in this forum.

Importantly, even if Mr. Stinchfield had made a libelous statement—which he did not—AMc would be "libel proof" as a matter of law.  As a result of decades of malfeasance, recently exposed in other high-profile disputes, AMc's professional reputation is "so diminished that . . . it could not be further damaged."[2]   Indeed, even before its current disputes with the National Rifle Association of America (the "NRA"), AMc had significant reputational liabilities.   For example:

- In 1990, when AMc was the subject of a sex discrimination lawsuit filed by the Equal Employment Opportunity Commission.[3] The agency was accused of firing an employee because she was pregnant – and an adverse ruling against the agency was allowed to let stand by the U.S. Supreme Court.[4]

- Shortly thereafter, Ackerman endured an embarrassing string of public news reports, as it came under fire by a former Oklahoma County Commissioner for work product that was an "absolute embarrassment" to the people of Oklahoma County.[5]  And although its dogged efforts to expand, via mergers and otherwise, briefly bore fruit, Ackerman began to spiral into decline by the early 2000s.  It lost lucrative accounts, come under scrutiny by state regulators, and struggled to meet the demands of expanded overhead. Left in its wake were dozens of terminated employees, fleeing clients, and numerous shuttered offices.[6]

- In May 2003, Ackerman came under scrutiny by state regulators in Oklahoma.[7] The Attorney General of Oklahoma commissioned an independent audit of the agency's contract with the Oklahoma Tourism and Recreation Department, and

---

[2] *See McBride v. New Braunfels Herald-Zeitung*, 894 S.W.2d 6, 9 (Tex. App. 1994), *writ denied* (Mar. 30, 1995).

[3] *City Ad Agency named in Sex Discrimination Suit*, The Oklahoman, May 8, 1990.

[4] *City Firm's Job Firing Appeal Lost,* The Oklahoman, October 6, 1992.

[5] Randy Ellis, *Commissioner Cites Poor Grammar In City's Letter to Aspin*, The Oklahoman, April 20, 1993.

[6] Paul Monies, *City ad agency confirms loss of Six Flags account*, The Oklahoman, August 28, 2003.

[7] Carmel Perez Snyder, *Tourism Spending decisions draw criticism from auditors*, The Oklahoman, May 8, 2003.

found that Ackerman invoiced the state and received payments in advance of rendering professional services in violation of state purchasing laws.[8]

- Shortly thereafter, Ackerman would lose its largest commercial client, Six Flags of America.[9] Although the agency publicly clung to a failing narrative about the strong financial health of the agency, Ackerman immediately began closing international offices and terminating employees – by the dozens. Not surprisingly, when Ackerman learned that it lost the account despite its efforts to save it, Ackerman's CEO publicly disparaged Six Flags for parting ways with the agency, insisting that Six Flags had endured "rough years" and fired Ackerman because of Ackerman's criticisms of its product offerings.[10]

- A couple of years later, in 2006, the educational toy manufacturer Leap Frog abruptly ended its relationship with Ackerman.[11] This would mark the beginning of an unfortunate chapter in the history of Ackerman, as the agency's business and billing practices drew scrutiny from former clients—and still-existing ones.

- In 2007, AMc's business practices again generated negative headlines, when news outlets throughout Oklahoma reported that it had originated conflicting engagements with adverse stakeholders in a local power-plant dispute."[12]

Through it all, AMc's stalwart primary client, the NRA, remained with the agency, apparently reassured by Ackerman's expression of loyalty to the Association and its core advocacy. Unfortunately, in hindsight, concerns raised by other AMc clients had merit—indeed, AMc apparently took advantage of the NRA, too.

Thus in 2015, NRA board member Lt. Col. Robert K. Brown identified billing discrepancies relating to Ackerman's costs for the NRA print publication, *First Freedom*. At the same time, Lt. Col. Brown recognized that Ackerman was billing the NRA and its members tens of thousands of dollars for mysterious "out of pocket expenses with no further documentation."

---

[8] Oklahoma Tourism And Recreation Department Special Investigate Audit for the period July 1, 2001 Through October10, 2002.

[9] Mindy Charski, *The Thrills—and $90 Mil.—Are Gone*, Adweek, August 29, 2003.

[10] Richard Williamson, *The Ride's Far Form Over at Ackerman McQueen*, Adweek, August 2, 2004.

[11] Gregory Solman, *LeapFrog to TBWA/Chiat/Day*, Adweek, August 24, 2006.

[12] Ben Fenwick, *Ackerman McQueen handled ads for both sides of coal-plant issue*, Oklahoma Gazette, September 9, 2007.

Lt. Col. Brown later referred to AMc leadership as "vampires" for the agency's allegedly inflated bills.

In January 2017, the NRA hired a digital media expert, recruited from a major Silicon Valley technology company, to help the Association leadership to better assess AMc's claims relative to the agency's claim regarding NRATV— the digital streaming network developed by AMc for the NRA at which Defendant worked.  This expert's initial review of Ackerman's work determined the agency was likely charging the NRA significant fees and yet failing to deliver even rudimentary value. On February 7, 2017, in a meeting which became legend around AMc headquarters in Dallas, this expert asked basic, nonconfrontational questions that sought to explore AMc's approach to digital viewership metrics and monetization.   Unable to answer the expert's questions, Mr. Revan McQueen dismissed her with foul language and stormed out of the room.   By April 2017, this expert was being stonewalled by Ackerman for basic data and information required to perform Google Analytics for NRATV.

Needless to say, these events eventually culminated in multiple lawsuits by the NRA against AMc.  There, the NRA's allegations and evidence have captured the attention of former clients and members of the advertising community.

