

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| DAVID DELL'AQUILA, LORANNDA BORJA, TODD CHESNEY, and BRENT WEBER, on behalf of themselves and all others similarly situated, | Case No. 3:19-cv-00679 |
| | Judge William L. Campbell, Jr. |
| Plaintiffs, | Magistrate Judge Jeffery Frensley |
| v. | |
| WAYNE LaPIERRE, the NATIONAL RIFLE ASSOCIATION OF AMERICA, a New York not-for-profit corporation, and the NRA FOUNDATION, INC., a Washington, D.C. not-for-profit corporation, | JURY TRIAL DEMANDED |
| Defendants. | |

## [DRAFT] THIRD AMENDED COMPLAINT

The Plaintiffs, David Dell'Aquila, Lorannda Borja, Todd Chesney and Brent Weber, on behalf of themselves and all those similarly situated, file this Amended Complaint, by and through counsel, against Wayne LaPierre, the National Rifle Association of America, a New York not-for-profit corporation, and the NRA Foundation, Inc., a Washington, D.C. not-for-profit corporation. In support hereof, the Plaintiffs state as follows:

### Parties & Jurisdiction

1.     Plaintiff David Dell'Aquila is an individual residing at 862 Bresslyn Road, Nashville, Tennessee 37205.

2.     Plaintiff Lorannda Borja is an  individual residing at 405 Stella Avenue, Lawrenceburg, Tennessee 38464.

3.    Plaintiff Todd Chesney is an individual residing at 678 North Fire Sky Lane, Chino Valley, Arizona 86323.

4.    Plaintiff Brent Weber is an individual residing at 1502 W. Browning Street, Andover, Kansas 67002.

5.    Defendant Wayne LaPierre is the Chief Executive Officer of the National Rifle Association. He maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, Virginia 22030.

6.    Defendant National Rifle Association of America ("NRA") is a New York not-for-profit corporation (the "NRA"). The NRA holds itself out as being a tax-exempt organization under 26 U.S.C § 501(c)(4). The NRA has a registered office at c/o Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

7.    Defendant the NRA Foundation, Inc. ("NRA Foundation") is a Washington, D.C. not-for-profit corporation (the "NRA Foundation"). The NRA Foundation holds itself out as being a tax-exempt organization under 26 U.S.C § 501(c)(3). The NRA Foundation has a registered office at c/o Corporation Service Company, 1090 Vermont Avenue, N.W., Washington, D.C. 20005.

8.    Defendant Brewer, Attorneys & Counselors ("Brewer Law Firm") is law firm with offices in Dallas, Texas and New York City, New York. Brewer's Dallas office is located at 1717 Main St. #5900, Dallas, Texas 75201, and Brewer's New York office is located at 750 Lexington Ave, New York, New York 10022.

9.    Defendant William Brewer III is a founding partner of the Brewer Law Firm. He maintains an office at the firm's Dallas headquarters.

DRAFT

10. Defendant Ackerman McQueen ("Ackerman") is an advertising agency located in Oklahoma City, Oklahoma. Ackerman has a registered office at 1133 N Robinson Ave, Oklahoma City, Oklahoma 73103.

11. The Plaintiffs are asserting jurisdiction in this Court pursuant to 28 U.S.C. §§ 1331, 1332.

## **Background**

12. Plaintiffs bring this class action lawsuit alleging fraud, breach of contract, and numerous violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), arising from the solicitation of donations by the Defendants Wayne LaPierre, the National Rifle Association of America, and the NRA Foundation, Inc.

13. The NRA holds itself out as the premier gun rights lobbying organization throughout the United States.

14. The NRA solicits donations by means of web pages, e-mail solicitations, and direct mail via the United States postal service. For example, the NRA's website makes the following claims:

**WHAT IS THE NRA?**

The NRA is America's preeminent gun rights organization, made up of nearly five million members. Together, we fight and win the toughest battles
for the Second Amendment, all while offering the best firearms educational programs in the country.

Every day, the NRA fights back against politicians, judges, and bureaucrats who want to regulate, restrict, and ultimately, destroy your Second Amendment freedom.

That's why you need to join the NRA RIGHT NOW.[1]

---

[1] https://membership.nra.org/FAQ?gclid=Cj0KCQiAgKzwBRCjARIsABBbFuiB0tmcEPvesgbB3SMTCy J7 lAf4Vd2hKSg_PrNE4Io5-0QfojZTryQaAqjwEALw_wcB

12.     The NRA sells annual memberships in the organization through the United States postal service and the NRA's website. The cost of an annual membership, as of December 2019, is $45 per year. A lifetime membership sells for $1,500. The NRA has approximately five million dues paying or lifetime members.

13.     The NRA claims that membership dues are used to promote gun education in the United States, and to lobby for gun ownership rights. Specifically, the NRA's website states as follows:

**How does the NRA use my membership dues?**

Your support will help us defend your Second Amendment freedom whenever and wherever it comes under attack.

In addition, your membership dues will help the NRA cultivate the next generation of sportsmen and women through our youth firearms trainings…empower women with our self-defense programs…and support our police officers with our world-class law enforcement training programs.

**What is the NRA's history?**

The National Rifle Association was founded in 1871 by U.S. Army veterans Col. William C. Church and Gen. George Wingate to "promote and encourage rifle shooting on a scientific basis." In the following decades, the NRA has provided world-class firearms instruction to thousands of gun owners across the country.

When anti-gun lobbyists and politicians began their war on the Second Amendment four decades ago, the NRA fought back. And over the years, we've defeated hundreds of attempts on the national, state and local levels to infringe on your Right to Keep and Bear Arms.

Today, the NRA stands as America's oldest civil rights organization. Every time there's a threat to your gun rights, the NRA is there to defend your freedom. We also provide firearms training and gun safety programs to gun owners from all walks of life.[2]

---

[2] Id.

