**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| DAVID DELL'AQUILA, LORANNDA BORJA, TODD CHESNEY, and BRENT WEBER, on behalf of themselves and all others similarly situated, | Case No. 3:19-cv-00679 |
| | Judge William L. Campbell, Jr. |
| Plaintiffs, | Magistrate Jefferey S. Frensley |
| v. | |
| WAYNE LaPIERRE, the NATIONAL RIFLE ASSOCIATION OF AMERICA, a New York not-for-profit corporation, the NRA FOUNDATION, INC., a Washington, D.C. not-for-profit corporation, and ACKERMAN McQUEEN, | JURY TRIAL DEMANDED |
| Defendants. | |

## [PROPOSED] THIRD AMENDED COMPLAINT

The Plaintiffs, David Dell'Aquila, Lorannda Borja, Todd Chesney and Brent Weber, on behalf of themselves and all those similarly situated, file this Amended Complaint, by and through counsel, against Wayne LaPierre; the National Rifle Association of America ("NRA"), a New York not-for-profit corporation; the NRA Foundation, Inc. ("NRA Foundation"), a Washington, D.C. not-for-profit corporation; and Ackerman McQueen ("Ackerman"), an advertising firm. In support hereof, the Plaintiffs state as follows:

### Introduction

1.     Plaintiffs bring this class action lawsuit alleging fraud, breach of contract, and violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO"). These claims arise from Defendants' dishonest solicitation and misuse of donations Plaintiffs made to the NRA and the NRA Foundation.

1

2.     The NRA describes its mission as promoting "firearms safety, education, and training; and advocacy on behalf of safe and responsible gun owners." Similarly, the NRA Foundation describes its mission as "support[ing] firearm-related public interest activities to defend and foster the Second Amendment right of law-abiding Americans," specifically by "promot[ing] firearms and hunting safety, enhance[ing] marksmanship skills of shooting sports participants, and educat[ing] the general public about firearms in their historic, technological and artistic context."

3.     These mission statements undergird the promises the NRA and the NRA Foundation made as they solicited millions of dollars in charitable contributions, including from Plaintiffs. Via its website and the U.S. Mail, the NRA promised its donors that "Contributions raised will be used to advance the mission of the NRA." In similar terms, the NRA Foundation's "Donor Bill of Rights" assured donors they would "be informed of the organization's mission" and that their "gifts will be used for the purposes for which they are given."

4.     These promises were illusory. The donations Defendants Wayne LaPierre and the NRA solicited by claiming the money would be used for the fulfillment of the NRA's mission were actually used in part to enrich LaPierre and his associates. And during the same period, Defendants LaPierre, the NRA, and the NRA Foundation used donations to the NRA Foundation to enrich the NRA, LaPierre, and organizations outside of the NRA Foundation's mission that were run by LaPierre associates.

5.     Defendants perpetrated this scheme both before and throughout the class period defined herein. During the class period alone, the scheme resulted in tens of millions of donor funds being siphoned off for purposes completely unrelated to the NRA and NRA Foundation's mission, contrary to the well-founded expectations of the donors.

2

6. Defendant LaPierre was at the center of this scheme. As a former NRA board member testified, "there are no decisions made pertaining to the board or the operation of the NRA that do not have Wayne's blessings."

7. But Defendants LaPierre, NRA, and NRA Foundation could not perpetrate this scheme alone. The only way such a brazen scheme could persevere for so long without detection was with the aid of Defendant Ackerman. As described below, Ackerman laundered the payment of donor funds so that they could go to LaPierre and his family and associates without scrutiny from the public and regulatory bodies into whether NRA and Foundation funds were improperly benefiting individuals. Ackerman's knowing participation in the scheme was critical to the scheme's success, as it was through Ackerman's efforts that LaPierre, the NRA, and the NRA Foundation were able to keep the improper use of donor funds hidden from the donors themselves.

## Parties

8. Plaintiff David Dell'Aquila is an individual residing at 862 Bresslyn Road, Nashville, Tennessee 37205.

9. Plaintiff Lorannda Borja is an individual residing at 405 Stella Avenue, Lawrenceburg, Tennessee 38464.

10. Plaintiff Todd Chesney is an individual residing at 678 North Fire Sky Lane, Chino Valley, Arizona 86323.

11. Plaintiff Brent Weber is an individual residing at 1502 W. Browning Street, Andover, Kansas 67002.

3

12.     Defendant Wayne LaPierre is the Chief Executive Officer of the National Rifle Association. He maintains an office address at National Rifle Association of America, 11250 Waples Mill Road, Fairfax, Virginia 22030.

13.     Defendant National Rifle Association of America ("NRA") is not-for-profit corporation incorporated in New York and with its principal place of business in Virginia. The NRA holds itself out as being a tax-exempt organization under 26 U.S.C § 501(c)(4). The NRA has a registered office at c/o Corporation Service Company, 80 State Street, Albany, New York 12207-2543.

14.     Defendant the NRA Foundation, Inc. ("NRA Foundation") is a not-for-profit corporation incorporated in Washington, D.C. and with its principal place of business in Virginia. The NRA Foundation holds itself out as being a tax-exempt organization under 26 U.S.C § 501(c)(3). The NRA Foundation has a registered office at c/o Corporation Service Company, 1090 Vermont Avenue, N.W., Washington, D.C. 20005.

15.     Defendant Ackerman McQueen ("Ackerman") is an advertising agency located in Oklahoma City, Oklahoma. Ackerman has a registered office at 1133 N Robinson Ave, Oklahoma City, Oklahoma 73103.

**<u>Jurisdiction & Venue</u>**

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332.

17.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff Dell'Aquila resides in this judicial district. The events and omissions giving rise to Plaintiff's claims occurred within this judicial district, in that Plaintiff Dell'Aquila received solicitations from the NRA and the NRA Foundation while in this district.

4

## Background

### *The NRA and the NRA Foundation*

15.     The NRA is a tax-exempt, not-for-profit organization organized under 26 U.S.C

§ 501(c)(4). The NRA is incorporated in New York and is subject to New York laws governing

nonprofit organizations. *See* N.Y. N-PCL § 101, *et seq.* Defendant Wayne LaPierre has served as

the Chief Executive Officer of the NRA since 1991.

18.     On its website, the NRA describes itself as "America's preeminent gun rights

organization," and details its mission as an advocacy organization as follows:

> **WHAT IS THE NRA?**
>
> The NRA is America's preeminent gun rights organization, made up of
> nearly five million members. Together, we fight and win the toughest
> battles for the Second Amendment, all while offering the best firearms
> educational programs in the country.
>
> Every day, the NRA fights back against politicians, judges, and
> bureaucrats who want to regulate, restrict, and ultimately, destroy your
> Second Amendment freedom.
>
> That's why you need to join the NRA RIGHT NOW.[1]

16.     The NRA's website goes on to detail its history, emphasizing its mission as an

advocacy organization and also describing its provision of "world-class firearms instruction,"

including "firearms training and gun safety programs":

> **What is the NRA's history?**
>
> The National Rifle Association was founded in 1871 by U.S. Army
> veterans Col. William C. Church and Gen. George Wingate to "promote
> and encourage rifle shooting on a scientific basis." In the following
> decades, the NRA has provided world-class firearms instruction to
> thousands of gun owners across the country.

---

[1]https://membership.nra.org/FAQ?gclid=Cj0KCQiAgKzwBRCjARIsABBbFuiB0tmcEPvesgbB3SMTCy
J7 lAf4Vd2hKSg_PrNE4Io5-0QfojZTryQaAqjwEALw_wcB

When anti-gun lobbyists and politicians began their war on the Second Amendment four decades ago, the NRA fought back. And over the years, we've defeated hundreds of attempts on the national, state and local levels to infringe on your Right to Keep and Bear Arms.

