IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID DELL'AQUILA, LORANNDA BORJA, TODD CHESNEY, and BRENT WEBER, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 3:19-cv-00679 Chief Judge Campbell/Frensley |
| v. | ) ) | |
| NATIONAL RIFLE ASSOCIATION OF AMERICA | ) ) ) | |
| Defendant. | ) ) | |

**RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Plaintiffs David Dell'Aquila, Lorannda Borja, Todd Chesney, and Brent Weber (collectively, "Plaintiffs") filed their Motion for Class Certification (the "Motion", Doc. No. 215) on March 13, 2026. Defendant National Rifle Association of America ("Defendant" or "NRA") respectfully responds to that Motion herein.[1]

**BACKGROUND**

Plaintiff Dell'Aquila originally filed this action as part of a publicity campaign intended to remove the NRA's then-CEO Wayne LaPierre from office. Now, more than six years and four versions of the complaint later, Plaintiffs seek to certify two classes: the NRA Class and the NRA Foundation Class. This Court should affirmatively hold that neither class can ever be certified, for

---

[1] Plaintiffs also filed an "Opposed Motion Instanter To Amend Case Management Order" (Doc. No. 214) earlier that same day. As noted in Defendant's "Notice of Response to Plaintiff's Motion for Class Certification," the motion to amend the case management order was rendered moot by the subsequent filing of the Motion. (Doc. No. 217).

1

individual legal and factual issues predominate throughout Plaintiffs' claims. Moreover, no discovery from the Defendant can change the fact that the proposed classes can never be certified—discovery from Plaintiffs can only strengthen the NRA's position, but only at great and unnecessary burden to the NRA and this Court.[2] This Court should deny class certification.

The NRA Class's proposed representatives are all four named Plaintiffs. For the NRA Class, Plaintiffs bring pendent state law counts of fraud (Count I) and breach of contract (Count II). Plaintiffs define the proposed NRA Class as "[a]ll persons residing in the United States who have donated funds to the National Rifle Association of America from November 30, 2015 through January 26, 2019." (Motion, at 2; Third Amended Complaint, at ¶ 106). Plaintiffs estimate that there are five million potential members of this class. (Motion, at 4).

The NRA Foundation Class's sole proposed representative is Plaintiff Dell'Aquila. For the NRA Foundation Class, Plaintiffs bring a pendent state law claim of tortious interference (Count III), and federal law claims of violation of RICO (Count IV), and related RICO Conspiracy (Count V). Plaintiffs define the proposed NRA Foundation Class as "[a]ll persons residing in the United States who have donated funds to the NRA Foundation from November 30, 2015 through January 26, 2019" (Motion, at 2; Third Amended Complaint, at ¶ 107). It is unclear how many potential

---

[2] On January 16, 2026—before the close of fact discovery—Defendant NRA served Plaintiffs with interrogatories and document requests seeking information and materials related to the Plaintiffs' claims that they relied on statements from the NRA concerning the proposed use of solicited funds, that go to the issues of class certification raised herein.

Plaintiffs' counsel requested an extension of the deadline to respond to those discovery requests on February 13, 2026, and Defendant extended the deadline to March 18, 2026. On March 13, 2026, Plaintiffs' counsel again requested an extension of the deadline to respond, "assur[ing] [Defendant] that we have been working with our clients on their responses and intend to provide substantive responses" to Defendant's discovery requests. Defendant agreed to extend the deadline for response to March 27, 2026.

On that day, Plaintiffs refused to provide substantive responses to those requests, and instead served objections to each of Defendant's requests on the grounds that those requests were untimely.

2

members are in the NRA Foundation Class. (Motion, at 5).

**<u>LEGAL STANDARD</u>**

To be certified, a class action must meet the following four factors: numerosity, commonality, typicality, and adequate representation. F.R.C.P. 23(a). And for a Rule 23(b) damages class, as proposed here (Motion, at 3), the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members." F.R.C.P. 23(b)(3); (Motion, at 3).

"The party seeking the class certification bears the burden of proof." *In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996). "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012) (citation omitted).

Because of the drastic effect that class treatment can have on the scope and stakes of a lawsuit, certification of a class is "the exception, not the rule." *See In re Ford Motor Co.*, 86 F.4th 723, 725-26 (6th Cir. 2023). Thus, to carry his or her burden on a class certification motion, a named plaintiff cannot merely rest on its pleadings, but must affirmatively offer "significant evidentiary proof" that he or she can meet Rule 23's requirements when contested. *Id.* (cleaned up). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011) (citation and quotation marks omitted).

Moreover, "[b]efore delving into the 'rigorous analysis' required by Rule 23, a court first should consider whether a precisely defined class exists and whether the named plaintiffs are members of the proposed class." *Chaz Concrete Co. v. Codell*, No. 3:03-52-KKC, 2006 U.S. Dist. LEXIS 60013, at *13 (E.D. Ky. Aug. 23, 2006) (quoting *Bentley v. Honeywell Int'l, Inc.*, 223

F.R.D. 471, 477 (S.D. Ohio 2004)). "Common class certification issues include evaluating proposed classes that are ill-defined or too broad." *McGee v. East Ohio Gas Co.*, 200 F.R.D. 382, 388 (S.D Ohio 2001). "Where extensive factual inquiries are required to determine whether individuals are members of a proposed class, class certification is likely improper." *Chaz Concrete Co.*, 2006 U.S. Dist. LEXIS 60013, at *13.[3]

It is not necessary that burdensome and costly discovery from defendants be completed before this Court decides whether class certification is appropriate. *Young*, 693 F.3d at 537 ("[I]t is not always necessary to probe behind the pleadings before coming to rest on the certification question, because sometimes there may be no disputed factual and legal issues that strongly influence the wisdom of class treatment." (internal citation and quotation marks omitted)). Plaintiffs state that "[t]his is such a case," where the Court should rule on class certification before discovery is complete. (Motion, at 3). Defendant agrees in one respect. This Court can decide class certification now, on the basis of legal principles that affirmatively prevent the purported classes from being certified.