A representative of The American Clean Skies Foundation, a former Ackerman client, wrote the NRA in April 2019 to note that he "could relate" to accusations being made by the NRA against the agency. He noted that his "demands for detailed billing went ignored" for the Ackerman project in which he was involved. He reportedly was rebuffed when he inquired about salary information for "TV anchors" employed by Ackerman, as the agency exhausted nearly all of the money that was allocated for a nonprofit marketing plan to promote cleaner energy in the U.S. transportation and power sectors.  He observed that he was pleased to see "AM get called

on their practices finally" – a ringing endorsement of the claims being made by the NRA and allegations captured in Defendant's affidavit.

By May 2019, there was full throated recognition of the merits of the NRA's lawsuit against Ackerman – *from other Ackerman clients*.

Dan Boren is a former NRA board member who is President of Corporate Development for the Chickasaw Nation. The Chickasaw Nation is one of Ackerman's largest clients. Boren wrote an email, dated May 30, 2019, that recognized "Ackerman is in trouble on this one [the NRA lawsuit]. They can't produce the backup to the invoices and were allocating fully salary to these employees that may have been working on our accounts." In other words, a representative of an existing Ackerman client recognized the fraudulent billing practices of the agency.

By August 2019, Ackerman captured headlines for reportedly laying off more than 50 employees – many without sufficient severance pay despite their years of loyal service. [13]

Amid these controversies—and many others—Ackerman has lashed out at anyone who dared to question its practices. Ackerman refuses to answer for the claims made in Stinchfield's affidavit or the string of NRA lawsuits in which it is ensnared. Instead, it has attacked Defendant, the NRA, and the lawyers and advisors who are taking measures to protect the legal, regulatory and reputational interests of the NRA.

Against this backdrop, Stinchfield denies the allegations in the Complaint, and asserts various affirmative defenses, as follows.

1.    Stinchfield denies the allegations contained in paragraph 1.

2.    Stinchfield denies the allegations contained in paragraph 2.

---

[13] Betsy Woodruff, *NRA TV Creator Laid off Dozens After Slit From Gun Group: Lawyer*, The Daily Beast, August 28, 2019.

**DEFENDANT'S AMENDED ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT**                    **Page 5**

## II. NOITCE OF RELATED CASE

3.     Paragraph 3 contains statements of law to which no responsive pleading is required.  Stinchfield denies the remaining allegations contained in paragraph 3.

### III. PARTIES

4.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 4.

5.     Stinchfield admits to the allegations contained in paragraph 5.

### IV. JURISDICTION AND VENUE

6.     Paragraph 6 contains statements of law to which no responsive pleading is required.  To the extent any response is required, Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 6.

7.     Paragraph 7 contains statements of law to which no responsive pleading is required.  To the extent any response is required, Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 7.

8.     Paragraph 8 contains statements of law to which no responsive pleading is required.  To the extent any response is required, Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 8.

## V. FACTUAL BACKGROUND

**A.   The relationship between AMC and the NRA.**

9.      Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 9.

10.      Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 10.

**B.   The creation and evolution of what became NRA TV.**

11.      Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 11.

12.      Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 12.

13.      Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations and, on that basis, denies the allegations contained in paragraph 13.

14.      Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 14.

**C.     The NRA touted NRA TV as one of its most successful projects.**

15.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 15.

**D.     Defendant was proud of AMc and NRA TV, too.**

16.     Stinchfield denies the allegations that he disparages and defames AMc. Stinchfield admits to the remaining allegations in in paragraph 16.

17.     Stinchfield admits to the allegations in paragraph 17.

18.     Stinchfield admits to the allegations in paragraph 18.

**E.     Defendant becomes a pawn in the NRA's and LaPierre's game.**

19.     Stinchfield admits to resigning from AMc on October 4, 2019. Stinchfield denies the remaining allegations in paragraph 19.

20.     Stinchfield denies that his affidavit contains false statements. Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations and, on that basis, denies the allegations contained in paragraph 20.

21.     Stinchfield admits to the statement quoted from Defendant's affidavit. Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations and, on that basis, denies the allegations contained in paragraph 21.

22.      Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 22.

23.     Stinchfield admits that the analytics presented a distorted picture of "live real time viewership of his show."  Stinchfield is without knowledge or information sufficient to form a

belief as to the truth or falsity of the remaining allegations and, on that basis, denies the allegations contained in paragraph 23.

24.     Stinchfield admits to allegations in paragraph 24.

25.     Stinchfield denies the allegations contained in paragraph 25.

26.     Stinchfield admits to the allegations in paragraph 26.

27.     Stinchfield admits to asking for a raise. Stinchfield denies the remaining allegations in paragraph in 27.

28.     Stinchfield denies the allegations contained in paragraph 28.

29.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 29.

30.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 30.

31.     Stinchfield denies that the allegations in his affidavit are false and disparaging. Stinchfield admits to the remaining allegations in paragraph in 31.

32.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 32.

33.     Stinchfield denies the allegations that he misconstrued AMc's with respect to School Shield. Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations and, on that basis, denies the allegations contained in paragraph 33.

34.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 34.

**F.      The motivation for Defendant's maliciously false written statement.**

35.     Stinchfield denies the allegations in paragraph in 35.

36.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 36.

37.     Stinchfield denies the allegations in paragraph in 37.

38.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 38.

39.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 39.

**CAUSES OF ACTION**

**Count One- Defamation**

40.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 40.

41.     Stinchfield denies the allegations in paragraph in 41.

42.     Stinchfield denies the allegations in paragraph in 42.

43.     Stinchfield admits that he is a non-media defendant and his written affidavit was not written as a member of the print, broadcast, or electronic media at time in paragraph 43.

44.     Stinchfield denies the allegations in paragraph in 44.

45.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 45.

46.     Stinchfield denies the allegations in paragraph in 46.

47.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 47.

**Count Two- Business Disparagement**

48.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 48.