14.     The NRA's website contains a "Uniform Disclosure Statement" concerning the activities of the organization. The NRA also provides a printed copy of the Uniform Disclosure Statement to donors by means of the United States mails. Specifically, the Uniform Disclosure Statement states as follows:

> On behalf of The National Rifle Association of America, Inc. (NRA), 11250 Waples Mill Road, Fairfax, Virginia, 22030, this charitable solicitation is being made by the NRA. <u>Contributions raised will be used to advance the mission of the NRA</u>.[3]

15.     Although the NRA is a tax-exempt organization under 26 U.S.C § 501(c)(4), donations to the NRA are not tax deductible because the organization engages in lobbying efforts.

16.     In 1990, the NRA created a separate tax-exempt organization, the NRA Foundation, governed by 26 U.S.C § 501(c)(3), donations to which are tax deductible. Organizations that are tax exempt under § 501(c)(3) are prohibited from engaging in lobbying efforts.

17.     According to its website, the NRA Foundation focuses on promoting shooting sports and education. The website for the NRA Foundation describes its mission as follows:

> For more than two decades, The NRA Foundation has served the needs of freedom-loving Americans across this great nation. We continue to teach freedom through programs that instill knowledge about our nation's great history. We build partnerships with leaders in our communities and provide grants that are instrumental in funding programs that support our shared vision.
>
> Since our establishment in 1990, we've awarded nearly $398 million in grant funding in support of the shooting sports. These grants provide essential funding that benefits programs such as youth education, law

---

[3]https://www.nra.org/NRA-UniformDisclosureStatement.pdf

enforcement training, hunter education, conservation, firearms and marksmanship training and safety, and much more.[4]

18.     The NRA Foundation describes its mission as threefold: freedom, family and future. The Foundation claims to promote freedom by "protecting our Second Amendment freedoms with activities that promote safe and responsible firearms ownership." The Foundation claims to promote family by "bringing families together through hunting and shooting sport traditions and Friends of NRA activities." Finally, the Foundation claims to promote the future by "investing in the next generation of America's leaders, [with] a significant majority of The NRA Foundation grants support[ing] youth shooting sports programs."[5]

19.     The NRA Foundation also offers to provide grants to eligible organizations in the United States. The Foundation's website describes this offer as follows:

> The NRA Foundation provides financial support to eligible projects, programs and organizations through its Grant Program. Each year, volunteer committees from across the country tirelessly raise charitable dollars and generous donors make gifts that are in turn awarded as grants in support of educational and public service programs relating to the shooting sports in our communities.
>
> The general focus of Foundation grants is to:
>
> •  Promote, advance and encourage firearms, shooting sports and hunting safety.
>
> •  Educate individuals with respect to firearms, firearms history, participation in the shooting sports, hunting safety, and marksmanship.
>
> •  Conduct research in furtherance of improved firearms safety and marksmanship facilities and techniques.[6]

---

[4] https://www.nrafoundation.org/

[5] Id.

[6] https://www.nrafoundation.org/grants/

20.     The website for the NRA Foundation contains a "Donor Bill of Rights." It states that all donors to the NRA Foundation have the following rights:

> To be informed of the organization's mission, of the way the organization intends to use donated resources, and of its capacity to use donations effectively for their intended purposes.
>
> To be informed of the identity of those serving on the organization's governing board and <u>to expect the board to exercise prudent judgment in its stewardship responsibilities</u>.
>
> To have access to the organization's most recent financial statements.
>
> <u>To be assured your gifts will be used for the purposes for which they are given</u>.[7]

21.     Defendants NRA and NRA Foundation have maintained the above statements—or similar statements—on their websites during the relevant time period for this case, from November 30, 2015, through January 26, 2019.

22.     Archives of Defendants' websites are available online through the Internet Archive. The Internet Archive is a non-profit organization which preserves digital images of websites, captured at specific moments in time.

23.     The Internet Archive indicates that the NRA and NRA Foundation have continually published statements about themselves that are similar or identical to the statements currently on their websites. For example, on January 6, 2016, Defendant NRA made the following statement about its mission on its website:

> <u>While widely recognized today</u> as a major political force and <u>as America's foremost defender of Second Amendment rights</u>, the NRA has, since its inception, been the premier firearms education organization in the world. But our successes would not be possible without the tireless efforts and countless hours of service our nearly five million members have given to champion Second Amendment rights and support NRA programs. As

---

[7] https://www.nrafoundation.org/a-donor-bill-of-rights/ (emphasis added).

former Clinton spokesman George Stephanopoulos said, "Let me make one small vote for the NRA. They're good citizens. They call their congressmen. They write. They vote. They contribute. And they get what they want over time."[8]

24.     Defendant Wayne LaPierre has served as the Chief Executive Officer of the NRA since 1991.

25.     LaPierre uses his position with the NRA to encourage donations to both the NRA and to the NRA Foundation. For example, on July 21, 2014, LaPierre sent an e-mail to the NRA donor base, stating as follows:

> On November 4, you and I are facing the biggest election of our lives.
>
> If Obama wins control of Congress, he'll have the unstoppable power to disarm American gun owners and destroy our freedom. But if you and I can defeat Obama's hand-picked gun-ban candidates, he'll go home at the end of his second term without EVER signing a major gun-ban bill into law.
>
> The stakes couldn't be higher. But we CAN'T WIN this election without your immediate support.
>
> That's why I'm asking you to renew your NRA membership today or even become a Life Member of the NRA. And to make it easier for you to make one of these commitments, we've created a special membership account for you here at NRA.
>
> * * *
>
> This is our opportunity to hand Obama the biggest defeat of his political career. But if we lose this election battle, our guns and our rights will be as good as gone.
>
> Victory starts with you – and your decision to upgrade or extend your membership today.
>
> Please access your special NRA membership account immediately to see the credits and discounts waiting for you – and to see the gifts you can receive when you upgrade or renew.

---

[8] https://web.archive.org/web/20160202235054/https://home.nra.org/about-the-nra/ (emphasis added).



Thanks in advance for standing tall with me in the most important election in freedom's history.

Wayne LaPierre

26. As of July 18, 2019, Defendant LaPierre was continuing to solicit donations on behalf of the NRA, based on its gun rights mission. On that day, LaPierre sent an e-mail to the NRA donor base stating:

You and I are now fighting the toughest and most consequential election battles of our lives – and I need you shoulder-to-shoulder with me like never before.