Today, the NRA stands as America's oldest civil rights organization. Every time there's a threat to your gun rights, the NRA is there to defend your freedom. We also provide firearms training and gun safety programs to gun owners from all walks of life.[2]

17.     These public proclamations of the NRA's mission echo the organization's filings with the Internal Revenue Service ("IRS"), which describe the NRA's mission as promoting "firearms safety, education, and training; and advocacy on behalf of safe and responsible gun owners." In other words, whether addressed to the public (in order to solicit donations) or to the IRS (in order to maintain its tax-exempt status), the NRA's statement of its mission is the same.

18.     To qualify as a tax-exempt organization under 26 U.S.C § 501(c)(4), the NRA is legally prohibited from using its net proceeds for the benefit of any individual. And as a not-for-profit organization incorporated in the State of New York, the NRA may not conduct "activities for pecuniary profit or financial gain, whether or not in furtherance of its corporate purposes, except to the extent that such activity supports its other lawful activities then being conducted." N.Y. N-PCL § 204.

19.     In 1990, the NRA created a separate tax-exempt, not-for-profit sister organization—the NRA Foundation—which is governed by 26 U.S.C § 501(c)(3). Donations to the NRA Foundation are tax deductible, but the NRA Foundation is prohibited from engaging in lobbying efforts. The Foundation, like the NRA, is prohibited from using its net proceeds for the benefit of any individual.

---

[2] *Id.*

20.     Not surprisingly given its 501(c)(3) status, the NRA Foundation's website does

not discuss lobbying efforts. In all other respects, however, the Foundation's mission mirrors that

of the NRA, *i.e.*, the promotion of firearm safety, education, and training:

> For more than two decades, The NRA Foundation has served the needs of freedom-loving Americans across this great nation. We continue to teach freedom through programs that instill knowledge about our nation's great history. We build partnerships with leaders in our communities and provide grants that are instrumental in funding programs that support our shared vision.
>
> Since our establishment in 1990, we've awarded nearly $398 million in grant funding in support of the shooting sports. These grants provide essential funding that benefits programs such as youth education, law enforcement training, hunter education, conservation, firearms and marksmanship training and safety, and much more.[3]

21.     The NRA Foundation website further details these activities by emphasizing three

core values: freedom, family, and future. The Foundation claims to promote freedom by

"protecting our Second Amendment freedoms with activities that promote safe and responsible

firearms ownership." The Foundation claims to promote family by "bringing families together

through hunting and shooting sport traditions and Friends of NRA activities." Finally, the

Foundation claims to promote the future by "investing in the next generation of America's

leaders, [with] a significant majority of The NRA Foundation grants support[ing] youth shooting

sports programs."[4]

22.     Like the NRA, the NRA Foundation's IRS filings describe its mission in the same

terms as described to the public: to "support firearm-related public interest activities to defend

and foster the Second Amendment right of law-abiding Americans. [To] promote firearms and

---

[3] https://www.nrafoundation.org/.

[4] *Id.*

7

hunting safety, enhance marksmanship skills of shooting sports participants, and educate the general public about firearms in their historic, technological and artistic context."

23.     The Foundation also offers grants to eligible organizations in the United States. The Foundation's website describes this offer as follows:

> The NRA Foundation provides financial support to eligible projects, programs and organizations through its Grant Program. Each year, volunteer committees from across the country tirelessly raise charitable dollars and generous donors make gifts that are in turn awarded as grants in support of educational and public service programs relating to the shooting sports in our communities.

24.     Defendant NRA Foundation further represents that the general purpose of Foundation grants is to:

- Promote, advance and encourage firearms, shooting sports and hunting safety.

- Educate individuals with respect to firearms, firearms history, participation in the shooting sports, hunting safety, and marksmanship.

- Conduct research in furtherance of improved firearms safety and marksmanship facilities and techniques.[5]

*Donation Solicitations During the Relevant Time Period*

25.     Both the NRA and the NRA Foundation solicit donations in various ways, including through direct mailings, emails solicitations, and on their respective websites. What all the solicitations have in common is that they purport to be raising money to support the mission of promoting gun safety and education and Second Amendment rights.

26.     One way to donate to the NRA is by purchasing an NRA membership. The NRA sells annual memberships in the organization through the United States Postal Service and on the NRA's website. The cost of a basic annual membership, as of December 2019, is $45 per year. A

---

[5] https://www.nrafoundation.org/grants/

lifetime membership sells for $1,500. The NRA has approximately five million dues paying or lifetime members in its donor base.

27. Another way the NRA fundraises is through direct solicitation from Defendant LaPierre, who uses his position with the NRA to personally encourage donations to both the NRA and to the NRA Foundation. He has solicited donations at various times within the class period and outside of it. His solicitations made outside the class period are representative of solicitations made during it.

28. For example, on July 21, 2014, LaPierre sent the following email to the NRA donor base, soliciting donations in the form of renewed and upgraded memberships:

> This is our opportunity to hand Obama the biggest defeat of his political career. But if we lose this election battle, our guns and our rights will be as good as gone.
>
> Victory starts with you – and your decision to upgrade or extend your membership today.
>
> Please access your special NRA membership account immediately to see the credits and discounts waiting for you – and to see the gifts you can receive when you upgrade or renew.
>
> Thanks in advance for standing tall with me in the most important election in freedom's history.
>
> Wayne LaPierre

29. In a letter dated March 23, 2015 that was mailed to the donor base, Defendant LaPierre solicited donations in the form of membership dues in the NRA as a means "to protect your guns and your precious freedoms."

30. In a letter dated December 27, 2016 that was mailed to the donor base, Defendant LaPierre solicited donations in the form of upgraded NRA membership in the following terms:

9



31.    A donation form that was mailed to the NRA donor base in 2016 along with a solicitation to donate through membership renewal contains the following statement that the donor was asked to endorse by checking a box next to a level of membership:



32.    In a letter dated October 22, 2018 that was mailed to the donor base, Defendant LaPierre solicited donations in the form of a membership renewal or a discounted Life Membership. He wrote, "I do understand that $600 is a major investment," and went on to make the following assurances:





33.     As of July 18, 2019, Defendant LaPierre was continuing to solicit donations on

behalf of the NRA, based on its gun rights mission. On that day, LaPierre sent an e-mail to the

NRA donor base stating:

> You and I are now fighting the toughest and most consequential election
> battles of our lives – and I need you shoulder-to-shoulder with me like
> never before.
>
> The news media is now attacking NRA 24/7, with a nonstop barrage of
> fake news and lies. Billionaire Michael Bloomberg is pledging to spend
> AT LEAST $500 million electing a gun-ban extremist to the White House
> next year.
>
> And we're facing the most radical anti-gun candidates in the history of
> American politics – gun-hating zealots who want to LICENSE and
> FINGERPRINT gun owners, OUTLAW magazines holding more than 10
> rounds, and BAN and CONFISCATE every semi-automatic rifle in
> America.
>
> * * *
>
> That's why – to prepare for these massive battles AND say thank you for
> your past support – I want to offer you a generous membership discount.
> Make no mistake: If you and I and our fellow NRA members don't band
> together and fight with all our strength, we will LOSE this election, a gun-
> ban fanatic will SEIZE the White House, and our guns and freedom will
> be GONE forever.

34.     And throughout the relevant time period, the NRA ran a webpage at

donate.nra.org which featured a large headshot of Wayne LaPierre with text identifying him by

name and stating, "Win the Big Battles for Your Gun Rights. Give to NRA." Underneath this

photo and text were several red buttons with donation amounts, ranging from $25-$1000, and a

location for a donor to input their personal and credit card information.

11

35.     Defendant LaPierre also sent a personal letter to Plaintiff Dell'Aquila on July 3, 2018, stating "Your leadership inspires so many to stand up and fight for the values we hold dear." His letter was intended to solicit additional donations to the NRA and the NRA Foundation.

36.     Defendants NRA and the NRA Foundation also solicited funds from Plaintiffs by means of the United States Postal Service on other occasions during the relevant time period. For example:

- On April 28, 2016, Laura Evans, from the NRA Office of Advancement, sent a letter to Plaintiff Dell'Aquila stating: "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment. For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

- On May 8, 2017, Evans sent another letter to Dell'Aquila stating: "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment. For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

- On March 15, 2018, the Executive Director of the NRA, Christopher Cox, sent a letter to Plaintiff Dell'Aquila, stating "Your leadership is vital to the future of the Second Amendment. It is the dedication of patriots like you that inspires others to stand up for freedom."