## ARGUMENT

The proposed classes cannot be certified for several reasons. Most importantly, Plaintiffs have not met their Rule 23 burden to show why common issues of law and fact predominate over individual ones with respect to each of their claims. But even putting that aside, class certification is inappropriate because individual issues predominate over both classes' claims, because the named Plaintiffs are not typical of the class they seek to certify.

---

[3] The classes here are still vaguely defined after four complaints. Plaintiffs do not define what they mean by "donated," which, as explained below, complicates class certification given the varying ways that and varying purposes for which individual Plaintiffs sent money to the NRA.

**A. The classes cannot be certified because of individual factual and legal issues that predominate over common issues for each claim.**

The most glaring and fatal issue in certifying these classes is commonality and predominance. Rule 23 requires that there be "questions of law or fact common to the class," and that common questions "predominate over any questions affecting only individual members." *See* Fed. R. Civ. P. 23(a)(2), (b)(3). To conduct the analysis, the Court should "add up all the suit's common issues" and "all of its individual issues" and then "qualitatively evaluate which side 'predominates' over the other." *Fox v. Saginaw Cnty.*, 67 F.4th 284, 300 (6th Cir. 2023) (citing *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018)). Importantly, even if Plaintiffs can point to "droves" of common questions, they must also demonstrate "the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (quoting Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009) (emphasis retained)). The critical inquiry undergirding the entire predominance analysis is "how a trial on the merits would be conducted if a class were certified." *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460 (6th Cir. 2017) (citation omitted).

Plaintiffs' proposed classes can be grouped into two categories. The first category, which includes the NRA Class fraud claim and the NRA Foundation Class RICO and RICO conspiracy claims, concerns causes of action that are fundamentally centered on fraud. All of Plaintiffs' fraud-related claims contain an individualized reliance requirement. Indeed, Plaintiffs have affirmatively pled reliance for their federal RICO and state law fraud claims—making predominance impossible and thus precluding certification of the RICO and fraud classes. The second category, which includes the NRA Class contract claim and the NRA Foundation Class state law tortious interference with contract claim, centers on contract claims that are based on discontinuous state

laws, many of which do not even acknowledge standing for such claims. Those discontinuities of law make predominance impossible for the nationwide classes sought by Plaintiffs and thus make certification of the state law contract-related claims also impossible.

1. <u>Plaintiffs have not carried their burden to show that common issues predominate as to any claim</u>

In Plaintiffs' brief discussion of Rule 23's predominance requirement, they list three items they purport that Defendants' liability "turns on," identify three broad categories of evidence they contend are common to all proposed plaintiffs, and then assert without elaboration that "there are no individual inquiries for individual class members." (Motion, at 9-10). Plaintiffs do not discuss the specific causes of action they seek to certify as to each class, nor how the elements of those causes of action can be established with common proof. And Plaintiffs' claim that there are no individual issues is unsupported and, as discussed below, inconsistent with their prior acknowledgement that fraud claims are generally too individualized for class treatment. Plaintiffs' conclusory argumentation is insufficient to meet their burden to show predominance. *See, e.g., Torres v. Dino Palmieri Salons, Inc.*, No. 1:19-CV-1501, 2021 WL 4808780, 2021 U.S. Dist. LEXIS 198550, *26 (N.D. Ohio Oct. 15, 2021) (denying motion for class certification where the plaintiff's "conclusory argument proceed[ed] at too high a level of generality without sufficient—or any—specificity . . . .").

Because Plaintiffs have failed to meet their burden, the Court can begin and end its class certification analysis here. If the Court decides to nonetheless consider the issue, however, Defendant—cognizant of the consequences that class certification might have on the stakes of this litigation—has thoroughly briefed why individualized issues would predominate over each of Plaintiffs' claims in the sections that follow. By submitting detailed arguments as to each cause of action, Defendant is not assuming Plaintiffs' burden, nor inviting the Court to do so.

6

<u>2. Fraud based claims (Fraud, RICO, RICO Conspiracy)</u>

Plaintiffs pled claims of state law fraud on behalf of the NRA Class, and federal RICO and RICO conspiracy claims on behalf of the NRA Foundation Class. But fundamentally, Plaintiffs' fraud and RICO claims center on the same individualized misrepresentations that make predominance impossible. Because Plaintiffs have affirmatively pled reliance, and because all of Plaintiffs' fraud-based claims—including the RICO predicate acts—ultimately turn on individualized misrepresentations, certification of the fraud and RICO claims rise or fall together.

Specifically, Plaintiffs' Third Amended Complaint alleges that the Plaintiffs "reasonably relied upon the statements made by Defendant and LaPierre concerning the proposed use of solicited funds" and, likewise, "reasonably relied upon the statements made by the Foundation concerning the proposed use of the solicited funds." (*See* Third Amended Complaint, at ¶¶ 123, 150).

Courts have routinely held, in both RICO and state law cases, that fraud-based claims of the type pled here are inappropriate for class certification. Indeed, the Sixth Circuit recently reiterated that the element of reliance is "often 'an insuperable barrier to class certification'" in fraud claims and vacated this Court's order granting class certification in a fraud case implicating multiple states' laws. *See In re Nissan N. Am., Inc.*, 122 F.4th 239, 249-51 (6th Cir. 2024) (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 351 n.6).[4] Plaintiffs know this, because they have previously admitted as much to this Court when they stated they would *not* seek class certification for state law fraud: "Plaintiffs do not intend to seek class certification on the operative Second Amended

---

[4] "Commonality issues taint the predominance inquiry from the get-go . . . . [Rule 23] requires a court to put the common issues on one side, the individual issues on the other, then qualitatively evaluate which side predominates . . . . Having determined that the district court failed to do so, especially in light of *Ford* and *Doster*, it follows that the predominance inquiry requires a second look." *In re Nissan*, 122 F.4th at 252 (vacating and remanding certification of class).