49.     Stinchfield denies the allegations in paragraph in 49.

50.     Stinchfield denies the allegations in paragraph in 50.

51.     Stinchfield denies the allegations in paragraph in 51.

52.     Stinchfield denies the allegations in paragraph in 52.

53.     Stinchfield denies the allegations in paragraph in 53

54.     Stinchfield denies the allegations in paragraph in 54.

55.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 55.

56.     Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 56.

## DEMAND FOR JURY TRIAL

57.     Paragraph 57 contains statements of law to which no responsive pleading is required.   To the extent any response is required, Stinchfield is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations and, on that basis, denies the allegations contained in paragraph 57. Additionally, Defendant herby demands a jury trial on all issues to which he is entitled to a jury trial in this action.

## PRAYER

58.     Plaintiff's Prayer sets forth requests for relief to which no responsive pleading is necessary.   To the extent any response is required, Stinchfield denies that Plaintiff is entitled to any relief from Stinchfield and further denies all allegations contained in paragraphs A–D of Plaintiff's Prayer.

## VI.AFFIRMATIVE DEFENSES

Stinchfield sets forth the following affirmative defenses.   Stinchfield does not intend to assume the burden of proof with respect to those matters as to which, pursuant to law, Plaintiff bears the burden.

59.     Plaintiff's claims are barred, in whole or in part, because the Complaint does not state a claim against Stinchfield upon which relief can be granted.

60.     Plaintiff's claims are barred, in whole or in part, by the litigation privilege doctrine.

61.    Plaintiff's claims are barred, in whole or in part by the substantial truth doctrine.

62.    Plaintiff's claims are barred, in whole or in part by the libel-proof doctrine.

63.    Plaintiff's claims are barred, in whole or in part by not pleading the required heighten burden as a public figure—actual malice.

64.    Plaintiff's claims are barred, in whole or in part by being liable for libel per se.

65.    Stinchfield reserves the right to amend this Answer based on information learned through discovery

Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

By:  /s/ *William A. Brewer III*
      William A. Brewer III
      State Bar No. 02967035
      wab@brewerattorneys.com
      Ian Shaw
      State Bar No.24117041
      ins@brewerattorneys.com
      1717 Main Street, Suite 5900
      Dallas, Texas 75201
      Telephone: (214) 653-4000
      Facsimile: (214) 653-1015

      **COUNSEL FOR DEFENDANT GRANT STINCHFIELD**

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the above was served on all counsel of record via the Court's electronic notification system in accordance with the Federal Rules of Civil Procedure on the 9th day of January 2020.

/s/ William A. Brewer III
William A. Brewer III

4815-0163-1662, v. 1

4822-2365-7905.3
8001-213

# **<u>EXHIBIT C</u>**

# U.S. District Court
# Northern District of Texas (Dallas)
# CIVIL DOCKET FOR CASE #: 3:19-cv-03016-X

Ackerman McQueen Inc v. Stinchfield

Assigned to: Judge Brantley Starr

Cause: 28:1332 Diversity-Libel,Assault,Slander

Date Filed: 12/20/2019

Jury Demand: Plaintiff

Nature of Suit: 320 Torts/Pers Inj: Assault, Libel & Slander

Jurisdiction: Diversity

**Plaintiff**

**Ackerman McQueen Inc**

represented by **J Brian Vanderwoude**
Dorsey & Whitney LLP
300 Crescent Ct.
Suite 400
Dallas, TX 75201
214-981-9953
Fax: 214-853-5095
Email: vanderwoude.brian@dorsey.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Brian E Mason**
Dorsey & Whitney LLP
300 Crescent Court
Suite 400
Dallas, TX 75201
214-981-9900
Fax: 214-981-9901
Email: mason.brian@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**G Michael Gruber**
Dorsey & Whitney LLP
300 Crescent Court
Suite 400
Dallas, TX 75201
214-981-9900
Fax: 214-981-9901
Email: gruber.mike@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Jay J Madrid**
Dorsey & Whitney LLP
300 Crescent Court
Suite 400
Dallas, TX 75201

214-981-9900
Fax: 214-981-9901
Email: madrid.jay@dorsey.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**V.**

**Defendant**

**Grant Stinchfield**                    represented by   **William A Brewer , III**
Brewer Storefront PLLC
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4000
Fax: 214-653-1010
Email: wab@brewerattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Ian Shaw**
1717 Main Street
Suite 5900
Dallas, TX 75201
214-653-4000 x4025
Fax: 214-653-1015
Email: ins@brewerattorneys.com
*ATTORNEY TO BE NOTICED*
*Bar Status: Admitted/In Good Standing*

**Mediator**

**ADR Provider**                    represented by   **Glen M Ashworth**
Honorable Glen M Ashworth
8401 N Central Expwy, Suite 610
Dallas, TX 75225
214-891-4525
Fax: 214-720-6010
Email: gashworth@jamsadr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Bar Status: Not Admitted*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/20/2019 | 1 | COMPLAINT WITH JURY DEMAND against Grant Stinchfield filed by Ackerman McQueen, Inc.. (Filing fee $400; Receipt number 0539-10495882) Clerk to issue summons(es). In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, |