The news media is now attacking NRA 24/7, with a nonstop barrage of fake news and lies. Billionaire Michael Bloomberg is pledging to spend AT LEAST $500 million electing a gun-ban extremist to the White House next year.

And we're facing the most radical anti-gun candidates in the history of American politics – gun-hating zealots who want to LICENSE and FINGERPRINT gun owners, OUTLAW magazines holding more than 10 rounds, and BAN and CONFISCATE every semi-automatic rifle in America.

\* \* \*

That's why – to prepare for these massive battles AND say thank you for your past support – I want to offer you a generous membership discount. Make no mistake: If you and I and our fellow NRA members don't band together and fight with all our strength, we will LOSE this election, a gun-ban fanatic will SEIZE the White House, and our guns and freedom will be GONE forever.

27. Defendants also solicited funds from the Plaintiffs by means of the United States postal service.

28. From 2016 to 2019, Defendant LaPierre solicited donations to the NRA that he claimed would be used for the fulfillment of NRA's mission but were in fact used to enrich him and his associates.

29.     In addition, from 2016 to 2019, Defendants NRA and LaPierre solicited donations to the NRA that they claimed would be used for the fulfillment of NRA Foundation's mission but were in fact used to enrich the NRA and organizations not within NRA Foundation's mission.

30.     For example, on April 28, 2016, Laura Evans, from the NRA Office of Advancement, sent a letter to Plaintiff Dell'Aquila stating: "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment. For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

31.     On May 8, 2017, Evans sent another letter to Dell'Aquila stating: "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment. For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

32.     On March 15, 2018, the Executive Director of the NRA, Christopher Cox, sent a letter to Plaintiff Dell'Aquila, stating "Your leadership is vital to the future of the Second Amendment. It is the dedication of patriots like you that inspires others to stand up for freedom."

33.     On May 23, 2018, Evans, sent a letter to Dell'Aquila stating: "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment. For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

34.     On July 3, 2018, Wayne LaPierre sent a personal letter to Dell'Aquila stating "Your leadership inspires so many to stand up and fight for the values we hold dear." His letter intended to solicit additional donations to the NRA and the NRA Foundation.

35.     On July 11, 2018, Christopher Cox sent a letter to Dell'Aquila stating:

> With the help of dedicated advocates like you, we've been able to restore the Second Amendment in ways we wouldn't have hoped for more than four decades ago. . . . However, the battleground is shifting now. The antigun

> opposition is more organized, better funded, and more ruthless that at any time in our nation's history. . . That is why your support is more necessary and meaningful than ever. New fronts are opening in the war on your rights every day, and there is no cavalry coming to save us. You are freedom's last stand, and I couldn't be prouder to stand with you. Together, we will prevail.

36. Each year, the NRA sends a dues renewal notification to all of its members through the United States postal service. Each of the Plaintiffs received such a notice from the NRA. The renewal statement serves as a reminder that dues are currently owed. It also includes the Uniform Disclosure Statement, which states: "Contributions raised will be used to advance the mission of the NRA."

37. Additionally, the NRA and the NRA Foundation both identify themselves to donors as tax-exempt organizations governed by 26 U.S.C § 501(c). *E.g.*, https://www.nrafoundation.org/ ("The NRA Foundation is a 501(c)(3) charitable organization."). By doing so, the NRA and the NRA Foundation implicitly promise donors that their donations will be expended in accordance with the restrictions placed on tax-exempt organizations, including that "no part [of the organizations'] net earnings [will] inure[] to the benefit of any private shareholder or individual." 26 U.S.C §§ 501(c)(3), (c)(4)(B).

38. Plaintiffs David Dell'Aquila, Lorannda Borja, Todd Chesney, and Brent Weber were exposed to the marketing messages of Defendants NRA, NRA Foundation and Wayne LaPierre.

39. Plaintiffs Dell'Aquila, Borja, Chesney, and Weber reasonably relied upon Defendants' solicitations, and made donations to the NRA and the NRA Foundation.

40. During the period from November 30, 2015 through January 26, 2019, Plaintiff Todd Chesney made the following donations to the NRA, on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 2/16/2017 | NRA | $20 |
| 6/18/2018 | NRA | $50 |

41.     During the period from November 30, 2015, through January 26, 2019, Plaintiff Lorannda Borja made donations to the NRA by purchasing special "NRA" license plates through the Tennessee Department of Motor Vehicles each year. Whenever she made a purchase of license plates, the NRA would receive $35 from the fee as a donation from Borja. Borja made donations of the following amounts on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 11/30/2015 | NRA | $35 |
| 12/8/2016 | NRA | $35 |
| 12/4/2017 | NRA | $35 |
| 12/10/2018 | NRA | $35 |

42.     During the period from November 30, 2015, through January 26, 2019, Plaintiff Dell'Aquila made the following donations to the following Defendants:

| Date | Payee | Amount |
|------|-------|--------|
| 3/22/16 | NRA | $1,000 |
| 3/14/16 | NRA | $100 |
| 3/30/16 | NRA | $1,000 |
| 4/18/16 | NRA | $250 |
| 6/2/16 | NRA Foundation | $20,000 |
| 9/2/16 | NRA | $90 |
| 10/25/16 | NRA | $100 |

| | | |
|---|---|---|
| 11/1/16 | NRA | $100 |
| 3/9/17 | NRA | $2,000 |
| 3/9/17 | NRA | $2,500 |
| 4/3/17 | NRA | $100 |
| 4/16/17 | NRA | $100 |
| 4/27/17 | NRA | $100 |
| 4/28/17 | NRA | $100 |
| 4/28/17 | NRA | $218 |
| 4/28/17 | NRA Foundation | $500 |
| 5/16/17 | NRA | $100 |
| 6/5/17 | NRA Foundation | $20,000 |
| 10/4/17 | NRA | $100 |
| 10/4/17 | NRA | $60 |
| 2/10/18 | NRA | $2,500 |
| 2/24/18 | NRA | $250 |
| 2/25/18 | NRA | $2,000 |
| 2/28/18 | NRA Foundation | $80 |
| 3/6/18 | NRA | $250 |
| 3/30/18 | NRA | $104 |
| 6/12/18 | NRA | $2,500 |
| 9/25/18 | NRA Foundation | $20,000 |
| 1/26/19 | NRA | $2,500 |

43.     Plaintiff Brent Weber is a benefactor member of the NRA. During the period from November 30, 2015, through January 26, 2019, Weber donated funds to the NRA for membership upgrades, and to help with its lobbying efforts.