- On May 23, 2018, Evans sent a letter to Dell'Aquila stating: "Thank you for your generous pledge commitment of $100,000 to The NRA Foundation's Leadership Fund Endowment. For your convenience, this letter serves to remind you of your next scheduled gift of $20,000."

- On July 11, 2018, Christopher Cox sent a letter to Dell'Aquila stating:

> With the help of dedicated advocates like you, we've been able to restore the Second Amendment in ways we wouldn't have hoped for more than four decades ago. . . . However, the battleground is shifting now. The antigun opposition is more organized, better funded, and more ruthless that at any time in our nation's history. . . . That is why your support is more necessary and meaningful than ever. New fronts are opening in the war on your rights every day, and there is no cavalry coming to save us. You are freedom's last stand, and I couldn't be prouder to stand with you. Together, we will prevail.

*Promises Made to All Donors*

37.   Each year, the NRA sends a dues renewal notification to all of its dues paying members through the United States Postal Service. Each of the Plaintiffs received such a notice from the NRA. The renewal statement includes a "Uniform Disclosure Statement," which states: "Contributions raised will be used to advance the mission of the NRA." The number of donors during the class period exceeds 5 million individuals.

38.   In addition to the above-described promises about how donations will be spent (*e.g.*, "to protect your guns and your precious freedoms"), the NRA represents to all donors that their membership dues are used to promote gun education in the United States and to lobby for gun ownership rights. For example, the NRA's website states as follows:

**How does the NRA use my membership dues?**

Your support will help us defend your Second Amendment freedom whenever and wherever it comes under attack.

In addition, your membership dues will help the NRA cultivate the next generation of sportsmen and women through our youth firearms trainings…empower women with our self-defense programs…and support our police officers with our world-class law enforcement training programs.[6]

---

[6] *Id.*

39.     The NRA's website also directs donors to the same Uniform Disclosure Statement concerning the activities of the organization that is included with membership renewal notices. On information and belief, this Uniform Disclosure statement is included with all solicitations the NRA makes via email or through the United States Postal Service. The Uniform Disclosure Statement promises as follows:

> On behalf of The National Rifle Association of America, Inc. (NRA), 11250 Waples Mill Road, Fairfax, Virginia, 22030, this charitable solicitation is being made by the NRA. Contributions raised will be used to advance the mission of the NRA.[7]

40.     Similarly, the NRA Foundation promises all donors who visit their website that their donations will be used "to provide funding to essential firearm-related programs of the NRA and other organizations that defend and foster the Second Amendment rights of all law-abiding Americans."[8]

41.     The website for the NRA Foundation also contains a "Donor Bill of Rights." It states that all donors to the NRA Foundation have the following rights:

> To be informed of the organization's mission, of the way the organization intends to use donated resources, and of its capacity to use donations effectively for their intended purposes.
>
> To be informed of the identity of those serving on the organization's governing board and to expect the board to exercise prudent judgment in its stewardship responsibilities.
>
> To have access to the organization's most recent financial statements.
>
> To be assured your gifts will be used for the purposes for which they are given.[9]

---

[7] https://www.nra.org/NRA-UniformDisclosureStatement.pdf.

[8] https://www.nrafoundation.org/donate/

[9] https://www.nrafoundation.org/a-donor-bill-of-rights/.

Defendants NRA and NRA Foundation have maintained the above statements—or similar statements—on their websites throughout the applicable time period for this case, from November 30, 2015 through January 26, 2019. True and accurate archives of Defendants' websites are available online through the Internet Archive, a non-profit organization which preserves digital images of websites, captured at specific moments in time.

42. The Internet Archive indicates that the NRA and NRA Foundation have continually published statements about themselves that are similar or identical to the statements currently on their websites. For example, on January 6, 2016, Defendant NRA made the following statement on its website about its purpose and the role of its donors:

> While widely recognized today as a major political force and as America's foremost defender of Second Amendment rights, the NRA has, since its inception, been the premier firearms education organization in the world. But our successes would not be possible without the tireless efforts and countless hours of service our nearly five million members have given to champion Second Amendment rights and support NRA programs.[10]

43. Additionally, the NRA and the NRA Foundation identify themselves to their donors as tax-exempt organizations governed by 26 U.S.C § 501(c). *E.g.*, "The NRA Foundation is a 501(c)(3) charitable organization."[11]; "[T]his charitable solicitation is being made by the NRA".[12] By doing so, the NRA and the NRA Foundation implicitly promise donors that their donations will be expended in accordance with the restrictions placed on tax-exempt organizations, including that "no part [of the organizations'] net earnings [will] inure[] to the benefit of any private shareholder or individual." 26 U.S.C §§ 501(c)(3), (c)(4)(B).

---

[10] https://web.archive.org/web/20160202235054/https://home.nra.org/about-the-nra/.

[11] https://www.nrafoundation.org/.

[12] https://www.nra.org/NRA-UniformDisclosureStatement.pdf.

*The Named Plaintiffs' Donations*

44.     As set out above, Plaintiffs David Dell'Aquila, Lorannda Borja, Todd Chesney, and Brent Weber were exposed to the solicitations and promises of Defendants NRA, NRA Foundation and Wayne LaPierre.

45.     Plaintiffs Dell'Aquila, Borja, Chesney, and Weber reasonably relied upon Defendants' solicitations and the promises they contained and made donations to the NRA as a result. Plaintiff Dell'Aquila also reasonably relied on the solicitations and promises of the NRA Foundation and made donations to the NRA Foundation as a result.

46.     During the period from November 30, 2015, through January 26, 2019, Plaintiff Todd Chesney made the following donations to the NRA, on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 2/16/2017 | NRA | $20 |
| 6/18/2018 | NRA | $50 |

47.     During the period from November 30, 2015, through January 26, 2019, Plaintiff Lorannda Borja made donations to the NRA by purchasing special "NRA" license plates through the Tennessee Department of Motor Vehicles each year. Whenever she made a purchase of license plates, the NRA would receive $35 from the fee as a donation from Borja. Borja made donations of the following amounts on the following dates:

| Date | Payee | Amount |
|------|-------|--------|
| 11/30/2015 | NRA | $35 |
| 12/8/2016 | NRA | $35 |
| 12/4/2017 | NRA | $35 |
| 12/10/2018 | NRA | $35 |

48. During the period from November 30, 2015, through January 26, 2019, Plaintiff Dell'Aquila made the following donations to the following Defendants:

| Date | Payee | Amount |
|---|---|---|
| 3/22/16 | NRA | $1,000 |
| 3/14/16 | NRA | $100 |
| 3/30/16 | NRA | $1,000 |
| 4/18/16 | NRA | $250 |
| 6/2/16 | NRA Foundation | $20,000 |
| 9/2/16 | NRA | $90 |
| 10/25/16 | NRA | $100 |
| 11/1/16 | NRA | $100 |
| 3/9/17 | NRA | $2,000 |
| 3/9/17 | NRA | $2,500 |
| 4/3/17 | NRA | $100 |
| 4/16/17 | NRA | $100 |
| 4/27/17 | NRA | $100 |
| 4/28/17 | NRA | $100 |
| 4/28/17 | NRA | $218 |
| 4/28/17 | NRA Foundation | $500 |
| 5/16/17 | NRA | $100 |
| 6/5/17 | NRA Foundation | $20,000 |
| 10/4/17 | NRA | $100 |
| 10/4/17 | NRA | $60 |

| Date | Payee | Amount |
|---|---|---|
| 2/10/18 | NRA | $2,500 |
| 2/24/18 | NRA | $250 |
| 2/25/18 | NRA | $2,000 |
| 2/28/18 | NRA Foundation | $80 |
| 3/6/18 | NRA | $250 |
| 3/30/18 | NRA | $104 |
| 6/12/18 | NRA | $2,500 |
| 9/25/18 | NRA Foundation | $20,000 |
| 1/26/19 | NRA | $2,500 |

49.    Plaintiff Brent Weber is a benefactor member of the NRA. During the period from November 30, 2015, through January 26, 2019, Weber donated funds to the NRA for membership upgrades, and to help with its lobbying efforts.