Complaint, given that **<u>a claim for common law fraud is generally not amenable for class treatment due to the individualized nature of the justifiable reliance element</u>**. Stated another way, Plaintiffs will not pursue class certification unless the proposed Third Amended Complaint is allowed." (Doc. No. 147, at ¶ 11 (emphasis added)). Plaintiffs' addition of the RICO class claims did nothing to change the fundamental problem they have already identified for the Court.

Plaintiffs base their federal RICO claims on fraud and misrepresentation, which courts have repeatedly found to be inappropriate for class certification. Specifically, Plaintiffs argue that the NRA knowingly used the NRA Foundation for the purpose of defrauding the class by misappropriating donated money. (Third Amended Complaint, at ¶ 144). Plaintiffs specifically plead that they relied upon alleged statements made about the intended use of the funds. (*Id.* at ¶ 150). Plaintiffs' RICO allegation is fundamentally centered on fraud, in particular, mail and wire fraud. (*Id.* at ¶¶ 154-55, 159).

Plaintiffs' mistaken belief that their RICO claim deserves different treatment from their state-law fraud claim probably stems from the Supreme Court's holding in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008). In *Bridge,* the Supreme Court held that first-party reliance is not always an element of a civil RICO claim predicated upon mail fraud but confirmed that it is an element when such first-party reliance is, as here, the basis of the RICO claim.  In other words, the Court held that a plaintiff injured because a third party relied on a defendant's misrepresentation has standing to sue under RICO. *Bridge* involved a scheme whereby a company obtained the right to bid for more tax liens in Cook County Illinois by using related, colluding companies to obtain a greater number of liens than a single company, acting alone, could obtain. *See id.* at 643-45. The competing companies that were injured could not show first-person reliance because it was Cook County, not the petitioners in *Bridge*, who had relied on the false mailings.

*See id.* at 645, 650-52. The Court nonetheless allowed the RICO claim to proceed because there was unquestionably mail fraud that caused the injury to the competing companies. *Id.* at 661.

The instant case is not like *Bridge* because Plaintiffs allege that they directly relied upon fraudulent mailings and communications. *Bridge* expressly acknowledged that such direct claims stand on different footing, and the Supreme Court cabined its holding in that decision by explaining that "[o]f course, none of this is to say that a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud can prevail without showing that *someone* relied on the defendant's misrepresentations." *Id.* at 659 (emphasis retained). Indeed, *Bridge* explained: "In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation." *Id*. at 658.

Subsequent decisions applying *Bridge* confirm that first-person RICO claims grounded in mail fraud—such as the claim pled here—require proof of reliance, and that reliance based-claims cannot be certified. *See, e.g.*, *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1220 (10th Cir. 2025) ("[I]n cases such as this where the plaintiff's chosen causation theory hinges on their personal reliance, we have held, such reliance *is* [a] required [element of RICO].") (emphasis retained), *cert. denied* No. 25-911, 2026 WL 568375 (U.S. Mar. 2, 2026); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1350 (11th Cir. 2016) ("[T]he [Supreme] Court was clear that its holding dismissing the need for first-party reliance on the fraud did not mean that a party can prevail without showing that someone had relied on the fraud. Without reliance on the fraud by someone . . . the plaintiffs would not be able to show that they were injured by reason of the alleged racketeering activity." (citing *Bridge*)); *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 119 (2d Cir. 2013) ("[P]roof of misrepresentation— even widespread and uniform misrepresentation—only satisfies half of the equation in cases such

as this because plaintiffs must also demonstrate reliance on a defendant's common misrepresentation to establish causation under RICO.") (internal quotation marks omitted).

The simple reality is that RICO claims based on fraud on the plaintiffs, as pled here, ultimately turn on reliance. And because reliance is an inherently individualized question, such claims are not susceptible to class action treatment. *See, e.g.*, *Chaz Concrete Co.*, 2006 U.S. Dist. LEXIS 60013, at *6 ("[P]resuming reliance in civil RICO actions is 'generally disfavored.'" (quoting *Chisolm v. TranSouth Fin. Corp.*, 194 F.R.D. 538, 560 (E.D. Va. 2000)).[5] Rather, that reliance needs to be considered on a plaintiff-by-plaintiff—not a class action—basis.

Like with the common law fraud claims discussed below, where a RICO plaintiff asserts an injury caused by a fraudulent misrepresentation that he or she received, post-*Bridge* courts routinely require proof of reliance. *See, e.g.*, *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) ("Because proving causation will ordinarily require proving reliance, and because of the difficulty of proving reliance using 'generalized proof,' it is quite difficult, though not impossible, to certify a class in a RICO mail-fraud case.") (internal citation omitted); *Ray*, 836 F.3d at 1350; *cf. Gaddy* 148 F.4th at 1202 ("Plaintiffs fall back on the argument that their 'reliance is not an element' of RICO causation. True . . . first-party reliance is not strictly required to establish RICO causation. But in cases such as this where the plaintiff's chosen causation theory hinges on their personal reliance, we have held, such reliance *is* required.") (citation omitted and emphasis retained). There is no way to establish that the NRA's alleged misrepresentations were the proximate or but-for causes of an individual class member's alleged harm without showing that those misrepresentations caused him

---

[5] The Fifth Circuit has gone so far as to create a presumption against reliance when considering RICO class certification. *See, e.g.*, *Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co.*, 319 F.3d 205, 219 (5th Cir. 2003) ("The pervasive issues of individual reliance that generally exist in RICO fraud actions create a working presumption against class certification.").

or her to donate—*i.e.*, that he or she relied on the misrepresentations.