| | | |
|---|---|---|
| | | or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Vanderwoude, J) (Entered: 12/20/2019) |
| 12/20/2019 | 2 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Ackerman McQueen, Inc.. (Vanderwoude, J) (Entered: 12/20/2019) |
| 12/20/2019 | 3 | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Horan). Clerk to provide copy to plaintiff if not received electronically. (cdt) (Entered: 12/20/2019) |
| 12/20/2019 | 4 | Summons Issued as to Grant Stinchfield. (cdt) (Entered: 12/20/2019) |
| 12/23/2019 | 5 | SUMMONS Returned Executed as to Grant Stinchfield; served on 12/20/2019. (rekc) (Entered: 12/26/2019) |
| 01/09/2020 | 6 | ANSWER to 1 Complaint filed by Grant Stinchfield. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. Attorney William A Brewer, III added to party Grant Stinchfield(pty:dft) (Brewer, William) (Entered: 01/09/2020) |
| 01/09/2020 | 7 | AMENDED ANSWER to 1 Complaint filed by Grant Stinchfield (Brewer, William) (Entered: 01/09/2020) |
| 01/21/2020 | 8 | Joint Submission on Discovery Matters *Joint Report Regarding Rule 26(F) Conference and Proposed Discovery Plan* by Grant Stinchfield. (Shaw, Ian) (Entered: 01/21/2020) |
| 04/17/2020 | 9 | SCHEDULING ORDER: The jury trial is scheduled on this Court's two-week docket beginning 5/17/2021 10:00 AM before Judge Brantley Starr. Deadline for mediation is on or before 10/27/2020. Amended Pleadings due by 5/7/2020. Discovery due by 10/13/2020. Pretrial Conference set for 5/10/2021 10:00 AM before Judge Brantley Starr. Joinder of Parties due by 5/7/2020. Motions due by 11/10/2020. Pretrial Order due by 5/3/2021. Pretrial Materials due by 5/3/2021. Settlement Status Report due by 11/3/2020. (Ordered by Judge Brantley Starr on 4/17/2020) (ndt) (Entered: 04/17/2020) |
| 06/01/2020 | 10 | Designation of Mediator by Ackerman McQueen Inc. (Vanderwoude, J) (Entered: 06/01/2020) |
| 06/26/2020 | 11 | MOTION for Protective Order filed by Ackerman McQueen Inc (Vanderwoude, J) (Entered: 06/26/2020) |
| 06/26/2020 | 12 | Brief/Memorandum in Support filed by Ackerman McQueen Inc re 11 MOTION for Protective Order (Vanderwoude, J) (Entered: 06/26/2020) |
| 06/26/2020 | 13 | Appendix in Support filed by Ackerman McQueen Inc re 12 Brief/Memorandum in Support of Motion, 11 MOTION for Protective Order (Vanderwoude, J) (Entered: 06/26/2020) |
| 07/16/2020 | 14 | RESPONSE filed by Grant Stinchfield re: 11 MOTION for Protective Order (Shaw, Ian) (Entered: 07/16/2020) |
| 07/16/2020 | 15 | Brief/Memorandum in Support filed by Grant Stinchfield re 14 Response/Objection *In Opposition to Plaintiff's Motion for Entry of Protective Order* (Shaw, Ian) (Entered: 07/16/2020) |
| 07/16/2020 | 16 | Appendix in Support filed by Grant Stinchfield re 15 Brief/Memorandum in Support of Motion, 14 Response/Objection *In Opposition to Plaintiff's Motion for Entry of Protective* |

| | | |
|---|---|---|
| | | *Order* (Shaw, Ian) (Entered: 07/16/2020) |
| 07/23/2020 | 17 | REPLY filed by Ackerman McQueen Inc re: 11 MOTION for Protective Order (Vanderwoude, J) (Entered: 07/23/2020) |
| 09/14/2020 | 18 | MOTION to Dismiss *Plaintiff's Claims with Prejudice* filed by Grant Stinchfield (Shaw, Ian) (Entered: 09/14/2020) |
| 09/14/2020 | 19 | Brief/Memorandum in Support filed by Grant Stinchfield re 18 MOTION to Dismiss *Plaintiff's Claims with Prejudice* (Shaw, Ian) (Entered: 09/14/2020) |
| 09/14/2020 | 20 | Appendix in Support filed by Grant Stinchfield re 18 MOTION to Dismiss *Plaintiff's Claims with Prejudice*, 19 Brief/Memorandum in Support of Motion *Plaintiff's Claims with Prejudice* (Attachments: # 1 Exhibit(s) A, # 2 Exhibit(s) B, # 3 Exhibit(s) C, # 4 Exhibit(s) D, # 5 Exhibit(s) E) (Shaw, Ian) (Entered: 09/14/2020) |
| 09/22/2020 | 21 | MOTION to Compel filed by Ackerman McQueen Inc (Vanderwoude, J) (Entered: 09/22/2020) |
| 09/22/2020 | 22 | Brief/Memorandum in Support filed by Ackerman McQueen Inc re 21 MOTION to Compel (Vanderwoude, J) (Entered: 09/22/2020) |
| 09/22/2020 | 23 | Appendix in Support filed by Ackerman McQueen Inc re 22 Brief/Memorandum in Support of Motion, 21 MOTION to Compel (Attachments: # 1 Declaration(s) A: Dec. of Brian Vanderwoude, # 2 Exhibit(s) A-1: Affidavit of Grant Stinchfield, # 3 Exhibit(s) A-2: Defendants Answers and Objections to Plaintiffs First Set of Interrogatories and Request for Production, # 4 Exhibit(s) A-3: Email from Julia Arciga to Brian Vanderwoude, # 5 Exhibit(s) A-4: Email from Travis Carter to Julia Arciga, # 6 Exhibit(s) A-5: Emails between Travis Carter and Asher Stocker) (Vanderwoude, J) (Entered: 09/22/2020) |
| 09/23/2020 | 24 | ORDER OF REFERENCE: Under authority of 28 U.S.C. § 636(b), it is ORDERED that Ackerman McQueen Inc's 21 Motion to Compel be referred to the Honorable David L.Horan, United States Magistrate Judge, for hearing, if necessary, and determination. (Ordered by Judge Brantley Starr on 9/23/2020) (twd) (Entered: 09/23/2020) |
| 10/05/2020 | 25 | RESPONSE filed by Ackerman McQueen Inc re: 18 MOTION to Dismiss *Plaintiff's Claims with Prejudice* (Vanderwoude, J) (Entered: 10/05/2020) |
| 10/05/2020 | 26 | Brief/Memorandum in Support filed by Ackerman McQueen Inc re 25 Response/Objection *to Defendant's Motion to Dismiss Under Rule 12(c)* (Vanderwoude, J) (Entered: 10/05/2020) |
| 10/13/2020 | 27 | Joint MOTION to Continue *Discovery and Mediation Deadlines* filed by Ackerman McQueen Inc with Brief/Memorandum in Support. (Vanderwoude, J) (Entered: 10/13/2020) |
| 10/13/2020 | 28 | RESPONSE filed by Grant Stinchfield re: 21 MOTION to Compel (Shaw, Ian) (Entered: 10/13/2020) |
| 10/13/2020 | 29 | Brief/Memorandum in Support filed by Grant Stinchfield re 28 Response/Objection *to Plaintiffs Motion to Compel* (Shaw, Ian) (Entered: 10/13/2020) |
| 10/13/2020 | 30 | Appendix in Support filed by Grant Stinchfield re 29 Brief/Memorandum in Support of Motion *Defendants Response to Plaintiffs Motion to Compel* (Attachments: # 1 Exhibit(s) A_AMcs First Set of Interrogatories and First Request for Production, # 2 Exhibit(s) B_Stinchfields Answers and Objections to AMcs First Set of Interrogatories and Request for Production, # 3 Exhibit(s) C_Email re follow up to meet and confer, # 4 Exhibit(s) D_Email re Stinchfields stance on discovery requests, # 5 Exhibit(s) E_Stinchfields |