44.     In 2019, Plaintiffs Dell'Aquila, Borja, Chesney and Weber learned that Defendants' solicitations were materially and intentionally false.

45.     Instead of spending the donated money on the purposes enumerated in their solicitations, Defendants used significant portions of the donated funds for purposes unrelated to the NRA's core mission.

46.     Plaintiffs learned of Defendants' misuse of their donations from media reports, following an investigation conducted by the NRA's former President, Lt. Col. Oliver North ("North").

47.     North served as President of the NRA from September 2018 through April 2019.

48.     As President of the NRA, North learned of material financial misconduct by the NRA.

49.     In early 2019, North learned that the NRA was paying its outside counsel, Texas attorney William Brewer, *about $2 million per month*. These expenditures had not been properly authorized by the NRA or documented by the Brewer law firm. North further learned that the NRA had paid roughly $20 million to Brewer from April 2018 through March 2019. When North and others requested to see the invoices relating to these extraordinary payments, Defendants LaPierre and the NRA repeatedly denied North access to the information.

50.     On April 17, 2019, North learned of allegations in  New Yorker magazine that raised concerns about  mismanagement of NRA funds. The New Yorker article quoted a former head  of  the  IRS  Exempt  Organizations  division  as  stating:  "The  litany  of  red  flags  is  just

extraordinary;" and, "The materials reflect one of the broadest arrays of likely transgressions that I've ever seen."

51.     On April 18, 2019, North wrote a letter to the General Counsel of the NRA and to the Chairman of the Audit Committee, explaining his concerns with the NRA's multi-million dollar monthly payments to attorney Brewer. In that letter, North requested that the NRA conduct an outside, independent review of the millions of dollars in payments to Brewer and his law firm.

52.     On April 22, 2019, the NRA's former public relations firm, Ackerman McQueen, disclosed that it had spent hundreds of thousands of dollars on clothing and private travel for Wayne LaPierre, and then billed the expenses back to the NRA. These reimbursements were not included as part of LaPierre's compensation on IRS Form 990, filed by the NRA.

53.     North pressed the NRA to investigate the above allegations. North initially raised his concerns through internal NRA channels, including the NRA's Audit Committee.

54.     On April 25, 2019, North wrote another letter—this time to the Executive Committee of the NRA Board of Directors. In that letter, North stated his intention to form a "Crisis Management Committee," to investigate the allegations of extraordinary spending by the NRA and LaPierre.

55.     Each time that North raised concerns about potential financial misconduct and tried to retain professionals to correct any wrongdoing, North's efforts were thwarted by Defendant LaPierre and the NRA's outside counsel, Brewer. Ultimately, LaPierre managed to shut down North's Crisis Management Committee. As of this date, there has been no independent investigation of the NRA's spending.

56.     Meanwhile, LaPierre retaliated against North for attempting to investigate the organization's spending.

DRAFT

57.     Ultimately, Wayne LaPierre forced North out as President of the NRA.

58.     From 1992 to 2018, Ackerman was the NRA's largest vendor. The NRA reported paying Ackerman $20,324,364 in 2017 and $31,994,168 in 2018 for "public relations and advertising" services.

59.     In addition, the NRA paid Ackerman $11,739,668 in 2017 and $6,337,508 in 2018 for "out of pocket expenditures" on behalf of the NRA for "media, outside vendor costs, and reimbursement of travel and business expenses." These expenses were incurred in violation of NRA policy, without proper oversight, and in many instances for the personal benefit of NRA insiders, like LaPierre.

60.     As stated      above, On April 22, 2019, the NRA's former public relations firm, Ackerman McQueen, disclosed that it had spent hundreds of thousands of dollars for clothing and private travel for Wayne LaPierre, and then billed the expenses back to the NRA. These reimbursements were not included as part of LaPierre's compensation on IRS Form 990, filed by the NRA.

61.     In mid-to-late 2018, the relationship between the NRA and Ackerman eroded and the NRA and Ackerman are now engaged in litigation.

62.     In addition to the services that Ackerman provided to the NRA pursuant to the Services Agreement, Ackerman also paid for a variety of unrelated out of pocket expenses and passed those expenses through to the NRA. The NRA used this arrangement to conceal expenditures by NRA executives—including LaPierre and Josh Powell, Executive Director of General Operations—many of which were personal or lacked the documentation required by IRS publication 463 to permit the NRA to avoid reporting such expenses as taxable income.

63.     Upon information and belief, the practice of passing expenses through Ackerman started decades ago as an informal agreement between LaPierre and Ackerman's co-founder and continued until the two companies severed ties in 2019.

64.     The NRA's annual budget with Ackerman included an aggregate line-item for "Pass-through Expenses." The amount earmarked for this purpose in the Ackerman/NRA budget increased over time. In 2018, the annual budget allocated $950,000 exclusively for this purpose.

65.     The effect of the pass-through expense arrangement was that these expenses would be paid for by the NRA without written approvals, receipts, or supporting business purpose documentation in accordance with NRA policies and procedures,

66.     Under the umbrella of "Pass-through Expenses," the NRA paid for millions of dollars in entertainment and travel expenses incurred by NRA executives and associates— including LaPierre and Powell—without scrutiny from within the organization. Examples of this practice include, without limitation, the following:

67.     Upon information and belief, over a five-year period, Ackerman paid, and the NRA reimbursed, more than $250,000—at a rate of $4,000 per month—in access fees to LaPierre's Travel Consultant. Like the other expenses passed through Ackerman, this $4,000 monthly fee was unrelated to the services that Ackerman provided to the NRA under the Services Agreement. Upon information and belief, Ackerman itself rarely used LaPierre's Travel Consultant's services.