50.    Each of Plaintiffs' donations was made in reliance on the promises of the NRA and the NRA Foundation that the funds raised would be used to advance the organizations' stated missions and would not be used to benefit individuals in violation of the laws governing not-for-profit organizations.

*Defendants' Scheme*

51.    As Plaintiffs Dell'Aquila, Borja, Chesney and Weber learned in 2019, Defendants' solicitations were materially and intentionally false. Instead of spending the donated money on the purposes enumerated in their solicitations and accompanying disclosures, Defendants used significant portions of the donated funds for purposes unrelated to the NRA's mission of gun rights advocacy and firearm safety, education, and training. As detailed further

18

below, donated funds were spent on personal travel and other benefits for Defendant LaPierre and others connected to him.

52. Moreover, during the class period, Defendants NRA and NRA Foundation improperly transferred millions of dollars that were donated to the NRA Foundation to the NRA. LaPierre has admitted in a deposition that the NRA received $5 million from the Foundation and did not repay it. On information and belief, the true amount of Foundation money transferred to the NRA during the relevant period is many times that amount.

53. To conceal its misuse of donated funds from the public, and especially from their donors, the NRA routed the money through Defendant Ackerman, which is a for-profit organization not subject to the reporting and auditing requirements imposed by law on Defendants NRA and the NRA Foundation, which are tax-exempt nonprofits.

54. From 1992 to 2018, Ackerman was the NRA's largest vendor. The NRA reported paying Ackerman $20,324,364 in 2017 and $31,994,168 in 2018 for "public relations and advertising" services.

55. In addition, the NRA paid Ackerman $11,739,668 in 2017 and $6,337,508 in 2018 for "out of pocket expenditures" on behalf of the NRA for "media, outside vendor costs, and reimbursement of travel and business expenses." These expenses were incurred in violation of NRA policy, without proper oversight, and in many instances for the personal benefit of NRA insiders, like LaPierre.

56. The NRA used this arrangement to conceal expenditures by NRA executives— including LaPierre—many of which were personal or lacked the documentation required by IRS publication 463 to permit the NRA to avoid reporting such expenses as taxable income.

57.     The NRA's annual budget with Ackerman included an aggregate line-item for "Pass-through Expenses." The amount earmarked for this purpose in the Ackerman/NRA budget increased over time. In 2018, the annual budget allocated $950,000 exclusively for this purpose.

58.     The effect of the pass-through expense arrangement was that expenses would be paid for by the NRA without written approvals, receipts, or the supporting business purpose documentation required by NRA policies and procedures.

59.     Under the umbrella of "Pass-through Expenses," the NRA paid for millions of dollars in entertainment and travel expenses incurred by NRA executives and associates—including LaPierre—without scrutiny from inside or outside the organization.

60.     One example of this practice is that, on information and belief, over a five-year period, Ackerman paid, and the NRA reimbursed, more than $250,000—a rate of more than $4,000 per month—in access fees to LaPierre's "travel consultant" (who was not a licensed travel agent). Like the other expenses passed through Ackerman, this over $4,000 monthly fee was unrelated to the services that Ackerman provided to the NRA. Upon information and belief, Ackerman itself rarely or never used LaPierre's travel consultant's services.

61.     Moreover, LaPierre's travel consultant has testified that, in addition to the $4000 funneled through Ackerman, the NRA paid her a flat fee of $26,000 per month to arrange LaPierre's travel and that LaPierre instructed her to alter invoices for private jets to conceal personal travel.

62.     LaPierre also used the pass-through arrangement with Ackerman to conceal his private travel and trips that were largely personal in nature. Upon information and belief, LaPierre directed Ackerman to pay for expenses related to NASCAR events, country music shows, vacations, and even medical visits, and billed those through to the NRA.

63.     For example, in 2018, LaPierre asked the president of Mercury Group, an affiliate of Ackerman, to accompany him on a visit to a medical clinic. In connection with this visit, the president of Mercury Group and LaPierre flew on a private charter and stayed at the Four Seasons for several days. The cost of this hotel for both the president of Mercury Group and LaPierre was paid for by Ackerman, but ultimately borne by the NRA. The lodging alone cost the NRA $9,550. The NRA also directly paid for the private travel associated with this visit to the medical clinic.

64.     The NRA also directed Ackerman to pay for a variety of other costs in connection with LaPierre's personal travel and to bill those costs to the NRA as pass-through expenses. When he travelled, LaPierre often required an individual from Ackerman to travel with him to provide logistical and administrative support. That individual was responsible for the payment of meals and gratuities for waiters, drivers, bellhops, hotel concierges, housekeepers, and others. On information and belief, the individuals who travelled with LaPierre instituted a practice of taking large cash advances—often several thousand dollars each at a time—to cover the cost of gratuities that LaPierre directed them to pay.

65.     In connection with NRA annual meetings and meetings of the NRA's Women's Leadership Forum, LaPierre's wife, Susan, incurred thousands of dollars of expenses per event for hair and makeup services, which were billed through Ackerman as out of pocket expenses. For example, between May 2016 and May 2017, the NRA paid one hair and makeup artist $16,359 for three events. On information and belief, both LaPierre and his wife were aware of the cost of these makeup services.

66.     The NRA also used the pass-through arrangement with Ackerman to pay for expenses related to Youth for Tomorrow, a charity unaffiliated with the NRA's mission[13] but headed by LaPierre's wife, who served as the president of its Board of Trustees in 2017 and 2018. The NRA and NRA Foundation spent thousands of dollars covering the fees for the entertainers at this charity's events and was one of the organization's largest sponsors.

67.     On information and belief, the practice of laundering expenses through Ackerman began decades ago as an informal agreement between LaPierre and Ackerman's co-founder and continued until the two companies severed ties in 2019.

68.     Plaintiffs learned of Defendants' misuse of their donations from media reports, following an investigation conducted by the NRA's former President, Lt. Col. Oliver North ("North").

69.     North served as President of the NRA from September 2018 through April 2019. As President of the NRA, North learned of material financial misconduct by the NRA.

70.     On April 17, 2019, North learned of allegations in New Yorker magazine that raised additional concerns about mismanagement of NRA funds. The New Yorker article quoted a former head of the IRS Exempt Organizations division as stating: "The litany of red flags is just extraordinary;" and, "The materials reflect one of the broadest arrays of likely transgressions that I've ever seen."

---

[13]     The Youth for Tomorrow website explains:

> The mission of Youth For Tomorrow is to provide children and families with the opportunity to focus their lives and develop the confidence, skills, intellectual ability, spiritual insight and moral integrity - each based on Godly principles, resulting in positive changes to the benefit of the child, the family, the community, and the nation.

https://www.youthfortomorrow.org/

71.     On April 22, 2019, the NRA's former public relations firm, Defendant Ackerman, disclosed that it had spent hundreds of thousands of dollars on clothing and private travel for LaPierre, and then billed the expenses back to the NRA. These reimbursements were not included as part of LaPierre's compensation on IRS Form 990, filed by the NRA.

72.     North pressed the NRA to investigate the above allegations. North initially raised his concerns through internal NRA channels, including the NRA's Audit Committee.

73.     On April 25, 2019, North wrote another letter—this time to the Executive Committee of the NRA Board of Directors. In that letter, North stated his intention to form a "Crisis Management Committee," to investigate the allegations of extraordinary spending by the NRA and LaPierre.

74.     Each time that North raised concerns about potential financial misconduct and tried to retain professionals to correct any wrongdoing, North's efforts were thwarted by Defendants and their associates. Ultimately, LaPierre managed to shut down North's Crisis Management Committee. As of this date, there has been no independent investigation of the NRA's spending.

75.     LaPierre also retaliated against North for attempting to investigate the organization's spending, eventually forcing North out as President of the NRA.