For the same reasons, Plaintiffs' RICO claim is also unworkable as a class action to the extent it is predicated on money laundering. To prove money laundering, Plaintiff would need to prove the existence of "funds that are proceeds of unlawful activity." *United States v. Price*, 214 F.3d 740, 747 (6th Cir. 2000) (citation omitted). Because the "unlawful activity" alleged in the Third Amended Complaint is fraud, proof of money laundering would necessarily require Plaintiffs to prove that Defendants successfully defrauded the putative class members. *See Riley v. Phx. Cmty. Cap.ital*, No. 3:25-cv-00036, 2026 WL 802301, 2026 U.S. Dist. LEXIS 60726, at *35 (M.D. Tenn. Mar. 23, 2026) ("[T]o make out a money laundering claim, [Plaintiffs] must show, *inter alia*, that Defendants engaged in a financial transaction involving proceeds from illegal activity. Plaintiffs argue that Defendants laundered money, . . . . thus, …the alleged illegal activity that resulted in proceeds was some form of fraud." (internal citations omitted)). So, reliance is as central to money laundering as it is to fraud, and individual issues predominate to the same extent. Thus, Plaintiffs' purported RICO classes fail for lack of predominance.

Plaintiffs' common-law fraud claims are equally problematic and help further illustrate the individualized reliance issues that are fatal to their class certification motion. As Plaintiffs have pointed out, to prove common-law fraud in any jurisdiction, each plaintiff must show that he or she individually reasonably relied on the NRA's alleged misrepresentations. *See* Restatement (Second) of Torts § 537 (1977) ("If the recipient [of a misrepresentation] does not in fact rely on the misrepresentation, the fact that he takes some action that would be consistent with his reliance on it and as a result suffers pecuniary loss, does not impose any liability upon the maker."); *Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th Cir. 2004) (holding that individual issues predominated over common issues because a putative class member's reason for playing gambling

11

machines could not be shown by common proof, noting that "one motivation does not 'fit all.'").

Because of this plaintiff-specific inquiry, federal courts have found that common-law fraud is not amenable for class treatment. *See e.g.*, *Wal-Mart Stores, Inc.*, 564 U.S. at 351 n.6 (noting that Rule 23(b)(3)'s predominance requirement is often an "insuperable barrier to class certification" in securities fraud actions because of the need to prove individualized reliance); *In re Nissan N. Am., Inc. Litig.*, 122 F.4th at 251 ("Reliance looms large in fraud claims."); *Bearden*, 720 F. Supp. 2d at 945 ("If individual reliance is at 'the factual core' of a class-wide fraud claim, then common issues do not predominate and class-wide resolution is not appropriate." (citation omitted)).[6]

The Third Amended Complaint alleges that Plaintiffs, and the putative class members, relied on Defendant's alleged statements. *See* (Third Amended Complaint, at ¶ 123) ("Dell'Aquila, Borja, Chesney, Weber and each member of the NRA Class reasonably relied upon the statements made by Defendant and LaPierre concerning the proposed use of solicited funds"); (*id.* at ¶ 150) ("Plaintiff Dell'Aquila and each member of the NRA Foundation Class reasonably relied upon the statements made by the Foundation concerning the proposed use of the solicited funds."). Defendant sought from Plaintiffs in discovery what specific statements were relied upon by

---

[6] Treatises and the Advisory Committee Notes to Rule 23 suggest the same outcome. Rules Advisory Committee Notes to 1966 Amendments to Rule 23 (1966) ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for a separate determination of damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was a material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed."); 2 Newberg and Rubenstein on Class Actions § 4:58 (6th ed.) ("If each member of a class need prove that he or she individually relied on an alleged misrepresentation or omission, such individual inquiries may become the predominant issues in a fraud case, making aggregate litigation infeasible."); 2 McLaughlin on Class Actions § 8:10 (22nd ed.) ("[R]eliance is an inherently individual inquiry: what did each claimant know about the product or transaction at issue; what alleged false or misleading statements was each claimant exposed to; what did each claimant believe about those statements?").

Plaintiffs. They refused to answer any such discovery, claiming it was untimely sought. *See supra* note 2. So, the Third Amended Complaint, Plaintiffs' discovery responses, and now Plaintiffs' Motion for Class Certification all fail to explain how each putative class members' reliance can be proven through common proof.

For example, it is unclear from the Third Amended Complaint what proposed Plaintiffs read which correspondence from Defendant, as well as what specific statements in that correspondence a particular proposed plaintiff relied on when making a donation. In fact, the Third Amended Complaint pleads multiple different communications that could have resulted in any number of different degrees of reliance or understanding from a proposed Plaintiff. *See e.g.*, (Third Amended Complaint, at ¶ 31) (email referencing defeating President Obama); (*id.* at ¶ 32) (letter referencing protecting "your guns and your precious freedoms"); (*id.* at ¶ 33) (letter referencing adding members to NRA); (*id.* at ¶¶ 37-41) (referencing personal communications sent to Plaintiff Dell'Aquila); (*id.* at ¶ 42) (referencing fake news and "radical anti-gun candidates"); (*id.* at ¶ 44) (website referencing cultivating the "next generation of sportsmen and women through our youth firearms trainings . . . empower women with our self-defense programs . . . and support our police officers with our world-class law enforcement training programs."). Defendant sought such specific information from Plaintiffs through interrogatories and document requests, but Plaintiffs stonewalled any such discovery relying instead on their vaguely pled allegations. *See supra* note 2.