| | | |
|---|---|---|
| | | Supplemental Responses, # 6 Exhibit(s) F_Grant Stinchfields Declaration, # 7 Exhibit(s) G_Sarah Rogerss Declaration) (Shaw, Ian) (Entered: 10/13/2020) |
| 10/16/2020 | 31 | PROTECTIVE ORDER. (Ordered by Judge Brantley Starr on 10/16/2020) (ctf) (Entered: 10/16/2020) |
| 10/16/2020 | 32 | ORDER EXTENDING DEADLINES: The parties filed a Joint Motion to Continue Discovery and Mediation Deadlines [Doc. No. 27 ]. The Court GRANTS IN PART the motion to extend deadlines. Deadlines are extended as follows: Discovery due by 12/21/2020. Deadline for mediation is on or before 1/4/2021. Motions due by 1/18/2021. All challenges to experts-including motions to strike or exclude expert witnesses-shall be filed by 1/18/2021. (Ordered by Judge Brantley Starr on 10/16/2020) (ctf) (Entered: 10/16/2020) |

# **EXHIBIT D**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, Inc., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-03016-X |
| | § | |
| GRANT STINCHFIELD, | § | |
| | § | |
| *Defendant.* | § | |

**SCHEDULING ORDER**

The Court has considered the Parties' *Joint Report Regarding Rule 26(f)
Conference and Proposed Discovery Plan* [Doc. No. 8], and it sets the following
schedule for this case's disposition.[1]

1.    The jury trial is scheduled on this Court's two-week docket beginning May 17,
      2021 at 10:00 AM.

2.    A Pretrial Conference is scheduled for May 10, 2021 at 10:00 AM.

3.    Motions for leave to join other parties shall be filed by May 7, 2020.

4.    Motions for leave to amend pleadings shall be filed by May 7, 2020.

5.    Counsel, if they have not done so already, shall comply with Fed. R. Civ. P.
      26(a)(1) by May 14, 2020.

6.    Counsel shall confer and file a joint report informing the Court of their choice
      of a mediator or their inability to agree upon a mediator by June 1, 2020.  At
      that time, the Court will issue a mediation order, discussing the guidelines and
      requirements of the mediation.  The parties shall mediate their case by October
      27, 2020.

7.    The party with the burden of proof on a claim shall file a designation of expert
      witnesses and comply with Fed. R. Civ. P. 26(a)(2) by July 15, 2020.  This party

---

[1] Unless the Court orders otherwise, the Parties must observe the Federal Rules of Civil
Procedure and the local rules of this Court.

1

is not required to file a written report as contemplated by Fed. R. Civ. P. 26(a)(2)(B).

8.     Rebuttal designation of expert witnesses and compliance with Fed. R. Civ. P. 26(a)(2) shall be made by August 14, 2020.  This party is not required to file a written report as contemplated by Fed. R. Civ. P. 26(a)(2)(B).

9.     All discovery procedures shall be initiated in time to complete discovery by October 13, 2020.[2]

10.    The Court generally discourages requests for filing motions and exhibits under seal.  The parties may agree between themselves to designate documents "confidential" during discovery.  The typical standard there involves the parties assessing whether they want that material in the public domain.  But filing that material with the Court under seal is a different matter altogether. Court proceedings are, by and large, public matters (and rightfully so given that tax dollars fund the courts and we have this wonderful protection called the First Amendment).[3]

A party seeking to file a specific document under seal must move for leave to do so and: (1) brief the legal authorities indicating the risks of disclosure outweigh the public's right to know, and (2) explain that no other viable alternative to sealing exists.[4]  Further, all facts recited in any such motion

---

[2] The parties generally may agree to extend this discovery deadline, provided that the extension does not affect any subsequent deadlines and the parties notify the Court in writing.  The Court retains the right to reject an agreed extension.

[3] *See United States v. Holy Land Found. For Relief & Dev.*, 624 F.3d 685, 690 (5th Cir. 2010) ("Public confidence [in our judicial system] cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view."  (quoting *In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 230 (5th Cir. 2008)); *SEC v. Van Waeyenberghe*, 990 F.2d 845, 848 (5th Cir. 1993) ("Public access [to judicial records] serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness."  (quoting *Littlejohn v. BIC Corp.*, 851 F.2d 673, 682 (3d Cir. 1998))).  *See also Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1177 (6th Cir. 1983) (the First Amendment and the common law limit the court's discretion to seal records).