68.     LaPierre also used the pass-through arrangement to conceal private travel and trips that were largely personal in nature. Upon information and belief, LaPierre directed Ackerman to pay for expenses related to NASCAR events, country music events, and even medical visits, and billed those through to the NRA. For example, in 2018, LaPierre asked the

president of Mercury Group to accompany him on a visit to a medical clinic. In connection with this visit, the president of Mercury Group and LaPierre flew on a private charter and stayed at the Four Seasons for several days. The cost of this hotel for both the president of Mercury Group and LaPierre was paid for by Ackerman, but ultimately borne by the NRA. The lodging alone cost the NRA $9,550.  The NRA also directly paid for the private travel associated with this visit to the medical clinic.

69.     The NRA also directed Ackerman to pay for a variety of other costs in connection with LaPierre's travel and bill those costs to the NRA as pass-through expenses. When he travelled, LaPierre often required an individual from Ackerman to travel with him to provide logistical and administrative support. That individual would be responsible for the payment of meals and gratuities for waiters, drivers, bellhops, hotel concierges, housekeepers, and others. Upon information and belief, the individuals who travelled with LaPierre instituted a practice of taking large cash advances—often several thousand dollars each at a time—to cover the cost of gratuities that LaPierre would direct them to pay.

70.     In connection with NRA annual meetings and Women's Leadership Forum meetings, LaPierre's wife would incur thousands of dollars of expenses per event for hair and makeup services, which were billed through Ackerman as out of pocket expenses. For example, between May 2016 and May 2017, the NRA paid one hair and makeup artist $16,359 for three events.. Upon information and belief, both LaPierre and his wife were aware of the cost of these makeup services.

71.     The NRA also used the pass-through arrangement with Ackerman to pay for expenses related to a charity unaffiliated with the NRA's mission, but headed by LaPierre's wife, who served as the president of its Board of Trustees in 2017 and 2018.

## Class Action Allegations

72.     Pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, the Plaintiffs bring this action on behalf of themselves and two nationwide classes of Plaintiffs.

73.     The first class of similarly situated persons is defined as: all persons residing in the United States who have donated funds to the NRA from November 30, 2015 through January 26, 2019 (the "NRA Class").

74.     The second class of similarly situated persons is defined as: all persons residing in the United States who have donated funds to the NRA Foundation from November 30, 2015 to January 26, 2019 (the "NRA Foundation Class").

75.     Excluded from each nationwide class are the Defendants, their legal representatives, heirs, successors, and assigns of Defendants, and all judges who may ever adjudicate this case.

76.     This action is brought as a class action and may be maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs reserve the right to modify the two nationwide classes.

77.     <u>Numerosity of the Nationwide Classes</u>: Each nationwide Class is so numerous that the individual joinder of all members, in this or any action is impracticable. The exact number of Class members is presently unknown to Plaintiffs; however, it is believed that the NRA Class numbers at least five million persons. The identity of the members of each class and their addresses may be ascertained from the business records maintained by the NRA and the NRA Foundation. Class members may be informed of the pendency of this action by a combination of e-mail and/or public notice.

78.   <u>Commonality</u>: There is a well-defined community of interest in the questions of law and fact involved affecting the members of each Class. These common legal and factual questions for the case involving the NRA Class include:

     a.     Whether the Plaintiffs gave money to the NRA with the expectation that such funds would be spent to promote the NRA's core mission.

     b.     Whether the NRA misspent such money, on matters unrelated to the NRA's core mission described in Defendants' solicitations.

     c.     Whether Defendants LaPierre and the NRA should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

79.   These common legal and factual questions for the case involving the NRA Foundation Class include:

     a.     Whether the Plaintiffs gave money to the NRA Foundation with the expectation that such funds would be spent to promote the NRA's core mission.

     b.     Whether the NRA Foundation misspent such money, on matters unrelated to the NRA's core mission described in Defendants' solicitations.

     c.     Whether Defendants LaPierre and the NRA Foundation should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

80.   <u>Typicality</u>: The claims of Plaintiffs Dell'Aquila, Borja, Chesney and Weber are typical of the claims of the members of the NRA Class and the NRA Foundation Class. Dell'Aquila, Borja, Chesney and Weber and each member of the NRA Class has, by definition, given funds to the NRA during the period from November 30, 2015 through January 26, 2019.

81.   Dell'Aquila and each member of the NRA Foundation Class has, by definition, given funds to the NRA Foundation during the period from November 30, 2015 through January 26, 2019.

82.     All members of each class have suffered similar harm arising from Defendants' violations, as alleged herein.

83.     <u>Adequacy</u>: Plaintiffs Dell'Aquila, Borja, Chesney, and Weber are adequate representatives of the NRA Class because their interests do not conflict with the interests of the members of the class they seek to represent. Plaintiff Dell'Aquila is an adequate representative of the NRA Foundation Class because his interests do not conflict with the interests of the members of that class.

84.     Plaintiffs Dell'Aquila, Borja, Chesney, and Weber intend to prosecute this action vigorously. Plaintiffs will fairly and adequately protect the interests of the members of each Class.

85.     <u>Predominance and Superiority</u>: This suit may also be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rule of Civil Procedure because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member, depending on the circumstances, may be relatively small or modest, especially given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Furthermore, it would be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Moreover, even if Class members themselves could afford such individual litigation, the court system could not. Individual litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expenses to all parties and the court system presented by the complex legal issues of the case. By contrast, the class action device presents far fewer management difficulties and

provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
### Fraud
### Dell'Aquila, Borja, Chesney and Weber
### and NRA Class v. LaPierre and the NRA

86.     The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

87.     During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja and each member of the NRA Class.

88.     When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

89.     Defendants LaPierre and the NRA also informed donors that the NRA is a tax-exempt organization under 26 U.S.C. § 501(c)(4), thereby implicitly promising in accordance with that section that the NRA's net earnings would not "inure[] to the benefit of any private shareholder or individual."