76.     Many of the NRA's improper expenditures for the personal benefit of Defendant LaPierre and his associates are further detailed in a complaint brought by the New York Attorney General that challenges the organization's not-for-profit status. These improper expenditures include, but are not limited to:

- LaPierre repeatedly approved private flights for his wife and extended family when he was not a passenger. In total, these lavish private flights cost over one million dollars and were neither authorized by the NRA board nor were in any way related to advancing the NRA's mission.

- LaPierre and his family repeatedly took extravagant yachting trips in the Bahamas, financed by an NRA contractor, but LaPierre repeatedly failed to disclose these gifts.

- The NRA reimbursed LaPierre more than $1.2 million dollars for personal expenses including Christmas gifts, airfare and lodging for his extended family, membership in a golf club, and travel to and from film shoots.
- In addition, several million dollars each year were allocated to LaPierre's personal security, which included extravagant purchases such as an armored vehicle.

77.    Other known instances of illicit spending by the NRA include:

- Spending $274,695 for clothing purchases for Defendant LaPierre from a Beverly Hills clothing store—through payments made to Ackerman McQueen—without reporting such expenses as income for LaPierre in the reports filed by the NRA with the IRS.

- Spending $243,644 on luxury travel for Defendant LaPierre to the Bahamas; Palm Beach; Los Angeles; Reno, Nevada; Budapest, Hungary; and Italy—through payments made to Ackerman McQueen—without reporting such compensation as income for LaPierre in the reports filed by the NRA with the IRS.

- Making inflated payments to the NRA's advertising agency, Ackerman McQueen, without obtaining documentation justifying such expense.

- Spending $5,446.16 per month for a luxury apartment for Megan Allen, an intern in Fairfax, Virginia.

- Spending tens of thousands of dollars on hair and make-up expenses for Susan LaPierre, the wife of Wayne LaPierre.

- Spending funds to investigate the purchase of a $6 million mansion for Wayne LaPierre on a lake and golf course near Dallas, Texas.

- Paying for private jets to fly Wayne LaPierre's niece in April 2017.

- Paying for private jet travel for Wayne LaPierre on a regular basis.

- Paying Wayne LaPierre's travel consultant a $26,000 per month flat fee.

- Promoting Josh Powell to Executive Director of General Operations after settling two separate sexual harassment suits against Mr. Powell.

24

78.     The NRA has admitted to some of its improper expenditures in its tax filings. Specifically, in the NRA's 2019 IRS Form 990 and its 2020 IRS Form 990, the organization admitted it had "identified what it believes are excess benefit transactions in which it engaged in 2019 and in prior calendar years of which it became aware but were not reported on its prior forms 990. . . There are other transactions in 2019 and prior calendar years that are still under review." The categories of excess benefit transactions from 2019 and earlier that the NRA self-identified in its filing include "personal transportation," "cosmetics," "gifts," "auto leases," and "first class travel and entertainment."

79.     The full extent of the NRA's financial misconduct has not yet been revealed. As a federal bankruptcy court noted in its order denying the NRA's bid for bankruptcy protection, the "NRA's former treasurer [Wilson Phillips] asserted his rights under the Fifth Amendment during large swaths of his deposition," shielding pertinent information. *In re Nat'l Rifle Ass'n of Am.*, 628 B.R. 262, 284 (Bankr. N.D. Tex. 2021).

80.     The questions former NRA treasurer and CFO Wilson Phillips declined to answer during his March 19, 2021 deposition on the basis that his answers could incriminate him include: whether he believes Defendant LaPierre mishandled the NRA's finances; who was responsible for preparing the NRA's IRS Form 990 in 2018 and earlier; and whether LaPierre reviewed the NRA's Form 990 during those years.

81.     Mr. Phillips's decision to invoke his Fifth Amendment privilege against self-incrimination is not the only indication that Defendants knew their conduct was unlawful. Revan McQueen, a co-CEO of Ackerman McQueen, testified in a deposition on August 23, 2021 that Defendant NRA's outside counsel informed Defendant Ackerman that Ackerman faced RICO liability. Similarly, an Ackerman Executive Vice President, Tony Makris, testified on April 16,

2021, during the NRA's bankruptcy trial, that Defendant LaPierre told a roomful of people that NRA's outside counsel was the only thing standing between him and incarceration.

## Class Action Allegations

82.     Pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure, the Plaintiffs bring this action on behalf of themselves and two nationwide classes of Plaintiffs.

83.     The first class of similarly situated persons is defined as: all persons residing in the United States who have donated funds to the NRA from November 30, 2015 through January 26, 2019 (the "NRA Class").

84.     The second class of similarly situated persons is defined as: all persons residing in the United States who have donated funds to the NRA Foundation from November 30, 2015 through January 26, 2019 (the "NRA Foundation Class").

85.     Excluded from each nationwide class are the Defendants, their legal representatives, heirs, successors, and assigns of Defendants, and all judges who may ever adjudicate this case.

86.     This action is brought as a class action and may be maintained pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs reserve the right to modify the two nationwide classes.

87.     Numerosity of the Nationwide Classes: Each nationwide Class is so numerous that the individual joinder of all members, in this or any action is impracticable. The exact number of Class members is presently unknown to Plaintiffs; however, it is believed that the NRA Class numbers at least five million persons. The identity of the members of each class and their addresses may be ascertained from the business records maintained by the NRA and the

NRA Foundation. Class members may be informed of the pendency of this action by a combination of e-mail and/or public notice.

88.     <u>Commonality</u>: There is a well-defined community of interest in the questions of law and fact involved affecting the members of each Class. These common legal and factual questions for the case involving the NRA Class include:

a.      Whether the Plaintiffs gave money to the NRA with the expectation that such funds would be spent to promote the NRA's mission.

b.      Whether the Plaintiffs gave money to the NRA with the expectation that the NRA would spend the money in accordance with all applicable laws.

c.      Whether the NRA misspent such money on matters unrelated to the NRA's mission as described in Defendants' solicitations.

d.      Whether the NRA spent such money in violation of laws governing not-for-profit organizations.

e.      Whether Defendants LaPierre and the NRA should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

89.     These common legal and factual questions for the case involving the NRA Foundation Class include:

a.      Whether the Plaintiffs gave money to the NRA Foundation with the expectation that such funds would be spent to promote the Foundation's mission.

b.      Whether the Plaintiffs gave money to the NRA Foundation with the expectation that the NRA would spend the money in accordance with all applicable laws.

c.      Whether the NRA Foundation misspent such money on matters unrelated to its mission as described in Defendants' solicitations.

d.      Whether the NRA Foundation spent such money in violation of laws governing not-for-profit organizations.

e.      Whether Defendants LaPierre and the NRA Foundation should be liable to repay Plaintiffs the amount of their donations, together with costs and punitive damages.

27

90.     Typicality: The claims of Plaintiffs Dell'Aquila, Borja, Chesney, and Weber are typical of the claims of the members of the NRA Class and the NRA Foundation Class. Dell'Aquila, Borja, Chesney, and Weber and each member of the NRA Class has, by definition, given funds to the NRA during the period from November 30, 2015 through January 26, 2019.

91.     Dell'Aquila and each member of the NRA Foundation Class has, by definition, given funds to the NRA Foundation during the period from November 30, 2015 through January 26, 2019.

92.     All members of each class have suffered similar harm arising from Defendants' violations, as alleged herein.

93.     Adequacy: Plaintiffs Dell'Aquila, Borja, Chesney, and Weber are adequate representatives of the NRA Class because their interests do not conflict with the interests of the members of the class they seek to represent. Plaintiff Dell'Aquila is an adequate representative of the NRA Foundation Class because his interests do not conflict with the interests of the members of that class.

94.     Plaintiffs Dell'Aquila, Borja, Chesney, and Weber intend to prosecute this action vigorously. Plaintiffs will fairly and adequately protect the interests of the members of each Class.