Plaintiffs carry the burden at the class certification stage, and Plaintiffs have made no showing—and refused to provide any discovery relating thereto—that their fraud-based class claims will not require an individualized, plaintiff-specific inquiry about whether the Plaintiffs individually relied on particular statements in making a donation. *See In re Am. Med. Sys.*, 75 F.3d

at 1079; *Young*, 693 F.3d at 537. To the contrary, Plaintiffs affirmatively pled that different representations were made in different forms to different class members, thereby effectively pleading that the fraud claims are individualized. Because of these individualized inquiries, there are not sufficient common questions of fact or law to certify a class action as to the fraud claim. *See e.g.*, *Wal-Mart Stores, Inc.*, 564 U.S. at 350-51.

### 3. Contract-based claims

Plaintiffs bring a state law claim against the NRA for breach of contract, and a state law claim against the NRA Foundation for tortious interference. These claims will rise and fall together on class certification. If the contract claim cannot be certified, neither can the tortious interference claim. Tortious interference with a contract requires an enforceable contract. *See* Restatement 2d of Torts, § 766 ("One who intentionally and improperly interferes with the performance of a contract…between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.").[7] The most glaring problem with Plaintiffs' request to certify their contract-based claims is that the residences of the putative class members span the nation, which implicates varying states' laws addressing contracts in the donor context.

---

[7] Regarding tortious interference, Plaintiffs plead that "Defendant NRA…caused the Foundation to make the promises set out above and used its influence over the Foundation to cause it to breach the contracts that were formed…" and "Defendant NRA and CEO LaPierre were aware of the contracts formed between the NRA Foundation and the members of the NRA Foundation Class and acted maliciously to induce the Foundation to breach those contracts." (Third Amended Complaint, at ¶¶ 137, 138). It is unclear how many potential members the NRA Foundation Class has, and it is also unclear how many states' laws would be impacted. (Motion, at ¶ 4). Dell'Aquila, a Tennessee resident, is the only named Plaintiff for the NRA Foundation Class. As discussed below, Tennessee has no donor standing statute, and its courts have not considered this issue. Thus, it is unclear if even the named Plaintiff would have a claim. Presumably, the other donors to the pled nationwide NRA Foundation Class are from multiple states.

The Sixth Circuit has held that the need to apply different states' laws can create differences in the question of law at issue, which in turn casts a "long shadow" over common questions of fact and renders a nationwide class unworkable. *Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946 (6th Cir. 2011) ("To demonstrate predominance, parties seeking class recognition must show that 'questions of law or fact common to class members predominate over any questions affecting only individual members.' The plaintiffs could not do that here . . . because each class member's claim would be governed by the law of the state in which he made the challenged purchase, and the differences between the consumer-protection laws of the many affected states would cast a long shadow over any common issues of fact plaintiffs might establish." (internal citation omitted)); *see also Bostick v. St. Jude Med., Inc.*, No. 03-2636 BV, 2004 WL 3313614, 2004 U.S. Dist. LEXIS 29997, at *36 (W.D. Tenn. Aug. 17, 2004) (finding a nationwide class inappropriate where there were too many individualized legal and factual circumstances, and "[b]ecause a choice of law analysis will be required to determine the law to be applied to the claims of each class member, the law that applies to these questions will necessarily differ as to each class member"). This Court has added a requirement that there be "some kind of identifiable discontinuity between the states' respective laws that would frustrate the possibility of a shared resolution of the claims." *Ciccio v. SmileDirectClub, LLC*, No. 3:19-cv-00845, 2020 WL 2850146, 2020 U.S. Dist. LEXIS 96568, at *16 (M.D. Tenn. June 2, 2020).

Contract law in the context of donations is decisively discontinuous between states. Plaintiffs have not shown and cannot show commonality or predominance for their breach of contract claims. Plaintiffs propose a nationwide class, meaning this Court must consider the laws of fifty different states, which, as discussed below, are very different on the issue Plaintiffs have pled.

Plaintiffs do not plead that any choice-of-law provision governs the alleged contracts because they cannot. This Court has previously found that "although Tennessee is the forum state, that does not mean that Tennessee contract law necessarily applies to the contract claims… It appears unlikely that contracts formed between the NRA and Plaintiffs in states other than Tennessee are subject to Tennessee law." (Doc. No. 186, at 6 n.1). And indeed, "Tennessee law provides that the law of the place where the contract was made governs the construction and validity of the contract unless the parties in good faith designate another jurisdiction. The place of contracting is the place where the contract is consummated." *Chase Manhattan Bank v. Cve, Inc.*, 206 F. Supp. 2d 900, 905 (M.D. Tenn. 2002) (citations omitted). In this case, the law that governs each contract will likely be where the donor accepted the alleged contract—*i.e.*, where the donor received mail, sent a donation from, answered a telephone call, or clicked on a website link. *See id.* (finding implied contract formed at Plaintiff's place of business in another state when offer letter was mailed from Tennessee).

It is unclear from the Third Amended Complaint and the Motion what "contracts" and legal theories Plaintiffs are relying on for their breach of contract claim. In the Third Amended Complaint, Plaintiffs reference "contracts" (*see e.g.*, Third Amended Complaint, at ¶¶ 131, 132); "solicitations" (*see e.g.*, *id.* at ¶¶ 50, 130); "donations" (*see e.g.*, *id.* at ¶¶ 44, 52); and "gifts" (*see e.g.*, *id.* at ¶¶ 24, 47 (quoting NRA Foundation documents)). Plaintiffs claim that the NRA Class has the common questions of "[w]hether the NRA was contractually obliged to use donor funds to further its stated mission" and "[w]hether the NRA used donated funds in compliance with applicable law, including laws governing nonprofit organizations." (Motion, at 6).[8]

---

[8] Plaintiffs claim that the NRA Foundation Class has similar common questions of "[w]hether the Foundation was legally or contractually obliged to use its funds to further the Foundation's stated mission"; "[w]hether the Foundation complied with laws governing nonprofit organizations" and "[w]hether the Foundation's conduct violated applicable nonprofit laws." (Motion, at 6).