[4] *See Planned Parenthood of Greater Tex. Family Planning & Preventative Health Servs., Inc. v. Kaufman*, No. 17-50534, Doc. 00514098372, at 2 (5th Cir. Aug. 1, 2017) ("This court disfavors the sealing of briefs or portions of the record where the parties on appeal have not articulated a legal basis for the sealing.").  The Fifth Circuit has "repeatedly required parties to justify keeping materials under seal."  *Id.*; *see, e.g., Claimant ID 100236236 v. BP Exploration & Prod'n, Inc.*, No. 16-30521 (5th Cir. Jan. 31, 2017) (requesting letter briefs *sua sponte* as to whether appeal should remain under seal and entering order unsealing appeal); *United States v. Quintanilla*, No.16-50677 (5th Cir. Nov. 16, 2016) (order authorizing briefs and record excerpts to be filed under seal on condition that the parties filed redacted briefs and record excerpts on the public docket).  Also, the parties should note that a showing that disclosure of the information sought to be sealed would harm a party's reputation or its business

2

must be verified by the oath or declaration of a person or persons with personal knowledge, which will assist the Court in making fact findings that can withstand appellate scrutiny.[5]

The Court recognizes that typically the party seeking to seal documents may not possess personal knowledge of the facts to be included in a motion for leave to file under seal. In these instances, the parties should either prepare joint motions for leave to file documents under seal (and the party with personal knowledge verifies the facts in the section on justification) or the parties should make separate filings.

11. Counsel shall confer and file a joint report setting forth the status of settlement negotiations by November 3, 2020.

12. All motions for summary judgment shall be filed by November 10, 2020.[6]

13. All challenges to experts—including motions to strike or exclude expert witnesses—shall be filed by November 10, 2020.

14. Counsel shall file by May 3, 2021 a Joint Pretrial Order containing the information required by Local Rule 16.4 plus the following:

    a. A list of witnesses who may be called by each party in its case in chief. Each such witness list shall contain a narrative summary of the testimony to be elicited from each witness, shall state whether the witness has been deposed, and whether the witness's testimony at trial is "probable," "possible," "expert," or "record custodian." A copy of this list must be furnished to the court reporter prior to trial;

    b. Each party's requested jury instructions and interrogatories (annotated with citations to pattern jury charges or caselaw);

    c. The status of settlement negotiations as of the date of the Pretrial Order;

    d. Each party's proposed *voir dire* questions if the matter is a jury trial. The Court will allow attorneys an allotted time to conduct questioning at *voir dire* so long as the questions are approved in advance by the Court. The Court reserves the right to conduct further questioning at

---

is not sufficient to overcome the strong common law presumption in favor of public access. *Brown*, 710 F.2d at 1179.

[5] *See United States v. Edwards*, 823 F.2d 111, 119 (5th Cir. 1987) (if closure of a presumptively open proceeding is to withstand a First Amendment challenge, the court must make specific fact findings that substantial probability exists that an interest of a higher value will be prejudiced and that no reasonable alternatives will adequately protect that interest).

[6] Counsel should review carefully Local Rule 56.2(b), which limits to one the number of summary judgment motions that a party may file "[u]nless otherwise directed by the presiding judge, or permitted by law."

3

the conclusion of attorney questioning; and

e.   Trial briefs may be filed with the Pretrial Order, but are not required unless specifically requested by the Court.

15.   Regarding exhibit lists, exhibits, witness lists, and deposition designations, the parties shall comply with Local Rule 26.2 by May 3, 2021.  This includes providing copies of your trial exhibits to the Court on a USB flash drive or by email at Starr_Orders@txnd.uscourts.gov.[7]

16.   Motions in limine shall be filed by May 6, 2021.

17.   Objections to the requested jury instructions and interrogatories shall be filed May 6, 2021.

18.   Objections to witnesses (except expert witnesses), exhibits, and deposition designations shall be filed by May 6, 2021.  Counsel must confer about exhibits and make reasonable efforts to agree upon admissibility.

19.   The Court will view with disfavor and will deny—absent a showing of good cause—requests for extensions of these deadlines.

20.   At the pretrial conference, the Court will determine the order in which the cases on its two-week docket will be tried.  Counsel and the Parties shall be ready for trial on 48-hours notice at any time during the docket period.

**IT IS SO ORDERED**, this April 17, 2020.

BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

---

[7] The Court will not accept original exhibits prior to trial.  Original exhibits are retained by counsel and are admitted into the official record during trial.  It is counsel's duty to care for the original exhibits before and after trial.  At the end of trial, the Court will return the original exhibits to counsel and counsel will sign a Receipt of Exhibits.  The Court will file the Receipt of Exhibits with the District Clerk.  It is counsel's responsibility to forward any exhibits to the Court of Appeals should the case be appealed.  All questions regarding exhibits are to be directed to the court reporter.

4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| ACKERMAN MCQUEEN, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Action No. 3:19-CV-03016-X |
| | § | |
| GRANT STINCHFIELD, | § | |
| | § | |
| *Defendant.* | § | |

## **ORDER EXTENDING DEADLINES**

The parties filed a Joint Motion to Continue Discovery and Mediation Deadlines [Doc. No. 27].  The Court **GRANTS IN PART** the motion to extend deadlines.  Deadlines are extended as follows:

- All discovery procedures shall be initiated in time to complete discovery by December 21, 2020.

- The parties shall mediate their case by January 4, 2021.

- All motions for summary judgment shall be filed by January 18, 2021.

- All challenges to experts—including motions to strike or exclude expert witnesses—shall be filed by January 18, 2021.