90.     Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

91.     As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

92. Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, the NRA used the solicited funds for alternative purposes, including without limitation, the following:

    a. By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense. By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

    b. By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

    c. By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

    d. By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

    e. By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

    f. By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

    g. By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

    h. By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

    i. By paying for private jet travel for Wayne LaPierre on a regular basis.

    j. By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

93. Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

94. Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

95. The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter an order certifying the NRA Class as a Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys' fees.

## COUNT II
### Fraud

### Dell'Aquila and NRA Foundation Class
### v. LaPierre and the NRA Foundation

96. The Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

97. During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

98. When soliciting such funds, Defendants LaPierre and the NRA Foundation advised Plaintiffs that their funds would be used for gun safety education; to promote shooting sports and

hunter safety; to foster wildlife conservation; and to protect gun ownership rights in the United States (collectively, the "NRA's core mission").

99.     Defendants LaPierre and the NRA Foundation also informed donors that the Foundation is a tax-exempt organization under 26 U.S.C. § 501(c)(3), thereby implicitly promising in accordance with that section that the NRA's net earnings would not "inure[] to the benefit of any private shareholder or individual."

100.     Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

101.     As a result of such reliance, Plaintiff Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

102.     Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

      a.      By transferring approximately $80 million from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible lobbying organization) over a ten-year period.

      b.      By paying $425,000 *per year* for nine years to the Speedway Children's Charity, a non-profit organization <u>not</u> related to the NRA's core mission.

      c.      By paying at least $125,000 to Youth for Tomorrow, a non-profit organization <u>not</u> related to the NRA's core mission. Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

      d.      Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

103.    Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

104.    The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

105.    Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's expenditures, unrelated to its mission.

106.    The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter an order certifying the NRA Foundation Class as Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Plaintiff Dell'Aquila and each member of the NRA Foundation Class damages equal to the amounts such persons donated to the NRA Foundation during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys' fees.

## COUNT III
## Breach of Contract

107.    Plaintiffs re-allege and incorporate all paragraphs of this complaint as if set forth fully herein.

108.    By all of the above, Defendants NRA and NRA Foundation made promises contained in their various solicitations to potential donors, like the Plaintiffs, regarding the use of Plaintiffs' donations. These promises were made to solicit good and valuable consideration from the Plaintiffs and class members themselves. Each member of the class donated to the NRA or NRA Foundation and therefore formed a contract between themselves and the NRA or NRA Foundation.

109.     Defendants breached the promises as set out above.

110.     As a direct and proximate result of Defendants' breach, Plaintiffs and the class members were damaged.

**COUNT IV**
**Violation of RICO**

**Dell'Aquila, Borja, Chesney, Weber**
**and the NRA Class v.**
**LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen**

111.     The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

112.     This Count is against Defendants Wayne LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen (the "Count IV Defendants").

113.     Through the below-described actions, the Count IV Defendants violated the federal Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

114.     Each of the Count IV Defendants is a "person" as defined in § 1961(3), as they are individuals or legal entities capable of holding an interest in property.

115.     NRA, as a corporate entity, is an enterprise engaged in and whose activities affect interstate commerce.

116.     The Count IV Defendants knowingly participated in the conduct of the NRA's affairs with the unlawful purpose of defrauding Plaintiffs and the NRA Class by misappropriating their donation money for their personal benefit, and for the benefit of their associates, and by laundering money with the purpose of perpetuating the donations and illicit expenditures.

117.     Pursuant to and in furtherance of their fraudulent scheme, the Count IV Defendants committed multiple related acts of mail and wire fraud, in violation of 18 U.S.C. § 1341 and 1343, thusly:

118.    During the period from November 30, 2015 to January 26, 2019, Defendant LaPierre solicited funds from Dell'Aquila, Borja and each member of the NRA Class, employing the same or substantially similar set of solicitations, as described above.

119.    Defendant LaPierre solicited funds from Plaintiffs Dell'Aquila, Borja, Chesney, Weber, and each member of the NRA Class by means of the United States Postal Service.

120.    Defendant LaPierre also used electronic mail to solicit funds from the Plaintiffs and NRA Class.

121.    When soliciting such funds, Defendant LaPierre advised Plaintiffs that their funds would be used for the "NRA's Core Mission").

122.    These solicitations, which were transmitted by mail or wire at dozens of times over the relevant time period, constitute a pattern of racketeering activity.

123.    Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendant Lapierre concerning the proposed use of the solicited funds.

124.    As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

125.    Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, they used the solicited funds for alternative purposes, including and without limitation, the following:

   a.    By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

   b.    By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

c.    By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

d.    By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

e.    By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

f.    By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

g.    By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

h.    By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

i.    By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

j.    By paying for private jet travel for Wayne LaPierre on a regular basis.

k.    By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

126.    Defendant LaPierre knew that their representations concerning the use of the solicited funds were materially false, at the time Defendant made such representations.

127.    The above list of illicit uses of the donated money includes multiple payments to the other Count IV Defendants, *i.e.*, William Brewer III, the Brewer Law Firm, and Ackerman McQueen.

128.    Defendant LaPierre knew at all relevant times that the proceeds of the donations were in violation of federal law prohibiting employing the postal and wire services to perpetuate a fraudulent scheme.

129.    The Count IV Defendants, by employing the US Postal Service to perpetrate a fraudulent scheme involving the donations from the NRA Class, committed a multitude of violations of the federal statute prohibiting mail fraud, as defined in 18 U.S.C. § 1341.

130.    Knowing that money received through donations were the result of a multitude of mail and wire frauds, the Count IV Defendants employed multiple "pass-through arrangements" with Ackerman McQueen, the Brewer Law Firm, and William Brewer III, as described above, to evade NRA member and NRA board scrutiny of his superfluous personal expenditures and his fraudulent scheme to perpetuate those superfluous expenditures.

131.    Such behavior constitutes multiple schemes to launder money.

132.    §1956(A)(1)(b)(i) prohibits conducting or attempting to conduct financial transactions which in fact involves the proceeds of specified unlawful activity with the intent to further that unlawful activity.