95.     Predominance and Superiority: This suit may also be maintained as a class action pursuant to Rule 23(b)(3) of the Federal Rule of Civil Procedure because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class. A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual class member, depending on the circumstances, may be relatively small or modest, especially given the burden and

28

expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Furthermore, it would be virtually impossible for the class members, on an individual basis, to obtain effective redress for the wrongs done to them. Moreover, even if class members themselves could afford such individual litigation, the court system could not. Individual litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expenses to all parties and the court system presented by the complex legal issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I**
**Fraud**
**Dell'Aquila, Borja, Chesney and Weber**
**and NRA Class v. LaPierre and the NRA**

96.     The Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

97.     During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA solicited funds from Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class.

98.     When soliciting such funds, Defendants LaPierre and the NRA advised Plaintiffs that their funds would be used for the NRA's mission of gun rights advocacy and firearm safety, education, and training.

99.     Defendants LaPierre and the NRA also operated as a tax-exempt organization under 26 U.S.C. § 501(c)(4), thereby implicitly promising its donors (in accordance with section (501(c)(4)) that the NRA's net earnings would not "inure[] to the benefit of any private shareholder or individual."

100. Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendants concerning the proposed use of the solicited funds.

101. As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015 to January 26, 2019.

102. Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, the NRA used the solicited funds for alternative purposes, including without limitation, for the purposes listed above in paragraphs 76-77.

103. Defendants LaPierre and the NRA knew that their representations concerning the use of the solicited funds were materially false, at the time Defendants made such representations.

104. Dell'Aquila, Borja, Chesney, Weber and the NRA Class have incurred damages as a result of the NRA's expenditures, unrelated to its mission.

105. The total amount of damages incurred by all Plaintiffs and the NRA Class is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court enter an order certifying the NRA Class as a Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys' fees.

## COUNT II
## Fraud

### Dell'Aquila and NRA Foundation Class
### v. LaPierre and the NRA Foundation

106.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

107.    During the period from November 30, 2015 to January 26, 2019, Defendants LaPierre and the NRA Foundation solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class.

108.    When soliciting such funds, Defendants LaPierre and the NRA Foundation represented that the solicited funds would be used for the NRA Foundation's mission of firearm safety, education, and training.

109.    Defendants LaPierre and the NRA Foundation also informed donors that the NRA Foundation is a tax-exempt organization under 26 U.S.C. § 501(c)(3), thereby implicitly promising that, in accordance with that section, the NRA's net earnings would not "inure[] to the benefit of any private shareholder or individual."

110.    Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon Defendants' false statements concerning the intended use of the solicited funds.

111.    As a result of such reliance, Plaintiff Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA Foundation during the time period from November 30, 2015 to January 26, 2019.

112.    Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, the NRA Foundation used the solicited funds for alternative purposes, including without limitation, the following:

31

a. By transferring millions of dollars from the NRA Foundation (a tax-deductible charitable organization) to the NRA (a non-tax-deductible lobbying organization) over a ten-year period. LaPierre has admitted in a deposition that the NRA Foundation transferred $5 million to the NRA and that the NRA did not repay these funds, but on information and belief the true amount transferred during the relevant period is many times that. Money transferred from the foundation to the NRA was then misused as described above in paragraphs 76-77.

b. By paying at least $125,000 to Youth for Tomorrow, a non-profit organization unrelated to the NRA's mission. Defendant LaPierre's wife, Susan LaPierre, served on the board of Youth for Tomorrow, and was its President from 2013 to 2018.

c. Defendants LaPierre and the NRA Foundation knew that their representations concerning the use of the solicited funds were materially false at the time they made such representations.

113. Plaintiff Dell'Aquila and the NRA Foundation Class have incurred damages as a result of the NRA's Foundation's illicit expenditures that were unrelated to its mission.

114. The total amount of damages incurred by Plaintiff and the NRA Foundation Class is greater than $5 million.

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court enter an order certifying the NRA Foundation Class as Class of Plaintiffs in this matter pursuant to Rule 23(c) of the Federal Rules of Civil Procedure, and (b) awarding to Plaintiff Dell'Aquila and each member of the NRA Foundation Class damages equal to the amounts such persons donated to the NRA Foundation during the period from November 30, 2015 to January 26, 2019, together with costs, punitive damages and attorneys' fees.

## COUNT III
### Breach of Contract

### Dell'Aquila, Borja, Chesney and Weber
### and NRA Class v. LaPierre and the NRA

115.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

116.    By all of the above, Defendants NRA and LaPierre made promises contained in their various solicitations to potential donors, like Plaintiffs, regarding the use of Plaintiffs' donations. These promises were made to solicit good and valuable consideration from the Plaintiffs and the NRA Class. Each member of the class donated to the NRA and therefore formed a contract between themselves and the NRA.

117.    Defendants breached the promises as set out above.

118.    As a direct and proximate result of Defendants' breach, Plaintiffs and the NRA Class were damaged.

## COUNT IV
### Breach of Contract

### Dell'Aquila and NRA Foundation Class
### v. LaPierre and the NRA Foundation

119.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as if fully set forth herein.

120.    By all of the above, Defendants NRA Foundation and LaPierre made promises contained in their various solicitations to potential donors, like Plaintiff Dell'Aquila, regarding the use of Plaintiff's donations. These promises were made to solicit good and valuable consideration from Plaintiffs and NRA Foundation Class. Each member of the class donated to NRA Foundation and therefore formed a contract between themselves and the NRA Foundation.

33

121.    Defendants breached the promises as set out above.

122.    As a direct and proximate result of Defendants' breach, Plaintiff Dell'Aquila and NRA Foundation Class were damaged.

### COUNT V
### Violation of RICO

**Dell'Aquila, Borja, Chesney, Weber**
**and the NRA Class v.**
**LaPierre and Ackerman**

123.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

124.    This Count is against Defendants LaPierre and Ackerman (the "Count V Defendants").

125.    Through the below-described actions, in the context of the full allegations in this complaint, the Count V Defendants violated the federal Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

126.    Each of the Count IV Defendants is a "person" as defined in § 1961(3), as they are individuals or legal entities capable of holding an interest in property.

127.    NRA, as a corporate entity, is an enterprise engaged in and whose activities affect interstate commerce.

128.    The Count V Defendants knowingly participated in the conduct of the NRA's affairs with the unlawful purpose of defrauding Plaintiffs and the NRA Class by misappropriating their donation money for their personal benefit, and for the benefit of their associates, and by laundering money with the purpose of perpetuating the donations and illicit expenditures.

129.    Pursuant to and in furtherance of their fraudulent scheme, the Count V Defendants committed multiple related acts of mail and wire fraud, in violation of 18 U.S.C. § 1341 and 1343, thusly:

130.    During the period from November 30, 2015 to January 26, 2019, Defendant LaPierre solicited funds from Dell'Aquila, Borja, Chesney, Weber, and each member of the NRA Class, employing the same or substantially similar set of solicitations, as described above.

131.    Defendant LaPierre solicited funds from Plaintiffs Dell'Aquila, Borja, Chesney, Weber, and each member of the NRA Class by means of the United States Postal Service.

132.    Defendant LaPierre also used electronic mail to solicit funds from Plaintiffs and NRA Class.

133.    When soliciting such funds, Defendant LaPierre advised Plaintiffs that their funds would be used for the NRA's mission of gun rights advocacy and firearm safety, education and training.

134.    These solicitations, which were transmitted by mail or wire dozens of times over the relevant time period, constitute a pattern of racketeering activity.

135.    Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendant LaPierre concerning the proposed use of the solicited funds.

136.    As a result of such reliance, Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class donated funds to the NRA during the time period from November 30, 2015, to January 26, 2019.

137.    Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, they used the solicited funds for alternative purposes, including and without limitation, for the purposes listed above in paragraphs 76-77.

138.     The illicit uses of the donated money solicited by LaPierre includes multiple payments to the other Count V Defendant, Ackerman McQueen.

139.     Defendants LaPierre knew that his representations concerning the use of the solicited funds were materially false at the time he made such representations.

140.     Defendant LaPierre also knew at all relevant times that the proceeds of the donations were in violation of federal law prohibiting employing the postal and wire services to perpetuate a fraudulent scheme.