To decide that claim, this Court would need to determine, according to a particular state's law, whether each member of the proposed class entered into a legal contract with the NRA or the NRA Foundation, or whether they instead made a gift or donation without a legal contract being formed. This Court would then have to determine if each member of the proposed class has standing under the applicable contract law of a particular state, or if any other particular state law applies (such as a requirement that the individual have donated a certain amount of money or have had restrictions on their gift). There is no commonality as to those requisite issues.

To avoid the complexity of the contract claim, some states have specific statutes conferring standing and legal rights on donors to charities. For example, Kansas, Iowa, and North Carolina have donor standing statutes.[9] *See* Kan. Stat. Ann. § 58-3621; Iowa Code § 540A.106(5)(a); N.C. Gen. Stat. § 36C-4-405.1(b). However, even the states with these statutes can have different nuances.

For example, Iowa provides for donor standing by statute in some circumstances, but limits this standing to donors who have given more than $100,000. Iowa Code § 540A.106(5)(a). Kansas specifically references situations with "an endowment agreement that imposes a written donor-imposed restriction." Kan. Stat. Ann. § 58-3623(a).

Other states allow a donor to sue to enforce conditions of gifts through their case law, in the absence of a relevant statute. For example, in 1914, Vermont Governor Mead donated money to Middlebury College to build a chapel, named the Mead Chapel. In 2021, Middlebury College decided to rename the chapel because of Governor Meads' "role in the eugenics movement." *Douglas v. President & Fellows of Middlebury Coll.*, 2023 Vt. Super. LEXIS 67, n.1 (August 4, 2023). When Mead's relatives sued, the Vermont state court denied a motion to dismiss and

---

[9] When finding that there is donor standing for a gift, the courts often use the terms "breach of contract" or "contract."

allowed the claim to continue, without deciding whether it would fall under gift or contract law. *Id.*[10]

Many other states, including Colorado, Pennsylvania, and Virginia, do not have donor standing statutes, and their courts have held that donors do not have standing to bring a lawsuit. *See e.g.*, *Herbst v. Univ. of Colo. Found.*, 513 P.3d 388, 394 (Colo. Ct. App. 2022) (discussing students suing for a university endowment underperforming and finding that "one's status as a member of the class to be benefited by a trust doesn't confer standing on such a person to enforce a trust"); *In re Found. for Anglican Christian Tradition*, 103 A.3d 425, 430 (Pa. Commw. Ct. 2014) ("In the instant case, Rawson's status as a donor is insufficient to confer on him authority to enforce the Board's option to declare a default."); *Dodge v. Trs. of Randolph-Macon Woman's Coll.*, 276 Va. 10, 12, 661 S.E.2d 805, 806 (2008) (finding standing limited to attorney general for charitable institution).[11]

The fact that Virginia affirmatively denies standing to bring the claim that Plaintiffs purport to bring is particularly salient here since Virginia is the domicile of the NRA. (*See* Third Amended Complaint, at ¶ 12; Answer to Third Amended Complaint, at ¶ 12). Thus, if Virginia law applies

---

[10] Like Kansas's statute, some courts focus their opinions on gift restrictions or limitations being breached, which is not what the Plaintiffs in this case have alleged. *See e.g.*, *Howard v. Adm'rs of Tulane Educ. Fund*, 986 So. 2d 47 (La. 2008).

[11] This case also involved consideration of Virginia statutes, such as Virginia Nonstock Corporation Act and Va. Code Ann. § 2.2-507.1. Though not affecting standing, these state-specific statutes affecting donations are present in many states and would require an additional level of analysis of the law of each state by this Court. Every state, except Pennsylvania, has adopted some version of the Uniform Prudent Management of Institutional Funds Act. *See* "Protecting Donor Intent: A 50-State Analysis of Legal Protections," Philanthropy Roundtable and Boyden Gray PLLC, (January 31, 2024), available at https://www.philanthropyroundtable.org/resource/protecting-donor-intent-a-50-state-analysis-of-legal-protections/ (last accessed April 2, 2026). Some states have also adopted a version of the Uniform Trust Code. *Id.* There are also different State and federal tax rules that could be implicated.

to all contract claims, those claims must be dismissed.

As if the foregoing divide were not enough, the situation is further complicated by the fact that the law in many states is not as clear-cut as a donor either having standing or not having standing. This Court would also have to delve into each of these complicated issues, often novel issues of state law, on a state-by-state basis. *See e.g.*, *Family Fed'n for World Peace & Unification Int'l v. Hyun Jin Moon*, 129 A.3d 234, 238 (D.C. 2015) ("Generally, with respect to charitable trusts and charitable corporations only a public officer, usually the state Attorney General, has standing to bring an action to enforce the terms of the trust . . . However, an important exception to the general rule exists in situations where an individual seeking enforcement of the trust has a special interest in continued performance of the trust distinguishable from that of the public at large. While 'special interest' is a term of uncertain scope, the key consideration is whether finding a justiciable interest in a given plaintiff would contravene the considerations underlying the traditional rule." (citation omitted)); *Styles v. Friends of Fiji*, 2011 WL 488951, 2011 Nev. Unpub. LEXIS 1128, *4 n. 3 (Feb. 8, 2011) (unclear ruling on donor standing, noting that "even if [a donor] restricted his charitable contribution to some specific use, it is not clear that he would have standing to enforce the restriction"), *affirmed* 373 P.3d 965 (Nev. 2011).[12]

Plaintiffs purport to bring a nationwide class, but these vastly divergent differences in contract and gift law indicate that the Court would have to engage in a significant legal analysis involving the law of every state in the nation. Most importantly, these states have laws that are so different that in some states the proposed plaintiff would have standing, in some they would not,

---

[12] *See also Protecting Donor Intent: A 50-State Analysis of Legal Protections*, Philanthropy Roundtable and Boyden Gray PLLC (noting that certain state courts have not had the opportunity to consider these legal arguments, including Alabama, Alaska, Hawaii, Idaho, Indiana, Maine, Montana, Nebraska, New Mexico, North Dakota, Oregon, Rhode Island, South Carolina, South Dakota, Tennessee, Washington, West Virginia and Wisconsin).

and in some it is unclear. Accordingly, this Court cannot certify a class for the breach of contract claim or the tortious interference claim because individual issues unique to each state's law would predominate over any common questions. *See, e.g.*, *Pilgrim*, 660 F.3d at 946; *Ciccio*, 2020 WL 2850146, at *16.