**IT IS SO ORDERED** this 16th day of October 2020.

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

**In re NRA Business Expenditures Litigation**                    **MDL-_____**

**PROOF OF SERVICE**

        I hereby certify that a copy of the foregoing Motion, Brief, Schedule of Actions, Declarations and Exhibits and this Certificate of Service was served by email (or ECF as requested) to the following:

Clerk, Middle District of Tennessee
Nashville, TN

Clerk, Northern District of New York
Albany, NY

Clerk, Northern District of New York
Syracuse, NY

Clerk, Northern District of Texas
Dallas, TX

Elliott J. Schuchardt, Esq.
Schuchardt Law Firm
6223 Highland Place Way
Suite 201
Knoxville, TN 37919
(865) 304−4374
Fax: (703) 232−1044
Email: elliott016@gmail.com
**Counsel for Plaintiffs David Dell'Aquila, Lorannda Borja, Todd Chesney and Brent Weber**
M.D. Tn. C.A. No. 3:19-cv-00679

Wallace A. McDonald
Lacy, Price & Wagner, P.C.
249 N. Peters Rd.
Suite 101
Knoxville, TN 37923
865−246−0800
Fax: 865−690−8199
Email: amcdonald@lpwpc.com
**Counsel for Defendant Wayne LaPierre**
M.D. Tn. C.A. No. 3:19-cv-00679

Aubrey B. Harwell , Jr.
Neal & Harwell, PLC
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203
(615) 244−1713
Fax: (615) 726−0573
Email: aharwell@nealharwell.com
**Counsel for Defendant NRA Foundation, Inc.**
M.D. Tn. C.A. No. 3:19-cv-00679

Monica Anne Connell, Esq.
New York State Attorney General – New York Office
28 Liberty Street
New York, NY 10005
212−416−8965
Fax: 212−416−6009
Email: monica.connell@ag.ny.gov
**Counsel for Defendant Letitia James**
N.D.N.Y. C.A. No. 1:20-cv-00889-MAD-TWD

J Brian Vanderwoude, Esq.
Dorsey & Whitney LLP
300 Crescent Ct.
Suite 400
Dallas, TX 75201
214−981−9953
Fax: 214−853−5095
Email: vanderwoude.brian@dorsey.com
**Counsel for Defendants Ackerman McQueen Inc., Mercury Group Inc., Henry Martin,**
**Jesse Greenberg, William Winkler and Melanie Montgomery**
N.D. Tx. C.A. No. 3:19−cv−02074−G
**Counsel for Plaintiff Ackerman McQueen Inc.**
N.D. Tx. C.A. No. 3:19-cv-03016-X

# **EXHIBIT E**

| Persons Likely to Possess Relevant Knowledge And / Or Documents – Stinchfield | |
|---|---|
| Name | Location |
| 5.11 Tactical, Corporate Representative | Irvine, CA |
| Ackerman McQueen, Inc. | Oklahoma City, OK |
| Adcor Defense, Corporate Representative | Highland, MD |
| Aitken, Michael | Manassas, VA |
| Allegiance Creative Group, Corporate Representative | Fairfax, VA |
| Almand, Travis | Allen, TX |
| American Clean Skies Foundation, Corporate Representative | Washington, DC |
| Associated Television International, Corporate Representative | Los Angeles, CA |
| Autaubo, Rodney | Dallas, TX |
| Azato, Dennis | Manassas, VA |
| Bach, Scott | Newfoundland, NJ |
| Berthelot, Charles | Fort Worth, TX |
| Betts, Gina | Dallas, TX |
| Boren, Dan | Edmond, OK |
| Brown, Robert | Boulder, CO |
| Brownell, Pete | Montezuma, IA |
| Butz, Dave | Swansea, IL |
| Cabela's Outdoor Fund, Corporate Representative | Sidney, NE |
| Campbell, Chester | Richardson, TX |
| Chesapeake Energy Corporation, Corporate Representative | Oklahoma City, OK |
| Chestnut, Mark | Jenks, OK |
| Childress, Richard | Lexington, NC |
| Collins, Idehen (aka Colin Noir) | Dallas, TX |
| Colt Manufacturing, Corporate Representative | West Hartford, CT |
| Concord Social & Public Relations, Corporate Representative | Fairfax, VA |
| Cors, Alan | McLean, VA |
| Cotton, Charles | Dallas, TX |
| Cox, Christopher | Alexandria, VA |
| Coy, David | Adrian, MI |
| Cremer, Lacey | Dallas, TX |
| Cummins, Emily | Virginia Beach, VA |
| CXIII Rex, Corporate Representative | Alexandria, VA |
| Darley, Brian | Dallas, TX |
| Foster, Natalie | El Dorado, AR |

| | |
|---|---|
| Froman, Sandra | Tucson, AZ |
| Golob, Julie | Kearney, MO |
| GPI-M Uptown, LP, Corporate Representative | Dallas, TX |
| Greater Oklahoma City Chamber of Commerce, Corporate Representative | Oklahoma City, OK |
| Greenberg, Jesse | Dallas, TX |
| GS2 Enterprises, Corporate Representative | Woodland Hills, CA |
| Hammer, Marion | Tallahassee, FL |
| Hart, Steve | Washington DC |
| HBC Auditors & Advisors, Corporate Representative | Oklahoma City, OK |
| Himes, Josh | Dallas, TX |
| Hornady Manufacturing Company, Corporate Representative | Grand Island, NE |
| Integris Health, Inc., Corporate Representative | Oklahoma City, OK |
| Inventive Incentive & Insurance Services Inc., Corporate Representative | Woodland Hills, CA |
| Ives, Michael | Memphis, TN |
| Keene, David | Washington, MD |
| Knight, Timothy | Signal Mountain, TN |
| Landini Brothers Restaurant, Corporate Representative | Alexandria, VA |
| Landini, Noe | Alexandria, VA |
| LaPierre, Susan | Great Falls, VA |
| Leapfrog Enterprises, Corporate Representative | Emeryville, CA |
| Lee, Willes | Fairfax, VA |
| Ling, Il | Meridian, ID |
| Lipe, Rodney | Dallas, TX |
| Loesch, Chris | Southlake, TX |
| Loesch, Dana | Southlake, TX |
| Makris, Anthony | Alexandria, VA |
| Maloney, Sean | Liberty Township, OH |
| Martin, Edmund | Edmond, OK |
| Martin, Henry | Dallas, TX |
| McKenzie, David | Los Angeles, CA |
| McKenzie, Laura | Los Angeles, CA |
| McQueen, Katie | Oklahoma City, OK |
| McQueen, Revan | Oklahoma City, OK |
| Meadows, Carolyn | Atlanta, GA |
| Membership Marketing Partners, Corporate Representative | Fairfax, VA |
| Mercury Group, Inc. | Oklahoma City, OK (AMc headquarters) |