133.    Mail and wire fraud, as enumerated in §1961(1) of RICO, constitute "specified unlawful activity," pursuant to §1956(c)(7)(A).

134.    The Count IV Defendants engaged in numerous financial transactions with the proceeds of these mail and wire frauds, as detailed without limitation above, while knowing that these proceeds were the result of the mail fraud.

135.    Therefore, by transferring money between each other in an effort to perpetuate these mail and wire frauds, the Count IV Defendants violated §1956(A)(1)(b)(i).

136.    Defendant LaPierre also employed the money laundering arrangement with Ackerman to make fraudulent tax statements, like failing to document his personal expenses as required by IRS publication 463, which permitted the NRA and LaPierre to avoid reporting such expenses as taxable income.

137.    §1956(A)(1)(b)(ii) prohibits conducting or attempting to conduct financial transactions involving the proceeds of specified unlawful activity with the intent to violate Section 7206 of the Internal Revenue Code.

138.    Section 7206 of the Internal Revenue Code prohibits willfully making any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which the maker does not believe to be true and correct as to every material matter.

139.    LaPierre willfully violated Section 7206 when he regularly filed false and misleading Forms 990, not listing his excess benefits resulting from his money laundering scheme with Ackerman.

140.    Likewise, Defendant LaPierre transferred the proceeds of the above-described mail and wire frauds to Defendants William Brewer III and the Brewer Law Firm to conceal the ultimate expenditure of those proceeds, in effect perpetuating the scheme to fraudulently draw more money from the Plaintiffs and the NRA Class.

141.    Therefore, the Count IV Defendants' use of money laundering schemes constitute violations of §1956(A)(1)(b)(i) and (ii).

142.    § 1961(1) of RICO enumerates mail and wire fraud as a predicate acts for violations of §1962 of the act.

143.    § 1961(1) of RICO enumerates laundering of monetary instruments (§ 1956) as a predicate act for violations of § 1962 of the act.

144.    The above course of conduct constitutes a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5).

145.    Therefore, The Count IV Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

146.    As a direct and proximate result of the Count IV Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dell'Aquila, Borja, Chesney, Weber, the NRA Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's mission.

147.    According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

148.    The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.

**COUNT V**
**RICO Conspiracy**

**Dell'Aquila, Borja, Chesney, Weber**
**and the NRA Class v.**
**LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen**

149.    The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

150.    This Count is against Defendants Wayne LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen ("Count V Defendants").

151.    As set forth above, the Count V Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically:

152.    The Count V Defendants conspired to violate § 1962(c) by participating in the conduct of the affairs of the NRA enterprise through a pattern of racketeering activity.

153.    Primarily through the efforts of Defendant LaPierre, a multitude of mail and wire frauds were committed over the course of the relevant time period.

154.    These frauds consisted of dozens of fraudulent solicitations for donations sent over years and via the United States Postal Service and/or email that contained materially false statements about how the donated money would be expended, in violation of §1341 and § 1343 of the U.S. Code prohibiting mail and wire fraud, respectively.

155.    Additionally, the Count V Defendants employed a series of schemes to launder the money gained through these solicitations.

156.    In one such scheme, money was transferred between LaPierre and Ackerman McQueen to conceal the expenditure of that money for LaPierre and his family's personal use, in violation of 18 U.S.C. §1956(A).

157.    Therefore, the Count V Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the NRA enterprise through a pattern of racketeering activity.

158.    The Count V Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c), in violation of 18 U.S.C. § 1962(d).

159.    As a direct and proximate result of the Count V Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Dell'Aquila, Borja, Chesney, Weber, the NRA Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's Core Mission.

160.    According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

161.    The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.

**COUNT VI**
**Violation of RICO**

**Dell'Aquila, Borja, Chesney, Weber**
**and the NRA Foundation Class v.**
**NRA, LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen**

162.     The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

163.     This Count is against Defendants NRA, Wayne LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen (the "Count VI Defendants").

164.     Through the below-described actions, the Count VI Defendants violated the federal Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

165.     Each of the Count VI Defendants is a "person" as defined in § 1961(3), as each is an individual or legal entity capable of holding an interest in property.

166.     NRA Foundation, as a corporate entity,  is an enterprise engaged in and whose activities affect interstate commerce.

167.     The Count VI Defendants knowingly participated in the conduct of the NRA Foundation's affairs with the unlawful purpose of defrauding Plaintiffs and the NRA Foundation Class by misappropriating their donation money for their personal benefit, and for the benefit of their associates, and by laundering money with the purpose of perpetuating this scheme.

168.     Pursuant to and in furtherance of their fraudulent scheme, the Count VI Defendants committed multiple related acts of mail and wire fraud, in violation of 18 U.S.C. § 1341 and 1343, thusly:

169.     During the period from November 30, 2015 to January 26, 2019, Defendants NRA and LaPierre solicited funds from Dell'Aquila, Borja and each member of the NRA Foundation Class, employing the same or substantially similar set of solicitations, as detailed above.

170.    Defendants NRA and LaPierre solicited funds from Plaintiffs Dell'Aquila, Borja, Chesney, Weber, and each member of the NRA Foundation Class by means of the United States Postal Service.

171.    Defendants NRA and LaPierre also used electronic mail to solicit funds from the Plaintiffs and NRA Foundation Class.

172.    When soliciting such funds, Defendants NRA and LaPierre advised Plaintiffs that their funds would be used for the NRA's Core Mission.

173.    These solicitations, which were transmitted by mail or wire at dozens of times over the relevant time period, constituted a pattern of racketeering activity.

174.    Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants NRA and Lapierre concerning the proposed use of the solicited funds.