141.     The Count V Defendants, by employing the United States Postal Service to perpetrate a fraudulent scheme involving the donations from the NRA Class, committed a multitude of violations of the federal statute prohibiting mail fraud, as defined in 18 U.S.C. § 1341.

142.     Knowing that money received through donations were the result of a multitude of mail and wire frauds, the Count V Defendants employed "pass-through arrangements" with Defendant Ackerman to evade scrutiny from regulators, NRA members, and the NRA board of their superfluous personal expenditures and their fraudulent scheme to perpetuate those superfluous expenditures.

143.     Such behavior constitutes multiple schemes to launder money.

144.     §1956(A)(1)(b)(i) prohibits conducting or attempting to conduct financial transactions which in fact involves the proceeds of specified unlawful activity with the intent to further that unlawful activity.

145.     Mail and wire fraud, as enumerated in §1961(1) of RICO, constitute "specified unlawful activity," pursuant to §1956(c)(7)(A).

146. The Count V Defendants engaged in numerous financial transactions with the proceeds of these mail and wire frauds, as detailed without limitation above, while knowing that these proceeds were the result of the mail fraud.

147. Therefore, by transferring money between each other in an effort to perpetuate these mail and wire frauds, the Count V Defendants violated §1956(A)(1)(b)(i).

148. Defendant LaPierre also employed the money laundering arrangement with Defendant Ackerman to make fraudulent tax statements, like failing to document his personal expenses as required by IRS publication 463, which permitted the NRA and LaPierre to avoid reporting such expenses as taxable income.

149. Section 1956(A)(1)(b)(ii) prohibits conducting or attempting to conduct financial transactions involving the proceeds of specified unlawful activity with the intent to violate Section 7206 of the Internal Revenue Code.

150. Section 7206 of the Internal Revenue Code prohibits willfully making any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which the maker does not believe to be true and correct as to every material matter.

151. LaPierre willfully violated Section 7206 when he regularly filed false and misleading Forms 990, not listing his excess benefits resulting from his money laundering scheme with Defendant Ackerman.

152. Therefore, the Count V Defendants' use of money laundering schemes constitute violations of §1956(A)(1)(b)(i) and (ii).

153. Section 1961(1) of RICO enumerates mail and wire fraud as a predicate acts for violations of §1962 of the act.

154.    Secion 1961(1) of RICO enumerates laundering of monetary instruments (§ 1956) as a predicate act for violations of § 1962 of the act.

155.    The above course of conduct constitutes a pattern of racketeering activity as defined in 18 U.S.C. § 1961(5).

156.    Therefore, the Count V Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

157.    As a direct and proximate result of the Count V Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dell'Aquila, Borja, Chesney, Weber, the NRA Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's mission.

158.    According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

159.    The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.

38

## COUNT VI
## RICO Conspiracy

## Dell'Aquila, Borja, Chesney, Weber
## and the NRA Class v.
## LaPierre and Ackerman

160.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

161.    This Count is against Defendants LaPierre and Ackerman ("Count VI Defendants")

162.    As set forth above, the Count VI Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically:

163.    The Count VI Defendants conspired to violate § 1962(c) by participating in the conduct of the affairs of the NRA enterprise through a pattern of racketeering activity.

164.    Primarily through the efforts of Defendant LaPierre, a multitude of mail and wire frauds were committed over the course of the relevant time period.

165.    These frauds consisted of dozens of fraudulent solicitations for donations sent over years and via the United States Postal Service and/or email that contained materially false statements about how the donated money would be expended, in violation of §1341 and § 1343 of the U.S. Code prohibiting mail and wire fraud, respectively.

166.    Additionally, the Count VI Defendants employed a series of schemes to launder the money gained through these solicitations.

167.    In one such scheme, money was transferred between LaPierre and Ackerman to conceal the expenditure of that money for LaPierre and his family's personal use, in violation of 18 U.S.C. §1956(A).

168.     Therefore, the Count VI Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the NRA enterprise through a pattern of racketeering activity.

169.     The Count VI Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962 (c), in violation of 18 U.S.C. § 1962(d).

170.     As a direct and proximate result of the Count VI Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Dell'Aquila, Borja, Chesney, Weber, the NRA Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's Mission.

171.     According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

172.     The total amount of damages incurred by all Plaintiffs, including the NRA Class, is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class damages equal to three times the amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.

40

# COUNT VII
## Violation of RICO

### Dell'Aquila and the NRA Foundation
### Class v. NRA, LaPierre, and Ackerman

173.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

174.    This Count is against Defendants NRA, LaPierre, and Ackerman (the "Count VII Defendants").

175.    Through the below-described actions, in the context of all of preceding allegations, the Count VII Defendants violated the federal Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. § 1961, et seq. ("RICO").

176.    Each of the Count VII Defendants is a "person" as defined in § 1961(3), as each is an individual or legal entity capable of holding an interest in property.

177.    NRA Foundation, as a corporate entity, is an enterprise engaged in and whose activities affect interstate commerce.

178.    The Count VII Defendants knowingly participated in the conduct of the NRA Foundation's affairs with the unlawful purpose of defrauding Plaintiffs and the NRA Foundation Class by misappropriating their donation money for Defendants' personal benefit, and for the benefit of their associates, and by laundering money with the purpose of perpetuating this scheme.

179.    Pursuant to and in furtherance of their fraudulent scheme, the Count VII Defendants committed multiple related acts of mail and wire fraud, in violation of 18 U.S.C. § 1341 and 1343, thusly:

180.    During the period from November 30, 2015, to January 26, 2019, Defendants NRA and LaPierre solicited funds from Plaintiff Dell'Aquila and each member of the NRA

41

Foundation Class, employing the same or substantially similar set of solicitations, as detailed above.

181. Defendants NRA and LaPierre solicited funds from Plaintiff Dell'Aquila and each member of the NRA Foundation Class by means of the United States Postal Service.

182. Defendants NRA and LaPierre also used electronic mail to solicit funds from Plaintiff and NRA Foundation Class.

183. When soliciting such funds, Defendants NRA and LaPierre advised Plaintiff and the NRA Foundation Class that their funds would be used to advance the NRA's mission.

184. These solicitations, which were transmitted by mail or wire dozens of times over the relevant time period, constituted a pattern of racketeering activity.

185. Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by Defendants NRA and LaPierre concerning the proposed use of the solicited funds.

186. As a result of such reliance, Dell'Aquila and each member of the NRA Foundation Class donated funds to the NRA during the time period from November 30, 2015, to January 26, 2019.

187. Defendants' statements concerning the use of the solicited funds were materially and intentionally false. In reality, they used substantial portions of the solicited funds for alternative purposes, including and without limitation, the purposes described above in paragraph 112.

188. Defendants NRA and LaPierre knew that their representations concerning the use of the solicited funds were materially false, at the time Defendant made such representations. LaPierre's culpable state of mind is manifested by, among other actions, his instruction to his

42

travel consultant to alter records to disguise that the NRA was paying for private planes to transport his niece.

189.    The above list of illicit uses of the donated money includes multiple payments to Defendant Ackerman.

190.    Defendant LaPierre knew at all relevant times that the proceeds of the donations were in violation of federal law prohibiting employing the postal and wire services to perpetuate a fraudulent scheme.

191.    Therefore, the Count VII Defendants, by employing the United States Postal Service and wire services to perpetrate a fraudulent scheme involving the donations from the NRA Class, committed violations of the federal statute prohibiting mail and wire fraud as defined in 18 U.S.C. § 1341.

192.    Knowing that money received through donations were the result of a multitude of mail and wire frauds, the Count VII Defendants employed "pass-through arrangements" with Defendant Ackerman to evade scrutiny of their superfluous personal expenditures and fraudulent scheme to perpetuate those superfluous expenditures.

193.    Such behavior constitutes multiple schemes to launder money.

194.    8 U.S.C. §1956(A)(1)(b)(i) prohibits conducting or attempting to conduct financial transactions which in fact involves the proceeds of specified unlawful activity with the intent to further that unlawful activity.