4. <u>Damages</u>

It is unclear what damages theory the proposed classes intend to proceed under for any of their claims. After filing four complaints, Plaintiffs still barely reference the issue of damages in their Motion, much less provide a formula or explanation of how the damages are to be calculated. *See e.g.*, (Motion, at 6) ("Whether the NRA must repay donations made by Plaintiffs and class members, together with costs and punitive damages"). In their Third Amended Complaint, Plaintiffs make a few vague references to the NRA Class and NRA Foundation Class damages being the "amounts such persons donated to the NRA Foundation during the period from November 2015, to January 26, 2019." (Third Amended Complaint, at ¶¶ 128, 173). The class definitions proposed by Plaintiffs do not appear to include damages, but Plaintiffs also do not seek any separate damages classes.

The Sixth Circuit requires a much more specific damages calculation formula at the class certification stage, which has not been put forth here. *In re GM, LLC*, No. 23-0509, 2024 U.S. App. LEXIS 15034, at *5 (6th Cir. June 20, 2024) ("[a] plaintiff seeking class certification must present a damages model that functions on a class-wide basis…else [q]uestions of individual damage calculations will inevitably overwhelm questions common to the class" (citations omitted)); *Hicks v. State Farm Fire & Cas. Co.*, 965 F.3d 452, 460 (6th Cir. 2020) ("a court must ensure at the class-certification stage that plaintiffs' formula calculates damages based only on their theory of liability"); *see also Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013) ("at the

20

class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case" (citation omitted)).

The vague damages listed in the Motion—"whether" donations should be repaid—are not at all suited to resolution by a class action because each donation and its purpose vary by individual donor. *See McLaughlin v. American Tobacco Co.*, 522 F.3d 215, 228 (2d Cir. 2008) ("[O]ut-of-pocket losses cannot be shown by common evidence because they constitute an inherently individual inquiry: individual smokers would have incurred different losses depending on what they would have opted to do, but for defendants' misrepresentation."); *Roberts v. The Scott Fetzer Co.*, *Roberts v. The Scott Fetzer Co.*, No. 4:07-CV-80 (CDL), 2010 WL 3937312, 2010 U.S. Dist. LEXIS 103627, at *38 (M.D. Ga. Sept. 30, 2010) ("If an individual who bought a Kirby cleaning system, thinking it was new when in fact it was not, brought a lawsuit seeking damages caused by the misrepresentation, that individual would simply produce evidence of either an out-of-pocket loss or the difference in the value of the cleaning system in its represented condition (new) and its actual condition (previously owned). Such a traditional method for proving damages, however, will not work in the class action context because the individual issues will clearly predominate the common ones."); *Stepps v. Allied Veterans of the World*, No. 3:13-CV-322-J-25 JRK, 2015 WL 12838349, *4 (M.D. Fla. Feb. 3, 2015) (finding that the plaintiffs' proposed damages were non-recoverable expectation damages, reasoning that the plaintiffs "expected Allied Vets' sweepstakes was legal and they also expected a significant portion of Allied's proceeds would benefit veterans' organizations. These are intangible injuries.").

Here, the individual donors would have incurred different losses depending on what they would have done but for the NRA's alleged misrepresentations. After tracking each donation, testimony would need to be elicited from each class member on what they would have done under

21

particular circumstances. Individual calculations may need to be done depending on the factual circumstances surrounding each donation and what the NRA ultimately did in response. *See, e.g.*, (Third Amended Complaint, at ¶ 31) (email referencing defeating President Obama); (*id.* at ¶ 32) (letter referencing protecting "your guns and your precious freedoms"); (*id.* at ¶ 33) (letter referencing adding members to NRA); (*id.* at ¶¶ 37-41) (referencing personal communications sent to Plaintiff Dell'Aquila); (*id.* at ¶ 42) (referencing fake news and "radical anti-gun candidates"); (*id.* at ¶ 44) (website referencing cultivating the "next generation of sportsmen and women through our youth firearms trainings…empower women with our self-defense programs…and support our police officers with our world-class law enforcement training programs."). Some donors may have suffered no injury at all. Since at least some of the money alleged in the Third Amended Complaint was likely tax-deductible, damages would also be complicated by each member's tax returns and tax bracket. All of these together make the damages sought on a class basis wholly inappropriate.

**B. The named Plaintiffs are not typical of the classes they seek to represent.**

A named plaintiff must show that their claims "are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "If a representative before a court does not seek to raise on the representative's own behalf a case or controversy circumstantially like those of the absent members of the class, the representative lacks standing to act as a class representative and this lack of standing goes to the heart of the jurisdiction of a court to act." Adequacy of representation—Representative as member of class, 5A Goodrich-Amram 2d § 1702(4):2.

The representatives proposed in the Third Amended Complaint for the NRA Class are only from three different states—Tennessee, Arizona, and Kansas. That is not representative of the nationwide class the Plaintiffs purport to be seeking, especially when (as explained above), some states do not even recognize standing for the breach of contract and tortious interference claims

that Plaintiffs appear to be attempting to bring. Furthermore, the amount "donated" by the named plaintiffs differ, as do their reasons for "donating." These differences, coupled with the fact that Plaintiffs have not defined what "donated" means for purposes of identifying the class, are fatal to their claim to be typical members of the ill-defined classes.