| | |
|---|---|
| Mitchell, Guy | Celina, TX |
| Mojack Distributors, Corporate Representative | Wichita, KS |
| Montgomery, Melanie | Dallas, TX |
| Mossberg Corporation, Corporate Representative | North Haven, CT |
| North, Oliver | Bluemont, VA |
| Nosler, Inc., Corporate Representative | Bend, OR |
| Nosler, Robert | Bend, OR |
| Nugent, Shemane | China Spring, TX |
| Nugent, Ted | China Spring, TX |
| Oklahoma Department of Tourism and Recreation, Corporate Representative | Oklahoma City, OK |
| Oklahoma Gas & Electric, Corporate Representative | Oklahoma City, OK |
| Oklahoma State University Foundation, Corporate Representative | Stillwater, OK |
| Olson, Lance | Marengo, IA |
| Omni Air Transport, Corporate Representative | Hartford, CT |
| Payne, Tammy | Oklahoma City, OK |
| Phillips, Woody | Dallas, TX |
| Plunkett, Jaqueline | Washington DC |
| Popp, John | Springfield, VA |
| Porter, James | Birmingham, AL |
| Powell, Jim | Plainview, MI |
| Powell, Josh | New Buffalo, MI |
| Remington Firearms, Corporate Representative | Madison, NC |
| Rendon Group, Corporate Representative | Washington, DC |
| RSM, Corporate Representative | Chicago, IL |
| Schmeits, Ron | Raton, NM |
| Schneider, Esther | Driftwood, TX |
| Selfridge, Edward | Dillwyn, VA |
| Senior Star, Corporate Representative | Tulsa, OK |
| Simone, Ginny | Naples, FL |
| Sinisi, Denise | Colleyville, TX |
| Six Flags of America, Corporate Representative | Bowie, MD |
| Sloan, Gurney | Colorado Springs, CO |
| Smith & Wesson, Corporate Representative | Springfield, MA |
| Stanford, Gayle | Woodland Hills, CA |
| Sterner, Colleen | Merna, NE |
| Sterner, Terry | Merna, NE |

| | |
|---|---|
| Stinchfield, Grant | Dallas, TX |
| Szucs, George | McKinney, TX |
| Tavangar, Nader | Alexandria, VA |
| Titus, Kristy | Prineville, OR |
| Turner, Clay | Colorado Springs, CO |
| Under Wild Skies, Corporate Representative | Alexandria, VA |
| Valinski, David | Palm Coast, FL |
| Varney, Alexander | Wylie, TX |
| Vista Outdoor Inc., Corporate Representative | Anoka, MN |
| Warner, Carl | Dallas, TX |
| Weaver, Kyle | Missoula, MT |
| Whatcott, Jace | Dallas, TX |
| Williams Companies, Inc., Corporate Representative | Tulsa, OK |
| Winkler, Brandon | Dallas, TX |
| Winkler, William | Edmund, OK |
| Workamajig, Inc., Corporate Representative | Oakhurst, NJ |
| WPX Energy, Corporate Representative | Tulsa, OK |

# UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

MDL No. _____ & TITLE - IN RE: _____

Case Caption (Include Plaintiff, District, and Civil Action No.) (attach list if necessary):

_____

# CORPORATE DISCLOSURE STATEMENT

The undersigned counsel for _____, (attach list if necessary) certifies that this party is a non-governmental corporate party and that:

This party's parent corporation(s) are listed below:

The following publicly-held corporation(s) own 10% or more of the party's stock (attach list if necessary):

**OR**

This party does not have any parent corporations; and no publicly-held corporation owns 10% or more of the party's stock.

_____     _____
Signature of Attorney                                           Name of Firm

_____     _____
Address                                                                  City/State/Zip Code

Date _____

**Instructions:**

1. Download the form. Fill out the form and save as a PDF document. All documents filed with the Judicial Panel should be in PDF Format including attachments and exhibits. The Corporate Disclosure Statement is to be filed as a separate document. Any documents submitted with the Corporate Disclosure Statement are attachments.
2. Select MDL from the menu bar at the top of the ECF screen.
3. Click on Corporate Disclosure Statement. Select Next.
4. Enter the three or four digit number (without the MDL letters) and click the Find This Case button.
5. If this is the correct MDL No., select next. Also, select next for the following screen.
6. Choose the cases for which the Disclosure Statement is being filed.
7. Select the party filing the Disclosure Statement
8. Select the document to which the Corporate Disclosure relates. (Note: Disclosures filed in new litigations will be linked to the initial Motion for Transfer and Disclosures filed in transferred litigations should be linked to the Conditional Transfer Order (CTO) or Motion and Brief to Vacate CTO).
9. Upload the Corporate Disclosure Form and any attachments as a PDF document.
10. Submit the Disclosure Statement by selecting the Next button.