175.    As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Foundation Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

176.    Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, used the solicited funds for alternative purposes, including and without limitation, the following:

      a.    By spending over $97,000 *per day* for the legal services of William A. Brewer, III during the first quarter of 2019, without obtaining documentation justifying such expense.

      b.    By spending approximately $2 million *per month* for the legal services of the Brewer Law Firm, over a thirteen-month period, without obtaining documentation justifying such expense.

      c.    By spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store -- through payments made to Ackerman

DRAFT

McQueen -- without reporting such expenses as income for LaPierre in the reports filed by the NRA with the Internal Revenue Service (the "IRS").

d.  By spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy -- through payments made to Ackerman McQueen -- without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

e.  By making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

f.  By spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

g.  By spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

h.  By spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

i.  By paying for private jets to fly Wayne LaPierre's relatives in April 2017.

j.  By paying for private jet travel for Wayne LaPierre on a regular basis.

k.  By promoting Josh Powell to Executive Director of General Operations, after the NRA settled two separate sexual harassment suits against Mr. Powell.

177.  Defendants NRA and LaPierre knew that their representations concerning the use of the solicited funds were materially false, at the time Defendant made such representations.

178.  The above list of illicit uses of the donated money includes multiple payments to the other Count VI Defendants, i.e., William Brewer III, the Brewer Law Firm, and Ackerman McQueen.

179.  Defendant LaPierre knew at all relevant times that the proceeds of the donations were in violation of federal law prohibiting employing the postal and wire services to perpetuate a fraudulent scheme.

180. Therefore, the Count VI Defendants, by employing the US Postal Service and wire services to perpetrate a fraudulent scheme involving the donations from the NRA Class, committed a multitude of violations of the federal statute prohibiting mail and wire fraud, as defined in 18 U.S.C. § 1341.

181. Knowing that money received through donations were the result of a multitude of mail and wire frauds, the Count VI Defendants employed multiple "pass-through arrangements," as detailed above, with Ackerman McQueen, the Brewer Law Firm, and William Brewer III to evade scrutiny of their superfluous personal expenditures and fraudulent scheme to perpetuate those superfluous expenditures.

182. Such behavior constitutes multiple schemes to launder money.

183. 8 U.S.C. §1956(A)(1)(b)(i) prohibits conducting or attempting to conduct financial transactions which in fact involves the proceeds of specified unlawful activity with the intent to further that unlawful activity.

184. Mail and wire fraud, as enumerated in Section 1961(1) of the RICO statute, constitute "specified unlawful activity," pursuant to §1956(c)(7)(A).

185. The Count VI Defendants engaged in numerous financial transactions with the proceeds of these mail and wire frauds, as     detailed above, while knowing that these proceeds were the result of the mail fraud.

186. Therefore, by transferring money between each other in an effort to perpetuate these mail and wire frauds, the Count VI Defendants violated § 1956(A)(1)(b)(i).

187. The Count VI Defendants also engaged in money laundering to the extent that money transferred between the NRA Foundation and NRA (roughly $80 million in the relevant

time period) constitutes a scheme to evade the restrictions on expenditures imposed by the tax code.

188.    Transferring money from the NRA Foundation to the NRA allows the NRA to use money collected for use by the NRA Foundation for lobbying purposes, in violation of the restrictions imposed on the NRA Foundation by its 501(c)(3) status.

189.    18 U.S.C. §1956(A)(1)(b)(ii) prohibits conducting or attempting to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to violate     Section7206 of the Internal Revenue Code.

190.    Section     7206 of the Internal Revenue Code prohibits willfully making any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which the maker does not believe to be true and correct as to every material matter.

191.    Defendant NRA willfully violated Section7206 when they regularly published false and misleading statements regarding their compliance with the provisions of Section 501(c) of the Internal Revenue Code.

192.    Likewise, Defendant LaPierre transferred the proceeds of the above-described mail and wire fraud to Defendants William Brewer III and the Brewer Law Firm to conceal the ultimate expenditure of those proceeds, in effect perpetuating the scheme to commit more mail and wire frauds.

193.    Therefore, the Count VI Defendants use of the money laundering arrangements constitute violations of 18 U.S.C. §1956(A)(1)(b)(i) and (ii).

194.     Section 1961(1) of RICO enumerates mail and wire fraud as a predicate acts for violations of §1962 of the act.

195.    Section § 1961(1) of RICO enumerates laundering of monetary instruments (§ 1956) as a predicate act for violations of § 1962 of the act.

196.    The above course of conduct constitutes a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5).

197.    Therefore, the Count VI Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

198.    As a direct and proximate result of the Count VI Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dell'Aquila, Borja, Chesney, Weber, the NRA Foundation Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's mission.

199.    According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

200.    The total amount of damages incurred by all Plaintiffs, including the NRA Foundation Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.

DRAFT

## COUNT VII
## RICO Conspiracy

**Dell'Aquila, Borja, Chesney, Weber
and the NRA Foundation Class v.
NRA, LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen**

201.    The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

202.    This Count is against Defendants NRA, Wayne LaPierre, William Brewer III, the Brewer Law Firm, and Ackerman McQueen (the "Count VII Defendants")

203.    As set forth above, the Count VII Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c). Specifically:

204.    The Count V Defendants conspired to violate    Section 1962(c) by participating in the conduct of the affairs of the NRA Foundation enterprise through a pattern of racketeering activity.

205.    Through the efforts of Defendants NRA and LaPierre, a multitude of mail and wire frauds were committed over the course of the relevant time period.

206.    These frauds consisted of dozens of fraudulent solicitations for donations to the NRA Foundation sent over years and via the United States Postal Service and/or email that contained materially false statements about how the donated money would be expended, in violation of §1341 and 1343 of the U.S. Code prohibiting mail and wire fraud, respectively.

207.    Additionally, the Count VII Defendants employed a series of schemes to launder the proceeds of these fraudulent solicitations.

208.    In one such scheme, money was transferred between LaPierre and Ackerman McQueen to conceal the expenditure of that money for LaPierre and his family's personal use, in violation of 18 U.S.C. §1956(A).

209.     In another such scheme, the Count VII Defendants violated portions of the Internal Revenue Code by fraudulently transferring money from the 501(c)(3) NRA Foundation and the 501(c)(4) NRA, in order to evade the restrictions on lobbying imposed by Section 501(c)3 of the Internal Revenue Code.

210.     Therefore, the Count VII Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

211.     The Count VII Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

212.     As a direct and proximate result of the Count VII Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Dell'Aquila, Borja, Chesney, Weber, the NRA Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's mission.

213.     According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

214.     The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.