195.    Mail and wire fraud, as enumerated in Section 1961(1) of the RICO statute, constitute "specified unlawful activity," pursuant to §1956(c)(7)(A).

43

196. The Count VII Defendants engaged in numerous financial transactions with the proceeds of these mail and wire frauds, as detailed above, while knowing that these proceeds were the result of the mail fraud.

197. Therefore, by transferring money between each other in an effort to perpetuate these mail and wire frauds, the Count VII Defendants violated § 1956(A)(1)(b)(i).

198. The Count VII Defendants also engaged in money laundering in that millions of dollars transferred between the NRA Foundation and NRA constitutes a scheme to evade the restrictions imposed by the tax code.

199. Transferring money from the NRA Foundation to the NRA allows the NRA to use money collected for use by the NRA Foundation for lobbying purposes, in violation of the restrictions imposed on the NRA Foundation by its 501(c)(3) status.

200. 18 U.S.C. §1956(A)(1)(b)(ii) prohibits conducting or attempting to conduct a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to violate Section 7206 of the Internal Revenue Code.

201. Section 7206 of the Internal Revenue Code prohibits willfully making any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which the maker does not believe to be true and correct as to every material matter.

202. Defendant NRA willfully violated Section7206 when they regularly published false and misleading statements regarding their compliance with the provisions of Section 501(c) of the Internal Revenue Code.

203. Therefore, the Count VII Defendants use of the money laundering arrangements constitute violations of 18 U.S.C. §1956(A)(1)(b)(i) and (ii).

204.     Section 1961(1) of RICO enumerates mail and wire fraud as a predicate acts for violations of §1962 of the act.

205.     Section 1961(1) of RICO enumerates laundering of monetary instruments (§ 1956) as a predicate act for violations of § 1962 of the act.

206.     The above course of conduct constitutes a pattern of racketeering activity, as defined in 18 U.S.C. § 1961(5).

207.     Therefore, the Count VII Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(c).

208.     As a direct and proximate result of the Count VII Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dell'Aquila and the NRA Foundation Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's mission.

209.     According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

210.     The total amount of damages incurred by all Plaintiff Dell'Aquila and the NRA Foundation Class is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila and each member of the NRA Foundation Class damages equal to three times the

amounts such persons donated to the NRA during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.

## COUNT VIII
## RICO Conspiracy

### Dell'Aquila and the NRA
### Foundation Class v. NRA,
### LaPierre, and Ackerman

211.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs as though fully set forth herein.

212.    This Count is against Defendants NRA, LaPierre, and Ackerman (the "Count VIII Defendants")

213.    As set forth above, the Count VIII Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c). Specifically:

214.    The Count VIII Defendants conspired to violate Section 1962(c) by participating in the conduct of the affairs of the NRA Foundation enterprise through a pattern of racketeering activity.

215.    Through the efforts of Defendants NRA and LaPierre, a multitude of mail and wire frauds were committed over the course of the relevant time period.

216.    These frauds consisted of dozens of fraudulent solicitations for donations to the NRA Foundation sent over years and via the United States Postal Service and/or email that contained materially false statements about how the donated money would be expended, in violation of §1341 and 1343 of the U.S. Code prohibiting mail and wire fraud, respectively.

217.    Additionally, the Count VIII Defendants employed a series of schemes to launder the proceeds of these fraudulent solicitations.

46

218.    In one such scheme, money was transferred between LaPierre and Ackerman to conceal the expenditure of that money for LaPierre and his family's personal use, in violation of 18 U.S.C. §1956(A).

219.    In another such scheme, the Count VIII Defendants violated portions of the Internal Revenue Code by fraudulently transferring money from the 501(c)(3) NRA Foundation and the 501(c)(4) NRA, in order to evade the restrictions on lobbying imposed by Section 501(c)3 of the Internal Revenue Code.

220.    Therefore, the Count VIII Defendants have intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.

221.    The Count VIII Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

222.    As a direct and proximate result of the Count VIII Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Dell'Aquila and the NRA Foundation Class have been injured in their business and property in that they have donated funds to an organization in reliance on the fraudulent statements of LaPierre that those funds would be used in furtherance of NRA's mission.

223.    According to 18 U.S.C. § 1964(c), "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

224.    The total amount of damages incurred by Plaintiff Dell'Aquila and the NRA Foundation Class is greater than $5 million.

WHEREFORE, the Plaintiffs respectfully requests that this Honorable Court award to Dell'Aquila and each member of the NRA Foundation Class damages equal to three times the amounts such persons donated to the NRA Foundation during the period from November 30, 2015 to January 26, 2019, together with costs, and attorneys' fees, pursuant to RICO.

DATED: June 30, 2023                    Respectfully submitted,

                                        s/ Julia Rickert
                                        *One of Plaintiffs' Attorneys*

                                        Michael I. Kanovitz (pro hac vice)
                                        Jonathan I. Loevy (pro hac vice)
                                        Julia Rickert (pro hac vice)
                                        Thomas Hanson (pro hac vice)
                                        Heather Sticht (BPR 030827)
                                        LOEVY & LOEVY
                                        311 N. Aberdeen St., 3rd Fl.
                                        Chicago, IL 60607
                                        O: (312) 243-5900
                                        julia@loevy.com

                                        Elizabeth Wang (pro hac vice)
                                        LOEVY & LOEVY
                                        2060 Broadway, Ste. 460
                                        Boulder, CO 80302
                                        O: (720) 328-5642
                                        elizabethw@loevy.com

                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2023, a true and exact copy of Plaintiffs' Amended

Complaint was electronically filed with the Clerk's Office using the the CM/ECF filing system

and served via the Court's CM/ECF system and/or via email and/or U.S. Mail upon the parties

listed below.  Parties may also access this filing through the Court's CM/ECF system.

> William A. Brewer
> Malvina Palloj
> BREWER, ATTORNEYS & COUNSELORS
> 750 Lexington Ave., 14th Floor
> New York, NY 10022
> Email: wbb@brewerattorneys.com
> mpalloj@brewerattorneys.com
>
> and
>
> Wallace A. McDonald
> LACY, PRICE & WAGNER, P.C.
> 249 N. Peters Rd., Suite 101
> Knoxville, TN 37923
> Email: amcdonald@lpwpc.com

Respectfully submitted,
s/ Julia Rickert
*One of Plaintiffs' Attorneys*

> Michael I. Kanovitz (pro hac vice)
> Jonathan I. Loevy (pro hac vice)
> Julia Rickert (pro hac vice)
> Thomas Hanson (pro hac vice)
> Heather Sticht (BPR 030827)
> LOEVY & LOEVY
> 311 N. Aberdeen St., 3rd Fl.
> Chicago, IL 60607
> O: (312) 243-5900
> julia@loevy.com
>
> Elizabeth Wang (pro hac vice)
> LOEVY & LOEVY
> 2060 Broadway, Ste. 460
> Boulder, CO 80302
> O: (720) 328-5642
> elizabethw@loevy.com

## <u>VERIFICATION</u>

I, David Dell'Aquila, hereby swear and affirm that I have read the foregoing Third Amended Complaint and that the allegations and facts set forth in the Complaint are true and correct to the best of my knowledge, information, and belief.

/s/   David Dell'Aquila
David Dell'Aquila

## **VERIFICATION**

I, Todd Chesney, hereby swear and affirm that I have read the foregoing Third Amended Complaint and that the allegations and facts set forth in the Complaint are true and correct to the best of my knowledge, information, and belief.

/s/ Todd Chesney
Todd Chesney

## **VERIFICATION**

I, Brent Weber, hereby swear and affirm that I have read the foregoing Third Amended Complaint and that the allegations and facts set forth in the Complaint are true and correct to the best of my knowledge, information, and belief.

/s/
Brent Weber

## **VERIFICATION**

I, Lorannda Borja, hereby swear and affirm that I have read the foregoing Third Amended Complaint and that the allegations and facts set forth in the Complaint are true and correct to the best of my knowledge, information, and belief.

Lorannda Borja
/s/
Lorannda Borja