For example, Plaintiff Chesney donated $20 in 2017 and 2018 (Third Amended Complaint, at ¶ 52); Plaintiff Borja donated $35 each year from 2015-2018 (*id.* at ¶ 53); Plaintiff Dell'Aquila donated multiple times a year from 2016 to 2019 to both the NRA and the NRA Foundation, with the donations being anywhere from $60 to $20,000 (*id.* at ¶ 54); and Plaintiff Webber does not allege *any* donation amounts, but alleges that he was a "benefactor" from 2015 to 2019 and donated for "membership upgrades" and "to help with [the NRA] lobbying efforts." (*Id.* at ¶ 55). Other than Plaintiff Webber, Plaintiffs do not explain the reasons why they donated funds to the NRA or what representations from the NRA they relied on, and have flatly refused to answer those basic questions in the discovery Defendant has served. *See supra* note 2.

The Third Amended Complaint itself pleads numerous communications that the members of the classes could have relied upon, and numerous reasons a donor could have had for "donating," including benefits of membership such as the magazine and "upgrades" that Plaintiff Webber alleges. It is unclear what, if any, of these correspondences and reasons the named Plaintiffs relied on when donating, or what they received in exchange (including membership benefits, which may render monies given not "donations" as that is commonly understood). Again, Defendant attempted through specific interrogatories and document requests to obtain answers to these very questions, but were rebuffed by Plaintiffs. *See* supra note 2. Given the small sample size and unanswered questions about the named Plaintiffs typicality vis-à-vis the over five million donors to the NRA, this Court should find that they are not typical members of the purported classes.

Plaintiff Dell'Aquila, who purportedly represents the RICO-based NRA Foundation Class, is the only Plaintiff recognized as donating to the NRA Foundation, and the Third Amended Complaint itself pleads that his donations and communications with the NRA and NRA Foundation were not typical. For example:

- LaPierre sent "a personal letter" to Dell'Aquila to solicit additional donations to the NRA and the NRA Foundation. (Third Amended Complaint, ¶ 37)

- Laura Evans, from the NRA Foundation, sent Dell'Aquila frequent reminders of his scheduled gifts. (*Id.* at ¶ 38).

- Christopher Cox, Executive Director of the NRA, sent Dell'Aquila personal—not form—letters to solicit donations for the NRA. (*Id.* at ¶ 41).

- Dell'Aquila's donation amounts also far exceed the nominal amounts Plaintiffs claim were made by other proposed class members. Among other gifts, Dell'Aquila donated over $60,000 to the NRA Foundation and over $15,000 to the NRA. (*Id.* at ¶ 54).

Plaintiffs have not carried their burden of showing that the named Plaintiffs are typical of the NRA Class and the NRA Foundation Class. *See In re Am. Med. Sys.*, 75 F.3d at 1079; *Young*, 693 F.3d at 537. Indeed, Plaintiffs have chosen to stonewall the efforts by Defendant through discovery to unravel this lack of typicality. Accordingly, this Court should also deny class certification on lack of typicality grounds.

## CONCLUSION

Plaintiffs have singularly failed to carry their burden of proof in showing that class certification is appropriate in this case. They have simply failed to affirmatively demonstrate compliance with Fed. R. Civ. P. 23. *See In re Am. Med. Sys.*, 75 F.3d at 1079; *Young*, 693 F.3d at

24

537. Defendant respectfully requests that the Court deny the Motion. Oral argument is respectfully requested.

Dated: April 3, 2026

Respectfully submitted,

/s/ Eric G. Osborne
Eric G. Osborne (No. 029719)
William J. Harbison II (No. 033330)
Micah Bradley (No. 038402)
SHERRARD ROE VOIGT & HARBISON, PLC
1600 West End Avenue, Suite 1750
Nashville, Tennessee 37203
Telephone: (615) 742-4200
Facsimile: (615) 742-4539
eosborne@srvhlaw.com

Thomas H. Dundon, BPR No. 004539
WOMBLE BOND DICKINSON (US) LLP
1222 Demonbreun Street, Suite 1201
Nashville, TN 37203
Telephone: (629) 312-1821
Email: tom.dundon@wbd-us.com

Aubrey B. Harwell, Jr.
ADAMS & REESE LLP
1600 West End Ave, Suite 1400
Nashville, TN 37203
Telephone: (615) 259-1450
Email: aubrey.harwell@arlaw.com

Carl W. Hittinger (pro hac vice)
BAKER & HOSTETLER LLP
1735 Market Street, Suite 3300
Philadelphia, PA 19103-7501
Telephone: (215) 564-2898
Email: chittinger@bakerlaw.com

*Counsel for Defendant*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify on the 3rd day of April 2026, a true and exact copy of the foregoing has been served on the following via the Court's electronic filing system:

LOEVY & LOEVY
Michael I. Kanovitz (admitted *pro hac vice*)
Jonathan I. Loevy (admitted *pro hac vice*)
Julia T. Rickert (admitted *pro hac vice*)
Thomas Hanson (admitted *pro hac vice*)
Jordan Poole (admitted *pro hac vice*)
Heather Sticht (BPR # 30827)
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
mike@loevy.com
jon@loevy.com
julia@loevy.com
hanson@loevy.com
poole@loevy.com
sticht@loevy.com
Elizabeth Wang (admitted *pro hac vice*)
2060 Broadway, Ste. 460
Boulder, CO 80302
(720) 328-5642
elizabethw@loevy.com

*Counsel for Plaintiff*

*/s/ Eric G. Osborne*

26